**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: COMMERCIAL MONEY | : | Case No. 1:02CV16000 |
| CENTER, INC., EQUIPMENT | : | |
| LEASE LITIGATION | : | (MDL Docket No. 1490) |
| | : | |
| | : | JUDGE KATHLEEN M. O'MALLEY |
| | : | |
| | : | **ORDER**        (Lead Opinion) |
| | : | |
| | : | Re: Motion for Judgment on the Pleadings |
| | : | (Doc. 53, 02-16000) |

These actions were transferred to this Court by order of the Judicial Panel on Multidistrict

Litigation ("the MDL Panel"), issued on October 25, 2002 (Doc. 1).  This Court has ordered that

these actions be coordinated for pretrial purposes (Doc. 2).  These cases are currently before the

Court on a plethora of pretrial motions, including the instant motion for judgment on the pleadings

(Doc. 53), collectively filed by the Bank Group[1] against the Surety Group.[2]  This opinion ("the

---

[1]     Prior to various dismissals or party substitutions (noted below) that removed certain parties
from this litigation, or otherwise limited their involvement, this group originally included the
following entities: Ameriana Bank and Trust, S.B. ("Ameriana"), Atlantic Coast Federal
("Atlantic Coast"), Bank of Waukegan ("Waukegan"), Bank One N.A. ("Bank One"),
Bluebonnet Savings Bank FSB ("Bluebonnet"), Citibank, N.A. ("Citibank"), FirstMerit
Bank, N.A. ("FirstMerit") (recently, CadleRock Joint Venture, L.P. was substituted for
FirstMerit as the party-plaintiff), Footbridge Limited Trust ("Footbridge"), General Electric
Capital Corp. ("GECC"), JPMorgan Chase Bank (f/k/a Chase Manhattan Bank, N.A.)
("Chase" or "Chase Manhattan"), Lakeland Bank ("Lakeland"), Metropolitan Bank & Trust
Company ("Metropolitan"), NetBank, FSB ("NetBank"), Riverway Bank ("Riverway"),
Second National Bank of Warren ("Second National"), Sky Bank (for itself and as successor
in interest to Mid Am Bank) ("Sky"), The Huntington National Bank ("Huntington"), The
Provident Bank ("Provident") and U.S. Bank National Association ("U.S. Bank").  For
convenience, the Court refers to these entities collectively as "the Banks" or "the Bank
Group," except where reference to one or a few of the bank entities is intended.

[2]     This group originally included the following entities: American Motorists Insurance
Company ("AMICO"), ACE American Insurance Company ("ACE American"), Illinois
Union Insurance Company of America ("Illinois Union"), RLI Insurance Company ("RLI"),
Royal Indemnity Company ("Royal"), and Safeco Insurance Company of America

'Lead' Opinion") addresses only the primary "lead" motion for judgment on the pleadings, as that

motion relates to sureties other than Illinois Union and ACE American.[3]  This matter has been

("Safeco").  The Court refers to these entities collectively as "the Surety Group" or "the Sureties."

Several of these entities (specifically, ACE American and Illinois Union) contend that they are insurers, rather than sureties.  The Court addresses Illinois Union's argument in a separate companion opinion (the Court does not address the arguments *vis-a-vis* ACE American and Riverway because those parties have dismissed their dispute).  Similarly, because the issues between ACE American and its insured, GECC, were addressed in a separate series of briefs within the context of an independent motion for judgment on the pleadings filed in 02-16006 (Doc. 19), those issues were addressed in a separate opinion that the Court prepared. Because GECC has dismissed its claims against those entities, as noted below, the Court will not issue that opinion.

[3]  Because NetBank has filed a notice of withdrawal of its motion for judgment on the pleadings (Doc. 1107 in 02-16000 and Doc. 20 in 02-10610), the Court does not address the effect of its analysis in either of its opinions on transactions involving NetBank.  Instead, NetBank has filed a motion for summary judgment and/or remand (Doc. 1678 in 02-16000), which remains pending.

Additionally, various voluntary and/or stipulated dismissals (some "with" and some "without" prejudice) have been filed during the pendency of the instant motion, each of which likely affects, in whole or in part, the filing parties' status in the MDL.  The following dismissals, each of which seek dismissal of claims as among the identified parties, are hereby acknowledged.  The Court has addressed the propriety of, and, when appropriate, endorsed each notice individually within the context of the case in which it was filed.

Two additional filings were made relating to dismissal of claims among various sureties and the Chapter 7 Trustee for the bankruptcy estates of CMC and CSC.  *See* Doc. 58 in 02-16006 and Doc. 48 in 02-16007.  In so far as those filings have been contested by certain parties, they are not listed here.  They will be addressed by the Court individually.

- Case No. 02-16000 – dismissal with prejudice of claims among AIMCO / Bluebonnet / U.S. Bank (Doc. 1220).

- Case No. 02-16001 – dismissal with prejudice of claims between Lakeland and Rafferty Capital Markets, Inc. (and its subsidiaries or affiliates) (Doc. 35) (Doc. 1705 in 02-16000).

- Case No. 02-16001 – dismissal with prejudice of claims between Lakeland and RLI

2

(Doc. 34).

- Case No. 02-16006 – dismissal with prejudice of claims among ACE American / Royal / AMICO / Riverway / GECC (Doc. 57).

- Case No. 02-16011 – dismissal with prejudice of claims between Rafferty Capital Markets, Inc. and RLI (Doc. 13).

- Case No. 02-16011 – dismissal with prejudice of claims between Lakeland and RLI (Doc. 14).

- Case No. 02-16011 – dismissal with prejudice of claims between Lakeland and Rafferty Capital Markets, Inc. (and its subsidiaries or affiliates) (Doc. 15) (Doc. 1705 in 02-16000).

- Case No. 02-16023 – dismissal with prejudice of claims among Bluebonnet / U.S. Bank / Royal (Doc. 15).

- Case No. 02-16024 – dismissal with prejudice of claims between AIMCO and Lakeland (Doc. 31).

- Case No. 02-16024 – dismissal with prejudice of claims between AIMCO and GECC (Doc. 35).

- Case No. 02-16024 – dismissal with prejudice of claims between AIMCO and Ameriana Bank & Trust (Doc. 36).

- Case No. 02-16024 – dismissal with prejudice of claims between Lakeland and Rafferty Capital Markets, Inc. (and its subsidiaries or affiliates) (Doc. 37) (Doc. 1705 in 02-16000).

- Case No. 02-16026 – dismissal without prejudice of GECC's complaint.  GECC's claims were reasserted *via* amended pleadings in Case No. 02-16006 (Doc. 2).

- Case No. 02-16028 dismissal with prejudice of claims between Lakeland and Royal (Doc. 26).

- Case No. 02-16028 – dismissal with prejudice of claims between Lakeland and Rafferty Capital Markets, Inc. (and its subsidiaries or affiliates) (Doc. 27) (Doc. 1705 in 02-16000).

- Case No. 02-16029 dismissal with prejudice of claims between Lakeland and Royal

3

extensively briefed and is now ripe for ruling.  The Court has considered all of the parties' memoranda and exhibits submitted in this matter, and has reviewed the record.  Upon thorough review, the Banks' motion for judgment on the pleadings is **DENIED**.  The Court also sets forth herein numerous threshold rulings relating to the legal issues briefed by the parties.

---

(Doc. 26).

- Case No. 02-16029 – dismissal with prejudice of claims between Lakeland and Rafferty Capital Markets, Inc. (and its subsidiaries or affiliates) (Doc. 27) (Doc. 1705 in 02-16000).

- Case No. 03-16001 dismissal with prejudice of claims between AIMCO and Lakeland (Doc. 9).

- Case No. 03-16001 – dismissal with prejudice of claims between Lakeland and Rafferty Capital Markets, Inc. (and its subsidiaries or affiliates) (Doc. 11) (Doc. 1705 in 02-16000).

Though these dismissals may have completely removed certain parties from this litigation, or otherwise significantly affected certain parties' involvement or interests, the Court continues to refer to the "Banks" and the "Sureties" as defined previously.  Obviously, if a party wholly has been removed from the litigation *via* dismissal, this opinion no longer speaks to that party, in as much as such a party likely had a stake in the outcome of the instant motions, even if the Court refers such a party as though it were still involved.  This is especially true with respect to the Court's references to what it characterizes as representative documents.  To the extent it occurs, the Court's reference to documents that pertain to a party that is no longer involved in this litigation does not affect the Court's analysis as to the issues among the remaining parties because the documents referenced remain representative of the documents at issue in these cases.  Though the Court has done its very best to harmonize the many facets of this litigation so as to accurately reflect the litigation's status at a given moment in time, given the litigation's complexity and changing nature, the Court deems this qualifier necessary.

I.      **BACKGROUND**

A.      **General Facts Underlying the Transactions.**[4]

The dispute in these actions centers around the Sureties' potential liability on various surety bonds issued in connection with certain transactions between the Banks and Commercial Money Center ("CMC").[5] CMC was a Nevada-based company that had significant operations in California. CMC's business purportedly involved leasing equipment and vehicles to numerous lessees in exchange for lease payments by each lessee.  CMC then pooled the leases and sold them (or the rights to the income streams on them) to institutional investors.[6]

---

[4]     The facts set forth in this section are taken from the parties' pleadings and briefing in these cases.  This section provides only a brief overview of the relevant facts; the facts will be referenced in more detail where essential to the Court's analysis.

As is appropriate in considering a motion for judgment on the pleadings, "[a]ll well-pleaded material allegations of the non-moving party's pleadings are taken as true and allegations of the moving party which have been denied are taken as false." *Benson v. O'Brien*, 67 F. Supp. 2d 825, 829 (N.D. Ohio 1999).  Documents attached to the pleadings as exhibits are considered incorporated therein and may be considered in evaluating a Rule 12 (c) motion. *See* Fed. R. Civ. P. 10(c) ("[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.")

[5]     CMC had several affiliates, including Commercial Servicing Center ("CSC") and  several special purpose entities.  However, for purposes of this motion, the CMC-affiliated defendants will be referred to collectively as "CMC," except where individual reference is necessary.

[6]     According to the Banks, the transactions differ in structure.  The four essential transaction forms involved in this action are as follows: (1) Ameriana, Atlantic Coast, Bank of Waukegan, Footbridge, Lakeland, NetBank and Riverway purchased the income stream from pools of leases directly from CMC; (2) Bank One, FirstMerit, Huntington, Metropolitan, Provident, Second National and Sky Bank (collectively, "the Ohio Banks") lent funds to third parties, who used the proceeds of the loans to purchase the income stream from lease pools from CMC (or special purpose entities created in connection with their respective transactions) and secured payment of all obligations under the loans by assigning the income streams from the lease pools, the Surety Contracts and all of the third parties' rights, and physically pledging the leases and the Surety Contracts to the respective Ohio Banks; (3) General Electric Capital Corporation ("GECC") purchased pools of leases from Riverway,

In connection with these transactions, the Sureties issued Surety Contracts or bonds guaranteeing the performance of the lessees.  Each investor expected to receive a monthly payment approximately equal to the amount due each month under the leases (or income streams) it purchased.  The Banks in these actions are investors who purchased interests totaling more than $400 million in the CMC lease pools.  CMC acted as sub-servicer of the various lease pools and was responsible for delivering the lease payments to the investors.

