# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: COMMERCIAL MONEY | : | **Case No. 1:02CV16000** |
| CENTER, INC., EQUIPMENT | : | |
| LEASE LITIGATION | : | **(MDL Docket No. 1490)** |
| | : | |
| | : | **JUDGE KATHLEEN M. O'MALLEY** |
| | : | |
| | : | **ORDER** |
| | : | |
| | : | **Re: Motion for Judgment on the Pleadings** |
| | : | **(Doc. 53, 02-16000)** *vis a vis* **Banks dealing** |
| | : | **with Illinois Union Insurance Company of** |
| | : | **America** |

These actions were transferred to this Court by order of the Judicial Panel on Multidistrict Litigation ("the MDL Panel"), issued on <u>October 25, 2002</u> (Doc. 1). This Court has ordered that these actions be coordinated for pretrial purposes (Doc. 2). These cases are currently before the Court on a plethora of pretrial motions, including the instant motion for judgment on the pleadings (Doc. 53 in 02-16000), collectively filed by the Bank Group[1] against the Surety Group.[2] This opinion addresses only the "lead"

---

[1]    Prior to various dismissals (*see* the Court's Lead Opinion – Doc. 1708 in 02-16000) that effectively removed certain parties from this litigation, or otherwise limited their involvement, this group originally included the following entities:  Ameriana Bank and Trust, S.B. ("<u>Ameriana</u>"), Atlantic Coast Federal ("<u>Atlantic Coast</u>"), Bank of Waukegan ("<u>Waukegan</u>"), Bank One N.A. ("<u>Bank One</u>"), Bluebonnet Savings Bank FSB ("<u>Bluebonnet</u>"), Citibank, N.A. ("<u>Citibank</u>"), FirstMerit Bank, N.A. ("<u>FirstMerit</u>") (recently, CadleRock Joint Venture, L.P. was substituted for FirstMerit as the party-plaintiff), Footbridge Limited Trust ("<u>Footbridge</u>"), General Electric Capital Corp. ("<u>GECC</u>"), JPMorgan Chase Bank (f/k/a Chase Manhattan Bank, N.A.) ("<u>Chase</u>" or "<u>Chase Manhattan</u>"), Lakeland Bank ("<u>Lakeland</u>"), Metropolitan Bank & Trust Company ("<u>Metropolitan</u>"), NetBank, FSB ("<u>NetBank</u>"), Riverway Bank ("<u>Riverway</u>"), Second National Bank of Warren ("<u>Second National</u>"), Sky Bank (for itself and as successor in interest to Mid Am Bank) ("<u>Sky</u>"), The Huntington National Bank ("<u>Huntington</u>"), The Provident Bank ("<u>Provident</u>")

motion for judgment on the pleadings as that motion relates to Banks that dealt with Illinois Union.[3]  Issues relating to other parties set forth in the "lead" motion for judgment on the pleadings have been addressed in the Court's lead opinion.  *See* Doc. 1708 in 02-16000.

This matter has been extensively briefed and is now ripe for ruling.  The Court has considered all of the parties' memoranda and exhibits submitted in this matter, and has reviewed the record.  Upon thorough review, the Banks' motion for judgment on the pleadings with respect to Illinois Union is **GRANTED**.

---

and U.S. Bank National Association ("U.S. Bank").  For convenience, the Court refers to these entities collectively as "the Banks" or "the Bank Group," except where reference to one or a few of the bank entities is intended.

[2]     This group originally included the following entities: American Motorists Insurance Company ("AMICO"), ACE American Insurance Company ("ACE American"), Illinois Union Insurance Company of America ("Illinois Union"), RLI Insurance Company ("RLI"), Royal Indemnity Company ("Royal"), and Safeco Insurance Company of America ("Safeco").  The Court collectively refers to these entities as "the Surety Group" or "the Sureties."

All issues between ACE American and its insured, GECC, were addressed in a separate series of briefs; thus, those issues are not relevant here.  In any event, GECC has since dismissed its claims, so the Court will not issue its analysis of the issues relative to GECC.

[3]     Like Illinois Union, as noted herein, ACE American also made the "insurer" argument *vis-a-vis* its dealings with Riverway.  This opinion addresses only those banks that dealt with Illinois Union, however, and not Riverway and ACE American because those parties have since dismissed their respective claims.  *See* Doc. 57 in 02-16006.

## I.  BACKGROUND

### A.  General Facts Underlying the Transactions.[4]

The dispute in these actions centers around the Sureties' potential liability on various surety bonds issued in connection with certain transactions between the Banks and Commercial Money Center, Inc. ("CMC").[5]  CMC was a Nevada-based company that had significant operations in California.  CMC's business purportedly involved leasing equipment and vehicles to numerous lessees in exchange for lease payments.  CMC then pooled the leases and sold them (or their anticipated income stream) to institutional investors.[6]

_____

[4]    The facts set forth in this section are taken from the parties' pleadings and briefs in these cases. Although this opinion addresses only the Banks' motion for judgment on the pleadings with respect to Illinois Union, this section sets forth the general context of all of the transactions in these cases.

As is appropriate in considering a motion for judgment on the pleadings, "[a]ll well-pleaded material allegations of the non-moving party's pleadings are taken as true and allegations of the moving party which have been denied are taken as false." *Benson v. O'Brien*, 67 F. Supp. 2d 825, 829 (N.D. Ohio 1999).  Documents attached to the pleadings as exhibits are considered incorporated therein and may be considered in evaluating a Rule 12 (c) motion. *See* Fed. R. Civ. P. 10(c) ("[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.")

[5]    CMC had several affiliates, including Commercial Servicing Center ("CSC") and several special purpose entities.  However, for purposes of this motion, the CMC-affiliated defendants will be referred to collectively as "CMC," except where individual reference is necessary.

[6]    According to the Banks, the transactions differ in structure.  The four essential transaction forms involved in this action are as follows: (1) Ameriana, Atlantic Coast, Bank of Waukegan, Footbridge, Lakeland, NetBank and Riverway purchased the income stream from pools of leases directly from CMC; (2) Bank One, FirstMerit, Huntington, Metropolitan, Provident, Second National and Sky Bank (collectively, "the Ohio Banks") lent funds to third parties, who used the proceeds of the loans to purchase the income stream from lease pools from CMC (or special purpose entities created in connection with their respective transactions) and secured payment of all obligations under the loans by assigning the income streams from the lease pools, the Surety Contracts and all of the third parties' rights, and physically pledging the leases and the Surety

In connection with these transactions, the Sureties issued Surety Contracts or bonds guaranteeing the performance of the lessees. Each investor expected to receive a monthly payment equal to the amount due under its leases (or income streams) it purchased. The Banks in these actions are investors who purchased interests totaling more than $400 million in the CMC lease pools. CMC acted as servicer or sub-servicer of the various lease pools and was responsible for delivering the lease payments to the investors.

According to both the Banks and the Sureties, the majority of CMC's leasing business was apparently a sham. The Sureties allege that many, if not most, of the purported CMC leases either never existed, were forged or were sham transactions with CMC-affiliated entities. Many of the transactions were never consummated, either because the leases were never signed or funded, or because the equipment at issue was never delivered. Additionally, some of the transactions are alleged to have been disguised usurious loans. Both the Banks and Sureties contend that CMC operated a Ponzi scheme, in which early investors were paid using money generated by new investors, while a large number of the supposed equipment leases were nonexistent or nonperforming. The Banks and Sureties each claim to have been defrauded by CMC's representations regarding its financial condition and the condition of its lease pools.[7]

---

Contracts to the respective Ohio Banks; (3) General Electric Capital Corporation ("GECC") purchased pools of leases from Riverway, who had previously purchased its pools from CMC; (4) Citibank and Bluebonnet purchased notes issued by special purpose entities created in connection with their respective transactions, which notes were secured by, and to be repaid from, the income stream from pools of leases sold to the special purpose entities, with JPMorgan Chase and U.S. Bank, respectively, acting as trustees.

[7]  In order to induce investment in its lease pools, CMC allegedly made numerous representations concerning its leasing program, lease default rates, lease recoveries and other matters. Some of

Eventually, the Banks ceased receiving monthly payments from these investments, and each looked to the respective Sureties for payment.  Although some of the claims apparently were paid, each Surety refused, at some point, to pay the remainder of the claims.  The Banks, Sureties and CMC filed these actions in various jurisdictions seeking judicial determination of their respective rights under the applicable documents.  CMC filed for bankruptcy on May 30, 2002 and is not a party to the proceedings before this Court.[8]

### B.    Facts Specifically Relating to Illinois Union.

Illinois Union issued purported insurance policies in connection with transactions involving seven (7) banks in this action: Waukegan, Second National, Chase (as Trustee), NetBank, Footbridge, Citibank, and Sky.[9]  The transactions with these banks fall essentially into three groups: (1) Bank of Waukegan,

---

the specific representations made included statements that (1) its combined lease default rate was about 10%; (2) its default rate on lease pools that complied with stricter underwriting guidelines ("the Safeco criteria") was about 4%; and (3) CMC aggressively pursued collection efforts and thus that its overall losses were limited to about 2%.

In actuality, the default rate was substantially higher (up to 90% in some pools).  Apparently, the supposedly stricter "Safeco criteria" did not actually exist.  CMC also allegedly misrepresented its financial condition at the time the investors and sureties were contemplating participation in these transactions.  The parties allege that CMC fraudulently concealed known defaults to induce investors to invest and to induce sureties to issue bonds.

[8]    CSC also filed for bankruptcy on June 13, 2002; thus, it also is not a party to these proceedings.  Some of the brokers and CMC-affiliated special purpose entities are, or were, parties to these actions, however, including numerous Guardian entities, several Diversity entities, Rafferty Capital Markets, Anthony & Morgan Surety & Insurance Services, Inc. and Michael Anthony.  Several individuals involved with CMC and its operation, including Blaine Tanner, Mark Fisher, Kelly Fisher Buh, Brian McMichael, Sterling Wayne Pirtle, and Anita Pirtle also are, or were, parties to these proceedings.

[9]    In so far as this opinion is limited to transactions involving Illinois Union, the Court's references herein to "the Banks" refers only to those the banks that dealt with Illinois Union.

Footbridge and NetBank are among the banks that purchased their interest in the leases directly from CMC;[10] (2) Second National and Sky are Ohio Banks and, like the others in that group[11], took secured interests in the income stream of the lease pools from certain Guardian entities; and (3) Citibank purchased notes issued by CMC Lease Funding 2000-220, LP ("Lease Funding"), a special purpose entity created in connection with its transaction, which notes were secured by the income stream from pools of leases sold to Lease Funding, with Chase acting as trustee.[12]   The policies issued in connection with the Citibank transaction are unique and contain provisions not found in any of the other documents.

      **C.**      **The Contentions of the Parties**.

In the lead motion, the Banks seek <u>partial</u> judgment on the pleadings against Illinois Union arguing that the Court should apply surety law, rather than insurance law, to the transactions because, despite being labeled "insurance policies" they operated as surety bonds.  The Banks argue that they are entitled to recover on the surety bonds, because (1) they are obligees on those bonds and were not involved in any alleged fraud; (2) fraud waivers contained in those documents preclude Illinois Union from asserting fraud-in-the-inducement by CMC as a defense; and, (3) even if Illinois Union could otherwise assert defenses to payment, it is estopped from asserting such defenses because of "estoppel letters" it issued touting the

---

[10]      Because NetBank has withdrawn its motion for judgment on the pleadings (*see* Doc. 1107 in 02-16000 and Doc. 20 in 02-16010), the Court does not address the effect of its analysis herein on transactions involving NetBank.

[11]      The "Ohio Banks" group consists of: Bank One, N.A., FirstMerit Bank, N.A., Metropolitan Bank & Trust Company, Second National Bank of Warren, Sky Bank, The Huntington National Bank and The Provident Bank.

[12]      In structuring this transaction, Citibank intended to market asset-based securities in the larger capital markets.

enforceability and legality of the transactions.

In the lead opposition, the Sureties seek declarations that their Surety Contracts are invalid and unenforceable due to CMC's fraud.  The Sureties argue that (1) CMC, not the Banks, is the obligee on the surety bonds; thus, fraud in the inducement by CMC and/or Michael Anthony renders the lease bonds void *ab initio*; (2) the fraud waivers contained in some of the bonds were intended to cover only issues of fraud by the lessees against CMC and <u>not fraud by CMC</u>; and (3) a surety cannot waive the defense of fraud by an obligee, despite unambiguous language in the parties' agreement.  Additionally, the Sureties challenge the validity and/or authenticity of many of the documents on which the Banks rely to support their claims.  Finally, the Sureties contend that, as long as their construction of the instruments is even arguably reasonable, the Court must deny the Rule 12(c) motion and allow the action to proceed.

Illinois Union joins in the general Surety arguments.  It presents, however, several additional arguments based on insurance law: (1) pre-existing losses are not covered by the policies; and (2) fraud by a coinsured voids a policy even as to an innocent insured.  Again, this opinion deals only with Illinois Union and its arguments because it is uniquely situated.

**D.      Choice of Law**.[13]

The Banks claim that the question of which state's law applies to the claims in these cases is irrelevant, since the basic legal principles applicable to the Banks' motion are established and consistent throughout the country.  The Sureties, however, contend that there is sufficient variation among the laws

---

[13]      The Court also has set forth a choice of law analysis in its "lead" opinion on the motions for judgment on the pleadings. (Doc.1708 in 02-16000).  The Court includes this section here only for purposes of specifying which law applies to each of the transactions in which Illinois Union participated.

