**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| **IN RE: COMMERCIAL MONEY** | : | **Case No. 1:02CV16000** |
| **CENTER, INC., EQUIPMENT** | : | |
| **LEASE LITIGATION** | : | **(MDL Docket No. 1490)** |
| | : | |
| | : | **JUDGE O'MALLEY** |
| | : | |
| | : | <u>**ORDER**</u> |
| | : | |
| | : | **This Order Relates To Case Nos.** |
| | : | **02cv16007 and 02cv16009** |


These actions were transferred to this Court by order of the Judicial Panel on

Multidistrict Litigation ("the MDL Panel"), issued on October 25, 2002. (02-16000, Doc. 1).

This Court has ordered that these actions be coordinated for pretrial purposes. (Doc. 2).

The dispute in these actions centers around the Sureties' liability on various surety bonds

issued in connection with certain transactions between the Banks[1] and Commercial Money

Center ("CMC"). CMC's business purportedly involved the leasing of equipment and vehicles

to numerous lessees in exchange for lease payments. CMC then pooled the leases and sold them

to institutional investors. Apparently, the majority of CMC's leasing business was a sham, and

the Banks lost over $400 million in these transactions. The Banks now sue the Sureties to

recover on the surety bonds associated with the transactions.[2]

---

[1] Where not defined herein, capitalized terms used in this Opinion have the meanings ascribed to them in the Court's Consolidated Rulings issued August 19, 2005 (Docs. 1708, 1709).

[2] The Court does not summarize here the entirety of the complicated factual scenario involved in these cases. Rather, the Court refers the reader to its two Consolidated Rulings on the numerous Motions for Judgment on the Pleadings, issued August 19, 2005 (Docs. 1708, 1709).

This action currently is before the Court upon several pending motions, including (1) the motion of Citibank, N.A. ("Citibank") and J.P. Morgan Chase Bank, N.A. ("Chase")[3] for final judgment (02-16009, Doc. 8), and (2) the motion of Citibank and Chase for partial final judgment (02-16007, Doc. 43).    For the reasons set forth herein, the motions of Citibank and Chase for final judgment (02-16009, Doc. 8), and for partial final judgment (02-16007, Doc. 43), are granted.

## FACTUAL BACKGROUND

In early 2001, Citibank, in connection with Chase acting as its trustee, entered into an investment transaction involving CMC-originated leases.  CMC Lease Funding 2000-220 L.P. ("Lease Funding"), a "special purpose entity" created and wholly owned by CMC,[4] acquired a pool of leases from CMC and, in turn, conveyed interests in the leases to Citibank.  Lease Funding issued Notes totaling $50 million to Chase (as trustee for Citibank), which Notes were secured by, and to be repaid from, the payment stream underlying the leases.  Finally, Illinois Union issued a "credit insurance" policy guaranteeing the payment stream.[5]

In order to implement the chosen transactional structure, the parties executed several documents, including (1) an Insurance Policy ("Policy"), which included a Collateral Security Insurance Endorsement (issued by Illinois Union)[6]; (2) a Sale and Servicing Agreement ("SSA"),

---

[3]    The Court sometimes refers to these parties collectively as "Chase."

[4]    The sole general partner of Lease Funding was CMC Lease Funding LLC, a limited liability company of which CMC was the sole member.  CMC was Lease Funding's only limited partner.

[5]    In structuring this transaction, Chase intended to market asset-backed securities in the larger capital markets.

[6]    Although denominated as an "insurance policy," this Court as already determined that the "Policy" is actually a surety agreement and was not, in fact, insurance.  For ease of reference, however, the Court uses the term "Policy" to refer to this particular transaction document.

executed by CMC as Seller, Lease Funding as Issuer, Commercial Servicing Center ("CSC") as Sub-Servicer, Illinois Union as Credit Insurer and Servicer, and Chase as Trustee; and (3) an Indenture, executed by Lease Funding as Issuer and Chase as Trustee. Additionally, CMC and its principals, Sterling Wayne Pirtle and Anita Pirtle, executed an Indemnity Agreement in favor of Illinois Union.

Chase ceased to receive the full amount of payments due under the leases in December 2001, and apparently received only partial or, in some cases, no payments thereafter. Chase filed several claims under the Illinois Union Policy, but Illinois Union denied those claims and asserted that the Policy was void due to fraud by CMC. Chase and Citibank subsequently commenced an action against Illinois Union, CMC, CSC and Lease Funding. That action has been consolidated before this Court as 02-16009. Illinois Union has asserted Counterclaims against Chase and various other parties in 02-16007.[7]

## PROCEDURAL BACKGROUND

On August 19, 2005, this Court issued its Consolidated Rulings (02-16000, Docs. 1708 and 1709), which resolved the numerous then-pending motions for judgment on the pleadings. The Illinois Union Order (Doc. 1709) granted partial judgment on the pleadings to certain Banks with respect to their claims against Illinois Union Insurance Company. In its Illinois Union Order, the Court instructed any party intending to file a Rule 58 motion for final judgment to do so within ten days. Additionally, the Court noted that it would leave to the parties the decision as to whether to seek partial final judgments pursuant to Fed. R. Civ. P. 54(b).

---

[7]     CMC and CSC filed for bankruptcy in 2002, thereby staying the action as to them. In a separate order, the Court has dismissed the Chase/Citibank action against those entities, without prejudice, subject to reopening, if appropriate, upon completion of or relief from the bankruptcy proceedings.

Pursuant to the Court's Order, Chase filed a motion for final judgment in Case No. 02-16009 on August 31, 2005, seeking judgment on certain claims asserted by Chase against Illinois Union. (02-16009, Doc. 8).[8] On September 21, 2005, the Banks (including Chase) filed their motion for partial final judgment on certain claims contained in Illinois Union's Second Amended Counterclaims. (02-16007, Doc. 43).[9]

On August 24, 2005, the Court ordered a general stay of filings in this case, pending establishment of a new case management plan. (02-16000, Doc. 1713). The Court issued a Partial Case Management Plan on October 31, 2005, which continued the stay on filings until the completion of mediation in this case,[10] and clarified that the stay applied generally to motions for final judgment pursuant to Rule 54 or Rule 58. (Doc. 1739, at 3, 4). The Partial Case Management Plan specifically excepted certain matters from the filing stay, including matters "relating to disputes between Citibank, N.A., and Ace American Insurance Company/Illinois Union Insurance Company. . . ." Doc. 1739, at 3. Accordingly, the within motions have been fully briefed and are ripe for decision.[11]

## DISCUSSION

### I.     Motion for Final Judgment (02-16009)

---

[8]     Chase actually electronically filed a letter with the Court and attached a Proposed Judgment Entry as an exhibit to its submission. The Court deems this filing to be a motion for final judgment pursuant to Fed. R. Civ. P. 58.

