# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: COMMERCIAL MONEY | : | **Case No. 1:02CV16000** |
| CENTER, INC., EQUIPMENT | : | |
| LEASE LITIGATION | : | **(MDL Docket No. 1490)** |
| | : | |
| | : | **JUDGE O'MALLEY** |
| | : | |
| | : | **MEMORANDUM OF OPINION** |
| | : | **AND ORDER** |
| | : | |
| | : | **As Identified Herein, This Order** |
| | : | **Relates to Numerous Individual** |
| | : | **Cases** |

These actions were transferred to this Court by order of the Judicial Panel on Multidistrict Litigation ("the MDL Panel"), issued on October 25, 2002. (02-16000, Doc. 1). This Court has ordered that these actions be coordinated for pretrial purposes. (02-16000, Doc. 2).

The dispute in these actions centers around the Sureties' liability on various surety bonds issued in connection with certain transactions between the Banks[1] and Commercial Money Center ("CMC"). CMC's business purportedly involved the leasing of equipment and vehicles to numerous lessees in exchange for lease payments. CMC then pooled the leases and sold them to institutional investors. Apparently, the majority of CMC's leasing business was a sham, and the Banks claim millions of dollars in losses from these transactions. The Banks now sue the Sureties to recover on the surety bonds associated with the transactions.[2]

---

[1] Where not defined herein, capitalized terms used in this Opinion have the meanings ascribed to them in the Court's Consolidated Rulings issued August 19, 2005 (02-16000, Docs. 1708, 1709).

[2] The Court does not summarize here the entirety of the complicated factual scenario involved in these cases. Rather, the Court refers the reader to its two Consolidated Rulings on the numerous Motions for Judgment on the Pleadings, issued August 19, 2005 (02-16000, Docs. 1708, 1709).

These actions currently are before the Court upon a plethora of motions, including multiple motions for leave to amend the pleadings to assert new claims and counterclaims in these actions.

## I. Overview of Pending Motions for Leave to Amend

Multiple motions for leave to amend currently are pending before the Court. For convenience, the Court sets forth each of the pending motions, and the Court's disposition of each, below.

|   | CASE NUMBER/NAME | FILING PARTY | MOTION | DISPOSITION |
|---|---|---|---|---|
| **(1)** | **02-16001, *RLI Ins. v. CMC, et al.*** | Ameriana | Motion to Amend Answer and Counterclaim (02-16001, Doc. 39) | GRANTED |
| **(2)** | | Atlantic Coast Federal | Motion to File Amended Counterclaim (02-16001, Doc. 40) | GRANTED |
| **(3)** | | RLI | Motion for Leave to File a Second Amended Complaint (02-16001, Doc. 41) | GRANTED |
| **(4)** | **02-16003 (*AMICO v. Rafferty, et al.*)**<br><br>**02-16006 (*CSC v. Ace American, et al.*)**<br><br>**02-16010 (*Netbank v. Illinois Union, et al.*)**<br><br>**02-16012 (*Metropolitan Bank v. Royal, et al.*)**<br><br>**02-16018 (*Huntington Bank v. Royal*)**<br><br>**02-16019 (*Sky Bank, et al. v. Royal*)** | Anthony & Morgan, Michael Anthony | Motion for Leave to File Third Party Complaints (02-16000, Doc. 1776) | DENIED |

| | | | | |
|---|---|---|---|---|
| | **02-16022 (*Second National Bank v. Royal*)**<br><br>**02-16023 (*Bluebonnet Bank v. Royal*)**<br><br>**02-16028 (*Lakeland Bank v. Royal, et al.*)**<br><br>**02-16029 (*Royal v. Lakeland Bank, et al.*)**<br><br>**03-16000 (*RLI Insurance Company v. Guardian Financial Group, LLC*)** | | | |
| **(5)** | **02-16004, *Safeco Ins. v. CMC, et al.*** | Safeco | Motion for Leave to Amend Complaint (02-16004, Doc. 9) | GRANTED |
| **(6)** | **02-16005, *Ameriana Bank v. RLI*** | Ameriana | Motion to Amend Complaint (02-16005, Doc. 9) | GRANTED |
| **(7)** | **02-16007, *CMC v. Ace American and Illinois Union, et al.*** | Illinois Union | Motion for Leave to Amend Counterclaims (02-16000, Doc. 1783) | GRANTED IN PART AND DENIED IN PART |
| **(8)** | **02-16007 (*CMC v. Ace American and Illinois Union*),**<br><br>**02-16009 (*Citibank and Chase v. Illinois Union, et al.*)**<br><br>**02-16010 (*Netbank v. Illinois Union, et al.*)** | Illinois Union | Motion for Leave to Amend Answers (Reply to Footbridge Counterclaims) (02-16007, Doc. 58)<br><br>(Amended Answer)<br><br>(Answer to Third Amended and Supplemental Complaint) | GRANTED IN PART AND DENIED IN PART |
| **(9)** | **02-16010, *Netbank v. Illinois Union, et al.*** | Royal | Motion for Leave to File First Amended Counterclaims (02-16010, Doc. 30) | GRANTED |
| **(10)** | **02-16012, *Metropolitan*** | Guardian | Motion to File Amended | GRANTED |

| | | | | |
|---|---|---|---|---|
| | *Bank v. Royal, et al.* | Capital XV LLC | Counterclaims (02-16012, Doc. 77) | |
| **(11)** | | CadleRock | Motion for Leave to File Amended Complaint (02-16012, Doc. 78) | GRANTED |
| **(12)** | **02-16013, *Sky Bank v. RLI, et al.*** | Sky Bank | Motion for Leave to File First Amended Complaint (02-16013, Doc. 63) | GRANTED |
| **(13)** | **02-16014, *Bank One (Chase) v. Safeco*** | Safeco | Motion for Leave to Amend Answer and Add Counterclaim (02-16014, Doc. 25) | GRANTED IN PART AND DENIED IN PART |
| **(14)** | | Chase (Successor by merger to Bank One) | Motion for Leave to File First Amended Complaint (02-16014, Doc. 26) | GRANTED |
| **(15)** | **02-16017, *Huntington Bank v. AMICO, et al.*** | AMICO | Motion to File an Amended And Supplemental Answer to Counterclaims of Guardian Capital XVI (02-16017, Doc. 51) | GRANTED |
| **(16)** | | Guardian Capital XVI, LLC, Blaine Tanner and Guardian Shield Holdings | Motion to File Amended Counterclaims (02-16017, Doc. 53) | GRANTED IN PART AND DENIED IN PART |
| **(17)** | **02-16018, *Huntington Bank v. Royal*** | Huntington Bank | Motion for Leave to File First Amended Complaint (02-16018, Doc. 52) | GRANTED |
| **(18)** | | Guardian Capital XIV LLC | Motion to File Amended Counterclaims (02-16018, Doc. 53) | GRANTED |
| **(19)** | **02-16019, *Sky Bank, et al. v. Royal*** | Guardian Capital IX LLC | Motion to File Amended Counterclaims (02-16019, Doc. 63) | GRANTED |
| **(20)** | | CadleRock | Motion for Leave to File Amended Complaint (02-16019, Doc. 64) | GRANTED |
| **(21)** | **02-16020, *CadleRock v. Safeco*** | Safeco | Motion for Leave to Amend Answer and Counterclaim with | GRANTED IN PART AND DENIED IN |

| | | | Second Amended Answer and Counterclaim (02-16020, Doc. 35) | PART |
|---|---|---|---|---|
| **(22)** | | CadleRock | Motion for Leave to File Amended Complaint (02-16020, Doc. 36) | GRANTED |
| **(23)** | **02-16021, *Provident Bank v. Safeco*** | Provident Bank | Motion for Leave to File Amended Complaint (02-16021, Doc. 28) | GRANTED |
| **(24)** | | Safeco | Motion for Leave to Amend Answer and Counterclaim with Second Amended Answer and Counterclaim (02-16021, Doc. 29) | GRANTED IN PART AND DENIED IN PART |
| **(25)** | **02-16022, *Second National Bank v. Royal*** | Diversity Capital II, LLC | Motion to File Amended Counterclaims (02-16022, Doc. 57) | GRANTED |
| **(26)** | | CadleRock | Motion for Leave to File Amended Complaint (02-16022, Doc. 58) | GRANTED |
| **(27)** | **02-16024, *AMICO v. Ameriana Bank*** | AMICO | Motion to File Second Amended Complaint and First Amended Answer to Counterclaims of United Security Bank (02-16024, Doc. 40) | GRANTED IN PART AND DENIED AS MOOT IN PART |
| **(28)** | **02-16027, *Atlantic Coast Federal v. RLI*** | Atlantic Coast Federal | Motion to File Second Amended Complaint (02-16027, Doc. 8) | GRANTED |
| **(29)** | **03-16000, *RLI v. Guardian Financial Group LLC*** | Guardian Financial Group LLC, Guardian Capital XVIII LLC and Blaine Tanner | Motion to File Amended Counterclaims (03-16000, Doc. 17) | GRANTED IN PART AND DENIED IN PART |
| **(30)** | **03-16002, *Guardian Capital LLC v. Safeco*** | Safeco | Motion for Leave to Amend Answer with First Amended Answer (03-16002, Doc. 8) | GRANTED |
| **(31)** | | Guardian Capital LLC | Motion to File Amended Complaint (03-16002, Doc. 9) | GRANTED |

| | | | | |
|---|---|---|---|---|
| **(32)** | **03-16003, *Guardian Capital I, LLC v. Safeco*** | Safeco | Motion for Leave to Amend Answer with First Amended Answer (03-16003, Doc. 8) | GRANTED |
| **(33)** | | Guardian Capital I, LLC | Motion to File Amended Complaint (03-16003, Doc. 9) | GRANTED |
| **(34)** | **03-16004, *Guardian Capital II, LLC v. Safeco*** | Safeco | Motion for Leave to Amend Answer with First Amended Answer (03-16004, Doc. 5) | GRANTED |
| **(35)** | | Guardian Capital II, LLC | Motion to File Amended Complaint (03-16004, Doc. 6) | GRANTED |
| **(36)** | **03-16005, *Guardian Capital III, LLC v. Safeco*** | Safeco | Motion for Leave to Amend Answer with First Amended Answer (03-16005, Doc. 5) | GRANTED |
| **(37)** | | Guardian Capital III, LLC | Motion to File Amended Complaint (03-16005, Doc. 6) | GRANTED |
| **(38)** | **03-16006, *Diversity Capital One, Inc. v. Safeco*** | Safeco | Motion for Leave to Amend Answer with First Amended Answer (03-16006, Doc. 6) | GRANTED |
| **(39)** | | Diversity Capital One, Inc. | Motion to File Amended Complaint (03-16006, Doc. 7) | GRANTED |
| **(40)** | **04-16001, *Bank of Waukegan v. RLI*** | RLI | Motion for Leave to File Amended Answer (04-16001, Doc. 3) | GRANTED |

The standard for evaluating a motion for leave to amend is set forth in Fed. R. Civ. P. 15(a), which provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Accordingly, a Court should deny a motion for leave only when "the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile. . . ." *See Crawford v. Roane*, 53 F.3d 750, 753 (6th Cir. 1995).

"In determining what constitutes prejudice, the court considers whether the assertion of the new claim or defense would: require the opponent to expend significant additional resources to conduct discovery and prepare for trial; significantly delay the resolution of the dispute; or prevent the plaintiff from bringing a timely action in another jurisdiction. . . ." *Phelps v. McClellan*, 30 F.3d 658, 662-63 (6th Cir. 1994). A Court also may deny a motion for leave to amend where "the proposed amendment would be futile. . . ." *Kottmyer v. Maas*, 436 F.3d 684, 692 (6th Cir. 2006), *citing Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 569 (6th Cir. 2003). "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." ***Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000).**

Some of these motions have met with vigorous opposition, while others are unopposed. The Court first addresses each of the opposed motions in light of the standards set forth above, proceeding through these cases in numerical order. Second, the Court briefly sets forth its rulings with respect to the unopposed motions.

In certain of these cases, the parties have cross-moved for leave to amend, requesting permission to file both affirmative and responsive pleadings in the same action. In instances where the Court has granted leave to file an amended affirmative pleading, the requests for leave to file amended responsive pleadings technically would be mooted to the extent that a new responsive pleading must be filed in any event. As discussed later in this opinion, however, new defenses and counterclaims sought to be asserted still are subject to the Rule 12(b)(6) standards of futility. *See* section II(E)(1), *infra*.

The Court, thus, has evaluated each request for leave to amend individually and on the merits. To the extent that the Court has made rulings herein disallowing a claim or defense sought to be asserted in a responsive pleading (based on futility or other merits-based

determinations), the parties are admonished to bear the Court's findings in mind when crafting any responsive pleading they may ultimately file.

## II.    Opposed Motions

A.    **02-16003, *American Motorists Insurance Company v. Rafferty Capital Markets, et al.*; 02-16006 *Commercial Servicing Corporation v. Ace American Insurance Company, et al.*; 02-16010, *NetBank v. Illinois Union Insurance Company, et al.*; 02-16012, *Metropolitan Bank & Trust Company v. Royal Indemnity Company, et al.*; 02-16018, *The Huntington National Bank v. Royal Indemnity Company*; 02-16019; *Sky Bank, et al. v. Royal Indemnity Company*; 02-16022, *Second National Bank of Warren v. Royal Indemnity Company*; 02-16023, *Bluebonnet Savings Bank v. Royal*; 02-16028, *Lakeland Bank v. Royal Indemnity, et al.*; 02-16029, *Royal Indemnity Company v. Lakeland Bank, et al.*; 03-16000, *RLI Insurance Company v. Guardian Financial Group LLC, et al.*[3]**

1.    **Anthony Motion for Leave to File Third Party Complaints (02-16000, Doc. 1776)**

Anthony & Morgan Surety & Insurance Services Inc. and Michael Anthony (collectively, "Anthony") seek leave to file Third Party Complaints in multiple actions, as set forth above.[4] According to Anthony's brief, Anthony seeks to add Counterclaims against each of the Sureties that have asserted claims against Anthony—RLI Insurance Company ("RLI"), American Motorists Insurance Company ("AMICO") and Royal Indemnity Company ("Royal")(collectively, "Sureties")—as well as claims against Sterling Wayne Pirtle, Ronald

---

[3] Although Anthony erroneously included Case No. 02-16001 in his motion, Anthony is not even a party to that case, and no claims have been asserted against him. It appears that Anthony actually intended to include Case No. 03-16000, *RLI Ins. Co. v. Guardian Financial Group LLC*. Accordingly, the Court has construed Anthony's filing as referring to Case No. 03-16000, rather than 02-16001.

[4] The Sureties correctly note that Anthony's proposed third-party claims, as against the Sureties, are actually proposed counterclaims in most cases. Likewise, Anthony's proposed claims against Pirtle and Fisher are, in some cases, proposed counterclaims or cross-claims rather than third-party claims. Anthony seems unsure as to his own position on the status of these claims, as he also refers to them variously throughout the motion papers as "counterclaims" and "cross-claims."

Fisher, and CMC.[5]    Anthony's proposed allegations include: (1) claims for fraudulent misrepresentation against the Sureties, Pirtle, Fisher, and CMC; (2) claims for negligent misrepresentation against the Sureties, Pirtle, Fisher, and CMC; (3) claims of intentional and negligent interference with prospective business advantage against the Sureties, Pirtle and Fisher; (4) a claim for intentional infliction of emotional distress against the Sureties, Pirtle, Fisher and CMC; (5) federal RICO claims pursuant to 18 U.S.C. § 1962(c) and (d) against the Sureties, Pirtle, Fisher and CMC; (6) a claim of unfair business practices under California law against the Sureties, Pirtle, Fisher, and CMC; and (7) a claim for trade libel against the Sureties.

Essentially, Anthony argues that CMC and its principals committed fraud, and that the Sureties aided that fraud by (1) continuing to issue bonds on the CMC lease program; (2) delegating their underwriting and servicing responsibilities to CMC; and (3) promising investors that they would pay on the bonds, when they had no intention of doing so.  Anthony also alleges that statements made by the Sureties to Anthony's customers harmed his standing in the business community.  Anthony alleges that fraud by CMC and the Sureties destroyed his previously "spotless" reputation in the surety industry, caused his customers to cease to deal with him, and eventually compelled him to sell his ownership interest in his surety brokerage business at a significant loss.

Anthony attaches three proposed amended complaints, which are substantially similar, with the exception of specific facts relevant to the lease pools bonded by each particular Surety. Each of the proposed complaints asserts claims against one of the Surety defendants, as well as claims against Pirtle and Fisher.  While it is unclear whether the proposed complaints seek to

---

[5] Anthony acknowledges that CMC remains in bankruptcy proceedings in the Southern District of California, but he apparently does not recognize the impact of the automatic bankruptcy stay on Anthony's claims against CMC.  Although Anthony's brief indicates his intent to file claims against CMC, it is unclear whether his proposed pleadings actually assert such claims at this juncture.

assert claims against CMC, to the extent they do so, that effort would violate the automatic bankruptcy stay imposed by virtue of the ongoing proceedings in the Southern District of California, and must be unavailing. Anthony also does not indicate in his filing which of his proposed complaints he seeks to file in each of the above cases. It appears, however, that in each case, Anthony wishes to file the form complaint(s) relating to the particular Surety(ies) involved in that case.[6]

Not surprisingly, all three Sureties vigorously have opposed Anthony's motion.[7] Neither of the individual defendants has filed any opposition papers. The Sureties argue that Anthony's motion must be denied because (1) Anthony's proposed new claims were compulsory counterclaims and thus were required to be asserted in Anthony's answer, absent good cause; (2) even if Anthony's claims were not compulsory counterclaims, Anthony has excessively delayed in filing, as fact discovery already is complete; (3) Anthony seeks to assert entirely new claims, which would require substantial additional discovery; and (4) Anthony's proposed new claims are futile. The Court addresses each of these arguments in turn, and weighs the effect of each on Anthony's motion for leave to amend. For the reasons explained herein, Anthony's motion for leave to amend is <u>denied</u>.

### a. Compulsory Counterclaim

As noted above, the Sureties contend that Anthony's proposed new claims must be construed as compulsory counterclaims, and thus that the liberal amendment standard set forth in Fed. R. Civ. P. 15(a) does not apply. The Sureties rely on Fed. R. Civ. P. 13(a) to support their

---

[6] Royal, on the other hand, construes Anthony's filing as seeking to file <u>all three</u> complaints in <u>each</u> of the actions named, regardless of whether all Sureties previously were parties to that action. Again, Anthony's precise intention is unclear.

[7] Additionally, all of the Sureties filed conditional motions to reopen discovery in the event Anthony's motion for leave to amend is granted. (02-16000, Docs. 1808 and 1809).

assertion that such compulsory counterclaims were required to be pleaded in Anthony's original answer:

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

Fed. R. Civ. P. 13(a). In order to assert a compulsory counterclaim subsequent to the filing of the original answer, the pleader must demonstrate that the failure to file the counterclaim was the result of "oversight, inadvertence, or excusable neglect. . . ," or that "justice requires" the granting of leave to amend. Fed. R. Civ. P. 13(f). The Sureties assert that Anthony has not met this standard and that, in the absence of such a showing, his late-filed compulsory counterclaim is barred.

"For a claim to qualify as a compulsory counterclaim, there need not be precise identity of issues and facts between the claim and the counterclaim; rather, the relevant inquiry is whether the counterclaim 'bears a logical relationship to an opposing party's claim. . . .'" *Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.*, 292 F.3d 384, 389 (3d Cir. 2002), *quoting Xerox Corp. v. SCM Corp.*, 576 F.2d 1057, 1059 (3d Cir. 1978). In general, such a logical relationship exists where the claims "involve the same factual issues, the same factual and legal issues, or are offshoots of the same basic controversy between the parties. . . ." *See Transamerica Occidental*, 292 F.3d at 390.

The Sureties' claims against Anthony arise primarily from Anthony's alleged breaches of fiduciary duty, based on (1) the failure to disclose his double agency in accepting payments from CMC as well as the Sureties; and/or (2) his failure to disclose to the Sureties his receipt of the Whitfield packet, which alleged fraud by CMC, prior to entering into multiple lease bond

transactions on behalf of the Sureties. The Sureties argue here that Anthony's proposed claims have a logical relationship to those asserted by the Sureties, since all of the claims arise out of the same transaction or occurrence and stem from the same basic controversy. Anthony, on the other hand, asserts that his claims for commercial defamation and other wrongs do not relate to the Sureties' fiduciary duty allegations and should not be construed as compulsory counterclaims.

Anthony argues that he first learned of his claims against the Sureties during fact discovery, and thus that the situation is governed by Fed. R. Civ. P. 13(e):

> A claim which either matured or was acquired by the pleader after serving a pleading may, with the permission of the court, be presented as a counterclaim by supplemental pleading.

Fed. R. Civ. P. 13(e). Anthony does not articulate, however, which precise claims he learned of during discovery, or which facts first came to his attention then that alerted him to the existence of those claims.

Upon review of Anthony's proposed amended pleadings, it appears to the Court that Anthony's claims stem from the same transaction or occurrence as do the Sureties' claims, and thus bear a logical relationship to the claims of the Sureties. At least the vast majority of Anthony's claims—including the Sureties' purported conduct of a RICO "enterprise" and the making of material misrepresentations regarding the Sureties' intent to pay on the bonds—arise from actions allegedly engaged in by the Sureties during the continuation of the CMC lease bond program. Those claims that do involve later conduct, moreover, are also closely related to the overall lease bond controversy in this case, since those causes of action still require examination of the conduct of both Anthony and the Sureties in connection with the CMC lease bond program. Thus, Anthony's proposed new claims have a "logical relationship" to the claims

previously asserted by the Sureties in these actions.

As such, Anthony's claims would be compulsory counterclaims if they had accrued at the time of Anthony's filing of his initial responsive pleading. It appears that the majority of Anthony's claims, including his claims for fraudulent and negligent misrepresentation and for RICO violations, were mature at that point. There is more doubt with respect to the claims for interference with business relationships and infliction of emotional distress, since the conduct giving rise to those claims arguably continued after the commencement of this litigation.

It is impossible to determine precisely when each of Anthony's claims matured in these actions, as Anthony has not specified either (1) when the challenged conduct occurred; or (2) what facts learned during discovery made Michael Anthony aware of that conduct. Thus, it is equally difficult to determine whether the omission of certain claims might have been due to "oversight, inadvertence or excusable neglect . . . ," and thus subject to permissible amendment by discretion of the Court. The Court notes that these obstacles to analysis have been caused solely by the sparseness of Anthony's briefing and his proposed amended pleadings. Thus, while the Court's evaluation of this argument weighs in favor of the Sureties, it simply is not conclusive as to all of Anthony's claims. The Court, accordingly, does not rest its conclusion on this basis alone.

