UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: COMMERCIAL MONEY CENTER, INC., EQUIPMENT LEASE LITIGATION | : : : : : : : : : : : | Case No. 1:02CV16000<br><br>(MDL Docket No. 1490)<br><br>JUDGE O'MALLEY<br><br>MEMORANDUM AND ORDER<br><br>This Order Relates To Case Nos. 02CV16012, 02CV16017, 02CV16018, 02CV16019, and 02CV16022 |

The dispute in these actions centers around the Sureties' liability on various surety bonds issued in connection with certain transactions between the Banks[1] and Commercial Money Center, Inc. ("CMC"). CMC's business purportedly involved the leasing of equipment and vehicles to numerous lessees in exchange for lease payments. CMC then pooled the leases and sold them to institutional investors. Apparently, the majority of CMC's leasing business was a sham, and the Banks claim millions of dollars in losses from these transactions. The Banks now sue the Sureties to recover on the surety bonds associated with the transactions. The Sureties raise CMC's fraud as a defense to the Banks' claims and seek to rescind the surety bond transactions based on fraud in the inducement.[2]

These actions are before the Court upon the following motions for summary judgment

---

[1] Where not defined herein, capitalized terms used in this Opinion have the meanings ascribed to them in the Court's Consolidated Rulings issued August 19, 2005 (Docs. 1708, 1709).

[2] The Court does not summarize here the entirety of the complicated factual scenario involved in these cases. Rather, the Court refers the reader to its two Consolidated Rulings on the numerous Motions for Judgment on the Pleadings, issued August 19, 2005 (02-16000, Docs. 1708, 1709).

1

against various Guardian Entities[3]:

> (1) Royal Indemnity Company ("Royal") Motion for Summary Judgment Against the Guardian/Diversity Entities (02-16000, Doc. 2156)[Cases 02-16012, 02-16018, 02-16019, and 02-16022];[4] and
>
> (2) American Motorists Insurance Company ("AMICO") Motion for Summary Judgment on Counterclaim of Guardian Capital XVI (02-16017, Doc. 70)[Case 02-16017].

Royal and AMICO (collectively, the "Sureties") argue, essentially, that the Guardian Entities lack standing to raise any claims against the Sureties, because certain banks have succeeded to the Guardian Entities' interests in the lease bonds and SSAs by means of (1) assignments of the Guardian Entities' interests to the banks as collateral for loans from the lender banks; and (2) subsequent foreclosure sales of the collateral by the lending banks. Thus, the Sureties argue that the Guardian Entities retain no interests in the bonds or SSAs, such as would support a claim premised upon those documents.[5]

For the reasons set forth herein, the motions for summary judgment against the Guardian Entities (02-16000, Doc. 2156 and 02-16017, Doc. 70) are <u>granted</u>.

---

[3] The "Guardian Entities," as referenced in this Memorandum and Order, refers to the entities against whom summary judgment is sought in each of the motions considered herein, as described below.

[4] The "Guardian Entities," as referenced in Royal's motion, are Guardian Capital IX, LLC; Diversity Capital II, LLC; Guardian Capital XV, LLC; and Guardian Capital XIV, LLC.

[5] In footnotes and brief references, the motions by Royal and AMICO also raise an argument presented by Safeco Insurance Company of America ("Safeco") in its motion for Partial Summary Judgment against Federal Deposit Insurance Corporation (as receiver for Netbank FSB); JP Morgan Chase Bank, N.A.; Provident Bank; CadleRock Joint Venture, L.P.; and the Guardian Entities (as referenced in Safeco's motion: Diversity Capital I, Inc.; Guardian Capital, LLC; Guardian Capital I, LLC; Guardian Capital II, LLC; and Guardian Capital III, LLC) (Doc. 2150). That argument relates to the viability of the bad faith claims raised by numerous Banks in these actions, as well as certain Guardian Entities. *See Cates Construction, Inc. v. Talbot Partners*, 980 P.2d 407 (Cal. 1999). The *Cates* argument will be addressed in a separate opinion to be issued by this Court. Given the Court's disposition of the within motions, however, the *Cates* issue is moot with respect to the Guardian Entities involved in the within actions.