According to the Sureties, the majority of CMC's leasing business was a sham.  The Sureties allege that many, if not most, of the purported CMC leases either never existed, were forged or were sham transactions with CMC-affiliated entities.  Many of the transactions were never consummated, either because the leases were never signed or funded, or because the equipment at issue was never delivered.  Additionally, some of the transactions are alleged to have been disguised usurious loans.  The Sureties contend that CMC operated a Ponzi scheme, in which early investors were paid using money generated by new investors, while a large number of the supposed equipment leases were nonexistent or nonperforming.  The Sureties claim to have been defrauded by CMC's representations regarding its financial condition and the condition of its lease pools.[7]

_____

who had previously purchased its pools from CMC; (4) Citibank and Bluebonnet purchased notes issued by special purpose entities created in connection with their respective transactions, which notes were secured by, and to be repaid from, the income stream from pools of leases sold to the special purpose entities, with JPMorgan Chase and U.S. Bank, respectively, acting as trustees.

[7]  In order to induce investment in its lease pools, CMC allegedly made numerous representations concerning its leasing program, lease default rates, lease recoveries and other matters.  Some of the specific representations allegedly made included statements that (1) its combined lease default rate was about 10%; (2) its default rate on lease pools that complied with stricter underwriting guidelines ("the Safeco criteria") was about 4%; (3) CMC aggressively pursued collection efforts so that its overall losses were limited to about 2%.

Eventually, the Banks ceased receiving monthly payments from these investments, and each looked to the respective Sureties for payment.  Although some of the claims were paid, each Surety refused, at some point, to pay the remainder of the claims.  The Banks, Sureties and CMC filed these actions in various jurisdictions seeking judicial determination of their respective rights under the applicable documents.  CMC filed for bankruptcy on May 30, 2002 and is not a party to the proceedings before this Court.[8]

**B.    The Contentions of the Parties**.

The Banks, in the instant motion, seek partial judgment on the pleadings against the Sureties, contending that the plain language of the transaction documents entitles the Banks to recover on the Surety bonds, because (1) they are obligees on those bonds and were not involved in any alleged fraud; (2) fraud waivers contained in those documents preclude the Sureties from asserting fraud-in-the-inducement as a defense; and (3) even if the Sureties could otherwise assert defenses to payment, the Sureties are estopped from asserting such defenses because of "estoppel letters" issued by the Sureties touting the enforceability and legality of the transactions.

---

In actuality, the default rate was substantially higher (up to 90% in some pools).  Apparently, the supposedly stricter "Safeco criteria" did not actually exist.  CMC also misrepresented its financial condition at the time the investors and Sureties were contemplating participation in these transactions.  The parties allege that CMC fraudulently concealed known defaults to induce investors to invest and to induce sureties to issue bonds.

[8]    CSC also filed for bankruptcy on June 13, 2002; thus, it also is not a party to these proceedings.  Some of the brokers and CMC-affiliated special purpose entities are, or were, parties to these actions, however, including numerous Guardian entities, Blaine Tanner (the sole principal of the Guardian entities), several Diversity entities, Rafferty Capital Markets, Anthony & Morgan Surety & Insurance Services, Inc. and Michael Anthony.  Several individuals involved with CMC and its operation, including Mark Fisher, Kelly Fisher Buh, Brian McMichael, Sterling Wayne Pirtle, and Anita Pirtle also are, or were, parties to these proceedings.

The Sureties, on the other hand, seek declarations that their Surety Contracts are invalid and unenforceable due to CMC's fraud.  The Sureties contend that (1) CMC, not the Banks, was the obligee on the surety bonds; thus, fraud-in-the-inducement by CMC and/or its representative, Michael Anthony, renders the Lease Bonds void *ab initio*; (2) the fraud waivers contained in some of the bonds were intended to cover only issues of fraud *by the lessees* against CMC; (3) a surety cannot waive the defense of fraud by an obligee, despite unambiguous language in the parties' agreement; and (4) the Banks have not shown that any sums are "due and owing" since many of the underlying leases are nonexistent or void.  Additionally, the Sureties challenge the validity and/or authenticity of many of the documents on which the Banks rely to support their claims.  Finally, the Sureties point out that, as long as their construction of the instruments is even arguably reasonable, the Court must deny the Rule 12(c) motion and allow the action to proceed.

### C.    Choice of Law.

The Banks claim that the question of which state's law applies to the claims in these cases is irrelevant, since the basic legal principles applicable to the Banks' motion are established and consistent throughout the country.  The Sureties, however, contend that there is sufficient variation among the laws of the relevant states that this Court should make a choice of law determination before considering the issues.  The Sureties thus attach "Appendix A," which contains a detailed choice of law analysis, to their brief in opposition to the Banks' motion. (Doc. 110).[9]  In this appendix, the Sureties argue that, with the exception of specific Sale and Servicing Agreements

---

[9]    Although the Court considers the Sureties' 8-page Appendix, which contains a detailed and substantive choice of law analysis, to be an impermissible attempt to augment the Sureties' 51-page memorandum, the Banks have not moved to strike the Appendix.  Thus, the Court will consider the Sureties' Appendix in evaluating choice of law issues.

8

("SSAs"), which contain Nevada choice of law provisions, California law governs the issues in these cases.

In their collective reply memorandum (Doc. 143), the Banks continue to assert that a choice of law analysis is neither relevant nor necessary; thus, the Banks do not specifically dispute or respond to the Sureties' characterization of the applicable law.  Only the Ohio Banks[10] filed a separate reply memorandum addressing the choice of law issue.  In that analysis, the Ohio Banks contend that Ohio law must apply to the transactions involving those banks, though they do not explain why that choice would have any material effect on the Court's legal analysis.

The Insurers' analysis generally tracks that of the Sureties; the Insurers contend that, absent a choice of law provision, either Nevada or California law must apply to the policies and issues in this case.[11]  The Insurers apply Nevada choice of law rules and determine that either California or Nevada would be the state with the "most significant relationship" to the dispute.  The Insurers also, however, point out several exceptions to the application of general choice of law rules, where the document in question contains an applicable choice of law provision.  Specifically, the Insurers assert that (1) the Chase Policy contains a provision specifying that California law applies; (2) the GECC policies contain a choice of law provision specifying that New York law applies; and (3) the SSAs involved in the Insurers' transactions contain a provision specifying that Nevada law applies.  Since the Banks have not contested the Insurers' characterization of these documents, the Court

---

[10]  This group consists of: Bank One, N.A., FirstMerit Bank, N.A., Metropolitan Bank & Trust Company, Second National Bank of Warren, Sky Bank, The Huntington National Bank and The Provident Bank.

[11]  Although the Court has dealt with the Insurers' substantive arguments in a separate opinion, the Court determines the law relevant to all of these actions in this "lead" opinion. Accordingly, the Court considers the Insurers' choice of law arguments in this section.

assumes that the documents specified by the Insurers, if valid, will be governed by the choice of law provisions contained within those documents.

In deciding conflict of law questions in diversity of citizenship cases, a federal court generally follows the choice of law rules of the state in which it sits. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). Where venue has been transferred to a federal court sitting in a different state, however, such a transfer does not change the state substantive law applicable in a diversity case. "[W]here the defendants seek transfer, the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue. A change of venue . . . generally should be, with respect to state law, but a change of courtrooms." *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). This rule also applies where a case is transferred for pretrial purposes pursuant to 28 U.S.C. § 1407. *See In re New Eng. Mut. Life Ins. Co. Sales Practices Litig.*, 236 F. Supp. 2d 69, 74 (D. Mass. 2002).

All of the cases involved in this MDL litigation were transferred to this Court from one of four states: California, Nevada, New Jersey or Ohio.[12]  Thus, this Court must, at a minimum, consider the choice of law rules of each of the four relevant states. The Court then must apply the rules of each relevant state to the facts of these cases.

---

[12]     Two of these cases (02-16005 and 02-16027) were originally filed in Indiana and Georgia, respectively. Prior to MDL consolidation, however, those cases had been transferred to California.

10

1.    **California.**

Choice of law relating to contract disputes in California is governed by two relevant statutory sections:

> A contract is to be interpreted according to the law and usage of the place where it is to be performed; or if it does not indicate a place of performance, according to the law and usage of the place where it is made.

Cal. Civ. Code § 1646.

> The language of a writing is to be interpreted according to the meaning it bears in the place of its execution, unless the parties have reference to a different place.

Cal. Code Civ. Proc. § 1857.

2.    **Nevada.**

Nevada courts have adopted the substantial relationship approach to resolving choice of law issues.  Pursuant to that analysis, the factors relevant to choice of law include the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation and place of business of the parties to the contract. *See Consolidated Generator-Nevada, Inc. v. Cummins Engine Co.*, 971 P.2d 1251, 1253-1254 (Nev. 1998), *citing Sotirakis v. United Serv. Auto. Ass'n*, 787 P.2d 788, 790 (Nev. 1990).

3.    **New Jersey.**

New Jersey has adopted a "most significant relationship test," based on the Restatement (2d) of Conflict of Laws, §§ 6 and 188.  Analysis under this test includes consideration of seven relevant

11

factors: "(1) the needs of the interstate and international system, (2) the relevant policies of the forum, (3) the relevant policies of other affected states and the relevant interests of those states in the determination of the particular issue, (4) the protection of justified expectations, (5) the basic policies underlying the particular field of law, (6) certainty, predictability, and uniformity of result, and (7) ease in the determination and application of the law to be applied." *State Farm Mut. Auto. Ins. Co. v. Estate of Simmons*, 417 A.2d 488, 491 (N.J. 1980).

Additionally, New Jersey has adopted the provisions of the Restatement relative to contracts of surety or casualty insurance.  That section provides:

> The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in §§ 6 to the transaction and parties, in which event the local law of the other state will be applied.

Restatement (2d) of Conflict of Laws, § 193; *see also Polarome Mfg. Co. v. Commerce & Indus. Ins. Co.*, 708 A.2d 450, 452 (N.J. Super. Ct. App. Div. 1998).  Thus, the law of the location of an insured risk generally governs choice of law issues where a suretyship contract is involved, unless another state's relationship to the parties and the underlying issues is more dominant and significant.

### 4.    Ohio.

Ohio also has adopted § 188 of the Restatement (2d) of Conflict of Laws in situations where the parties have not indicated a contractual choice of law. *See Ohayon v. Safeco Ins. Co.*, 747 N.E.2d 206, 209 (Ohio 2001).  Thus, Ohio follows the general rule that, "in the absence of an effective

12

choice of law by the parties, their rights and duties under the contract are determined by the law of the state that, with respect to that issue, has 'the most significant relationship to the transaction and the parties.'" *Id.*, *quoting* Restatement (2d) of Conflict of Laws, § 188(1).  Courts make this determination by evaluating "the place of contracting, the place of negotiation, the place of performance, the location of the subject matter, and the domicile, residence, nationality, place of incorporation, and place of business of the parties." *Ohayon*, 747 N.E.2d at 209.

### 5. Relevant Facts.

The Sureties rely on the following undisputed facts to support their contention that California law applies to this dispute:

- CMC's operations, including CMC's equipment leasing program, were centered in Escondido, California.

- Most of CMC's employees and senior management were located in California, and most of the leases were executed from the California office.

- Most of CMC's communications with the lessees, Sureties and Banks originated from its California office.

- All lease servicing was performed in Escondido, and all lease payments were received in, or made from, that office.

- Michael Anthony and his brokerage firm, Anthony and Morgan, are residents of California.

- The Lease Bonds were printed and executed by Anthony, one of his colleagues, or Surety underwriters physically present in California.

The Insurers rely on these same factors, with the additional note that the location of CMC's

13

headquarters in Nevada alternatively renders the application of Nevada law proper.