7

of the relevant states that this Court should make a choice of law determination before considering the issues.  With respect to the choice of law question, only the Ohio Banks filed a separate reply memorandum addressing the choice of law issue, in which they contend that Ohio law must apply to the transactions involving those banks.   Illinois Union's analysis generally tracks that of the Sureties'.  It contends that, absent a choice of law provision, either Nevada or California law must apply to its policies.  Illinois Union applies Nevada choice of law rules and determines that either California or Nevada would be the state with the "most significant relationship" to the dispute.

Illinois Union, however, also points out several exceptions to the application of general choice of law rules where the documents in question contain applicable choice of law provisions.  Specifically, Illinois Union asserts that (1) the Chase Policy contains a provision specifying that California law should apply; and (2) the Sales and Servicing Agreements ("SSA") involved in Illinois Union's transactions contain a provision specifying that Nevada law applies.  These documents are relevant and will be considered in connection with the Court's analysis herein.  Since the Banks have not contested Illinois Union's characterization of these documents, the Court assumes that the documents specified by Illinois Union, if valid, will be governed by the choice of law provisions contained within those documents.

With respect to any Illinois Union documents that do not contain a choice of law provision, the Court's conclusion in its lead opinion (Doc.1708 in 02-16000) that California law applies to the transactions at issue in these cases governs.  Accordingly, as to any such documents, the Court will apply California law.

### E.    Standard of Review.

A court may grant judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) only "when no

material issue of fact exists and the party making the motion is entitled to judgment as a matter of law."

*United States v. Moriarty*, 8 F.3d 329, 332 (6th Cir. 1993).  In considering a Rule 12(c) motion, "[a]ll

well-pleaded material allegations of the non-moving party's pleadings are taken as true and allegations of

the moving party which have been denied are taken as false." *Benson v. O'Brien*, 67 F. Supp. 2d 825,

829 (N.D. Ohio 1999).  Documents attached to the pleadings as exhibits are considered incorporated

therein and may be considered in evaluating a Rule 12 (c) motion. *See* Fed. R. Civ. P. 10(c) ("[a] copy

of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.") The Court

may consider such exhibits, however, only where the authenticity of such exhibits is not contested. *See*

*DeMarco v. Depotech Corp.*, 149 F. Supp. 2d 1212, 1217 (S.D. Cal. 2001).

## II.    DISCUSSION

### A.    Construction of the Transaction Documents and the Relationship Between the Parties.

The crux of the dispute between Illinois Union and the Banks hinges on the characterization of the

relationships between the parties and the construction of the transaction documents establishing those

relationships.  The Banks contend that the documents applicable to the respective transactions created a

surety relationship in each case, while Illinois Union asserts that the same documents were insurance

policies that created an insurance relationship.  Suretyship involves a tripartite relationship between a

principal, an obligee and a surety. *See Superior Precast, Inc. v. Safeco Ins. Co. of Am.*, 71 F. Supp. 2d

438, 451 (E.D. Pa. 1999).  Insurance, on the other hand, involves only a bipartite relationship between an

insurer and its insured. *See id.*

Thus, before evaluating Illinois Union's defenses to the Banks' claims, the Court first must resolve

two questions.  First, with respect to the transactions involving Illinois Union, do they involve insurance policies or surety contracts?  Second, if the transactions involve surety contracts, who is the "obligee" on the contracts?  The Court first will describe the documents to be construed and then will address these questions.

### 1.      The Documents.

Generally speaking, the transactions at issue in these cases were consummated through the procurement of "insurance policies" for groups of underlying leases.[14]  The Court sets forth below examples of policy language in the transactions in which Illinois Union was involved, with differences in language noted where significant and relevant[15]:

> Coverage E: Lease Coverage–The Company will indemnify the Named Insured for any amount due but not paid on an insured lease ("Lease"), subject to the terms and conditions herein. . . .
>
> ***
>
> 1. The Company is responsible to the Named Insured for the individual underwriting of each lessee and Lease, including but not limited to, all relating credit matters, issues of fraud, bankruptcy, that the lease is a true lease and not a secured financing, usury, that the Lease is valid, binding and enforceable, and the accurate and timely performance by any servicer or sub-servicer designated by the Company, and the Company shall assert no defenses to any claim under this Policy as a result of any

---

[14]      The Banks argue that these "insurance policies" actually are "lease bonds" or "surety contracts." As the Court explains below, however, the actual label given to the document is not significant. Thus, the Court uses all three terms interchangeably throughout this opinion.

[15]      The Citibank/Chase policy has been set forth separately because of the significant differences between that policy and the other policies involved in these cases.

of the foregoing.[16]

***

4.  The Company reserves the right as Master Servicer to approve any Sub-Servicer of the Leases.  Commercial Servicing Corp. is hereby approved as Sub-Servicer of the Leases.

***

6.  If the Named Insured fails to receive a payment under the Lease from the Company, as servicer or from any sub-servicer, on the scheduled due date, default under the Lease occurs.  Upon such default, the Company shall have thirty (30) days to cause the default to be remedied. . . .[17]

---

[16]      In the Second National and Sky policies, Condition 1 provides as follows:

> 1.  The issuance of this endorsement shall represent the Company's approval of the individual underwriting and execution and delivery of each Lease, including, but not limited to, all related credit matters, issues of fraud, bankruptcy, validity, legality and enforceability and the Company shall pay all Claims hereunder unconditionally and assert no defenses to any Claim under this endorsement as a result of any of the foregoing or based on any act or omission of the Master or Sub-Servicer.

Complaint, 02-16015, Doc. 1, attach. 1; Complaint, 02-16016, Doc. 1, attach. 1 (referring to Mid Am. Bank, Sky's predecessor in interest).

[17]      Condition 6 under the Second National and Sky policies provide as follows:

> If the Named Insured fails to receive a payment under the Lease from the lessee, Master Servicer or Sub-Servicer on the scheduled due date or if any payment previously made is rescinded, reclaimed or recovered upon a bankruptcy, receivership, insolvency, reorganization or other similar proceeding involving the lessee, Master

***

>8.  The Named Insured shall notify the Company within thirty (30) days by registered or certified mail of any assignment of the Named Insured's rights under this Policy.  Any such assignee shall become the Named Insured under this Policy, effective as of the date specified in the notice of assignment, immediately upon the Company's receipt of such notice of assignment.

Footbridge Reply and Counterclaim, 02-16007, Doc. 11, attach. 5.

Citibank's policy, as noted above, is unique and contains distinct provisions, which are set forth below:

>Coverage E: Lease Coverage–The Company will indemnify the Insured, its successors and assigns, for all Scheduled Payment Amounts on a Lease due on each Scheduled Due Date as set forth in the applicable Lease Agreement without deduction or set off of any kind, subject to the terms and conditions herein. . . .

>***

>1.  The issuance of this Policy shall represent the Company's approval of the individual underwriting of each Lease (including the applicable lessee thereunder), including but not limited to, all relating credit matters, issues of fraud, insolvency, bankruptcy and timely performance by the Insured, any transferee of the Leases or any interest therein or by any servicer or sub-servicer designated by the Company, and the Company shall

---

>Servicer or any Sub-Servicer of the Lease, then default under the Lease occurs.  Upon such default, the Company shall have thirty (30) days to cause the default to be remedied. . . . .

Complaint, 02-16015, Doc. 1, attach. 1; Complaint, 02-16016, Doc. 1, attach. 1.

12

assert no defenses to any claim under this Policy as a result of any of the foregoing.  Coverage hereunder shall not be affected by (i) a determination that the Lease is a secured financing or not a true Lease, is subject to usury, or is not valid, binding or enforceable, (ii) any financial difficulties, including bankruptcy, insolvency or similar proceedings, involving the Insured or any of the parties to the Sale and Servicing Agreement . . . (iii) any failure by the Insured or any party to the Referenced Documents to comply with its obligations thereunder. . . .

*** *

4.  The Company reserves the right as Servicer under the Sale and Servicing Agreement . . . to approve the Sub-Servicer (as defined under the Sale and Servicing Agreement) of the Leases.   Commercial Servicing Corporation is hereby approved as the initial Sub-Servicer of the Leases.

*** *

4.  If (a) the Insured fails to receive all or a portion of a Scheduled Payment Amount on the Scheduled Due Date as specified in Schedule A attached hereto . . . or (b) any Scheduled Payment Amount previously made on a Scheduled Due Date or otherwise to any of Commercial Money Center, Inc., the Insured or otherwise (x) is not paid over to and received by the Additional Insured Loss Payee for any reason whatsoever or (y) is paid over to the Additional Insured/Loss Payee and is required to be rescinded, reclaimed, voided or recovered from the Additional Insured/Loss Payee for any reason, including as a result of a bankruptcy, receivership, insolvency, reorganization or other similar proceeding involving any party under a Lease, or the Servicer or any sub-servicer of such Lease or any party to any of the Referenced Documents . . . then a default under the Lease with respect to the payment of such Scheduled Payment Amount shall be deemed to occur. . . .  The Company must be notified by registered or certified mail of such

13

default within thirty (30) days after such default has occurred. . . .

\*\*\*

7.  The Company acknowledges that Commercial Money Center, Inc. has sold the Leases to the Insured (and granted a back-up security interest to the Insured) and that the Insured has pledged all of its rights hereunder with respect to the Leases to secure the obligations of the Insured under the Indenture and that it is intended that such pledge shall constitute a first priority perfected security interest therein. . . . [T]he Company shall make all payments hereunder to the Trustee on behalf of the Additional Insured/Loss Payee and not the Insured within thirty (30) days of receipt of written notice of a default of a Lease in accordance with its terms. . . .

\*\*\*

9.  The Insured, the Additional Insured/Loss Payee, the Company as Servicer, any sub-servicer, trustee or any assignee or pledgee of any of the foregoing shall notify the Company immediately by facsimile, with a copy of such notification to be sent by registered or certified mail within two business days of such notice by facsimile, of any assignment, pledge or grant of a security interest of the Insured's rights under this Policy. . . . Any such assignee shall become the Insured under this Policy, effective as of the date specified in the notice of assignment, immediately upon the Company's receipt of such notice.

\*\*\*

13.  The issuance of this Policy shall represent the Company's acknowledgement [sic] that (i) it is acting for its own account, (ii) it has made its own independent decisions to issue this Policy and to enter into any of the Referenced Documents applicable to it, (iii) it has reviewed the Referenced Documents and has full knowledge of the transactions contemplated in such

14

Referenced Documents, (iv) it has determined that this Policy and the other Referenced Documents to be entered into by it, and the transactions contemplated therein, are appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.   It is not relying on any communication (written or oral ) of the Insured or the Additional Insured/Loss Payee as a recommendation to issue this Policy or to enter into any of the Referenced Documents applicable to it; it being understood that information and explanations related to the terms and conditions of this Policy and the Referenced Documents and the transactions contemplated therein shall not be considered a recommendation to issue this Policy and to enter into the Referenced Documents applicable to it. The Company has not received from the Insured or the Additional Insured/Loss Payee any assurance or guarantee as to the expected results of this Policy or the transactions contemplated by the Referenced Documents.

14.  The Company acknowledges that it is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Policy and the transactions contemplated by the Referenced Documents.

15.  The Company acknowledges that the Additional Insured/Loss Payee is not acting as a fiduciary or an adviser for it in respect to this Policy, the Referenced Documents, or the transactions contemplated therein.

02-16007, Doc. 9, Exh. M.

Many of the policies contain express waivers of all defenses, including fraud.  The fraud waiver language is set forth in each of the policies in paragraph 1, above.  Notably, the fraud waiver language in the Citibank documents is significantly broader than the language in the other transaction documents.  The significance of the fraud waiver language will be discussed later in this opinion.

15

Michael Anthony, of Anthony & Morgan Insurance Services ("Anthony & Morgan" or "A & M"), was an independent broker involved in procuring the lease bonds and policies.  Pursuant to powers of attorney issued to Anthony by the Sureties, Anthony signed several lease bonds and/or insurance policies on behalf of the Sureties.[18]  These powers of attorney were attached to the lease bonds given to CMC and later assigned to the Banks.  A "typical" power of attorney issued by a Surety to Anthony provided as follows:

> [Surety] does . . . hereby appoint MICHAEL ANTHONY; SCOTT MORGAN; San Clemente, California, its true and lawful attorney(s) in fact, with full authority to execute on its behalf fidelity and surety bonds or undertakings and other documents of a similar character issued in the course of its business, and to bind the respective company thereby.

NetBank Second Amended Complaint, 02-16010, Doc. 2, attach. 16.[19]

In connection with many of the transactions, the parties executed SSAs in addition to the lease bonds and/or policies.  The SSAs were not executed in every case and, even in the transactions where they were, there is significant variation among the SSAs in those transactions.  In some cases, for example, Anthony signed the SSAs as agent for the Sureties.  The general purpose of the SSAs was to (1) effect a transfer of CMC's rights under the leases (and/or the lease bonds) to the investor; and (2) set forth terms

---

[18]     The Sureties allege, however, that Anthony was also acting as an agent for CMC throughout the transactions, and that CMC paid Anthony over $15 million for his efforts.

[19]     Although NetBank has withdrawn its motion for judgment on the pleadings (Doc. 1107 in 02-16000 and Doc. 20 in 02-16010), NetBank's power of attorney document is included merely as a relevant example of the power of attorney documents executed by the parties in connection with these transactions.  As noted previously, however, the Court's ruling herein does not pertain to NetBank because it has withdrawn its motion for judgment on the pleadings.