[9]     The Banks that participated in this filing include Chase, Sky Bank, Footbridge Limited Trust, and Bank of Waukegan. The Banks' filing also indicated NetBank's intention to join the motion in the event that the Court should grant its Motion to Renew Its Motion for Judgment on the Pleadings. Illinois Union has since resolved its disputes with Sky, Footbridge and Waukegan through the Court-ordered mediation process.

[10]     With only limited, Court-authorized exceptions, the global mediation in these actions was complete by March 15, 2006. The filing stay automatically terminated on that date.

[11]     Additionally, as noted above, Illinois Union now has resolved its disputes with all Banks party to the within motion, with the sole exception of Chase.

Citibank and Chase have asserted fourteen claims in this action (02-16009, Doc. 1, attach. 3), including the following causes of action against Illinois Union: claims (I) and (II) for declaratory relief; claim (III) for indemnification; claim (IV) for breach of the implied covenant of good faith and fair dealing; claim (V) for fraudulent inducement; claim (VI) for unfair business practices; claim (VII) for unfair claims settlement practices; claim (VIII) for breach of the SSA (based on failure to service the leases); claim (IX) for breach of the SSA (based on CSC's conversion); claim (X) for breach of warranty; and claim (XI) for breach of the SSA (based on failure to give notice of default). Chase and Citibank also assert claims against (1) Lease Funding, for breach of the Indenture; (2) CMC, for breach of the SSA and specific performance; and (3) CSC, for breach of the SSA and conversion.[12] In addition to declaratory and injunctive relief, Chase's complaint seeks compensatory and punitive damages, prejudgment and postjudgment interest, attorneys' fees and expenses.

Pursuant to Fed. R. Civ. P. 58(a), Chase has requested that the Court enter final judgment in its favor in case 02-16009. Chase claims that the Illinois Union Order (Doc. 1709) finally resolved its claims on Counts (I) through (III), and requests that the remainder of the claims be dismissed as moot. Chase also asserts that default was entered against Lease Funding in May 2003 and that default judgment should now be entered, so as to finally resolve all claims in the action.[13] Additionally, Chase contends that its damages involve a sum certain, which is capable

---

[12] As noted above, the claims against CMC and CSC are subject to the automatic bankruptcy stay and are not at issue here.

[13] Lease Funding asserted a cross-claim in this action against Illinois Union; Chase argues that the cross-claim should be dismissed for failure to prosecute due to Lease Funding's default in the action. As noted below, that request is well-taken.

of calculation merely by reference to the transaction documents and the monthly payments due on the underlying leases.

Illinois Union, on the other hand, challenges Chase's entitlement to final judgment based on three overarching arguments: (1) Chase has failed to meet its burden with respect to proving damages sustained; (2) the entry of final judgment is premature prior to allowing Illinois Union leave to amend to allege facts supporting its claims; and (3) these proceedings are not "final" such as to justify a Rule 58 order, since default judgment has not been entered against Lease Funding, and that entity's cross-claim remains outstanding. The Court addresses each of these arguments in turn.

### A. Proof of Damages

#### 1. Damages Calculation Issues

Illinois Union argues that (1) Chase has failed to submit admissible evidence in support of its claimed entitlement to damages, and (2) Chase's calculation of damages is dramatically overstated and at odds with the terms of the transaction documents. After careful consideration, the Court rejects both contentions.

With respect to the first argument, Illinois Union asserts obliquely that Chase's letter motion is supported only by "unauthenticated charts and calculations." The Court disagrees. Although Chase has attached Tables 1 through 3 to its request for final judgment, those tables undisputedly are derived from the information set forth in Schedule A of the Policy. (02-16009, Doc. 12, Exh. 5).[14] The Chase/Illinois Union Policy has been treated as authentic by all parties

---

[14] Even assuming that the Court would decline to consider the information set forth in Tables 1 through 3, the Court itself could perform the same calculations based upon the data contained in Schedule A to the Policy.

throughout this proceeding, and in fact Illinois Union previously has admitted its authenticity. *See* Illinois Union Opposition Memorandum to Supplemental Memorandum of Citibank and Chase, 02-16000, Doc. 115, at 2, n.5 ("[t]here is no dispute concerning the authenticity of the Policy or the Chase SSA. . . ."). Additionally, to the extent that Chase's tables contain information relating to the amounts received by Chase in particular months, that information is authenticated by the Declaration of Chase's Vice President, Diane Wallace. (02-16009, Doc. 8, Exh. 4). Accordingly, the information submitted in support of Chase's request for final judgment is properly authenticated and appropriate for consideration by this Court.

Illinois Union also claims that Chase's motion for final judgment is an improper attempt to avoid its burden to prove damages at trial, and that final judgment cannot be entered unless Chase satisfies this burden. *See Mendoyoma, Inc. v. County of Mendocino*, 87 Cal. Rptr. 740, 745 (Cal. App. 1st Dist. 1970).[15] Specifically, Illinois Union states that Chase's permitted recovery is limited to the amount due under the Notes issued to it by Lease Funding—a sum that may be significantly less than the amount due under the leases.

Although Chase has not produced information regarding the amount due under the Notes, it appears from the transaction documents that the parties contemplated an investment of approximately $50 million.[16] According to Illinois Union, the stream of payments necessary to amortize a $50 million note over its 60-month life could have been no more than $60 million.

---

[15]    As both parties concede, the Policy issued by Illinois Union to Chase contains a choice of law clause, which provides for the application of California law. The SSA, however, provides for the application of New York law (except for the question of true sale, which is specified to be governed by Texas law), and thus the Court will apply the law of New York to the extent necessary to interpret that document.

[16]    A Private Placement Memorandum prepared in connection with the transactions states that the Note balance, as of March 29, 2001 (the date of funding of the last tranche), was $49,882,871.91. *See* 02-16009, Doc. 17 (Exh. 1 to Nogues Declaration).

The stream of anticipated lease payments, on the other hand, totals $66, 337, 748.06, and it is this amount (minus payments received by Chase) that Chase requests.

Illinois Union asserts that the parties intended Chase to have an interest in the leases only as security for the payments due to Chase under the Note, and that any excess of payments received was to be retained by Lease Funding. *See, e.g.,* Indenture, 02-16009, Doc. 26, Exh. 7, at ¶ 8.3(a)(x) (excess funds to be returned to the Issuer).[17]  Accordingly, Illinois Union argues that funds ultimately belonging to Lease Funding cannot be awarded to Chase as "damages" in this action.[18]

Illinois Union's argument is not without some initial force.  In the Illinois Union Order (Doc. 1709), this Court found that the Policy should be construed as a Surety Bond, rather than an insurance policy.  Additionally, the Court held, based on the transaction documents, that CMC (or, in this case, Lease Funding) was properly viewed as the obligor on the Surety Bond, while the parties intended that Chase would be an obligee on that bond.  Undisputedly, Lease Funding's independent obligation to Chase exists only to the extent set forth in the Notes and the

---

[17]    In support of this construction of Lease Funding's status, Illinois Union points out that, subsequent to the transactions described herein, CMC sold its ownership interest in Lease Funding (and with it the right to receive excess cash flow) to a third party. *See* 02-16009, Doc. 17, attach. 3 (Exhibit 4 to Nogues Declaration); 02-16007, Doc. 46, attach. 1 (Exh. 2 to Leonard Declaration).