**b.    Undue Delay**

In the alternative, the Sureties argue, even if the liberal standard of Fed. R. Civ. P. 15(a) applies, a Court has discretion to deny a motion for leave to amend pursuant to that Rule where "the amendment is brought in bad faith, for dilatory purposes, results in underlined undue delay or prejudice to the opposing party, or would be futile. . . ." *See Crawford v. Roane*, 53 F.3d 750, 753 (6th Cir. 1995)(emphasis added). The Sureties contend that Anthony's two-and-a-half-year delay in filing

his claims demonstrates a lack of "due diligence," *United States v. Midwest Suspension & Brake*, 49 F.3d 1197, 1202 (6th Cir. 1995), and weighs heavily against the Court's granting of leave to amend in these cases. The Sureties cite numerous cases involving long delays in moving for leave to amend, and argue that such motions frequently are denied as prejudicial where the new claims sought to be asserted (1) would require the re-opening of completed fact discovery, *see Solomon v. North Am. Life & Cas. Ins. Co.*, 151 F.3d 1132, 1139 (9th Cir. 1998); or (2) would significantly shift the focus of the litigation. *See, e.g., Magnesystems v. Nikken, Inc.*, 933 F. Supp. 944, 952 (C.D. Cal. 1996); *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990)(motion for leave to amend to assert RICO claim denied).

Anthony, on the other hand, relies on the liberal language of Fed. R. Civ. P. 15(a), arguing that "leave [to amend] shall be freely given when justice so requires . . . ," and that "cases should be tried on their merits rather than the technicalities of pleadings. . . ." *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 425 (6th Cir. 1999), *amended by and reh'g denied by* 1999 U.S. App. LEXIS 3414, *quoting Tefft v. Seward*, 689 F.2d 637, 639 (6th Cir. 1982). According to Anthony, his proposed claims are timely, since they were filed on March 16, 2006, "the very first day after the Court's stay on amendments was lifted. . . ." (Anthony reply memorandum, 02-16000, Doc. 1801, at 2). Anthony asserts that the Court "encouraged" parties to wait until after its decision on the motions for judgment on the pleadings prior to amendment, and that, once the Court's ruling was issued, Anthony filed his proposed claims at the first opportunity. Anthony also contends that he was unable to assert his proposed claims earlier, since he was required to draft his answer without full knowledge of the facts, and became aware of the information underlying those claims only during the course of fact discovery.

Anthony argues that the Sureties cannot be prejudiced by the filing of his proposed Third

Party Complaints, because the Sureties have been on notice of these claims for quite some time. According to Anthony, his requests for admissions served on the Sureties, as well as his questioning of Surety witnesses at deposition, gave sufficient warning of the matters Anthony now seeks to raise.[8]  Additionally, Anthony claims that the facts in question—including certain disclosures and representations made by the Sureties—were known by the Sureties long before they were known by Anthony.   In short, Anthony argues that any delay cannot have caused prejudice to the Sureties.

The Court reiterates that, as explained in the Court's prior Orders, any delay of a party in filing motions for leave to amend its pleadings was a strategic choice by that party, and not based on any request by or order from the Court.  The Court made it clear from the start of this matter that it did not anticipate that its rulings on the many Rule 12(c) motions filed by the parties would be dispositive of the parties' disputes.  And, the Court did not bar the filing of amended pleadings.  Indeed, the Court encouraged the parties to finalize their pleadings at the earliest opportunity.  The mere passage of time since the filing of these cases, however, can not, alone, govern the Court's analysis.  The evaluation of the "delay" factor cannot occur in a vacuum, as mere delay is insufficient reason for denying a motion for leave to amend pursuant to Fed. R. Civ. P. 15(a).  Rather, a showing of prejudice to the opposing party is required. *See Dana Corp. v. Blue Cross & Blue Shield Mut.*, 900 F.2d 882, 888 (6th Cir. 1990), *clarified by and reh'g denied by* 1990 U.S. App. LEXIS 6860, *citing Moore v. Paducah*, 790 F.2d 557, 562, n.2 (6th Cir. 1986).  The Court notes that one factor demonstrating such "prejudice" may be the need to reopen discovery in order to address new claims. *See Leary v. Daeschner*, 349 F.3d 888, 907 (6th Cir. 2003)(amendment would prejudice defendant where reopening discovery would be

---

[8] Anthony attaches no exhibits that would demonstrate the nature of the issues raised by Anthony during discovery.

necessary, and a new defense would be necessary in response to the new claim); *Duggins v. Steak 'n Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999)(affirming district court's denial of leave to amend where reopening of discovery would have been necessary).

The Court will, accordingly, look to other factors, including the prejudice that would be caused by the need to reopen discovery in this case. The extent of the necessary discovery, and the existence of such prejudice, is discussed in section II(A)(1)(c), *infra*.

### c. Need for Discovery

In addition, the Sureties argue that Anthony's motion for leave to amend should be denied because his proposed pleadings raise entirely new issues, which would require significant additional discovery—including discovery into areas as to which Anthony previously has refused to respond to discovery requests. Specifically, the Sureties assert that Anthony previously declined to provide discovery regarding his finances, his post-CMC business dealings, and civil and criminal litigation in which Anthony was involved during the post-CMC time frame.

The Sureties contend that Anthony's new proposed claims bring all of these matters into issue, since the Sureties now must investigate (1) the basis for Anthony's new claims and the conduct by the Sureties alleged to have violated Anthony's rights; (2) Anthony's finances and the losses purportedly incurred because of the Sureties' actions; (3) the identity of Anthony's prior customers and why those customers ceased their dealings with Anthony; (4) the quality of Anthony's reputation both before and after his dealings with CMC; and (5) Anthony's emotional state, diagnosis and treatment, as well as other factors in his life that may have caused Anthony's emotional distress. In addition to fact discovery, the Sureties contend that these new issues may require the retention of additional experts, including experts on Anthony's damages, his "before

and after" reputation, his medical condition, and the value of his surety brokerage business.

Anthony argues that only limited, focused discovery will be required, since Anthony already has conducted detailed questioning of the Sureties regarding alleged misrepresentations made by employees of the Sureties to Anthony. Anthony contemplates that future discovery will last only 60-90 days, and will include only a "handful" of depositions and written discovery relating to certain representations made by the Sureties and their employees. Finally, Anthony asserts that, since expert discovery has not yet commenced, delay of discovery and scheduling in this case should not be a real concern. Anthony argues that the Sureties have had "ample time" and opportunity to address the issues set forth in his proposed amended pleadings.

Although Anthony does not address the Sureties' assertions as to the new areas in which discovery would be necessary, the Court agrees with the Sureties that a significant amount of discovery would be required to address the proposed new claims. While Anthony claims to need only limited discovery relating to certain representations by the Sureties, Anthony fails to give sufficient attention to the extensive discovery that would be needed to allow the Sureties to respond to these unanticipated claims. In the event that the Court were to grant Anthony's motion for leave to amend, the topics raised by the Sureties certainly are areas as to which the Sureties would be entitled to inquire. While Anthony refused previously to respond to certain lines of questioning at deposition (and arguably was entitled to do so, given the tenuous relevance of those matters to the claims then at issue in these actions), those issues now would be of central importance to the Sureties in responding to Anthony's proposed claims. Such topics would include inquiries into Anthony's financial and medical records, as well as inquiries as to civil and criminal matters that might have affected his business, finances or emotional state.

The Court also rejects the argument that the discovery conducted to date offered

sufficient opportunity to explore the claims Anthony seeks to assert. First, as noted above, the positions taken by Anthony or his counsel precluded the exploration of multiple areas relevant to the current proposed claims. Second, even to the extent that Anthony had not resisted certain discovery, the Court does not find the allegations Anthony now seeks to raise to be of such a nature as to have been reasonably anticipated by the Sureties. Contrary to Anthony's suggestion, the Sureties' allegations of breach of fiduciary duty and Anthony's defenses to those claims do not logically encompass such diverse claims as unfair business practices, intentional infliction of emotional distress, and violations of the RICO statute. Rather, the proposed new allegations inject multiple unanticipated issues into the controversy and significantly shift the focus of the litigation.

Accordingly, the Court finds that the breadth of Anthony's claims, the change in focus that would be required to conduct a full exploration of those claims, and the substantial amount of discovery that such an exploration would necessitate, are factors that more than justify denying Anthony's request to file his proposed amendments. Although it could do so, moreover, the Court need not rest its decision on this basis alone, since all of Anthony's claims are futile in any event. The Court's analysis of the legal sufficiency of Anthony's claims is set forth in detail below.

### d.    Futility

The Sureties argue that Anthony's proposed amended pleadings must fail, because each claim Anthony seeks to assert is futile. "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000). The Sureties assert that Anthony's proposed claims are futile for several reasons: (1) all of the claims alleged by Anthony are barred by California's

unqualified litigation privilege; (2) the majority of the claims sought to be asserted by Anthony are time-barred; and (3) none of Anthony's proposed new claims could survive a Rule 12(b)(6) challenge.

First, the Sureties rely on the absolute California statutory litigation privilege contained in Cal. Civ. Code 47(b), which protects "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Silberg v. Anderson*, 50 Cal. 3d 205, 212 (1990).[9] The Sureties argue that this privilege protects any communication occurring after the reasonable anticipation of litigation and that, to the extent that Anthony's claims are premised on such protected communications, such claims are barred.

California law draws a "careful distinction between a cause of action based squarely on a privileged communication, such as an action for defamation, and one based upon an underlying course of conduct evidenced by the communication . . . ." *See White v. Western Title Ins. Co.*, 40 Cal.3d 870, 888 (1985).[10] Thus, Anthony's proposed new claims would not be barred to the extent that those claims were based on conduct outside the scope of the privilege. Additionally, the statutory privilege "does not apply to statements made outside of the courtroom to nonparties unconnected to the proceedings." *Begier v. Begier*, 46 Cal. App. 4th 877, 882 (1st Dist. 1996).

Remarkably, Anthony's reply brief provides virtually no discussion of the Sureties' futility arguments, and thus does not discuss which of his allegations might fall outside the

---

[9] In his reply brief, Anthony does not address the issue of whether California law would apply to his new proposed claims. Given, however, that several of Anthony's new proposed claims indicate that they are derived from California state law, the Court assumes that Anthony intends to rely on California law as to his proposed non-federal claims.

[10] In *White*, the California Supreme Court held that evidence of bad faith settlement offers by an insurer was not protected by the litigation privilege and therefore was admissible. The Court recognizes that there has been some uncertainty in the California courts as to the precise scope of *White*. *See, e.g., California Physicians' Service v. Superior Court*, 9 Cal. App. 4th 1321, 1327 (4th Dist. 1992). *White* is, however, still good law in California.

California litigation privilege. Additionally, as noted above, Anthony does not indicate in his proposed amended pleadings the dates on which any of the Sureties' allegedly wrongful acts occurred. Thus, it is difficult for the Court to evaluate whether the acts underlying Anthony's proposed claims occurred prior to or during the pendency of these actions. Although the Court suspects that several of Anthony's claims are, in fact, based on communications that would be protected by the litigation privilege, the Court does not extensively consider this argument, as the Court finds Anthony's claims to be futile for several independent reasons.

The Sureties argue, second, that all of the proposed claims, with the exception of Anthony's RICO claim, are barred by their respective statutes of limitations. The Court notes that the parties' briefing is woefully inadequate with respect to the statute of limitations issue. In framing their arguments, all parties have assumed that the statute of limitations question must be decided according to the law that would govern the substantive legal issues in these actions. Since the parties apparently agree on the application of California law to these cases, the parties have relied on the statutes of limitations provided by California law in framing their arguments.

Where a case is transferred pursuant to 28 U.S.C. § 1407, however, the Court must undertake a significantly more complex analysis. First, with respect to state law claims, the federal transferee court must apply the substantive law of the state in which the action originally was filed, including the choice of law rules of the original filing jurisdiction. *See Ferens v. John Deere Co.*, 494 U.S. 516, 519-21 (1990); *In re Air Crash Disaster near Chicago*, 644 F.2d 594, 610 (7th Cir. 1981). Application of the transferor court's choice of law rules includes a determination of whether that state considers statutes of limitations to be <u>substantive</u> or <u>procedural</u> for conflicts purposes. *See* 17-111 MOORE'S FEDERAL PRACTICE—CIVIL 111.20(1)(c)(i). Where the statute of limitations is considered by the transferor jurisdiction to be

a matter of substantive law, the court should apply the statute of limitations of the jurisdiction whose law governs the substantive claims. *See id.* at 111.20(1)(c)(i)-(ii). Where the transferor forum treats statutes of limitations as procedural, however, the transferee court should assume that the transferor court would apply its own statute of limitations, and the transferee court should apply that limitations period as well. *See Electrical Power Board v. Monsanto Co.*, 879 F.2d 1368, 1375 (6th Cir. 1989).[11]

An exception to the rule that the Court must apply the choice of law rules of the transferor forum occurs where jurisdiction or venue was improper in the original jurisdiction. *See Muldoon v. Tropitone Furniture Co.*, 1 F.3d 964, 967 (9th Cir. 1993). In that circumstance, the court should apply the choice of law rules of the forum where the action is properly lodged, including its characterization of statutes of limitations as either substantive or procedural. *See id.*

Thus, in order to determine the statutes of limitations applicable here, the Court would be required, at a minimum, to examine the choice of law rules of each of the original filing jurisdictions, in order to determine whether each of those jurisdictions would consider statutes of limitations as substantive or procedural for conflicts purposes. That analysis would be complicated, moreover, by the fact that, in many of these cases, certain parties have sought to challenge the appropriateness of jurisdiction or venue in the original forum. At least in some instances, the Court might be required to resolve the jurisdictional and venue issues prior to determining the applicable statutes of limitations—at least some of which, presumably, might differ from case to case, depending on the jurisdiction of original filing. None of these questions have been briefed by the parties. Accordingly, the Court will not render definitive

---

[11] With respect to conflicts issues arising under federal law, the analysis is different. A federal transferee court is under no obligation to defer to a transferor court's differing interpretation of federal law, and should interpret federal law pursuant to the binding precedent of its own circuit. *See, e.g., Knouse v. Gen. Am. Life Ins. Co. (In re Gen. Am. Life Ins. Co. Sales Practices Litig.)*, 391 F.3d 907, 911 (8th Cir. 2004); *Hartline v. Sheet Metal Workers' Nat'l Pension Fund*, 201 F. Supp. 2d 1, 4 (D.D.C. 1999).

determinations as to the statute of limitations applicable to each of Anthony's proposed new claims.

Regardless of the statute of limitations applicable to each proposed new claim, the filing of many of those claims in this district might be barred by this Court's application of federal procedural law. The Sureties rely on Sixth Circuit law in arguing that omitted Counterclaims do not relate back to the filing of the original pleadings for statute of limitations purposes. *See Stoner v. Terranella*, 372 F.2d 89, 91 (6th Cir. 1967). As noted previously, in determining disputed matters of <u>federal</u> law, a district court must follow the precedent of its own circuit. *See, e.g.*, *Knouse*, 391 F.3d at 911; *Hartline*, 201 F. Supp. 2d at 4.

Accordingly, this Court is bound by *Stoner*, and would consider the timeliness of each of Anthony's proposed new claims without reference to the relation back doctrine.[12] The application of *Stoner* thus would bar at least the majority of Anthony's proposed new claims.[13] Given the uncertainty at this stage as to which state's statute of limitations applies to each proposed new claim, the Court individually examines the elements of each of Tanner's proposed causes of action. For the reasons set forth herein, the Court finds that each fails to state a claim, whether timely or not. Accordingly, all of Anthony's new proposed causes of action are futile.

### (1) Intentional Misrepresentation

Under California law, the elements of fraudulent misrepresentation are "(1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damages. . . ."

---

[12] Although *Stoner* has been criticized outside of this Circuit, *see, e.g., Banco Para El Comercio Exterior de Cuba v. First Nat'l City Bank*, 744 F.2d 237, 243 (2d Cir. 1984); *Saes Getters S.p.A. v. Aeronex, Inc.*, 219 F. Supp. 2d 1081, 1095 (S.D. Cal. 2002), it remains the law here.

[13] Interestingly, it appears that virtually all of the claims that arguably would not be time-barred are those that clearly <u>would be</u> barred by the absolute litigation privilege. The bottom line is that Anthony's request to amend his claims is vulnerable to attack on numerous grounds.

*Okun v. Morton*, 203 Cal. App. 3d 805, 828 (2d Dist. 1988). Pursuant to Fed. R .Civ. P. 9(b), a plaintiff raising claims based on allegations of fraud is required to set forth those allegations with particularity:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed. R. Civ. P. 9(b). The required particularity includes "'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1106 (9th Cir. 2003), *quoting Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1998).

Anthony's fraudulent misrepresentation claims do not come close to satisfying Fed. R. Civ. P. 9(b)'s particularity standard, nor, in many instances, would they otherwise state a claim. Anthony alleges, essentially, only that (1) CMC, through Pirtle and Fisher, made fraudulent misrepresentations regarding the existence, validity and performance of the CMC lease pools; (2) although the Sureties claimed servicing responsibility, the Sureties "delegated" such responsibilities to CMC; (3) despite representations to the contrary, the Sureties failed to conduct due diligence regarding either CMC or the underlying leases prior to issuing lease bonds and entering into SSAs; and (4) the Sureties represented that they would pay on the lease bonds even in the event of fraud by CMC, when they had no actual intention of ever doing so. All of these allegations are insufficiently particular and/or fail to state a claim.

With respect to the statements allegedly made by Pirtle and Fisher, Anthony's claims that CMC represented, "through Pirtle and Fisher and others . . . that CMC had originated valid equipment lease contracts that were to be bonded, pooled and sold to investors . . ." (02-16000, Doc. 1776, Exh. 1, at 15) contain no particularity whatsoever. Anthony identifies the employees purportedly responsible for the misrepresentations only in general terms, and he fails to describe

the specific representations made or even the general time frame in which they were made. Although Anthony does allege a fair number of allegedly fraudulent representations by "CMC," he does not specify which defendant made such statements, to whom, or the time at which they occurred. As claims against CMC itself currently are precluded by the operation of the automatic bankruptcy stay, Anthony's allegations against CMC alone fail to state a claim against any defendant. Accordingly, those claims would fail to survive a motion to dismiss and are futile.

As regards the proposed new claims against the Sureties, the vast majority of the allegations appear to stem from representations that were incorporated into the lease bonds and SSAs—which representations, arguably, would be sufficiently particularized as to satisfy the standards of Fed. R. Civ. P. 9(b). The problem is that Anthony was not a party to any of those transactions, and no representations could have been made to Anthony in those documents. In fact, by the time that bonds and SSAs were executed in any particular transaction, Anthony's role in that transaction was nearly complete. It simply strains credulity to imagine that representations made to CMC and/or the Banks, at a time when Anthony's role in the particular transaction had virtually ended, could have been intended to induce any reliance by Anthony, or that any actual reliance by Anthony would have resulted from representations made in the bonds or SSAs. Finally, to the extent that Anthony intends to base his fraudulent misrepresentation claims against the Sureties on representations made outside the transaction documents, such allegations are insufficiently particularized.

Accordingly, Anthony's fraudulent misrepresentation claims fail to satisfy the heightened pleading standards of Fed. R. Civ. P. 9(b) and are futile.

### (2)    Negligent Misrepresentation

Negligent misrepresentation, under California law, requires "(1) [a] representation as to a material fact, (2) [the] representation is untrue, (3) regardless of actual belief, the defendant made the representation without a reasonable ground for believing it true, (4) intent to induce reliance, (5) justifiable reliance by plaintiff who does not know the representation is false, and (6) damage. . . ." *Masters v. San Bernardino County Employees Retirement Assn.*, 32 Cal. App. 4th 30, 40 (4th Dist. 1995). As with the fraudulent misrepresentation claim, claims for negligent misrepresentation are subject to the particularity requirements of Fed. R. Civ. P. 9(b). *See Meridian Project Sys. v. Hardin Constr. Co.*, 404 F. Supp. 2d 1214, 1219 (E.D. Cal. 2005)("[i]t is well-settled in the Ninth Circuit that misrepresentation claims are a species of fraud, which must meet Rule 9(b)'s particularity requirement. . . ."), *citing Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1141 (C.D. Cal. 2003)("[i]t is well-established in the Ninth Circuit that both claims for fraud and negligent misrepresentation must meet Rule 9(b)'s particularity requirements. . . ."). Accordingly, for the reasons described above, Anthony's negligent misrepresentation claims also fail to satisfy the particularity requirements of Fed. R. Civ. P. 9(b), and thus are futile.

### (3)    Interference with Prospective Business Advantage

Anthony's proposed new claims include causes of action for both intentional and negligent interference with prospective business advantage. "To establish a claim of intentional interference with prospective business advantage, the plaintiff must establish: (1) a specific economic relationship between the plaintiff and some third person containing the probability of future economic benefit to the plaintiff; (2) knowledge by defendant of the existence of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship;

(4) actual disruption of the relationship; and (5) damages proximately caused by the defendant's acts. . . ." *Panavision Int'l L.P. v. Toeppen*, 945 F. Supp. 1296, 1305 (C.D. Cal. 1996), *aff'd*, 141 F.3d 1316 (9th Cir. 1998). The elements for negligent interference with prospective business advantage are the same, except that mere negligence is required. *See, e.g., North American Chemical Co. v. Superior Court*, 59 Cal. App. 4th 764, 786 (2d Dist. 1997).

Anthony's new proposed complaints allege essentially that (1) the Sureties refused to pay on their bonds, based on a spurious fraud defense; (2) certain (unspecified) customers of Anthony's, when they heard of the fraud allegations and the Sureties' refusal to pay, ceased to do business with Anthony; (3) at the time that defendants made false representations, they were "aware of the business relationships between Michael Anthony and A & M, on the one hand, and the bank, financial institutions and other participants in the capital markets on the other hand . . . ." (02-16000, Doc. 1776, Exh. 1, at 22); (4) that defendants' conduct also caused Anthony to lose his business relationship with A & M; and (5) that defendants engaged in their alleged conduct with the intention of disrupting those relationships.

Other than Anthony's allegation that he had a business relationship with A & M, Anthony's new proposed pleading fails to allege the existence of any specific economic relationship that was or could have been disrupted by the defendants' conduct. Although Anthony's business relationships may have been extensive, and it may have been impractical to detail all those relationships, there is no justification for Anthony's failure to specify even one such relationship. Without specific allegations as to any relationship purportedly disrupted by defendants' conduct, Anthony cannot possibly demonstrate (1) defendants' knowledge of those relationships, (2) their intent to disrupt such relationships, or (3) causation of the alleged damage suffered by Anthony.

Moreover, Anthony has not alleged any conduct by defendants directed at disrupting his business relationships. Rather, it appears that Anthony's allegations relate only to the Sureties' allegedly wrongful refusal <u>to pay the Banks</u> on the surety bonds.[14] While the propriety of the Sureties' conduct vis-à-vis the Banks remains one of the central issues in this litigation, the Court does not find that any possible construction of Anthony's pleadings supports the conclusion that the Sureties denied the Banks' claims with the specific intention of harming Anthony's relationships with his clients, or in disregard of any duty of care owed to Anthony. Since Anthony was not a party to any of the transactions at issue, the Court does not find that allegations of an alleged breach of the transaction documents are sufficient to support a claim for interference with prospective economic advantage vis-à-vis Anthony.