## I. Background

When the Guardian Entities purchased (or made secured loans relating to) the lease pools from CMC, each Guardian Entity financed the transaction through a loan from a lender bank. Lease bonds were issued by a Surety for each lease pool. In each transaction, the relevant Guardian Entity entered into a Sale and Servicing Agreement ("SSA") with CMC and the relevant Surety. As security for each loan, the Guardian Entity assigned to each lender bank a security interest in the bonds through a Notice of Assignment, and also entered into a "Credit and Security Agreement" with the lender bank. The Credit and Security Agreements granted each lender bank a security interest in (1) the leases, including the right to receive all scheduled payments under the leases; (2) the surety bonds associated with each lease transaction; and (3) the relevant SSAs, all of which were included within the broad definition of "collateral."

The transactions were structured in such a way that the monthly income stream to each lender bank on its lease pools was greater than the monthly payment that the relevant Guardian Entity was required to make to its lender bank. The lender banks would remit any monthly excess to the Guardian Entities, thus permitting the Guardian Entities to profit from the transactions. After CMC collapsed and payments on the lease pools ceased, the failure of the lender banks to receive the monthly income stream from the lease pools caused defaults by the Guardian Entities in their monthly payments to the lender banks.

Various lender banks, as well as the Guardian Entities, then commenced these actions against the Sureties, seeking to recover on the lease bonds issued by the Sureties. While these actions remained pending, on October 26, 2005, The Huntington National Bank ("Huntington") conducted secured party sales with respect to the interests of the Guardian Entities in the leases,

bonds and SSAs involved in the Huntington pools. On November 9, 2005, Sky Bank ("Sky")[6] conducted secured party sales with respect to the Guardian Entities' interests in the leases, bonds, and SSAs involved in its pools.[7]

Each secured party sale was conducted pursuant to a Notification of Disposition of Collateral ("Notification of Disposition"), which enumerated the property to be sold. Each Notification of Disposition stated that the collateral to be sold included:

> All of Debtor's right, title, or interest in or to:
>
> (a) the leases listed on Exhibit 1 hereto ("Leases"), including, but not limited to, all contract rights under each Lease and any and all equipment that is the subject of any and all of the Leases;
>
> ***
>
> (e) all insurance policies, insurance policy endorsements or surety bonds, and all rights thereunder, issued to protect Debtor or [Lender] against losses incurred due to a default under the Leases, including, but not limited to, each of the Lease Bonds issued by [Surety] in respect of each of the Leases and more fully described on Exhibit 2 hereto;
>
> (f) the Purchase and Security Agreement between Debtor and Commercial Money Center, Inc., ("CMC"), dated [], and the Sale and Servicing Agreement dated as of [] among Debtor, CMC and [Surety]. . . .

(Sky Notification of Disposition to Guardian Capital IX, LLC, Doc. 2158, attach. 7).[8]

---

[6] Sky Bank held security interests in the lease bonds and SSAs in these cases as a result of its status as a successor in interest to three separate Ohio banks: Mid Am Bank, Second National Bank of Warren, and Metropolitan Bank & Trust Company.

[7] The Sureties involved with the Sky and Huntington pools were Royal and AMICO.

[8] The language set forth in all other Notifications issued by Sky, as well as the Notifications issued by Huntington, is substantially identical. The language contained in the Notifications parallels the definition of "collateral" contained in each respective Credit and Security Agreement.

Huntington was the successful purchaser at its secured party sales, and Sky was the successful purchaser at its secured party sales. Thus, Huntington and Sky took title to all of the Guardian Entities' interests in the collateral.[9] The Sureties have settled their claims with both Sky and Huntington.

**II.     Discussion**

Both Royal and AMICO allege that the Guardian Entities lack standing to assert any of the claims upon which relief is sought in this litigation, because any interest of the Guardian Entities in the lease bonds or SSAs was extinguished by (1) the assignment of the security interests to the lender banks; and/or (2) the secured party sales conducted pursuant to the Uniform Commercial Code by Huntington and Sky. (02-16000, Doc. 2156; 02-16017, Doc. 70). The Guardian Entities have opposed the Royal and AMICO motions (02-16000, Doc. 2188), and argue that they retain interests in their claims sufficient to convey standing in these actions.