With respect to the transactions relating to the Ohio Lender Banks, the Banks contend that the relevant transactions were negotiated, funded, performed in part and breached in the state of Ohio.  The Banks rely on Ohio choice of law rules and Restatement (2d) of Conflict of Laws §§ 187-88 to support their contention that Ohio has the most significant relationship to both the transaction and the parties.  The Ohio Lender Banks assert that they all maintain their principal places of business in Ohio, that each bank granted loans to the Guardian entities in Ohio, that the Banks received and relied upon the estoppel letters in Ohio, and that the Banks received assignments of the Surety Contracts in Ohio.  Additionally, the Banks assert that several of the Surety Contracts provide that "jurisdiction regarding this bond shall rest in the State of the Obligee."  Finally, several opinion letters sent to the Banks in Ohio state that "the governing jurisdiction of [the] Lease Bonds shall be in the State of Ohio."[13]

### 6.    **Applicable Law**.

With respect to all transactions not involving the Ohio Lender Banks, it appears that all parties agree that California law has the most substantial connection to this dispute.  Thus, for the purposes of this motion, the Court assumes the applicability of California local law to transactions not involving the Ohio Lender Banks.

With respect to the Ohio Lender Bank transactions, no party to these cases has indicated to the Court that the conflict of laws issue makes a material difference in the Court's analysis.  Indeed, it appears to the Court that the Banks are correct in asserting that this dispute is governed by principles of well-established substantive law.  To the extent that the Court must determine the law

---

[13]    In particular, certain letters sent by Safeco appear to contain this language.

applicable to the Ohio Lender Banks' dispute at this stage of the proceedings, however,  it appears that California law should apply here as well.

Although the majority of the Banks' contacts with Guardian may have taken place in Ohio, the Court believes that the relevant contacts between Guardian and the Sureties took place in California.  The Ohio Banks were not party to the Surety Contracts; the Banks merely received assignments of rights under those contracts, and the Banks were aware at the time they took assignments from Guardian that the contracts had been negotiated and executed elsewhere.  The provision that "jurisdiction . . . shall rest in the state of the Obligee," even assuming that a bank might qualify as obligee, is not a choice of law provision, and it does not change the result.

Nor does the Court believe that a statement in Safeco's estoppel letter compels a different result.  First, the provision is ambiguous as to whether it is intended to be a choice of law provision or merely a venue selection clause.  Second, even assuming that the estoppel letters are valid (which the Sureties vigorously contest), the statements in the particular letter at issue were neither negotiated by the parties nor incorporated into the contract.  The Court concludes, accordingly, that, except where express choice of law provisions are included in a particular document, and the dispute directly involves construction of those documents, California law applies to these cases.[14]

---

[14]    To the extent that the choice of law rules of either Indiana or Georgia must be consulted, the rules of those jurisdictions do not change the Court's analysis.  Indiana follows the Restatement (2d) Conflict of Laws § 188, *see Travelers Indem. Co. v. Summit Corp. of Am.*, 715 N.E.2d 926, 931 (Ind. Ct. App. 1999), while Georgia follows a traditional *lex loci contractus* rule, unless the contract is to be performed in another state.  *See Boardman Petroleum v. Federated Mut. Ins. Co.*, 135 F.3d 750, 752 (11th Cir. 1998)(applying Georgia law).  Either of these rules would result in the application of California law.

15

### D.      Standard of Review.

A court may grant judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) only "when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *United States v. Moriarty*, 8 F.3d 329, 332 (6th Cir. 1993).  In considering a Rule 12(c) motion, "[a]ll well-pleaded material allegations of the non-moving party's pleadings are taken as true and allegations of the moving party which have been denied are taken as false." *Benson v. O'Brien*, 67 F. Supp. 2d 825, 829 (N.D. Ohio 1999).  Documents attached to the pleadings as exhibits are considered incorporated therein and may be considered in evaluating a Rule 12 (c) motion. *See* Fed. R. Civ. P. 10(c) ("[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.") The Court may consider such exhibits, however, only where the authenticity of such exhibits is not contested. *See DeMarco v. Depotech Corp.*, 149 F. Supp. 2d 1212, 1217 (S.D. Cal. 2001).[15]

## II.    <u>DISCUSSION</u>

### A.      Construction of the Transaction Documents and the Relationship Between the Parties.

This dispute turns largely on the characterization of the relationships between the parties and the construction of the transaction documents establishing those relationships.  As between the Banks and Sureties, although the parties agree on the existence of the suretyship relation, there is stark disagreement on the structure of this suretyship relation.  The Banks strenuously assert that the Sureties, through their Surety Contracts, covenanted to guaranty the performance of both the lessees

---

[15]      Given the limitations Rule 12(c) places on the Court's ability to examine matters outside the pleadings, the Court urged the parties to abandon their current motions and present these complex maters to the Court in the context of motions filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The Court's urgings were to no avail.

16

and CMC, as principals.  Under such a construction, the Banks would be obligees, and thus would be the parties to whom the Sureties owed a duty of performance.  The Sureties argue, however, that such a construction was never intended.  Rather, the Sureties assert that the plain language of the Surety Bonds indicates that CMC is the obligee, and, thus, the party to whom the Sureties' obligations run.  Under the Sureties' reading, the Banks are merely assignees of the rights of CMC, who was the original obligee on the Lease Bonds.  Since CMC is the party responsible for the alleged fraud in this case, the interpretation of the transaction documents with respect to the party relationships greatly affects the parties' rights and obligations in these cases.

Thus, before evaluating the Sureties' defenses to the Banks' claims, the Court must first determine whether it can resolve the following threshold question: With respect to the transactions between the Banks and the Sureties, what are the respective roles of the parties?  The Court first will describe the documents to be construed and then will turn to address this question.

### 1.    **The Documents**.

Generally speaking, the transactions at issue in these cases were consummated through the procurement of "Lease Bonds" for each of the underlying leases.[16]  Each Lease Bond correlated with a single CMC lease.  An example of "typical" operative Lease Bond language is set forth below:

> KNOW ALL MEN BY THESE PRESENTS:
>
> That we, [], as principal, and [the surety company] . . . as Surety, are hereby firmly bound unto Commercial Money Center, Inc., as Obligee and its successors and assigns in the amount of [$___]. . . .  The Obligee accepts the bond and [the surety company], as Surety, agrees to pay to the Obligee any amounts due and owing by the principal with regards to the lease

---

[16]    The "Lease Bonds" also are referred to elsewhere in this opinion as "Surety Contracts."

17

known as lease number [specific lease], subject to the following provisions:

1.  If all payments required by the Lease are made in accordance with the Lease provisions, then this obligation shall be void; otherwise it shall remain in full force and effect.

2.  The Surety is responsible to Obligee for the individual underwriting of each lessee and Lease, including, but not limited to, all related credit matters, issues of fraud, bankruptcy and the accurate and timely performance by any sub-servicer designated by Surety, and Surety shall assert no defenses to any claim under this Bond as a result of any of the foregoing.  This Lease Bond and the Surety's obligation constitute an unconditional and absolute guarantee of payment, not collection.

\*\*\*

5.  If the Obligee fails to receive a payment under the Lease from the Surety, as servicer or from any sub-servicer, on the scheduled due date, default under the Lease occurs.  Upon such default, the Surety shall have thirty (30) days to cause the default to be remedied.  The Surety shall make payment on this Bond to Obligee upon written demand from Obligee, within this 30 day period.

\*\*\*

7.  The Obligee shall notify the Surety within thirty (30) days by registered or certified mail of any assignment of Obligee's rights under this Bond.  Any such assignee shall become the Obligee under this Bond, effective as of the date specified in the notice of assignment, immediately upon the Surety's receipt of such notice of assignment.

The above conditions are applicable to all successors or assigns of the Obligee. . . .

18

Metropolitan Bank Complaint, 02-16012, Doc. 1, attach. 1.  Many of the Lease Bonds also contain express waivers of all defenses, including fraud.  A typical example of the fraud waiver language provides as follows:

> The Surety is responsible to Obligee for the individual underwriting of each lessee and Lease, including, but not limited to, all related credit matters, issues of fraud, bankruptcy and the accurate and timely performance by any sub-servicer designated by Surety, and the Surety shall assert no defenses to any claim under this Bond as a result of any of the foregoing.  This Lease Bond and the Surety's obligation constitute an unconditional and absolute guarantee of payment, not collection.

Footbridge Answer, Counterclaim, 02-16029, Doc. 4, attach. 2.

Michael Anthony, of Anthony & Morgan Insurance Services ("A & M"), was an independent broker involved in procuring the Lease Bonds.  Anthony signed many of the Lease Bonds on behalf of the Sureties, pursuant to powers of attorney issued to Anthony by the Sureties.[17]  These powers of attorney were attached to the bonds given to CMC and later assigned to the Banks.  A "typical" power of attorney issued by a Surety to Anthony provided as follows:

> [Surety] does . . . hereby appoint MICHAEL ANTHONY; SCOTT MORGAN; San Clemente, California, its true and lawful attorney(s) in fact, with full authority to execute on its behalf fidelity and surety bonds or undertakings and other documents of a similar character issued in the course of its business, and to bind the respective company thereby.

---

[17]     The Sureties allege, however, that Anthony was also acting as agent for CMC throughout the transactions, and that CMC paid Anthony over $15 million for his efforts.

NetBank Second Amended Complaint, 02-16010, Doc. 2, attach. 16.[18]

In connection with many of the transactions, the parties executed SSAs in addition to the Lease Bonds.  The SSAs were not executed in every case and, even where those agreements were executed, there is significant variation among the SSAs in these transactions.  Some of the SSAs were executed only between CMC and a Surety; in other instances, a Bank also was party to the SSAs.[19]  The purpose of the SSAs, generally speaking, was to (1) effect a transfer of CMC's rights under the leases (and/or the Lease Bonds) to the investor; and (2) set forth terms relating to the servicing of the leases.  Although the language of the SSAs is by no means uniform, many of the SSAs used language similar to the following with respect to assignment of rights:

> Section 2.1 Conveyance of Leases and related Assets.
> (a) Subject to the terms and conditions of this Agreement, the Seller . . . hereby sells, transfers, assigns, and otherwise conveys to the Purchaser . . . all of the right, title, and interest, including any security interest, whether now owned or hereafter acquired, of the Seller in and to the following (the "Transferred Assets"):
>
> > (i) All contract rights under each Lease to receive all Scheduled Payments. . . . ;
> >
> > (ii) all funds on deposit from time to time in the Collection Account. . . .;
> >
> > (iii) the rights of the Seller in the Transfer Agreement. . . .;

---

[18]    Although NetBank has withdrawn its motion for judgment on the pleadings, the Court sets forth  several of NetBank's documents within this opinion only as typical examples of the documents involved in these cases.

[19]    In other instances, the SSAs were executed between CMC and a Bank; no surety was party to that transaction.

> (iv) all rights under the Surety Bonds; and
>
> (v) any and all proceeds of the foregoing.

Footbridge Answer/Counterclaim, 02-16029, Doc. 4, Exh. 1.  With respect to servicing obligations, an example of the SSA language is set forth below:

> Section 3.7  **Sub-Servicers.**  CMC is hereby appointed to be the initial Sub-Servicer and assumes all responsibility, as agent for and on behalf of the Servicer, to perform the duties of the Servicer hereunder. . . .  Notwithstanding the terms or existence of any such agreement between the Servicer and the Sub-Servicer, including CMC, the Servicer shall not be relieved of any of its obligations under this Agreement by reason of such agreement and shall be obligated to the same extent and under the same terms and conditions as if the Servicer alone was servicing and administering the Leases. . . .

Footbridge Answer/Counterclaim, 02-16029, Doc. 4, Exh. 1.