16

relating to the servicing of the leases.  Although the language of the SSAs is by no means uniform, the Court sets forth below the essential SSA language involved in the Illinois Union transactions, with differences noted where significant and relevant:

> Section 2.1 Conveyance of Leases and Related Assets.
> (a) Subject to the terms and conditions of this Agreement, the Seller . . . hereby sells, transfers, assigns, and otherwise conveys to the Purchaser . . . all of the right, title, and interest, including any security interest, whether now owned or hereafter acquired, of the Seller in and to the following (the "Transferred Assets"):
>
>> (i) All contract rights under each Lease to receive all Scheduled Payments. . . .
>>
>> (ii) all funds on deposit from time to time in the Collection Account. . . .;
>>
>> [(iii) all rights of the Seller in the Transfer Agreement. . . .;]
>>
>> (iv) all rights under the Surety Bonds; and
>>
>> (v) any and all proceeds of the foregoing.

Footbridge Reply and Counterclaim, 02-16007, Doc. 11, Exh. 1; *see also* Waukegan Reply in support of Motion to Dismiss, docket, U.S. Dist. Court, D. Nev., CV-S-01-685, Doc. 104, attach. 5.[20, 21]  With

---

[20]    With the exception of the bracketed text, the SSA relevant to Sky's claims (entered into by Guardian Capital VI LLC, CMC and Illinois Union) contains the same language.  *See* 02-16016 Complaint, Doc. 1, attach. 1.  The document applicable to Second National's claims (entered into by Guardian Capital V, LLC, CMC, and Illinois Union), also is virtually identical.  *See* 02-16015, Doc. 1, attach. 1.

[21]    The Citibank/Chase document provides, in relevant part:

> Section 2.1.  Conveyance of Leases.

respect to servicing obligations, an example of the SSA language is set forth below:

> Section 3.7 **Sub-Servicers.** CMC is hereby appointed to be the initial Sub-Servicer and assumes all responsibility, as agent for and on behalf of the Servicer, to perform the duties of the Servicer hereunder. . . . Notwithstanding the terms or existence of any such agreement between the Servicer and the Sub-Servicer, including CMC, the Servicer shall not be relieved of any of its obligations under this Agreement by reason of such agreement and shall be obligated to the same extent and under the same terms and conditions as if the Servicer alone was servicing and administering the Leases. . . .

Footbridge Reply and Counterclaim, 02-16007, Doc. 11, Exh. 1; *see also* Waukegan Reply in support

of Motion to Dismiss, docket, U.S. Dist. Court, D. Nev., CV-S-01-685, Doc. 104, attach. 5.[22, 23]

---

> a) <u>Purchase and Sale</u>.  Subject to the terms and conditions of this Agreement, the Seller . . . hereby agrees to sell, convey, transfer and assign to the Issuer, and the Issuer hereby agrees to purchase on the Closing Date and from time to time thereafter on subsequent Purchase Dates . . . all of the right, title and interest, whether now owned or hereafter acquired, of the Seller in and to the Leases identified on a Supplement Lease Schedule to each Purchase Supplement. . . .

Chase Answer and Counterclaim, 02-16007, Doc. 12, Exh. 14.

[22]  The SSA relevant to Sky's claims (entered into by Guardian Capital VI LLC, CMC and Illinois Union) contains the same language. *See* 02-16016 Complaint, Doc. 1, attach. 1.  The document applicable to Second National's claims (entered into by Guardian Capital V, LLC, CMC, and Illinois Union), also is virtually identical. *See* 02-16015, Doc. 1, attach. 1.

[23]  The relevant provision in the Chase/Citibank SSA provides:

> Section 3.1.  <u>Sub-Servicer</u>.

> (a) <u>Servicer To Act Through Sub-Servicer</u>.  The Servicer hereby appoints Commercial Servicing to act as Sub-

18

In addition to the lease bonds, Anthony also was involved in arranging the issuance of several "estoppel letters" to the Banks.  In many cases, Anthony either drafted the estoppel letters himself or hired outside counsel to do so.  The Sureties, including Illinois Union, deny knowledge of most of these letters, and they vehemently deny that Anthony had any authority to draft, or otherwise have prepared, any such letters.  A typical example of the estoppel letters received by the Banks provides:

> Illinois Union Insurance Company ("Insurance Company"), a wholly owned subsidiary of Ace, Ltd. has approved the attached list of equipment leases ("Leases") and the related Sale and Servicing Agreement. . . .  The Lease Insurance has been issued by Illinois Union Insurance Company, and executed on our behalf by our agent, A & M Select Insurance Services, Inc.  The Sale and Servicing Agreement has been executed on our behalf by our agent, A & M Select Insurance Services, Inc.  The Lease Insurance is in full force and effect. . . .

> Servicer on behalf of the Servicer as its express agent.  Commercial Servicing assumes all responsibility, as Sub-Servicer and agent for and on behalf of the Servicer, to perform the servicing duties hereunder for all Leases, and the Seller agrees to cause the Sub-Servicer to perform all of its duties and obligations hereunder. . . .

> (b) Servicer To Remain Responsible for Servicing Functions.  Notwithstanding the undertaking of the Sub-Servicer to act as agent of and on behalf [of] the Servicer with respect to all of the servicing functions hereunder. . . the Servicer shall retain in full, and be bound by, all obligations and financial responsibilities under this Agreement with respect to the servicing functions as set forth herein. . . .  The Servicer shall Supervise, administer, monitor, enforce and oversee the servicing of the Leases by any Sub-Servicer appointed by it.

Chase Answer and Counterclaim, 02-16007, Doc. 12, Exh. 1.

19

> The Lease Insurance and the Sale and Servicing
> Agreement are valid and binding obligations of the
> Insurance Company enforceable in accordance with its
> terms. . . .

Sky Opposition to Motion to Dismiss or Transfer, 02-16016, Doc. 20, attach. 2.[24]

Having set forth examples of the language contained in the relevant documents, the Court now turns
to consider the construction of that language and the roles of the respective parties in the transactions.  To
the extent that the Court's analysis depends on variations in the applicable documents' language, the Court
notes that circumstance.

### 2.  The Surety Contract Argument.

As noted earlier in this opinion, construction of the documents is essential to determining the nature
of the relationship between the parties and, thus, the availability of certain defenses to the Banks' claims.
Illinois Union contends that it is an insurer, rather than a surety, and, thus, that surety law should not apply
to its transactions.  Based on that argument, Illinois Union then raises and discusses at length various
insurance related defenses upon which it claims a right to rely.  The Banks disagree, arguing that Illinois
Union's policies should be construed as surety contracts rather than traditional insurance policies and that
Illinois Union's insurance-related defenses are, thus, irrelevant.  <u>The Court finds, as a matter of law, that
the Illinois Union transaction documents establish a suretyship relation between Illinois Union and those
banks with which it dealt</u>.

---

[24]     An estoppel letter received by Second National, as well as several received by Citibank, are
substantially similar. *See* 02-16015, Doc. 25, attach. 2; 02-16007, Doc. 6, attach. 1-2, 6, 10.  The
estoppel letters involved in the Illinois Union transactions all were signed either by Illinois
Union/ACE American employees or by outside counsel.

The Banks rely on the Restatement (3d) of Suretyship & Guaranty for the proposition that, where a transaction satisfies the substantive criteria for suretyship, "the secondary obligor has suretyship status . . . regardless of the form of the transaction fulfilling the criteria [and] regardless of any term used by the parties to describe the secondary obligor or the secondary obligation." Restatement (3d) of Suretyship & Guaranty § 1(3).  Several cases cited by the Banks also support this proposition.  *See, e.g., Superior Wholesale Electric Co. v. Cameron*, 264 Cal. App. 2d 488, 493 (Cal. App. 2d Dist. 1968) ("No particular form of agreement is required to establish a suretyship contract.  So long as the agreement establishes the intention to create such a contract, no set words and form are required.").

Thus, the Banks argue that the Court must look to substance rather than form to differentiate a contract of insurance from a surety contract.[25]  *See, e.g., Superior Wholesale Electric Co.,* 70 Cal. Rptr. at 639.  Citing *Rhode Island Recreational Bldg. Auth. v. Industrial Nat'l Bank,* 494 A.2d 537, 539 (R.I. 1985), the Banks assert that an insurance contract may be found to be a surety agreement where an analysis of the document demonstrates that the parties so intended.  In that case, the Rhode Island Supreme Court stated:

> The plaintiff asserts that the mortgage insurance agreement between the parties is clearly a contract of insurance. . . .  One must look to the intent of the parties, however, and not just to the technical language used, to determine whether a suretyship exists. . . .  Generally, a surety is one who undertakes to pay money or perform other acts in the event that when his principal defaults, the

---

[25]     Although Illinois Union seeks to rely on previous alleged "admissions" by the investor Banks that Illinois Union issued insurance policies rather than surety bonds, the Court relies at this point only on the language and substance of the documents themselves.  Accordingly, the Court does not believe that any purported "admissions" would be relevant or binding in this context.

21

> surety becomes directly and immediately liable for the
> debt. . . .  In considering this standard, we must affirm the
> trial justice's determination that this agreement, although
> styled as an insurance agreement, is actually a contract of
> suretyship.

*Id.*  The Banks claim that the Court must examine the structure of the transactions in detail to determine

whether the parties formed a bipartite or tripartite relationship.  "While a liability insurance contract involves

only two parties, the insurer and the insured, suretyship involves a tripartite relationship between a surety,

its principal, and the bond obligee. . . ." *See Great Am. Ins. Co. v. North Austin Mun. Utility. Dist. No.

1*, 908 S.W.2d 415, 418 (Tex. 1995), *rev'd on other grounds*, 950 S.W.2d 371.

     In addition, the Banks argue that obligations undertaken by Illinois Union appear identical to those

undertaken by the Sureties in nearly identical transactions.  The terms of Illinois Union's insurance policies,

the Banks contend, set forth its promise to perform the obligations of any party owing payment on the

underlying leases.  These obligations are consistent with those imposed on a surety by the California Civil

Code: "A surety or guarantor is one who promises to answer for the . . . default . . . of another." Cal. Civ.

Code  § 2787 (1993).

     A final factor noted in support of the Banks' claim that Illinois Union is, in fact, a surety, is the

existence of indemnification rights running from CMC to Illinois Union.  "Suretyship status gives the

secondary obligor recourse against the principal obligor to cause the principal obligor to perform the

underlying obligation or bear the cost of performance." Restatement (3d) of Suretyship & Guaranty, §

18(1).  Illinois Union has pleaded that it entered into indemnification agreements with CMC.  *See* Illinois

22

Union Second Amended Counterclaims, Doc. 32, at ¶ 41 in 02-16000.[26]  The Banks argue that the existence of the indemnification agreements is consistent with a suretyship contract, not with an insurance policy.

Illinois Union, on the other hand, contends that the law cited by the Banks is inapplicable and that California law is contrary to the proposition that a document styled as an insurance policy may be construed as a surety contract. *See, e.g.,* Cal. Civ. Code § 1638 (providing that the clear and unambiguous language of a contract governs the contract's interpretation).  Essentially, Illinois Union contends that, where the documents at issue are styled as insurance policies, the Court must treat them as such, without regard to or analysis of the form of "insurance" provided by those documents.   The Court's research does not reveal, however, that California law differs markedly from that of the rest of the nation with respect to the construction of surety agreements.  *See, e.g., Mead v. Sanwa Bank California*, 71 Cal. Rptr. 2d 625, 628 (Cal. App. 4th Dist. 1998) (suretyship relation may be implied by law).  Indeed, it is apparent under California law that it is the substance, rather than the form, of a transaction that determines the existence of a suretyship relation.  *See Superior Wholesale Electric Co.*, 70 Cal. Rptr. at 639.[27]

---

[26]    Examples of the indemnity agreements between Illinois Union and CMC are set forth at Doc. 2, Exh. 8 in 02-16010; and docket, U.S. Dist. Court, D. Nev., CV-S-01-685, Doc. 101, Exhs. A, B.

[27]    The court in *Rhode Island Recreational Bldg. Auth. v. Industrial Nat'l Bank,* 494 A.2d 537 (R.I. 1985), is not alone in concluding that it is the relationship between the parties that distinguishes surety agreements from insurance contracts, not the title placed on the document.  At least one additional state court has held that insurance policies may be construed as surety agreements where the circumstances of the agreement and the substance of the obligations undertaken supports such a construction.  *See, e.g., Cruz-Mendez v. ISU/Insurance Servs.*, 156 N.J. 556, 571-72 (1999) (construing an insurance policy as a suretyship contract so as to authorize a direct action against a surety where the plaintiff was injured by the negligence of a pyrotechnics company).

23

The Court is persuaded by the Banks' arguments that Illinois Union acted as a "surety" in the transactions.  Although Illinois Union's contracts purport to be insurance policies, the obligations under the contracts are fundamentally identical to those set forth in classic surety contracts.   The existence of indemnity agreements between CMC and Illinois Union is significant, moreover, because those agreements are inherently inconsistent with the traditional relationship between an insured and its insurer.  Thus, the Court construes all of the transaction documents involving Illinois Union, including the indemnity agreements between Illinois Union and CMC, together and finds that, as a matter of law, these documents establish a suretyship relation.