[18] Illinois Union also contends that Lease Funding's interest in funds in "excess" of those owed to Chase compels a conclusion that Lease Funding is an "obligee" under the Policy.  In the Illinois Union Order, however, this Court rejected Illinois Union's arguments as to the obligee status of the CMC entities after a detailed analysis. (02-16000, Doc. 1709).

To the extent that obligee issues even remain open for consideration by the Court, the Court's findings also would not be altered by Illinois Union's assertions that Lease Funding did not provide any indemnity to Illinois Union. Concededly, CMC, the sole owner of Lease Funding, as well of the principals of that entity, did provide indemnity. Thus, indemnity by Lease Funding would have been duplicative.

Indenture.[19]  Accordingly, there is inherent appeal to the notion, suggested by Illinois Union, that its obligations under the Policy should be limited to the extent of the Note obligation of Lease Funding, the principal on the bond.

The logic of Illinois Union's argument is undercut, however, by the fact that the transaction documents contemplate both a payment stream from Lease Funding and a guarantee by Illinois Union, which are not capped at the value of the Note.  The Court believes that a careful review of the relevant documents supports the construction urged by Chase.  The Policy (02-16009, Doc. 26, Exh. 5), the most significant document in determining the duties imposed on Illinois Union, contains no provisions linking Illinois Union's obligations to the amounts owed by Lease Funding under the Note.  Rather, the Policy provides, in relevant sections:

> COVERAGE E: LEASE COVERAGE—  The Company will indemnify the Insured, its successors and assigns, for <u>all Scheduled Payment Amounts on a Lease</u> due on each Scheduled Due Date as set forth in the applicable Lease Agreement without deduction or set off of any kind, subject to the terms and conditions herein. . . .

Policy, 02-16009, Doc. 26, Exh. 5, at 1 (emphasis added).

> **Scheduled Payment Amounts**—shall mean the amounts due on each Scheduled Due Date on each Lease as specified on the attached Schedule A.

Policy, 02-16009, Doc. 26, Exh. 5, at 1.

> If (a) the Insured fails to receive all or a portion of a Scheduled Payment Amount on the Scheduled Due Date as specified in Schedule A attached hereto, with respect to a Lease (such date on which the Insured fails to receive such payment, a

---

[19] The Court does not mean to suggest that Lease Funding has <u>no</u> obligation to Chase independent of the Notes and Indenture.  Rather, as explained in the Illinois Union Order and herein, both Lease Funding and Illinois Union undertook obligations to Chase under the Policy and SSA, which were tied to the amounts due on the underlying leases. Accordingly, the Court does not seek to impose on Illinois Union a burden greater than that which could be imposed on its principal.

"Date of Loss"), or (b) any Scheduled Payment Amount previously made on a Scheduled Due Date or otherwise to any of Commercial Money Center, Inc., the Insured or otherwise . . . is not paid over to and received by the Additional Insured/Loss Payee for any reason whatsoever . . ., then a default under the Lease with respect to the payment of such Scheduled Payment Amount shall be deemed to occur and the date of such occurrence of any such default shall be the applicable Date of Loss. . . .

Policy, 02-16009, Doc. 26, Exh. 5, at Condition 6.

The Company acknowledges that . . . the Insured has pledged all of its rights hereunder with respect to the Leases to secure the obligations of the Insured under the Indenture and that it is intended that such pledge shall constitute a first priority perfected security interest therein. To give effect to the foregoing, the Company acknowledges that unless and until otherwise notified by the Trustee acting under the Indenture, the Company shall make all payments hereunder to the Trustee on behalf of Additional Insured/Loss Payee and not the insured within thirty (30) days of receipt of written notice of a default of a Lease in accordance with its terms. . . . The Company agrees that all payments required to be made by it in respect of a Scheduled Payment Amount on a Lease shall be made notwithstanding (i) any transactions entered into by the Insured, Commercial Money Center, Inc. or any other person in connection therewith, including any transactions or purported transactions under the Sale and Servicing Agreement, the Indenture or otherwise, and (ii) the involvement or noninvolvement by the Company in any of the matters contemplated by clause (i) above. Notwithstanding anything to the contrary in this Policy, the Company further agrees to make all Scheduled Payment Amounts on a Lease that is in default in accordance with its terms from and after the time such Lease falls in default in accordance with its terms. . . .

Policy, 02-16009, Doc. 26, Exh. 5, at Condition 7 (emphasis added).

Reading these provisions together, the Court reaches the conclusion that the scope of Illinois Union's commitment under the Policy was defined by the Scheduled Payments on the underlying leases—payments promised to Chase under the SSA—and not by Lease Funding's obligations under the Notes. All of the sections set forth above refer to the right of Chase to

receive Scheduled Payments on leases, and there is no reference to the Notes whatsoever. The general coverage provision sets forth Illinois Union's indemnification responsibilities with respect to "Scheduled Payments," and Condition 6 defines "default" in terms of Chase's failure to receive such payments.

Most importantly, Condition 7 expressly separates Illinois Union's duty to pay the "Scheduled Payments" from any obligations undertaken by Lease Funding, CMC or other parties—including any obligations undertaken pursuant to the SSA or the Indenture. Unequivocally, therefore, Condition 7 demonstrates that the parties did not intend Illinois Union's payment responsibility to be circumscribed by Lease Funding's Indenture obligations.

Even assuming that the Court must also look to the SSA and the Indenture to shed light on the duties imposed on Illinois Union by the parties, the Court finds those documents to be consistent with its analysis of the Policy. Illinois Union does not rely on any provision of the SSA, and upon an independent review of that document, the Court finds that the SSA contains no provisions relevant to the damages calculation issue.

Rather, Illinois Union relies on § 8.3(a) of the Indenture, which provides for a priority allocation of "Distributable Funds"—essentially, excess funds in the Collection Account. Section 8.3 provides for a distribution of such funds in the following priority: (1) to the Trustee for fees and expenses, (2) to the Noteholders for interest and principal payments due, (3) to reserve accounts to satisfy required reserves, (4) to the payment of taxes and assessments, (5) to the Credit Insurer for any Credit Insurer Suspension Amounts, and (6) to the Sub-Servicer for Recovered Sub-Servicer Advances and administrative fees. Only after the foregoing distributions

is Lease Funding entitled to receive any remainder.[20]  Thus, although Section 8.3 supports Illinois Union's assertion that Lease Funding had an <u>ultimate</u> right to certain "excess" funds, it also makes clear that Lease Funding's rights were subordinate to the claims of virtually all other parties, including Illinois Union.