In essence, Anthony's new proposed pleading falls short of alleging that the refusal of customers to deal with Anthony resulted from any affirmative acts of the Sureties (and certainly none clearly exempt from the protections of the Sureties' litigation privilege). Rather, Anthony appears to allege that his customers, upon hearing of the Sureties' fraud claims and allegations of Anthony's role in the CMC scheme, made unilateral decisions to cease dealing with Anthony. The Court declines to find that either (1) a Surety's denial of a bond claim made by a third party; or (2) a Surety's privileged conduct in filing fraud litigation against its former agent, may give rise to a claim for interference with prospective business advantage on the part of the former agent. Accordingly, Anthony's claims for interference with prospective business advantage are futile.

---

[14] To the extent that Anthony seeks to assert this cause of action against individual defendants Fisher and Pirtle, Anthony has not pleaded any facts supporting the assertion of such claims, as Anthony does not allege any conduct by Fisher or Pirtle directed at interfering with Anthony's business relationships. Although Anthony's pleading arguably may allege that fraudulent statements were made by these two defendants, it is not enough to suggest that the making of fraudulent statements also constitutes an interference with prospective business advantage whenever customers later come to suspect that the plaintiff also was involved in the fraud.

## (4)    Intentional Infliction of Emotional Distress

"Under California law, the elements of intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by defendant's outrageous conduct." *Simo v. Union of Needletrades, Indus. & Textile Emple., Southwest Dist. Council*, 316 F.3d 974, 992 (9th Cir. 2003), *amended by* 322 F.3d 602 (2003). "The conduct must not only be intentional and outrageous, but must also be 'directed at plaintiff. . . .'" *Id.*, *quoting Sabow v. United States*, 93 F.3d 1445, 1454-55 (9th Cir. 1996), *amended by* 1996 U.S. App. LEXIS 24973 (9th Cir. 1996), *and reh'g granted, amended by* 1996 U.S. App. LEXIS 27829 (9th Cir. 1996) (internal quotation omitted).

"Conduct is deemed outrageous if it is so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Simo*, 316 F.3d at 992, *quoting Saridakis v. United Airlines*, 166 F.3d 1272, 1278 (9th Cir. 1999)(internal quotation omitted).  Parties retain a privilege to pursue their own economic interests and assert their legal rights, although emotional distress may result from such conduct. *See Fletcher v. Western National Life Ins. Co.*, 10 Cal. App. 3d 376, 395 (4th Dist. 1970)("[u]ndoubtedly an insurance company is privileged, in pursuing its own economic interests, to assert in a permissible way its legal rights and to communicate its position in good faith to its insured even though it is substantially certain that in so doing emotional distress will be caused. . . .").

With respect to Anthony's emotional distress claim, the proposed pleadings are sparse as to the conduct actually alleged to have caused Anthony's harm.  Anthony alleges only that all of the defendants engaged in actions that "were extreme and outrageous, and were perpetrated with

the intent to cause, or with reckless disregard to the probability they would cause, Michael Anthony emotional distress." (02-16000, Doc. 1776, Exh. 1, at 24). Construing the pleadings loosely, the Court finds allegations of (1) fraudulent misrepresentations by CMC; (2) the Sureties' failure to honor their commitments, including the obligations to perform due diligence and to oversee the servicing performance of CMC; (3) the Sureties' refusal to pay on the surety bonds based on assertions of fraud by CMC; and (4) Anthony's claim that the loss of his business, and the income associated with that business, caused him emotional distress.

In the Court's view, there is no reasonable construction under which Anthony's new proposed allegations state a claim for intentional infliction of emotional distress. To the extent that it is possible to discern what conduct Anthony alleges to have caused his emotional distress, Anthony bases his claims on either (1) fraud by CMC—an entity which remains in bankruptcy and currently is not subject to claims against it; or (2) conduct stemming from the Sureties' assertion of rights vis-à-vis the Banks. Insofar as Anthony was not a beneficiary under the surety bonds or a party to whom any rights were owed under those bonds, the Court is unable to construe any breach of those obligations as a wrong toward Anthony, let alone such an "extreme and outrageous" wrong as to state a claim for intentional infliction of emotional distress.

Moreover, to the extent that Anthony's claims arise from actions allegedly taken by the Sureties during this litigation, any such actions would be privileged unless taken in outright bad faith. Finally, even construing Anthony's allegations in the light most favorable to him, Anthony does not appear to allege that the defendants' actions proximately caused the loss of his business or the resulting emotional distress. Rather, he appears to allege unilateral actions by his customers after learning facts that were publicly available.

Accordingly, Anthony's new proposed claim for intentional infliction of emotional distress is futile.

### (5)    RICO—18 U.S.C. § 1962(c)-(d)

In order to prove a violation of the RICO statute, 18 U.S.C. § 1962(c), a plaintiff must demonstrate "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62 (1997). A pattern of racketeering activity requires "at least two acts of 'racketeering activity,' the so-called predicate acts. . . ." *Id.* (internal quotation omitted), *citing* 18 U.S.C. § 1961(5). In order to prove a conspiracy pursuant to 18 U.S.C. § 1962(d), the plaintiff must demonstrate that the partners in a criminal plan have conspired to violate § 1962.

As Anthony relies on alleged predicate acts of wire or mail fraud as the underlying basis for his RICO claim, he must plead the elements of a mail or wire fraud action, including "(1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell. Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996). Additionally, RICO claims must be pleaded under the heightened standards of Fed. R. Civ. P. 9(b) when the predicate acts are based on fraud. *See, e.g., Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004); *Eva v. Midwest Nat'l Mortg. Banc, Inc.*, 143 F. Supp. 2d 862, 877-78 (N.D. Ohio 2001).

Anthony alleges, in conclusory terms, that "cross-defendants committed predicate wire and mail fraud acts under RICO by making and ratifying false statements about the existence of lessees and leases, making and ratifying false statements about doing individual lease underwriting investigations on the leases and lessees, and making and ratifying false statements

about paying on the bonds where lessees defaulted." (02-16000, Doc. 1776, Exh. 1, at 25). Although Anthony alleges vague representations by "defendants," "orally and in writing," (02-16000, Doc. 1776, Exh. 1, at 15), Anthony does not allege even one specific wire or mail communication that could form the basis for an underlying predicate act. Without a single predicate act alleged with the requisite Rule 9(b) specificity, the claims that unnamed defendants operated a RICO enterprise, or conspired to do so, must fail.

Although Anthony indicates in his proposed pleadings that he intends to file a RICO case statement setting forth his allegations in more detail, the "**RICO** order is a discretionary administrative tool . . .," and "the Court need not consider Plaintiff's **RICO case statement** in determining the adequacy of the allegations contained in the [proposed Amended] Complaint. . . ." *Leisure v. Franklin County Court of Common Pleas*, 2006 U.S. Dist. LEXIS 29531, *14, n.3 (S.D. Ohio May 8, 2006)(internal quotation omitted)(unpublished disposition). Where, as here, the allegations of the proposed new pleadings are so evidently insufficient, the Court sees no reason to permit or require the filing of a Case Statement.

Accordingly, the RICO allegations of Anthony's proposed new complaints are futile.

### (6) Unfair Business Practices

Under California law, a violation of section 17200 of the Business and Professions Code includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [§ 17500 *et seq*., dealing with false advertising]." Cal. Bus. & Prof. Code § 17200. While the scope of § 17200 is sweeping, encompassing various forms of unfair and unlawful business conduct, a complainant proceeding under that section is required both (1) to identify the particular section of the Act that has been

violated, and (2) to describe the facts supporting the violation <u>with particularity</u>. *See Khoury v. Maly's of California, Inc.*, 14 Cal. App. 4th 612, 619 (2d Dist. 1993).

Anthony attempts to support this claim by alleging, in a conclusory manner, that defendants defrauded him and that they tortiously interfered with his business relationships with A & M and with various banks. Anthony also appears to suggest that the Sureties, through the issuance of bonds they did not intend to honor, generated millions of dollars in premiums, and thus unfairly competed with other sureties in the industry.

For the reasons set forth above with respect to Anthony's fraud and tortious interference claims, Anthony fails to identify any allegedly unfair business practices with the requisite specificity. Anthony has neither identified any particular misrepresentations (including the speaker, date and content of the misrepresentation), nor has he specified the relationships interfered with or the conduct alleged to constitute such interference. Anthony falls far short of meeting California's heightened pleading standard for this tort. To the extent, moreover, that Anthony relies on alleged unfair competition by the Sureties with other businesses in the surety industry, such conduct cannot have caused any harm to Anthony, as Anthony is not in competition with any of the Sureties.

Accordingly, Anthony's claim for violation of Cal. Bus. & Prof. Code § 17200 is futile.

### (7)     Trade Libel

Anthony's tenth count seeks to assert a claim for trade libel against the Sureties. "Trade libel is defined as an intentional disparagement of the quality of property, which results in pecuniary damage to plaintiff. . . . Injurious falsehood, or disparagement, then, may consist of the publication of matter derogatory to the plaintiff's title to his property, or its quality, or to his

business in general. . . ." *Erlich v. Etner*, 224 Cal. App. 2d 69, 73 (2d Dist. 1964), *quoted in Atlantic Mutual Ins. Co. v. J. Lamb, Inc.*, 100 Cal. App. 4th 1017, 1035 (2d Dist. 2002).

A plaintiff seeking to plead a claim for trade libel must allege "that the defendant: (1) made a statement that disparages the quality of the plaintiff's product; (2) that the offending statement was couched as fact, not opinion; (3) that the statement was false; (4) that the statement was made with malice; and (5) that the statement resulted in monetary loss." *Optinrealbig.com, LLC v. Ironport Sys.,* 323 F. Supp. 2d 1037, 1048 (N.D. Cal. 2004). A plaintiff claiming trade libel must plead special damages, which must be specifically set forth pursuant to Fed. R. Civ. P. 9(g). *See Isuzu Motors Ltd. v. Consumers Union of United States, Inc.*, 12 F. Supp. 2d 1035, 1043-44 (C.D. Cal. 1998).

A showing of special damages requires, at a minimum:

> facts showing an established business, the amount of sales for a substantial period preceding the publication, the amount of sales subsequent to the publication, and facts showing that such loss in sales were the natural and probable result of such publication. . . .

*Isuzu Motors*, 12 F. Supp. 2d at 1047, *quoting Fowler v. Curtis Publishing Co.*, 182 F.2d 377, 379 (D.C. Cir. 1950). "A bare allegation of the amount of pecuniary loss is insufficient for the pleading of a trade libel claim . . . . " *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1113 (C.D. Cal. 2004). Additionally, "in the usual case, . . . plaintiff must identify the particular purchasers who have refrained from dealing with him, and specify the transactions of which he claims to have been deprived. . . ." *Erlich*, 224 Cal. App. 2d at 73-74.

Once again, Anthony forces the Court to guess at the conduct of defendants that is alleged to constitute the tort of trade libel. Anthony alleges that the Sureties "made false, disparaging statements to existing and potential future clients and business associates of Michael Anthony . . .," (02-16000, Doc. 1776, Exh. 1, at 30), but he fails to allege any specific statement

by any defendant that disparaged his products or services. Rather, Anthony alleges only rumors and innuendo, stating that "[w]hen word got out that the bonds were not being paid . . . current and potential customers . . . stopped doing business with Michael Anthony." (02-16000, Doc. 1776, Exh. 1, at 5)(emphasis added). To the extent that Anthony seeks to allege trade libel based on statements made by the Sureties in their pleadings or otherwise in this litigation, such statements are absolutely privileged. Cal. Civ. Code § 47(b). To the extent that Anthony claims that the Sureties made defamatory statements outside this litigation, he simply has not alleged such statements. "The failure . . . to distinctly aver a disparaging publication in [the] complaint precludes any recovery on a [trade libel] theory. . . ." *Nichols v. Great American Ins. Companies*, 169 Cal. App. 3d 766, 774 (3d Dist. 1985).

Moreover, Anthony has failed to allege either (1) any customers allegedly lost by virtue of the defendants' defamatory statements; or (2) special damages. Anthony's proposed new complaints do not identify a single lost customer, nor do they set forth specifically the amount of sales lost from those customers as a result of defendants' alleged trade libel. Rather, the proposed complaints state only, without explanation, that the "[a]ctual damages for the loss of Mr. Anthony's ownership interest in A & M are $60,000,000. . . ." (02-16000, Doc. 1776, Exh. 1, at 28).

Anthony's trade libel allegations are insufficient, and accordingly, his proposed new trade libel claim is futile.

### e. Conclusion

For the reasons set forth herein, Anthony's motion for leave to file third-party complaints is denied in its entirety.

**B.**     **02-16007, *Commercial Money Center, Inc. v. Ace American Insurance Company and Illinois Union Insurance Company***

      **1.**     **Illinois Union Motion for Leave to Amend Counterclaims [Doc. 50]**[15]

Illinois Union Insurance Company ("Illinois Union") moves, pursuant to Fed. R. Civ. P. 15(a), for leave to file its Third Amended Counterclaims, arguing that the new allegations sought to be pleaded are based on (1) facts and evidence obtained through discovery; (2) certain rulings by the Court, which require Illinois Union to assert new claims and defenses; and (3) Illinois Union's recent settlement of some of the claims previously asserted in its Second Amended Counterclaims.

Illinois Union's motion for leave to amend originally sought to amend its counterclaims against Footbridge Limited Trust ("Footbridge"), NetBank, N.A. ("NetBank"), and JP Morgan Chase Bank/Citibank, N.A. (collectively, "Chase").  On April 5, 2006, Illinois Union and Footbridge filed a stipulation requesting that all claims and counterclaims between them be stayed due to a pending settlement, and that Footbridge be granted until April 29, 2006 to respond to Illinois Union's motion. (02-16007, Doc. 59).  On June 20, 2006, Illinois Union and Footbridge filed a motion for dismissal (02-16007, Doc. 67), which the Court granted on July 27, 2006.  All claims between Illinois Union and Footbridge now have been resolved, and accordingly, Illinois Union's motion for leave to amend to assert its proposed First Counterclaim is <u>denied as moot</u>.

With respect to Illinois Union's motion for leave to amend as against Chase, the Court granted Chase's motion for partial final judgment in this action on April 20, 2006. (02-16000, Doc. 1817).  On August 4, 2006, the Court entered partial final judgment in Chase's favor

---

[15] In connection with this motion, Illinois Union also has filed a motion for leave to file an oversized memorandum of law in support of its motion for leave to amend counterclaims.  That motion (02-16007, Doc. 55) is <u>granted</u> as unopposed.

pursuant to Fed. R. Civ. P. 54(b). (02-16007, Doc. 69). Since the claims between Illinois Union and Chase in this action have been finally resolved, Illinois Union's motion for leave to file its proposed Fourth Counterclaim against Chase accordingly is <u>denied as moot</u>.

As against NetBank, Illinois Union seeks to amend its pleadings to assert additional facts relating to the following contentions:

(1)     NetBank concealed its knowledge of extensive defaults and CMC's operation of a Ponzi scheme, in order to induce Illinois Union to issue its replacement Policy;[16] and

(2)     NetBank knew that Illinois Union had issued insurance policies, not bonds.

Illinois Union also seeks leave to assert alternative claims and defenses based on the Court's ruling, in the Illinois Union Order (02-16000, Doc. 1709), that the purported "Policies" issued by Illinois Union were actually surety bonds. Finally, Illinois Union seeks leave to withdraw certain claims, including claims against parties with whom it has settled and claims it has decided not to pursue. Illinois Union asserts that its proposed amendments were contemplated by the Court's original scheduling order, are timely, and do not cause prejudice to any party.

The Court details each of Illinois Union's arguments, and the opposing arguments raised by NetBank, below. For the reasons set forth herein, Illinois Union's motion for leave to amend

---

[16] The Court, in its Illinois Union Order (02-16000, Doc. 1709), previously found that Illinois Union issued surety bonds, not insurance policies. That finding notwithstanding, the Court adopts the terminology used by the parties in referring to the instrument guaranteeing each lease pool as a Policy.

is <u>granted in part and denied in part</u>.[17]

### a. Claims Against NetBank (Proposed Second, Third and Tenth Counterclaims)

Illinois Union's proposed Second and Third Counterclaims assert rescission claims against NetBank with respect to the Policies issued in September and October 2000, and the Policy issued in January 2001, respectively. Illinois Union contends that NetBank made misrepresentations and concealed material facts when seeking to obtain its Policies from Illinois Union, and asserts that it is entitled to rescind its Policies and SSAs vis-à-vis NetBank because of fraud both by NetBank and by its co-insured and agent, CMC.

Illinois Union seeks to allege that NetBank knew certain facts from the beginning of its relationship with CMC, including facts that led NetBank to believe that CMC was committing fraud and operating a Ponzi scheme, and that NetBank nonetheless acquired interests in more than $100 million of CMC leases (guaranteed by Illinois Union's Policies), without ever informing Illinois Union of these material facts. Illinois Union asserts that, at least by the fall of 2000, NetBank had information sufficient to inform it that lease defaults were much higher than reported, that many pools had default rates exceeding 35%, and that a few pools had default rates as high as 69%. Allegedly, through an audit in the fall of 2000 by NetBank's regulator, the Office of Thrift Supervision ("OTS"), NetBank learned that CMC was paying more than $300,000 per month to cover defaults on NetBank's pools alone—and thus that CMC's cash "burn rate" was more than $7 million per year.

After learning this information, a team of auditors from NetBank and OTS traveled to California in December 2000 to conduct an internal audit of CMC and determine whether its

---

[17] The analysis in this section does not address Illinois Union's proposed Eleventh Counterclaim, as this Counterclaim contains no allegations directed at NetBank, and no party has opposed the filing of this proposed Counterclaim. Accordingly, Illinois Union's motion for leave to amend to add the proposed Eleventh Counterclaim is <u>granted</u>.

ability to continue making servicer advances was sustainable. CMC refused to allow access to its reserve account records, and the OTS/NetBank team was unable to complete its audit. Additionally, in the fall of 2000, NetBank allegedly learned that another bank in Texas was having significant problems relating to high default rates on CMC leases. Thus, according to Illinois Union, NetBank knew by no later than the fall of 2000 that its problems with the CMC leases were not isolated.

Prior to the fall of 2000, NetBank already had acquired interests in multiple CMC lease pools, several of which were bonded by sureties Frontier Insurance Company ("Frontier") and Amwest Surety Insurance Company ("Amwest"). The ratings of these two sureties declined precipitously in 2000, and OTS informed NetBank that it would be required to post significant loss reserves if it could not secure new coverage on the pools previously bonded by Frontier and Amwest. Accordingly, NetBank sought replacement coverage from Illinois Union in the winter of 2000-2001.

Illinois Union contends that NetBank failed to disclose the foregoing facts to it in an attempt to secure such replacement coverage and avoid the necessity of posting large reserves. Additionally, Illinois Union alleges that NetBank sought to avert potential fraud liability by avoiding direct contact with Illinois Union, instead engaging CMC as its agent to communicate with Illinois Union and make certain representations regarding the status of the leases in question. Illinois Union contends that, regardless of whether the Policies are construed as credit insurance or as surety bonds, NetBank had a duty to disclose facts that materially increased the surety's risk "beyond that which the creditor has reason to believe the surety intends to assume . . . ," where NetBank had "reason to believe that these facts [were] unknown to the surety and

[had] a reasonable opportunity to communicate them to the surety. . . ." *Sumitomo Bank of California v. Iwasaki*, 70 Cal. 2d 81, 90 (1968).

Illinois Union's proposed amendments thus set forth detailed facts regarding allegedly fraudulent conduct of NetBank. NetBank has opposed Illinois Union's motion for leave to amend its counterclaims, arguing that (1) to the extent Illinois Union seeks to amend in order to allege fraud by NetBank as to the two earlier lease pools (i.e., those that predate the OTS audit), the proposed amendment does not state a claim and does not satisfy the heightened standards of Fed. R. Civ. P. 9(b); and (2) to the extent that Illinois Union seeks to allege extrinsic facts in support of its contentions relating to the replacement Policy issued by Illinois Union in January 2001, or to add facts to other Counterclaims that have not been challenged, such amendments are superfluous.

With respect to Illinois Union's proposed Second Counterclaim (which seeks rescission of the September and October 2000 Policies), NetBank argues that all of the allegations contained therein are barred by the law of the case, fail to state a claim or do not satisfy the specificity standards of Fed. R. Civ. P. 9(b). The Court agrees.

The proposed Second Counterclaim contains (1) general assertions regarding NetBank's "knowledge" of unspecified facts that caused NetBank to suspect in 1999 that CMC was operating a Ponzi scheme; (2) allegations that, despite such "knowledge," NetBank then proceeded to invest more than $100 million of its own funds into CMC's lease pools; (3) allegations regarding CMC's role as NetBank's "agent" in connection with the transactions; and (4) allegations concerning NetBank's knowledge of and agreement to the issuance of an insurance policy rather than a surety bond. NetBank argues that Illinois Union's proposed new allegations cannot meet Fed. R. Civ. P. 9(b) standards, since Illinois Union fails to allege any of

the facts learned by NetBank, its president or its "senior officers," which purportedly caused NetBank to suspect that CMC could be operating a Ponzi scheme.

NetBank also contends that Illinois Union's allegations in the Second Counterclaim fail to state a claim because they fail to allege any facts that would give rise to a duty to disclose on the part of NetBank. In the absence of any fiduciary or confidential relationship, NetBank asserts, a creditor has no duty to disclose information to a surety, where the information in question is equally available to the surety. According to NetBank, no such duty can arise where, as here, (1) Illinois Union had a long-term insurance relationship with CMC; (2) the transaction documents provided that Illinois Union would have full access to the books and records of CMC; (3) Illinois Union has not alleged that NetBank had any reason to believe that all of the facts regarding CMC were not in the possession of Illinois Union; and (4) the first two Policies were procured by CMC from Illinois Union, and NetBank thus had no reasonable opportunity to communicate any known facts or beliefs regarding CMC's operations.

The Court carefully has considered the entirety of the allegations in Illinois Union's proposed Second Counterclaim, and finds that those allegations lack the requisite particularity under Fed. R. Civ. P. 9(b). Although Illinois Union seeks to allege that NetBank knew facts in 1999 sufficient to inform it that CMC was operating a Ponzi scheme, Illinois Union does not specify what any of those facts were or how they should have led NetBank to such a conclusion. Given the extensive discovery that has occurred in these cases, the deficiency is notable. In addition, with respect to Illinois Union's allegations of NetBank's 1999 knowledge of fraud, the Court finds such contentions far-fetched, to say the least. Illinois Union's theory that NetBank learned sufficient information to reach a determination that CMC was operating a multimillion-

dollar Ponzi scheme—and that NetBank yet decided to invest more than $100 million of its own funds in such a scheme—strains credulity.