The Guardian Entities' pleadings assert three claims against the Sureties: (1) bad faith; (2) promissory estoppel; and (3) breach of contract/intended third party beneficiary. The bad faith claim alleges that the Sureties wrongfully failed to make payments to the lender banks as required under the bonds. Similarly, the promissory estoppel claim alleges that the lease bonds contained a promise to guarantee the investment of the Guardian Entities by issuing lease bonds and paying claims on those bonds when appropriate. Finally, the claim for breach of contract/intended third party beneficiary alleges breach of the terms of the bonds and/or SSAs. The Sureties contend that each of these claims requires a continuing interest in the underlying transaction documents, and thus that each was vitiated by the secured party sales of collateral.

---

[9] Sky subsequently assigned certain rights in the collateral to The Cadle Company, which assigned those rights to CadleRock Joint Venture, L.P. ("CadleRock"). CadleRock remains a party to certain actions in this MDL.

The Sureties rely on the definition of "collateral" as set forth in the Notifications of Disposition, and on § 9-617 of the Uniform Commercial Code ("UCC"), which provides, in relevant part:

> a. A secured party's disposition of collateral after default does all of the following:
>
>   i. Transfers to a transferee for value all of the debtor's rights in the collateral. . . .

Cal. U. Com. Code § 9617.[10] Pursuant to this provision, the Sureties assert that any rights that the Guardian Entities had in the leases, bonds or SSAs now have been transferred to the lender banks.

As all parties apparently recognize, evaluation of the Sureties' argument requires consideration of the nature of each claim raised by the Guardian Entities. With respect to the Guardian Entities' bad faith claims, the Sureties argue that such a claim is mere shorthand for a tortious breach of the implied covenant of good faith and fair dealing. Consequently, the Sureties assert, no such claim exists independent of an underlying contractual obligation. *See, e.g., Moreau v. Air Fr.*, 356 F.3d 942, 954 (9th Cir. 2004)(an "implied covenant cannot impose any substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement. . . .")(internal quotation omitted); *Seretti v. Superior Nat. Ins. Co.*, 71 Cal. App. 4th 920, 929 (2d Dist. 1999)("liability for 'bad faith' has been strictly tied to the implied-in-law covenant of good faith and fair dealing arising out of an underlying contractual relationship. . . .")(internal quotation omitted); *Hand v. Farmers Ins. Exch.*, 23 Cal. App. 4th 1847, 1859 (2d Dist. 1994)("a right of action for breach of the implied covenant of

---

[10] Although AMICO argues in its motion that California law should apply to the Court's consideration of this issue, all parties apparently agree that choice of law does not affect the outcome with respect to the standing issue, since the Sureties' argument is based upon the common law of assignments and the Uniform Commercial Code. The relevant provisions of the Ohio version of UCC § 9-617 (O.R.C. § 1309.617) are substantially similar.

good faith . . . has always been implied by law from and into the contract itself. . . ."); *Austero v. National Cas. Co.*, 62 Cal. App. 3d 511, 515 (4th Dist. 1976)("[a]lthough an action for bad faith breach of the covenant of good faith and fair dealing sounds in tort, the duty of good faith and fair dealing derives from and exists solely because of the contractual relationship between the parties. . . .").

With respect to the Guardian Entities' promissory estoppel claims, the Sureties argue that promissory estoppel is merely a contract claim based on the Sureties' alleged promise to issue lease bonds with certain terms, and/or to pay the lender banks if claims on the bonds were made. The Sureties contend that the Guardian Entities, having lost their rights under the bonds, cannot now substitute a claim based on breach of promises to issue or pay on the bonds.[11]

Finally, the Sureties argue that the Guardian Entities' claim for breach of contract/intended third party beneficiary fails because the Guardian Entities no longer have an interest in the underlying contract and were not third party beneficiaries. The Sureties again argue that the alleged contractual interest terminated upon the completion of the secured party sales. As a matter of basic assignment law, an assignor who has transferred contract rights no longer can sue a third party to recover on the transferred rights. *See, e.g., Nebco & Assoc. v. United States*, 23 Cl. Ct. 635, 644 (1991)("[a] valid assignment transfers all interest of the assignor to the assignee so that the assignor no longer has any rights in the property. . . ."); Cal. Civ. Code § 1084; 6 AM. JUR. 2d *Assignments* § 1 ("an assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by