In addition to the Lease Bonds, Anthony also was involved in arranging the issuance of "estoppel letters" to the Banks.  In most cases, Anthony either drafted the estoppel letters himself or hired outside counsel to do so.  The Sureties deny knowledge of most of these letters, and they vehemently deny that Anthony had any authority to arrange for the drafting of any such letters.  A typical example of the estoppel letters received by the Banks provides:

> [The Surety] has approved the attached list of Lease Bonds and the related Sales and Servicing Agreement to be executed by our Attorney-In-Fact, Mr. Michael Anthony. . . .  All bonds on this list are in full force and effect.  Each Lease Bond executed by [the Surety] and the related Sales and Servicing Agreement is a valid and binding obligation of the Insurance Company enforceable in accordance with its terms. .

Atlantic Coast Federal Counterclaim, 02-16001, Doc. 8, attach. 3.

Having set forth examples of the language contained in the relevant documents, the Court now turns to consider the construction of that language and the roles of the respective parties in the transactions.  To the extent that the Court's analysis depends on variations in the language of the applicable agreements, the Court notes such fact.

### 2.       The Suretyship Argument.

The Banks' argument regarding the status of the parties is based on their understanding of the substance of the transactions.  The Banks rely on the Restatement (3d) of Suretyship & Guaranty for the proposition that, where a transaction satisfies the substantive criteria for suretyship, "the secondary obligor has suretyship status . . . regardless of the form of the transaction fulfilling the criteria [and] regardless of any term used by the parties to describe the secondary obligor or the secondary obligation." Restatement (3d) of Suretyship & Guaranty § 1(3).  Several cases cited by the Banks also support this proposition.  *See, e.g., Superior Wholesale Electric Co. v. Cameron*, 264 Cal. App. 2d 488, 493 (Cal. App. 2d Dist. 1968)("No particular form of agreement is required to establish a suretyship contract.  So long as the agreement establishes the intention to create such a contract, no set words and form are required.").  The Banks apply this common sense approach not only to the issue of the existence of the suretyship relationship, but also to the status of each of the parties to the transaction.  Thus, the Banks conclude, the obligations that the Sureties meant to guaranty were those of <u>both</u> CMC and the lessees; since the Banks were ultimately intended to receive payment, they must be considered to be the obligees.

22

Additionally, the Banks point to several characteristics of the transaction documents that are consistent with the Banks' argument that CMC was intended to be a principal on the Surety Contracts.  For example, the Sureties have brought claims against CMC, seeking indemnification under several written indemnity agreements.  The Banks argue that CMC's agreement to indemnify the Sureties indicates a principal/surety relationship between those parties.  Moreover, the Banks contend that all parties had an understanding that the Sureties would not be called on to perform their obligations unless the Banks failed to receive a payment from CMC, regardless of any default by the individual lessees.  Such an understanding would be consistent only with an agreement by the Sureties to guaranty the obligations of CMC as well as the individual lessees.

The Banks also argue that, despite the nominal identification of CMC as the "obligee," the substance of the transactions indicates that CMC was never intended to receive proceeds from the Surety Contracts.  The SSAs, which were executed with the Surety Contracts pursuant to the same transaction, provided for the assignment of the Surety Contracts in exchange for the Banks' funding of the underlying leases.  Thus, the Sureties were parties to the transactions in which the Banks obtained their rights, and the Sureties knew from the beginning that the Banks intended to have rights in the Surety Contracts.

The Sureties, on the other hand, vigorously assert that both the plain language and substance of the transaction documents support a finding that CMC was the intended obligee of the Surety Contracts.  Since the transaction documents expressly name CMC as the "obligee" of the Surety Contracts,[20] the Sureties contend that the Banks, in effect, are improperly seeking a reformation of

---

[20]     The opening sentence of a typical Lease Bond provides:

KNOW ALL MEN BY THESE PRESENTS:

23

the contracts through a motion for judgment on the pleadings.  Such a request, according to the Sureties, requires the Court to consider extrinsic evidence to determine the intent of the parties and resolve ambiguities, considerations that are wholly inappropriate at this stage of the proceedings. The Sureties thus rely on the terms used on the face of the transaction documents to support their contention that the Banks' role in these transactions was merely that of assignee, not obligee. According to the Sureties, the Banks, as assignees, take subject to all defenses that could be raised against CMC, including fraud-in-the-inducement.

As a threshold matter, the Court believes that it is appropriate to construe the relevant documents to determine the status of the parties.  This is true, however, only to the extent that such evaluation does not include the consideration of evidence outside the parties' pleadings.[21]  Upon a thorough review of the transaction documents available to it at this stage of the proceedings, the Court is unable to  conclude that the Banks are obligees as a matter of law.

---

> That we, [lessee], as principal, and Royal Indemnity Company, a corporation, organized under the laws of the State of Delaware, and duly authorized to transact business in the State of     as Surety [sic], are hereby firmly bound unto Commercial Money Center, Inc., as Obligee and its successors and assigns in the amount of [], and that we hereby bind ourselves, executors, administrators, successors, and assigns by these presents by execution of this instrument below.

Metropolitan Bank & Trust Company Complaint, Doc. 18, attach. 2.

[21]  Although the Sureties raise numerous defenses, including the lack of authority on the part of Michael Anthony to sign the SSAs on behalf of the Sureties, the Court does not consider those defenses as relevant at this point in the Court's analysis.  The Court seeks here only to determine the form of transaction initially intended by the parties, regardless of the validity of Anthony's actions or the applicability of other defenses. Issues related to Anthony are addressed later in this opinion.

24

First, the Court recognizes the proposition that, in determining the existence of a surety relationship and the status of the parties thereto, the Court must look to the substance of the transaction, regardless of the parties' use of technical words or use of another form to describe the contract. *See Chemical Bank v. Meltzer*, 93 N.Y.2d 296, 302-03 (1999)("As this Court stated half a century ago, a contract of suretyship *does not depend upon the use of technical words* but upon a clear intent that one party as surety [is bound] to the second party as creditor to pay a debt contracted by a third party, either immediately upon default of the third party or after attempts to effect collection from the third party have failed.  The existence of suretyship status depends upon the respective roles of the parties and the nature of the underlying transaction. . . .")(internal citations and quotations omitted)(emphasis in original); *see also Superior Wholesale Electric Co.,* 264 Cal. App. 2d at 493.

The Court's ability to examine the substance of the transaction as a whole, however, is limited by the context in which the issue is presented to the Court. On a Rule 12(c) motion, the Court may not receive evidence outside the narrow transaction documents to determine the parties' intent in entering into the Surety Contracts.  At this point,  the Court is limited to the parties' pleadings and the plain language of the documents attached to, or incorporated in, those pleadings. Unquestionably, the Surety Contracts at issue here name only CMC as an obligee; in fact, there is no mention of any of the investor Banks in any of the Surety Contracts.

The Banks argue that the Court's evaluation of the transaction documents should not be limited to the Surety Contracts; rather, the Court must also consider the indemnity agreements between CMC and the Sureties.  The Banks assert that construing these documents together permits the Court to divine the intent of the parties and thus, the true substance of their transaction. The

Court agrees that the indemnity agreements, which designate CMC as principal, and affirmatively

oblige CMC to indemnify each respective Surety, shed significant light on the transaction and tend

to indicate the Sureties' intent to benefit parties other than CMC through the lease guarantee

transactions.  The difficulty is that the Banks' proposed construction contradicts the plain language

of the Surety Contracts, each of which explicitly conveys rights only to CMC.  The Court finds that

it may disregard the plain language of those documents only through a reformation of the Surety

Contracts, or by finding – after consideration of all aspects of the parties' relationship – that the

intention of the parties is <u>other</u> than as expressed in those Surety Contracts.[22]

Under California law,[23] "[r]eformation or revision on the ground of mutual mistake . . .

requires clear and convincing evidence of the alleged mistake." *Inamed Corp. v. Medmarc Cas. Ins.

Co.*, 258 F. Supp. 2d 1117, 1123 (C.D. Cal. 2002).  Such a standard generally only can be met

through the introduction of parol evidence. *See Bosse v. Crowell Collier & MacMillan*, 565 F.2d

602, 609 (9th Cir. 1977)(applying Arizona law)("parol evidence usually is necessary to establish the

---

[22]  California Civil Code § 3399 permits reformation of a contract upon a plaintiff's proof of certain elements in a case:

> When through fraud or mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised, on the application of the party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value.

Cal. Civ. Code § 3399.

[23]  Even in the event that California law were inapplicable to these actions, the Court has found no indication that the law of any other relevant state would differ from that of California, on this point.

content of the parties' true agreement. . . ."). Thus, although the Court does not discount the significance of the indemnity agreements, the Court finds that these agreements alone (particularly since the Banks were not party to those agreements) are insufficient to meet the "clear and convincing evidence" standard necessary to reform an agreement and override the express language of the Surety Contracts.

Consideration of the SSAs does not alter this conclusion. Placing reliance on the SSAs is particularly problematic for the Banks because of the lack of uniformity in those documents. In most, if not all, of the SSAs, either a Bank or Surety entered into the contract solely with a CMC affiliate. Thus, many of the SSAs were not contracts negotiated and executed <u>by the parties</u> to these cases. Accordingly, reliance on the SSAs may be more appropriate in some cases than in others, and the Court's decision whether to rely on these documents may depend on extrinsic evidence of the parties' involvement in the negotiation of the particular SSAs at issue.

Even in cases where both a Bank and a Surety were party to the SSAs, the language of the relevant SSAs does not unambiguously indicate that a Bank was intended to be the obligee in the transactions. Although the language set forth in many of the SSAs relating to the Sureties' servicer obligations (including the obligation to guarantee performance of any sub-servicer) is highly suggestive of an intention to undertake obligations to the Banks as well as CMC, the juxtaposition of this language with Surety Contracts that contain <u>no mention</u> of the Banks' rights at least creates a question that can be resolved only by the presentation of evidence at a later stage in the proceedings.

The Court's conclusion on this point is hardly novel, under any applicable substantive law. While it is true that a Court can, in some cases, glean the intent of the parties to a transaction from

27

the face of the transaction documents, in most cases intent is considered a question of fact not amenable to pre-discovery resolution.  This is especially true, moreover, where the documents memorializing the parties' agreement are, as here, hardly a picture of clarity.  Similarly, where reformation of the transaction documents is necessary to effectuate the parties' intent, that equity-based remedy is rarely available as a matter of law.

In finding that the Banks have not met the "clear and convincing" standard for establishing that they are the intended obligees on the Surety Contracts, the Court does not determine that the Banks are precluded from asserting obligee status, nor does the Court intimate that the Banks may not be able to succeed in proving this status at some later point in time.  The Court finds, however, that the indemnity agreements and SSAs do not alone override the express designation of CMC as "obligee" in the Surety Contracts, and that this issue is more appropriate for resolution at later stages of these proceedings.[24]

Thus, the Court can make no determination as to the Banks' obligee status in these transactions, and the Banks' motion for judgment on the pleadings must, accordingly, be **<u>DENIED</u>**. The Court proceeds, however, to render certain threshold findings on several issues presented by the parties in this motion, where decision on such issues is possible based on the parties' pleadings and the documents attached thereto. While the Court normally would not engage in such an advisory

---

[24]     Both parties agree, at least in some cases, that the Banks timely presented notices of assignment to the respective Sureties and thus would have at least some rights <u>as</u> <u>assignees</u> under the suretyship contracts.  The Court's finding of such an assignee status, rather than an obligee status, presumably would affect the scope of the Banks' rights, since an assignee may be subject to any defenses that could be raised against the assignor, including CMC. "[T]he assignee of a nonnegotiable thing in action can acquire no greater right than that possessed by his assignor. . . ." *Lara v. Board of Supervisors*, 130 Cal. Rptr. 668, 672 (Cal. App. 5th Dist. 1976)(citations omitted).

exercise where doing so does not resolve any of the claims before it, there are several reasons to do so here.