The Court is aware of the general rule that, in a Rule 12(c) motion for judgment on the pleadings, the Court must construe all well-pleaded material facts in favor of the nonmoving party.  *See Benson v. O'Brien*, 67 F. Supp. 2d 825, 829 (N.D. Ohio 1999).  The Court's conclusion that the Illinois Union policies actually establish a surety relationship is not based, however, on any facts that Illinois Union could establish during the remainder of the course of discovery.  It is, rather, based on the structure and substance of the transactions between the parties and the Court's determination of the parties' obvious intent, as gleaned from the transaction documents.

For the reasons set forth above, the Court finds that the policies issued by Illinois Union actually set forth a surety relationship as between it, CMC and the Banks.[28]  The Court bases the remainder of its analysis on this characterization of the parties' relationship.

---

[28]     Since the Court finds that Illinois Union issued surety bonds rather than insurance policies, the Court need not address several of Illinois Union's defenses grounded in insurance law, including the question of whether Illinois Union could raise the defense of fraudulent inducement against one insured based on the pre-policy fraud of a coinsured.

24

### 3.    Obligee Status of the Banks.

Now that the Court has determined that the "insurance" policies issued by Illinois Union actually are surety contracts and should be so construed, the next task is to determine the respective roles of the parties in the *tripartite* surety relationship.  Again, the Banks urge the Court to look to the substance of the transaction, regardless of the parties' use of technical words or use of another form to describe the contract.  *See Chemical Bank v. Meltzer*, 93 N.Y.2d 296, 302-303 (1999) ("a contract of suretyship *does not depend upon the use of technical words* but upon a clear intent that one party as surety [is bound] to the second party as creditor to pay a debt contracted by a third party, either immediately upon default of the third party or after attempts to effect collection from the third party have failed.  The existence of suretyship status depends upon the respective roles of the parties and the nature of the underlying transaction. . . .") (internal citations and quotations omitted) (emphasis in original); *see also Superior Wholesale Electric Co.,* 264 Cal. App. 2d at 493.  The Banks apply this common sense approach not only to the issue of the existence of the suretyship relationship, but also to the status of each of the parties to the transaction.  Thus, the Banks conclude, the obligations that Illinois Union meant to guaranty were those of both CMC and the lessees; since the Banks were ultimately intended to receive payment, they must be considered to be the "obligees."

The Banks point to several characteristics of the transaction documents that are consistent with the Banks' argument that CMC was intended to be a principal in the Illinois Union transactions.  For example, Illinois Union has  brought claims against CMC, seeking indemnification under several written indemnity agreements.   The Banks argue that CMC's agreement to indemnify Illinois Union indicates a principal/surety relationship between those parties.  Moreover, the Banks contend that all parties had an

25

understanding that Illinois Union would not be called on to perform its obligations unless the Banks failed to receive a payment from CMC, regardless of any default by the individual lessees.  Such an understanding would be consistent only with an agreement by Illinois Union to guaranty the obligations of CMC as well as the individual lessees.

The Banks also argue that, despite the nominal identification of CMC as an "insured" or the "First Named Insured," the substance of the transactions indicates that CMC was never intended to receive proceeds from the "insurance" policies.  The SSAs, which were executed with the policies in the course of the same transaction, provided for the assignment of the policies in exchange for the Banks' funding of the underlying leases.  Thus, in the cases where the Banks were party to the SSAs, Illinois Union knew from the beginning that the Banks were intended to have rights in the Surety Contracts.[29]

As a threshold matter, the Court believes that it is appropriate to construe the relevant documents to determine the status of the parties.  This is true, however, only to the extent that such evaluation does not include the consideration of evidence outside the parties' pleadings or require a reformation of those agreements.  Upon a thorough review of the entirety of the transaction documents, the Court concludes that the Banks are appropriately designated as obligees in the Illinois Union transactions.

Each surety contract is, as discussed above, styled as an insurance policy, and the contracts are structured in accordance with that designation.  Accordingly, each document contains a cover page identifying the "insureds" under the contract.  The majority of Illinois Union's contracts identify CMC as

---

[29]     With respect to the transactions involving Chase/Citibank, Footbridge, and Waukegan, both the Banks and Illinois Union were parties to the SSAs, along with CMC.  With respect to the transactions involving the Ohio Banks that dealt with Illinois Union (i.e., Sky and Second National), however, Guardian replaced the Banks as a party to the SSAs.

26

the "First Named Insured."[30, 31]  Each respective bank, however, also is designated on the cover page as

an "additional insured."[32]  With the exception of the Chase document (the provisions of which are set forth

below), the contracts do not indicate to which insured payments are to be made; rather, the contracts

simply provide that Illinois Union will "indemnify the Named insured for any amount due but not paid under

an Insured Lease. . . ." (02-16015, Doc. 1, Exh. 1).[33]

      Since Citibank and Chase are uniquely situated with respect to the provisions of their contracts,

the Court addresses those documents first.  As noted earlier in this opinion, Chase Manhattan Bank is

designated in the contracts as an "Additional Insured/Loss Payee."  Although the Court does not address

---

[30]     The Chase policy identifies CMC Lease Funding 2000-220, LP as the First Named Insured.

[31]     At least one of Waukegan's policies appears to identify the Bank of Waukegan as the First Named Insured.  *See* docket, U.S. Dist. Court, D. Nev., CV-S-01-685, Doc. 104, Exh. 3.  Other policies, however, contain an "Additional Insured" designation.  *See* docket, U.S. Dist. Court, D. Nev., CV-S-01-685, Doc. 104, Exhs. 2, 4.  In fact, in at least one instance, separate copies of a policy with the same effective dates provide a different order of designation for CMC and the respective bank.  Since the Court finds, however, that all of the Banks are obligees by virtue of their designation in the Illinois Union policies, these differences are not relevant.

     NetBank also appears to have been designated as the "First Named Insured" in some instances; however, as previously noted, the Court does not include NetBank in its analysis because it has withdrawn its motion for judgment on the pleadings (*see* Doc. 1107 in 02-16000 and Doc. 20 in 02-16010).

[32]     In the Citibank/Chase policy, Chase Manhattan is designated as "Additional Insured/Loss Payee."  Since the Court finds in this section that all of the Banks that dealt with Illinois Union are obligees by virtue of their designation in the policies, the Court need not address the additional designation in the Chase policy, though there is no doubt that the additional designation strengthens Chase's individual position.

[33]     "Named Insured" is defined in each policy to mean "the entity(ies) or organization named in item 1. of the Declarations of this Policy."  Item 1. of the declarations, in most cases, names CMC, while Item 1A. names each of the respective banks. See Doc. 1, Exh. 1 in 02-16015.

whether independent significance should attach to the inclusion of the term "loss payee" in this context,[34] the Chase contracts also specifically provide that "unless and until otherwise notified by the Trustee . . . , the Company shall make all payments hereunder to the Trustee on behalf of the Additional Insured/Loss Payee and not the Insured. . . ." *See* Doc. 12, Exh. 14, at ¶ 7 in 02–16007.  Additionally, the provisions of that policy clearly provide that payments will be made even in the event that a scheduled payment is received by CMC and not paid over to Chase. *See* Doc. 12, Exh. 14, at ¶ 6 in 02-16007.  Finally, both Chase Manhattan and Illinois Union joined CMC as parties to the SSA and thus memorialized the ultimate flow of the transaction proceeds to Chase as trustee.  The transaction documents thus make clear that, at least in the case of the Chase/Citibank policy, the parties never contemplated that CMC would receive any of the proceeds of the transaction.  Under these circumstances, there can be no question that Chase was intended to be the obligee and that Illinois Union owed its obligations to Chase.  Accordingly, the Court need not undertake a detailed analysis with respect to the Chase documents.

With respect to the transactions not involving Chase, the Court ultimately reaches the same result, although the analysis is more complicated. First, the Court indicates its intent to rely on *Superior Wholesale Electric Co.,* 70 Cal. Rptr. at 639, and look to substance rather than form in evaluating the obligations of the parties to the transactions.

The Court finds that an application of this principle and review of the transaction documents <u>as a whole</u> reveals that the Banks were the intended obligees <u>in the Illinois Union contracts</u>.[35]  While the parties

---

[34]    Given the Court's findings in this section, the Court need not reach Chase's alternative argument that, as a loss payee, it has rights independent of and greater than those of CMC.

[35]    In this Court's lead opinion, the Court found that it was unable to resolve the obligee status of the Banks in the non-Illinois Union transactions.  The Court concluded that either reformation of at

concede that the majority of the contracts designate CMC as the "First Named Insured," each document also expressly designates an investor bank as an additional insured.  Moreover, within the policies, Illinois Union expressly guarantees "payment under the Lease from the lessee, Master Servicer or Sub-Servicer . . . ." (*See, e.g.*, Sky Contract, 02-16016, Doc. 1, Exh. A, at ¶ 6).[36]  Thus, it appears from the face of the documents that Illinois Union was aware, from the inception of the transactions, that payment might be required of it not only if a lessee defaulted in performance, but also if a default in performance by any sub-servicer (including CMC) occurred.

In those transactions where the Banks were parties to the SSAs (i.e., the non-Ohio Bank transactions), the Court's conclusion is buttressed by the terms of the SSAs.  *See, e.g.*, Footbridge SSA, Doc. 11, Exh. 1 in 02-16007).  The SSA documents imposed on Illinois Union specific duties as Servicer of the leases.  *See id.* at §§ 3.1-3.13. Additionally, although the SSAs designate CMC as the initial sub-servicer, by the terms of the SSAs, such designation does not relieve Illinois Union of any of its servicing duties. *See id.* at § 3.7.  It is clear to the Court, therefore, that, at least in the non-Ohio Bank transactions, Illinois Union knew that the Banks were party to the transactions and were intended to receive the proceeds of those transactions.  Moreover, despite the fact that CMC is the First Named Insured under

---

least some of the parties' agreements, or a more fact-based analysis of the parties' intent, was necessary to the result the Banks urged.  Because reformation is an inherently fact-based inquiry, and equity-based remedy, and because the Court could not go outside the pleadings to determine the parties' intent, the Court concluded it could not resolve those questions through a Rule 12(c) motion.  No reformation of the Illinois Union documents is necessary, however.  Construing the transaction documents as written, the Court is capable of divining and, thus, defining the parties' status in these transactions.

[36]   Footbridge's contract provides for payment from the "Company, as servicer or from any sub-servicer. . . ."  *See* Doc. 11, Exh. 5 in 02-16007.  The Court does not, however, discern any relevant difference between these provisions.

29

the Illinois Union contracts, it seems absurd that the Illinois Union could have intended to guaranty CMC's obligations (as sub-servicer) to itself (as obligee).  Thus, it appears that, in executing the SSAs, the parties *must have intended* the investor banks to be the beneficiaries of Illinois Union's obligations.[37]

With respect to the Ohio Banks that dealt with Illinois Union (i.e., Sky and Second National), the Court has noted that several Guardian entities, rather than the Banks, signed the SSAs as purchasers.  *See, e.g.*, Second National SSA, Doc. 1, Exh. D in 02-16015.  The Court also notes, however, that the indemnity agreements between CMC and Illinois Union applied to <u>all</u> future lease transactions executed by Illinois Union, including the Ohio Bank transactions. *See, e.g.,* Doc. 2, Exh. 8 in 02-16010.  These indemnity agreements designate CMC as a "principal" and expressly obligate CMC and several individuals to indemnify Illinois Union for any loss it might incur. *See, e.g.,*, Doc. 2, Exh. 8 in 02-16010; and docket, U.S. Dist. Court, D. Nev., CV-S-01-685, Doc. 101, Exhs. A, B.[38]   An obligee is entitled only to the benefits from a surety contract; it is the principal that may be expected to indemnify a surety.

The terms of the contracts entered into between certain of the Banks and Illinois Union leave these Banks in a stronger position than those Banks that exclusively dealt with other Sureties.  Each of Illinois

---

[37]    In reaching its conclusion in the lead opinion that it could not resolve the Banks' obligee status argument under the Surety Contracts as a matter of law, the Court did not discount the importance of the SSAs or the nature of the servicer and sub-servicer obligations that arose thereunder.  In that context, the Court was simply unwilling to rely on the SSAs <u>alone</u> to define the relationship between the parties where there were transaction documents which, on their face, described that relationship quite differently.  Here the SSAs only bolster the Court's reading of the other Illinois Union-related transaction documents.

[38]    The Sureties alleged the existence of these indemnification agreements in their original complaints in these cases; however, these allegations were not repeated in the later Amended Complaints because the stay imposed by virtue of CMC's bankruptcy filing precluded the Sureties from stating claims against CMC.

30

Union's policies, without exception, names a bank as an "insured." Thus, without undertaking any analysis of assignment law or analyzing any issue relating to reformation of the documents, the Court easily finds that the Banks obtained some rights under the policies. Since the Court has determined that these "insurance" policies actually were surety contracts, the Court's task simply is to identify the respective roles of those parties named in the contracts. The Court has done so and, considering the contracts in connection with all of the other transaction documents, has concluded that the Banks that dealt with Illinois Union must be found to be the "obligees." Thus, the Court finds that, construing the relevant transaction documents in their appropriate context, those documents show that the Banks that dealt with Illinois Union were intended to be the "obligees" in connection with the Illinois Union policies. The Court relies on this characterization of the parties' roles in analyzing the parties' respective obligations.