Additionally, in its Opposition to Chase's motion for partial final judgment (02-16007), Illinois Union cites § 6.13(b)(iii) of the Indenture, which provides:

> In the event the Trustee receives a Credit Insurance Claim Event Notice from the Sub-Servicer . . ., but the Trustee determines that the aggregate amount of Scheduled Payments due under the Leases . . . and amounts then in the Collection Account are sufficient to pay the sum of the Principal Payment plus the Interest Payment derived from Scheduled Payments in respect of Leases included in the Note Collateral equal to the amount to be due on such Payment Date as set forth in the Master Amortization Schedule, it shall . . . give written notice thereof to the Noteholders, and it shall not be deemed to be aware of a Credit Insurance Claim Event until it receives a written concurrence of a Note Majority that a Credit Insurance Claim Event has occurred.

Indenture, 02-16009, Doc. 26, Exh. 7, at § 6.13(b)(iii).

Illinois Union interprets this section to mean that Chase had no right to file a claim <u>unless</u> Chase determined that payments made in a particular month were insufficient to satisfy Lease Funding's obligations under the Notes.  It is far from clear, however, that this provision is to be so read.  Rather, the Indenture defines "Master Amortization Schedule" as "a schedule with respect to all Leases <u>setting forth the Principal Payment and Outstanding Principal Balance</u>

---

[20]    Similarly, Article V of the Indenture, which defines "events of default" and sets forth the remedies available to the Trustee upon default, establishes priorities in the application of funds collected by the Trustee.  Pursuant to Section 5.5, such recovered funds are to be distributed first to the Trustee for amounts due and owing, then to the Noteholders for amounts due on interest and principal, then for the payment of any taxes and assessments, then to the Credit Insurer for any Credit Insurer Suspension Amounts, then to the Sub-Servicer for any Recovered Sub-Servicer Advances or fees.  Only after the foregoing distributions is Lease Funding entitled to receive any remainder.

associated with all Leases as of each Payment Date. . . ." Indenture, 02-16009, Doc. 26, Exh. 7, at I-10 (emphasis added). As such, the provision appears to refer to Chase's determination that payments were insufficient to satisfy obligations under the Leases, not the Notes.

Assuming, however, that Illinois Union's construction of § 6.13(b)(iii) is correct, that section still does not undermine the Court's reading of Illinois Union's Policy obligations. Even under Illinois Union's reading, § 6.13(b)(iii) would not preclude Chase from filing a claim when payments were sufficient to meet Lease Funding's obligations on the Notes. Rather, that section simply would impose a duty on Chase to provide notice to the Noteholders, and thus allow the Noteholders to confirm whether a claim should be filed.

As noted above, the transaction documents grant Lease Funding only a tenuous interest—subordinate to the rights of virtually all other parties to the transaction—and that interest does not affect the duties imposed upon Illinois Union. Whether Chase as Trustee ultimately will be required to distribute some portion of its recovery to Lease Funding (or to other parties) is a question governed by the transaction documents, and it is of no concern to Illinois Union. Illinois Union's obligation, as set forth in the Policy, is to pay all Scheduled Payments due and unpaid to the Trustee.[21] That amount, as substantiated by Chase, was $41,331,727.13 as of October 31, 2005.[22]

## 2.     Other Arguments with Respect to Proof of Damages

---

[21]     This finding obviates the necessity of addressing Illinois Union's alternative argument that Chase's prior receipt of "excess" funds may have reduced Chase's damages.

[22]     Prior to the Court's entry of final judgment in this matter, Chase will be required to submit updated damage calculations.

Apart from the calculation arguments, Illinois Union also raises several arguments in support of its contention that Chase is not entitled to the damages claimed on the merits of the case. First, Illinois Union asserts that Chase cannot recover from its Policy, which acted as surety for the underlying lease payments, unless Chase first proves that there was (1) an underlying obligation on each lease as to which it seeks compensation, and (2) a default on that underlying obligation. Illinois Union asserts that Chase cannot prove the existence of an underlying obligation on many of the allegedly defaulted leases, and that, even where an underlying obligation exists, Chase cannot demonstrate that any of those specific leases is in "default." Finally, even to the extent that Chase can show a "default" on an underlying obligation, Illinois Union argues that permitting Chase to recover amounts in excess of its initial investment would violate public policy.

In support of its claim that Chase has failed to show default on an underlying obligation, Illinois Union relies on the Policy language, which states that benefits are payable under the policy where a Scheduled Payment is "contractually due but not paid. . . ." (02-16009, Doc. 26, Exh. 5, at Condition 6, 7). Chase cannot satisfy its burden, Illinois Union argues, since many of the underlying leases insured by the Policy were nonexistent, unfunded, fraudulent or fictitious.[23] Accordingly, despite any waiver of defenses to the "validity" or "enforceability" of the leases, a "default" on these leases could not have occurred, and Illinois Union cannot have any liability for the Scheduled Payments. *See, e.g., Royster Constr. Co. v. Urban West Communities*, 47 Cal. Rptr. 2d 684, 690 (Cal. App. 2d Dist. 1995)("[a] surety may raise all defenses allowed to the

---

[23] Illinois Union has produced supporting evidence, including declarations from an Illinois Union investigator and several lessees, indicating that certain leases were unfunded or that the leased equipment was never delivered.

principal. . . ."). Additionally, Illinois Union cites the proposition, acknowledged by the Court in its prior rulings, that "the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal." (Doc. 1708, at 53). *See also* Cal. Civ. Code § 2809; *United States Leasing Corp. v. Du Pont*, 444 P.2d 65, 75 (Cal. 1968)("since the liability of a surety is commensurate with that of the principal, where the principal is not liable on the obligation, neither is the guarantor.").

The Court can dispose of these arguments quickly. With respect to the assertion that Illinois Union's obligation is limited to that of each particular Lessee, Illinois Union has blatantly ignored this Court's prior determination that the obligations guaranteed by the Policy were those of the CMC entities—in this case, Lease Funding. Since the Policy guaranteed Lease Funding's obligations to Chase—including its obligations under the SSA—Chase is required only to demonstrate a breach of obligations by Lease Funding.

The contractual language defining the occurrence of "default" bolsters this conclusion. As set forth and analyzed in the previous section of this Opinion, the Policy defines the occurrence of "default" as follows:

> If (a) the Insured fails to receive all or a portion of a Scheduled Payment Amount on the Scheduled Due Date as specified in Schedule A attached hereto, with respect to a Lease . . . or (b) any Scheduled Payment Amount previously made . . . is not paid over to and received by the Additional Insured/Loss Payee for any reason whatsoever . . ., then a default under the Lease with respect to the payment of such Scheduled Payment Amount shall be deemed to occur. . . .