In its reply brief, Illinois Union argues that the Court should consider Illinois Union's allegations of information purportedly learned in 2000 as supporting Illinois Union's claims for rescission of the September and October 2000 lease pool transactions. Illinois Union cannot point to the receipt of any such information, however, that predates the consummation of these transactions. The OTS investigation, which purportedly revealed to NetBank the nature of CMC's scheme, allegedly occurred between September and December 2000. NetBank's internal Action Plan, which purportedly disclosed NetBank's intent to withhold information about CMC from Illinois Union, is dated November 15, 2000. Even assuming that these allegations would reflect NetBank's knowledge of CMC's fraud, the Court simply cannot infer from these allegations that NetBank had the same knowledge of fraud weeks earlier, at the time that it entered into the September and October 2000 lease pool transactions.[18]

Illinois Union's proposed additional allegations relating to (1) NetBank's alleged knowledge and agreement that the Policies issued by Illinois Union were to be construed as credit insurance; and (2) CMC's agency on behalf of NetBank, are futile. To the extent that Illinois Union seeks to revisit the Court's rulings regarding the structure of the transactions, any such challenge is precluded by the Court's prior Orders. (*See* Illinois Union Order, 02-16000, Doc. 1709, at 20 (the "transaction documents establish a suretyship relation between Illinois Union and those Banks with which it dealt. . . .")). Moreover, to the extent that Illinois Union seeks to rely on CMC's alleged status as "agent" to impute CMC's fraud to the Banks, those

---

[18] Moreover, Illinois Union's proposed Second Counterclaim contains no allegations that NetBank knew the results of the OTS investigation prior to entering into the September and October 2000 transactions. Rather, the allegations of facts learned by NetBank as a result of the OTS investigation are contained only in the proposed Third Counterclaim, which seeks rescission of the January 2001 transaction.

allegations still are insufficient to plead such agency, and Illinois Union is precluded from raising such defenses. (*See* NetBank Order, 02-16000, Doc. 1826 at 15). The Court thus determines that the proposed Second Counterclaim is futile, and the Court need not reach NetBank's alternative argument regarding NetBank's lack of obligation to disclose.

With respect to the January 2001 lease pool, Illinois Union's proposed allegations are set forth in the proposed Third Counterclaim. NetBank argues that the expanded or additional allegations proffered by Illinois Union are unnecessary and redundant. NetBank asserts that, where proposed new allegations are unneeded and do not add anything to a pleading, the Court should exercise its discretion to disallow the amendment. *See, e.g., Jefferson v. Myles*, 2003 U.S. App. LEXIS 5972, *4 (7th Cir. Mar. 27, 2003)(unpublished disposition)(proposed amendment denied, where adequacy of claim had not been challenged and additional facts were "superfluous").

Illinois Union counters that, since NetBank previously complained that Illinois Union's allegations lacked particularity, NetBank's objection to the proposed supplementation cannot be countenanced. In addition, Illinois Union argues that its proposed new allegations add further detail to its claim and "go to the very heart of Illinois Union's claim for rescission. . . ." (02-16000, Doc. 1833, at 12). Accordingly, Illinois Union asserts, those allegations cannot be superfluous.

The Court recognizes that, to the extent that a moving party seeks to add additional, and extraneous, information to allegations already deemed sufficient, a Court has discretion to deny the proposed amendments as unnecessary. *See, e.g., Jefferson*, 2003 U.S. App. LEXIS 5972, at *4. The proposed allegations here, however, simply amplify Illinois Union's core contentions and the factual background of its claims. While the Court found, in the NetBank Order (02-

16000, Doc. 1826, at 26), that Illinois Union's allegations were sufficient to state a claim, and thus that additional amendments were, in that sense, "unnecessary," no perceptible prejudice inures to NetBank based on allowance of Illinois Union's proposed amendment.

As noted above, the Court already has determined that Illinois Union's allegations would be sufficient to survive a Rule 12(b)(6) motion to dismiss. Thus, Illinois Union will have the opportunity, in any event, to marshal evidence in support of its contentions, and NetBank will be compelled to respond in the context of summary judgment or at trial. The proposed Third Counterclaim does not change the substance of the underlying obligations, and thus does not cause any unfair surprise. Moreover, the proposed additional allegations appear to arise from facts learned in discovery, and thus supplementation of Illinois Union's original allegations appears reasonable in this context.[19]

Accordingly, Illinois Union's motion for leave to amend to add its proposed Second Counterclaim is <u>denied</u>. Illinois Union's motion for leave to amend to add its proposed Third and Tenth Counterclaims is <u>granted</u>.

### b. Suretyship Arguments (Proposed Fifth, Sixth, Seventh, Eighth and Ninth Counterclaims)

In the Court's Illinois Union Order (02-16000, Doc. 1709), issued on August 19, 2005, the Court held that Illinois Union's documents, denominated as insurance policies, actually should be construed as surety bonds as a matter of law. Illinois Union, in its motion for leave to amend, argues that it seeks to amend its counterclaims to assert certain claims and defenses to coverage based on suretyship law.

---

[19] The Court reaches the same conclusion with respect to the proposed Tenth Counterclaim, which seeks a declaration that the previously issued bonds by Frontier Insurance Company should provide primary coverage with respect to the third lease pool. The primary change from Illinois Union's original allegations is that Illinois Union has abandoned the allegations of this Counterclaim as against Royal Indemnity Company. This proposed change presumably arises from facts learned during discovery and is appropriate. Accordingly, Illinois Union's motion for leave to amend to add the proposed Tenth Counterclaim is <u>granted</u>.

NetBank contends, however, that all of the facts and claims sought to be asserted by Illinois Union as "suretyship arguments" are precluded by the law of the case doctrine and the Court's prior Orders in this case, including the Illinois Union Order and the Court's Order extending its rulings to the transactions between Illinois Union and NetBank ("NetBank Order")(02-16000, Doc. 1826).  According to NetBank, the new proposed claims allegedly barred by the reasoning set forth in the Court's prior Orders include: (1) the proposed Fifth and Sixth Counterclaims, which assert insurance law defenses; (2) the proposed Seventh and Eighth Counterclaims, which seek declarations that Illinois Union is not liable as to nonexistent or unenforceable leases, nor is it liable for any obligations undertaken by CMC; and (3) the proposed Ninth Counterclaim, which seeks rescission as against NetBank based on the fraud of CMC.

The Court agrees with NetBank that the assertion of the new proposed Fifth and Sixth Counterclaims is barred by the Court's prior finding, in the NetBank Order, that NetBank was entitled to judgment on Illinois Union's previously asserted Eighth and Ninth Counterclaims. Those counterclaims, like the new proposed Fifth and Sixth Counterclaims, asserted insurance law defenses relating to usury and preexisting losses.  As the Court stated in its NetBank Order, "Illinois Union is prohibited from relying on insurance-related defenses in response to NetBank's claims. . . ." (02-16000, Doc. 1826, at 16).  The addition by Illinois Union of its argument that public policy prevents the enforcement of the bonds in the context of CMC's Ponzi scheme also has been foreclosed by the Court in its recent Order granting Chase's motion for final judgment. (02-16000, Doc. 1817).  Accordingly, the new proposed Fifth and Sixth Counterclaims are disallowed as futile.

Similarly, the assertion of the proposed Seventh and Eighth Counterclaims is precluded by the Court's prior findings in the Illinois Union Order. As noted above, those Counterclaims seek declarations to the effect that Illinois Union's Policies undertook to guarantee only the enforceable underlying obligations of the lessees and did not cover any obligation of CMC. This Court, however, held in the Illinois Union Order that "as a matter of law, the transaction documents demonstrate that Illinois Union intended to guarantee not only the obligations of the lessees but those of CMC as well. . . ." (02-16000, Doc. 1709, at 34). Illinois Union's Seventh and Eighth Counterclaims also seek a declaratory judgment that Illinois Union's Policies do not include a blanket waiver of defenses. To the extent that Illinois Union seeks to assert the defense of fraud in the inducement vis-à-vis the Banks, based on alleged fraud by CMC, this Court has held that "the fraud waivers contained in the transaction documents preclude any such defense. . . ." (02-16000, Doc. 1709, at 52). The proposed new Seventh and Eighth Counterclaims thus also are futile, and leave to amend to add those claims is <u>denied</u>.

The proposed Ninth Counterclaim, which seeks rescission of the bonds based on the fraud of CMC, is similarly barred. That Counterclaim is based on Illinois Union's assertion that CMC is a co-obligee with the Banks, a contention expressly rejected by the Court in its prior Orders. (*See, e.g.,* NetBank Order, 02-16000, Doc. 1826, at 13)(describing Court's finding, in Illinois Union Order, that CMC "had undertaken obligations to the Banks and was appropriately denominated as an obligor. . . ."). As with the proposed Seventh and Eighth Counterclaims, therefore, the assertion of Illinois Union's proposed Ninth Counterclaim would be futile, and leave to amend to add that claim is <u>denied</u>.

In its reply memorandum, Illinois Union cites case law in support of the proposition that "every order short of a final decree is subject to reopening at the discretion of the district judge .

. . ," *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983), and thus that the Court should reconsider its previous rulings and allow Illinois Union to challenge the Court's findings regarding the structure of the transactions. In light of the extensive and careful attention given to these issues in connection with the motion for judgment on the pleadings, the Court declines to exercise such discretion. All of the legal theories presented by Illinois Union in its amendment motion previously were considered at great length, and a reconsideration of those issues would be a futile exercise.

Additionally, to the extent that Illinois Union argues that its new proposed Counterclaims have not been previously reviewed by the Court, the Court notes that the NetBank Order specifically addressed the availability of certain defenses to Illinois Union, noting that "Illinois Union is prohibited from relying on insurance-related defenses in response to NetBank's claims and may not resist the payment obligations to NetBank by reference to the underlying fraud of CMC or the lessees. . . ." (02-16000, Doc. 1826, at 16). While the Court has not previously considered the allegations of the proposed Third Amended Counterclaims, the Court has ruled as to the availability of specific legal theories in defense of NetBank's claims. Illinois Union's new proposed pleading may not simply recast those precluded claims.[20] Illinois Union's motion for leave to amend is <u>denied</u> with respect to the Fifth, Sixth, Seventh, Eighth and Ninth proposed Counterclaims.

### c. Settled/Abandoned Claims

Illinois Union seeks to abandon its claims against Sky Bank (including claims against Sky Bank as successor in interest to Mid Am Bank and Second National Bank), Bank of

---

[20] While this Court would grant leave to amend in order to permit Illinois Union to assert certain <u>surety defenses</u> in light of the rulings set forth in the Court's Illinois Union Order (02-16000, Doc. 1709), the amendments proposed by Illinois Union are not such "surety defenses." Rather, they consist exclusively of arguments already foreclosed by the Court in the Illinois Union Order. Accordingly, the proposed amendments are unequivocally futile, and the Court has no obligation under the circumstances to permit the filing of such legally insufficient claims.

Waukegan (now NorStates Bank), and certain Guardian entities. These cases were recently settled through the Court-ordered global mediation in these cases.[21] Illinois Union also seeks to eliminate its claims for indemnity, purportedly because it has learned that (1) special purpose entities, such as CMC Lease Funding, were never part of any such indemnity; and (2) Illinois Union never relied on any such indemnity in underwriting its Policies. To the extent that Illinois Union seeks to amend in order to abandon certain claims it no longer wishes to pursue, such leave is granted.

### d.       Timeliness/Prejudice Issues

Illinois Union argues that its motion for leave to amend is timely, since it was filed shortly after the lifting of the mediation stay (which was in place from August 24, 2005 to March 15, 2006), and within the time frame set by the Court for the filing of amendment motions. Illinois Union argues that all of the facts it seeks to allege were known to the Banks long before being discovered by Illinois Union during the discovery process. Additionally, Illinois Union asserts that all of its new allegations have been encompassed by the extensive discovery in these cases, and thus that its Third Amended Complaint will not necessitate any new discovery or cause any identifiable prejudice to NetBank. Accordingly, Illinois Union contends that its motion cannot be considered untimely.

NetBank, conversely, argues that the Court should exercise its discretion to deny leave. NetBank claims that the proposed amendments are untimely, because Illinois Union could have moved for leave to amend its counterclaims at any point during the pendency of the motions for judgment on the pleadings. Illinois Union waited, however, until those motions were resolved to attempt to raise its new allegations. NetBank argues that the majority of Illinois Union's

---

[21] As noted earlier in this opinion, Illinois Union now also has resolved its claims against Footbridge Limited Trust and does not seek to pursue those claims.

proposed amendments are designed merely to avoid or undermine the impact of the Court's rulings in the Illinois Union Order, issued August 19, 2005 (and subsequent Court Orders). NetBank points, specifically, to Illinois Union's proposed Second Counterclaim, which seeks to add new allegations relating to NetBank's failure to disclose material information in connection with the acquisition of the first two lease pools—information which, according to NetBank, should have been added years ago and prior to the Court's determination of the pleadings motions.

With respect to NetBank's argument regarding the untimeliness of Illinois Union's proposed Counterclaims, the Court previously has explained that it did not prohibit parties from filing motions for leave to amend during the pendency of the motions for judgment on the pleadings. Given that fact, NetBank's arguments with respect to delay, <u>at least as they relate to the proposed Second Counterclaim</u>, are well-taken. To the extent Illinois Union wished to assert fraud by NetBank as to the first two lease pools, it could have, and should have, done so long ago. The allegations that purport to assert those claims are certainly not new and were known to Illinois Union when the litigation began, or certainly soon thereafter. A reading of the parties' Motions for Judgment on the Pleadings revealed, moreover, as confirmed by the Court's Order, that the question of fraud by an obligee (as distinct from fraud by the underlying lessee or other third party) was of <u>substantial</u> legal significance. In such circumstances, it is easy to conclude that Illinois Union's delay as to the Second Counterclaim was "undue" and served to both complicate these proceedings and prejudice NetBank in its ability to prosecute and defend the claims between it and Illinois Union. The Court finds, accordingly, that Illinois Union's motion for leave to amend the proposed Second Counterclaim must be denied as untimely, even if that claim were not otherwise inadequate under Rule 9(b). As the Court has found that the proposed

Second Counterclaim is futile for independent reasons, the Court declines to consider the impact of delay on the other aspects of Illinois Union's motion.[22]

For the reasons previously explained, Illinois Union's motion for leave to file its Third Amended Counterclaims is <u>granted in part and denied in part</u>, as set forth herein. Illinois Union's motion for leave to amend is <u>denied</u> as to the proposed First, Second, Fourth, Fifth, Sixth, Seventh, Eighth and Ninth Counterclaims. Illinois Union's motion for leave to amend is <u>granted</u> as to the proposed Third, Tenth and Eleventh Counterclaims. To the extent that Illinois Union has sought leave to amend in order to abandon certain claims, the motion for leave to amend is <u>granted</u>.

C. **02-16007, *Commercial Money Center, Inc. v. Ace American Insurance Company and Illinois Union Insurance Company*; 02-16009, *Citibank v. Illinois Union Insurance Company*; 02-16010, *NetBank v. Commercial Money Center, Inc.***

1. **Illinois Union Motion for Leave to Amend Answers (02-16007, Doc. 58)**

Illinois Union seeks leave to file Amended Answers in the above cases, arguing that such amendment is necessary to permit Illinois Union to (1) allege facts learned through discovery in these MDL proceedings; and (2) assert appropriate affirmative defenses in light of the Court's rulings on the motion for judgment on the pleadings.[23] Illinois Union claims that all of the Banks should have anticipated the filing of such "surety defenses," since each of the Banks has pleaded that Illinois Union issued surety bonds. Additionally, Illinois Union asserts that its

---

[22] This analysis does not apply to the proposed allegations set forth in the Third Counterclaim, as those allegations do not change Illinois Union's underlying theory, and seek only to amplify the background of Illinois Union's claims based on facts learned during discovery. For these reasons, and those set forth above, the Court has granted Illinois Union's motion for leave to amend to assert the proposed Third Counterclaim.

[23] Illinois Union also has moved for leave to conduct additional non-expert discovery with respect to the affirmative claims asserted by NetBank and Chase. (02-16000, Doc. 1807).

49

proposed amendments are timely, prejudice no party, and should be granted in the interests of justice.

Illinois Union bases its motion primarily on the arguments set forth in its brief in support of its motion for leave to file its Third Amended Counterclaims, including the arguments that (1) Illinois Union's Policies covered only such underlying obligations as were enforceable against the lessees; and (2) the rights of the Banks are derivative of those of CMC, and thus that all defenses available against CMC also should be available as against the Banks. Illinois Union also seeks to assert as a defense under surety law the argument that a bad faith claim may not be asserted against the issuer of a surety bond. For the reasons set forth herein, Illinois Union's motion is <u>granted in part and denied in part</u>.

Illinois Union's motion originally sought leave to file amended responses to claims asserted by Chase in 02-16009 (the "Chase Answer"), NetBank in 02-16010 (the "NetBank Answer") and Footbridge in 02-16007 (the "Footbridge Reply"). Since, however, Illinois Union and Footbridge have resolved their claims as previously set forth in this opinion, Illinois Union's motion for leave to amend vis-à-vis Footbridge is <u>denied as moot</u>. Additionally, on April 20, 2006, the Court granted Chase's motion for final judgment in this action. (02-16000, Doc. 1817). On August 31, 2006, the Court entered final judgment in Chase's favor pursuant to Fed. R. Civ. P. 58 (02-16009, Doc. 36). Since the claims between Illinois Union and Chase in Case No. 02-16010 have been finally resolved, Illinois Union's motion for leave to amend as against Chase is <u>denied as moot</u>.

With respect to Illinois Union's proposed response to NetBank's Third Amended and Supplemental Complaint, Illinois Union does not seek leave to amend, but rather requests leave to file its first response to NetBank's Third Amended and Supplemental Complaint. Illinois

Union asserts that it never responded to that complaint under an agreement with NetBank, since NetBank previously contemplated filing a fourth amended complaint. According to Illinois Union, NetBank now has advised that it will not seek to file a fourth amended complaint. NetBank has not objected to Illinois Union's request to file its responses to the allegations of the Third Amended and Supplemental Complaint, but argues that all of the new affirmative defenses that Illinois Union seeks to assert are barred by this Court's prior rulings.

The Court has reviewed the proposed Answers sought to be filed by Illinois Union. With respect to each of the proposed Answers, Illinois Union seeks leave to amend to assert the following defenses: (1) that the Policies covered only those payments from lessees to CMC that were contractually due and owing under the leases; (2) that the obligation of a surety can be no greater than that of its principal; (3) that the rights of NetBank and Chase under the Policies are derivative of the rights of CMC, and that the Banks therefore are subject to all defenses available against CMC; and (4) that surety law does not permit an obligee to assert a claim for insurance bad faith against the issuer of a surety bond.

The Court agrees with NetBank that the first and third of Illinois Union's new proposed affirmative defenses (denominated the Thirtieth and Thirty-Second Affirmative Defenses) are barred by the Court's prior rulings. The Thirtieth proposed affirmative defense is barred for the reasons explained with respect to Illinois Union's proposed Seventh and Eighth Counterclaims, at section II(B)(1)(c), *supra*, while the Thirty-Second proposed affirmative defense is barred for the reasons set forth with respect to Illinois Union's proposed Ninth Counterclaim, also at section II(B)(1)(c).

The Court finds, however, that the second and fourth new affirmative defenses (denominated the Thirty-First and Thirty-Third Affirmative Defenses) are permissible and should be allowed to stand. The Thirty-First proposed affirmative defense reads:

> To the extent that Illinois Union is deemed to have issued surety bonds rather than insurance policies (which Illinois Union expressly denies), the obligation of an issuer of a surety bond can be no greater than that of the [obligor].[24]

(02-16010, Doc. 32, at 43).

Although the Court already has determined, in the Illinois Union Order, that Illinois Union issued surety bonds, rather than insurance policies (and Illinois Union thus is not free to contest that conclusion), the Court has not foreclosed the basic proposition of surety law that Illinois Union seeks to assert. In fact, the Court noted, in the Lead Opinion on the Motions for Judgment on the Pleadings, that "the obligation of a surety 'must be neither larger in amount nor in other respects more burdensome than that of the principal. . . .'" (02-16000, Doc. 1708 at 51, *citing* Cal. Civ. Code § 2809). While the <u>application</u> of this principle to the facts and issues of this litigation will be controlled by the Court's prior rulings in this case, the principle itself is unobjectionable, and the Court's prior rulings do not preclude Illinois Union from asserting such a defense under surety law.

Similarly, the Thirty-Third proposed affirmative defense should be allowed to stand. That proposed defense provides:

---

[24] Illinois Union's Thirty-First proposed affirmative defense reads, "obligation . . . can be no greater than that of the <u>obligee</u>." (02-16010, Doc. 32, at 43)(emphasis added). The Court assumes that Illinois Union intended to refer to the obligation of a surety vis-à-vis its principal, the obligor, rather than the obligee.

> To the extent that Illinois Union is deemed to have issued surety bonds rather than insurance policies (which Illinois Union expressly denies), NetBank cannot maintain any claim for insurance bad faith.

(02-16010, Doc. 32, at 43). Although, again, Illinois Union is bound by this Court's finding that it issued surety bonds, none of the Court's prior orders has determined or even considered the Banks' bad faith claims. Thus, the Court does not find the Thirty-Third proposed defense to be precluded. Rather, it is an appropriate response to the Banks' bad faith claims, in light of the Court's recent rulings that Illinois Union issued surety bonds rather than insurance policies.

For the foregoing reasons, Illinois Union's Motion for Leave to File an Answer to NetBank's Third Amended and Supplemental Complaint in 02-16010 is <u>granted in part and denied in part</u>. Illinois Union is granted leave to respond to the allegations of NetBank's pleading and to add its proposed Thirty-First and Thirty-Third affirmative defenses. Leave to add the proposed Thirtieth and Thirty-Second affirmative defenses is denied, as those defenses are precluded by the prior rulings of this Court. Additionally, Illinois Union's requests for leave to amend as against Chase in 02-16009, and as against Footbridge in 02-16007, are <u>denied as moot</u>.

### D.     02-16010, *NetBank v. Commercial Money Center, Inc.*

#### 1.     Royal Indemnity Company's Motion for Leave to File its First Amended Counterclaims (02-16010, Doc. 30)

Although NetBank filed its Third Amended and Supplemental Complaint on June 1, 2004, Royal and NetBank apparently agreed to an open-ended extension for the filing of Royal's

responsive pleading, since NetBank was contemplating the possibility of further amendments. Royal now seeks leave to file its Answer to NetBank's Third Amended and Supplemental Complaint, as well as leave to file its First Amended Counterclaims against NetBank. NetBank opposes Royal's motion only to the extent it seeks leave to file amended counterclaims. For the reasons set forth herein, Royal's motion is granted.

Royal's proposed new counterclaims seek to assert causes of action for fraud, aiding and abetting fraud, and negligent misrepresentation against NetBank, with respect to the replacement bonds issued by Royal to NetBank in January 2001. Royal contends that its motion is timely, as it learned the facts on which its Counterclaims are based during fact discovery in this case, including a deposition taken on August 17, 2004, after the close of fact discovery.[25]

NetBank has opposed Royal's motion on the grounds that the proposed counterclaims (1) are untimely; (2) are asserted in an attempt to evade the Court's rulings on the motions for judgment on the pleadings and preclude NetBank from establishing obligee status; and (3) will require the reopening of fact discovery and substantially delay the resolution of the action. Like Illinois Union, Royal asserts claims based on NetBank's alleged knowledge regarding the level of lease pool defaults and information allegedly gained during the December 2000 OTS audit. Royal, however, unlike Illinois Union, did not seek to assert these claims when it filed its original counterclaims in January 2003, and did not request permission to assert such claims at any point until it filed the instant motion. NetBank asserts that Royal was aware of its proposed

---

[25]Royal also argues that, even independent of the Court's findings above, the filing of NetBank's Third Amended Complaint (02-16000, Doc. 1257), to which no responsive pleading has been filed, would entitle Royal to plead new affirmative defenses and counterclaims as of right, regardless of the Court's ruling on this motion. Courts have taken divergent views on this issue, many of them holding that defendants are entitled to amend counterclaims as of right only where plaintiff's amended pleading changes or expands plaintiff's theory of the case. See, e.g., Elite Entm't, Inc. v. Khela Bros. Entm't, 2005 U.S. Dist. LEXIS 9143, at *4-6 (E.D. Va. May 13, 2005)(examining conflicting approaches and adopting "moderate approach"); see also Brown v. E. F. Hutton & Co., 610 F. Supp. 76, 78 (S.D. Fla. 1985)("when a plaintiff files an amended complaint which changes the theory or scope of the case, the Defendant is allowed to plead anew as though it were the original complaint filed by the Plaintiff. . . ."). The Court need not address this issue, however, as it has found that Royal is entitled to file its First Amended Counterclaims for the reasons set forth herein.

allegations by no later than August 2004, upon the conclusion of discovery and depositions, and that its untimely filing warrants the Court's refusal to exercise its discretion to allow amendment.