---

[11] AMICO also contends that "estoppel" is not an independent basis for a claim, but rather an affirmative defense that bars the assertion of certain claims. The Court agrees with the Guardian Entities, however, that at least under Ohio law, and presumably the laws of other relevant jurisdictions as well, promissory estoppel is a recognized cause of action. *See, e.g., Patrick v. Painesville Commer. Props., Inc.*, 123 Ohio App. 3d 575, 583 (11th Dist. 1997). Accordingly, the Court does not address this issue further.

the obligor is extinguished . . . and the assignee acquires a right to such performance. . . .").

With respect to the Guardian Entities' alleged third party beneficiary interest, the Sureties rely on statutory and case law delineating the scope of such an interest. In order for a third party to qualify as a beneficiary under an insurance contract, the Sureties assert, "the contracting parties must have intended to benefit that individual and such intent [must] appear[] on the terms of the agreement. . . ." 39A CAL. JUR. 3d Insurance Contracts § 356. *See also Murphy v. Allstate Ins. Co.*, 17 Cal. 3d 937, 944 (1976)("[a] third party should not be permitted to enforce covenants made not for his benefit, but rather for others. . . ."); *Cancino v. Farmers Ins. Group*, 80 Cal. App. 3d 335, 344 (2d Dist. 1978)(same). The Sureties argue that, although the Guardian Entities were direct beneficiaries (<u>not</u> third party beneficiaries) of the bonds at the time they purchased their interest from CMC, they divested themselves of any such interest by assigning payment rights to the banks. Thus, according to the Sureties, what occurred here was assignment of a direct interest, not creation of an enforceable third party interest.

In response to the Sureties' arguments, the Guardian Entities maintain that the transfer of security interests and subsequent dispositions of collateral did not eliminate their interests in their claims against the Sureties, since commercial tort claims are unassignable in certain circumstances and, in any event, these claims were not assigned to Huntington and Sky. First, the Guardian Entities assert, their causes of action were not transferred to the banks through the secured party sales, since "claims" were not included in the description of collateral contained in the Notices of Disposition.

The Guardian Entities rely on O.R.C. § 1309.108 (UCC § 9-108), which defines the level of specificity necessary to bring a category of personal property within the definition of collateral encompassed by a security interest. UCC § 9-108 provides, in relevant part:

8

> (A) Except as provided in divisions (C), (D), and (E) of this section, any description of personal or real property is sufficient whether or not it is specific if it reasonably identifies what is described.
>
> (B) Except as otherwise provided in division (D) of this section, a description of collateral reasonably identifies the collateral if it identifies the collateral by:
>
>> (1) Specific listing;
>> (2) Category;
>> ***
>> (4) Quantity;
>> ***
>> (6) Except as otherwise provided in division (C) of this section, any other method, if the identity of the collateral is objectively determinable.
>
> (C) A description of collateral as "all the debtor's assets" or "all the debtor's personal property" or using words of similar import does not reasonably identify the collateral.
>
> ***
>
> (E) A description only by type of collateral . . . is an insufficient description of:
>
>> (1) A commercial tort claim. . . .

O.R.C. Ann. § 1309.108. The Guardian Entities argue that the description of collateral contained in the Notices of Disposition did not identify "claims" with a level of specificity sufficient to bring such claims within the description of "collateral" set forth in the Notices of Disposition. *See Epicentre Strategic Corp. v. Perrysburg Exempted Vill. Sch. Dist.*, 2005 U.S. Dist. LEXIS 42579, *5-*6 (N.D. Ohio Dec. 14, 2005)(unpublished disposition). Accordingly, the Guardian Entities maintain, no security interest in "claims" held by the Guardian Entities was conveyed to the banks, and the banks did not take title to such claims by virtue of the secured party sales.