First, resolution of <u>any</u> issue in this matter required a detailed analysis of all matters presented by the parties.  Thus, the Court has examined a host of documents and culled through thousands of pages of argument analyzing those documents in order to determine that the threshold question of Banks' obligee status on these contracts is not amenable to resolution in this Rule12(c) context.  In doing so, the Court necessarily considered and  reached some definitive conclusions on several other legal issues raised by these motions.

Second, the parties have waited a considerable period of time for these rulings.  Given the complexity of the issues presented and the need to give uninterrupted and lengthy attention to them, these rulings were delayed by the Court's need to attend to the remainder of its docket.[25] While the Court apologizes to the parties (and their counsel) for that delay, an apology is hardly enough.  The parties deserve as much guidance as the Court realistically can provide.  Thus, the Court will address as many issues as the current procedural context allows.

**B.      Validity of Fraud-in-the-inducement/Rescission Defenses.**

The Sureties' primary defense to the Banks' claims is their contention that the Surety Contracts are void from the inception, because of fraud-in-the-inducement by CMC.  The Banks, on the other hand, assert that fraud by CMC is not attributable to the Banks and that such a defense may not be raised against an innocent third party.  While the Court's analysis of this defense is necessarily premature, since the Court has not determined at this stage whether the Banks should be considered

---

[25]      Given the current budget crisis facing the judiciary, the Court was unable to obtain additional assistance in dealing with these matters, or its remaining docket, in the form of an additional law clerk.

innocent, third-party obligees or mere assignees of CMC's rights, the Court can address the question in the alternative.

The Banks assert that the purpose of a surety contract is to induce an obligee to do business with the principal by guaranteeing the principal's performance.  In order to facilitate this purpose, the Banks argue that a surety must take responsibility for due diligence with respect to the principal. Since it is the surety that bears responsibility for investigating the principal, the surety likewise must bear the loss if fraud by the principal occurs.

It is a basic principle of surety law that "fraud or misrepresentation practiced by the principal alone on the surety, without any knowledge or participation on the part of the creditor or obligee, in inducing the surety to enter into the suretyship contract will not affect the liability of the surety." *American Mfg. Mut. Ins. Co. v. Tison Hog Mkt., Inc.*, 182 F.3d 1284, 1288 (11th Cir. 1999); *see also Lewin v. Anselmo*, 56 Cal. App. 4th 694, 701 (Cal. Ct. App. 1997)("The rule is well settled and generally followed that fraud of the principal debtor will not relieve the guarantor or surety who acted at the request of the debtor from liability, if the creditor did not have notice of the fraud and did not participate therein."); Restatement (3d) of Suretyship and Guaranty, § 12(2)(1996)("If the secondary obligor's assent to the secondary obligation is induced by a fraudulent or material representation by either the principal or a third person . . . , the secondary obligation is voidable by the secondary obligor unless the obligee, in good faith and without reason to know of the misrepresentation, gives value or relies materially on the secondary obligation.").  The Banks cite these principles and assert that, since they relied on the Sureties' bonds without knowledge of CMC's fraud, the Sureties are bound to the Banks regardless of any fraud by CMC.

In the *Tison Hog* case, a surety issued two bonds on behalf of livestock dealers to secure the performance of the dealers in their purchase of hogs.  The surety failed to discover that the bond applications contained forged signatures.  The Court rejected the surety's defense that the bonds were void *ab initio*.  Instead, the Court held that the fraud perpetrated on the surety did not vitiate the surety's obligation to the innocent merchants:

> From a practical standpoint, this common law treatment of a principal's fraud is the only one that makes sense.  A creditor does business with a principal in reliance upon the existence of a bond....  If the creditor's ability to recover on a bond was dependent on the accuracy of the principal's representations to the surety, then the value of the bond to the creditor would be greatly lessened because the creditor would have no way of knowing what representations were made in the procurement of the bond.

182 F.3d at 1288-89.

The Banks rely both on the general *Tison Hog* rule and on the policy principle underlying that ruling–namely, that sureties should be responsible for performing due diligence and investigating their principals, since innocent investors rely on the credit of the surety in entering into a transaction. *See, e.g., Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 235 (2d Cir. 1995)(citation omitted)(sureties must "look out for themselves and ascertain the nature of their obligations."); *Busse v. Pacific Employers Ins. Co.*, 117 Cal. Rptr. 718, 724 (Cal. App. 2d Dist. 1974).

The Sureties, although they do not dispute the basic rule of surety liability to an innocent obligee, argue that the rule does not apply here.  As set forth above, the Sureties characterize CMC as the original obligee on the Surety Contracts and thus argue that CMC's fraud should be imputed to the Banks to defeat recovery.  The Sureties contend that CMC fraudulently induced them to enter

31

into the Surety Contracts and that CMC's fraud entitles them to rescission of those contracts. *See, e.g., Vai v. Bank of America Nat'l Trust & Sav. Asso.*, 364 P.2d 247, 256 (Cal. 1961)("when the agreement itself is procured by fraud, none of its provisions have any legal or binding effect."). And, the Sureties contend that CMC's fraud, and hence the Sureties' defenses in the face of that fraud, are imputed to the Banks. If the Banks are mere assignees of CMC's rights, the Sureties argue that they assume no greater rights in an action against the Sureties than would be available to CMC.

Both the Banks and the Sureties have set forth correct general legal principles.  The Court agrees that principles of well-established surety law would preclude the Sureties from raising a "fraud-in-the-inducement" defense against innocent third-party obligees.  If the Court were to find obligee status, the Banks would be protected by the basic principles of surety law, and CMC's fraud could not be imputed to them.  Regardless of CMC's fraud, the Sureties could not rescind the Surety Contracts where the Banks gave value and relied on those contracts prior to the rescission. *See, e.g., J. R. Watkins Co. v. Lankford*, 256 S.W.2d 788, 790-91 (Mo. 1953)("Where the surety by fraud or duress of the principal has been induced to become bound to the creditor, the fraud or duress is not a defense against the creditor, if, without knowledge of the fraud, he has extended credit to the principal on the security of the surety's promise or, relying on the promise, has changed his position in respect of the principal.")

It is equally true, however, that a party who commits fraud in a transaction, <u>or obtains rights from a party to the fraud</u>, may not reap the benefit of a Surety's guarantees.  An entity that procures another party's consent by fraud is precluded from enforcing the agreement. *See, e.g.,* Cal. Civ. Code § 1689(b)(1)("A party to a contract may rescind the contract . . . [i]f the consent of the party rescinding . . . was given by mistake, or obtained through duress, menace, fraud, or undue influence.

. . ."); *Vai*, 364 P.2d at 256.  This inability to enforce a contract induced by fraud extends to all subsequent assignees of the fraudfeasor.  *See Lara*, 130 Cal. Rptr. at 672 ("the assignee of a nonnegotiable thing in action can acquire no greater right than that possessed by his assignor. . . ."); *Berrington v. Williams*, 52 Cal. Rptr. 772, 776 (Cal. Ct. App. 1966)("[t]he assignee 'stands in the shoes' of the assignor, taking his rights and remedies, subject to any defenses which the obligor has against the assignor prior to notice of assignment.").

As this Court previously has found, a determination of the Banks' role in these transactions is premature and must be postponed to at least the summary judgment stage.  As set forth above, the application of surety law to these transactions is dependent on the Court's construction of the relevant documents and determination of the respective roles of the parties in the transactions.  Accordingly, the Court must decline at this point to determine whether the Sureties are precluded from raising the defenses of fraud-in-the-inducement or rescission, pending resolution of the Banks' status in these transactions.

C.    **Fraud Waivers/Fraud-in-the-inducement Defense**.

The Banks assert that, in addition to basic principles of surety law, the very language of the transaction documents precludes the Sureties from raising fraud-in-the-inducement as a defense.  The Banks argue that since certain "fraud waiver" language in the Surety Contracts bound the Sureties to bear responsibility for the underwriting of each lease, the Sureties are precluded from pointing to CMC's fraud as a defense to payment, regardless of whether the Court finds them to be obligees under the bonds.  The Banks contend that the express waiver language required the Sureties to undertake investigation with respect to matters of credit, fraud and other issues relative to the risk involved in the transactions.  Such an obligation allegedly also is imposed by the terms of the SSAs,

33

which held the Sureties responsible for matters relating to servicing of the leases.

A typical example of the purported "fraud waivers" in this case is set forth below:

> The Surety is responsible to Obligee for the individual underwriting of each lessee and Lease, including, but not limited to, all related credit matters, issues of fraud, bankruptcy and the accurate and timely performance by any sub-servicer designated by Surety, and Surety shall assert no defenses to any claim under this Bond as a result of any of the foregoing.  This Lease Bond and the Surety's obligation constitute an unconditional and absolute guarantee of payment, not collection.

Metropolitan Bank Complaint, 02-16012, Doc. 1, attach. 1.  The Banks assert that this "fraud waiver" language precludes the Sureties from claiming any defense based on the fraud of CMC, even if CMC were the obligee in these transactions.

Additionally, the Banks rest their waiver arguments on the Sureties' assumption of particular duties in the SSAs, including the Sureties' servicer duties and responsibility for the performance of any sub-servicer, including CMC.  A typical example of the SSA language is set forth below:

> Section 3.7  **Sub-Servicers.**  CMC is hereby appointed to be the initial Sub-Servicer and assumes all responsibility, as agent for and on behalf of the Servicer, to perform the duties of the Servicer hereunder. . . .  Notwithstanding the terms or existence of any such agreement between the Servicer and the Sub-Servicer, including CMC, the Servicer shall not be relieved of any of its obligations under this Agreement by reason of such agreement and shall be obligated to the same extent and under the same terms and conditions as if the Servicer alone was servicing and administering the Leases. . . .

Footbridge Answer/Counterclaim, 02-16029, Doc. 4, Exh. 1.  The Banks contend that the Sureties' unconditional assumption of responsibility for the performance of the leases, including the

34

performance of CMC as sub-servicer, renders the Sureties liable as a matter of law for the lessees' default.

In their memorandum in support, the Banks rely on several cases holding that Sureties may not rely on a defense of fraud-in-the-inducement to escape a guaranty obligation.  In *Citibank, N. A. v. Plapinger*, 66 N.Y.2d 90 (1985), the guarantors of a corporate debt sought to raise fraudulent inducement as a defense.  The New York Court of Appeals refused to consider parol evidence supporting the fraud-in-the-inducement defense, because the guarantees were "absolute and unconditional" on their face. *Id.* at 95.[26]

Additionally, several cases filed by the Banks as "supplemental authority" in support of the Banks' motion discuss the extent to which fraud waivers preclude a fraudulent inducement defense. *See, e.g., MBIA Ins. Corp. v. Royal Indem. Co.*, 286 F. Supp. 2d 347, 359 (D. Del. 2003)(holding that, where the language of Royal's guarantees was negotiated between sophisticated parties and was "absolute, unconditional and irrevocable," Royal was precluded from introducing the principal's fraud-in-the-inducement as a defense); *see also Valley Nat'l Bank v. Greenwich Ins. Co.*, 254 F. Supp. 2d 448, 463 (S.D.N.Y. 2003); *Tucker Leasing Capital Corp. v. Marin Medical Management*, 833 F. Supp. 948, 957-58 (E.D.N.Y. 1993).