### B. Validity of Fraud-in-the-inducement/Rescission Defenses.

The basic defense of all the Sureties (including Illinois Union) to the Banks' claims is their contention that the surety and "insurance" contracts are void from the inception, because of fraud-in-the-inducement by CMC.[39] The Banks, on the other hand, assert that fraud by CMC is not attributable to the Banks and that such a defense may not be raised against an innocent third party. Now that the Court has construed the applicable transaction documents to determine the parties' respective roles, the Court applies

---

[39]     Illinois Union's opposition brief primarily focused on its insurance-based arguments and defenses. Because the Court has determined that Illinois Union issued surety contracts and not insurance policies, and since Illinois Union has adopted the arguments presented by other Sureties in case of the eventuality of such a finding, the Court treats the arguments made by other Sureties as having been made by Illinois Union. Because of this, there is some duplication of the discussion already set forth in the Court's "lead" opinion. *See* Doc. 1708 in 02-16000. That duplication is necessary to assure that this opinion is self-contained and does not necessitate undue reference to the lead opinion.

well-established surety law and concludes that CMC's fraud may not be imputed to the Banks so as to defeat the Banks' rights in the Illinois Union contracts.

The Banks assert that the purpose of a surety agreement is to induce an obligee to do business with the principal by guaranteeing the principal's performance. In order to facilitate this purpose, the Banks argue that a surety must take responsibility for due diligence with respect to the principal. Since it is the surety that bears responsibility for investigating the principal, the surety likewise must bear the loss if any fraud by the principal occurs.

It is a basic principle of surety law that "fraud or misrepresentation practiced by the principal alone on the surety, without any knowledge or participation on the part of the creditor or obligee, in inducing the surety to enter into the suretyship contract will not affect the liability of the surety." *American Mfg. Mut. Ins. Co. v. Tison Hog Mkt., Inc.*, 182 F.3d 1284, 1288 (11th Cir. 1999); *see also Lewin v. Anselmo*, 56 Cal. App. 4th 694, 701 (Cal. Ct. App. 1997) ("The rule is well settled and generally followed that fraud of the principal debtor will not relieve the guarantor or surety who acted at the request of the debtor from liability, if the creditor did not have notice of the fraud and did not participate therein."); Restatement (3d) of Suretyship and Guaranty, § 12(2)(1996) ("If the secondary obligor's assent to the secondary obligation is induced by a fraudulent or material representation by either the principal or a third person . . . , the secondary obligation is voidable by the secondary obligor unless the obligee, in good faith and without reason to know of the misrepresentation, gives value or relies materially on the secondary obligation.") The Banks cite these principles and assert that, since they relied on Illinois Union's contracts without knowledge of CMC's fraud, Illinois Union is bound to the Banks regardless of any fraud by CMC.

32

In the *Tison Hog* case, a surety issued two bonds on behalf of livestock dealers to secure the performance of the dealers in their purchase of hogs.  The surety failed to discover that the bond applications contained forged signatures.  The Court rejected the surety's defense that the bonds were void *ab initio*.  Instead, the Court held that the fraud perpetrated on the surety did not vitiate the surety's obligation to the innocent merchants:

> From a practical standpoint, this common law treatment of a principal's fraud is the only one that makes sense. A creditor does business with a principal in reliance upon the existence of a bond. . . .  If the creditor's ability to recover on a bond was dependent on the accuracy of the principal's representations to the surety, then the value of the bond to the creditor would be greatly lessened because the creditor would have no way of knowing what representations were made in the procurement of the bond.

182 F.3d at 1288-89.

The Banks rely both on the general *Tison Hog* rule and on the principle underlying that ruling – namely, that sureties should be responsible for performing due diligence and investigating their principals, since innocent investors rely on the credit of the surety in entering into a transaction.  *See, e.g., Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 235 (2d Cir. 1995) (citation omitted) (sureties must "look out for themselves and ascertain the nature of their obligations."); *Busse v. Pacific Employers Ins. Co.*, 117 Cal. Rptr. 718, 724 (Cal. App. 2d Dist. 1974).

Illinois Union, although it does not dispute the basic rule of surety liability to an innocent obligee, argues that the rule does not apply here.  First, Illinois Union characterizes CMC as the original obligee on the contracts and thus argues that CMC's fraud should be imputed to the Banks to defeat recovery.  Illinois

Union contends that CMC fraudulently induced it to enter into the Lease Bonds and that CMC's fraud entitles it to rescission of the contracts. *See, e.g., Vai v. Bank of America Nat'l Trust & Sav. Asso.*, 364 P.2d 247, 256 (Cal. 1961) ("when the agreement itself is procured by fraud, none of its provisions have any legal or binding effect.").

The Court has disposed of this argument above (*see* discussion *supra*, section II.A.3), in its finding that, as a matter of law, the transaction documents demonstrate that Illinois Union intended to guaranty not only the obligations of the lessees but those of CMC as well.  This finding necessarily precludes the application of "assignment" law[40] to determine the Banks' rights.  At least *vis-a-vis* Illinois Union, the Banks stand in the position of obligees rather than mere assignees.  By virtue of their obligee status, the Banks are protected by the basic principles of surety law, and CMC's fraud cannot be imputed to them. Regardless of CMC's fraud, Illinois Union is not entitled to rescind the surety bonds where the Banks have given value and relied on the bonds prior to the rescission.  *See, e.g., J. R. Watkins Co. v. Lankford*, 256 S.W.2d 788, 790-91 (Mo. 1953) ("Where the surety by fraud or duress of the principal has been induced to become bound to the creditor, the fraud or duress is not a defense against the creditor, if, without

---

[40]                Assignment carries with it all the rights of the assignor, but
                    the assignee of a nonnegotiable thing in action can acquire
                    no greater right than that possessed by his assignor, and
                    takes subject to all equities and defenses existing in favor
                    of the obligor prior to notice of the assignment and
                    whether acquired before or after execution of the
                    assignment.

Lara v. Board of Supervisors, 130 Cal. Rptr. 668, 672 (Cal. Ct. App. 1976) (citations omitted).
Illinois Union asserts that the Banks are mere assignees of CMC's rights, and thus that the Banks
are subject to any defense that could have been asserted against CMC. Again, the Court rejects
this contention as a matter of law to the extent it is made by Illinois Union.

34

knowledge of the fraud, he has extended credit to the principal on the security of the surety's promise or, relying on the promise, has changed his position in respect of the principal.")  Thus, the Court rejects the argument that the Illinois Union contracts may be rescinded based on the fraud of CMC alone.

### C. CMC's Agency.

As an alternative argument for rescission, Illinois Union asserts that CMC's fraud may be imputed to the Banks through the principles of agency law, since CMC procured the policies while acting as agent for the Banks.  Such fraud, if imputable to the Banks through agency law principles, would defeat the Banks' surety rights in the Illinois Union policies.  The Court carefully has considered this argument and rejects Illinois Union's contention.

With respect to the Court's analysis of Illinois Union's allegations of an agency relationship between CMC and the Banks, the Court first notes that the Sureties have not made similar allegations against the Banks.  Illinois Union *alone* argues that an agency relationship existed and contends that, even if the Court were to find that the Banks were the obligees of a suretyship agreement, Illinois Union still could show fraud by the Banks through the Banks' purported agency relationship with CMC.  Since the Court has found that the Banks were the intended obligees in the parties' suretyship relation (*see* discussion *supra*, section II.A.3.), the Court must address whether Illinois Union can allege fraud imputable to the Banks, which would defeat the Banks' right to judgment on the pleadings in these cases.

Illinois Union bases its agency claim on the assertion that CMC acted as the "agent of the investor banks in obtaining the Policies for the Investor Banks' benefit." *See* Doc. 119, at 19-20 in 02-16000.  In this respect, Illinois Union contends that "the act of an agent for purposes within the scope of his authority is the act of the principal," *see Nuffer v. Insurance Co. of North America*, 45 Cal. Rptr. 918, 922 (Cal.

35

App. 4th Dist. 1965), and thus that the Banks should be held responsible for CMC's fraud on the insurers. *See, e.g., First Am. Title Ins. Co. v. Lawson*, 827 A.2d 230, 240 (N.J. 2003) (managing partner's misrepresentations in policy application were binding on law firm, and insurer was entitled to rescind).

The Banks vigorously dispute Illinois Union's allegations of agency on several grounds. First, they argue that it falls within the normal course of suretyship business for a principal to obtain a surety bond "on behalf of" an obligee, and that this should not provide a basis for a finding of agency or for imputing the principal's fraud to the obligee. *See, e.g., Tison Hog*, 182 F.3d at 1286 (livestock dealers procured bond from surety on behalf of obligee seller); *Big Red Boat (Two) Ltd. v. Greenwich Ins. Co.*, 2002 U.S. Dist. LEXIS 9858, *12-13 (S.D.N.Y. May 31, 2002) (unpublished disposition) (principal solicited and negotiated the bond with the surety, but there was no evidence to support a finding that the principal was an agent for the obligee).

The Banks also argue that Illinois Union has alleged the elements of neither actual nor ostensible agency. With respect to actual agency, the Banks maintain that Illinois Union has not alleged that CMC had the authority to vary the language of any of the Illinois Union policies, or that Illinois Union believed that CMC had the power to create legal relations with third parties on behalf of the Banks. Moreover, no such agency is provided in the terms of the transaction documents. In fact, where an agency is indicated, the SSAs provide that CMC is the agent of the Sureties (including Illinois Union).

Additionally, the Banks rely on Illinois Union's recitation of facts indicating that it and its affiliate, ACE American, had a long-standing business relationship with CMC prior to the commencement of negotiations regarding these transactions. *See* Ace Second Amended Counterclaim, Doc. 2, at ¶¶ 30, 32 in 02-16006; Illinois Union Second Amended Counterclaim, Doc. 3, at ¶¶ 39-43 in 02-16007. The

36

Banks contend that this long-standing relationship is more suggestive of an agency relationship between the Illinois Union and CMC than agency by CMC on the Banks' behalf.

Finally, with respect to apparent or ostensible agency, the Banks assert that Illinois Union has alleged none of the elements of estoppel, which generally forms the basis of an apparent or ostensible agency claim. "An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." Cal. Civ. Code § 2300. When a principal has led a third party to believe that another is his agent, the principal is estopped from denying the agency. The Banks deny that Illinois Union has alleged any such statements or representations by the Banks.

The Banks focus their argument primarily on Fed. R. Civ. P. 9(b) and its requirement that allegations of fraud be pleaded with particularity. The Banks assert that, where fraud is pleaded against a party through actions allegedly committed by an agent, both the fraud <u>and</u> the agency relationship must be pleaded with particularity. The Banks' allegation is based chiefly on Seventh Circuit cases, including *MorEquity, Inc. v. Naeem*, 118 F. Supp. 2d 885, 895-96 (N.D. Ill. 2000), which hold that, where the plaintiff relies on the same circumstances to establish both the alleged fraud and the agency relationship, agency must be pleaded with particularity in accordance with Fed. R. Civ. P. 9(b).

Illinois Union contends that (1) under the law applicable to this case, averments of agency are not subject to Fed. R. Civ. P. 9(b), and (2) even under the heightened pleading standard, its allegations in support of agency are sufficient to survive the Banks' motion for judgment on the pleadings. The Court thus first looks to the pleading standard applicable to this case and then briefly examines the allegations set forth in Illinois Union's pleadings.

37

Illinois Union asserts that Rule 9(b), by its very terms, applies only to "averments of fraud or mistake," Fed. R. Civ. P. 9(b), and that the Supreme Court expressly has refused to extend the scope of Rule 9(b) beyond its narrowly defined boundaries. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993) (refusing to extend heightened standard to claims under 42 U.S.C. § 1983); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (same). Illinois Union also cites cases in which courts have refused to apply the heightened pleading standard to the ultimate fact of the existence of an agency. *See Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 916 (8th Cir. 2001) (reversing district court's dismissal of claim and implicitly rejecting court's application of heightened pleading standard).

Illinois Union correctly points out that the cases relied on by the Banks apply, by their terms, only to a situation where the agency relationship itself constitutes part of the fraud.  In such a circumstance, agency allegations necessarily become subject to the requirements of Fed. R. Civ. P. 9(b).  There is no evidence within the Banks' cited cases, however, that the stricter pleading requirements apply to allegations of agency where the facts underlying the agency are distinct from the fraud alleged.  The Court agrees with Illinois Union that the Banks' cited securities cases are similarly inapposite because those cases apply the more stringent pleading requirements of the Private Securities Litigation Reform Act ("PSLRA").  The Court concludes, therefore, that, absent a sufficient demonstration to the contrary, the standard pleading requirements of Fed. R. Civ. P. 8(a) apply to agency allegations in these cases.  Thus, the Court examines the facts pleaded by Illinois Union in light of the more liberal "notice pleading" standards.

Illinois Union avers the following facts: (1) CMC purchased the insurance policies in question "on

38

behalf of itself and the lenders" (*see* Illinois Union Second Amended Counterclaim,  Doc. 3, ¶¶ 36-37 in 02-16007); (2) CMC entered into contracts with at least some of the Banks, the terms of which required CMC to obtain insurance coverage on behalf of the Banks (*see* Illinois Union Second Amended Counterclaim, Doc. 3, ¶¶ 36-37 in 02-16007); (3) Illinois Union relied upon CMC and the Banks "to disclose accurately all information material to the insurance policies and coverages sought by CMC, the CMC Entities and [the lenders]" (*see* Illinois Union Second Amended Counterclaim, Doc. 3, ¶¶ 43 in 02-16007); (4) the information provided formed the basis of Illinois Union's decisions regarding whether to insure CMC and the Banks, what endorsements and exclusions would be set forth in the policies and the premiums to be charged (*see* Illinois Union Second Amended Counterclaim, Doc. 3, ¶ 43 in 02-16007); (5) "[t]he lenders . . . knew that Illinois Union was receiving and relying on information provided by CMC to determine whether or not to issue the Policies, what endorsements and exclusions would be included in the Policies, and the premiums to be charged for the Policies" (*see* Illinois Union Second Amended Counterclaim, Doc. 3, ¶ 44 in 02-16007); (6) "CMC acted as the agent . . . in obtaining the Policies and providing information to Illinois Union for that purpose" (*see* Illinois Union Second Amended Counterclaim, Doc. 3**,** ¶ 47 in 02-16007); and (7) in reliance on the allegedly false representations of CMC, Illinois Union issued the Policies.