Policy, 02-16009, Doc. 26, Exh. 5, at Condition 6.[24]  Based on the plain definitional language, default occurs not only upon the failure of a Lessee to transmit payments to Lease Funding, but also upon the failure of Chase to receive all Scheduled Payments <u>from</u> Lease Funding.      A s explained by the Court in the Illinois Union Order (Doc. 1709), "the provisions of [the Chase] policy clearly provide that payments will be made even in the event that a scheduled payment is received by [Lease Funding] and not paid over to Chase. . . .   Under these circumstances, there can be no question that Chase was intended to be the obligee and that Illinois Union owed its obligations to Chase." Illinois Union Order, Doc. 1709, at 28.

Overall, Illinois Union's contentions are mere permutations of the Sureties' prior assertions that CMC (and/or Lease Funding) should be construed as the obligee on any Surety Bond.  The claim that no "default" could have occurred under these leases ignores both the Court's prior rulings and the plain language of the transaction documents.  The express language of the Policy defined default in terms of <u>Chase's failure to receive</u> Scheduled Payments; thus, proof of default does not require Chase to show failure by a particular Lessee to transmit a Scheduled Payment.  Through the declaration of its vice president, Diane Wallace, Chase has demonstrated that it received less than all <u>scheduled</u> payments, commencing in February 2002. As explained above, the terms of the Policy obligate Illinois Union to make all Scheduled Payments upon a default.  Chase thus has shown the occurrence of default under the Policy terms and has triggered the right to seek payment from Illinois Union.

---

[24]     As Chase points out, the claim form attached as an exhibit to the SSA also recognizes these two distinct types of default, and permits a claiming party to indicate which type has occurred.

Illinois Union also raises the new argument that Chase is not entitled to recover any amount in excess of the funds originally lent to Lease Funding because, as a matter of public policy, Chase's damages cannot include any amounts that constitute "profits" from an illegal Ponzi scheme. Illinois Union's novel argument stems chiefly from its reliance on bankruptcy cases involving trustee avoidance claims, where the courts have found that disbursements to investors in excess of their initial investments constituted fraudulent or preferential transfers and thus were avoidable by a trustee. *See, e.g., Floyd v. Dunson (In re Rodriguez)*, 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997); *In re Taubman*, 160 B.R. 964, 985-86 (Bankr. S.D. Ohio 1993). Illinois Union relies on these cases to support its assertion that any recovery by Chase should be limited to the amount advanced by Chase to Lease Funding—i.e., the principal amount of the Notes. While, again, there is some appeal to Illinois Union's argument, and the Court is tempted to limit any award to Chase by reference to the Note balance, it does not find that Illinois Union has provided the Court with firm footing upon which to do so.

The Court is unable to conclude that Illinois Union's cases, drawn as they are from the specific context of bankruptcy avoidance claims, would preclude Chase from recovering on the Policy here. Each of those cases held only that a bankruptcy trustee could recover transfers in excess of an investor's initial investment, since such transfers were fraudulent and/or preferential from the standpoint of a debtor engaged in a Ponzi scheme. On their face, Illinois Union's bankruptcy cases do not appear to apply in non-bankruptcy civil litigation—particularly where, as here, the Court is tasked with determining the equities between two non-participants in the fraud.

Illinois Union's public policy argument, moreover, seems inconsistent with *MBIA Ins. Corp. v. Royal Indem. Co.*, 286 F. Supp. 2d 347, 359 (D. Del. 2003), *aff'd in relevant part*, 426 F.3d 204 (3d Cir. 2005), previously analyzed by the Court in the Illinois Union Order and cited by Chase here.  Although *MBIA Insurance* dealt primarily with the issue of the enforceability of fraud waivers, the fact pattern of that case is similar to that presented here.

Defendant Royal had issued insurance policies in connection with several thousand student loan transactions originated by a company called Student Finance Corporation ("SFC"). *MBIA Insurance*, 286 F. Supp. 2d at 349.  As in this case, the loans were transferred to a special purpose entity, which issued certificates to investors. *See id.* at 348-49.  When it became apparent that SFC had operated its business as a Ponzi scheme, plaintiff investors sued for benefits under the policies.  The court granted summary judgment in plaintiffs' favor based on the plain language of Royal's policies.[25]  The court did not discuss any public policy considerations that would restrict plaintiffs' recovery, and it did not limit plaintiffs to their invested principal.

Similarly, here, the Court does not believe that any such limitation operates to bar Chase's recovery.  Accordingly, the Court holds that Chase has satisfied its burden of proving entitlement to the damages requested.

### 3. Prejudgment Interest Rate.

Although Illinois Union apparently does not dispute either Chase's entitlement to prejudgment interest or the methodology used to compute such interest, Illinois Union contends

---

[25]  Notably, the court also found that Royal's policy, denominated "credit insurance," was actually a guaranty. *See id.* at 355.

that the prejudgment interest rate should be limited to the contractual rate provided in the Indenture—a rate which, as of March 29, 2001, became fixed at 7.91%. Chase, on the other hand, argues that, in the absence of a negotiated contractual interest rate, the rate set forth in Cal. Civ. Code § 3289 should govern.

Cal. Civ. Code § 3289 provides:

> (a) Any legal rate of interest stipulated by a contract remains chargeable after a breach thereof, as before, until the contract is superseded by a verdict or other new obligation.

> (b) If a contract entered into after January 1, 1986, does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach.

Cal. Civ. Code § 3289.

Upon examination of the relevant transaction documents, the Court determines that the Policy does not contain a contractual interest rate, and thus the rate provided by Cal. Civ. Code § 3289 should apply. Given that Illinois Union was not even a party to the Indenture, and its obligations bear no relation to the terms of the Indenture, the Court finds no basis for applying the rate set forth in that document. Accordingly, the Court finds that the rate applicable to Chase's claims against Illinois Union is ten percent (10%) per annum.[26]

## B.      Request for Leave to Amend

As noted above, Illinois Union argues that this Court should not enter final judgment on Chase's affirmative claims without granting Illinois Union the right to amend its counterclaims to allege facts uncovered in discovery that provide further support for those claims. Illinois

---

[26]      Chase will be required to submit updated damage calculations, including calculations of prejudgment interest, prior to the entry of final judgment.