NetBank also argues that Royal's assertion of claims is a ruse to circumvent the Court's ruling, in the Lead Opinion on the motions for judgment on the pleadings ("Lead Opinion")(02-16000, Doc. 1708), that the fraud of CMC may not be imputed to the Banks if the Banks can establish obligee status on the bonds. Although Royal had the information needed to amend much earlier, NetBank claims, Royal waited until the issuance of the Court's Lead Opinion and then filed the proposed amendments in an attempt to escape the consequences of the Court's rulings.

Finally, NetBank argues that permitting the proposed amendments would significantly prejudice NetBank, since fact discovery closed nearly two years ago, and NetBank has been deprived of the money owed to it for over four years. NetBank observes that, in recent correspondence to the Court (02-16000, Doc. 1830), Royal suggested that additional fact discovery might be necessary prior to the briefing of summary judgment motions. Thus, NetBank asserts that the proposed amendments will cause additional delay, expense and prejudice.

The Court has conducted a side-by-side comparison of Royal's original Counterclaims with the proposed First Amended Counterclaims. The prior Counterclaims focused on the improper conduct of CMC and surety broker Michael Anthony, as well as the lack of underlying obligations on the part of the lessees, and NetBank's lack of obligee status. Royal's new proposed Counterclaims all are based on alleged fraudulent misrepresentations and nondisclosure by NetBank in connection with the 2001 lease bond transaction. Such allegations

appear to stem from facts learned in discovery, and the assertion of such new allegations following the close of discovery is appropriate.

Although the Court agrees with NetBank that there was no impediment to Royal's filing its proposed amendments earlier, it is beyond dispute that Royal's claims are based on information gained from internal NetBank documents and depositions of NetBank employees. Thus, Royal did not have reason to be aware of the proposed new claims until the completion of discovery and depositions in August 2004.

The Court does not find, moreover, that any real prejudice would inure to NetBank based on the allowance of Royal's proposed amendments. While Royal's proposed amendments may be asserted strategically to some extent (as are most pleadings filed in federal court litigation), these amendments are neither inconsistent with the Court's prior rulings nor precluded by any of the Court's prior orders.[26]   Additionally, as Royal points out, the Court cannot envision a scenario in which Royal's earlier filing of its proposed Amended Counterclaims actually would have affected the course of this litigation to date.   To the extent that Royal learned facts supporting its claims of fraud against NetBank during discovery, Royal now is entitled to amend to allege such facts in arguing that NetBank is not entitled to obligee status under the Royal bonds.   To the extent, moreover, that Illinois Union has, with the Court's permission, asserted claims based on almost identical facts, *see* section II(B)(1)(a), *supra*, it is clear that NetBank will need to respond to those factual allegations in this litigation in any event.

Finally, the Court does not read Royal's recent correspondence as requesting any additional discovery with respect to its allegations against NetBank in this case.   In fact, Royal

---

[26] Particularly since NetBank asserted its Motion to Renew Interest in the Consolidated Motion for Judgment on the Pleadings only as to Illinois Union, the Court would not hold Royal precluded from asserting its proposed claims vis-à-vis NetBank.   The claims proposed here, in any event, would not run afoul of the Court's prior rulings, which denied the Banks' motions for judgment on the pleadings vis-à-vis Sureties such as Royal.

does not appear to request that discovery be opened with respect to its claims in <u>any</u> case. Rather, Royal simply suggests that the Court defer summary judgment briefing until such time as the Court has ruled on pending motions for leave to reopen discovery—including all such motions filed by <u>other</u> parties to these proceedings. Royal's reply memorandum in support of its motion to file its First Amended Counterclaims (02-16010, Doc. 39), confirms the Court's understanding of Royal's position.

Royal's motion for leave to file its first amended counterclaims is <u>granted</u>.

### E. 02-16014, *Bank One, N.A. v. Safeco Insurance Company of America*

#### 1. Safeco Motion for Leave to Amend Answer and Counterclaim (02-16014, Doc. 25)

Safeco Insurance Company of America ("Safeco") has moved for leave to file its proposed Second Amended Answer and Counterclaim, in order to add the following claims and defenses:

(1)     In its proposed Ninth Defense, Safeco seeks to allege that Diversity and CMC are indispensable parties to the action.[27]

(2)     In its proposed Seventeenth Defense and Count IV of its proposed Counterclaim, Safeco seeks to allege that Bank One, N.A. ("Bank One") failed to exercise sufficient due diligence prior to agreeing to lend money to the Guardian entities.

(3)     In its proposed Eighteenth Defense, Safeco seeks to allege a lack of causation between the injury alleged and the damages suffered.[28]

---

[27] It is unclear from the proposed pleading to which Diversity entity Safeco refers; however, Safeco's request for leave to allege that Diversity is an indispensable party is unopposed, and accordingly, that request is <u>granted</u>.

[28] Bank One does not appear to object to the assertion of the proposed Eighteenth Defense; accordingly, Safeco's motion for leave to amend to assert the proposed Eighteenth Defense is <u>granted</u>.

(4)     In its proposed Nineteenth Defense, Safeco seeks to allege that Bank One should be limited to recovery of its out-of-pocket damages.

Additionally, Safeco's new proposed Answer and Counterclaim contains new factual allegations, which amplify Safeco's contentions relating to (1) the fraud of CMC; and (2) the background of Blaine Tanner, the principal of the Guardian entities.

Safeco asserts that each of its proposed new defenses and claims is meritorious, that each is based on information learned by Safeco during discovery, and that no prejudice will result from the Court's allowance of the proposed amendments.  Accordingly, Safeco argues, this Court should apply the liberal standards of Fed. R. Civ. P. 15(a) in favor of granting leave to amend.

JPMorgan Chase Bank, as successor by merger to the interests of Bank One, N.A. ("Bank One"), has opposed Safeco's motion for leave to amend, arguing that (1) CMC is not a necessary or indispensable party to this action; (2) Bank One's negligence could not have been a cause of Safeco's loss, since Bank One's involvement began after Safeco issued its bonds; and (3) both the proposed Seventeenth Affirmative Defense and the proposed Nineteenth Affirmative Defense are mere duplicates of affirmative defenses previously asserted.[29]  The Court examines the parties' positions with respect to each of these issues below.  For the reasons set forth herein, Safeco's motion for leave to amend is <u>granted in part and denied in part</u>.

### a.     Indispensable Party

---

[29] Bank One also has filed a motion to conduct limited additional discovery with respect to (1) Bank One's two new proposed causes of action; (2) Safeco's new proposed affirmative defenses and claims; (3) the factual bases of any denial of any request for admission (in the event that the Court denies Bank One's motion to deem requests admitted (02-16014, Doc. 27)); and (4) any new proposed affirmative defenses and claims that Safeco may seek to assert relating to Bank One's First Amended Complaint (if leave to file is granted).  (02-16000, Doc. 1810).

Fed. R. Civ. P. 19(a) provides that a person is to be joined as a necessary party, if feasible, where:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. P. 19(a).

Bank One asserts that CMC does not meet the definition of "necessary party" set forth in Fed. R. Civ. P. 19(a)(1), since the issues in this action involve the determination of rights and obligations as between Bank One and Safeco, and both parties can obtain complete relief without the involvement of CMC. Bank One argues, first, that CMC's presence is not required either for determination of Bank One's claims to enforce the Safeco bonds or Safeco's claims to rescind the bonds. Second, Bank One asserts that CMC does not meet the standards of Fed. R. Civ. P. 19(a)(2), since the Bankruptcy Trustee has not claimed any interest in the Safeco bonds. Since CMC is not a "necessary" party pursuant to Fed. R. Civ. P. 19(a), Bank One maintains that CMC also cannot be an "indispensable" party. *See Local 670, United Rubber v. Int'l Union, United Rubber*, 822 F.2d 613, 618 (6th Cir. 1987).

Additionally, Bank One argues that Safeco has excessively delayed in asserting its new proposed Ninth Defense. According to Bank One, Safeco has long been aware of the extent of CMC's fraud and could easily have asserted such a defense years ago—including at the time of filing of its First Amended Answer in January 2003. Since Safeco has not articulated any evidence that would have changed Safeco's understanding of CMC's role, Bank One contends, the Court should not countenance such undue delay.

Safeco counters that its motion for leave to amend cannot be considered untimely, as Safeco filed its proposed amendments on the same day as Bank One and many other parties to these actions. Moreover, Safeco argues that its assertion of the indispensable party defense is timely pursuant to Fed. R. Civ. P. 12(h)(2), which provides that "a defense of failure to join a party indispensable under Rule 19 . . . may be made in any pleading permitted or order under Rule 7(a), or by motion for judgment of the pleadings or at the trial on the merits."

Safeco also points out that Bank One has filed a motion for leave to amend pleadings in the within action (02-16014, Doc. 26), which Safeco has not opposed (and which the Court has granted in the within opinion, *see* section III(F)(1), *infra*). Safeco argues that, in the event that the Court grants Bank One's motion for leave to amend, then Safeco is entitled to amend its answer and counterclaim <u>as of right</u>. Courts have taken divergent views on this issue, many of them holding that defendants are entitled to file amended defenses and counterclaims as of right only where plaintiff's amended pleading changes or expands plaintiff's theory of the case. *See, e.g., Elite Entm't, Inc.*, 2005 U.S. Dist. LEXIS 9143, *4-6 (E.D. Va. May 13, 2005)(examining conflicting approaches and adopting "moderate approach"); *EEOC v. Morgan Stanley & Co.*, 211 F.R.D. 225, 227 (S.D.N.Y. 2002)(holding that affirmative defenses could not be added as of right, where plaintiff filed an amended complaint containing only changes in terminology); *Brown v. E. F. Hutton & Co.*, 610 F. Supp. 76, 78 (S.D. Fla. 1985)("when a plaintiff files an amended complaint which changes the theory or scope of the case, the Defendant is allowed to plead anew as though it were the original complaint filed by the Plaintiff. . . .").

Although Sixth Circuit law governs federal procedural matters in this MDL, *see Fehmers v. Ford Motor Co. (In re Bridgestone/Firestone, Inc., ATX, ATX II, & Wilderness Tires Prods. Liab. Litig.*, 129 F. Supp. 2d 1202, 1205 (S.D. Ind. 2001)(procedural matters in multidistrict

litigation proceedings are determined pursuant to the law of the circuit in which the transferee court sits), there apparently is no controlling Sixth Circuit law on this question. The only district court case from this circuit, *Moellers N. Am. v. MSK Covertech*, 912 F. Supp. 269, 272-273 (W.D. Mich. 1995), appears to adopt a permissive reading, broadly allowing the filing of amended counterclaims by a defendant after plaintiff had filed an amended complaint.

The decisions addressing this issue deal primarily with two principal questions: (1) the necessity for a defendant to file a motion seeking leave to file amended defenses and/or counterclaims; and (2) the effect of a defendant's alleged delay in asserting amended defenses and/or counterclaims. The Court does not find that any of these decisions address the issue of whether a court <u>must</u> permit amendment by a defendant in a situation where both parties have filed motions for leave to amend and it appears to the Court that certain proposed amendments are futile as a matter of law.

In *Joseph Bancroft & Sons Co. v. M. Lowenstein & Sons, Inc.*, 50 F.R.D. 415, 420 (D. Del. 1970), in the context of a motion to dismiss or strike, the court determined that plaintiff was entitled to file counterclaims as of right in response to defendant's amended counterclaims, without leave of court, and then proceeded to consider whether the proposed counterclaims were futile for any other reason, including redundancy or improper venue. Similarly, the Court finds that it has authority here to examine Safeco's proposed amendments for futility. Since Bank One opposes Safeco's proposed amendments chiefly on the ground of futility, the Court will not rely on Safeco's assertion that it is entitled to file its amendments "as of right," and will determine the appropriateness of Safeco's proposed amendments on the merits.

With respect to Bank One's indispensable party argument, Safeco responds that CMC has an interest in the subject matter of this action, which could be impaired or impeded by a

judgment in its absence, since an adverse finding against Safeco in this action would give rise to additional claims by Safeco in CMC's bankruptcy proceedings, under the provisions of the Global Settlement Agreement approved by the Bankruptcy Court. The Court notes that numerous other defendants in these actions have raised as a defense the plaintiffs' failure to join CMC as an indispensable party, at various stages in these proceedings, without objection by any of the plaintiffs. (*See, e.g.*, 02-16024, Docs. 10-13 (AMICO answers to counterclaims, filed 1/27/2003); 02-16027, Doc. 2 (RLI Amended Answer, filed 1/13/2003); 02-16028, Doc. 8 (Royal Answer to First Amended Complaint, filed 5/19/2003)). In several other cases, defendants recently moved for leave to file amended answers including such a defense. Many such motions have been unopposed. (*See, e.g.*, 02-16020, Doc. 35 (Safeco proposed Second Amended Answer); 04-16001, Doc. 3 (RLI Proposed Amended Answer)).

In at least some of the actions mentioned above, defendants have invoked the indispensable party defense based on the Trustee's assertion of an interest in the bonds at issue in those actions. Here, Safeco does not argue that CMC's Bankruptcy Trustee has asserted any interest in the bonds at issue. Rather, Safeco contends only that the outcome of this action may give rise to further claims against CMC's bankruptcy estate pursuant to the provisions of the Global Settlement Agreement. Although the parties did not file a copy of the Global Settlement Agreement in connection with this motion, a copy was previously provided to the Court, and the Court takes judicial notice that the Global Settlement Agreement was approved by the Bankruptcy Court for the Southern District of California on May 31, 2005. (Docket, Bankr. S.D. Cal., 02-09721-JH7, Doc. 1075).

The Court declines, however, to decide on this record whether CMC has an interest in the subject matter of the action that may be impaired by failure to join CMC as a party. Nor is it the

function of the Court at this point to interpret the Global Settlement Agreement approved by the Bankruptcy Court, in order to determine whether the outcome of this litigation may affect the rights of the Banks and/or Sureties vis-à-vis CMC and/or its Bankruptcy Estate.

Safeco, at this stage, need not make a full showing of the merits of its affirmative defense; rather, the Court will not preclude such a defense absent a showing by Bank One that the proposed defense is patently frivolous. "Unless a proposed claim is clearly frivolous or legally insufficient on its face, the court should not consider the merits of a claim or defense on a motion to amend." *Remee Prods. Corp. v. Sho-Me Power Elec. Coop.*, 2002 U.S. Dist. LEXIS 19700, *34 (S.D.N.Y. Oct. 15, 2002), *citing Lerman v. Chuckleberry Pub., Inc.*, 521 F. Supp. 228, 231 (S.D.N.Y. 1981).

Notwithstanding the considerable factual differences among the various actions in this MDL, the Court also finds it relevant that multiple sureties have asserted or sought to assert the same defense without strenuous objection from the Banks. Accordingly, in the context of this motion for leave to amend, the Court accepts Safeco's assertions relating to the potential interest of CMC in the subject matter of this action.[30] Additionally, to the extent that Safeco's rights vis-à-vis CMC were altered by the Bankruptcy Court's approval of the Global Settlement Agreement on May 31, 2005, the timing of that approval also may support Safeco's arguments with respect to timeliness.

Safeco's motion for leave to amend is <u>granted</u> with respect to Safeco's proposed Ninth Defense.[31]

---

[30] The Court emphasizes that it <u>does not</u> make any finding that CMC is a necessary or indispensable party to this action, particularly in the absence of detailed briefing on the issue. Indeed, at this stage, the Court is far from persuaded that it is; the Court holds only that such a contention is not so frivolous as to be futile.

[31] The parties do not address, in the amendment motion, the extent to which new discovery will be required on this new defense in order to avoid prejudice to Bank One. The Court anticipates, however, that if any such discovery is required at all, it will be minimal. The Court will determine the pending motions to reopen discovery in an order to be issued shortly.

### b.     Negligence Counterclaim

Bank One also argues that Safeco's motion for leave to add its proposed counterclaim for negligence should be denied, both because Safeco has delayed too long in asserting this proposed counterclaim, and because such a counterclaim would be futile on the merits. Bank One contends, first, that since the relationship between Safeco and Bank One arose from contracts, including the surety bonds and the Sale and Servicing Agreements, a tort claim such as negligence could not arise in this contract-based action.

Second, Bank One asserts that Safeco's proposed claim is not cognizable, since Bank One did not owe any legal duty to Safeco.  According to Bank One, no such duty could arise, since Safeco issued its lease bonds before Bank One made its first loans to the Guardian Capital II and III entities.  Moreover, Bank One maintains that the relationship between a secured lender and a surety does not give rise to any legal duty, since any due diligence conducted by a lender is conducted for the exclusive benefit of the lender and its shareholders.

Finally, to the extent that Safeco's claimed losses on the negligence claim stem from the costs of defending against this action, Bank One argues that it had the right, as an obligee, to make a claim, regardless of any harm occurring to Safeco as a result.  Bank One contends that Safeco should not be permitted to shift its due diligence obligations to its innocent obligees, who relied on Safeco's promises of performance of due diligence.

Safeco apparently bases its negligence claim entirely on the California appellate case of *Commercial Standard Ins. Co. v. Bank of America*, 57 Cal. App. 3d 241, 249 (4th Dist. 1976),[32]

---

[32] Safeco evidently assumes, based on the Court's prior rulings on the motions for judgment on the pleadings (Docs. 1708, 1709), that California law would apply to Safeco's assertion of a negligence claim against Bank One.  Neither party has briefed this issue in connection with the within motion.  The Court notes that its prior rulings applied only in the context of construing the transaction documents applicable to the parties' contract claims, and the Court has made no choice of law determination with respect to tort claims between the parties.  Given the Court's denial of leave to amend, however, the Court need not address choice of law issues herein.

which held that a surety on a construction bond had a negligence cause of action against a lender who negligently disbursed proceeds of a construction loan without properly monitoring construction progress. As a result of the lender's failure to inspect and monitor progress prior to disbursing funds, insufficient funds remained in the loan account to finish the project after the contractor's default. Accordingly, the surety was required to advance funds in order to allow the owners to complete the project. The Court permitted an action by the surety against the allegedly negligent lender.

The Court carefully has considered the *California Standard* decision and finds that, under any interpretation, that case does not support a surety's cause of action for negligence against a lender bank in the circumstances presented here. Unlike the negligence claim proposed by Safeco, the *California Standard* case did not purport to impose liability on a lender for its allegedly negligent decision to lend funds in the first instance. Rather, that decision held only that, where the lender had contractual and other duties <u>to the owners/obligees</u> relating to the ongoing disbursements of the loan proceeds, the lender bank also could be held liable to a surety for failure to fulfill such obligations.

As articulated by the Ninth Circuit in *Community Nat'l Bank v. Fidelity & Deposit Co.*, 563 F.2d 1319, 1323 (9th Cir. 1977), *Commercial Standard* held only that "a surety, independent of any right of subrogation, may recover from a tortfeasor who inflicts injury <u>on the surety's creditor</u> causing the surety to incur liability. . . ." *Community Nat'l*, 563 F.2d at 1323 (emphasis added). The third-party *Commercial Standard* lender, by its negligence in disbursing loan proceeds <u>to the surety's principal</u>, caused harm <u>to the obligee</u>, thus requiring the surety to pay the loss.

In this Court's view, the Ninth Circuit's recognition of the limits of the *Commercial Standard* court's decision is significant. The appellate court in *Commercial Standard* actually held only that the duties of a lender to the obligees on a surety bond could be construed as extending to the surety as well. Thus, a surety apparently can state a claim against a purportedly negligent lender only in connection with an allegation of harm to the obligee.

Regardless of the parties' differing positions as to whether Bank One is an "obligee" or only an assignee of an "obligee,"[33] Bank One's role in these transactions is not comparable to that played by the lender in *Commercial Standard*. Here—regardless of the status of the parties to the transaction—Safeco does not allege conduct by a third party that purportedly caused harm to an obligee. Rather, Safeco appears to allege that <u>Bank One</u> (which is either the obligee, or the obligee's assignee, depending on the construction of the transactions), lent money <u>to Guardian</u> (which also is either the obligee, or the obligee's assignee), thus causing harm. In fact, it is unclear precisely to whom (other than to Safeco) harm is alleged. Presumably, however, such harm could have occurred only to the interests of Guardian or to Bank One itself.[34]

Assuming that Safeco seeks to allege injury to Guardian, it seems absurd that Safeco could premise a negligence claim on harm caused to Guardian by Bank One's failure to investigate Guardian and its proposed transactions. In the event that the alleged injury is to Bank One itself, Safeco's proposed claim is even more ludicrous. In that event, Safeco would premise its negligence claim against Bank One on harm caused to Bank One by its own conduct.

---

[33] In these transactions, the Guardian entities purchased the lease pools from CMC, and then granted a security interest in those pools to Bank One, their secured lender. Safeco argues that CMC is the obligee on its bonds, and that Guardian and Bank One have only assignee status. Bank One argues that either it or the Guardian entity is the obligee in each transaction.

[34] Since the Guardian entities used the proceeds of loans funded by Bank One to purchase the lease pools in question from CMC, CMC no longer had any interest in these transactions that could have been harmed by the Sureties' failure to pay on the lease bonds.

In *Commercial Standard*, the lender bank was a third-party non-beneficiary of the surety's guarantees. The circumstances are different here, however, and the policies articulated in *Commercial Standard* simply are inapposite. Safeco's proposed claim for negligent disbursement of funds is legally meritless on its face and, accordingly, cannot be allowed.

Safeco's motion for leave to amend to add its claim for negligent disbursement of funds is <u>denied</u>.

### c.    Allegedly Redundant Defenses

To the extent that Safeco seeks to add its new proposed Seventeenth and Nineteenth Affirmative Defenses, Bank One contends that such defenses are redundant as duplicates of Safeco's previously-asserted Tenth and Eleventh Affirmative Defenses. Accordingly, Bank One argues, the Court has discretion to deny Safeco leave to assert such defenses. For the reasons set forth below, Safeco's new proposed affirmative defenses will be <u>disallowed</u>.

The Court compares the allegedly duplicative defenses below. The Tenth and proposed Seventeenth Defenses provide, respectively, as follows:

> TENTH DEFENSE
> Bank One's claims are barred, in whole or in part, by the doctrine(s) of comparative negligence and/or contributory negligence, and/or by its own lack of due diligence.