Second, the Guardian Entities assert that their claim for bad faith is a commercial tort, and that their interest in commercial tort claims has not been assigned or transferred to any

entity. The Guardian Entities cite to O.R.C. § 1309.204 (UCC § 9-204), which provides that an after-acquired property clause contained in a description of collateral cannot create a security interest in a commercial tort claim. *See* O.R.C. Ann. § 1309.204(B)(2); *Epicentre*, 2005 U.S. Dist. LEXIS 42579, *4.[12] Since commercial tort claims against the Sureties would have accrued to the Guardian Entities only upon the Sureties' default in payment of claims (which occurred at a time subsequent to the assignments to the lender banks), the Guardian Entities argue that no such tort claim could have been assigned to the banks. Thus, the banks could not have foreclosed upon any interest in such claims, and could not have taken title to those claims.

With respect to their promissory estoppel claim, the Guardian Entities further argue that this claim does not depend upon an interest in the underlying collateral, as such a claim involves neither a contract right nor an interest in the lease bonds. The Guardian Entities provide no argument specifically addressing their claim for breach of contract/intended third party beneficiary, and thus implicitly concede that maintenance of such a claim (whether as a direct breach of contract claim or a third party claim) requires retention of an interest in the contractual documents on which the claim is premised.

In their reply memoranda, the Sureties assert that the Guardian Entities have wrongly focused their arguments on their purported interests in claims against the Sureties, rather than their interests in the underlying leases, bonds and SSAs. The Sureties maintain that the secured party sales undisputedly extinguished the Guardian Entities' rights in the collateral, and that each of the Guardian Entities' asserted claims requires the Guardian Entities to retain an interest in the underlying documents on which their claims are based.

---

[12] Prior to a 2001 revision, Article 9 of the UCC prohibited a borrower from granting any security interest in a commercial tort claim. The Guardian Entities argue, additionally, that certain transactions occurred prior to the UCC Article 9 amendment, and thus that no security interest in the Guardian Entities' commercial tort claims could have been transferred in those transactions.

The Sureties argue that it is irrelevant whether the Guardian Entities' <u>claims</u> for bad faith and promissory estoppel were themselves part of the collateral transferred to the banks, because those claims could not have survived the secured party sales in any event. As noted above, the Sureties contend that a bad faith claim arises only from an existing contractual relationship, *see Walker v. Dominion Homes, Inc.*, 164 Ohio App. 3d 385, 397 (10th Dist. 2005), and no such claim exists absent an interest in the underlying contract. Similarly, the Sureties assert, the promissory estoppel claim is merely a contract claim, based upon a promise that the Sureties would issue the bonds, and has no independent existence absent any interest in the bonds.[13]

The parties have cited no case law precisely on point, presumably because the issue presented appears to be relatively novel. In fact, there appears to be no case law addressing the relevant issues in either of the two jurisdictions whose law arguably applies—California and Ohio. Regardless, the underlying legal questions involve rules relating to UCC transactions, which are straightforward and uniform across jurisdictions. Thus, in an attempt to understand the full scope of these issues, the Court has conducted its own broad research, analyzing relevant UCC provisions as well as case law from other jurisdictions relating to the rights of a contract party after foreclosure on collateral by a secured party holding a security interest in the contract documents.

The Sureties apparently do not dispute the Guardian Entities' construction of the Credit and Security Agreements as conveying interests in the Guardian Entities' contract rights only, rather than an interest in "claims." Accordingly, the Court assumes that the terms of the

---

[13] In its reply memorandum, AMICO also contends that the Guardian Entities, by alleging that the assignment excluded the rights to commercial tort claims, are attempting to effect an impermissible "partial assignment" of a claim. *See Stein v. Cobb*, 38 Cal. App. 2d 8, 10 (2d Dist. 1940). As noted below, the Court treats the assignments here as assignments of contractual rights, not of "claims." In any event, the Court deems this argument to be inapplicable to the issues presented here.

transaction documents conveyed contractual interests only, and the Court examines the effect of such a conveyance.

The Sureties rely on the general principle that a party assigning interests in a contract loses its rights under that document, as well as its standing to assert claims based on the contract. This precept, standing alone, is well established and unremarkable. *See Knott v. McDonald's Corp.*, 147 F.3d 1065, 1068 (9th Cir. 1998)(assignment by former franchisee of all interest in franchise agreement deprived franchisee of standing to assert claims for breach of franchise agreement and breach of the implied covenant of good faith and fair dealing); *Michelson v. Enrich Int'l, Inc.*, 2001 U.S. App. LEXIS 3909, *13 (10th Cir. Mar. 14, 2001)(unpublished disposition)(plaintiff could not sue for income allegedly lost by defendant's breach of distributorship agreement, where plaintiff had assigned all interest in the distributorship interest to his corporation).