The Sureties dispute the applicability of the law cited by the Banks on several grounds and contend that the fraud waivers do not bar their defenses.   First, the Sureties maintain that, if the

---

[26]     "An absolute guaranty is a contract by which the guarantor promises that if the debtor does not perform his obligation or obligations, the guarantor will perform some act (such as the payment of money) to or for the benefit of the creditor, irrespective of any additional contingencies." *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1449 (6th Cir. 1993); *see also Bank Leumi Trust Co. v. Block 3102 Corp.*, 580 N.Y.S.2d 299, 300 (N.Y. App. Div. 1992)("[t]he language of the guarantees specifies that they are absolute and unconditional, negating the claim of fraudulent inducement.")

purported "fraud waiver" had actually intended to waive the assertion of any fraud claim against

CMC, the waiver clause would be invalid.  The Sureties rely on cases from several jurisdictions,

including California, to support this proposition:

> A party to a contract who has been guilty of fraud in
> its inducement cannot absolve himself from the
> effects of his fraud by any stipulation in the contract,
> either that no representations have been made, or that
> any right which might be grounded upon them is
> waived. Such a stipulation or waiver will be ignored,
> and parol evidence of misrepresentations will be
> admitted, for the reason that fraud renders the whole
> agreement voidable, including the waiver provision.

*Danzig v. Jack Grynberg & Assocs.*, 208 Cal. Rptr. 336, 342 (Cal. App. 1st Dist. 1984); *see also*

*Bank of Montreal v. Signet Bank*, 193 F.3d 818, 828 (4th Cir. 1999)("false representation of a

material fact, constituting an inducement to the contract . . .  is always ground for rescission. . . .");

*Galmish v. Cicchini*, 734 N.E.2d 782, 790 (Ohio 2000)(parol evidence rule does not bar admission

of extrinsic evidence of fraud-in-the-inducement).  Court enforcement of a waiver provision, argue

the Sureties, would exculpate a tortfeasor from the consequences of its own fraud and thus would

violate public policy.  *See* Cal. Civ. Code § 1668 ("[a]ll contracts which have for their object,

directly or indirectly, to exempt anyone from responsibility for his own fraud . . . are against the

policy of the law."); *Blankenheim v. E. F. Hutton & Co.*, 266 Cal. Rptr. 593, 599 (Cal. App. 6th Dist.

1990)(California law precluded enforcement of a hold harmless agreement that would exempt the

defendant from fraud liability).

Second, the Sureties vigorously assert that the Banks' interpretation of the "fraud waiver"

provision is erroneous, and that no such intent to waive a fraud-in-the-inducement defense may be

gleaned from the documents here.  The Sureties argue that the waiver provision renders the Sureties

responsible to CMC for the underwriting of the individual lessee and the specific lease referenced in each Surety Contracts.  Thus, the provision should be construed as guaranteeing matters of credit, fraud and bankruptcy only on the part of the lessees, and not on the part of CMC.  The Sureties contend that such an interpretation is consistent with the doctrine of *ejusdem generis*,[27] since the entirety of the clause refers to lessee performance risks. Thus, the Sureties argue that, regardless of whether the Banks are obligees on the bonds, the "fraud waivers" only apply to circumstances in which the Banks can tie their losses to fraud by the lessees, and not to losses caused by the fraud of CMC.

The Sureties vigorously dispute the applicability of the Banks' "absolute and unconditional" case law, claiming that the Banks quote the relevant provisions here out of context.[28]  The crux of the "fraud waiver" provision, according to the Sureties, focuses on the language "unconditional guarantee of payment, not collection."  Thus, they argue, inclusion of that sentence was intended to highlight the difference (well recognized in surety law) between a guarantee of payment and guarantee of collection.[29]  The Sureties argue that the main purpose of the sentence containing the

---

[27]     *See Martin v. Holiday Inns, Inc.*, 245 Cal. Rptr. 717, 719 (Cal. App. 5th Dist. 1988)("the meaning of a word is or may be known from the accompanying words.").

[28]     The entirety of the phrase at issue reads "unconditional and absolute guarantee of payment, not collection. . . ."

[29]                        [A] guarantee of payment [is] a very different one
                           from a guaranty of collectability. 'A guarantor of
                           payment or performance is liable to the guarantee
                           immediately upon the default of the principal, and
                           without demand or notice.' (Civil Code, sec. 2807).
                           'A guaranty to the effect that an obligation is good, or
                           is collectable, imports that the debtor is solvent, and
                           that the demand is collectable by the usual legal
                           proceedings, if taken with reasonable diligence.' (Civ.

"unconditional" language was merely to convey the obligee's right to sue the surety directly, without first pursuing the principal (in this case the lessee) and securing a judgment.  That suit, however, would not assure the right to collect in the face of factually supported fraud defenses.

In support of their interpretation of the express language of the bonds, the Sureties also cite two cases for the proposition that great linguistic specificity is required in order to bar a defendant from asserting a fraud-in-the-inducement defense.  First, in *JPMorgan Chase Bank ex rel. Mahonia Ltd. v. Liberty Mut. Ins. Co.*, 189 F. Supp. 2d 24 (S.D.N.Y. 2002), surety bonds were issued guaranteeing the obligations of several Enron-related corporations.  Enron deceived the sureties, disguising a series of loans as a sale of assets.  The bond language stated that the "obligations of each Surety hereunder [were] absolute and unconditional. . . ." *Id.* at 27.  The court held that the general disclaimer language could not disclaim a defense of fraudulent inducement, absent a specific disclaimer of reliance on particular representations. *Id.*  The Court noted that "the touchstone is specificity." *Id.*; *see also Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir. 1993)("in order to be considered sufficiently specific to bar a defense of fraudulent inducement . . . , a guarantee must contain explicit disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim. . . .").

The Court concludes that the Sureties are correct that California law would bar enforcement of a provision exempting a party from its own fraud and that the "fraud waivers" would not operate to bar assertion of a fraud-in-the-inducement <u>if</u> the Court ultimately determines that CMC is the

---

Code, sec. 2800).

*Citizens' Nat'l Trust & Sav. Bank v. Seaboard Surety Corp.*, 41 P.2d 956, 957 (Cal. App. 1935).

obligee on the Surety Contracts and that the Banks are mere assignees of CMC's rights.  That is the end of the Court's agreement with the Sureties on this issue, however.  If the Banks are found to be obligees in these transactions, the Banks would be innocent parties not alleged to have profited from CMC's fraud.  In such a circumstance, enforcing the provision at issue would not result in the delivery of any proceeds to CMC and would not grant a windfall to any party involved in the original fraud. Under such circumstances, nothing in California law would prohibit literal and broad enforcement of the "fraud waivers."

The Court does not find that the language of the waiver provisions only indicates an intent to undertake liability to CMC for the default of the lessees and does not apply to fraud by CMC.  The express language of the provision, negotiated by sophisticated parties, does not limit the Sureties' responsibility to incidents of fraud by the lessees.  Rather, the provision requires the Sureties to assume the risk of liability for "all . . . issues of fraud. . . ."[30]  Thus, the Court finds that where neither CMC nor its assignees would benefit from enforcement of the fraud waivers, those waivers apply to fraud by CMC as well as the lessees.

The Sureties' argument that the Court should ignore the words "absolute and unconditional" in order to focus on the words "payment, not collection," is equally unpersuasive to the Court. Although the Court recognizes the specialized distinction between guarantees of payment and

---

[30]    The Ohio Banks assert that several of the Ohio Surety Contracts, particularly those issued by AMICO and RLI, provide that "[i]n the event of a claim, the issuer of this bond agrees to waive all defenses." (02-16000, Doc. 56). The Ohio Banks argue that these waivers are broader than the general "fraud waivers" discussed here.  Since the Court has denied judgment to the Banks on the issue of whether the Banks were the designated obligees on the bonds, the Court need not consider this issue at this point in the litigation.  Since the language included in the Ohio Banks' Surety Contracts is broader than that contained in the other Surety Contracts, the difference in language does not affect the Court's analysis in this portion of the opinion, except to make it stronger perhaps.

collection, the Court does not believe that this distinction wholly  negates the "absolute and unconditional" language.  Rather, the Court eschews an interpretation that would render the parties' negotiated language superfluous.  The Court believes that an inclusive interpretation of the parties' selected language compels a finding that the Sureties actually did intend to assume an unconditional undertaking to guarantee the performance of the CMC leases to the obligee on the Surety Contracts, and that the effect of the fraud waivers thus turns on a resolution of that threshold question.

Although the Court recognizes the proposition that specificity may be required in order to render a fraud waiver effective, there are several significant differences between the Sureties' two cited cases and the circumstances before this Court.   In *JPMorgan*, 189 F. Supp. 2d at 27, Enron disguised a series of loans to appear as legitimate sale transactions, by secretly arranging to buy from a Mahonia subsidiary the same oil and gas Enron had arranged to sell to Mahonia.  The Court considered *Plapinger* and held that that case "d[id] not stand for the extraordinary proposition -- the logical extension of plaintiff's interpretation -- that a general sweeping disclaimer can serve to disclaim any and all extrinsic fraud between sophisticated parties. . . ." *Id.* at 27.  The Court held that, where the underlying transaction was "a total sham" and the surety had no idea of the type of transaction involved, the surety was entitled to raise a fraudulent inducement defense. *Id.* at 28. Similarly, in *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 317 (2d Cir. 1993), the Court held that  a generalized boilerplate disclaimer that did not purport to waive defenses to its own validity was insufficient to waive the guarantor's claim of fraud-in-the-inducement.

Thus, in both of the cases relied on by the Sureties, the court believed that the disclaimers involved were insufficiently specific to foreclose a fraud-in-the-inducement claim.  In several other cases, however, courts have found disclaimers sufficient to foreclose a defense of fraudulent

40

inducement. *See, e.g., Valley National Bank v. Greenwich Insurance Company*, 254 F. Supp. 2d 448, 459 (S.D.N.Y. 2003)(court found bond enforceable where the guaranty (1) was negotiated between sophisticated parties; and (2) contained a broad clause waiving defenses based on "any other circumstance"); *Tucker Capital Leasing Corp. v. Marin Medical Management, Inc.*, 833 F. Supp. 948, 957 (E.D.N.Y. 1993)(following *Plapinger* and holding that the defendants were precluded from claiming fraud where they signed an "absolute, unlimited and continuing Guaranty of payment and performance.").

The Court has examined in detail the purported "fraud waivers" in this case, and believes that the language involved in the documents is more similar to that contained in the *Tucker* and *Valley National* cases than that in the *JPMorgan* and *Yanakas* cases. The language here cannot be construed as boilerplate; the provisions no doubt were negotiated by the parties over a long period of time. In fact, the language set forth in the documents here is even more explicit than that contained in either *Tucker* or *Valley National*, since the transaction documents here contain an express waiver of defenses based on fraud. In neither of the Banks' cited cases was an express fraud waiver present, yet the courts found in each of those cases that the guarantor had waived a fraudulent inducement defense.

Additionally, the Sureties cannot complain that the transaction was a "sham" in the same sense that the court so found in *JPMorgan*–the sureties in that case were duped into entering into an illegal financial guaranty rather than an insurance contract. In this case, despite the fraud allegations, the Surety Contracts were exactly what they purported to be–an undertaking of the obligation to

investigate the parties involved in the underlying lease transactions.[31]  The Sureties here knew the type of contract they were insuring and had the opportunity to investigate the parties involved in the underlying leases.

Even more significantly in the Court's view, both of the cases relied on by the Sureties appear to have involved situations in which the Sureties were defrauded by misrepresentations in which the obligees were involved. *JP Morgan* involved collusion between Mahonia and Enron, and the Court relied on the proposition that the "wrongdoer, whether willful or negligent, should not benefit from his own wrongdoing." *JPMorgan*, 189 F. Supp. 2d at 28.  Similarly, in *Yanakas*, the fraudulent inducement defense was based on misrepresentations by the Bank, the obligee on Yanakas's note. Thus, depending on the Court's eventual finding regarding the status of the Banks, the Court believes that the equities involved in the Sureties' cited cases may be fundamentally distinguishable from those at issue here.  Notably, in this case, the alleged misrepresentations were made by CMC alone. Accordingly, any determination of the enforceability of the fraud waivers depends on the Banks' status vis-a-vis CMC, which has been deferred until later in these proceedings.