Although the Court has concluded that the more liberal pleading standard of Fed. R. Civ. P. 8(a) applies, the Court need not accept as sufficient conclusory allegations of agency unsupported by any pleaded facts.  "Indicia of an agency relationship are the agent's power to alter legal relations between the principal and others, a fiduciary relationship, and the principal's right to control the agent's conduct. *Vallely Investments v. BancAmerica Commercial Corp.*, 106 Cal. Rptr. 2d 689, 698 (Cal. App. 4th Dist.

2001).  Even under the more lenient standard of Fed. R. Civ. P. 8(a), the Court finds that Illinois Union's allegations are insufficient.

The Banks cite several cases in which courts have dismissed conclusory agency allegations even under the more lenient standard of Fed. R. Civ. P. 8(a).  *See Cohen v. Standard Bank Inv. Corp.*, 1998 U.S. Dist. LEXIS 17568, *15 (S.D.N.Y. Nov. 5, 1998) (unpublished disposition) ("[p]laintiff made no allegation that Standard Bank knew what Carajohn told Cohen, let alone that the Bank had control over those misrepresentations. . . .")  In addition, several district courts have held that "[m]ere legal conclusions are insufficient to state a claim based on agency.  Instead, a claimant must plead facts that would support a finding that the alleged agents had actual or apparent authority to act on behalf of another. . . ." *Gunderson v. ADM Investor Servs., Inc.*, 85 F. Supp. 2d 892, 905 (N.D. Iowa 2000) (citation omitted) (later concluding that Rule 9(b) applied to fraud-by-agency allegations).

Illinois Union's pleadings contain no allegations regarding the conduct of the Banks.  Rather, the factual averments set forth above focus on CMC's conduct in defrauding the Sureties.  The allegations state that CMC allegedly purchased the policies "on behalf of" the Banks and that Illinois Union relied upon CMC's representations in determining whether to issue the policies.  Illinois Union does not allege that CMC had the power to alter the legal relationships of the Banks or that the Banks had any authority to control CMC's conduct.  Rather, the facts alleged throughout Illinois Union's complaint appear consistent with the existence of an arm's-length negotiating posture between the Banks and CMC.  The only averment of actual agency between the Banks and CMC is the allegation that the contract between those parties required CMC to obtain insurance and/or surety bonds guaranteeing the underlying leases. The Court has already found, however, that the transaction documents between the Banks and Illinois Union created, as

40

a matter of law, a surety relationship.  Simply alleging facts consistent with a surety relationship cannot be construed as sufficient to support an averment of agency between the obligee and the principal based on the same facts.  Illinois Union merely has described the factual roles of the parties in a suretyship transaction.

Moreover, with respect to ostensible agency, the averments are even more sparse.  There is, in fact, no allegation that any claimant acted in a manner that reasonably would lead Illinois Union to believe that CMC was acting as the Banks' agent.  Thus, the Court finds that Illinois Union's allegations of agency fail to state a claim, even under  Fed. R. Civ. P. 8(a)'s lenient notice pleading guidelines.

**D.     Fraud Waivers/Fraud-in-the-inducement Defense**.

Regardless of the Court's findings above with respect to the parties' status and the validity of Illinois Union's claims for rescission, Illinois Union would be precluded even from asserting those claims if it were barred from doing so by the language of the transaction documents.  The Banks assert that the language of the transaction documents does preclude Illinois Union from raising fraud-in-the-inducement as a defense, since the waiver language in the contracts bound Illinois Union to bear responsibility for the underwriting of each lease. The Banks contend that the express waiver language required Illinois Union to undertake investigation with respect to matters of credit, fraud and other issues relative to the risk involved in the transactions.  Such an obligation allegedly also is imposed by the terms of the SSAs, which held Illinois Union responsible for matters relating to servicing of the leases.

The purported fraud waivers involved in these transactions took one of several forms. The Court sets forth examples relevant to Illinois Union's transactions:

41

> 1.  The Company is responsible to the Named Insured for the individual underwriting of each lessee and Lease, including but not limited to, all related credit matters, issues of fraud, bankruptcy, that the lease is a true lease and not a secured financing, usury, that the Lease is valid, binding and enforceable, and the accurate and timely performance by any servicer or sub-servicer designated by the Company, and the Company shall assert no defenses to any claim under this Policy as a result of any of the foregoing.

Footbridge Reply and Counterclaim, Doc. 11, attach. 5 in 02-16007; *see also* Waukegan Reply in support of Motion to Dismiss, docket, U.S. Dist. Court, D. Nev., CV-S-01-685, Doc. 104, attach. 2.

> 1.  The issuance of this endorsement shall represent the Company's approval of the individual underwriting and execution and delivery of each Lease, including, but not limited to, all related credit matters, issues of fraud, bankruptcy, validity, legality and enforceability and the Company shall pay all Claims hereunder unconditionally and assert no defenses to any Claim under this endorsement as a result of any of the foregoing or based on any act or omission of the Master or Sub-Servicer.

Complaint, Doc. 1, attach. 1 (Second National) in 02-16015; and Complaint, Doc. 1, attach. 1 in 02-16016 (Sky) (referring to Mid Am Bank, Sky's predecessor in interest).

> 1.  The issuance of this Policy shall represent the Company's approval of the individual underwriting of each Lease (including the applicable lessee thereunder), including but not limited to, all relating credit matters, issues of fraud, insolvency, bankruptcy and timely performance by the Insured, any transferee of the Leases or any interest therein or by any servicer or sub-servicer designated by the Company, and the Company shall assert no defenses to any claim under this Policy as a result of any of the foregoing.  Coverage hereunder shall not be affected by (i) a determination that the Lease is a secured financing or not a true Lease, is subject to usury,

42

> or is not valid, binding or enforceable, (ii) any financial
> difficulties, including bankruptcy, insolvency or similar
> proceedings, involving the Insured or any of the parties to
> the Sale and Servicing Agreement . . . (iii) any failure by
> the Insured or any party to the Referenced Documents to
> comply with its obligations thereunder. . . .

Citibank's Counterclaim, Doc. 9, Exh. M in 02-16007.[41]  The Banks assert that this "fraud waiver"

language precludes Illinois Union from claiming any defense based on the fraud of CMC.

Additionally, the Banks rest their waiver arguments on Illinois Union's assumption of particular

duties in the SSAs, including Illinois Union's servicer duties and responsibility for the performance of any

sub-servicer, including CMC.  The relevant SSA language is set forth below:

> Section 3.7  **Sub-Servicers.**  CMC is hereby appointed
> to be the initial Sub-Servicer and assumes all
> responsibility, as agent for and on behalf of the Servicer,
> to perform the duties of the Servicer hereunder. . . .
> Notwithstanding the terms or existence of any such
> agreement between the Servicer and the Sub-Servicer,
> including CMC, the Servicer shall not be relieved of any
> of its obligations under this Agreement by reason of such
> agreement and shall be obligated to the same extent and
> under the same terms and conditions as if the Servicer
> alone was servicing and administering the Leases . . . .

Footbridge Reply and Counterclaim, Doc. 11, Exh. 1 in 02-16007; *see also* Waukegan Reply in support

of Motion to Dismiss, docket, U.S. Dist. Court, D. Nev., CV-S-01-685, Doc. 104, attach. 5.[42]

---

[41]     The Banks also cite to a "Misrepresentation and Fraud" provision that was <u>deleted</u> from Illinois
Union's policies by the manuscripted endorsement.  The Court will not speculate, however, on the
parties' perceived intent in choosing <u>not</u> to include particular provisions.  Rather, the Court will
interpret the language selected by the parties to embody their agreement.

[42]     The SSA relevant to Sky's claims (entered into by Guardian Capital VI LLC, CMC and Illinois
Union) contains the same language. *See* Complaint, Doc. 1, attach. 1 in 02-16016.  The document
applicable to Second National's claims (entered into by Guardian Capital V, LLC, CMC, and

Section 3.1.  Sub-Servicer.

(a) Servicer To Act Through Sub-Servicer. The Servicer hereby appoints Commercial Servicing to act as Sub-Servicer on behalf of the Servicer as its express agent. Commercial Servicing assumes all responsibility, as Sub-Servicer and agent for and on behalf of the Servicer, to perform the servicing duties hereunder for all Leases, and the Seller agrees to cause the Sub-Servicer to perform all of its duties and obligations hereunder. . . .

(b)  Servicer To Remain Responsible for Servicing Functions. Notwithstanding the undertaking of the Sub-Servicer to act as agent of and on behalf [of] the Servicer with respect to all of the servicing functions hereunder . . . the Servicer shall retain in full, and be bound by, all obligations and financial responsibilities under this Agreement with respect to the servicing functions as set forth herein. . . . The Servicer shall Supervise, administer, monitor, enforce and oversee the servicing of the Leases by any Sub-Servicer appointed by it.

Chase Answer and Counterclaim, Doc. 12, Exh. 14 in 02-16007. The Banks contend that Illinois Union's

unconditional assumption of responsibility for the performance of the leases, including the performance of

CMC as sub-servicer, renders Illinois Union liable as a matter of law for the lessees' default.

In their memorandum in support, the Banks rely on several cases holding that sureties may not rely

on a defense of fraud-in-the-inducement to escape a guaranty obligation. In *Citibank, N. A.  v.

Plapinger*, 66 N.Y.2d 90 (1985), the guarantors of a corporate debt sought to raise fraudulent inducement

as a defense. The New York Court of Appeals refused to consider parol evidence supporting the fraud-in-

the-inducement defense because the guarantees were "absolute and unconditional" on their face. *Id.* at 95.

_____

Illinois Union) also is virtually identical. *See* Doc. 1, attach. 1 in 02-16015.

Additionally, several cases filed by the Banks as "supplemental authority" in support of the Banks'

motion speak to the issue of fraud waivers as precluding a fraudulent inducement defense. *See, e.g., MBIA*

*Ins. Corp. v. Royal Indem. Co.*, 286 F. Supp. 2d 347, 359 (D. Del. 2003) (unpublished disposition)

(holding that, where the language of Royal's guarantees was negotiated between sophisticated parties and

was "absolute, unconditional and irrevocable," Royal was precluded from introducing the principal's fraud-

in-the-inducement as a defense); *see also Valley Nat'l Bank v. Greenwich Ins. Co.*, 254 F. Supp. 2d

448, 463 (S.D.N.Y. 2003); *Tucker Leasing Capital Corp. v. Marin Medical Management*, 833 F.

Supp. 948, 957-58 (E.D.N.Y. 1993).

Illinois Union disputes the applicability of the law cited by the Banks on several grounds.  First,

Illinois Union maintains, that if the purported "fraud waiver" had actually intended to waive the assertion

of any fraud claim against CMC, the waiver clause would be invalid.  Illinois Union relies on cases from

several jurisdictions to support this proposition:

> A party to a contract who has been guilty of fraud in its
> inducement cannot absolve himself from the effects of his
> fraud by any stipulation in the contract, either that no
> representations have been made, or that any right which
> might be grounded upon them is waived. Such a
> stipulation or waiver will be ignored, and parol evidence
> of misrepresentations will be admitted, for the reason that
> fraud renders the whole agreement voidable, including the
> waiver provision.

*Danzig v. Jack Grynberg & Assocs.*, 208 Cal. Rptr. 336, 342 (Cal. App. 1st Dist. 1984); *see also Bank*

*of Montreal v. Signet Bank*, 193 F.3d 818, 828 (4th Cir. 1999) ("false representation of a material fact,

constituting an inducement to the contract . . .  is always ground for rescission. . . ."); *Galmish v. Cicchini*,

734 N.E.2d 782, 790 (Ohio 2000) (parol evidence rule does not bar admission of extrinsic evidence of

45

fraud-in-the-inducement).  Court enforcement of a waiver provision, argues Illinois Union, would exculpate a tortfeasor from the consequences of its own fraud and thus would violate public policy.  *See* Cal. Civ. Code § 1668 ("[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud . . . are against the policy of the law"); *Blankenheim v. E. F. Hutton & Co.*, 266 Cal. Rptr. 593, 598 (Cal. App. 6th Dist. 1990) (California law precluded enforcement of a hold harmless agreement that would exempt the defendant from fraud liability).

Second, Illinois Union  vigorously asserts that the Banks' interpretation of the "fraud waiver" provision is erroneous, and that no such intent to waive a fraud-in-the-inducement defense may be gleaned from the documents here.  Illinois Union argues that the waiver provision renders Illinois Union responsible <u>to CMC</u> for the underwriting of the individual lessee and the specific lease referenced in each policy.  Thus, the provision should be construed as guaranteeing matters of credit, fraud and bankruptcy only on the part of the lessees, and not guaranteeing any performance by CMC. Illinois Union contends that such an interpretation is consistent with the doctrine of *ejusdem generis*,[43] since the entirety of the clause refers to lessee performance risks.  Moreover, Illinois Union contends that it is commercially absurd to determine that Illinois Union would agree to pay CMC for a loss incurred through CMC's own fraud.