Union contends that it deferred the filing of any such motion to amend at the request of the Court, and that the requested amendment would cause no prejudice to Chase. Thus, Illinois Union argues, refusing to allow amendment at this point would be inequitable. Specifically, Illinois Union seeks to amend to allege facts supporting its claims that (1) Illinois Union issued an insurance policy, not a surety bond (and Chase knew that the transaction was so structured); (2) the obligee in the transaction was Lease Funding, not Chase (and Chase knew that the parties' transaction provided such rights to Lease Funding), and (3) the Policy provisions did not waive Illinois Union's defenses to fraud in the inducement.[27]

As the Court has pointed out to Illinois Union, however,[28] the Court made no "request" for delay of amendments, nor did Illinois Union indicate at any point that it was relying on any such request. To the contrary, the Court continually has stated its desire for amendment of pleadings to occur "sooner rather than later." *See* Transcript, 10/22/2003 Status Conference (Doc. 557, at 90). In May 2004, the Court affirmed its intention to continue with the adjudication of the Rule 12(c) motions <u>even if</u> a party chose to amend its pleadings during the pendency of the motions. *See* Transcript, 5/20/04 Status Conference, at 10-11.

Moreover, as Chase correctly argues, the vast majority of the matters that Illinois Union seeks to raise by "amendment" are issues that the Court already has resolved on the pleadings through the Illinois Union Order (Doc. 1709). Illinois Union did not object to this method of proceeding. Rather, Illinois Union stated early on that the "first order of business should be the

---

[27]     On March 29, 2006, on the Court-established final deadline for filing motions for leave to amend, and shortly before issuance of the within Order, Illinois Union filed a Motion for Leave to Amend Counterclaims, seeking to allege against Chase essentially the contentions set forth above. *See* 02-16007, Doc. 55, attach 1 (motion attached as exhibit).

[28]     *See, e.g.,* Order Addressing Request for Clarification, 02-16000, Doc. 1743, at 3.

finalization of the pleadings.  In that regard, the Court should first rule on the pending motions to dismiss . . . filed against the Insurance Parties. . . ." *See* Illinois Union Proposed Case Management Plan, 02-16000, Doc. 14, at 10.   At the initial Case Management Conference, Illinois Union reaffirmed that it had no objection to the Court's deciding the pending Rule 12 motions, and that it "would encourage" the Court to decide such motions at that point. *See* Transcript of Case Management Conference held on November 21, 2002, at 80.[29]

The issues encompassed by the August 2005 Illinois Union Order (Doc. 1709) include all issues related to (1) whether Illinois Union issued an insurance policy or surety bond; (2) the obligor/obligee status of CMC and/or its related entities in the transactions; and (3) the enforceability of the fraud waivers in Illinois Union's Policy.  Illinois Union, in its opposition to Citibank's motion for final judgment, expresses its intention to add factual allegations relating to extrinsic evidence of the parties' intent regarding the above issues.  The Court, however, already has held that such evidence is irrelevant to its interpretation of the transaction documents. *See* Illinois Union Order, Doc. 1709, at 24 ("[t]he Court's conclusion that the Illinois Union policies actually establish a surety relationship is not based . . . on any facts that Illinois Union could establish during the remainder of the course of discovery.  It is, rather, based on the structure of the transactions . . . and the Court's determination of the parties' obvious intent. . . .").

The Court declines to determine whether Illinois Union's proposed amendment would be "futile" or would cause prejudice to Chase, as such a determination is more appropriately made

---

[29]     Additionally, the fact that several other parties, including NetBank and Lakeland Bank, sought and were granted leave to amend during the pendency of the pleadings motions undercuts Illinois Union's argument that it believed such requests were not permitted.  In fact, Illinois Union itself sought leave to amend during that time period, in order to assert claims against CMC. *See* 02-16000, Doc. 77.

in the context of a fully briefed motion for leave to amend.[30]  Although the Court will review and determine all timely motions for leave to amend, the Court hereby advises the parties that, to the extent that a motion for leave to amend seeks to revisit or undermine the impact of the Consolidated Rulings, such leave will not be granted.

## C.  Default Entry against Lease Funding

Illinois Union asserts that this case lacks finality, and thus that a Rule 58 order is not appropriate, based on the pendency of a cross-claim asserted by Lease Funding against Illinois Union.  The Court rejects this contention, as the Court did in fact enter default against Lease Funding (as well as other defendants) on the record of proceedings held on May 30, 2003. *See* Transcript of 5/30/03 Hearing Regarding Show Cause Order, Doc. 1716, at 2, 27; Transcript of 6/4/03 Hearing Regarding Show Cause Order, Doc. 271, at 2.[31]  While the May 30, 2005 hearing was noticed as, among other things, a hearing on various requests for default judgment, and such a hearing was conducted, the Court withheld formal entry of default judgment at that time at the parties' request.  The Court indicated, however, that it would enter default judgment in individual cases when and as appropriate.  The Court finds it appropriate to issue a final order granting default judgment against Lease Funding in this action at this point in the proceedings, and will dismiss Lease Funding's cross-claim for failure to prosecute.[32]

---

[30]  Similarly, the Court also will not evaluate Chase's argument that Illinois Union attempts to plead matters that are "the opposite" of the assertions set forth in its prior pleadings.

[31]  At the hearing held on June 4, 2003, the Court indicated that it would issue an Order "confirming" its entry of default against various defendants. *See* Transcript of 6/4/03 Hearing, Doc. 271, at 23.  Apparently due to oversight, such an Order never was issued.  The Court's failure to issue a confirmation order, however, does not negate the effect of the Court's definitive rulings on the record.

[32]  Dismissal of this cross-claim would be appropriate, regardless of the ruling on this final judgment motion, given Lease Funding's complete failure to pursue that claim or comply with any of its discovery or filing obligations in this action.

Accordingly, Chase's motion for final judgment (02-16009, Doc. 8) is <u>granted</u>.

## II. Motion for Partial Final Judgment (02-16007)

In this case, Chase moves for partial final judgment on certain claims contained in Illinois Union's Second Amended Counterclaims (02-16007, Doc. 3). Chase's motion is part of a larger filing by multiple Banks, including Sky Bank, Footbridge Limited Trust, and Bank of Waukegan (02-16007, Doc. 43). The Court's Partial Case Management Plan, issued on October 31, 2005 (Doc. 1739, at 3, 4), continued a previously imposed stay on filings, including briefing on motions for final judgment, and permitted briefing to proceed only with respect to Chase's portion of the motion for final judgment. In the interim, Illinois Union resolved its claims with Sky, Footbridge and Waukegan through the Court-ordered mediation process. Accordingly, Chase's portion of the motion now is ripe for decision.

Chase, in its motion, seeks partial final judgment on the Seventh, Eighth and Ninth Counterclaims, which are the only claims asserted by Illinois Union against it. For the reasons set forth herein, Chase's motion is <u>granted</u> in its entirety.