> SEVENTEENTH DEFENSE
> Bank One's claims are barred, in whole or in part, due to Bank One's failure to exercise sufficient due diligence prior to agreeing to loan monies to Guardian to acquire a security interest in CMC's lease pool.

(02-16014, Doc. 25, Exh. 1, at 9, 10).

The Eleventh and proposed Nineteenth Defenses provide, respectively, as follows:

> ELEVENTH DEFENSE
> Bank One's claims are barred, in whole or in part, because, if and to the extent that it is determined that Safeco is liable to Bank One,

and that both Bank One and Safeco have been defrauded by CMC, Guardian II and/or Guardian III, then principles of equity require that any recovery herein should be limited to Bank One's proven out of pocket loss, and not to any profits anticipated by Bank One.

NINETEENTH DEFENSE
To the extent that Bank One is entitled to any damages, such damages are limited to out-of-pocket damages because Safeco is the innocent victim of fraud.

(02-16014, Doc. 25, Exh. 1, at 9, 11).

The Court recognizes that redundancy would be an appropriate ground for striking allegations of a pleading or for denying leave to amend, since a redundant affirmative defense would be legally "futile." *See, e.g., Fr. Telecom S.A. v. Novell, Inc.*, 2002 U.S. Dist. LEXIS 19967, * (D. Del. Oct. 17, 2002)(unpublished disposition)(granting motion for leave to amend, since proposed new affirmative defense was not redundant); *Wausau Ins. Co. v. Woods Equip. Co.*, 2002 U.S. Dist. LEXIS 4171, *6-7 (N.D. Ill. Mar. 13, 2002)(unpublished disposition)(striking affirmative defenses as redundant of existing counterclaims). Where, however, a proposed affirmative defense is merely similar to an existing defense, the proposed defense will be allowed. *See United States v. Hartz Constr. Co.*, 2000 U.S. Dist. LEXIS 12405, *30 (N.D. Ill. Aug. 17, 2000)(unpublished disposition)(proposed affirmative defense was not redundant of prior affirmative defense and would not be stricken). Safeco argues that, in this case, the proposed new affirmative defenses merely "clarify" the prior pleadings and should be permitted.

The Court finds that, here, the proposed Seventeenth Defense is entirely subsumed within the previously-asserted Tenth Defense, which already encompasses Safeco's proposed "new" defense of lack of due diligence. Although the proposed Seventeenth Defense is arguably more detailed than the Tenth Defense, the proposed Seventeenth Defense does not add any new factual

or legal allegations.  Accordingly, that defense is merely redundant of Safeco's previously-asserted defenses and will not be allowed.

With respect to the proposed Nineteenth Defense and the Eleventh Defense, although those defenses are articulated differently, they also are substantially similar and appear to set forth the same theory of equitable limitation of Bank One's recovery.  As with the proposed Seventeenth Defense, the proposed Nineteenth Defense does not set forth any new factual or legal allegations.  Accordingly, the proposed Nineteenth Defense also is disallowed as redundant.

For the reasons stated herein, Safeco's motion for leave to amend is <u>granted in part and denied in part</u>.  Safeco's motion for leave to amend to assert its proposed Ninth and Eighteenth Defenses is <u>granted</u>.  With respect to Safeco's request to amend to assert its proposed Fourth Counterclaim, as well as its proposed Seventeenth and Nineteenth Defenses, the motion for leave to amend is <u>denied</u>.  With respect to the new factual allegations sought to be asserted by Safeco, Safeco's motion for leave to amend to amplify the background of its claims and defenses is <u>granted</u>.

**F.** **02-16017, *Huntington National Bank v. American Motorists Ins. Co.***

**1.** **Motion of Guardian Capital XVI, Blaine Tanner and Guardian Shield Holdings for Leave to File Amended Counterclaims (02-16017, Doc. 53)**

Guardian Capital XVI, LLC, Guardian Shield Holdings (collectively, "Guardian XVI") and Blaine Tanner have moved for leave to file amended counterclaims, in order to assert two additional causes of action: (1) an additional counterclaim by Guardian XVI, alleging that

Guardian XVI became the "obligee" on the surety bonds, either directly through contract or as an intended third-party beneficiary of the transactions (rather than purely through assignment by CMC); and (2) a new counterclaim by Blaine Tanner, alleging interference with business opportunity on the part of AMICO, whose conduct allegedly impaired Tanner's ability to obtain financing for his business ventures throughout the course of this litigation.

AMICO has not objected to the portion of this motion requesting leave to file Guardian XVI's third-party beneficiary counterclaim, and the motion for leave to amend is <u>granted</u> to the extent that it requests leave to file Guardian XVI's proposed Third Counterclaim. AMICO opposes, however, Tanner's request for leave to file the proposed Fourth Counterclaim, asserting that (1) Tanner's new proposed Counterclaim is a compulsory counterclaim, which may be barred by the statute of limitations; (2) even if Tanner's claim is not barred by the limitations period, Tanner has shown no good cause for his delay of more than three years in asserting this claim; (3) significant discovery would be needed in order to address Tanner's new allegations; and (4) Tanner's proposed Counterclaim is futile. For the reasons set forth herein, the motion for leave to amend is <u>denied</u> to the extent that it relates to Tanner's request for leave to file the proposed Fourth Counterclaim.

### (a) Compulsory Counterclaim/Statute of Limitations

AMICO argues, first, that Tanner knew of the substance of AMICO's claims against him, and his defenses to such claims, no later than January 2003, when Tanner first answered AMICO's complaint. AMICO asserts that Tanner's proposed claim must be construed as a compulsory counterclaim, and thus that such a counterclaim was required to be pleaded in Tanner's original answer. As noted previously in this opinion, "the relevant inquiry is whether

the counterclaim 'bears a logical relationship to an opposing party's claim. . . .'" *Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.*, 292 F.3d 384, 389 (3d Cir. 2002), *quoting Xerox Corp. v. SCM Corp.*, 576 F.2d 1057, 1059 (3d Cir. 1978), and whether the proposed new claims "involve the same factual issues, the same factual and legal issues, or are offshoots of the same basic controversy between the parties. . . ." *See Transamerica Occidental*, 292 F.3d at 390. In order to assert a compulsory counterclaim subsequent to the filing of the original answer, the pleader must demonstrate that the failure to file the counterclaim was the result of "oversight, inadvertence, or excusable neglect . . . ," or that "justice requires" the granting of leave to amend. Fed. R. Civ. P. 13(f).

AMICO asserts that, since Tanner's proposed claim is an offshoot of the same controversy encompassed by AMICO's claims, Tanner's proposed new claim is a compulsory counterclaim. AMICO points out that, under Sixth Circuit law, an omitted compulsory counterclaim does not relate back to the filing of the original answer for statute of limitations purposes. *See Stoner v. Terranella*, 372 F.2d 89, 91 (6th Cir. 1967). Thus, AMICO argues that Tanner's counterclaim now is barred by the statute of limitations. In any case, AMICO maintains, Tanner cannot satisfy the standards of Fed. R. Civ. P. 13(f) and should not be permitted leave to amend.

Tanner does not address AMICO's assertion that his counterclaim is compulsory, and thus apparently concedes the point. Tanner argues, however, that his attempts to obtain financing for his business ventures continued throughout 2003 and 2004, and thus that his claims had not matured at the time that he filed his original answer to AMICO's complaint. Rather, Tanner contends, he timely filed his motion for leave to assert those claims promptly upon the completion of the mediation process and the Court's lifting of the filing stay.

The application of the statute of limitations to Tanner's claim logically depends on the nature of Tanner's allegations. Although Tanner contends that he has properly alleged facts relating to both communications and conduct on the part of AMICO, the Court considers only Tanner's conduct-related allegations, since only these allegations are properly pleaded.[35] The only such conduct alleged is AMICO's refusal to honor the bond claims of Guardian XVI and/or Huntington Bank.[36] That refusal could have occurred no later than AMICO's initiation of litigation against Huntington and Guardian XVI, which occurred on July 12, 2002 and December 18, 2002, respectively.

Viewing Tanner's proposed Counterclaim in that framework, Tanner's claim may well be barred by the statute of limitations. As the Court has noted previously in this opinion, *see* section II(A)(1)(d), *supra*, the analysis required with respect to determination of the applicable statute of limitations is complex in the context of a multidistrict litigation proceeding. The Court notes that this action was commenced in the Northern District of Ohio, and that the state of Ohio treats statutes of limitations as procedural for conflicts purposes. *See Phelps v. McClellan*, 30 F.3d 658, 661 (6th Cir. 1994). While the Court does not determine the applicable statute of limitations in the absence of briefing by the parties, the Court also notes that, under Ohio law, Tanner's claim is subject to a one-year statute of limitations. *See* O.R.C. § 2305.11; *Petrola v.*

---

[35] As explained in section II(F)(1)(c), *infra*, to the extent that Tanner bases his claim on statements made by AMICO in these judicial proceedings, such claims are barred by the litigation privilege. To the extent that Tanner seeks to rely on statements made by AMICO outside the context of litigation, he simply has not pleaded any such statements. His allegation that AMICO made false statements "in its pleadings and elsewhere," without any specificity as to the time frame, context or recipient of such statements, is insufficient.

[36] Tanner's proposed Counterclaim does not allege, and does not reasonably support an inference of, any other conduct on the part of AMICO. (*See, e.g.* ¶¶ 59-60, 02-16017, Doc. 53, Exh. 1, at 14-15)(alleging that Tanner's harm occurred as a "result of AMIC's actions in refusing to make payment under the Lease Bonds and in accusing Blaine Tanner of being a co-perpetrator of a Ponzi scheme. . . .").

*American Fedn. of Teachers*, 1984 Ohio App. LEXIS 9040, *3-4 (7th Dist. Apr. 27, 1984)(unpublished disposition).

As noted above, the Sixth Circuit has held that omitted counterclaims do not relate back to the filing of the original pleadings for statute of limitations purposes. *See Stoner*, 372 F.2d at 91. In determining disputed questions of federal procedural law, this Court is bound to follow *Stoner* as the law of this circuit. Thus, in the event that Ohio provides the appropriate statute of limitations for the intentional interference claim, that claim unquestionably is barred by the application of the *Stoner* rule. The Court need not rest its decision on this basis alone, however. As set forth below (*see* section II(F)(1)(c)), the Court finds that Tanner's claim is futile for several independent reasons.

### (b)  Necessity for Additional Discovery

AMICO argues that Tanner's proposed Counterclaim would radically shift the nature of the case, and would require substantial additional discovery. AMICO asserts that there has been no discovery in these cases relating to Tanner's alleged inability to secure financing for potential business ventures. Accordingly, in the event that the Court were to grant Tanner's motion for leave to amend, AMICO contends that the Sureties would need to conduct: (1) discovery relating to the factual basis for Tanner's claims of interference with business advantage; (2) written discovery and document production requests regarding Tanner's finances (and the finances of companies owned by Tanner) and his allegations that he has been unable to secure financing; (3) a deposition of Tanner regarding his allegations and purported damages; and (4) depositions of any witnesses identified in support of Tanner's claim, including representatives of any individuals or companies with whom Tanner unsuccessfully sought to do business.[37]

---

[37] AMICO and RLI have filed a conditional joint motion requesting leave to conduct such discovery in the event that Tanner's motion is granted. (02-16000, Doc. 1809).

Tanner argues that his proposed new Counterclaim is an appropriate defense to AMICO's allegations against him, and is not appropriately characterized as a "radical shift" in the focus of the litigation. Additionally, Tanner contends, AMICO vastly overestimates the amount of discovery that would be required by his proposed new Counterclaim, since AMICO already has spent exorbitant amounts in completing the hundreds of depositions taken to date. Tanner asserts that any additional discovery that would be required would be minuscule in comparison with the discovery already conducted. Additionally, Tanner contends, no dates have been established for expert discovery, dispositive motions, or trial in these cases, and thus, the time frame for resolution of these actions will not be disrupted.

While the Court does not necessarily find that the assertion of an additional Counterclaim by Tanner in these actions would create a "radical shift" in the course of the litigation, the Court agrees that substantial discovery would be required in order to permit AMICO to respond to such a claim. At a minimum, AMICO would be entitled to reexamine Tanner as to the scope of his allegations and claimed damages, and to require him to identify the entities that allegedly refused to do business with him following the collapse of CMC. AMICO also might need additional discovery from such entities relating to Tanner's requests for financing and the banks' reasons for declining to provide such financing. Although the significant amount of discovery that would be required to address Tanner's proposed new Counterclaim does give the Court pause, the Court, again, does not choose to rest its denial of Tanner's motion solely on this ground. Rather, the Court finds that Tanner's proposed new Counterclaim is futile, for the reasons set forth below.

### (c) Futility

AMICO asserts that Tanner's allegations are futile, because (1) Guardian XVI's lender,

Huntington National Bank ("Huntington"), already had made the decision not to lend any more money in transactions of this type, long before Tanner approached that institution for additional financing; (2) statements made in AMICO's pleadings and otherwise in these judicial proceedings are encompassed by an unqualified litigation privilege; and (3) Tanner's proposed counterclaim fails to state a claim under Fed. R. Civ. P. 12(b)(6).

Tanner responds, first, that AMICO's contentions are based on AMICO's view that California law applies to this claim. Tanner correctly notes that the Court has made no such ruling, nor will it do so in the context of this amendment motion. Although the primary thrust of Tanner's argument is that such a choice of law determination should be deferred, Tanner suggests that Ohio law applies to his claims, and argues that he has adequately pleaded the elements of his proposed Counterclaim under Ohio law. *See Juhasz v. Quik Shops, Inc.*, 55 Ohio App. 2d 51 (9th Dist. 1977). Second, Tanner contends that the projects for which he sought financing were not related to the CMC lease pools and had not been previously presented to Huntington Bank, and thus Huntington could not have made any prior decision regarding the transactions. Tanner argues, finally, that his proposed Counterclaim does not implicate the litigation privilege since there is no such privilege for non-verbal <u>conduct</u> by AMICO, including AMICO's allegedly improper nonpayment on its surety bonds.

With respect to AMICO's argument that Huntington had decided not to fund any more lease pool transactions upon the completion of the Guardian XVI transaction, long before Tanner approached Huntington for additional financing in 2003 and 2004, the Court has no evidence before it as to the similarity or dissimilarity of the proposed transactions. Thus, the Court assumes that Tanner is correct, and that the later transactions Tanner proposed were unrelated to CMC or the funding of lease pools.

Although Tanner strenuously argues against AMICO's reliance on California law in support of its invocation of the litigation privilege, the Court finds that California and Ohio law are substantially similar on this point. Both California and Ohio recognize an absolute privilege for statements made in the context of judicial proceedings. *See* Cal. Civ. Code 47(b); *Hecht v. Levin*, 66 Ohio St. 3d 458, 460 (1993)( "A statement made in a judicial proceeding enjoys an absolute privilege against a defamation action as long as the allegedly defamatory statement is reasonably related to the proceeding in which it appears. . . .").

Additionally, as relates to AMICO's futility arguments, the elements for pleading a claim of interference with prospective business opportunity also are similar under both California and Ohio law. California requires "(1) a specific economic relationship . . . containing the probability of future economic benefit to the plaintiff; (2) knowledge by defendant of the existence of the relationship; . . . (4) actual disruption of the relationship; and (5) damages," *see Panavision*, 945 F. Supp. at 1305, in addition to either intent or negligence on the part of the defendant. *See id.*, 945 F. Supp. at 1305; *North American Chemical Co. v. Superior Court*, 59 Cal. App. 4th 764, 786 (2d Dist. 1997). Similarly, under Ohio law, the elements for pleading tortious interference are "1) the existence of the prospect of a business relationship; 2) that defendant knew of the . . . prospective relationship; 3) that defendant intentionally and materially

interfered with the . . . prospective relationship; 4) without justification; and 5) caused plaintiff to suffer damages." *Chrvala v. Borden, Inc.*, 14 F. Supp. 2d 1013, 1023 (S.D. Ohio 1998).[38]

In order to determine either the applicability of privilege or the sufficiency of Tanner's claim, the Court first must discern the precise scope of Tanner's allegations against AMICO. Construed liberally in the manner most favorable to Tanner, the proposed Counterclaim alleges that (1) AMICO refused to pay money due on the bonds either to Guardian XVI or to its lender and assignee, Huntington Bank; (2) AMICO's failure to pay caused Guardian XVI to default on its loans to the Bank; (3) AMICO has maliciously, "in its pleadings and elsewhere," accused Blaine Tanner of being a perpetrator of a fraudulent scheme; (4) the alleged fraudulent scheme also received substantial publicity in the northern Ohio banking industry; and (5) as a result of AMICO's failure to pay and its false accusations, northern Ohio banks will no longer consider financing any project engaged in by Blaine Tanner.

There is no question that a substantial portion of Tanner's allegations relate to statements made by AMICO in judicial proceedings, which would be protected by the litigation privilege. Thus, in considering the sufficiency of Tanner's pleading, the Court must disregard any assertions that allege only statements made in the context of litigation.

Although the Court considers all allegations relating to statements made by AMICO outside the context of judicial proceedings, as well as any allegations concerning allegedly

---

[38] Neither Tanner nor AMICO has discussed the distinction between claims for <u>intentional</u> interference with prospective business relations, and claims alleging mere negligent interference. It is unclear to this Court whether Ohio even recognizes a claim for negligent interference with prospective business advantage. *See, e.g., A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St. 3d 1, 14 (1995)("[t]he torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, <u>induces or otherwise purposely causes</u> a third person not to enter into or continue a business relation with another, or not to perform a contract with another. . . .")(emphasis added).

Tanner's pleading, however, alleges that AMICO acted "with malice, bad faith or in reckless disregard of . . . Tanner's rights. . . ." Accordingly, Tanner apparently seeks to proceed under an intentional tort theory. For this reason, the Court has considered Tanner's claim under an intentional tort analysis.

wrongful conduct by AMICO, the Court nonetheless finds that Tanner's pleading fails to state a claim. Tanner alleges no specific statements by AMICO outside the context of AMICO's pleadings in this litigation (other than a blanket assertion that such statements were made), and does not identify any bank that learned of such statements or altered its behavior as a result.

Tanner's proposed pleading also is notably sparse in its allegations regarding the existence of any specific economic relationship or AMICO's knowledge of any such relationship. In his proposed Fourth Counterclaim, Tanner does not even name Huntington as the bank in question, nor does he allege that he had a banking "relationship" with Huntington or any other bank. The allegations of Tanner's proposed pleadings suggest, in fact, that Tanner did not have an ongoing relationship with banks other than Huntington and that, after learning of AMICO's allegations against Tanner, those banks declined to establish any economic relationship with Tanner. In order to allege that AMICO interfered with his prospective business relationship, Tanner bears the burden of pleading that at least one such prospective relationship existed.

Even if Tanner did allege the existence of such relationships, moreover, he does not allege that AMICO had any knowledge whatsoever of Tanner's economic relationships with Huntington or any other bank.[39] Moreover, to the extent that any unspecified banks declined to deal with Tanner after learning of AMICO's allegations through the "substantial publicity" of these disputes in the northern Ohio area, Tanner also does not allege that any such publicity was attributable to any conduct by AMICO.

Finally, to the extent that Tanner's claims are based on AMICO's conduct in denying

---

[39] The complaint does allege (02-16017, Doc. 53, at ¶ 19) that Michael Anthony (as agent for the Sureties) was informed of Huntington's role in the Guardian XVI transaction, as a lender to Guardian XVI; however, since the Guardian XVI transaction was consummated, Tanner cannot possibly allege any interference by AMICO in connection with that transaction.

bond claims filed by parties other than Tanner (specifically, Guardian XVI and Huntington), the Court finds that those allegations also are insufficient to allege that such conduct was directed at disrupting the business relationships of Tanner, a nonparty to the CMC transactions. Accordingly, Tanner's proposed counterclaim for interference with prospective business relations fails to state a claim and is futile.

For the reasons set forth herein, the motion of Guardian XVI and Tanner to file amended counterclaims is <u>granted in part and denied in part</u>. The motion is <u>granted</u> to the extent that Guardian XVI requests leave to file the Third Amended Counterclaim. Tanner's request for leave to file the proposed Fourth Amended Counterclaim is <u>denied</u>.

### G. 02-16021, *Provident Bank v. Safeco Insurance Company of America*

#### 1. Safeco Motion for Leave to File Second Amended Answer and Counterclaim (02-16021, Doc. 29)

Safeco has moved for leave to file its proposed Second Amended Answer and Counterclaim, in order to add the following claims and defenses against Provident Bank ("Provident"):

(1) In its proposed Ninth Defense, Safeco seeks to allege that CMC is an indispensable party to the action.

(2) In its proposed Seventeenth Defense and Count IV of its proposed Counterclaim, Safeco seeks to allege that Provident failed to exercise sufficient due diligence prior to agreeing to lend money to the Guardian and Diversity entities.

(3) In its proposed Eighteenth Defense, Safeco seeks to allege a lack of causation between the injury alleged and the damages suffered.[40]

---

[40] Provident does not appear to object to the assertion of the proposed Eighteenth Defense; accordingly, Safeco's motion for leave to amend to assert the proposed Eighteenth Defense is <u>granted</u>.

(4)     In its proposed Nineteenth Defense, Safeco seeks to allege that Provident should be limited to recovery of its out-of-pocket damages.

Additionally, Safeco's new proposed Answer and Counterclaim contains new factual allegations, which amplify Safeco's contentions relating to (1) the fraud of CMC; and (2) the background of Blaine Tanner, the principal of the Guardian entities.

Safeco asserts that each of its proposed new defenses and claims is meritorious, that each is based on information learned by Safeco during discovery, and that no prejudice will result from the Court's allowance of the proposed amendments.   Accordingly, Safeco argues, this Court should apply the liberal standards of Fed. R. Civ. P. 15(a) in favor of granting leave to amend.

Safeco argues, first, that in the event that the Court grants Provident's (unopposed) motion for leave to file an amended complaint (02-16021, Doc. 28), Safeco is entitled to file its amended answer and counterclaims <u>as of right</u>. *See, e.g., Moellers N. Am. v. MSK Covertech*, 912 F. Supp. 269, 273 (W.D. Mich. 1995).   Safeco asserts, however, that even if the Court should consider its motion for leave to amend on the merits, its new claims and defenses are both timely and meritorious.   Safeco contends that CMC is an indispensable party to this litigation because, pursuant to the Global Settlement Agreement, an adverse finding against Safeco in this litigation would give rise to additional claims by Safeco against CMC in the bankruptcy litigation.   In addition, Safeco argues that its negligence claim and its new proposed defenses are both adequately pleaded and appropriate as a matter of law.

Provident responds that (1) all of Safeco's proposed amendments are based on facts that were previously known to Safeco, and should have been set forth in Safeco's original pleading; and (2) Safeco's proposed amendments are futile as a matter of law.   Provident contends, first,

that CMC is neither a necessary nor indispensable party, since CMC's Bankruptcy Trustee has released any interest in the bonds that are the subject matter of this action, and the claims between Provident and Safeco can be determined in the absence of CMC. Provident asserts that Safeco's interests are adequately protected through Safeco's proof of claim in the CMC bankruptcy and by Safeco's continuing action against CMC and its principals (02-16004).