The Court notes, however, that the questions presented on this motion have arisen in a unique context. Initially, the Guardian Entities did not transfer to the lender banks the entirety of their interests in the leases and bonds. Instead, they conveyed only collateral assignments as security for the amounts owed by the Guardian Entities to their lending banks. The subsequent events that allegedly divested the Guardian Entities of the totality of their interests did not involve voluntary assignment; rather, the alleged total assignments occurred through foreclosure sales and through operation of the provisions of the UCC. Thus, in order to determine the precise scope of the rights conveyed by virtue of the foreclosure sales, the Court examines the provisions of the UCC with respect to the rights and obligations of parties after a secured party's foreclosure on collateral identified in a security agreement.

The right of a secured party to dispose of collateral after default by a debtor is created by

section 9-610 of the UCC. Cal. U. Com. Code § 9610; O.R.C. § 1309.610. That section also permits the secured party to purchase the collateral at a public disposition. Cal. U. Com. Code § 9610(c)(1); O.R.C. § 1309.610(C)(1). Section 9-615 of the UCC, which governs the application of proceeds after disposition of collateral, provides that (1) the secured party is required to account to and pay the debtor for any surplus; and (2) the obligor is liable for any deficiency. Cal. U. Com. Code § 9615(d)(1)-(2); O.R.C. § 1309.615(D)(1)-(2). As noted previously in this opinion, section 9-617 of the UCC provides that a foreclosure sale of the collateral transfers "all of the debtor's rights in the collateral. . . ." Cal. U. Com. Code § 9617(a); O.R.C. § 1309.617(A).

Against this statutory framework, the question presented here involves the impact of the application of these procedures on any remaining interest of the obligor in the collateral. The Court's independent research has located one recent case directly on point with the issues raised by the Sureties' motions. In *Westchester Fire Ins. Co. v. Punit Corp.*, 2006 U.S. Dist. LEXIS 91372 (N.D. Fla. Dec. 19, 2006)(unpublished disposition), which involved a surety performance bond issued in the context of a construction contract, the Florida district court held that a debtor lacked standing to maintain claims for breach of contract and bad faith following a foreclosure sale of collateral.

In *Westchester*, defendant Punit obtained financing for a construction project from First National Bank Northwest Florida. Plaintiff insurance company issued a performance bond. *Id.* at *2. As security for the bank loan, Punit executed a security agreement and an assignment of its interest in the contract documents. *Id.* at *3. When the contractor defaulted, a number of disputes between the parties ensued. Ultimately, the surety filed a declaratory judgment action, and Punit counterclaimed for breach of contract and bad faith. *Id.* at *5-6. In the meantime, First

13

National Bank foreclosed on the rights assigned to it by the security agreement. *Id.* at *6. The bank and the surety then settled the claims between them, and the bank assigned to the surety all rights that it had obtained through the foreclosure sale. *Id.* at *6-7.

In a motion for summary judgment on Defendant's counterclaims, the plaintiff surety argued that defendant Punit was not the real party in interest and lacked standing to maintain its counterclaims. *Id.* at *8. Punit responded that its claims were not foreclosed because the rights to causes of action arising from the performance bond were excluded as collateral under the security agreement. *Id.* at *9. The Florida district court disagreed, and held that the assignment and subsequent foreclosure divested defendant of all its rights in the underlying contract documents, as well as causes of action arising from those documents. *Id.* at *17. Accordingly, defendant lacked standing to maintain its counterclaims, and those counterclaims were moot. *Id.* at *22-23.

The *Westchester* case, while not controlling, involved a factual situation parallel to that presented here and, thus, is persuasive authority supporting the Sureties' position. The Court agrees with the Sureties, and with the holding of the *Westchester* court, that maintenance of claims of the type asserted by the Guardian Entities requires a continued interest in the subject matter underlying those claims. Although the Guardian Entities contend that the terms of the assignment did not transfer "causes of action" or "claims" to their lending banks pursuant to the Credit and Security Agreements, the Guardian Entities' argument strikes the Court as somewhat beside the point. Regardless of whether the Credit and Security Agreements contained language specifically assigning the Guardian Entities' interests in "causes of action," each of the claims asserted by the Guardian Entities nonetheless derives from, and depends on, an interest in the underlying contractual documents, including the lease bonds and/or the SSAs. Absent such a

continuing interest, the Guardian Entities have no standing to maintain their claims.