In a final attempt to buttress their construction of the transaction documents, the Sureties also refer to an opinion drafted by Judge Roger Hunt of the District of Nevada earlier in this litigation. Judge Hunt, in construing an Illinois Union policy, stated:

> [I]t is clear from the language of the provision that the bar on assertion of a fraud defense refers to the "individual underwriting of each Lease."  Illinois Union does not allege fraudulent misrepresentations by CMC to its lessees; rather, Illinois Union contends

---

[31]  *See, e.g., MBIA Ins. Corp. v. Royal Indem. Co.*, 286 F. Supp. 2d 347, 359 (D. Del. 2003)(holding that an allegedly fraudulent transaction involving student loan guarantees was not a total sham, in contrast to the *JPMorgan* case).

> that CMC's fraudulently misrepresented [sic] the state
> of its operations to induce Illinois Union's issuance of
> collateral security insurance policies.  The Court finds
> no indication in the language of the policy indicating
> that Illinois Union agreed to forfeit its right to seek
> rescission in the event of pre-contract fraudulent
> misrepresentation.

*Commercial Servicing Corp. v. Illinois Union Ins. Co.*, No. CV-S-01-685-RLH (LRL)(D. Nev. Jan. 9, 2002)(pending in this Court as 02-16007), at 5.  In connection with their citation to this opinion, the Surities rely on case law holding that rescission voids all provisions in a contract, including a waiver or incontestability provision. *See, e.g., Crump v. Northwestern Nat'l Life Ins. Co.*, 236 Cal. App. 2d 149, 157 (1965)("[I]ncontestability does not apply to a policy which is void *ab initio. . . .*"); *Sierra Diesel Injection Serv. v. Burroughs Corp.*, 651 F. Supp. 1371, 1377 (D. Nev. 1987)("fraud-in-the-inducement invalidates the entire contract.").

For several reasons, the Court believes that the Sureties' reliance on Judge Hunt's opinion is misplaced.  First, the litigation before Judge Hunt involved CSC (an affiliate of CMC) and Illinois Union.  Thus, Judge Hunt considered whether Illinois Union could raise its fraud defense vis-a-vis CSC, a party allegedly involved in the extensive fraud in this case.  As this Court has already found, under California law, a party responsible for the fraud may not shield itself from that fraud by negotiation of a detailed "fraud waiver" provision.  Judge Hunt, however, did not consider the other issue raised by the current motions – i.e., whether the purported "fraud waiver" provision precludes the Sureties from raising the fraud-in-the-inducement defense vis-a-vis the Banks <u>if</u> the Banks are found to be innocent obligees in the suretyship transaction.[32]

---

[32]    The Banks also argue that, even if the Sureties may assert fraudulent inducement as a defense, as a matter of law, those parties cannot establish that their reliance on CMC's misrepresentations was justifiable.  The Banks assert that the Sureties undertook the

For these reasons, the Court finds that, if it ultimately concludes that the Banks are obligees on the bonds,  the Sureties will be  precluded from raising the defense of fraudulent inducement by CMC vis-a-vis the Banks.

**D.     Fraud by Anthony/Agency.**

The Sureties next assert that many of the SSAs and other documents created in connection with the lease transactions should not be binding on them, since those documents were signed by Michael Anthony, who was a participant in the alleged fraud.  The Sureties rely, essentially, on the theory that Anthony was acting exclusively as the agent for CMC at all times throughout the fraudulent scheme so  that his conduct could not bind the Sureties.  In support of this proposition, the Sureties cite Cal. Civ. Code § 2306, which provides: "An agent can never have authority, either actual or ostensible, to do an act which is, and is known or suspected by the person with whom he deals, to be a fraud upon the principal."  *Id.*

---

obligation to perform due diligence on the underlying leases and that, since the Sureties did not undertake the appropriate investigation, they could not have justifiably relied on any representations by CMC. *See, e.g., Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 599 (N.Y. 1959) (specific disclaimer of representations precluded any claim of justifiable reliance).  The Sureties, however, deny that the language of the transaction documents waived their right to seek rescission, and they vigorously assert that they reasonably relied on representations from CMC in determining whether to become involved in the transactions at issue.

The Court concludes that the issue of reliance, if relevant to these actions, would not be conducive to resolution on the pleadings, since the language of the transaction documents does not contain an unambiguous disclaimer of reliance on representations, and since there are genuine issues of material fact as to the fact and/or reasonableness of the Sureties' reliance on representations by CMC.

44

The Sureties also rely on the terms of Anthony's written limited power of attorney, a copy of which apparently was attached to each Surety Contracts.[33]  The Sureties argue that, since the power of attorney was in the Banks' possession, the Banks should have been aware that the power of attorney was limited and provided Anthony with authority to execute <u>only</u> the Lease Bonds. *See Jay v. Dollarhide*, 84 Cal. Rptr. 538, 549 (Cal. App. 5th Dist. 1970), *overruled on other grounds by Morris v. Thogmartin*, 105 Cal. Rptr. 919 (1973)("[t]he power to act is determined solely from the language of the instrument. . . .  Powers of attorney are strictly construed.  Authority never is extended beyond that which is directly given or necessary and proper to carry the authority into full

---

[33]    A typical example of Anthony's power of attorney provides as follows:

> [Surety] does hereby appoint MICHAEL ANTHONY; SCOTT MORGAN; San Clemente, California, its true and lawful attorney(s) in fact, with full authority to execute on its behalf fidelity and surety bonds or undertakings and other documents of a similar character issued in the course of its business, and to bind the respective company thereby.

NetBank Second Amended Complaint, 02-16010, Doc. 2, attach. 10.  Apparently, RLI's power of attorney was narrower than that set forth above; that document provided that RLI appointed Anthony:

> its true and lawful Agent and Attorney-in-Fact, with full power and authority hereby conferred, to sign, execute, acknowledge and deliver for and on its behalf as Surety, the following described bond.

> Any and all bonds provided the bond penalty does not exceed Twenty-five Million Dollars ($25,000,000).

02-16000, Doc. 151, Exh. A.  The Court nonetheless finds, however, that this bond also conveys upon Anthony sufficient authority to execute documents necessary to effect the issuance of bonds, including SSAs.  Thus, the difference in language in the power of attorney does not affect the Court's analysis herein.

effect. . . ."). Thus, according to the Sureties, the Banks cannot claim that Anthony's authority was any broader than that set forth in the power of attorney.

Finally, the Sureties claim that the issue of ostensible authority cannot be resolved on this Rule 12(c) motion, because there is a factual dispute as to whether the Sureties acted so as to clothe Anthony with authority, and as to whether the Banks proceeded in good faith in their dealings with Anthony. *See Kaplan v. Coldwell Banker Residential Affiliates, Inc.*, 69 Cal. Rptr. 2d 640, 643 (Cal. App. 2d Dist. 1997)("The person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one; such belief must be generated by some act or neglect of the principal sought to be charged; and the third person in relying on the agent's apparent authority must not be guilty of negligence.").

The Banks counter that Anthony's fraud cannot vitiate the Sureties' obligations, because principals are bound by the acts of an agent who fraudulently induced his appointment, as long as the agent had apparent authority. *See Biggs v. United States Fire Ins. Co.*, 611 S.W.2d 624, 629 (Tex. 1981); Restatement (2d) of Agency, § 257 (b).[34] The Banks state that they are innocent parties

---

[34]     That section provides:

> A principal is subject to liability for loss caused to another by the other's reliance upon a tortious representation of a servant or other agent, if the representation is:
>
> (a) authorized;
>
> (b) apparently authorized; or
>
> (c) within the power of the agent to make for the principal.

Restatement (2d) of Agency, § 257(b).

46

who relied on Anthony's authority, and that their interests cannot be defeated by Anthony's misrepresentations to his principal.

The Banks' cited cases, which provide that a principal may be liable to innocent third parties for the unauthorized acts of an apparently authorized agent, appear to represent widely recognized law.  The Court relies on these principles in determining the scope of Anthony's apparent authority.

Based on these well-established principles, the Court finds that Michael Anthony was, as a matter of law, authorized to sign both the Lease Bonds (Surety Contracts) and the SSAs on behalf of the Sureties.  The Court believes that, even if it construes the language of the powers of attorney narrowly, as the Sureties argue is required, those authorizations gave Michael Anthony the authority to execute both the Lease Bonds and the SSAs as a matter of law.  The power of attorney provision, by its express language, provided that Anthony had authority to "execute on its behalf fidelity and surety bonds. . . ."  Such language indicates that Anthony had actual authority to execute Lease Bonds, and thus the Court need not consider the question of apparent authority.  As a result, the Lease Bonds (Surety Contracts) are binding on the Sureties.

With respect to the SSAs, the Court also finds, as a matter of law, that Anthony had authority to execute these documents.  Although the Sureties argue that Anthony had no actual authority, the Court believes that the terms of the power of attorney were broad enough to grant Anthony apparent authority to execute the SSAs as a matter of law.  The relevant language stated that Anthony had authority not only to execute Lease Bonds, but also to execute "other documents of a similar character issued in the course of its business. . . ."  As the SSAs were intricately bound up in the Lease Bonds transaction, the Court cannot imagine what "other" documents this language could refer to, if not to SSAs.  The Sureties' argument that the SSAs were clearly outside of the scope of the

47

power of attorney, and that this should have been obvious to the Banks, is unavailing.[35]

With respect to the estoppel letters, the question of Anthony's authority is more complex. The Court proceeds to address this question below.

### E.    Estoppel Letters.

As noted earlier in this opinion, certain Banks received letters from, or on behalf of, the Sureties, which purported to affirm the validity and enforceability of the leases and the Surety Contracts.[36]  The letters in question were signed by Anthony on behalf of the Sureties or, in several cases, secured by Anthony from outside counsel.[37]  The Banks argue that, because of these letters, the Sureties should be estopped from denying their obligations under the Surety Contracts.  *See*

---

[35]    Although the Court finds that both the Lease Bonds (Surety Contracts) and the SSAs are binding on the Sureties, the analysis herein does not apply to allegedly forged documents. For instance, before filing notices of dismissal in actions involving that entity, RLI alleged that, within its Atlantic pool, at least 56 of the bonds were outright forgeries – that is, the name of an RLI employee was improperly scripted onto the documents.  In cases where forgery is alleged, such documents cannot be binding on the Sureties as a matter of law. Rather, the issue of forgery is a factual question that cannot be resolved at this stage of the proceedings.

[36]    The following is a typical example of the language contained in the estoppel letters:

> [The Surety] has approved the attached list of Lease Bonds and the related Sales and Servicing Agreement to be executed by our Attorney-In-Fact, Mr. Michael Anthony. . . .  All bonds on this list are in full force and effect.  Each Lease Bond executed by [the Surety] and the related Sales and Servicing Agreement is a valid and binding obligation of the Insurance Company enforceable in accordance with its terms ...

Atlantic Coast Federal Counterclaim, 02-16001, Doc. 8, attach. 3.

[37]    It appears that, at least with respect to the Ohio Banks, the Cleveland law firms of Gallagher, Sharp, Fulton & Norman and Dinn, Hochman & Potter, LLC participated in creating opinion letters on behalf of the Sureties, at Anthony's request.

48

*United States Quarry Tile Co. v. Massachusetts Bonding & Ins. Co.*, 71 F.2d 400, 402 (6th Cir. 1934)(surety estopped from denying coverage after letter from surety's agent had confirmed coverage).