In support of its interpretation of the express language of the bond, Illinois Union cites two cases for the proposition that great linguistic specificity is required in order to bar a defendant from asserting a fraud-in-the-inducement defense.  First, in *JPMorgan Chase Bank ex rel. Mahonia Ltd. v. Liberty Mut. Ins. Co.*, 189 F. Supp. 2d 24 (S.D.N.Y. 2002), surety bonds were issued guaranteeing the obligations of

---

[43]     *See Martin v. Holiday Inns, Inc.*, 245 Cal. Rptr. 717, 719 (Cal. App. 5th Dist. 1988) ("the meaning of a word is or may be known from the accompanying words.").

46

several Enron-related corporations.  Enron deceived the sureties, disguising a series of loans as a sale of assets.  The bond language stated that the "obligations of each Surety hereunder [were] absolute and unconditional. . . ." *Id.* at 27.  The court held that the general disclaimer language could not disclaim a defense of fraudulent inducement, absent a specific disclaimer of reliance on particular representations. *Id.* The Court noted that "the touchstone is specificity." *Id.*; *see also Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir. 1993) ("in order to be considered sufficiently specific to bar a defense of fraudulent inducement . . . , a guarantee must contain explicit disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim. . . .").

The Court rejects all of Illinois Union's arguments as inapplicable to the provision at issue in this case.[44]  First, although Illinois Union contends that California and Nevada law would bar enforcement of a provision exempting a party from its own fraud, the provision at issue here has no such effect.  The cases cited by Illinois Union involve situations where recognizing a fraud waiver provision would result in a windfall to the party responsible for the fraud.  The Illinois Union contracts at issue in this case, however, were not entered into for the benefit of CMC; rather, the parties intended that the proceeds of those policies go to the Banks.  The Banks are innocent parties who are not alleged to have profited from CMC's fraud.  Thus, enforcing the provision at issue in the Illinois Union contracts would not result in the delivery of any proceeds to CMC, and would not grant a windfall to any party involved in the original fraud.

Second, as noted in its lead opinion, the Court does not believe that the language of the fraud

---

[44]     In its lead opinion, the Court rejected many of these same arguments raised by the Sureties; except, significantly, the Court agreed with the Sureties that if CMC were found to be the obligee on their Lease Bonds (as opposed to the Banks), California law would prohibit enforcement of the fraud waivers.

waivers indicates only an intent to undertake liability to CMC for the default of the lessees.  First, as noted previously (*see* discussion *supra*, section II.A.3), the Banks were the known obligees on these contracts, and Illinois Union was aware that the Banks had such an interest.  The express language of the provision, negotiated by sophisticated parties, does not limit Illinois Union's responsibility to incidents of fraud <u>by the lessees</u>.  Rather, the provision requires Illinois Union to assume the risk of liability for "<u>all</u> . . . issues of fraud. . . ." Complaint, Doc. 1, attach. 1 in 02-16015 (emphasis added).[45]      It is true, moreover, that Illinois Union's proposed construction of the policies ignores Illinois Union's responsibility, assumed under the SSAs, for CMC's performance as sub-servicer.  Construing the obligations set forth in the SSAs as running <u>only</u> <u>to</u> <u>CMC</u> would seem to produce a nonsensical result – that is, that Illinois Union was guaranteeing CMC's obligations to itself.  Thus, at least in the instances where the Banks were parties to the SSAs, the Court finds that the Banks were the intended beneficiaries of Illinois Union's assumed obligations.[46]

Although the Court recognizes the proposition that specificity may be required in order to render a fraud waiver effective, there are several significant differences between Illinois Union's two cited cases and the instant motion for judgment on the pleadings.  In *JPMorgan Chase Bank*, 189 F. Supp. 2d at 27,

---

[45]    With respect to the policy issued by Illinois Union to Citibank, the fraud waiver provision is even broader.  That provision purports to waive "issues of fraud, insolvency, bankruptcy and timely performance by the Insured, any transferee of the Leases . . . or by any servicer or sub-servicer designated by the Company. . . ."  Since the Court finds, however, that all of the fraud waivers are effective to bar Illinois Union's fraud-in-the-inducement defense, the Court need not address the broader scope of the Citibank waiver.

[46]    The Court relies on the SSA's to bolster its view that the fraud waivers are broadly enforceable in favor of the obligees in these transactions.  If the SSA's were the only support for the Banks construction of the fraud waivers, the Court would decline to resolve their enforceability as a matter of law.

48

Enron disguised a series of loans to appear as legitimate loan transactions, by secretly arranging to buy from a Mahonia subsidiary the same oil and gas Enron had arranged to sell to Mahonia.  The Court considered *Plapinger* and held that that case "d[id] not stand for the extraordinary proposition – the logical extension of plaintiff's interpretation – that a general sweeping disclaimer can serve to disclaim any and all extrinsic fraud between sophisticated parties. . . ." *Id.* at 27.  The Court held that, where the underlying transaction was "a total sham" and the surety had no idea of the type of transaction involved, the surety was entitled to raise a fraudulent inducement defense. *Id.* at 28.  Similarly, in *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 317 (2d Cir. 1993), the Court held that  a generalized boilerplate disclaimer that did not purport to waive defenses to its own validity was insufficient to waive the guarantor's claim of fraud-in-the-inducement.

Thus, in both of the cases relied on by Illinois Union, the courts believed that the disclaimers involved were insufficiently specific to foreclose a fraud-in-the-inducement claim.  In several other cases, however, courts have found disclaimers sufficient to foreclose a defense of fraudulent inducement.  *See, e.g., Valley National Bank v. Greenwich Insurance Company*, 254 F. Supp. 2d 448, 459 (S.D.N.Y. 2003) (court found bond enforceable where the guaranty (1) was negotiated between sophisticated parties; and (2) contained a broad clause waiving defenses based on "any other circumstance"); *Tucker Capital Leasing Corp. v. Marin Medical Management, Inc.*, 833 F. Supp. 948, 957 (E.D.N.Y. 1993) (following *Plapinger* and holding that the defendants were precluded from claiming fraud where they signed an "absolute, unlimited and continuing Guaranty of payment and performance.").

The Court has examined in detail the purported "fraud waivers" in this case, and believes that the language involved in the Illinois Union documents is more like the waivers in the *Tucker* and *Valley*

49

*National* cases than those in *JPMorgan* or *Yanakas*. The language here cannot be construed as boilerplate, where the provisions no doubt were negotiated by the parties over a long period of time. In fact, the language set forth in the documents here is even more explicit than that contained in either *Tucker* or *Valley National* because the transaction documents contain express waivers of defenses based on fraud. In neither of the Banks' cited cases was an express fraud waiver present, yet the courts found in each of those cases that the guarantor had waived a fraudulent inducement defense.[47]

Additionally, Illinois Union cannot complain that the transaction was a "sham" in the same sense that the court so found in *JPMorgan* – the sureties in that case were duped into entering into an illegal financial guaranty rather than an insurance contract. In this case, despite the fraud allegations, and despite the title placed on the contracts, the agreements were exactly what they purported to be – an undertaking of the obligation to investigate the parties involved in the underlying lease transactions.[48] Illinois Union knew the type of contract into which it was entering, and could have investigated the parties involved in the underlying leases. It did not do so.

Even more significantly, in the Court's view, both of the cases relied on by Illinois Union appear to involve situations in which the sureties were defrauded by misrepresentations involving the obligees. *JP Morgan* involved collusion between Mahonia and Enron, and the Court relied on the proposition that the "wrongdoer, whether willful or negligent, should not benefit from his own wrongdoing." *JPMorgan*, 189

---

[47]     Moreover, at least one of the policies here also contains a waiver of defenses based on the validity of the lease itself. *See* Footbridge Reply and Counterclaim, Doc. 11, attach. 5 in 02-16007.

[48]     *See, e.g., MBIA Ins. Corp. v. Royal Indem. Co.*, 286 F. Supp. 2d 347, 359 (D. Del. 2003) (holding that an allegedly fraudulent transaction involving student loan guarantees was not a total sham, in contrast to the *JPMorgan* case).

50

F. Supp. 2d at 28.    Similarly, in *Yanakas*, the fraudulent inducement defense was based on misrepresentations by the Bank, the obligee on Yanakas's note.  Thus, the Court believes that the equities involved in the cited cases were fundamentally distinguishable from those presented here.  Notably, in this case, the misrepresentations were made by CMC alone, and the Court already has found that Illinois Union insufficiently pleaded an agency relationship between CMC and the Banks.

  In a final attempt to buttress their construction of the transaction documents, Illinois Union also refers to an opinion drafted by Judge Hunt of the District of Nevada earlier in this litigation.  Judge Hunt, in construing an Illinois Union "insurance" policy, stated:

> [I]t is clear from the language of the provision that the bar on assertion of a fraud defense refers to the "individual underwriting of each Lease."  Illinois Union does not allege fraudulent misrepresentations by CMC to its lessees; rather, Illinois Union contends that CMC's fraudulently misrepresented [sic] the state of its operations to induce Illinois Union's issuance of collateral security insurance policies.  The Court finds no indication in the language of the policy indicating that Illinois Union agreed to forfeit its right to seek rescission in the event of pre-contract fraudulent misrepresentation.

*Commercial Money Center, Inc. v. ACE INA Holdings, Inc., et al.*, docket, U.S. Dist. Court, D. Nev., No. CV-S-01-685 (pending in this Court as 02-16007), Doc. 54, at 5.  In connection with its citation to this opinion, Illinois Union relies on case law holding that rescission voids all provisions in a contract, including a waiver or incontestability provision.  *See, e.g., Crump v. Northwestern Nat'l Life Ins. Co.*, 236 Cal. App. 2d 149, 157 (1965) ("[I]ncontestability does not apply to a policy which is void *ab initio*. . . ."); *Sierra Diesel Injection Serv. v. Burroughs Corp.*, 651 F. Supp. 1371, 1377 (D. Nev. 1987) ("fraud-in-the-inducement invalidates the entire contract.").

For several reasons, the Court believes that Illinois Union's reliance on Judge Hunt's opinion is misplaced.  First, the litigation before Judge Hunt involved CSC (an affiliate of CMC) and Illinois Union.  Thus, Judge Hunt considered whether Illinois Union could raise its fraud defense *vis-a-vis* CSC, a party involved in the alleged fraud in this case.  To this Court's knowledge, no court has ever held that a party responsible for the fraud could shield itself by negotiation of a detailed fraud waiver provision.  The issue before this Court on the instant motion, however, is distinct – whether the purported fraud waiver provision precludes Illinois Union from raising the fraud-in-the-inducement defense *vis-a-vis* innocent obligees in the suretyship transaction.

Second, Judge Hunt's opinion is premised on a factual matter that is irrelevant to this Court's analysis. Judge Hunt's opinion states that Illinois Union "does not allege fraudulent misrepresentations by CMC to its lessees."  The lessees, however, to the extent they exist, are neither parties to this action nor purported beneficiaries on the contractual language at issue. The fundamental question is not whether fraudulent misrepresentations were made by CMC to Illinois Union rather than <u>to</u> the lessees.  Rather, the question presented is whether the language of the waiver covers fraudulent misrepresentations made by CMC rather than <u>by</u> the lessees, when it is third-parties who seek to enforce the guarantees extended to them by Illinois Union.

For the foregoing reasons, the Court finds that, having found that the Banks are obligees in the Illinois Union transactions, Illinois Union is not entitled to raise a defense of fraudulent inducement.  The fraud waivers contained in the transaction documents preclude any such defense.

### E.      Fraud by Anthony/Agency.

For the reasons described in the lead opinion, the Court finds that Michael Anthony was, as a

matter of law, authorized to sign the SSAs on behalf of Illinois Union.  The Court believes that, even if it construes the language of the power of attorney narrowly, Michael Anthony still had authority to execute both the policies and the SSAs as a matter of law.  The power of attorney provision, by its express language, provides that Anthony had authority to "execute on its behalf fidelity and surety bonds. . . ."  Such language indicates that Anthony had actual authority to execute surety contracts, and thus the Court need not consider the question of apparent authority to execute such contracts.[49]

With respect to the SSAs, the Court also finds, as a matter of law, that Anthony had authority to execute these documents.  Although the Sureties argue generally that Anthony had no _actual_ authority, the Court believes that the terms of the power of attorney were broad enough to grant Anthony apparent authority to execute the SSAs as a matter of law.  The relevant language stated that Anthony had authority not only to execute Lease Bonds, but also to execute "other documents of a similar character issued in the course of its business. . . ."  As the SSAs were intricately bound up in the Illinois Union transactions, the Court cannot imagine what "other" documents this language could refer to, if not to SSAs. Any argument that the SSAs were clearly outside of the scope of the power of attorney, and that this should have been obvious to the Banks, is unavailing.

### F.    Estoppel Letters .

As noted earlier in this opinion, certain Banks received letters from or on behalf of Illinois Union, wherein Illinois Union purported to affirm the validity and enforceability of the leases and the Lease Bonds

---

[49]    Michael Anthony did not sign Illinois Union's policies; however, Anthony signed most, if not all, of Illinois Union's SSAs.