The Seventh Counterclaim is asserted against Chase, Lease Funding and CMC Lease Funding LLC ("Lease Funding LLC"), and seeks rescission of the Policy. The Eighth Counterclaim is asserted against multiple CMC entities (including Lease Funding and Lease Funding LLC), and multiple Banks including Chase, and seeks declaratory relief that pre-existing losses are not covered under the policies. The Ninth Counterclaim is asserted against multiple CMC entities (including Lease Funding and Lease Funding LLC), and multiple Banks including Chase, and seeks both rescission and declaratory relief that the policies are void as against public policy.

Fed. R. Civ. P. 54(b) provides:

> (b) Judgment Upon Multiple Claims or Involving Multiple Parties.
> When more than one claim for relief is presented in an action,
> whether as a claim, counterclaim, cross-claim, or third-party claim,
> or when multiple parties are involved, the court may direct the
> entry of a final judgment as to one or more but fewer than all of
> the claims or parties only upon an express determination that there
> is no just reason for delay and upon an express direction for the
> entry of judgment. . . .

Fed. R. Civ. P. 54(b).  According to that section, the entry of final judgment is appropriate where
(a) such judgment can be directed as to one or more, but fewer than all, of the claims or parties
in the action; and (b) there is no just reason for delay. *See Curtiss-Wright Corp. v. General Elec.
Co.*, 446 U.S. 1, 7 (1980); *GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 443 (6th Cir. 2004).
Chase argues that a final decision has been rendered as to a subset of pending claims (Seventh
through Ninth Counterclaims) and a subset of the parties (i.e., Chase).  Chase asserts that the
Illinois Union Order (Doc. 1709) resolved the issues involved in the Seventh through Ninth
Counterclaims, since that Order held that (1) Illinois Union could not assert fraud defenses to the
enforcement of its policies by the Banks; and (2) since the policies were properly construed as
surety bonds, the defenses of pre-existing losses and usury were unavailable to Illinois Union.

Additionally, Chase cites Sixth Circuit authority in support of its assertion that there is no
just reason to delay the entry of final judgment in this case.  In *Corrosioneering, Inc. v. Thyssen
Environmental Systems, Inc.*, 807 F.2d 1279, 1283 (6th Cir. 1986), the Court set forth several
factors for consideration in determining the propriety of a partial final judgment entry pursuant
to Rule 54(b):

> (1) the relationship between the adjudicated and unadjudicated
> claims; (2) the possibility that the need for review might or might
> not be mooted by future developments in the district court; (3) the

possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

*Corrosioneering, Inc. v. Thyssen Envtl. Sys., Inc.*, 807 F.2d 1279, 1283 (6th Cir. 1986), *quoting*

*Allis-Chalmers Corp. v. Philadelphia Elec. Co.*, 521 F.2d 360, 362-63 (3d Cir. 1975).[33]

Chase argues that the issues remaining to be decided after the issuance of a partial final judgment will be distinct from those already resolved, since (1) the claims against CMC insiders and others are distinct from the claims asserted by and against the Banks; and (2) the Citibank/Chase policy is unique and distinct from the policies issued to the other Banks. Additionally, since the Court's decisions on the Motions for Judgment on the Pleadings ("Pleadings Motions") were based only on the transaction documents, any subsequent information learned in discovery could not moot the need for review of the Court's decisions or require reconsideration of the same issues. Finally, Chase asserts, the case involves no claims that could serve as an offset to Illinois Union's liability, and the prospect of further delaying recovery would impose a substantial and unwarranted hardship on the Banks.

Illinois Union, on the other hand, asserts that the Court's discretion to declare an order "final" pursuant to Rule 54(b) must be exercised sparingly, and that partial final judgment may

---

[3] The *Allis-Chalmers* standard appears to have been rejected in part by the U.S. Supreme Court in *Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 7 (1980), on the basis that the standard established in *Allis-Chalmers* imposed an unduly harsh burden on a party seeking the entry of partial final judgment. It is unclear, however, what effect *Curtiss-Wright* has had on the five factors enumerated in *Allis-Chalmers*. As noted above, the Sixth Circuit applied the *Allis-Chalmers* factors in an opinion issued subsequent to the *Curtiss-Wright* decision. Given that the Court has found the entry of partial final judgment appropriate, even under the strict *Allis-Chalmers* standard, any confusion about the applicability of that standard should not affect the result here.

be awarded "only in a relatively select group of cases and applied to an even more limited category of decisions. . . ." 10 WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE: CIVIL 3D § 2656. Illinois Union argues that the standards of Fed. R. Civ. P. 54(b) are not satisfied here, because (1) each of the Seventh through Ninth Counterclaims also is asserted against parties other than Chase; (2) the Sixth Circuit is unlikely to accept any partial judgment for review, and the Chase judgment would be effectively "unreviewable" until the completion of the litigation; and (3) judgment should not be entered in favor of Chase without permitting Illinois Union the opportunity to amend its counterclaims.[34]

The Court declines to give detailed attention to Illinois Union's argument that final judgment should not be entered prior to permitting Illinois Union to amend and plead extrinsic facts in support of its interpretation of the transaction documents. Illinois Union has dedicated no less than 24 pages of its opposition memorandum to its amendment arguments, despite the fact that many of these arguments have been extensively addressed previously. While the Court does not prejudge the merits of a motion for leave to amend prior to considering such a motion upon full briefing, the Court notes that it does not contemplate the use of the amendment procedure as a means for undercutting this Court's thoroughly considered decisions. As such, the Court does not anticipate that any permitted amendment will moot the findings set forth in the Court's prior decisions or result in duplicative review of those findings. The Court thus turns to consideration of Illinois Union's other arguments and an assessment of the *Corrosioneering* factors.

---

[34] Illinois Union also argues that partial final judgment cannot be entered in favor of Chase, because Chase has failed to meet its burden of proving entitlement to the damages requested. The Court does not address that argument here, as the Court already has considered the sufficiency of Chase's proof.

According to Illinois Union, a grant of partial final judgment in this case would not dispose of "one or more, but fewer than all" claims or parties, since the Eighth and Ninth Counterclaims involve claims against other Banks in addition to Chase.[35]  Additionally, Illinois Union contends that the inclusion of CMC-related parties (including Lease Funding and Lease Funding LLC) precludes an entry of partial final judgment on any of the Seventh, Eighth or Ninth Counterclaims.[36]  Since none of the CMC-related entities were parties to the Pleadings Motions, Illinois Union asserts that the rights of those parties have not been and cannot be adjudicated at this stage.

For similar reasons, Illinois Union argues that the Sixth Circuit is unlikely to hear an appeal from a partial final judgment while claims against other Banks remain pending.  Illinois Union contends that the claims involving Chase and Illinois Union have much in common, both factually and legally, with those between Illinois Union and other Banks.  Thus, future developments might moot the need for review or result in duplicative review—particularly if Illinois Union is permitted to amend its counterclaims.  Finally, Illinois Union argues that considerations of expense and judicial economy counsel in favor of consolidating the issues for review here.