Provident points to the motion for leave to amend filed by Safeco in 02-16004 (granted by the Court in section III(B)(1), *infra*), in which Safeco sought to withdraw its claim for indemnity against CMC. The fact that Safeco sought to withdraw that claim, according to Provident, demonstrates that CMC cannot be an indispensable party to this action. In any event, Provident contends, Safeco has been aware of CMC's role in these transactions for more than four years, and no new facts learned in discovery could have rendered CMC an indispensable party.

Provident argues, second, that Safeco cannot state a claim for negligence against Provident (under the law of any potentially applicable jurisdiction), because Safeco cannot plead that Provident owed it any duty, nor can Safeco show that any action by Provident caused any harm to Safeco. According to Provident, since Safeco's liability is not related to the performance of any obligations by Provident's borrowers (e.g., the Guardian and/or Diversity entities), Safeco cannot allege that Provident's lending decision affected the scope of Safeco's obligations or Safeco's decision to issue its bonds. Additionally, since Safeco does not allege that Provident had knowledge of any defects in the lease pools or any fraud by CMC, Safeco cannot allege that Provident breached any duty owed to Safeco. Provident asserts that permitting a claim such as Safeco's proposed negligence claim would be offensive to public policy, since Safeco seeks to impose the burden of its surety obligations on Provident, its obligee. Provident

contends, finally, that Safeco's proposed Seventeenth and Nineteenth Defenses should be disallowed as redundant and duplicative of the existing Tenth and Eleventh Defenses.

The positions taken by the parties as to Safeco's motion are substantively identical to those taken by the parties in Case No. 02-16014. The Court has examined the structure of these transactions, as well as the parties' allegations, and finds that there are no material factual differences between the transactions implicated here and those involved in Case No. 02-16014. Accordingly, for the reasons set forth in sections II(E)(1), *supra*, Safeco's motion is <u>granted in part and denied in part</u>, as set forth herein:

(1)      Safeco's motion for leave to amend to assert its proposed Ninth and Eighteenth Defenses is <u>granted</u>;

(2)      Safeco's motion for leave to amend to assert its proposed Fourth Counterclaim is <u>denied</u>; and

(3)      Safeco's motion for leave to amend to assert its proposed Seventeenth and Nineteenth Defenses is <u>denied</u>.

With respect to the new factual allegations sought to be asserted by Safeco, Safeco's motion for leave to amend to amplify the background of its claims and defenses is <u>granted</u>.

**H.      03-16000, *RLI Insurance Company v. Guardian Financial Group, LLC***

**1.      Motion of Guardian Financial Group, Guardian Capital XVIII and Blaine Tanner for Leave to File Amended Counterclaims (03-16000, Doc. 17)**

Guardian Financial Group ("Guardian Financial"), Guardian Capital XVIII ("Guardian XVIII") and Blaine Tanner have moved for leave to file amended counterclaims, in order to assert three additional causes of action: (1) an additional counterclaim by Guardian XVIII,

alleging that Guardian XVIII became the "obligee" on the surety bonds, either directly through contract or as an intended third-party beneficiary of the transactions (rather than purely through assignment by CMC); (2) a new counterclaim by Blaine Tanner, alleging interference with business opportunity based on actions by RLI, whose conduct allegedly impaired Tanner's ability to obtain financing for his business ventures throughout the course of this litigation; and (3) a promissory estoppel counterclaim by Guardian Financial and Blaine Tanner, alleging that RLI's failure to honor its representations and pay on its surety bonds damaged Tanner and Guardian XVIII by causing them to default on a loan from Sky Bank.

RLI has not objected to the portion of this motion requesting leave to file Guardian XVIII's third-party beneficiary counterclaim, and the motion for leave is <u>granted</u> to the extent that it requests leave to file Guardian XVIII's proposed Third Counterclaim. RLI opposes, however, the requests by Tanner and Guardian Financial to file the proposed Fourth and Fifth Counterclaims, asserting that (1) the new proposed Counterclaims are compulsory counterclaims, and there is no good cause for the delay in asserting these claims; (2) significant discovery would be needed in order to address the new allegations; and (3) the new proposed Counterclaims are futile. For the reasons set forth herein, the motion for leave to amend is <u>denied</u> with respect to the proposed Fourth and Fifth Counterclaims.

### (a) Interference with Business Opportunity (Proposed Fourth Counterclaim)

RLI argues, first, that Tanner knew of the substance of RLI's claims against him, and his defenses to those claims, prior to June 2004, when Tanner first answered RLI's complaint. RLI contends that the proposed business interference counterclaim must be construed as a compulsory counterclaim, and thus that such a counterclaim was required to be pleaded in Tanner's original answer. RLI asserts that, in order to be granted leave to file at this stage,

Tanner must demonstrate that his failure to file the counterclaim previously was the result of "oversight, inadvertence, or excusable neglect . . . ," or that "justice requires" the granting of leave to amend. Fed. R. Civ. P. 13(f).

While Tanner suggests that information supporting the new tort claim was learned through the deposition of Michael Anthony, RLI points out that Anthony's deposition was completed in December 2003—six months before Tanner filed his original answer to RLI's complaint. According to RLI, Tanner has presented no excuse for his delay that would satisfy the standards of Fed. R. Civ. P. 13(f), and he should not be permitted leave to amend.[41] RLI asserts, alternatively, that even under the more lenient standards of Fed. R. Civ. P. 15(a), the Court should deny the motion for leave to amend because Tanner's undue delay in filing the new proposed counterclaim demonstrates a lack of "due diligence." *See United States v. Midwest Suspension & Brake*, 49 F.3d 1197, 1202 (6th Cir. 1995).

RLI argues, additionally, that permitting the filing of the new proposed counterclaim by Tanner and Guardian Financial will cause undue prejudice, because significant further discovery will be required to allow RLI to address that claim. Specifically, RLI contends that it needs: (1) discovery relating to the factual basis for Tanner's claims of interference with business opportunity; (2) discovery relating to the identity of any lenders from whom Tanner claims to have lost business opportunities, and depositions of employees of those institutions; (3) discovery relating to loans sought by Tanner prior to the collapse of the CMC Ponzi scheme, in comparison with loans sought after the collapse of CMC in early 2002; (4) written discovery and document production requests regarding the finances of Tanner and his related companies, in

---

[41] Additionally, RLI contends, Tanner cannot argue that discovery revealed that RLI had knowledge of the Guardian entities' role in the transaction, since "uncontroverted evidence" demonstrates that RLI did not know of the existence of Guardian or Blaine Tanner until the commencement of this litigation. The Court discounts this argument, however, since it appears from Tanner's reply brief that evidence on this point is controverted at best. (03-16000, Doc. 20, at 1-2).

order to evaluate Tanner's alleged damages; and (5) unanticipated expert discovery as to damages, including expert analysis of the "before and after" conditions of Tanner's companies.[42] RLI asserts that the conduct of such broad-based discovery will take months and will add significant expense to this litigation.

Moreover, RLI contends that the proposed claim for interference with business opportunity is futile, because (1) all of RLI's alleged acts after January 18, 2002 are encompassed by an unqualified litigation privilege; (2) the proposed new counterclaim fails to state a claim under Fed. R. Civ. P. 12(b)(6); and (3) the counterclaim is barred by the statute of limitations. In support of its privilege argument, RLI cites this Court's prior ruling that RLI seriously anticipated litigation by January 18, 2002, and argues that all of its acts occurring after that date were absolutely privileged. Additionally, RLI asserts that the business interference allegations fail to state a claim because Tanner has not alleged any intentional wrongdoing directed at him, or any conduct that was independently "wrongful." *See National Medical Transportation Network v. Deloitte & Touche*, 62 Cal. App. 4th 412, 439 (4th Dist. 1998).

With respect to the statute of limitations issue, RLI suggests that the claim for interference with business opportunity accrued no later than February 2002, when RLI filed its first CMC-related lawsuit seeking to rescind all of the lease bonds. As noted previously in this opinion, *see, e.g.*, section II(A)(1)(d), application of the appropriate statute of limitations presents a complex issue in the context of a multidistrict litigation proceeding. The Court notes, however, that this action originally was filed in the Southern District of California, and that California construes statutes of limitations as procedural for conflicts purposes. *See Cossman v. DaimlerChrysler Corp.*, 108 Cal. App. 4th 370, 376 (1st Dist. 2003)("whether a claim is barred

---

[42] AMICO and RLI have filed a conditional joint motion requesting leave to conduct such discovery in the event that Tanner's motion for leave to amend is granted. (02-16000, Doc. 1809).

by a statute of limitations 'is a procedural matter governed by the law of the forum, regardless of where the cause of action arose.'"), *quoting Biewend v. Biewend*, 17 Cal. 2d 108, 114 (1941). Under California law, a tortious interference claim is subject to a two-year statute of limitations. *See* Cal. Civ. P. § 339(1).  RLI argues that, even if the omitted counterclaim relates back to the filing of the original answer in June 2004, that claim still would be time-barred.  Although RLI's argument has some force based on the analysis above, the Court again declines to rest its denial of leave to amend on issues of timeliness alone.

The tortious interference with business opportunity claim pleaded by Tanner here is substantially identical to that pleaded in 02-16017, discussed previously at section II(F)(1), *supra*.  For the reasons set forth in that section, Tanner's claim for interference with business opportunity is futile.  Leaving aside issues of timeliness, which readily could serve as an independent basis to deny leave to amend, Tanner's pleading fails to state a claim.  Tanner alleges no specific economic relationship, nor RLI's knowledge of any such relationship. Moreover, Tanner alleges no statements by RLI other than those made in RLI's pleadings and otherwise in the context of this litigation.  Any such statements would be privileged and could not be actionable.

Accordingly, for the reasons set forth in section II(F)(1) and herein, Tanner's proposed new claim for tortious interference with business opportunity is futile.

### (b) Promissory Estoppel (Proposed Fifth Counterclaim)

RLI argues first that the proposed Fifth Counterclaim sought to be asserted by Tanner and Guardian Financial was required to be raised in the original answer filed in June 2004.  RLI relies on the same reasons set forth with respect to the Proposed Fourth Counterclaim—specifically, the compulsory counterclaim provisions set forth in Fed. R. Civ. P.

13(f) and the "undue delay" provisions of Fed. R. Civ. P. 15(a). RLI asserts that, since Tanner and Guardian Financial have not even attempted to articulate a reason for their late filing, the motion for leave to amend to assert the proposed Fifth Counterclaim must be denied.

RLI indicates further that it does not understand the basis of the proposed promissory estoppel claim and that, depending on the basis for that claim, additional discovery may be needed to permit RLI to respond. To the extent that the proposed promissory estoppel claim relates to the lease bonds issued by Anthony on RLI's behalf in December 2001, RLI concedes that no further discovery is needed. To the extent, however, that defendants seek to assert claims with respect to a different, unconsummated transaction, RLI contends that discovery will be necessary with respect to that putative transaction.

RLI argues, moreover, that the proposed Fifth Counterclaim is futile, because it is time-barred and fails to state a claim. RLI argues that the relevant events for statute of limitations purposes are (1) RLI's filing of its first CMC-related lawsuit in February 2002; and (2) Sky Bank's securing judgment against the Guardian entities for the full amounts of its loans in May 2002. According to RLI, the claims of Tanner and Guardian Financial could have accrued no later than May 24, 2002, when Sky Bank obtained its state court judgments, and would have been time-barred by May 2004.

RLI also argues that the proposed Fifth Counterclaim fails to state a claim under California law. The elements of promissory estoppel under California law are (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance by the party to whom the promise is made; and (3) damages as a result of the reliance. *See Thomson v. International Alliance of Theatrical Stage Employees & Moving Picture Machine Operators*, 42 Cal. Rptr. 785, 790 (2d Dist. 1965). In the proposed Fifth Counterclaim, Tanner and Guardian Financial allege that they

relied on RLI's representation that it would honor the lease bonds "according to their terms." RLI contends that such an allegation is insufficient to state a claim because, not only were the bonds fraudulently induced, but those bonds provided only for payment to CMC of amounts "due and owing" under the leases. Since there were no amounts "due and owing" under the leases, RLI reasons, it cannot have breached any promise under a lease bond. Moreover, RLI argues, since Tanner admits that he never had any communications with RLI, these defendants cannot base their claim on purported representations by RLI to them.

The Court declines to accept RLI's Rule 12(b)(6) futility argument. The essence of that argument is that, construing the bonds in accordance with RLI's interpretation, RLI does not have any liability on the bonds. That question has not been determined at this stage, and it is at the heart of the litigation between these parties. (*See, e.g.*, 02-16000, Doc. 1708)(denying motion by Claimant Banks for judgment on the pleadings). It would be inappropriate for the Court to adopt RLI's conclusory characterization of the bonds in the context of a motion for leave to amend.

The Court finds, nonetheless, that leave to amend must be denied, because of the extensive delay by Tanner and Guardian Financial in raising their proposed promissory estoppel claim. With respect to the statute of limitations argument, the Court notes initially that this action was commenced in the Southern District of California, and that California construes the statute of limitations as procedural for conflicts purposes. *See Cossman*, 108 Cal. App. 4th at 376. If the Court were to apply the California statute of limitations (an issue which the Court does not decide at this point), the proposed promissory estoppel counterclaim would be governed by the two-year limitations period of Cal. Civ. Proc. § 339(1) (oral contracts or obligations not founded upon a written instrument), and accordingly would have been time barred even before

Tanner and Guardian Financial filed their original answer in June 2004.

Although the Court thus suspects that the promissory estoppel claim is time-barred, the Court finds that the undue delay of Tanner and Guardian Financial provides an independent basis for denial of the motion for leave to amend. Neither Tanner nor Guardian Financial articulates any reason for the delay in asserting this claim, nor do they allege that they were unaware of any facts underlying the promissory estoppel claim at the time of filing the original answer in June 2004. Rather, Tanner and Guardian Financial merely point to the fact that Guardian XVIII filed a promissory estoppel claim in 2004 as supporting their argument that the issues underlying the promissory estoppel claim have been involved in this action, and thus a subject of discovery between the parties, since 2004.

The fact that Guardian XVIII filed a promissory estoppel claim in 2004, however, only buttresses the conclusion that the conduct underlying any such claim was known to all of these defendants at that time. If Tanner and Guardian Financial had a promissory estoppel claim against RLI, they should have filed it in June 2004 or, at least, at some point during the nearly two years since the filing of the original answer. Allowing the defendants to inject new plaintiffs on their counterclaim at this late date would unfairly prejudice RLI in its defense of that claim. Leave to amend to assert the proposed Fifth Counterclaim is denied.

**For the reasons set forth herein, the motion for leave to file amended counterclaims is granted in part and denied in part. The motion for leave is granted with respect to the proposed Third Counterclaim. With respect to the proposed Fourth and Fifth Counterclaims, the motion for leave to amend is denied.**

**III.     Unopposed Motions**

The Court has set forth below each of the cases in which there are pending unopposed motions for leave to amend and has summarized the allegations sought to be added by the moving parties in each case. In each instance, the Court has conducted a side-by-side comparison between the proposed amendment and the moving party's original pleading, and has determined the scope of the claims sought to be added. Additionally, the Court has considered such questions as the necessity of additional discovery arising from the proposed amendment and the prejudice that would inure to opposing parties.

Where the Court has determined that the motion in question should be granted as unopposed, the Court has set forth its conclusion herein with little analysis. Where, however, the Court finds that a motion for leave to amend must be denied, the Court has set forth the reasons supporting its determination.

## A. 02-16001, *RLI Insurance Company v. Commercial Money Center, Inc., et al.*

### 1. Ameriana Bank Motion to Amend Answer and Counterclaim (02-16001, Doc. 39)

Ameriana Bank ("Ameriana") has filed a motion for leave to amend its answer and counterclaim against RLI, arguing that it seeks leave to amend in order to make its pleadings consistent with the claims set forth in the amended complaint in its companion case, 02-16005. Ameriana seeks leave to add (1) several new facts, including facts relating to the proceedings in the Commercial Money Center and Commercial Servicing Corporation bankruptcies; (2) three affirmative defenses; and (3) affirmative claims for reformation, estoppel and rights as a third party beneficiary.

Ameriana's motion for leave to amend (02-16001, Doc. 39) is <u>granted</u>.

### 2. Atlantic Coast Federal Motion to File Amended Counterclaim (02-16001, Doc. 40)

Atlantic Coast Federal ("Atlantic Coast") has moved for leave to file an amended counterclaim, in order to set forth "additional legal theories of recovery against RLI Insurance Company, Inc." A side-by-side comparison of the proposed amended counterclaim with Atlantic Coast's prior counterclaim indicates that Atlantic Coast seeks to add the following claims:

(1)    Counts III and IV, Misrepresentation and Negligent Misrepresentation

(2)    Count V, Fraudulent Concealment

(3)    Count VII, Specific Performance of the Sale and Servicing Agreement ("SSA")

(4)    Count IX, Declaratory Relief

(5)    Counts XI and XII, Reformation based on Mutual and Unilateral Mistake

(6)    Count XIII, Third Party Beneficiary Contract

(7)    Count XIV, Estoppel

In its proposed amended Counterclaim, Atlantic Coast also has omitted its previously-asserted claim for conversion.

The motion for leave to file an amended counterclaim (02-16001, Doc. 40) is <u>granted</u>.

### 3. RLI Motion for Leave to File a Second Amended Complaint (02-16001, Doc. 41)

RLI has moved for leave to file a Second Amended Complaint, and asserts that its new allegations account for new factual information, remove certain claims precluded by CMC's bankruptcy filing, and emphasize RLI's equitable and declaratory relief claims. RLI seeks to add allegations relating to (1) the forgery of RLI bonds; (2) the creation of purported RLI documents without the knowledge of RLI; (3) the scope of CMC's fraud and Michael Anthony's

double agency; (4) the Whitfield whistleblower package; and (5) the knowledge of CMC's fraud by several claimant banks (e.g., those that had received the Whitfield package).

RLI's motion for leave to amend (02-16001, Doc. 41) is <u>granted</u>.

**B.  02-16004, *Safeco Insurance Company of America v. Commercial Money Center, Inc., et al.***

**1.  Safeco Motion for Leave to Amend Complaint (02-16004, Doc. 9)**

Safeco seeks leave to file a First Amended Complaint, (1) in order to eliminate claims previously asserted against CMC and no longer assertable due to the ongoing status of the CMC bankruptcy in the Southern District of California; and (2) to pursue individual fraud claims against the principals of CMC.  Safeco's First Amended Complaint seeks to assert causes of action for fraud and misrepresentation against Sterling Wayne Pirtle, Ronald Fisher and Mark Fisher, individually.  Safeco also seeks to withdraw its causes of action relating to the CMC indemnity agreements.

Safeco essentially has withdrawn all the allegations of its original complaint, which dealt primarily with indemnity, exoneration and causes of action against CMC.  The only causes of action sought to be asserted in the proposed First Amended Complaint are:

(1)  Fraud and Deceit, Aiding and Abetting Fraud and Deceit, and Conspiracy to Commit Fraud and Deceit; and

(2)  Negligent Misrepresentation and Omission of Material Fact.

Safeco's motion for leave to amend (02-16004, Doc. 9) is <u>granted</u>.

### C. 02-16005, *Ameriana Bank & Trust v. RLI Insurance Company*

#### 1. Ameriana Motion for Leave to Amend Complaint (02-16005, Doc. 9)

Ameriana seeks leave to file a Second Amended Complaint, in order to make its pleadings consistent with the allegations set forth in the answer and counterclaim in its companion case, 02-16001. Additionally, Ameriana seeks to (1) add a paragraph relating to RLI's obligations under the SSA; (2) add claims seeking reformation of the bonds based on mutual mistake and unilateral mistake; (3) add a claim asserting third-party beneficiary rights under the bonds and SSA; and (4) update the allegations relating to the proceedings in the CMC and CSC bankruptcies.

Ameriana's motion for leave to amend (02-16005, Doc. 9) is <u>granted</u>.

### D. 02-16012, *Metropolitan Bank and Trust Company v. Royal Indemnity Company*

#### 1. Guardian Capital XV LLC's Motion to File Amended Counterclaims (02-16012, Doc. 77)

Guardian Capital XV, LLC ("Guardian XV"), moves for leave to file an additional counterclaim, alleging that Guardian XV became the "obligee" on the surety bonds, either through contract or as an intended third-party beneficiary of the transactions (rather than purely through assignment from CMC). The only other proposed amendments are minor edits to Guardian XV's original counterclaims, primarily relating to Guardian XV's description of the Royal lease bond transactions and the legal effect of the transaction documents.

Guardian XV's motion for leave to amend (02-16012, Doc. 77) is <u>granted</u>.

2. **CadleRock's Motion for Leave to File Amended Complaint (02-16012, Doc. 78)**

CadleRock Joint Venture, L.P. ("CadleRock") is the purchaser of the interests of Sky Bank, which is successor in interest by merger to Metropolitan Bank & Trust Co. CadleRock moves for leave to file a second amended complaint, in order to set forth additional claims for fraudulent and negligent misrepresentation, fraud in the inducement, and breach of the Sale and Servicing Agreement.

CadleRock's motion for leave to file a second amended complaint (02-16012, Doc. 78) is <u>granted</u>.

E. **02-16013, *Sky Bank v. RLI Insurance Company***

1. **Sky Bank's Motion for Leave to File First Amended Complaint (02-16013, Doc. 63)**

Sky Bank ("Sky") moves for leave to file a first amended complaint against RLI. Sky's proposed First Amended Complaint retains all of the causes of action contained in its original complaint, but adds new claims for (1) negligent misrepresentation, (2) fraudulent misrepresentation, (3) breach of the Sale and Servicing Agreement, (4) breach of fiduciary duty, (5) unjust enrichment, and (6) equitable estoppel.

Sky's motion for leave to amend (02-16013, Doc. 63) is <u>granted</u>.

F. **02-16014, *Bank One, N.A. v. Safeco Insurance Company of America***

1. **Bank One Motion for Leave to File First Amended Complaint (02-16014, Doc. 26)**

Chase, as successor by merger to Bank One ("Bank One"), has moved for leave to file a First Amended Complaint against Safeco. The proposed First Amended Complaint includes

substantial amendments, including new claims for (1) express indemnity; (2) an accounting; (3) equitable estoppel and detrimental reliance; (4) bad faith; (5) fraud or misrepresentation; (6) negligence; and (7) violation of Ohio's Deceptive Trade Practices Act. Bank One also seeks to amend the allegations contained in its previously asserted claims for breach of contract and declaratory judgment. Bank One asserts that the bulk of these amendments are an "update" to its original complaint, since at the time of filing of Bank One's original complaint, Safeco had not yet denied Bank One's claims.

Bank One's motion for leave to amend (02-16014, Doc. 26) is <u>granted</u>.

### G. 02-16017, *Huntington National Bank v. American Motorists Ins. Co.*

#### 1. AMICO Motion for Leave to File an Amended and Supplemental Answer to Counterclaims (02-16017, Doc. 51)

AMICO has moved for leave to file an amended and supplemental answer to the counterclaims of Guardian XVI, based upon information learned during discovery and new factual developments that occurred subsequent to AMICO's filing of its original answer. AMICO asserts that, during discovery, it learned of alleged conduct by Guardian XVI's related company, Guardian Financial. Allegedly, Guardian Financial entered into an arrangement through which it extended access to its own Sky Bank line of credit to CMC, in exchange for a fee. AMICO seeks to add its Thirty-Third Defense based on its allegations that Guardian Financial's actions facilitated CMC's fraudulent scheme.