The Court's exhaustive research revealed one case which, in dicta, arguably took a view contrary to *Westchester*. *See MHI Shipbuilding, L.L.C. v. Nat'l Fire Ins. Co.*, 2002 U.S. Dist. LEXIS 19974 (D. Mass. Oct. 7, 2002)(unpublished disposition). That case suggested that a debtor might retain standing after a foreclosure sale of collateral, to the extent such a foreclosure sale could result in a surplus payable to the debtor, or a deficiency that might be sought in an action against the debtor. *See id.* at *40-41. As the facts of the *MHI* case did not involve a foreclosure sale, however, the discussion of the issue by the *MHI* court necessarily was academic. Moreover, the Guardian Entities have not raised any argument relating to the potential of a deficiency judgment, nor have they produced any evidence that such potential exists. Particularly in the absence of any treatment of this issue by the parties, the Court will not engage in theoretical speculation as to the impact of hypothetical events on the standing of the Guardian Entities.

Rather, the Court will follow the lead of *Westchester*, decided by apparently the only federal district court to have considered this precise issue, in circumstances analogous to those present here. Accordingly, the Court finds that the completion of secured party sales by Huntington and Sky deprived the Guardian Entities of any interest in the underlying collateral and thus divested them of standing to maintain their claims. The motions for summary judgment filed by Royal and AMICO against the Guardian Entities are <u>granted</u>.

### III. Conclusion

For the reasons set forth herein, the Royal and AMICO motions for summary judgment against the Guardian Entities (02-16000, Doc. 2156 and 02-16017, Doc. 70) are <u>granted</u>. The

continuing interest, the Guardian Entities have no standing to maintain their claims.

The Court's exhaustive research revealed one case which, in dicta, arguably took a view contrary to *Westchester*. *See MHI Shipbuilding, L.L.C. v. Nat'l Fire Ins. Co.*, 2002 U.S. Dist. LEXIS 19974 (D. Mass. Oct. 7, 2002)(unpublished disposition). That case suggested that a debtor might retain standing after a foreclosure sale of collateral, to the extent such a foreclosure sale could result in a surplus payable to the debtor, or a deficiency that might be sought in an action against the debtor. *See id.* at *40-41. As the facts of the *MHI* case did not involve a foreclosure sale, however, the discussion of the issue by the *MHI* court necessarily was academic. Moreover, the Guardian Entities have not raised any argument relating to the potential of a deficiency judgment, nor have they produced any evidence that such potential exists. Particularly in the absence of any treatment of this issue by the parties, the Court will not engage in theoretical speculation as to the impact of hypothetical events on the standing of the Guardian Entities.

Rather, the Court will follow the lead of *Westchester*, decided by apparently the only federal district court to have considered this precise issue, in circumstances analogous to those present here. Accordingly, the Court finds that the completion of secured party sales by Huntington and Sky deprived the Guardian Entities of any interest in the underlying collateral and thus divested them of standing to maintain their claims. The motions for summary judgment filed by Royal and AMICO against the Guardian Entities are <u>granted</u>.

### III.    Conclusion

For the reasons set forth herein, the Royal and AMICO motions for summary judgment against the Guardian Entities (02-16000, Doc. 2156 and 02-16017, Doc. 70) are <u>granted</u>. The

Court will grant judgment in favor of the Sureties on the Guardian Entities' claims in separate orders, as and where appropriate.

The Sureties are directed, within ten (10) days of the date of this Memorandum and Order, to advise the Court as to any cases in which they believe entry of judgment is appropriate as a result of the within Memorandum and Order. The Guardian Entities, to the extent they disagree with the identification of cases made by the Sureties, may so advise the Court within ten (10) days of the filings made by the Sureties.

**IT IS SO ORDERED.**

<u>**s/ Kathleen M. O'Malley**</u>
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 15, 2008**

59338-2