The Sureties contend, first, that many or most of the letters received by the Banks were received after the closing of the transactions and that the letters could constitute, at best, only retroactive ratification of the Lease Bonds and SSAs.  The Sureties assert, however, that they are entitled to rescind such ratification, because the letters were fraudulently induced and thus void *ab initio*.  "A ratification may be rescinded when made without such consent as is required in a contract, or with an imperfect knowledge of the material facts of the transaction ratified, but not otherwise." Cal. Civ. Code § 2314.  Moreover, some of the letters were actually signed by Anthony, who lacked authority to ratify his own *ultra vires* acts.  Finally, the Sureties contend that, even if the purported "estoppel letters" were valid, it is a question of fact whether those letters could retroactively modify actions by Anthony outside the scope of his authority.

The Court finds that it can not determine the effect of the purported "estoppel letters" at this point in the litigation.  With respect to any letters signed by Anthony, there is a question of fact regarding whether actual or apparent authority to execute or obtain the "estoppel letters" was conveyed by the power of attorney granting Anthony authority to execute fidelity and surety bonds and "other documents of a similar character issued in the course of its business. . . ."  The Court does not believe that the  language is so broad as to encompass, as a matter of law, Anthony's signing or procuring "estoppel letters" on behalf of the Sureties.[38]  Additionally, with respect to any letters

---

[38]    The Court's conclusion in this regard partially turns on its view that the estoppel letters were less central to the Lease Bond transactions than were the SSAs.  An understanding of commitments regarding the servicing of the leases and their income streams was critical to

executed by an employee of a surety company, there appear to be questions of fact as to when these letters were executed and/or received by the Banks.  Moreover, since the Court has concluded in the previous sections of this opinion that a final determination as to the applicability of the Sureties' fraud defenses vis-a-vis the Banks is premature, it finds it  unnecessary to determine at this point whether the "estoppel letters" preclude the Sureties from raising such defenses.

### F.    Non-Fraud Defenses.

Finally, in addition to the fraud defenses, which the Court has examined above, the parties raise several other defenses that do not stem from the Sureties' fraud allegations.  The Court briefly addresses each of these remaining issues below.

### 1.    "Due and Owing."

As an alternative to the fraud-related defenses, the Sureties contend that the language of the Lease Bonds exempts the Sureties from any obligation to pay, because the express language of the Lease Bonds only requires the Sureties to "pay to the Obligee any amounts due and owing by the principal with regards to the lease."  The Sureties assert that, in order to require the Sureties to pay, the Banks must first establish that amounts are "due and owing" by the lessees.  Many of the underlying leases here cannot be enforced because they were never consummated by CMC or the lessee, were never funded, or were fraudulent or fictitious.  Accordingly, the Sureties argue that, to the extent any of the underlying leases were illegal or invalid, the sums claimed by the Banks cannot be "due and owing" on the underlying leases.  Thus, any potential liability of the Sureties should be

---

the underlying investments to which the Lease Bond applies.  While the estoppel letters may have provided additional comfort to certain of the investors, they are less typical of documents reflecting the financing arrangements made here. It is, accordingly, less readily apparent that the powers of attorney would encompass their issuance.

reduced by the amounts that are not "due and owing" from the lessees.

The Sureties rely on the well-established proposition that the obligation of a surety "must be neither larger in amount nor in other respects more burdensome than that of the principal." Cal. Civ. Code § 2809; *see also United States Leasing Corp. v. Du Pont*, 444 P.2d 65, 75 (Cal. 1968)("since the liability of a surety is commensurate with that of the principal, where the principal is not liable on the obligation, neither is the guarantor. Consequently, no liability can be imposed upon defendants as guarantors unless [the lessee] is liable under the lease.").  The Sureties also cite case law holding that a surety's obligation is discharged where enforcement of the principal obligation would give effect to an illegal or invalid contract. *See, e.g., Lewis & Queen v. N. M. Ball Sons*, 308 P.2d 713, 722 (Cal. 1957)("[t]he defense of illegality is available to the surety if it is available to his principal.").

Relying on case law from other jurisdictions, the Banks assert that the Sureties are precluded from raising the illegality of the Surety Contracts as a defense, because the Sureties are responsible for verifying the legality and enforceability of their contracts and must be held liable where they have not done so. *See Greenblatt v. Delta Plumbing & Heating Corp.*, 834 F. Supp. 86, 93 (S.D.N.Y. 1993), *vacated on other grounds*, 68 F.3d 561 (2d Cir. 1995)(holding that the sureties must be held to obligations consistent with the express language of the bond, although such an interpretation rendered the bond illegal); *Ursa Minor Ltd. v. Aon Fin. Prods.*, 2000 U.S. Dist. LEXIS 10166, *18-20 (S.D.N.Y. Jul. 20, 2000)(surety's obligation was not conditioned on the validity of the underlying bond; thus, the validity of the bond was irrelevant).  The Sureties here, the Banks contend, also waived any invalidity defense through the plain language of the Surety Contract (e.g., the "unconditional and absolute" language); thus, the Sureties should not be permitted to rely on any

such defense.

The Sureties' interpretation of the amounts "due and owing," the Banks assert, is inconsistent with the express definition of lease default set forth in the Surety Contracts. The Banks assert that, since a lease default is triggered by <u>CMC's</u> failure to perform, the Sureties' obligations must be grounded on amounts owing by CMC – i.e., a promised income stream – not by the lessees. Thus, the Banks contend that even if the Sureties' description of the relevant case law is accurate, that case law does not preclude the Court from finding the Sureties liable for the defaults of CMC, the principal and sub-servicer under the leases.

Again, the Court finds that this issue is not amenable to resolution at this point. It turns on a determination of the parties' respective statuses vis-a-vis CMC and each other, as well as vis-a-vis the lessees. As discussed above, if the Banks are the obligees, CMC's failure to perform likely would be the relevant "default" for purposes of this analysis. Resolution of this question also turns on the enforceability and breadth of the fraud and defense waivers in the transaction documents. As noted, the Court has reserved all of these issues for a later stage of theses proceedings.

Even if CMC is the obligee and the Sureties are correct in their general legal theory, moreover, the question of what is "due and owing" under any lease is a factual question which would differ from lease to lease. The Court, accordingly, declines to resolve this question on a purely theoretical basis.

### 2. Bank Ownership of Bonds/Proceeds.

The Sureties contend that, as putative assignees, it is the Banks' burden to prove effective assignment. First, the Sureties argue, many of the Banks have not produced any Assignment or Notice of Assignment documents.

52

Even for those Banks that have produced such assignment documents, however, the Sureties argue that judgment on the pleadings is inappropriate.  In support of this argument, the Sureties note the then-ongoing bankruptcy proceedings, in which the Chapter 7 Trustee for CMC and CSC articulated various theories as to why the Banks do not have an ownership interest in the bonds.  The Sureties allege that this ownership dispute alone precludes judgment on the pleadings.

In raising this argument, however, the Sureties ignore that this Court has specifically recognized that the bond ownership issues between the Banks and the Chapter 7 Trustee are not before this Court. (Transcript of Proceedings held April 28, 2003, Doc. 226, at 48-49).  The issues before the Court today involve only the Banks' rights in the bonds vis-a-vis the Sureties, issues which are independent of the ownership and assignment issues which are the province of the bankruptcy court.[39]

---

[39]  On May 31, 2005, United States Bankruptcy Judge John Hargrove granted in its entirety a Motion for an Order Approving the Global Settlement (Doc. 1007 in Case No. 02-09721-H7 before the United States Bankruptcy Court for the Southern District of California), which was filed by Richard M. Kipperman, the Chapter 7 trustee for the bankruptcy estates of Commercial Money Center, Inc. ("CMC") and Commercial Servicing Corporation ("CSC") in what has been referred to herein as the CMC/CSC bankruptcy proceeding.  That order both authorized the Chapter 7 trustee to enter into the proposed settlement agreement in the bankruptcy proceeding (the "Settlement Agreement") and approved the proposed Settlement Agreement as being in the best interests of CMC and CSC's respective bankruptcy estates.  Pursuant to Paragraph 19(a) of the *executed* Settlement Agreement, liaison counsel for the Banks (as defined in the Settlement Agreement) provided this Court with notice and a copy of the approval order and Settlement Agreement.

In so far as the Court can determine, the Settlement Agreement in the CMC/CSC bankruptcy proceeding has no direct impact on the Court's merits analysis of the instant motion for judgment on the pleadings.  The only impact the Settlement Agreement *may* have in the MDL proceeding relates to a possible reduction in damage calculations, to the extent any damages are ever determined, in accordance with Paragraphs 4(h) and 9(d) of the Settlement Agreement.  Accordingly, though noteworthy, the settlement in the CMC/CSC bankruptcy proceeding does not affect this Court's analysis of the issues presented in the instant motion for judgment on the pleadings.

3.      **Other Issues.**

The Sureties also briefly note, in their opposition to the motion to dismiss, that they have raised several other defenses in their pleadings, including the absence of necessary and indispensable parties, failure to execute the bonds or contracts, exoneration of the bonds by CMC's alteration or release of the underlying lease obligations, public policy, assumption of risk and failure to mitigate.

The Court believes that some of these issues have been addressed, at least tangentially, in the Court's analysis of the issues briefed by the parties with respect to the instant motion.  To the extent that these issues have not been addressed in detail in this opinion it is because, after due consideration of them, the Court finds no reason to conclude that any of these defenses would alter the Court's analysis.

### III.     <u>CONCLUSION</u>

For the reasons set forth herein, the Banks' motion for judgment on the pleadings (Doc. 53) is **<u>DENIED</u>**.  The Court **<u>ORDERS</u>** as follows:

- The Court finds that California law applies to all issues in this action, with the exception of documents containing an express choice of law provisions.

- Upon thorough review of the transaction documents presented by the parties, the Court is unable to conclude, as a matter of law, that the Banks are the intended obligees in these transactions, and the Court declines to so find.

- Given the Court's determination that a ruling as to the status of the parties is premature, the Court also declines to preclude the Sureties' fraud-in-the-inducement defense at this stage in the proceedings.

- The Court declines to reach a definitive ruling regarding the application of the fraud

54

waiver language to preclude the Sureties' defenses in these cases, since any such ruling would involve a premature determination of the respective roles of the parties to this litigation.  The Court notes, however, that in the event the Banks are found to be obligees, the language of the fraud waivers would preclude the Sureties from raising the fraud-in-the-inducement defense.

- The Court finds, as a matter of law, that the powers of attorney issued to Michael Anthony by the Sureties granted Anthony either actual or ostensible authority to sign both Lease Bonds (Surety Contracts) and SSAs on behalf of the Sureties. Accordingly, the Sureties cannot rely on Anthony's fraud to vitiate the terms of those documents.

- With respect to the estoppel letters, the Court finds that there are questions of fact as to Anthony's authority to sign or procure such letters.  Accordingly, the Court declines to find that those letters preclude the Sureties' fraud defenses as a matter of law.

- With respect to the "due and owing" defense, the Court declines to find that defense precluded as a matter of law, since analysis of that defense is dependent on the Court's findings with respect to the status of the parties and the scope of any applicable defense or fraud.

- As to all other issues raised by the parties, the Court finds either that resolution of those issues involves inappropriate factual determinations, or that resolution of those issues is premature at this point in the proceedings.  Accordingly, the Court declines to address any other issues raised.

- The Banks' motion for judgment on the pleadings (Doc. 53 in 02-16000) is **<u>DENIED</u>**, subject only to the limited aspects granted in the Court's companion opinion relative to those banks who engaged in transactions with Illinois Union Insurance Company of America.

**IT IS SO ORDERED.**

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: August 19, 2005**