(i.e., its policies).[50]  With respect to these Banks, the letters in question were signed by Illinois Union or

Ace American employees or, in several cases, secured by Anthony from outside counsel.  The Banks argue

that, because of these letters, Illinois Union should be estopped from denying its obligations under the

---

[50]        The following is a typical example of the language contained in the estoppel letters:

> Illinois Union Insurance Company ("Insurance Company"), a wholly owned subsidiary of Ace, Ltd. has approved the attached list of equipment leases ("Leases") and the related Sale and Servicing Agreement. . . .  The Lease Insurance has been issued by Illinois Union Insurance Company, and executed on our behalf by our agent, A & M Select Insurance Services, Inc.  The Sale and Servicing Agreement has been executed on our behalf by our agent, A & M Select Insurance Services, Inc.  The Lease Insurance is in full force and effect. . . . The Lease Insurance and the Sale and Servicing Agreement are valid and binding obligations of the Insurance Company enforceable in accordance with its terms. . . .

*See* Sky Opposition to Motion to Dismiss or Transfer, Doc. 20, attach. 2 in 02-16016.  An estoppel letter received by Second National, as well as several received by Citibank, are substantially similar. *See* Doc. 25, attach. 2 in 02-16015; and Doc. 6, attachs. 1, 2, 6, 10 in 02-16007.

The Banks contend that Waukegan also received an "estoppel letter" from Ace American.  However, the cited document is a handwritten notation on a piece of correspondence sent to Ace American by Waukegan.  The notation reads, "These policies are in force and in good standing.  As the policies are noncancelable, they will remain in force for the term of the lease obligations." *See* docket, U.S. Dist. Court, D. Nev., CV-S-01-685, Doc. 62, Exh. B.  The Court does not believe, however, that this vague, handwritten notation constitutes an "estoppel letter" and, accordingly, the Court does not consider it.

All of these letters came from employees either of Illinois Union or of its parent, Ace American.  Citibank also received several subsequent letters from Sidley & Austin, affirming the prior letters from Illinois Union.  The record does not indicate that Footbridge received any estoppel letters.

54

policies. *See United States Quarry Tile Co. v. Massachusetts Bonding & Ins. Co.*, 71 F.2d 400, 402 (6th Cir. 1934) (surety estopped from denying coverage after letter from surety's agent had confirmed coverage). Illinois Union, on the other hand, argues that the documents merely confirm coverage and do not bar extrinsic defenses such as invalidity or fraud-in-the-inducement.

The Court finds that it need not determine the effect of the purported "estoppel letters" at this point in the litigation. First, with respect to Illinois Union, it does not appear that any of the alleged estoppel letters were signed by Michael Anthony; accordingly, the Court need not address Anthony's authority to execute any such letters on behalf of Illinois Union. Additionally, since the Court has concluded previously in this opinion that Illinois Union is precluded by the terms of its contracts from raising fraud defenses in connection with its obligations, it is not necessary to determine at this point whether the "estoppel letters" also preclude Illinois Union from raising such defenses.

### G.    Non-Fraud Defenses.

Finally, in addition to the fraud defenses, the parties raise several other defenses and issues that do not stem from Illinois Union's fraud allegations. The Court briefly addresses each of these remaining issues below. The Court sets forth a brief description of the parties' positions, even where the Court's findings earlier in this opinion have rendered the parties' arguments irrelevant or unnecessary to its analysis.

#### 1.    "Insurance Defenses."

In connection with Illinois Union's contention that it issued insurance policies rather than surety contracts, Illinois Union raises several defenses grounded in insurance law, which it argues should apply to these cases. Although the Court concluded above, *see* section II.A.2, that Illinois Union issued Lease Bonds, and not insurance policies, the Court briefly sets forth each of these defenses and the parties'

55

respective positions.

### a.    Pre-existing Losses.

First, Illinois Union argues that leases that were nonexistent or in default before the insurance policies in question were issued are uninsurable, since losses incurred as a result of such fraudulent leases were pre-existing losses. *See Waller v. Truck Ins. Exchange, Inc.*, 900 P.2d 619, 626 (Cal. 1995) (the "concept of fortuity is basic to insurance law. . . .   Insurance typically is designed to protect against contingent or unknown risks of harm . . . , not to protect against harm that is certain or expected."); *Royal Ins. Co. v. Smith*, 77 F.2d 157, 159 (9th Cir. 1935) ("[i]f insurance is written upon an object which has no existence, it is void, irrespective of the knowledge of the parties. . . .   It would be a violation of the principles which have always governed placement of insurance, and a sound public policy, to permit recovery where there was no insurable interest . . . even if the parties had agreed thereto.").  Additionally, "[i]n order to recover on an insurance policy, an individual must have [a]n insurable interest in the property insured. . . .   An interest in the property insured must exist when the insurance takes effect and when the loss occurs." *Liberty Mutual Fire Ins. Co. v. McKenzie*, 105 Cal. Rptr. 2d 910, 915 (Cal. App. 2d Dist. 2001).  Illinois Union has averred that, prior to the issuance of any insurance policy, certain leases had defaulted and some of the leased equipment had been repossessed.  Illinois Union contends that, as a matter of law, such pre-existing losses could not have been insured by the policies.

The Banks recognize the validity of the principle that "the purpose of insurance is to protect insureds against unknown risks." *Rohm & Haas Co. v. Cont'l Cas. Co.*, 781 A.2d 1172, 1176 (Pa. 2001).  The Banks argue, however, that the relevant inquiry is not whether the loss had already occurred but whether the insured was aware of the loss and fraudulently concealed it.  In *Chase Manhattan Bank*

56

*v. New Hampshire Ins. Co.*,193 Misc. 2d 580, 589 (N.Y. Sup. Ct. 2002), the parties contracted for insurance to cover a single potential loss.  When the insured sought to make a claim, the insurer argued that the alleged loss was nonfortuitous, and thus that it was not covered.  The Court held, however, that the insurer knew that it was contracting to insure a nonfortuitous loss and that, since there was no concealment, the doctrine of nonfortuity could not serve as a defense.  The Banks argue that where, as her, Illinois Union never undertook an analysis of the losses it insured, it should be charged with knowledge that some may have been nonfortuitous.

Moreover, the Banks assert that the Court must focus on the obligations of CMC, not those of the lessees, in determining whether an insured had an insurable interest.  With respect to the relationship between CMC and the Banks, the Banks were entitled to no payments from CMC until the parties entered into the transactions in question, and the Banks suffered no losses from those transactions until CMC failed to make its required payments to the Banks.  CMC's obligations, according to the Banks, were independent of both the validity and the enforceability of the underlying leases.


Again, the Court agrees with the Banks.  It appears that the Illinois Union, in setting forth its defenses, has premised its arguments on the Court's presumed acceptance of the underlying leases as the relevant insured transactions.  Since the Court has already found that the Banks were obligees, however, it follows that Illinois Union must also have undertaken to guaranty the transactions between CMC and the Banks.  The Court need not decide this issue, however, since it has already determined that the transaction documents in question established a surety relationship, not an insurance relationship.  Thus, the pre-existing loss/nonfortuity defenses asserted by Illinois Union are not available.

57

### b.      Usurious Loans.

Likewise, Illinois Union argues that many of the underlying leases with CMC were disguised usurious loans and, thus, were also uninsurable.  An insurer cannot agree to insure that which is illegal or against public policy.  *See, e.g., Mez Indus. v. Pacific Nat. Ins. Co.*, 90 Cal. Rptr. 2d 721, 734-36 (Cal. App. 2d Dist. 1999) (coverage for willful acts was barred, even though the policy in question purported to cover such acts); *State Farm Fire & Casualty Co. v. Baer*, 745 F. Supp. 595, 597-98 (N.D. Cal. 1990) (coverage for illegal act denied as against public policy).

The Banks, while disputing none of Illinois Union's stated legal principles, dispute that legal authority relating to usury has any relevance to these cases.  Whether the leases involved usurious loans, the Banks assert, is simply irrelevant to the issues before the Court because there is no allegation that the Banks made usurious loans to CMC.[51]

Again, the Court agrees that this defense impermissibly is grounded on the obligations of the lessees rather than those of CMC.  Again, however, since the policies at issue are to be treated as surety contracts, the Court need not conclusively determine the availability of the usury defense.

### 2.      Justifiable Reliance.

The Banks argue that, even if Illinois Union may assert fraudulent inducement as a defense, as a matter of law, Illinois Union cannot establish that its reliance on CMC's misrepresentations was justifiable.

---

[51]      Moreover, even if the usury defense were relevant, the Banks state that the express language of Illinois Union's policies issued to Footbridge and Citibank explicitly waives usury as a defense to Illinois Union's obligations.

*See Conrad v. Bank of Am.*, 53 Cal. Rptr. 2d 336, 352 (Cal. App. 3d Dist. 1996), *overruled in part by Lovejoy v. AT & T Corp.*, 111 Cal. Rptr. 2d 711 (2001).  The Banks assert that Illinois Union undertook the obligation to perform due diligence on the underlying leases and that, since Illinois Union did not perform adequate investigation, it could not have justifiably relied on any representations by CMC. *See, e.g., Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 599 (N.Y. 1959) (specific disclaimer of representations precluded any claim of justifiable reliance).  Illinois Union, however, denies that the language of the transaction documents waived its right to seek rescission, and it vigorously asserts that it reasonably relied on representations from CMC in determining whether or not to engage in the transactions at issue.

The Court concludes that the issue of reliance, if relevant to these actions, would not be conducive to resolution at this stage of the proceedings because the transaction documents do not contain unambiguous disclaimers of reliance on representations,[52] and there are genuine issues of material fact as to Illinois Union's assertions of reliance.  The Court need not further consider the issue of reliance, however, since the Court has already concluded that the Banks are the obligees in these transactions and that Illinois Union waived any issues of fraud with respect to the transactions.

## III.   CONCLUSION

For the reasons set forth herein, Waukegan, Second National, Chase (as Trustee), Footbridge,

---

[52]    Chase Manhattan, in its supplemental memorandum of law (Doc. 55 in 02-16000), argues that the policy issued to it by Illinois Union does contain a specific disclaimer of reliance on any communications.  Since the Court need not reach the issue of reliance, however, the Court likewise makes no determination on the specific language of the policies issued to Chase.  It notes again, however, that the Chase documents were far more carefully drafted, and far more protective of that institution's interests than the other documents before the Court.

Citibank, and Sky's  (i.e., the banks whose transactions involved Illinois Union) portions of the lead motion for judgment on the pleadings (Doc. 53 in 02-16000) are **GRANTED**.  To the extent any party believes it is entitled to a final order of judgment pursuant to Rule 58 by virtue of this ruling, that party shall submit a proposed judgment entry to the Court within ten (10) days of the date of the filing of this opinion.  The Court leaves it to all other parties to determine whether they wish to seek partial final judgments pursuant to Federal Rule of Civil Procedure 54(b) based on this opinion.  Any party desiring to obtain partial final judgment shall so move the Court.  Any motion seeking partial final judgment based upon this order must specifically identify the claim(s) upon which the party seeks partial final judgment, with references to the relevant pleading(s) in which the claim(s) is asserted.

In light of NetBank's withdrawal of its motion for judgment on the pleadings (*see* Doc. 20 in 02-16010 and Doc. 1107 in 02-16000), as noted previously herein, this ruling does not pertain to NetBank even though it is one of the seven banks that had dealings with Illinois Union and would otherwise benefit if this ruling applied to it.  In so far as the analysis and result would be the same as that applied to the other six banks, NetBank may, upon motion, renew its interest in the lead motion for judgment on the pleadings (Doc. 53 in 02-16000).  Such a renewal motion, however, must be made within ten (10) days of the filing date of this opinion.  Upon filing of a timely motion renewing its interest in the lead motion for judgment on the pleadings, a copy of which shall also be faxed to the Court (216-357-7246) on the day of filing, the Court will enter an order making this opinion applicable to NetBank.[53]

---

[53]    The Court notes NetBank's pending *Motion for Partial Summary Judgment or, In the Alternative for Suggestion of Remand* (Doc. 1678 in 02-16000) ("Motion for Summary Judgment"), which NetBank chose to pursue after withdrawing its interest in the lead motion for judgment on the pleadings, and *Netbank's Motion for Enforcement or Clarification of Briefing*

**IT IS SO ORDERED.**

> s/Kathleen M. O'Malley
> KATHLEEN McDONALD O'MALLEY
> UNITED STATES DISTRICT JUDGE

**Dated: August 19, 2005**

---

*Deadlines for Dispositive Motions* (Doc. 1695 in 02-16000) ("Motion for Enforcement"). Briefing on the summary judgment aspect of NetBank's motion remains incomplete, which is the issue addressed in the Motion for Enforcement.

If NetBank renews its interest in the lead motion for judgment on the pleadings making this opinion applicable to it, which seemingly would impact *at least* a portion of its pending Motion for Summary Judgment, then, within twenty (20) days of the filing date of this opinion, it shall:

    a)    file a notice informing the Court as to why making this opinion applicable to NetBank does not impact its pending Motion for Summary Judgment; or

    b)    withdraw its Motion for Summary Judgment and, to the extent appropriate, file a new motion for summary judgment addressing any remaining claims and parties against whom NetBank wishes to pursue a dispositive ruling.

If NetBank does not to renew its interest in the lead motion for judgment on the pleadings, it shall within twenty (20) days of the filing date of this opinion file a Supplement to its Motion for Summary Judgment that informs the Court of NetBank's view of the impact of this opinion on the pending Motion for Summary Judgment.  In the event this course is pursued, as well as option (b) above, the Court will at that time address the briefing deadline issues raised in NetBank's Motion for Enforcement, which is hereby held in abeyance pending NetBank's decision on the foregoing matter.