The Court takes the limitations of Fed. R. Civ. P. 54(b) seriously.  The Court has no desire, moreover, to condemn this already complex case to years of convoluted and duplicative

---

[35]    Although Illinois Union has resolved its claims with Sky, Footbridge and Waukegan since the filing of the motion for partial final judgment, claims remain pending by and against NetBank, including claims asserted against NetBank by Illinois Union in the Eighth and Ninth Counterclaims.

[36]    The Court does not address Illinois Union's alternative argument that an order of partial final judgment would not dispose of Chase's affirmative claims, since the Court already has considered and granted Chase's motion for final judgment as to those claims.

wrangling on appeal.  As such, the Court has given careful attention to the precise nature of the claims it is being asked to certify as final.  Although the Court finds certain differences between the allegations set forth in the Seventh Counterclaim and those articulated in the Eighth and Ninth Counterclaims, the Court has determined that it is appropriate to issue partial final judgment to Chase on all three counterclaims

The Seventh Counterclaim is asserted only against Chase, Lease Funding and Lease Funding LLC.  The Court entered default against Lease Funding and Lease Funding LLC on May 30, 2003 (*see* Transcript of 5/30/03 Hearing Regarding Show Cause Order, Doc. 1716, at 2, 27; Transcript of 6/4/03 Hearing Regarding Show Cause Order, Doc. 271, at 2), and will now proceed to enter default judgment against those entities as to the Seventh Counterclaim. Accordingly, the Seventh Counterclaim effectively is asserted against Chase alone.

Illinois Union's Seventh Counterclaim, which requests rescission of its Policy, is essentially the mirror image of Chase's affirmative claims against Illinois Union.  Chase's affirmative claims were pleaded in 02-16009, and the Court already has determined that an entry of final judgment is appropriate as to those claims pursuant to Fed. R. Civ. P. 58.  The Court's decision herein as to Chase's affirmative claims in 02-16009 is final in every sense of the word—it disposes of all claims between all parties in that action. Given the related nature of the claims, partial final judgment also will be entered as to the allegations contained in the Seventh Counterclaim.

While there is unquestionably overlap here between the allegations of the Seventh Counterclaim and the allegations asserted against other Banks in the First through Sixth Counterclaims, the similarity between those claims is far less apparent than that between the

Seventh Counterclaim and the mirror-image affirmative claims set forth in 02-16009. Since the Court has determined that final judgment is appropriate in 02-16009 pursuant to Rule 58, it is likewise appropriate to certify the related allegations of the Seventh Counterclaim. Consolidating all of these related issues in the same proceeding furthers both economy and judicial efficiency.

The Court does anticipate the later recurrence of certain overarching issues on appeal, including (1) whether surety or insurance law should apply to the construction of Illinois Union's policies; and (2) which entities were intended to be "obligees" in these transactions. The structure of the Chase/Illinois Union transaction is so unique, however, and the provisions of the Chase/Illinois Union policy so distinctive, that the Court expects such duplication to be minimal in this instance. The Court will enter a partial final judgment in favor of Chase and against Illinois Union, as to the allegations of the Seventh Counterclaim.

The Court finds that entry of partial final judgment also is appropriate as to the Eighth and Ninth Counterclaims, although for different reasons. Illinois Union filed the Eighth and Ninth Counterclaims asserting allegations against multiple parties, including not only CMC-related entities but numerous Banks. Since the filing of the motion for partial final judgment, Illinois Union has resolved its claims with Sky, Footbridge and Waukegan. Accordingly, the only Bank parties remaining to these counterclaims are Chase and NetBank.[37]

Although the Eighth and Ninth Counterclaims are not "mirror images" of any of Chase's affirmative claims, carving out Illinois Union's claims against Chase will not present the danger of duplicative review in these circumstances. As to Chase only, the substantive allegations of

---

[37] NetBank did not join in the motion for partial final judgment, pending this Court's resolution of its Motion to Renew Interest in Motion for Judgment on the Pleadings.

the Eighth and Ninth Counterclaims were effectively adjudicated by the Court in its Illinois Union Order. (Doc. 1709). In that Order, the Court held that Illinois Union's Policy actually was a surety bond, not an insurance policy, and should be so construed. Although it was unnecessary for the Court to reach the issue of the availability of insurance law defenses, the Court's holding with respect to the substantive nature of the transaction compels a finding that such defenses are precluded as a matter of law. *See* Doc. 1709, at 57 (preexisting loss defense unavailable where transaction documents showed undertaking of obligation to Banks), 58 (usury defense unavailable where obligations guaranteed were those of CMC, not the lessees). Accordingly, defenses grounded solely in insurance law are unavailable and the allegations of the Eighth and Ninth Counterclaims are moot as between Chase and Illinois Union.

Moreover, to the extent that other parties still remain as defendants to the Eighth and Ninth Counterclaims, the claims against Chase are distinct from those against such other parties. With respect to Illinois Union's claims against NetBank, the substantive issues underlying the Eighth and Ninth Counterclaims have not been resolved at this point, since NetBank did not participate in the Consolidated Motion for Judgment on the Pleadings.[38] With respect to the CMC-affiliated entities, the Court agrees with Chase that claims against those entities were not affected by the Court's rulings on the Motions for Judgment on the Pleadings, and thus those claims are entirely severable from the claims against Chase.

Accordingly, Chase's motion for partial final judgment is granted in its entirety.

---

[38] The applicability of the Court's prior Orders to NetBank is yet to be determined, through the Court's consideration of NetBank's pending Motion for Leave to Renew its Interest in the Motion for Judgment on the Pleadings (Doc. 1712).

## III. Conclusion

For the reasons set forth herein, Chase's motion for final judgment (02-16009, Doc. 8) is granted. Within ten days of the date of this Order, Chase shall submit an updated proposed judgment entry, including updated damage calculations. Judgment then will be entered in favor of Chase and against Illinois Union on Counts I through III of Chase's Complaint (02-16009, Doc. 1, attach. 3). The remainder of Chase's claims against Illinois Union will be dismissed as moot. Based on the Court's prior entry of default against Lease Funding in this action, Lease Funding's cross-claim also will be dismissed for failure to prosecute. As noted above, finally, all claims by Chase against CMC and CSC have been dismissed without prejudice.

Chase's motion for partial final judgment (02-16007, Doc. 43) is granted in its entirety. Judgment will be entered in favor of Chase and against Illinois Union as to Illinois Union's Seventh, Eighth and Ninth Counterclaims. Default judgment also will be entered against Lease Funding and Lease Funding, LLC as to the Seventh Counterclaim only.

**IT IS SO ORDERED.**

**s/Kathleen M. O'Malley**
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: April 20, 2006**