AMICO also seeks to supplement its pleading to allege certain events that have occurred as a result of AMICO's settling its claims with Huntington in this action. AMICO seeks leave to allege that, as part of the settlement, AMICO has become the holder of a judgment against

Guardian XVI in the amount of approximately $4 million. Accordingly, AMICO seeks to plead its Thirty-Fourth Defense of offset.

AMICO's motion for leave to amend (02-16017, Doc. 51) is <u>granted</u>.

### H. 02-16018, *Huntington National Bank v. Royal Indemnity Company*

#### 1. Huntington's Motion for Leave to File First Amended Complaint (02-16018, Doc. 52)

Huntington has moved for leave to file a First Amended Complaint, in order to assert certain new claims against Royal. Huntington seeks leave to assert new causes of action for breach of fiduciary duty, unjust enrichment and equitable estoppel, as well as to refine its factual allegations, including its contentions relating to (1) the CMC transactions; (2) the scope of Michael Anthony's power of attorney; (3) Royal's purported servicing duties; and (4) Huntington's accession to all rights formerly held by Guardian Capital XIV, LLC ("Guardian XIV") in the Bonds and SSA, through a secured party disposition of collateral. These new fact allegations apparently stem from Huntington's learning of additional facts through completion of discovery in this matter.

Huntington's motion for leave to amend (02-16018, Doc. 52), is <u>granted</u>.

#### 2. Guardian XIV's Motion for Leave to File Amended Counterclaims (02-16018, Doc. 53)

Guardian XIV has moved for leave to amend its counterclaims, in order to assert a new Third Counterclaim alleging that Guardian XIV became the "obligee" on the surety bonds, either directly through contract or as an intended third-party beneficiary of the transactions (rather than purely through assignment by CMC). The only other proposed amendments are minor edits to

Guardian XIV's original counterclaims, primarily relating to Guardian XIV's description of the Royal lease bond transactions and the legal effect of the transaction documents.

Guardian XIV's motion for leave to amend (02-16018, Doc. 53) is <u>granted</u>.

### I.    02-16019, *Sky Bank v. Royal Indemnity Company*

#### 1.    Motion of Guardian Capital IX LLC for Leave to File Amended Counterclaims (02-16019, Doc. 63)

Guardian Capital IX LLC ("Guardian IX") has moved for leave to amend its counterclaims, in order to assert a new Third Counterclaim alleging that Guardian IX became the "obligee" on the surety bonds, either directly through contract or as an intended third-party beneficiary of the transactions (rather than purely through assignment by CMC). The only other proposed amendments are minor edits to Guardian IX's original counterclaims, primarily relating to Guardian IX's description of the Royal lease bond transactions and the legal effect of the transaction documents.

Guardian IX's motion for leave to amend (02-16019, Doc. 63) is <u>granted</u>.

#### 2.    CadleRock's Motion for Leave to File Amended Complaint (02-16019, Doc. 64)

CadleRock, purchaser of all rights, title and interest to Sky Bank's claims in this case, has moved for leave to file an amended complaint, in order to assert additional claims against defendant Royal. Sky's original complaint asserted claims only for (1) breach of the lease bonds; (2) bad faith; and (3) declaratory judgment. CadleRock seeks leave to add claims for (1) negligent misrepresentation, (2) fraud in the inducement, and (3) breach of the SSA. CadleRock also seeks to substantially amplify the factual allegations of the complaint, based on facts presumably learned by CadleRock during discovery in these actions.

CadleRock's motion for leave to amend (02-16019, Doc. 64) is <u>granted</u>.

**J.      02-16020, _CadleRock Joint Venture, L.P. v. Safeco Insurance Company of America_**

**1.      Safeco Motion for Leave to File Second Amended Answer and Counterclaim (02-16020, Doc. 35)**

Safeco has moved for leave to file its proposed Second Amended Answer and Counterclaim, in order to add the following claims and defenses:

(1)      In its proposed Ninth Defense, Safeco seeks to allege that Diversity[43] and CMC are indispensable parties to the action.

(2)      In its proposed Seventeenth Defense and Count IV of its proposed Counterclaim, Safeco seeks to allege that First Merit Bank, N.A. ("First Merit") failed to exercise sufficient due diligence prior to agreeing to lend money to the Guardian entities.

(3)      In its proposed Eighteenth Defense, Safeco seeks to allege a lack of causation between the injury alleged and the damages suffered.

(4)      In its proposed Nineteenth Defense, Safeco seeks to allege that First Merit should be limited to recovery of its out-of-pocket damages.

Additionally, Safeco's new proposed Answer and Counterclaim contains new factual allegations, which amplify Safeco's contentions relating to (1) the fraud of CMC; (2) the receipt, by certain parties, of the anonymous Whitfield packet; and (3) the background of Blaine Tanner, the principal of the Guardian entities.

Although First Merit has not opposed Safeco's motion, this motion is substantively identical to the motions filed by Safeco in 02-16014 (addressed by the Court in section II(E)(1),

---

[43] It is unclear from the proposed pleading to which Diversity entity Safeco refers; however, Safeco's request for leave to amend to add the Diversity entity to its necessary party defense is <u>granted</u>.

*supra*), and 02-16021 (addressed by the Court in section II(G)(1), *supra*).  Both of those motions were opposed by the Banks that dealt with Safeco and, in previous sections of this opinion, the Court found that Safeco's motions should be granted in part and denied in part.

The Court has examined the structure of these transactions, as well as the parties' allegations, and finds that there are no material factual differences between the transactions implicated here and those involved in cases 02-16014 and 02-16021.  Accordingly, for the reasons set forth in sections II(E)(1) and II(G)(1), *supra*, Safeco's motion is granted in part and denied in part, as set forth herein:

(1)    Safeco's motion for leave to amend to assert its proposed Ninth and Eighteenth Defenses is granted;

(2)    Safeco's motion for leave to amend to assert its proposed Fourth Counterclaim is denied; and

(3)    Safeco's motion for leave to amend to assert its proposed Seventeenth and Nineteenth Defenses is denied.

With respect to the new factual allegations sought to be asserted by Safeco, Safeco's motion for leave to amend to amplify the factual background of its claims and defenses is granted.

### 2.    CadleRock Motion for Leave to File Amended Complaint (02-16020, Doc. 36)

CadleRock, purchaser of all rights, title and interest to First Merit's claims in this case, has moved for leave to file an amended complaint, in order to assert additional claims against defendant Safeco.  First Merit's original complaint asserted only claims for (1) breach of the lease bonds; (2) bad faith; and (3) declaratory judgment.  CadleRock seeks leave to add claims for (1) negligent misrepresentation, (2) fraud in the inducement, and (3) breach of the SSA.

CadleRock also seeks to substantially amplify the factual allegations of the complaint, presumably based on facts learned by CadleRock during discovery in these actions.

CadleRock's motion for leave to amend (02-16020, Doc. 36) is <u>granted</u>.


### K. 02-16021, *Provident Bank v. Safeco Insurance Company of America*

#### 1. Provident Bank Motion for Leave to File Amended Complaint (02-16021, Doc. 28)

Provident has moved for leave to file an amended complaint, in order to assert three new claims for relief against Safeco. In its proposed amended complaint, Provident essentially restates its previously asserted claims and adds claims for: (1) breach of SSA; (2) indemnification; and (3) negligent misrepresentation. The claims for breach of SSA and indemnification relate to Safeco's alleged breach of its servicing duties under the SSA, as well as Safeco's purported promise to indemnify Provident for any losses resulting from such a breach. The negligent misrepresentation claims allegedly are based on Safeco's representations concerning the validity and enforceability of Safeco's bonds, as well as statements made in alleged "estoppel letters" issued by Safeco.

Provident's motion for leave to amend (02-16021, Doc. 28) is <u>granted</u>.


### L. 02-16022, *Second National Bank of Warren v. Royal Indemnity Company*

#### 1. Motion of Diversity Capital II, LLC to File Amended Counterclaims (02-16022, Doc. 57)

Diversity Capital II, LLC ("Diversity II") has moved for leave to file amended counterclaims, in order to assert a new Third Counterclaim alleging that Diversity II became the "obligee" on the surety bonds, either directly through contract or as an intended third-party

beneficiary of the transactions (rather than purely through assignment by CMC). The only other proposed amendments are minor edits to Diversity II's original counterclaims, primarily relating to Diversity II's description of the Royal lease bond transactions and the legal effect of the transaction documents.

Diversity II's motion for leave to amend (02-16022, Doc. 57) is <u>granted</u>.

### 2. CadleRock Motion for Leave to File Amended Complaint (02-16022, Doc. 58)

CadleRock, purchaser of all rights, title and interest to the claims of Sky Bank, successor by merger to Second National Bank of Warren, has moved for leave to file an amended complaint, in order to assert additional claims against defendant Safeco for (1) fraud/negligent misrepresentation, (2) fraud in the inducement, and (3) breach of the SSA.

CadleRock's motion for leave to amend (02-16022, Doc. 58) is <u>granted</u>.

### M. 02-16024, *American Motorists Insurance Company v. Ameriana Bank and Trust*

### 1. AMICO Motion for Leave to File Second Amended Complaint and First Amended Answer to Counterclaims of United Security Bank (02-16024, Doc. 40)

AMICO has moved for leave to file (1) an amended answer to the counterclaims of United Security Bank ("USB"); and (2) a Second Amended Complaint against USB.[44] The proposed Second Amended Complaint is substantially similar to the First Amended Complaint, and contains two causes of action seeking declaratory relief as to the USB bonds and SSAs.

---

[44] Subsequent to AMICO's filing of its motion for leave to amend, the Court granted USB's previously filed motion for leave to file a supplemental counterclaim. (02-16000, Doc. 1824). AMICO then filed an amended answer. (02-16024, Doc. 44). AMICO has informed the Court that the filing of its amended answer has mooted AMICO's motion for leave to amend, insofar as that motion requested leave to file a First Amended Answer. AMICO's motion for leave to amend is still pending, however, insofar as that motion requests leave to file a Second Amended Complaint. Since AMICO's filed answer is not before the Court, the Court accordingly does not address the merits of that pleading, including any potential issues relating to futility of allegations or defenses.

AMICO seeks primarily to supplement its pleading with facts learned during discovery in this matter, and also to delete provisions relating to other defendants with whom AMICO has reached settlement in these cases.[45] The additional facts relate primarily to information learned regarding the chain of assignment of the USB bonds, and allegations of fraud by parties prior to USB in the assignment chain, including alleged fraud by Guardian Financial, LLC.

AMICO's motion for leave to amend (02-16024, Doc. 40) is <u>granted in part and denied as moot in part</u>. With respect to the motion for leave to file a Second Amended Complaint, the motion is <u>granted</u>. With respect to the motion for leave to file a First Amended Answer, the motion is <u>denied as moot</u>.

### N. 02-16027, *Atlantic Coast Federal v. RLI Insurance Company*

#### 1. Atlantic Coast Federal Motion for Leave to File Second Amended Complaint (02-16027, Doc. 8)

Atlantic Coast has moved for leave to file a Second Amended Complaint against RLI, in order to set forth "additional legal theories of recovery against RLI Insurance Company, Inc." A side-by-side comparison of the proposed Second Amended Complaint with Atlantic Coast's original Complaint indicates that Atlantic Coast seeks to add the following claims:

(1)   Counts III and IV, Misrepresentation and Negligent Misrepresentation

(2)   Count V, Fraudulent Concealment

(3)   Count VII, Specific Performance of the Sale and Servicing Agreement ("SSA")

(4)   Count IX, Declaratory Relief

(5)   Count X, Breach of Implied Covenant of Good Faith and Fair Dealing

---

[45] Although USB has not opposed AMICO's motion for leave to amend, USB has moved conditionally for leave to reopen discovery with respect to purported new facts sought to be asserted in the Second Amended Complaint. (02-16024, Doc. 41).

(6)     Counts XI and XII, Reformation based on Mutual and Unilateral Mistake

(7)     Count XIII, Third Party Beneficiary Contract

(8)     Count XIV, Estoppel

In its proposed amended Counterclaim, Atlantic Coast also has omitted its previously-asserted claim for conversion.

The motion for leave to file an amended counterclaim (02-16027, Doc. 8) is <u>granted</u>.


**O.     03-16002, *Guardian Capital LLC v. Safeco Insurance Company of America***

**1.     Safeco Motion for Leave to File First Amended Answer and Counterclaim (03-16002, Doc. 8)**

Safeco has moved for leave to file its First Amended Answer and Counterclaim, in order to add an additional defense alleging failure to mitigate damages on the part of Guardian Capital LLC ("Guardian Capital").[46]  Safeco also seeks leave to amend its Counterclaim against Guardian Capital, to allege additional fraudulent acts on the part of Guardian Capital and Blaine Tanner, and also to allege the failure of Provident to exercise sufficient due diligence prior to agreeing to lend money to Guardian Capital.

Safeco contends that it seeks leave to amend in order to add new factual information learned during discovery in these actions, and it appears that the proposed amendments are consistent with that purpose.  Safeco does not seek leave to add any new claims or parties; rather, the allegations relating to Provident are added in the nature of a defense to the claims of Guardian Capital.

Safeco's motion for leave to file a first amended answer (03-16002, Doc. 8) is <u>granted</u>.

---

[46] In its proposed Amended Answer and Counterclaim, attached to its motion, Safeco also has eliminated its affirmative defenses dealing with the scope of Michael Anthony's authority to bind Safeco.

### 2. Guardian Capital Motion for Leave to File Amended Complaint (03-16002, Doc. 9)

Guardian Capital has moved for leave to file an amended complaint, in order to assert a new cause of action alleging that Guardian Capital became the "obligee" on the surety bonds, either directly through contract or as an intended third-party beneficiary of the transactions (rather than purely through assignment by CMC). The only other proposed amendments are minor edits to Guardian Capital's original counterclaims, primarily relating to Guardian Capital's description of the Safeco lease bond transactions and the legal effect of the transaction documents.

Guardian Capital's motion for leave to amend (03-16002, Doc. 9) is <u>granted</u>.

### P. 03-16003, *Guardian Capital I, LLC v. Safeco Insurance Company of America*

### 1. Safeco Motion for Leave to File First Amended Answer and Counterclaim (03-16003, Doc. 8)

Safeco has moved for leave to file its First Amended Answer and Counterclaim, in order to add an additional defense alleging failure to mitigate damages on the part of Guardian Capital I LLC ("Guardian I").[47] Safeco also seeks leave to amend its Counterclaim against Guardian I, to allege additional fraudulent acts on the part of Guardian I and Blaine Tanner, and also to allege the failure of First Merit to exercise sufficient due diligence prior to agreeing to lend money to Guardian I.

Safeco contends that it seeks leave to amend in order to add new factual information learned during discovery in these actions, and it appears that the proposed amendments are consistent with that purpose. Safeco does not seek leave to add any new claims or parties;

---

[47] In its proposed Amended Answer and Counterclaim, attached to its motion, Safeco also has eliminated its affirmative defenses dealing with the scope of Michael Anthony's authority to bind Safeco.

rather, the allegations relating to First Merit are added in the nature of a defense to the claims of Guardian I.

Safeco's motion for leave to file a first amended answer (03-16003, Doc. 8) is <u>granted</u>.

### 2. Guardian I Motion for Leave to File Amended Complaint (03-16003, Doc. 9)

Guardian I has moved for leave to file an amended complaint, in order to assert a new cause of action alleging that Guardian I became the "obligee" on the surety bonds, either directly through contract or as an intended third-party beneficiary of the transactions (rather than purely through assignment by CMC). The only other proposed amendments are minor edits to Guardian I's original counterclaims, primarily relating to Guardian I's description of the Safeco lease bond transactions and the legal effect of the transaction documents.

Guardian I's motion for leave to amend (03-16003, Doc. 9) is <u>granted</u>.

### Q. 03-16004, *Guardian Capital II LLC v. Safeco Insurance Company of America*

### 1. Safeco Motion for Leave to File First Amended Answer and Counterclaim (03-16004, Doc. 5)

Safeco has moved for leave to file its First Amended Answer and Counterclaim, in order to add an additional defense alleging failure to mitigate damages on the part of Guardian Capital II LLC ("Guardian II").[48] Safeco also seeks leave to amend its Counterclaim against Guardian II, to allege additional fraudulent acts on the part of Guardian II and Blaine Tanner, and also to allege the failure of Bank One to exercise sufficient due diligence prior to agreeing to lend money to Guardian II.

---

[48] In its proposed Amended Answer and Counterclaim, attached to its motion, Safeco also has eliminated its affirmative defenses dealing with the scope of Michael Anthony's authority to bind Safeco.

Safeco contends that it seeks leave to amend in order to add new factual information learned during discovery in these actions, and it appears that the proposed amendments are consistent with that purpose. Safeco does not seek leave to add any new claims or parties; rather, the allegations relating to Bank One are added in the nature of a defense to the claims of Guardian II.

Safeco's motion for leave to file a first amended answer (03-16004, Doc. 5) is <u>granted</u>.

### 2. Guardian II Motion for Leave to File Amended Complaint (02-16004, Doc. 6)

Guardian II has moved for leave to file an amended complaint, in order to assert a new cause of action alleging that Guardian II became the "obligee" on the surety bonds, either directly through contract or as an intended third-party beneficiary of the transactions (rather than purely through assignment by CMC). The only other proposed amendments are minor edits to Guardian II's original counterclaims, primarily relating to Guardian II's description of the Safeco lease bond transactions and the legal effect of the transaction documents.

Guardian II's motion for leave to amend (03-16004, Doc. 6) is <u>granted</u>.

### R. 03-16005, *Guardian Capital III, LLC v. Safeco Insurance Company of America*

### 1. Safeco Motion for Leave to File First Amended Answer and Counterclaim (03-16005, Doc. 5)

Safeco has moved for leave to file its First Amended Answer and Counterclaim, in order to add an additional defense alleging failure to mitigate damages on the part of Guardian Capital III, LLC ("Guardian III").[49] Safeco also seeks leave to amend its Counterclaim against Guardian III, to allege additional fraudulent acts on the part of Guardian III and Blaine Tanner, and also to

---

[49] In its proposed Amended Answer and Counterclaim, attached to its motion, Safeco also has eliminated its affirmative defenses dealing with the scope of Michael Anthony's authority to bind Safeco.

allege the failure of Bank One to exercise sufficient due diligence prior to agreeing to lend money to Guardian III.

Safeco contends that it seeks leave to amend in order to add new factual information learned during discovery in these actions, and it appears that the proposed amendments are consistent with that purpose. Safeco does not seek leave to add any new claims or parties; rather, the allegations relating to Bank One are added in the nature of a defense to the claims of Guardian III.

Safeco's motion for leave to file a first amended answer (03-16005, Doc. 5) is <u>granted</u>.

### 2. Guardian III Motion for Leave to File Amended Complaint (03-16005, Doc. 6)

Guardian III has moved for leave to file an amended complaint, in order to assert a new cause of action alleging that Guardian III became the "obligee" on the surety bonds, either directly through contract or as an intended third-party beneficiary of the transactions (rather than purely through assignment by CMC). The only other proposed amendments are minor edits to Guardian III's original counterclaims, primarily relating to Guardian III's description of the Safeco lease bond transactions and the legal effect of the transaction documents.

Guardian III's motion for leave to amend (03-16005, Doc. 6) is <u>granted</u>.

### S. 03-16006, *Diversity Capital One, Inc. v. Safeco Insurance Company of America*

### 1. Safeco Motion for Leave to File First Amended Answer and Counterclaim (03-16006, Doc. 6)

Safeco has moved for leave to file its First Amended Answer and Counterclaim, in order to add an additional defense alleging failure to mitigate damages on the part of Diversity Capital

One, Inc. ("Diversity One").[50]  Safeco also seeks leave to amend its Counterclaim against Diversity One, to allege additional fraudulent acts on the part of Diversity One and Blaine Tanner, and also to allege the failure of Provident Bank to exercise sufficient due diligence prior to agreeing to lend money to Diversity One.

Safeco contends that it seeks leave to amend in order to add new factual information learned during discovery in these actions, and it appears that the proposed amendments are consistent with that purpose.  Safeco does not seek leave to add any new claims or parties; rather, the allegations relating to Provident Bank are added in the nature of a defense to the claims of Diversity One.

Safeco's motion for leave to file a first amended answer (03-16006, Doc. 6) is <u>granted</u>.

### 2. Diversity One Motion for Leave to File Amended Complaint (03-16006, Doc. 7)

Diversity One has moved for leave to file an amended complaint, in order to assert a new cause of action alleging that Diversity One became the "obligee" on the surety bonds, either directly through contract or as an intended third-party beneficiary of the transactions (rather than purely through assignment by CMC).  The only other proposed amendments are minor edits to Diversity One's original counterclaims, primarily relating to Diversity One's description of the Safeco lease bond transactions and the legal effect of the transaction documents.

Diversity One's motion for leave to amend (03-16006, Doc. 7) is <u>granted</u>.

---

[50] In its proposed Amended Answer and Counterclaim, attached to its motion, Safeco also has eliminated its affirmative defenses dealing with the scope of Michael Anthony's authority to bind Safeco.

### T.     04-16001, *Bank of Waukegan v. RLI Insurance Company*

#### 1.     RLI's Motion for Leave to File Amended Answer (04-16001, Doc. 3)

RLI has moved for leave to file an amended answer, stating that it seeks to conform its pleading in this action with the January 2003 amended pleadings filed in RLI's other MDL actions.[51]  RLI states that it adds no new claims or defenses and that no new discovery will be needed.[52]

RLI's motion for leave to file an amended answer (04-16001, Doc. 3) is <u>granted</u>.

## IV.     Conclusion

For the reasons set forth herein, the Court disposes of the multiple pending motions for leave to amend as set forth in detail in the chart contained in section I, *supra*.

To the extent that the Court has granted any party's motion for leave to file an amended affirmative pleading (or an amended responsive pleading in an action where no amended affirmative pleading is to be filed), such amended pleading shall be filed within ten (10) days of the date of this Order.  All pleadings to be filed in response to amended affirmative pleadings (whether or not such responsive pleadings are encompassed by the analysis set forth in the within Order) shall be filed within ten (10) days of service of the amended affirmative pleading.

---

[51] This action was not transferred to this Court until December 2004; accordingly, RLI has not filed an amended pleading in these consolidated proceedings.

[52] The Court notes that several of the affirmative defenses asserted by RLI in its proposed Amended Answer appear to be duplicative.  For instance, the Thirteenth Defense appears to be functionally duplicative of the Eighth Defense.  The Twentieth Defense is entirely duplicative of the Nineteenth Defense.  Since RLI's original answer does not appear on this Court's electronic docket, the Court is uncertain whether these affirmative defenses appeared in RLI's original pleading.  Without this information, and in the absence of any opposition or challenge to RLI's proposed pleading, the Court declines to strike or preclude these allegations at this point.

**IT IS SO ORDERED.**

                                        s/ Kathleen M. O'Malley
                                        **KATHLEEN McDONALD O'MALLEY**
                                        **UNITED STATES DISTRICT JUDGE**

**Dated: October 3, 2006**

41771-1