# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: COMMERCIAL MONEY | : | **Case No. 1:02CV16000** |
| CENTER, INC., EQUIPMENT | : | |
| LEASE LITIGATION | : | **(MDL Docket No. 1490)** |
| | : | |
| | : | **JUDGE O'MALLEY** |
| | : | |
| | : | **MEMORANDUM AND ORDER** |
| | : | |
| | : | **This Order Relates To Case Nos.** |
| | : | **02CV16010, 02CV16012,** |
| | : | **02CV16014, 02CV16019,** |
| | : | **02CV16020, 02CV16021,** |
| | : | **02CV16022, 02CV16024,** |
| | : | **03CV16002, 03CV16003,** |
| | : | **03CV16004, 03CV16005 and** |
| | : | **03CV16006** |

The dispute in these actions centers around the Sureties' liability on various surety bonds issued in connection with certain transactions between the Banks[1] and Commercial Money Center, Inc. ("CMC"). CMC's business purportedly involved the leasing of equipment and vehicles to numerous lessees in exchange for lease payments. CMC then pooled the leases and sold them to institutional investors. Apparently, the majority of CMC's leasing business was a sham, and the Banks claim millions of dollars in losses from these transactions. The Banks now sue the Sureties to recover on the surety bonds associated with the transactions. The Sureties raise CMC's fraud as a defense to the Banks' claims and seek to rescind the surety bond transactions based on fraud in the inducement.[2]

---

[1] Where not defined herein, capitalized terms used in this Opinion have the meanings ascribed to them in the Court's Consolidated Rulings issued August 19, 2005 (Docs. 1708, 1709).

[2] The Court does not summarize here the entirety of the complicated factual scenario involved in these cases. Rather, the Court refers the reader to its two Consolidated Rulings on the numerous Motions for Judgment on the Pleadings, issued August 19, 2005 (02-16000, Docs. 1708, 1709).

These actions are before the Court upon the following motions for partial summary judgment:

1.    <u>Safeco Motion for Summary Judgment</u> (02-16000, Doc. 2150)

Safeco Insurance Company of America ("Safeco") has moved for partial summary judgment against J.P. Morgan Chase Bank, N.A. ("Chase"); The Provident Bank ("Provident"); Federal Deposit Insurance Corporation ("FDIC"), as Receiver for NetBank FSB;[3] CadleRock Joint Venture, L.P. ("CadleRock"); and certain Guardian/Diversity Entities ("Guardian Entities")[4] (collectively, the "Banks," except where individual reference is intended), on the following grounds:

        (a)    Safeco seeks summary judgment on the Banks' claims for bad faith/breach of the covenant of good faith and fair dealing. Safeco argues that California law bars a tort claim for bad faith in the context of a commercial surety contract.

        (b)    Safeco also seeks summary judgment on CadleRock's claims for punitive damages. Safeco argues that CadleRock acquired its rights in this litigation by assignment and that, under California law, claims for punitive damages are not assignable.

2.    <u>Royal Motion for Summary Judgment</u> (02-16000, Doc. 2154)

Royal Indemnity Company ("Royal") moves for partial summary judgment against CadleRock on the following grounds:

        (a)    Royal seeks summary judgment on CadleRock's claims for bad

---

[3] For clarity, FDIC will be referred to as "NetBank" throughout this opinion.

[4] The "Guardian Entities," as referenced in this Memorandum and Order, refers to Guardian Capital, LLC; Guardian Capital I, LLC; Guardian Capital II, LLC; Guardian Capital III, LLC; and Diversity Capital One, Inc.

faith/breach of the covenant of good faith and fair dealing, for the same reasons set forth above relating to Safeco's motion for summary judgment.

      (b)     Royal seeks summary judgment as to CadleRock's claims for punitive damages, for the same reasons set forth above relating to Safeco's motion for summary judgment.

      (c)     Royal seeks summary judgment as to all of CadleRock's claims premised upon the Sale and Servicing Agreements ("SSAs").  Royal argues that, when CadleRock purchased its interests in three CMC lease pools from Sky Bank ("Sky"), the rights that CadleRock obtained did not include any rights under the SSAs.

    3.    <u>AMICO Motion for Summary Judgment</u> (02-16024, Doc. 52)

American Motorists Insurance Company ("AMICO") moves for partial summary judgment on the supplemental counterclaim of United Security Bank ("USB"), based on bad faith/breach of the covenant of good faith and fair dealing.  As set forth above with respect to the summary judgment motions filed by Safeco and Royal, AMICO argues that California law does not recognize a tort claim for bad faith in the context of a commercial surety bond.


## I.    BACKGROUND

On September 12, 2006, the Court issued an Amended Revised Case Management Plan (02-16000, Doc. 1861), which set forth the procedure applicable to the filing of dispositive motions in these cases.  The Amended Revised Case Management Plan provided that each party wishing to file a dispositive motion should file a Notification of Intent and Request for Leave to File Summary Judgment Motion ("Notification").  Pursuant to the Amended Revised Case

Management Plan, each of the Sureties filed a Notification on November 17, 2006 seeking leave to file summary judgment motions on multiple issues. On December 19, 2007, the Court issued a ruling (Doc. 2138) disposing of various Notifications and granting the Sureties leave to file the summary judgment motions described above. The motions set forth above were filed on February 15, 2008, and are ripe for ruling.

For the reasons set forth herein, the motions of Safeco, Royal and AMICO (the "Sureties") for summary judgment are <u>granted</u> in part and <u>denied</u> in part. Safeco's motion for summary judgment against the Banks (Doc. 2150) is determined as follows:

      (a)    Safeco's motion for summary judgment on the Banks' claims for bad faith/breach of the covenant of good faith and fair dealing is <u>granted</u> as to all Banks except NetBank, and <u>denied</u> as to NetBank.

      (b)    Safeco's motion for summary judgment on CadleRock's claims for punitive damages is <u>granted.</u>

Royal's motion for summary judgment against CadleRock (Doc. 2154) is <u>granted</u> in its entirety, as follows:

      (a)    Royal's motion for summary judgment against CadleRock on CadleRock's claims for bad faith/breach of the covenant of good faith and fair dealing is <u>granted</u>.

      (b)    Royal's motion for summary judgment on CadleRock's claims for punitive damages is <u>granted</u>.

      (c)    Royal's motion for summary judgment as to CadleRock's claims premised upon the SSAs is <u>granted</u>.

AMICO's motion for summary judgment against USB (02-16024, Doc. 52) as to USB's claims

based on bad faith/breach of the covenant of good faith and fair dealing is <u>granted</u>.

**II.      DISCUSSION**

These cases have arisen in various jurisdictions, under a variety of procedural circumstances.  Since the Sureties' summary judgment motions are grounded primarily on principles of California law, the Court must first determine the applicability of those principles to the cases under consideration.  First, the Court examines the procedural posture of each group of cases to determine the applicable state choice of law rules.  Second, the Court applies the relevant choice of law rules to determine the governing law for the bad faith claims asserted in each group of cases.  Finally, the Court analyzes the relevant substantive law in order to determine the merits of the Sureties' motions.

**A.      Procedural Background**

The motions currently before the Court relate to thirteen of the cases in this multidistrict litigation.  These thirteen cases break down categorically by motion (i.e., each case relates only to one of the three pending summary judgment motions) and by jurisdiction of original filing.

In deciding conflict of law questions in diversity of citizenship cases, a federal court generally follows the choice of law rules of the state in which it sits. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941).  Where venue has been transferred to a federal court sitting in a different state, however, such a transfer does not change the state substantive law applicable in a diversity case.  "[W]here the defendants seek transfer, the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue.  A change of venue . . . generally should be, with respect to state law, but a

change of courtrooms. . . ." *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964).

This rule also applies where a case is transferred for pretrial purposes pursuant to 28 U.S.C. § 1407. *See SG Metals Indus. v. New Eng. Life Ins. Co. (In re New Eng. Mut. Life Ins. Co. Sales Practices Litig.)*, 236 F. Supp. 2d 69, 74 (D. Mass. 2002). Accordingly, prior to determining the law applicable in each of the cases under consideration, the Court must consider the state of initial filing.

This inquiry is relatively simple with respect to the cases encompassed by the Royal and AMICO motions. The motion for summary judgment filed by AMICO (02-16024, Doc. 52) concerns only one case—02CV16024. That case was filed by AMICO in the Southern District of California and remained in the Southern District of California until its consolidation in this Court for pretrial purposes pursuant to 28 U.S.C. § 1407. With respect to AMICO's summary judgment motion, therefore, the Court will apply California choice of law rules to determine the governing substantive law.

Royal's summary judgment motion (02-16000, Doc. 2154) relates to three cases—02CV16012, 02CV16019, and 02CV 16022. The first of these cases, 02-16012, was filed by CadleRock's predecessor in interest in the Northern District of Ohio. Cases 02-16019 and 02-16022 were filed in Ohio state court by CadleRock's predecessors in interest and removed by Royal to the Northern District of Ohio. Ohio choice of law rules apply to determine the governing substantive law for each of these three cases.

With respect to the summary judgment motion filed by Safeco (02-16000, Doc. 2150), the inquiry is more complex. Safeco's summary judgment motion relates to nine cases in this consolidated litigation—02CV16010, 02CV16014, 02CV16020, 02CV16021, 03CV16002, 03CV16003, 03CV16004, 03CV16005, and 03CV16006. Two of these actions were filed in

Ohio state court and removed to the Northern District of Ohio. This includes 02-16020 (filed in state court by FirstMerit Bank, N.A., CadleRock's predecessor in interest), and 02-16021 (filed in state court by Provident). Additionally, six actions were filed directly in the Northern District of Ohio—including 02CV16014 (filed by Bank One, N.A., Chase's predecessor in interest), and 03CV16002 through 03CV16006 (filed by various Guardian Entities). With respect to these eight actions, therefore, Ohio choice of law rules apply.

The remaining case encompassed by Safeco's summary judgment motion is 02CV16010. That case was filed in Georgia state court by NetBank, FSB, and removed by the defendants to the Northern District of Georgia. Subsequently, the case was transferred to the District of Nevada by stipulation of the parties. The parties apparently agree that this procedural posture requires the application of Georgia choice of law rules, and the Court also finds this result to be consistent with the applicable law.[5]

Accordingly, in determining the substantive law applicable to the Sureties' motions, the Court must apply the choice of law rules of three jurisdictions—California, Ohio and Georgia. The Court sets forth its choice of law analysis pursuant to these rules below.

---

[5] In determining which state's substantive law applies in a transferred case, courts distinguish between cases transferred pursuant to 28 U.S.C. § 1404 (forum non conveniens) and those transferred pursuant to 28 U.S.C. § 1406 based upon improper venue. In cases involving § 1404 transfers, the transferee court must apply the law of the transferor court. Where, on the other hand, the state of initial filing was an improper venue, and transfer was made pursuant to § 1406, the law of the transferee court should apply. *See, e.g., Nelson v. International Paint Co.*, 716 F.2d 640, 643 (9th Cir. 1983); *Martin v. Stokes*, 623 F.2d 469, 471 (6th Cir. 1980).

When this case was initially removed to the Northern District of Georgia, Safeco and Royal moved for transfer based on the forum non conveniens provisions of § 1404. Illinois Union Insurance Company (which subsequently settled its disputes with NetBank) moved to dismiss based upon improper venue. The Northern District of Georgia deferred ruling on both the motions to dismiss and to transfer, pending NetBank's consent to a transfer to the District of Nevada. NetBank subsequently filed its consent to transfer. The Georgia court did not make any finding of improper venue.

Accordingly, the case was transferred to Nevada pursuant to stipulation, rather than based upon improper venue. This type of transfer results in the application of the substantive law rules of the forum of original filing—i.e., Georgia choice of law rules. In its summary judgment motion, Safeco apparently concedes this, and does not argue that Nevada choice of law rules should apply.

### B. Choice of Law

In determining the substantive law applicable to the bad faith claims asserted in each group of cases, the Court will examine the relevant choice of law rules on a state-by-state basis. In each case, the Court must first classify the claims in question, and apply the local choice of law rules governing those claims.

### 1. California Choice of Law

As noted above, Case No. 02CV16024 was filed in the Southern District of California, and California choice of law rules govern the Court's choice of law inquiry for that case.

California law employs distinct choice of law analyses for claims sounding in contract and tort. Accordingly, the first step is to classify the claims for bad faith/breach of covenant of good faith and fair dealing. In California, a claim for bad faith/breach of covenant of good faith and fair dealing sounds in both contract and tort. *See Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 573 (1973); *Kilroy Industries v. United Pacific Ins. Co.*, 608 F. Supp. 847, 859 (C.D. Cal. 1985). For choice of law purposes, however, when considering claims for bad faith/breach of the covenant of good faith and fair dealing, California courts have applied tort choice of law principles. *See, e.g, Kilroy*, 608 F. Supp. at 858, n.5.[6]

In tort cases, California courts engage in a three-step "governmental interest" analysis. *See Hurtado v. Superior Court of Sacramento County*, 11 Cal. 3d 574, 579-80 (1974); *Frontier Oil Corp. v. RLI Ins. Co.*, 153 Cal. App. 4th 1436, 1455 (2d Dist. 2007). First, the Court must decide whether the laws of the affected states differ in any way. *See Kilroy*, 608 F. Supp. at 858. If so, the Court must assess each state's interest in having its respective laws applied. *See id.*

---

[6] AMICO argues here that this Court should conduct its choice of law analysis pursuant to Cal. Civ. Code § 1646, and § 188 of the Restatement (Second) of Conflict of Laws. As AMICO acknowledges, however, these provisions set forth the applicable choice of law rules for contract-based claims. The court in *Kilroy*, 608 F. Supp. at 858, n.5, rejected the application of a contract choice of law analysis to a bad faith claim.

Finally, if the Court determines that the interests of the affected states conflict, "the Court must determine which state's interest would be impaired to the greater degree if its law were not applied. . . ." *Id.*

Although AMICO has erroneously cited the California choice of law principles applicable in <u>contract</u> cases, AMICO argues here that California law should apply to the Banks' bad faith claims because (1) the bonds provide that "jurisdiction shall rest in the state of the obligee," and CMC (the initial obligee), as well as USB, are located in California; (2) the bonds were prepared, requested and issued in California by the sureties' broker, Michael Anthony, and CMC; (3) USB, a California corporation, corresponded with CMC's Escondido, California office regarding the sale of the leases and bonds; and (4) both AMICO and USB filed lawsuits relating to this dispute in California courts. Accordingly, AMICO argues that California has the most substantial connection to the dispute between AMICO and USB.

USB argues, confusingly, that California law does not apply to the dispute between these parties, and that there is <u>no</u> controlling authority governing this dispute. USB correctly notes that the "governmental interest test" applies as the relevant choice of law analysis for tort claims. USB asserts that the states potentially affected in this matter are California and Nevada, since (1) USB is a California Bank; (2) AMICO did business in California; (3) surety broker Michael Anthony operated out of California; (4) CMC had a Las Vegas, Nevada office; and (5) the SSA contained a Nevada choice of law provision.

USB continues its argument, however, by asserting that the laws of California and Nevada are the same regarding bad faith, since neither state has any controlling law regarding whether a bad faith claim may be asserted against a surety under these precise circumstances. According to USB, neither state has addressed a situation similar to that presented here, in which

a surety assumed fiduciary responsibilities and made affirmative representations to its obligee in connection with a lease bond.

USB focuses on case law relating to circumstances where the governing law of two affected states is identical.  USB notes that both Nevada and California recognize claims for bad faith in the context of an insurer's unreasonable handling of a claim. *See Pemberton v. Farmers Ins. Exch.*, 109 Nev. 789, 792-93 (1993); *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809, 818 (1979).  Accordingly, USB asserts that California law does not control, and that this Court should consider "any state's law" as to the issue of whether AMICO is subject to a bad faith claim in the circumstances present here.

Despite USB's puzzling contention that the law of "any state" is relevant, the vast majority of USB's briefing is based on California cases recognizing a bad faith claim in the context of an insurer's failure to properly investigate or settle a claim.  USB relies heavily on its interpretation of public policy—including its description of the lease bonds as an adhesive contract—to argue that AMICO should be charged with a good faith obligation in the circumstances presented here.

In its reply memorandum of law, AMICO disputes many of the facts asserted by USB, including the representations allegedly made to USB by AMICO and USB's asserted lack of bargaining power.  In any event, however, AMICO argues that the facts relied on by USB are irrelevant to the choice of law inquiry, and that the dispute between these parties is clearly controlled by California law.

The Court agrees that, in the context of Case 02-16024, a dispute between two parties doing business in California, which involves lease bonds requested and issued in California, California law should control.  Although USB references Nevada law, USB does not argue that

Nevada law applies to this case, nor does USB provide detailed analysis as to how Nevada law would apply to this precise situation. Even assuming, however, that Nevada law differs from California law, the Court is convinced that California provides the proper rule of decision here.

The parties' arguments and the record in this case demonstrate that Nevada has no material interest in this case to be protected through application of Nevada law. Although USB references the location of CMC's Nevada headquarters, CMC also maintained a California office, through which CMC communicated with USB and the Sureties, and procured the lease bonds at issue here. AMICO, through its attorney in fact, Michael Anthony, issued the lease bonds in question in California.[7] Further, while the SSAs contain a Nevada choice of law provision, such a provision would govern only contractual disputes arising from the terms of the SSAs. It could not govern a tort claim arising from the business relationship of California parties engaged in a California transaction.

The Court is mindful that the claims at issue here arise not from the terms of the lease bonds or SSAs, but from AMICO's allegedly bad faith handling of USB's claims. Although the parties' briefs do not discuss the issue of where AMICO conducted its claims handling process, there is no evidence that AMICO would have handled such claims in Nevada. The Court presumes, rather, that AMICO would have conducted its claims handling process primarily at its headquarters, located in Illinois. Neither party has argued for the application of Illinois law. The Court finds that, where the claimant is a California entity, which submitted claims and communicated with AMICO from its California office, and allegedly suffered injury to its business interests in California, California has a far more substantial interest in this matter than

---

[7] The lease bonds in question went through several assignments of interest prior to their assignment to USB. Guardian Capital and Sky Bank—both located in Ohio—were interim assignees of the lease bonds. Neither of these Ohio entities are parties to the instant dispute, however, and neither AMICO nor USB argues that Ohio retains any interest in the current dispute between California business entities.

does Illinois.

Accordingly, with respect to Case 02-16024, the Court finds that its analysis of USB's bad faith claim will be governed by California law.

2.  Ohio Choice of Law

As noted above, the Court uses Ohio choice of law rules to determine the governing law for the bad faith claims asserted in eleven of the cases relating to the instant summary judgment motions—including the three cases encompassed by Royal's summary judgment motion (02-16012, 02-16019 and 02-16022), and eight of the cases encompassed by Safeco's summary judgment motion (02-16014, 02-16020, 02-16021, and 03-16002 through 03-16006).  As set forth above, the first step in conducting an appropriate choice of law analysis involves classification of the underlying claims. *See* RESTATEMENT OF THE LAW, 2D, CONFLICT OF LAWS, § 7, Comment b (choice of law rules depend on the "classification of a given factual situation under the appropriate legal categories and specific rules of law. . ."*); see also Hagberg v. Delphi Auto. Sys.*, 268 F. Supp. 2d 855, 860 (N.D. Ohio 2002)(choice of law analysis differs under Ohio law for contract and tort claims); *Chase v. Humrichouser*, 214 F. Supp. 2d 799, 805 (N.D. Ohio 2002)(same).  Once the claims at issue have been classified appropriately, the Court then can apply the relevant choice of law principles to determine the applicable substantive law.

Royal argues, in connection with its summary judgment motion, that California law should be applied to CadleRock's bad faith claims based on this Court's earlier ruling, in connection with the Banks' motions for judgment on the pleadings, that California law applies to the analysis of the Banks' contractual claims. (02-16000, Doc. 1708, at 14-15).  Royal asserts that, at the time CadleRock acquired its rights by assignment and became a party to this litigation, CadleRock was aware of the Court's prior decision regarding choice of law.  Royal

contends, further, that based on Ohio choice of law principles, including an analysis of the Restatement factors, California law should apply to the bad faith claims.

Royal asserts that California has a "more significant relationship" to the litigation than does Ohio, because (1) the bonds were issued by Michael Anthony in California; (2) CMC assigned the lease bonds to the Guardian Entities in California; and (3) Royal had no contact with any of the Banks in Ohio. Royal argues that it did not act in Ohio, and had no expectation that Ohio law could apply in litigation against it. Accordingly, Royal asserts that the Court should protect its "justified expectations," RESTATEMENT OF THE LAW, 2D, CONFLICT OF LAWS, § 6(2)(d), and apply California law.

CadleRock, although it does not conduct any explicit choice of law analysis, bases nearly the entirety of its opposition memorandum on Ohio law. CadleRock states that "Royal offers no explanation why California law is applicable to bonds issued for the protection of Ohio residents. Sky Bank filed suit in Ohio and this Court is required to apply the law of the forum. . . ." (Doc. 2174, at 24). CadleRock asserts that, as a general rule, tort claims are subject to the law of the place where the tort occurred, *see Sarmiento v. Grange Mut. Cas. Co.*, 106 Ohio St. 3d 403 (2005), and that CadleRock's bad faith claim is based upon Royal's refusal to pay contractual benefits in Ohio to an Ohio resident. According to CadleRock, Royal has not met its burden of demonstrating that any other state has an interest outweighing that of Ohio.

With respect to Safeco's motion for summary judgment, Safeco acknowledges that Ohio choice of law rules apply in determining the relevant substantive law for these cases. Safeco argues, however, that the Banks' bad faith claim should be treated as a contract claim and analyzed pursuant to Ohio's contractual choice of law rules. Safeco bases this conclusion on its assertion that Ohio courts have not considered a claim for bad faith/breach of the covenant of

good faith and fair dealing as it relates to a commercial surety bond, and thus that the courts have not made a determination as to the nature of such a claim.

Safeco argues that cases such as *Suver v. Personal Service Ins. Co.*, 11 Ohio St. 3d 6, 8 (1984), which found that a bad faith claim against the issuer of a financial responsibility bond sounds in tort, are inapplicable to evaluating the nature of a bad faith claim against a commercial surety. Safeco argues that, unlike a financial responsibility bond, a commercial surety bond is issued to guaranty an underlying contract. Accordingly, Safeco contends, a breach of the duty of good faith in connection with a commercial surety bond is best analyzed as a contractual claim.[8]

Safeco further argues that, even under Ohio's choice of law provisions governing tort claims, California substantive law has the most significant relationship to the relevant issues and should apply to determine the viability of the Banks' claims. Safeco contends that (1) CMC's operations, including CMC's equipment leasing program, were centered in Escondido, California; (2) most of CMC's employees were located in California, and most leases were issued from that office; (3) most of CMC's communications with lessees, Sureties and Banks originated from the California office; (4) all lease servicing was performed in the California office, and all lease payments were received there; (5) misrepresentations were made to Safeco by CMC personnel at CMC's office in California; and (6) Anthony & Morgan, the broker firm

---

[8] If, as suggested by Safeco, the Banks' bad faith claim were analyzed under the choice of law provisions applicable to contract claims, the Court would be required to apply the Restatement, section 188 *et seq.* to those claims. Section 194 of the Restatement provides:

> The validity of a contract of surety and the rights thereby are determined in the absence of an effective choice of law by the parties, by the law governing the principal obligation which the contract of surety was intended to secure, unless, with respect to the particular issue, some other state has a more significant relationship. . . .

RESTATEMENT OF THE LAW, 2D, CONFLICT OF LAWS, § 194. Safeco argues that the "principal obligation" in these cases refers to the underlying leases, and that each lease contains a choice of law clause which requires the application of California law. Safeco thus contends that, pursuant to § 194 of the Restatement, California law also should be applied to the bad faith claims arising from the surety bonds.

for the Sureties, was physically located in California and issued the lease bonds there.

In response to Safeco's summary judgment motion, the Banks argue that Ohio law applies to this Court's evaluation of their bad faith claims. The Banks maintain, first, that a bad faith claim against a commercial surety sounds in tort, as does a bad faith claim relating to an insurance policy or a financial responsibility bond. *See, e.g., Suver*, 11 Ohio St. 3d at 8. The Banks argue that, pursuant to the application of Ohio tort choice of law rules, there is a presumption that a tort claim is subject to the law of the place where the injury occurred. *See Sarmiento v. Grange Mut. Cas. Co.*, 106 Ohio St. 3d 403 (2005). *See also Sky Tech. Partners, LLC v. Midwest Research Inst.*, 125 F. Supp. 2d 286, 297 (S.D. Ohio 2000)(a tort claim arises "where the loss is suffered . . . . That loss is deemed to be suffered where its economic impact is felt, normally the plaintiff's residence. . . ."). Accordingly, the Banks assert that Ohio law governs the Banks' bad faith claims.

Alternatively, even to the extent that the Court should choose to apply a contractual choice of law analysis to the Banks' bad faith claims, the Banks maintain that Ohio law should govern.[9] As noted by Safeco, Section 194 of the Restatement provides that a contractual claim against a surety should be governed by the law applicable to the principal obligation. *See* RESTATEMENT OF THE LAW, 2D, CONFLICT OF LAWS, § 194. According to the Banks, however, Safeco improperly presumes that the underlying obligation is the leases, and ignores the parties' vigorous dispute regarding the nature of that underlying obligation. The Banks assert that Safeco has failed to submit evidence establishing that the principal obligations secured by the bonds are

---

[9] Unlike the other Banks, CadleRock, in its memorandum in opposition, asserts that Nevada law should apply to any contractual claims by CadleRock against Safeco, because of the Nevada choice of law provision contained in the Sale and Servicing Agreements ("SSAs"). CadleRock argues that the Nevada choice of law extends to all documents referenced in the SSAs, including the bonds. According to CadleRock, Nevada law recognizes a claim for bad faith in the circumstances present here. Since the Court finds, in any event, that the Banks' bad faith claims sound in tort, not contract, the Court does not consider the potential applicability of Nevada law.

governed by California law. In any event, the Banks argue that, pursuant to § 194, the law governing the principal obligations controls only where there is no other state with a more significant relationship to the issues in question.[10] Here, the Banks argue that the significant relationship that Ohio bears to this litigation outweighs the presumption in favor of applying the state law governing the principal obligation.

The Banks assert that they maintain their headquarters in Ohio, that the Guardian Entities secured credit in Ohio, and that all Banks suffered harm in Ohio when Safeco failed to honor its obligations under the lease bonds. Accordingly, the Banks contend that they extended credit to the principal in Ohio, and their injury occurred in Ohio. The Banks argue, therefore, that pursuant to the Restatement's choice of law provisions for either contractual or tort claims, Ohio law must apply unless Safeco can overcome the presumption that Ohio bears the most significant relationship to the bad faith claims.

According to the Banks, Safeco's suggested choice of law analysis relies on disputed facts, and improperly emphasizes actions and occurrences that are only marginally relevant to the Banks' bad faith claims. For example, the Banks argue, Safeco assumes that the only obligation secured by the lease bonds is payment by the lessees to CMC, the purported obligee. As the Banks observe, Safeco's asserted facts relating to CMC's obligee status and the nature of the obligations secured by the lease bonds are vigorously disputed by the Banks, and the Court has denied the parties' requests for leave to file summary judgment motions as to these factual

---

[10] According to the Comments to § 194, other states that may have a more significant relationship to the bad faith claim include "(1) the state where the creditor extended credit to the principal or otherwise relied upon the surety's promise . . ., (2) the state where the contract of surety was to be performed, (3) the state where the negotiations between the surety and creditor were conducted or where the surety delivered the contract to the creditor, or (4) the state of domicil of either the creditor or the surety. . . ." RESTATEMENT OF THE LAW, 2D, CONFLICT OF LAWS, § 194, Comment c. The Reporters Notes to section 194 state that, "[i]n the majority of cases . . . the courts have stated that the law governing the suretyship contract is the local law of the state where the creditor acted upon the guaranty by extending credit. . . ." RESTATEMENT OF THE LAW, 2D, CONFLICT OF LAWS, § 194, Reporters Notes.

issues.

Moreover, the Banks contend, Safeco improperly focuses primarily on the relationship between Safeco, CMC and Anthony & Morgan, as well as on the origination and underwriting of the lease pools. The Banks argue that, in connection with the bad faith claims, the proper factual focus should be on Safeco's relationships with the Banks, as well as Safeco's actions relating to claims handling.

The Banks contend that, with reference to claims handling, the relevant states include Ohio (the state of residence of the claimant Banks) and Washington (the state of Safeco's principal office, from which Safeco handled claims and directed claims investigations).[11] The Banks argue that Ohio clearly maintains a stronger interest in these transactions. The Banks note that each of them handled and funded the loans to the Guardian Entities from their Ohio offices, and managed the accounts associated with those transactions from Ohio. The Banks assert that Safeco issued alleged "estoppel letters" to certain Banks at their Ohio addresses, representing that Safeco was authorized to transact business in Ohio. Additionally, the Banks argue that Safeco authorized delivery of the issued lease bonds to the Banks in Ohio for finalization and inclusion in the loan closings, and that Safeco contemplated that payment to the Banks in Ohio would be required in the event of a default. The Banks assert that, based on Safeco's representations contained in the bonds and the estoppel letters, the Banks had the justified expectation that Ohio law would apply in the event of a dispute.

---

[11] The Banks assert that, although Safeco's California office may have been involved in underwriting the leases, there is no evidence indicating that the California office had any involvement in the claims handling process. Rather, the Banks contend, all investigation and handling of claims was directed from Safeco's headquarters in Washington. To the extent that Washington law might be found to apply, the Banks contend that Washington law permits a bad faith claim against a surety for conduct relating to claims handling practices. *See Smith v. Safeco Ins. Co.*, 150 Wn. 2d 478, 484 (2003).

*Smith*, 150 Wn. 2d at 484, however, deals with a bad faith claim against an <u>insurer</u>, not a surety. Whether Washington recognizes a bad faith claim against a surety is irrelevant, however, as this Court does not find Washington law applicable to these cases.

Finally, the Banks contend that Ohio has a strong public policy interest in protecting the justified expectations of Ohio investors and obligees, ensuring that sureties licensed in Ohio deal with their obligees in good faith, and protecting the right of Ohio obligees to recover punitive damages in accordance with established Ohio law. The Banks assert that these public policies were articulated by the Ohio Supreme Court in *Suver*, 11 Ohio St. 3d at 8, where the Court held that sureties on a financial responsibility bond were subject to liability for bad faith conduct.

Initially, the Court finds it clear under Ohio law that a claim for breach of the covenant of good faith and fair dealing sounds in tort. *See, e.g., Staff Builders, Inc. v. Armstrong*, 37 Ohio St. 3d 298, 302 (1988); *Maxey v. State Farm Fire & Cas. Co.*, 569 F. Supp. 2d 720, 724 (S.D. Ohio 2008). Although the Ohio courts have not considered a case involving the precise circumstances presented here, the Court finds that Ohio courts have consistently treated bad faith claims as claims arising in tort—even when the bad faith claims relate to obligations arising from a contract (as is typical in insurance bad faith situations). *See, e.g., Staff Builders*, 37 Ohio St. 3d at 302; *Suver*, 11 Ohio St. 3d at 8; *Maxey*, 569 F. Supp. 2d at 724. The bad faith claim asserted by the Banks here is not sufficiently distinguishable as to change the nature of the underlying claim. Accordingly, the Court analyzes the Banks' bad faith claim in the context of Ohio's tort choice of law analysis.

When conducting choice of law analysis in a tort action, Ohio courts give significant weight to the location of the injury, but do not apply that factor exclusively. *See Morgan v. Biro Mfg. Co.*, 15 Ohio St. 3d 339, 341 (1984)("traditional rule of *lex loci delicti* is still viable in Ohio, but is no longer used to automatically determine the prevailing state law. . . ."). Ohio has adopted the principles of the Restatement (Second) of Conflicts of Law, sections 146, 145 and 6, for resolving choice of law issues in tort cases. *See Morgan*, 15 Ohio St. 3d at 342. Initially,

section 146 creates a presumption that the law of the place of the injury controls, unless another jurisdiction has a more significant relationship to the lawsuit. *See Burns v. Prudential Secs., Inc.,* 167 Ohio App. 3d 809, 841 (3d Dist. 2006); *see also* RESTATEMENT OF THE LAW, 2D, CONFLICT OF LAWS, § 146.  In order to determine which jurisdiction bears the most significant relationship to the lawsuit, an Ohio court considers the principles set forth in section 145. *See Burns*, 167 Ohio App. 3d at 841.

Pursuant to section 145, the factors to be considered in a choice of law analysis include "(1) the place of the injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; (4) the place where the relationship between the parties, if any, is located; and (5) any factors under section 6 which the court may deem relevant to the litigation.  All of these factors are to be evaluated according to their relative importance to the case. . . ." *See Morgan*, 15 Ohio St. 3d at 342; *see also* RESTATEMENT OF THE LAW, 2D, CONFLICT OF LAWS, § 145.  Section 6 of the Restatement provides the following additional factors relevant to the choice of the applicable law: "(a) the needs of the interstate and international systems[;] (b) the relevant policies of the forum[;] (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue[;] (d) the protection of justified expectations[;] (e) the basic policies underlying the particular field of law[;] (f) certainty, predictability and uniformity of result[;] and (g) ease in the determination and application of law to be applied. . . ." RESTATEMENT OF THE LAW, 2D, CONFLICT OF LAWS, § 6.

Undisputedly, the Banks are headquartered in Ohio and, as a result, would suffer injury in Ohio as a result of any tortious conduct directed at them.  Under the presumption created by § 146 of the Restatement, Ohio law thus will control unless a balancing of the Restatement factors

compels a different result.

With respect to the § 145 factors, the Court balances the first three of those factors as follows: (1) Place of injury—Ohio; (2) Place of conduct causing injury—North Carolina (Royal), Washington (Safeco); (3) Domicile, residence, nationality, place of incorporation, place of business of the parties—Ohio/North Carolina/Washington. Given that the Sureties' states of headquarters are divergent, the choice of law analysis balances slightly in favor of Ohio law at this point.

The fourth factor, the place where the relationship between the parties is located, is more difficult to determine. Unquestionably, the Sureties had contacts with multiple parties, including Michael Anthony and CMC, in California. As the Banks point out, however, those contacts related to the negotiation and issuance of the lease bonds, while the Banks' causes of action at issue here involve the investigation and denial of the Banks' claims on the lease bonds. The contacts relating to the Banks' filed claims involved communications between, primarily, the head offices of the Sureties (located in Washington and North Carolina) and the Banks in Ohio.

The Sureties have not argued for application of the laws of the states of their respective home offices, nor have they articulated any aspect of the claims handling process that occurred in California. Thus, a balancing of the section 145 factors demonstrates that California's interest in this matter is insufficient to outweigh the presumption in favor of Ohio law.

Several of the factors set forth in section 6 of the Restatement also are relevant here, and weigh in favor of Ohio law. Factors (b) and (c) evaluate the relevant policies of the forum, as balanced against the relevant policies of other interested states. Although the Sureties argue that California has articulated a policy of protecting commercial sureties from bad faith suits relating to their handling of obligees' claims, the Sureties' handling of the Banks' claims did not actually

occur in that state. California can have no interest in protecting non-resident sureties from liability for claims brought by residents of other states, based on claims handling that occurred outside the state. Ohio, conversely, has a significant interest in determining the degree to which it will protect Ohio obligees from bad faith conduct by sureties dealing with those obligees.

Although the Sureties argue that "protection of justified expectations" (factor (d) under section 6 of the Restatement) supports the application of California law, the Court finds that any expectation that California law would apply to claims handling could not have been justified. While it may, arguably, have been reasonable to assume the application of California law as to claims arising from the terms of the bonds, each of the Sureties knew that it was headquartered in a state other than California, and that it handled claims of obligees primarily from its home office. In addition, the Sureties knew that obligees of the bonds resided in many states, and that any claims on the bonds would come from those states.[12] There is simply no justification for concluding that California has the most significant relationship to the Banks' bad faith claims, nor is there any justification for having anticipated the application of California law.

Accordingly, the Court holds that Ohio substantive law provides the rule of decision for the three cases encompassed by the Royal motion (02-16012, 02-16019 and 02-16022), as well as eight of the cases encompassed by the Safeco motion (02-16014, 02-16020, 02-16021, and 03-16002 through 03-16006).

3.      Georgia Choice of Law

With respect to 02-16010, the one case originally filed in Georgia, Safeco argues that

---

[12] There is a dispute between the parties as to the identity of the "obligee" under the surety bonds. The Court does not intend to resolve this dispute in the context of making a choice of law determination. Even if CMC were the "obligee" in a legal sense, the transaction documents provided that the interests protected by the bonds were freely assignable. Thus, regardless of the identity of the obligee, the Sureties were aware that they might receive claims on the bonds from entities other than CMC, some of which entities might reside in states other than California. Safeco could not have expected California law to apply to its handling of claims from each of these assignee entities.

application of Georgia choice of law rules leads to a decision that California law should apply to the bad faith claims. Safeco argues that a claim for bad faith/breach of the covenant of good faith and fair dealing sounds in contract under Georgia law, and thus that the choice of law provisions applicable to contractual claims should apply.

NetBank, on the other hand, argues that its claims are tort claims, to which Georgia law properly applies. NetBank notes that, although Safeco has treated its claims for "bad faith" and "breach of the covenant of good faith and fair dealing" as a single claim, these are actually two independent causes of action under Georgia law. *See* O.C.G.A. § 10-7-30 (bad faith claim against a surety); O.C.G.A. 13-6-11 (recovery of damages for bad faith in contract actions); *Spears v. Mack & Bernstein, P.C.*, 227 Ga. App. 743, 745-46 (1997)(claim for breach of the covenant of good faith)(non-surety). NetBank argues that both of these causes of action are tort claims. NetBank further argues, however, that even under a contractual choice of law analysis, Georgia law properly applies. The Court addresses both bad faith claims asserted by NetBank together.

Safeco contends that the Georgia courts have not held that a bad faith claim is a tort, and that such a claim is better viewed as a contract claim. Safeco relies on case law holding that a plaintiff may not sue in tort for breach of a duty imposed by a contract. *See, e.g., Sheppard v. Yara Eng'g Corp.*, 248 Ga. 147 (1981). Safeco contends that a tort claim is appropriate only where a defendant breaches a duty independent of a contract <u>and</u> causes plaintiff damages other than the loss of the benefits of the contract. *See Davis v. Aetna Casualty & Surety Co.*, 169 Ga. App. 825, 828 (1984), *aff'd in part and rev'd in part, Aetna Casualty & Surety Co. v. Davis*, 253 Ga. 376 (1984). Safeco argues that NetBank has not suffered any damages beyond the loss of the benefits of the contract, and thus that the claim asserted does not sound in tort under Georgia

law. Safeco argues that, if a Georgia contractual choice of law analysis is applied, such an analysis leads to the application of California law.[13]

In support of its contention that bad faith is a tort claim under Georgia law, NetBank relies on a Georgia statute allowing attorney fees and a 25% penalty above contract damages for breach of a commercial surety bond. *See* O.C.G.A. §10-7-30(b).[14] NetBank also cites to case law indicating that a plaintiff may bring a tort claim independent of a contractual relationship between the parties, if the duty alleged to be imposed upon the defendant arises outside the contract itself. *See Spears*, 227 Ga. App. at 745; *Travelers Ins. Co. v. King*, 160 Ga. App. 473, 475 (1981). NetBank further notes that, at least in the context of an insurer/insured relationship, breach of such an independent duty gives rise to a claim in tort, not contract. *See Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1545-46 (11th Cir. 1991)(relationship between insurer and insured creates a duty independent of the contract, and a tort claim arises where insured sustains damages from insurer's negligence or bad faith); *see also Arrow Exterminators, Inc. v. Zurich Am. Ins. Co.*, 136 F. Supp. 2d 1340, 1354 (N.D. Ga. 2001).

In support of its contention that Georgia's contractual choice of law rules mandate application of California law, Safeco points to the doctrine of *lex loci contractus*, holding that

---

[13] In its motion and reply memorandum of law, Safeco concedes that, if the Court finds the claims for bad faith/breach of the covenant of good faith and fair dealing to be tort claims, then Georgia law applies to those claims.

[14] That section provides:

> (b) In the event of the refusal of a corporate surety to commence the remedy of a default covered by, to make payment to an obligee under, or otherwise to commence performance in accordance with the terms of a contract of suretyship within 60 days after receipt from the obligee of a notice of default or demand for payment, and upon a finding that such refusal was in bad faith, the surety shall be liable to pay such obligee, in addition to the loss, not more than 25 percent of the liability of the surety for the loss and all reasonable attorney's fees for the prosecution of the case against the surety. . . .

O.C.G.A. § 10-7-30(b).

"contracts are to be governed as to their nature, validity, and interpretation by the law of the place where they were made, except where it appears from the contract itself that it is to be performed in a State other than that in which it was made. . . ." *IBM v. Kemp*, 244 Ga. App. 638, 641 (2000); *see also Federal Ins. Co. v. National Distributing Co.*, 203 Ga. App. 763, 765 (1992). Under Georgia law, a contract is "made" where it is delivered, *see Boardman Petroleum v. Federated Mut. Ins. Co.*, 135 F.3d 750, 752 (11th Cir. 1998); *Federal Ins. Co.*, 203 Ga. App. at 767. Based on these principles, Safeco argues that application of California law is compelled by the fact that the bonds were "delivered" to CMC in California.[15]

As with respect to bad faith claims under Ohio law, the Court looks to the nature of the claims, and to the treatment of analogous claims by Georgia courts. NetBank has correctly cited Georgia case law relating to bad faith claims in numerous contexts, including insurance bad faith claims, and has pointed out that the courts have treated such claims as tort claims. *See, e.g., Delancy*, 947 F.2d at 1545-46; *Arrow Exterminators*, 136 F. Supp. 2d at 1354. Moreover, the existence of a Georgia statute providing for attorney fees and a 25% penalty in a bad faith claim against a surety is suggestive of an intent on the part of the Georgia legislature to provide tort damages in the context of such claims. *See* O.C.G.A. §10-7-30(b). While Safeco may be correct in noting that the Georgia courts have not explicitly attached the "tort" label to a bad faith claim in these precise circumstances, the treatment of such claims by the Georgia legislature and Georgia courts strongly suggests Georgia's intent to analyze bad faith claims within a tort law framework.

Safeco's other arguments—including its argument that NetBank fails to demonstrate

---

[15] NetBank counters this last point by asserting that the bonds were not "delivered" until NetBank received them at its Georgia headquarters, at the closing of its transactions, pursuant to the provisions of the SSAs. The Court need not resolve the dispute regarding "delivery" of the bonds since, as will be discussed, the Court determines that the bad faith claims are properly treated as tort claims under Georgia law.

damages other than those occasioned by the loss of the benefit of its contract—go to NetBank's ability to prove its tort claim, and not to the characterization of such a claim. Thus, for the reasons set forth above, the Court finds that, under Georgia law, NetBank's claims for bad faith and breach of the covenant of good faith and fair dealing sound in tort.

Under Georgia's tort choice of law principles, tort cases are governed by the law of the state in which the tort was committed. *See Ga. Farm Bureau Mut. Ins. Co. v. Williams*, 266 Ga. App. 540, 541 (2004), *Kemp*, 244 Ga. App. at 640. Under the traditional *lex loci delicti* rule, the location of the tort is the state where the tortious injury occurred. *See Best Canvas Products & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983); *Management Science America, Inc. v. NCR Corp.*, 765 F. Supp. 738, 739 (N.D. Ga. 1991)(law of the place of the injury is "the place where . . . there takes place the last event necessary to make an actor liable. . . .)(internal citation omitted); *Risdon Enterprises, Inc. v. Colemill Enterprises, Inc.*, 172 Ga. App. 902, 903 (1984).

Applying these principles, NetBank argues that its injury was sustained in Alpharetta, Georgia, where it maintains its headquarters. In fact, NetBank contends, its only physical place of business was in the state of Georgia. Under the Georgia principle of *lex loci delicti*, NetBank argues that its injury and economic harm could only have been sustained in Georgia. Accordingly, NetBank asserts, Georgia law must apply to these claims.[16]

As noted previously in this opinion, Safeco concedes that, to the extent the Court finds that NetBank's bad faith claims sound in tort, substantive Georgia law must apply to those tort claims. The Court agrees that Georgia tort choice of law rules, as cited by NetBank, compel

---

[16] Alternatively, NetBank relies upon Nevada choice of law principles and argues that those principles also would support the application of Georgia law. The Court does not address this argument since, as set forth above, it has determined that Georgia choice of law rules provide the governing framework.

such a result. Accordingly, the Court holds that Georgia substantive law provides the rule of decision for the bad faith claims asserted by NetBank in 02-16010.

### C. Viability of Bad Faith Claims

The Court now considers the viability of the bad faith claims asserted by the Banks under the laws of the relevant jurisdictions, as determined in section II.B. of this opinion. The Court evaluates the laws of California, Ohio and Georgia separately.

#### 1. California Law

As found previously in this opinion, California law applies to the claims by USB against AMICO in 02-16024 for bad faith/breach of the covenant of good faith and fair dealing. In its summary judgment motion, AMICO argues that California law does not recognize a tort claim for bad faith/breach of the covenant of good faith and fair dealing in the context of a surety bond. Accordingly, in its motion (02-16024, Doc. 52), AMICO seeks summary judgment on the second count of USB's supplemental counterclaim (Doc. 43).[17]

In its motion, AMICO argues that California recognizes bad faith claims only in the context of an insurer/insured relationship, and has declined to extend recognition of such claims to situations outside the insurance setting. *See, e.g., Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1400-01 (2d Dist. 1990)(declining to find a "special relationship" between a bank and its customers, such as would support the recognition of a tort remedy for breach of the implied covenant of good faith and fair dealing); *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 693 (1988)("the employment relationship is not sufficiently similar to that of insurer and insured to warrant judicial extension of the proposed additional tort remedies in view

---

[17] The first, third, and fourth causes of action in the supplemental counterclaim—which are irrelevant to the motion at issue here—include breach of contract, fraud and negligent misrepresentation.

of the countervailing concerns. . . ."); *see also Hunter v. Up-Right, Inc.*, 6 Cal. 4th 1174, 1180 (1993).

AMICO's summary judgment motion in this action is based primarily on a California Supreme Court case, *Cates Construction, Inc. v. Talbot Partners*, 21 Cal. 4th 28 (1999). In *Cates*, the California court held that tort claims for bad faith/breach of the covenant of good faith and fair dealing were not available against a surety in the context of a construction performance bond. The *Cates* obligee sued the performance bond surety in contract and tort, due to the alleged failure of the principal to properly complete the construction project. The California Supreme Court found the surety liable for contract damages, but refused to allow the bad faith claim to proceed against the surety.

The *Cates* court noted California's traditional rule limiting bad faith claims to the insurance context, and observed that certain policy considerations justified recognition of such claims in the narrow circumstances of an insurance relationship. The *Cates* court stated:

> Unlike most other contracts for goods or services, an insurance policy is characterized by elements of adhesion, public interest and fiduciary responsibility. . . . In general, insurance policies are not purchased for profit or advantage; rather, they are obtained for peace of mind and security in the event of an accident or other catastrophe. . . . Moreover, an insured faces a unique 'economic dilemma' when its insurer breaches the implied covenant of good faith and fair dealing. . . . Unlike other parties in contract who typically may seek recourse in the marketplace in the event of a breach, an insured will not be able to find another insurance company willing to pay for a loss already incurred. . . .

*Cates*, 21 Cal. 4th at 44 (internal citations omitted). The *Cates* court then distinguished between insurance policies and construction performance bonds, noting that (1) in the context of a construction performance bond, obligees often have significant bargaining power; (2) construction performance bond obligees generally purchase bonds for commercial advantage,

rather than protection against calamity; (3) the obligee of a construction performance bond generally has a right of recovery against the principal; (4) the construction bond obligee generally may look to the marketplace to obtain completion of its project; and (5) the relationship between a construction performance bond surety and its obligee generally is not fiduciary in nature. *See id.* at 53-56.

The California court analyzed decisions from other jurisdictions, which permitted bad faith claims against commercial sureties, and rejected the reasoning of those courts. In summarizing its holding, the *Cates* court stated, "[A] construction performance bond is not an insurance policy. Nor is it a contract otherwise marked by elements of adhesion, public interest or fiduciary responsibility, such that an extracontractual remedy is necessitated in the interests of social policy. Obligees have ample power to protect their interests through negotiation, and sureties, for the most part, are deterred from acting unreasonably by the threat of stiff statutory and administrative sanctions and penalties. . . ." *Id.* at 60.

AMICO also relies on *Schwerdt v. Int'l Fid. Ins. Co.*, 2002 U.S. App. LEXIS 1486 (9th Cir. 2002), an unpublished federal case, in which the Court refused to permit a bad faith claim against a surety on a technology equipment sale performance bond. After the buyers failed to perform, the seller brought suit in tort against the performance bond surety. The *Schwerdt* court granted summary judgment on the tort claim. In affirming the district court's ruling, the Ninth Circuit relied on *Cates*, and stated:

> The principles underlying the holding in Cates apply here. . . . Just as in Cates, there are no elements here of adhesion or disparate bargaining power. . . . [Plaintiff] decided the form of the bond which he was willing to accept from Buyers, and he could have rejected the surety bond provided. . . . Moreover, the . . . bond was a means to obtain economic protection for [plaintiff], and therefore its issuance does not implicate public policy concerns. Unlike insurers who seek protection against 'accidental and generally

unforeseeable losses caused by a calamitous or catastrophic event,' obligees such as [plaintiff] merely seek protection against an adverse financial outcome. . . . Finally, the relationship between [plaintiff] and [surety] is not fiduciary in nature. . . .

*Schwerdt*, 2002 U.S. App. LEXIS 1486, at *7-9.

AMICO notes that this Court previously found, in its opinions on the parties' motions for judgment on the pleadings, that the transactions between the Sureties and Banks in these actions were, in sum and substance, suretyship transactions, not insurance policies. (02-16000, Doc. 1708, 1709). AMICO argues that here, as in *Cates*, the Court should refuse to find these transactions functionally the equivalent of "insurance," and should decline to recognize a bad faith claim against a commercial surety. AMICO points out that USB is a large commercial bank, which purchased the lease bonds as part of a commercial investment.

AMICO asserts that there was no adhesionary relationship, as USB was an assignee of the bonds, and the bond language was actually negotiated by Blaine Tanner of Guardian Capital, one of USB's predecessors in interest. Further, AMICO points out that USB purchased leases in the CMC program in order to obtain an income stream with a 9% yield. AMICO contends that, in these circumstances, USB's position is not analogous to that of an insured that has suffered from a disaster or calamity. Thus, AMICO argues, in the event that USB should prevail in its suit against AMICO, contract remedies are sufficient to make USB whole.

AMICO asserts that California law never has recognized a tort claim for bad faith outside the context of an insurance relationship, and maintains that this case has no public policy factors that would justify the recognition of such a claim here. AMICO contends that it, like USB, is a victim of fraud committed by USB's assignors, CMC and Guardian Capital. Under these circumstances, AMICO argues, there is no social policy to be vindicated by creating a tort claim in favor of USB against a party defrauded by USB's predecessors in interest.

29

AMICO argues, finally, that there is no fiduciary relationship between USB and AMICO that might justify the imposition of tort duties on AMICO.  AMICO asserts that sureties, unlike insurers, do not have fiduciary duties to their obligees as a matter of law. *See Cates*, 21 Cal. 4th at 56 ("a surety does not stand in a fiduciary or quasi-fiduciary position with respect to an obligee. . . .").  Moreover, AMICO contends, the provisions in the SSA relating to AMICO's obligation to defend USB from third-party claims for servicing breaches do not create any general fiduciary duty.  In fact, AMICO asserts, since there are no third party claims involved in this action, AMICO's duty to defend is entirely irrelevant in the context of this motion.

In its opposition to AMICO's summary judgment motion, USB argues that the facts of this case render it distinguishable from the *Cates* line of cases.  USB notes that the surety bonds here contain language representing that the surety's "obligations constitute an unconditional and absolute guarantee of payment, not collection," and that the surety "agrees to waive all defenses."  Moreover, USB notes, pursuant to the terms of the SSAs, AMICO agreed to (1) perform all underwriting obligations regarding the leases; (2) act as the agent of USB in enforcing the leases; (3) pay USB (or any obligee) unconditionally, within 30 days of a notice of default; and (4) assume quasi-fiduciary obligations vis-à-vis the bond obligees.

USB notes that the *Cates* court specifically restricted its analysis "to the subject of construction performance bonds. . . ." *Cates*, 21 Cal. 4th at 47, n.10.  USB maintains that the California courts have not addressed the viability of a bad faith claim against a surety issuing a loan guarantee bond.  According to USB, following the *Cates* analysis would be inappropriate here, because the factors expressly cited in *Cates* are absent from the surety relationship in this case.

USB asserts that, unlike a construction performance bond, the surety bond issued by

AMICO here presents characteristics of adhesion and unequal bargaining power. Despite the fact that USB is a large commercial entity, USB states that it had no involvement in negotiating the bond terms and that, rather, it accepted the language of the bond as issued by AMICO. USB argues, further, that bargaining power should be evaluated not at the time of issuance of the bonds, but at the time a claim is submitted. At the time of claim submission, USB contends, the surety has an incentive to withhold payment with no risk other than payment of the sums owed under the bond. USB thus maintains that bargaining power between the parties is dramatically unequal once a loss is suffered.

USB attempts also to distinguish this case from *Schwerdt*, 2002 U.S. App. LEXIS 1486 (9th Cir. 2002), based on the *Schwerdt* court's finding of equal bargaining power between the parties. The *Schwerdt* court noted that the plaintiff "determined the terms of the payment bond at issue . . . and had the power to seek out other principals if he objected to the terms of the bond. . . ." *Id.* at *8. USB contends that, since there is no evidence that USB participated in negotiation of the bond language here, the *Schwerdt* reasoning cannot apply.

USB also notes that the *Cates* court relied, in part, on the obligee's participation in the negotiation of the underlying contractual obligations guaranteed by the surety bond. The *Cates* court noted that the terms of such contracts generally are negotiated between the obligee and the principal, without input from the surety, and then are incorporated by reference into the bonds. That factor, the *Cates* court observed, supported its finding of significant bargaining power on the part of the obligee. USB asserts, however, that it had no such involvement in the negotiation of the underlying leases here. Rather, AMICO agreed to underwrite those leases and waive any defenses to payment.

USB also argues that, unlike the obligee involved in *Cates*, it did not elect to participate

in the CMC lease bond program for reasons of commercial advantage. USB asserts that it entered into the CMC program with the goal of protecting its business, not gaining a business advantage. USB argues that its purchase of the lease bonds was akin to the purchase of business interruption insurance, which would have permitted USB to protect its income upon the occurrence of a covered loss.

USB contends that the public interest and fiduciary responsibility factors present in this case further distinguish it from *Cates* and *Schwerdt*. USB asserts that, contrary to the situation present in *Cates*, it has no ability to "go to the marketplace" to acquire a substitute for the protection that AMICO promised.[18] *See, e.g., Agricultural Ins. Co. v. Superior Court*, 70 Cal. App. 4th 385, 398 (2d Dist. 1999)("an insured cannot buy protection after a loss has already occurred. . . ."). Nor, USB argues, can it go to the principal—CMC—to make good its loss. USB analogizes to the insurance cases, and argues that permitting a surety to deny payment after an obligee has suffered a loss deprives the obligee of the benefit of its bargain. *See, e.g., Egan v. Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809, 819 (1979)("[t]he purchase of . . . insurance provides peace of mind and security. . . . To protect these interests it is essential that an insurer fully inquire into possible bases that might support the insured's claim. . . ."). USB argues that, unlike the obligee on a construction surety bond, USB has no other recourse to obtain payment for its losses.

USB argues, finally, that the terms of the SSA, as executed by AMICO, imposed fiduciary obligations on AMICO in favor of its obligee, USB. According to USB, the duties

---

[18] USB urges that this inability to obtain relief from the marketplace exists for two reasons. First, USB contends that no other surety would willingly assume a loss already incurred. Second, unlike the obligee on a construction performance bond, USB argues that it paid for its participation in the CMC lease bond program up front, rather than in installment payments. Because the installment payment structure is common in construction contracts, USB asserts, a construction bond obligee is considerably less vulnerable to abuse by a surety than is USB here.

assumed by AMICO pursuant to the terms of the SSA included (1) the duty to act as USB's agent and custodian of the lease files; (2) the duty to indemnify USB from any losses or liabilities arising out of breach of the bonds or breaches of servicing obligations; (3) the duty to manage, service and administer the leases; and (4) the duty to preserve USB's rights in the leases and bonds, to take all reasonable efforts to maximize USB's recovery under the leases, and to defend USB's title to the lease assets against any third party claims. USB asserts that the acceptance of these fiduciary obligations by AMICO placed these parties in a relationship akin to an insurance relationship, and thus would justify the Court's recognition of a bad faith claim in this context.

Undisputedly, this case does not involve construction performance bonds. USB emphasizes that the bonds (and related transaction documents) at issue here contain provisions distinct from those included in a typical construction performance bond. USB contends that the unique obligations created by the SSA have transformed AMICO's bond obligations, such that those obligations are more similar to those of an insurer than to those of a typical commercial surety. Thus, USB urges the Court to extend the bad faith tort from the insurance context and permit USB to pursue such a claim here.

After careful consideration of the parties' positions and the relevant California law, the Court finds that California law does *not* recognize a bad faith claim of the type sought to be asserted by USB here. Accordingly, though USB's arguments certainly are not without force, AMICO's motion for summary judgment on USB's bad faith claim in this case is <u>granted</u>.

Initially, as noted by AMICO in its briefing, the Court previously found that the transaction documents and structures in these cases created, functionally, tripartite surety relationships. (02-16000, Doc. 1708, 1709). The Court accordingly rejects any attempt to

characterize these transactions as insurance policies. It is further clear that, over the past few decades, California courts have resisted any expansion of the bad faith tort outside the insurance context. *See, e.g., Foley*, 47 Cal. 3d at 693; *Hunter*; 6 Cal. 4th at 1180. The *Cates* decision, 21 Cal. 4th at 44, represented a continuation of this established California policy.

Recent federal court decisions have continued to interpret California bad faith claims narrowly, and have declined to recognize new bad faith claims absent guidance from the California legislature. *See, e.g., Cal. Joint Powers Ins. Auth. v. Munich Reinsurance Am., Inc.*, 2008 U.S. Dist. LEXIS 56654, *5 (C.D. Cal. Apr. 21, 2008)(unpublished disposition)(refusing to recognize bad faith tort claim by reinsured against reinsurer, "[b]ased on the California Supreme Court's consistent limitation of tort recovery for breach of the covenant of good faith and fair dealing. . . ."); *Schwerdt*, 2002 U.S. App. LEXIS 1486, *7-8 (declining to extend "exceptional approach" taken in insurance setting to allow bad faith cause of action against surety in context of a technology equipment purchase bond). In the face of a recognized and established California policy against the expansion of bad faith remedies in tort, significant judicial restraint on the part of this Court is warranted.[19]

In addition to the deference owed to well-established California policy, the Court finds that the public policy factors articulated by the California Supreme Court in *Cates* are best served by the denial of a bad faith cause of action in the circumstances of this case. The Court has evaluated the factors considered in the *Cates* case and has determined that, on balance, those factors support the denial of a claim for bad faith/breach of the covenant of good faith and fair

---

[19] The Court also has considered numerous cases from other jurisdictions, cited by USB in support of its bad faith claims. *See, e.g., Dodge v. Fidelity & Deposit Co.*, 161 Ariz. 344,348 (1989); *Transamerica Premier Ins. Co. v. Brighton Sch. Dist. 27J*, 940 P.2d 348, (Colo. 1997). The *Cates* court examined both *Dodge* and *Transamerica*, and declined to adopt their reasoning. *Cates*, 21 Cal. 4th at 60. This Court accordingly rejects those cases as inconsistent with California law and with *Cates*.

dealing under the circumstances presented here. First, despite the arguments of USB—an alleged obligee by assignment— that it did not personally participate in the negotiation of the surety bond language, it is indisputable that the obligees as a group had significant input into the language of the surety bonds. The evidence presented by all parties demonstrates that back-and-forth discussion and negotiation occurred between certain Banks and Michael Anthony, the attorney in fact for the Sureties. In particular, Guardian Capital, one of USB's predecessors in interest, was able to achieve certain changes to the surety bond language, as a result of the efforts of its principal, Blaine Tanner, and his counsel.

Moreover, USB, as an obligee by assignment, was under no compulsion to purchase the income stream from the CMC lease bonds. It did so voluntarily, and with full awareness of the terms and provisions contained in the transaction documents. USB thus retained bargaining power to the extent it could have declined to participate in the CMC transaction and sought to invest its funds elsewhere. Accordingly, the Court cannot find that the lease bond transactions were adhesionary with respect to the interests of USB.

The Court also rejects USB's contention that it participated in the CMC bond program in order to protect itself against calamity, in a manner akin to an insured's purchase of business interruption insurance. The transaction documents reflect that USB purchased an income stream expected to generate a 9% yield over a 60-month period. If the CMC transaction had proceeded as contemplated, USB would have received monthly payments for the entirety of that period, regardless of the occurrence of any "calamity." While USB may view the loss of the benefit of its bargain, and attendant financial injury, as a calamity, a financial institution's failure to receive the expected return on its investment simply is not analogous to the position of an insured following the occurrence of an unforeseen disaster.

Although the collapse of CMC's scheme has rendered that company valueless, and thus has deprived USB of a remedy against its "principal,"[20] the Court declines to find that the absence of a remedy against the principal justifies the recognition of a tort claim in the commercial surety context.  Situations involving failure of a principal may present themselves equally frequently in the context of construction performance bonds, yet the *Cates* court elected to deny a bad faith remedy to construction bond obligees.  Where, as here, the obligee is a sophisticated financial institution, the Court finds that this case is not sufficiently distinguishable from *Cates* as to warrant the construction of a novel tort remedy.

Similarly, although USB has no ability to "look to the market" to mitigate its losses and seek substitute performance of AMICO's obligation, the *California Joint Powers* court declined to find this factor sufficient to justify the recognition of a tort cause of action in favor of a commercial reinsured.  The *California Joint Powers* court stated:

> Reinsureds do face the economic dilemma recognized by the California Supreme Court.  In the event of non-payment by the reinsurer, they are not able 'to find another insurance company willing to pay for a loss already incurred. . . .'  However, given the 'extraordinary' nature of tort relief for breach of an insurance agreement . . ., and the California Supreme Court's consistent limitation of the grounds for that relief, the Court concludes that this concern alone is not sufficient to impose tort liability on reinsurers.  This is particularly true as a reinsured facing this dilemma is a sophisticated business entity capable of incorporating risk of non-payment into its reinsurance agreement. . . .

*California Joint Powers*, 2008 U.S. Dist. LEXIS 56654, *12 (internal citations omitted).  Likewise, here, the Court finds that, given the status of USB and its predecessors in interest as sophisticated investors and financial institutions, as well as the evidence of negotiation of the

---

[20] As previously noted in this opinion, the parties disagree as to the identity of the "principal" on the surety bonds.  For purposes of analysis and determination of AMICO's summary judgment motion, the Court construes the term "principal" to mean CMC, in accordance with USB's construction of the term.

terms of the transaction documents, USB (and its predecessors in interest) had a similar ability to anticipate and protect itself against the risks of non-performance of the surety contracts.

The final *Cates* factor, relied on heavily by USB, relates to the alleged fiduciary nature of the relationship between the parties. As this Court has previously noted in its opinion disposing of the parties' Notifications (*see generally* Doc. 2138), an evaluation of the terms of the SSAs, as well as the parties' intentions in executing the SSAs, may involve determination of factual issues. While the Court, in connection with its consideration of summary judgment motions, has declined to "consider factual issues relating to the extent of any fiduciary duty created by the CMC transactions. . . .," *see* Doc. 2138, at 36, the Court does not believe that any factual findings relating to the extent of the fiduciary duties created are necessary or that such findings would, in any event, be determinative here. In the Court's view, the scope of the fiduciary duties alleged by USB is narrow and largely irrelevant to the facts underlying the alleged bad faith claims.

The fiduciary duties alleged by USB to have been assumed by AMICO include (1) the duty to act as USB's agent or custodian in maintaining the lease files; (2) the duty to indemnify USB from losses or liabilities arising from breach of the bonds or of servicing obligations; (3) the duty to service and administer the leases; and (4) the duty to preserve USB's rights, defend its title to the lease assets and maximize its recovery under the lease bonds.

The Court has examined the relevant provisions of the SSAs and finds that, despite USB's attempts to characterize the "duties" allegedly assumed in a broad and amorphous manner, none of the duties alleged to have been assumed by AMICO relates to claims handling or to a surety's obligation to process an obligee's claims in good faith. The duties cited by USB involve primarily administrative obligations relating to AMICO's servicing responsibilities. To

the extent these alleged obligations are substantive, they appear to focus primarily on protection of USB in the context of third-party claims. Undisputedly, USB's bad faith claims arise neither from alleged breaches of servicing duties, nor from third-party claims against USB.

While the Court makes no determination here as to whether the parties intended to create certain fiduciary duties within the scope of the obligations imposed on AMICO by the SSA, the fiduciary duties alleged to have been assumed here are far less extensive than those inherent in an insurance relationship. In this context, where USB's claims do not arise from servicing breaches or third-party claims, the Court cannot find that the duties alleged effectively convert a surety relationship into an insurance relationship, so as to change the body of law applicable to those claims.

The transaction documents here created a surety relationship, and certain features necessarily inhere in such a relationship. As several other courts have noted, a surety, unlike an insurer, is a member of a tripartite relationship, and bears responsibilities not only to its obligee, but also to its principal. *See, e.g., Dodge*, 161 Ariz. at 347 ("a surety has an enforceable obligation of good faith toward its principal. . . ."); *Transamerica*, 940 P.2d at 353, n.4. California courts have held that these unique features distinguish surety from insurance, placing the parties on a more equal contractual footing and diminishing the fiduciary aspect of the relationship. In the circumstances here, where sophisticated commercial entities have independently entered into a suretyship transaction, the Court finds this case insufficiently distinguishable from *Cates* to justify the application of a different rule. AMICO's motion for summary judgment (02-16024, Doc. 52) is <u>granted</u>.

        2.     <u>Ohio Law</u>

In their summary judgment motions (Docs. 2150, 2154), Royal and Safeco (collectively,

the "Sureties") have argued that, to the extent Ohio law applies to these cases, Ohio courts also do not recognize bad faith claims of the type sought to be asserted by the Banks here.[21]  As the Court previously has found, Ohio law does apply to the three cases encompassed by the Royal motion (02-16012, 02-16019 and 02-16022), as well as eight of the cases encompassed by the Safeco motion (02-16014, 02-16020, 02-16021, and 03-16002 through 03-16006).

The relevant case to be considered in analyzing Ohio law with respect to bad faith claims is *Suver v. Personal Service Ins. Co.*, 11 Ohio St. 3d 6, 8 (1984), in which the Ohio Supreme Court recognized a bad faith tort claim against the issuer of a financial responsibility bond for the surety's malicious and willful failure to pay the amount of the bond.  The *Suver* court noted that Ohio courts have recognized a comparable claim in the context of an insurance relationship, *see Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St. 3d 272 (1983).  Based on similarities between a financial responsibility bond and an insurance policy, including a similar disparity of resources between the parties and comparable public policy concerns, the court held that recognition of a

---

[21] As relevant to this section of this opinion, Safeco has moved for summary judgment on the following claims by the Banks, each of which alleges bad faith on the part of Safeco:

    (1)  Sixth Count of Chase's First Amended Complaint (02-16014, Doc. 36);
    (2)  Fourth Count of Provident's First Amended Complaint (02-16021, Doc. 35);
    (3)  Third Count of CadleRock's First Amended Complaint (Safeco has moved to dismiss other counts on different grounds)(02-16020, Doc. 39);
    (4)  First Count of the Amended Complaints filed by Diversity Capital I, Guardian Capital, Guardian Capital I, and Guardian Capital III (03-16002, Doc. 12, 03-16003, Doc. 12; 03-16005, Doc. 9; and 03-16006, Doc. 10).
    (5)  First Count of the Amended Complaint filed by Guardian Capital II (03-16004, Doc. 9).  (With respect to this Count, Safeco inadvertently denominated the bad faith claim as the fourth count of Guardian Capital II's pleading.  Since the pleading contains no fourth count, the Court construes Safeco's motion as referring to the First Count, which contains the claim for bad faith).

Safeco states that its summary judgment motion is addressed only to bad faith claims regarding the bonds, and that Safeco has not moved for summary judgment as to claims under the SSAs or any other documents.

Royal also has moved for summary judgment on the Third Count of the First Amended Complaints filed by CadleRock in 02-16012, 02-16019 and 02-16022 (02-16012, Doc. 90; 02-16019, Doc. 74; 02-16022, Doc. 69).

bad faith claim against the issuer of a financial responsibility bond also was appropriate. *See Suver*, 11 Ohio St. 3d at 8.

The *Suver* court noted that, like an insurance policy, a financial responsibility bond does not protect its principal. Rather, it is written for the protection of the motoring public and is merely a substitute for an automobile insurance policy. *See id.* Thus, the relationship between an injured third party and the financial responsibility bond surety is virtually identical to that between an insured and its insurer. *See id.* In summarizing its holding, the *Suver* court stated:

> [T]his court concludes that the issuer of a financial responsibility bond has a duty to act in good faith in the handling and payment of claims by one who may be injured by the principal. Bad faith actions are a breach of this duty and will give rise to a cause of action in tort against the issuer of the bond. Thus, although the surety's obligations on the bond may be discharged by payment of the amount of the bond, the independent duty to act in good faith continues.
>
> Since this duty is tortious in nature, punitive damages may be recovered against the issuer of a financial responsibility bond for breach of its duty of good faith upon adequate proof . . . of actual malice, fraud or oppression. . . .

*Suver*, 11 Ohio St. 3d at 8.

The Sureties argue that *Suver* does not control this case, since that case considered the availability of a bad faith claim only in the narrow context of a financial responsibility bond. The Sureties contend that the *Suver* decision was based on a specific form of bond (the financial responsibility bond) and the Ohio court's finding that that type of bond was effectively a form of insurance. The bonds issued here, the Sureties argue, involve a tripartite surety relationship, and are not similar to the essentially two-party financial responsibility bond issued in *Suver*. Moreover, the Sureties argue, these bonds do not involve parties with a comparable disparity in resources, nor does a commercial surety bond implicate the same public interest factors present

in *Suver*.

The Sureties rely on the general Ohio rule that it is "no tort to breach a contract, no matter how [willful] or malicious the breach. . . ," *Int'l Fid. Ins. Co. v. Vimas Painting Co.*, 2008 U.S. Dist. LEXIS 27018, *12 (S.D. Ohio Apr. 3, 2008), *citing Ketcham v. Miller*, 104 Ohio St. 372, 377 (1922), and that "only in those contract situations where a special or fiduciary relationship exists between the parties and imposes a duty of good faith will the breach of same result in a tortious cause of action. . . ." *Empire-Detroit Steel Div. Cyclops Corp. v. Pennsylvania Electric Coil, Inc.*, 1992 Ohio App. LEXIS 3559, *9 (5th Dist. Ct. App. June 29, 1992). The Sureties maintain that the Ohio courts have been willing to deviate from the general rule only in limited circumstances, in situations analogous to the insurance context. Absent guidance from an Ohio court or the Ohio legislature, the Sureties argue, this Court should act with similar caution.

The Sureties urge the Court to employ a functional analysis and examine the differences between the *Suver* financial responsibility bond and the commercial surety bonds at issue here. According to the Sureties, the lease bonds here are distinguishable from the financial responsibility bond involved in *Suver* based on the following: (1) unlike the *Suver* obligees (the motoring public), certain parties in this dispute, including CMC and the Guardian Entities, assumed a role in negotiating provisions of the lease bonds; (2) the CMC lease bonds were entered into for commercial advantage, not "protection against calamity"; (3) the commercial surety bonds at issue here created a tripartite relationship characterized by relatively equal bargaining power, unlike the essentially two-party, adhesionary relationship present in *Suver*; and (4) due to the three-party relationship present here, the investigative process from the surety's standpoint is much more complex than that involved in a two-party bond. These

distinctions, according to the Sureties, are sufficient to warrant this Court's refusal to extend the application of *Suver*.

In their oppositions to the Sureties' summary judgment motions, the Banks argue that the *Suver* case stands for the general proposition that a tort claim for bad faith is available against a compensated surety. The Banks assert that the surety bonds issued in this case are sufficiently similar both to insurance policies and to the financial responsibility bonds involved in *Suver* to justify recognition of a tort claim here. First, the Banks cite O.R.C. § 5725.01(C), which defines an "insurance company" as "every corporation . . . acting as surety on bonds or undertakings. . . ."

The Banks also assert that the bonds here are equivalent in relevant aspects to the financial responsibility bond issued in *Suver*, and that the Ohio Supreme Court's recognition of a bad faith tort claim in *Suver* thus should be extended to the surety bonds before this Court. According to the Banks, financial responsibility bonds and surety bonds, while not identical, share some relevant characteristics—including a right of indemnity against the principal upon payment of a claim. These similarities, the Banks contend, justify the recognition of a tort claim for bad faith in connection with the surety bonds.

The Banks dispute the Sureties' assertion that *Suver* involved a "two-party relationship," rather than a tripartite surety relationship. The Banks argue, instead, that *Suver* also involved a tripartite relationship—between the surety, the obligee and the "motoring public." Moreover, the Banks assert, insurance policies sometimes also involve three-party situations, as where a bad faith claim is brought by a non-insured policy beneficiary. *See, e.g., Brown v. Zurich US*, 150 Ohio App. 3d 105 (10th Dist. 2002). Thus, according to the Banks, the Sureties' attempt to distinguish *Suver* based on the alleged "three-party" relationship here is artificial and

unconvincing.

The Banks argue that the policy considerations underlying *Suver* support the recognition of a bad faith claim here, since the public must be able to rely on a surety's contractual payment obligation. In this regard, the Banks cite the reasoning articulated by the *Suver* court:

> [T]o insulate the issuer of a financial responsibility bond from liability for the deliberate refusal to pay its obligations arising from the bond is to encourage the routine denial of payment of claims for as long as possible. This court should not provide an incentive to act in bad faith. . . .

*Suver*, 11 Ohio St. 3d at 8. The *Suver* court, the Banks assert, recognized a bad faith claim because it was concerned that a contrary rule would encourage the routine denial of claims by financial responsibility sureties, which would harm the public interest by denying compensation to injured individuals. The Banks argue that, as regulated multiline insurers conducting business in Ohio, the Sureties here are equally affected with a public interest and should similarly be subject to tort liability for bad faith conduct.[22]

Again, the Banks rely heavily on the provisions of the transaction documents in order to buttress their policy arguments. The Banks contend, for example, that recognition of a tort claim for bad faith/breach of the covenant of good faith and fair dealing is justified by the provisions of the lease bonds and SSAs, which effectively imposed fiduciary obligations on the Sureties— including obligations relating to the underwriting and servicing of leases, as well as protection of the rights of the obligees.

The Banks also cite to case law from jurisdictions recognizing surety bad faith claims, and reiterate the policy justifications set forth in those cases. The Banks argue, for example, that

---

[22] The Banks also suggest that, due to the "absolute and unconditional" language contained in the surety bonds, the bonds here should be treated as financial guaranty or credit enhancement bonds, which create a relationship akin to an insurance relationship.

sureties have been treated as insurers by courts in several other states with respect to bad faith claims. *See, e.g., Dodge*, 161 Ariz. at 347. In *Dodge*, the Arizona court evaluated (1) whether the parties had contracted for protection from calamity rather than commercial advantage; and (2) whether permitting tort damages was likely to deter breaches by sureties. *See id*. After answering those questions in the affirmative, the Arizona court held that a bad faith claim against a construction bond surety was recognized under Arizona law.

Similarly, in *Transamerica*, a Colorado court considered the bargaining power of the parties within a surety relationship. The *Transamerica* court concluded that the parties possess unequal bargaining power at the time a claim is submitted, since a surety retains the ultimate decision of whether to pay on that claim. *See Transamerica*, 940 P.2d at 353; *see also Dodge*, 161 Ariz. at 346-47. Moreover, the *Transamerica* court noted, contract damages "offer no motivation whatsoever for the insurer *not* to breach. If the only damages an insurer will have to pay . . . are the amounts that it would have owed under the policy plus interest, it has every interest in retaining the money. . . ." *Transamerica*, 940 P.2d at 353, *quoting Dodge*, 161 Ariz. at 346. Accordingly, the *Dodge* and *Transamerica* courts concluded that recognition of a tort claim against a surety acting in bad faith was appropriate. The Banks argue that, after an evaluation of Ohio law, this Court should adopt a similar rule.

This Court carefully has considered case law from Ohio relating to the scope of permissible tort claims in the context of a breach of contractual good faith duties. A detailed examination of such law reveals that, traditionally, Ohio courts have been circumspect in allowing tort remedies for breaches of such duties. *See, e.g., Rice v. Central Reserve Life of North America Ins. Co.*, 1982 Ohio App. LEXIS 15335, *9 (Apr. 23, 1982)("[I]t is no tort to breach a contract, regardless of motive. A tort exists only if a party breaches a duty which he

owes to another independently of the contract. . . .").

In the insurance area, Ohio courts have created an exception to this general rule. *See, e.g., Staff Builders, Inc. v. Armstrong*, 37 Ohio St. 3d 298, 302 (1988). Such an exception "is necessary because of the relationship between the parties and the fact that in the insurance field the insured usually has no voice in the preparation of the insurance policy and because of the great disparity between the economic positions of the parties to a contract of insurance. . . ." *Rice*, 1982 Ohio App. LEXIS 15335, at *11 (citation omitted). *See also Empire-Detroit Steel Div. Cyclops Corp. v. Pennsylvania Electric Coil, Inc.*, 1992 Ohio App. LEXIS 3559, *9 (Jun. 29, 1992)("only in those contract situations where a special or fiduciary relationship exists between the parties and imposes a duty of good faith will the breach of same result in a tortious cause of action. . . .").

The question before the Court, therefore, is the extent to which the relationship created by the surety bonds in this case falls within the limited exception created by the above cases. In this regard, the Court notes that multiple Ohio courts have recently considered related questions in a series of unpublished cases, several of which were issued while the parties were engaged in briefing the now-pending summary judgment motions in this matter.

In *Proctor v. Nasco Construction, Inc.*, Case No. 2006-08038-PR (Ohio Ct. Cl. Nov. 30, 2007), the Ohio Court of Claims considered a case filed by the Ohio Department of Transportation ("ODOT") against a bridge painting contractor and its surety for damages arising out of a bridge painting contract. The contractor tendered defense of the action to its surety, and the surety demanded that the contractor provide collateral for any potential liability. The contractor then filed a cross-claim against its surety, alleging that the surety acted in bad faith by conditioning its acceptance of the tendered defense upon collateralization of the potential

liability to ODOT. The court found that, as a matter of law, the contractor's allegations failed to state a claim for relief in tort. The court distinguished *Suver* on the grounds that "*Suver* involves a contract of insurance and not a surety agreement. . . ." *Proctor*, Case No. 2006-08038-PR, Nov. 30, 2007 Order, at 2.

*Kokosing Constr. Co. v. RLI Ins. Co.*, 2008 U.S. Dist. LEXIS 10327 (S.D. Ohio Feb. 12, 2008) involved an action by an obligee against a construction performance bond surety, based on a subcontractor's alleged failure to perform. Plaintiff moved for leave to amend to add a bad faith cause of action, alleging that the surety's failure to pay was without reasonable justification. *See id.* at *2. Defendant opposed the amendment motion, arguing that a bad faith tort claim against a performance bond surety was not available under Ohio law. *See id.* at *2. Plaintiff, citing *Suver*, argued that a bad faith tort claim was viable. *See id.* at *3. The court, interpreting the liberal standards of Fed. R. Civ. P. 15(a), held that the proposed amendment was "plausible," and declined to hold at the amendment stage that the plaintiff could not prevail on its proposed claim as a matter of law. *See id.* at *8. The court stated that "[d]efendant's arguments are . . . more appropriate at the summary judgment stage after a full briefing on the merits. . . ." *See id.* at *9.[23]

Most recently, another Southern District of Ohio court considered a bad faith claim against a construction performance bond surety in *Int'l Fid. Ins. Co. v. Vimas Painting Co.*, 2008 U.S. Dist. LEXIS 27018 (S.D. Ohio Apr. 3, 2008). In that case, the surety sued Vimas, its principal, which then filed a counterclaim alleging bad faith based on various acts committed by the surety in defending litigation brought by the obligee. The surety filed a motion to dismiss. The parties, in their briefing, directed the court's attention to *Proctor* and *Kokosing*.

---

[23] Subsequent to the amendment of the pleadings, the *Kokosing* case was settled and dismissed by the parties. Accordingly, the *Kokosing* court did not have the opportunity to rule definitively on the issues presented in that case.

The *Vimas* court considered Ohio's traditional tort rules, as well as *Suver*, *Proctor* and *Kokosing*, and concluded that Ohio law did not permit a bad faith claim by a principal against its surety in the context of a construction performance bond. The court found, first, that *Suver* was inapposite to the claim by Vimas against its construction bond surety, "because the same policy considerations are not at stake. . . ." *See id.* at *15. Second, the *Vimas* court found, the court in *Suver* addressed a claim by an obligee, not a principal. *See id.* at *16. The court relied on *Proctor*, as well as on authority from other jurisdictions, in holding that no such good faith duty exists in Ohio between a surety and its principal. *See id.* at 18.

The above cases appear to establish, as a general proposition, that Ohio does not recognize a tort claim for bad faith by a <u>principal</u> against its surety. However, since the instant case involves claims by purported obligees, neither *Proctor* nor *Vimas* directly addresses the question presented to this Court.

Although *Kokosing* involved a bad faith claim by an obligee, it is inapposite as well, since that case was decided under the liberal amendment standards of Fed. R. Civ. P. 15(a). As the *Kokosing* court noted, no Ohio case law exists either <u>recognizing</u> or <u>barring</u> a bad faith claim against a surety in the context of a construction performance bond. Accordingly, there is also no Ohio law that would control this Court's determination on the convoluted facts of this case, and the Court must decide the instant motion based on the Court's interpretation of existing Ohio case law and the policy statements made by the Ohio courts.

Despite the lack of binding law either recognizing or barring a bad faith claim against a commercial surety, the Court finds that the *Proctor* and *Vimas* decisions indicate the continuing reluctance of Ohio courts to extend such claims beyond their traditional boundaries, absent a compelling justification. Given the historically narrow scope of the bad faith tort in Ohio

jurisprudence and the policy justifications articulated in the case law, the Court finds that the exception carved by *Hoskins* and *Suver* is a narrow one, and that the claims asserted by the Banks in these cases do not state cognizable claims within the scope of that exception.

The factors cited by the *Hoskins* court to justify the recognition of a bad faith claim in the insurance context rely heavily on concerns of unequal bargaining power, and include "the relationship between the [parties] and the fact that in the insurance field the insured usually has no voice in the preparation of the insurance policy and because of the great disparity between the economic positions of the parties to a contract of insurance; and furthermore, at the time an insured party makes a claim he may be in dire financial straits and therefore may be especially vulnerable to oppressive tactics by an insurer seeking a settlement or a release. . . ." *Hoskins*, 6 Ohio St. 3d at 275 (citation omitted). *Suver*, 11 Ohio St. 3d at 8, extended the *Hoskins* rule to the specific context of a financial responsibility bond, based on the similarities discussed above. Much like the *Cates* case, the *Suver* analysis focused on (1) disparity of resources; and (2) the public interest nature of the insurance relationship.

These factors are among those discussed by the Court at length in connection with its analysis of California law, *see* section II.C.2., *supra*. For the reasons articulated in that section, the Court declines to find that (1) the surety bonds were adhesionary as regards the interests of the Banks; (2) the surety bonds were entered into for protection against calamity; or (3) the surety bonds or SSAs created any fiduciary relationship relevant to the Banks' bad faith claims here.

Given the historical restrictions in both California and Ohio relating to tort relief in the context of bad faith claims arising from a contractual relationship, as well as the common factors articulated by the California and Ohio courts in creating an insurance exception, the Court finds

that the Ohio courts, like the California courts, would refuse to recognize a bad faith tort claim in the circumstances presented here. Accordingly, the motions by Safeco and Royal for summary judgment on the bad faith claims in these cases (02-16012, 02-16014, 02-16019, 02-16020, 02-16021, 02-16022, 03-16002, 03-16003, 03-16004, 03-16005 and 03-16006) are <u>granted</u>.

3.    <u>Georgia Law</u>

In its summary judgment motion (02-16000, Doc. 2150), Safeco has moved for summary judgment on the Ninth and Tenth Counts asserted by NetBank in its Third Amended and Supplemental Complaint (02-16010, Doc. 23). As found previously in this opinion, Georgia substantive law applies to the claims by NetBank against Safeco in 02-16010 for bad faith/breach of the covenant of good faith and fair dealing.

NetBank relies on O.C.G.A. § 10-7-30(b), which provides statutory authorization for a claim against a surety, based on the surety's bad faith refusal to pay an obligee's claim. A second statute, O.C.G.A. § 13-6-11, permits a bad faith claim where a defendant has acted in bad faith outside the context of a surety or insurance relationship. Georgia case law also permits a tort claim for breach of the covenant of good faith and fair dealing, where a defendant is alleged to have breached a duty imposed by law, arising independent of the contract between the parties. *See Spears*, 227 Ga. App. at 745; *Travelers Ins. Co.*, 160 Ga. App. at 475.

Safeco concedes the existence of the cited Georgia law and, in fact, concedes the viability of NetBank's claims under Georgia law. (Doc. 2190, at 4).[24] While the Court expresses no opinion as to NetBank's ability to <u>establish</u> its asserted claims, the Court has found Georgia law applicable to NetBank's bad faith claims against Safeco, and the Court also recognizes the viability of the causes of action asserted under Georgia law.

---

[24] As previously set forth in this opinion, Safeco challenged the applicability of Georgia law to NetBank's bad faith claims. This Court has found, however, that Georgia law governs those claims. *See* section II.B.3., *supra*.

Accordingly, Safeco's motion for summary judgment must be <u>denied</u> as to the bad faith claims asserted by NetBank in 02-16010.

**D.      Claims for Punitive Damages by Assignee**

In their motions for summary judgment (02-16000, Docs. 2150 and 2154), both Safeco and Royal move for summary judgment on all of CadleRock's claims for punitive damages—the Third, Fourth and Fifth Counts asserted by CadleRock in its First Amended Complaints in cases 02-16012, 02-16019, 02-16020, and 02-16022. (02-16012, Doc. 90; 02-16019, Doc. 74; 02-16020, Doc. 39; 02-16022, Doc. 69). Since the Court has granted summary judgment as to the bad faith claims asserted by CadleRock in the Third Count, *see* section II.C.2., *supra*, the Court focuses on the punitive damages claims set forth in the Fourth and Fifth counts only. Safeco and Royal assert that CadleRock acquired its claims through assignment, and that, under California law, an assignee is precluded from recovering punitive damages.

Initially, the Court must determine the state law applicable to the punitive damage claims asserted by CadleRock in connection with the claims set forth in the Fourth and Fifth Counts of its First Amended Complaints. These counts include claims for fraud/negligent misrepresentation and fraudulent inducement. Again, Safeco and Royal argue that California law should be applied to all of CadleRock's claims for punitive damages.

With respect to the claims set forth in the Fourth and Fifth Counts of CadleRock's First Amended Complaints, Safeco and Royal concede that these claims are tort claims and that Ohio's choice of law analysis, set forth under § 145 of the Restatement, applies. Safeco and Royal argue, however, that, with respect to the issue of punitive damages, the Court should conduct an analysis separate from that relating to the underlying claims and that, with respect to

that issue, the primary focus should be on the location of the defendant's alleged conduct. *See* Restatement of the Law, 2d, Conflict of Laws, § 145, cmts. c-e; *see also In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 517 F. Supp. 2d 832, 852 (E.D. La. 2007)(applying Ohio law).

In choosing to apply the law of the state of the defendant's residence to the issue of punitive damages, the *Educ. Testing* court stated:

> Section 145 applies differently to the issue of whether plaintiffs can recover punitive damages in tort than it did to the other tort questions in this case. Punitive damages, as a general matter, are intended to fulfill different policy objectives than other tort rights and remedies. Punitive damages are typically permitted in order to punish and deter wrongful conduct, rather than to compensate victims for their losses. . . . Accordingly, in the case of punitive damages, the contacts of the state in which the allegedly wrongful conduct occurred and the state of the defendant's place of business take on a more prominent role. . . .

*Educ. Testing*, 517 F. Supp. 2d at 852 (internal citations omitted). *See also Minebea Co. v. Papst*, 377 F. Supp. 2d 34, 40 (D.D.C. 2005)("When the primary purpose of a rule of law is to deter or punish conduct, the jurisdictions with the most significant interests are those in which the conduct occurred and in which the principal place of business and place of incorporation of the defendant are located. . . ."); *Keene Corp. v. Insurance Co. of N. Am.*, 597 F. Supp. 934, 938 (D.D.C. 1984)(same).

According to Safeco and Royal, the claims set forth in the Fourth and Fifth Counts of the First Amended Complaints arise from representations made in the lease bonds and SSAs. Safeco and Royal assert that the bonds were issued in California, and the SSAs were executed by the Sureties and CMC in California. Additionally, all lease servicing was performed in California, and all lease payments were made from CMC's accounts in California. Safeco and Royal argue that the only arguably relevant Ohio contact was a single letter, sent from California and received

in Ohio by FirstMerit Bank, CadleRock's predecessor in interest. Safeco and Royal argue, therefore, that the bulk of the wrongful conduct alleged in the Fourth and Fifth Counts occurred in California, and that California law should apply.

CadleRock disputes the proposition that its punitive damages claims are governed by California law and asserts, rather, that all claims relating to an assignment contract entered into by Ohio companies should be governed by Ohio law. CadleRock relies, moreover, on the choice of law principles previously cited as generally applicable to tort claims, and argues that tort claims are generally governed by the law of the place of the injury. *See, e.g., Morgan*, 15 Ohio St. 3d at 342.[25] CadleRock contends that, although CMC engaged in conduct in California, CadleRock's tort claims do not arise from the actions of CMC, and rather stem from the actions of Safeco and Royal. CadleRock argues that California has no interest in this dispute between an Ohio plaintiff and insurers domiciled in states other than California (i.e., Washington and North Carolina).[26]

With respect to the merits of CadleRock's punitive damages claim, Safeco and Royal argue that California law prohibits the recovery of punitive damages by an assignee, and thus that the punitive damages claims by CadleRock are barred. *See Murphy v. Allstate Ins. Co.*, 17 Cal. 3d 937, 942 (1976)("[B]ecause a purely personal tort cause of action is not assignable in California, it must be concluded that damage for emotional distress is not assignable. . . . The same is true of a claim for punitive damage. . . ."); *People v. Superior Court of Los Angeles*

---

[25] Alternatively, CadleRock argues that, under contractual choice of law principles, all of its claims are governed by Nevada law, because the SSAs contained a choice of law provision specifying the application of Nevada law. The Court rejects the contractual choice of law analysis and does not consider it further.

[26] CadleRock does not, however, argue that the laws of either Washington or North Carolina (the states in which Safeco and Royal, respectively, are headquartered) should apply to CadleRock's punitive damages claims. Given that the claims set forth in the Fourth and Fifth Counts are based on representations made in the lease bonds and SSAs, all of which were executed by the Sureties in California, the Court also finds that Washington and North Carolina have no material interest in this matter.

*County*, 9 Cal. 3d 283, 287 (1973)("in the absence of statute, exemplary damages are allowed only to the immediate person injured. . . ."); *Dugar v. Happy Tiger Records, Inc.*, 41 Cal. App. 3d 811, 819 (2d Dist. 1974)("in the absence of a statute[,] punitive damages are allowed only to the immediate person injured. . . .").

Safeco and Royal argue, alternatively, that Ohio courts have not indicated definitively that punitive damages are assignable, and that Ohio authority suggests that recovery of punitive damages by an assignee might also be barred in Ohio. *See, e.g.,* 30 O. JUR. Damages § 131 ("In general, punitive damages are allowed only to the immediate person receiving the injury. . . ."); *Wolford v. Wesleyan Holiness Chapel*, 1985 Ohio App. LEXIS 6812, *10 (7th Dist. Jul. 22, 1985)(denying punitive damages to indemnitee seeking recovery from indemnitor based on general rule that such damages are allowed only to immediate person injured); 22 AM. JUR. 2D Damages § 583. Safeco and Royal contend that the Court should extend the general rule prohibiting the assignment of punitive damages to Ohio, since the transfer of a right to seek punitive damages is against public policy.

CadleRock does not specifically address the choice of law arguments presented by Safeco and Royal, nor does it challenge the proposition that California law bars the recovery of punitive damages by an assignee. Rather, CadleRock argues that Ohio law governs its punitive damage claims, and does not preclude the assertion of a punitive damages claim by an assignee. In support of this contention, CadleRock cites case law to the effect that "a chose in action is transferable. . . ." *Pilkington N. Am., Inc.  v. Travelers Cas. & Sur. Co.*, 112 Ohio St. 3d 482, 483 (2006). CadleRock does not, however, cite any Ohio cases specifically allowing recovery of punitive damages by an assignee.

The Court has examined the authority cited by all parties, and has determined that, as an

initial matter, California law likely applies to the claims for punitive damages asserted by CadleRock. Regardless of which state's law may ultimately apply to the underlying tort claims (and the Court makes no finding in this respect), the Restatement and the cited case law indicate that punitive damages claims require an independent analysis focused on the location of the defendants' conduct.

In this case, the claims for fraud/negligent misrepresentation and fraudulent inducement, which are set forth in the Fourth and Fifth Counts of CadleRock's First Amended Complaints, are based entirely on allegedly fraudulent representations made by Safeco and Royal in the lease bonds and SSAs. Unequivocally, both the lease bonds and SSAs were issued by Safeco and Royal in California. California thus is the undisputed situs of the conduct underlying these claims.[27] CadleRock does not seriously dispute, nor can it dispute, that California law bars the recovery of punitive damages by an assignee. *See Murphy*, 17 Cal. 3d at 942. The Court thus finds that CadleRock's claims for punitive damages as to the Fourth and Fifth Counts are barred.

Alternatively, even if Ohio law were to apply to CadleRock's punitive damage claims set forth in the Fourth and Fifth Counts, the Court's research suggests that an Ohio court also would decline to recognize claims for punitive damages by an assignee. As explained by courts in numerous other jurisdictions, the "weight of authority seems to be against an award of punitive damages . . ." in favor of an assignee. *Watts v. Golden Age Nursing Home*, 127 Ariz. 255, 257 (1980). Courts have reasoned in favor of such a result because "part of the damage arises from the personal tort aspect . . ." of the cause of action, *see Murphy*, 17 Cal. 3d at 942, and "the

---

[27] Although the Court previously has granted summary judgment on CadleRock's bad faith claims, it is worth noting that the fraud and fraudulent inducement claims differ from the bad faith claims in this regard. The conduct underlying the bad faith claims occurred not in California, but in the states of the Sureties' respective headquarters. Accordingly, if the Court were required to consider choice of law for the punitive damage claims arising from the bad faith causes of action, the result might well be different.

transfer of such right is against public policy. . . ." *French v. Orange County Inv. Corp.*, 125 Cal. App. 587, 591 (2d Dist. 1932).

Although no published Ohio case appears to have considered this precise issue, the Court's research has revealed that Ohio courts also recognize the policy justifications underlying decisions such as *Murphy*, *Watts* and *French*. *See, e.g., Arbino v. Johnson & Johnson*, 116 Ohio St. 3d 468, 488 (2007)("punitive damages are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence . . . .")(internal quotation omitted). Presumably for this reason, the only unpublished Ohio case to have considered the issue declined to permit an assignee to recover punitive damages. *See Wolford*, 1985 Ohio App. LEXIS 6812, *10.

For the reasons set forth herein, the motions of Safeco and Royal for summary judgment on CadleRock's punitive damages claims, the Fourth and Fifth Counts asserted by CadleRock in its First Amended Complaints in cases 02-16012, 02-16019, 02-16020, and 02-16022 (02-16012, Doc. 90; 02-16019, Doc. 74; 02-16020, Doc. 39; 02-16022, Doc. 69) are <u>granted</u>.

### E.     CadleRock's Claims under the SSAs

In its motion (02-16000, Doc. 2154), Royal has moved the Court for summary judgment on all of CadleRock's claims arising under the SSAs, on the grounds that CadleRock did not obtain any rights under those documents, and thus has no standing to maintain its claims. The relevant claims involve portions of the Second Count and all of the Sixth Count in 02-16012, 02-16019 and 02-16022.[28]

---

[28] The Second Count seeks a Declaratory Judgment that "the Sale and Servicing Agreement and all of the Lease Bonds are valid and subsisting obligations of Royal. . . ." (02-16012, Doc. 90, ¶ 64; 02-16019, Doc. 74, ¶ 85; 02-16022, Doc. 69, ¶ 87). Royal seeks summary judgment dismissing so much of the Second Count as relates to the SSAs.

In evaluating Royal's contentions, it is instructive to review a brief history of the transactions giving rise to CadleRock's interest in this litigation. The three lease pools in which CadleRock claims an interest initially were purchased from CMC in three separate transactions by Guardian Capital IX LLC ("Guardian IX"), Diversity Capital II LLC ("Diversity II"), and Guardian Capital XV LLC ("Guardian XV"). The purchase transactions were financed with loans from three separate Ohio banks—Mid Am Bank ("Mid Am"), Second National Bank of Warren ("Second National"), and Metropolitan Bank & Trust Company ("MB&T"). Each loan was evidenced by a cognovit note. Through later bank mergers, Sky Bank succeeded to the interests of all three of these banks.

For each transaction, Royal lease bonds were issued and the relevant Guardian Entity entered into an SSA with Royal and CMC. As security for each loan, the Guardian Entity assigned to each lender bank a security interest in the bonds through a Notice of Assignment, and also entered into a "Credit and Security Agreement" with the lender bank. The Credit and Security Agreements granted each lender bank a security interest in (1) the leases, including the right to receive all scheduled payments under the leases; (2) the surety bonds associated with each lease transaction; and (3) the relevant SSAs, all of which were included within the broad definition of "collateral."

The transactions were structured in such a way that the monthly income stream to each lender bank on its lease pools was greater than the monthly payment that the relevant Guardian Entity was required to make to its lender bank. The lender banks would remit any monthly excess to the Guardian Entities, thus permitting the Guardian Entities to profit from the transactions. After CMC collapsed and payments on the lease pools ceased, the failure of the

---

The Sixth Count seeks relief for breach of the SSA. Royal seeks summary judgment on the Sixth Count in its entirety.

lender banks to receive the monthly income stream from the lease pools caused defaults by the Guardian Entities in their monthly payments to the lender banks.

The lender banks then commenced these actions against Royal, seeking to recover on the lease bonds. As previously noted, Sky Bank succeeded at various times to the interests of all three lender banks. While the MDL litigation was pending, Sky Bank obtained judgments against the Guardian Entities for the accelerated amount owed on the three cognovit notes.

On November 9, 2005, Sky Bank conducted foreclosure sales with respect to the interests of Guardian IX, Diversity II and Guardian XV in the leases, bonds, and SSAs. Each sale was conducted pursuant to a Notification of Disposition of Collateral ("Notification of Disposition"), which enumerated the property to be sold. Each Notification of Disposition stated that the collateral to be sold included:

>All of Debtor's right, title, or interest in or to:

>(a)    the leases listed on Exhibit 1 hereto ("Leases"), including, but not limited to, all contract rights under each Lease and any and all equipment that is the subject of any and all of the Leases;

> ***

>(e)    all insurance policies, insurance policy endorsements or surety bonds, and all rights thereunder, issued to protect Debtor or Sky against losses incurred due to a default under the Leases, including, but not limited to, each of the Lease Bonds issued by Royal Indemnity Company in respect of each of the Leases and more fully described on Exhibit 2 hereto;

>(f)    the Purchase and Security Agreement between Debtor and Commercial Money Center, Inc., ("CMC"), dated November 20, 2000, and the Sale and Servicing Agreement dated as of November 20, 2000 among Debtor, CMC and Royal Indemnity Company. . . .

(Sky Notification of Disposition to Guardian Capital IX, LLC, Doc. 2158, attach. 7).[29]  Sky was the successful purchaser at its secured party sales and, accordingly, took title to all of the Guardian Entities' interests in the collateral.

On December 14, 2005, Sky entered into an Assignment and Acceptance Agreement ("A&A Agreement") with The Cadle Company (an affiliate of CadleRock), and assigned to The Cadle Company specific rights relating to the three lease pools.  Subsequently, in June 2006, The Cadle Company entered into an Assignment of the Assignment and Acceptance Agreement (the "Further Assignment") with CadleRock, under which The Cadle Company assigned all of its rights under the A&A Agreement to CadleRock.

The question presented by Royal's motion for summary judgment is the extent of the rights transferred by Sky to The Cadle Company through the A&A Agreement (and thus later transferred to CadleRock through the Further Assignment).  As both parties agree, the scope of the rights transferred is defined by the operative language of the A&A Agreement.

The A&A Agreement defines the "Guardian Credit Agreements" as the three Credit and Security Agreements entered into by Guardian IX, Diversity II and Guardian XV.  The A&A Agreement also defines the term "Loan Documents" as including both the Guardian Credit Agreements and "the other documents listed on Exhibit 1" to the A&A Agreement.  The documents listed in Exhibit 1 (using the Guardian IX transaction as an exemplar) included:

> 1. Credit and Security Agreement, dated November 20, 2000 between Guardian Capital IX LLC and Mid Am Bank.
> 2. Term Note, dated November 20, 2000, executed by Guardian Capital IX LLC.
> 3. Pledge/Security Agreement, dated November 20,

---

[29] The language from the Notice of Disposition for the Guardian IX sale is provided as an exemplar.  The language set forth in all other Notifications issued by Sky is substantially identical.  The language contained in the Notifications parallels the definition of "collateral" contained in each respective Credit and Security Agreement.

2000.
4.        Uniform Commercial Code Financing Statements.

Doc. 2158, attach. 8. Corresponding documents were listed in Exhibit 1 for the Diversity II and Guardian XV transactions.

Using these defined terms, the A&A Agreement enumerated the rights assigned by Sky to the Cadle Company as follows:

> one hundred percent (100%) of the Assignor's rights and interests under the Guardian Credit Agreements and the other documents listed on Exhibit 1 hereto (collectively with the Guardian Credit Agreements the "Loan Documents"), including, without limitation:
>
> (i)      the right to receive rent under those equipment lease pools, and the surety bonds related to such pools, described in Exhibit 2 hereto;
> (ii)     the Loan under each Credit Agreement;
> (iii)    those certain judgments ("the Cognovit Judgments") [entered in state court against Guardian IX, Diversity II and Guardian XV]; and
> (iv)    the following cases filed by the Assignor, as plaintiff, in the Cuyahoga County Court of Common Pleas ("the Creditors Bill Actions") [against Guardian IX, Diversity II and Guardian XV].

Doc. 2158, attach. 8, at ¶ 1. Royal argues, simply, that since the SSAs are not included in the definition of "Guardian Credit Agreements" or "Loan Documents," are not itemized in Exhibit 1, and are not listed in the A & A Agreement among the rights assigned to The Cadle Company, the A&A Agreement did not assign any rights under the SSA to The Cadle Company, and CadleRock did not subsequently succeed to any rights under the SSAs.

Royal notes that, one month prior to the execution of the A&A Agreement, Sky conducted a foreclosure sale, foreclosing on its security interest in the SSAs. Accordingly, Royal argues, any rights that Sky had in the SSAs, as of the date of the A&A Agreement, it had as the successful purchaser at the foreclosure sale, not under the Guardian Credit Agreements or

Loan Documents.

Moreover, Royal contends, although the A&A Agreement contained assignments of all of Sky's rights in two groups of state court actions (the Cognovit Judgments and the Creditors Bill Actions), the A&A Agreement did not contain a blanket assignment of all of Sky's rights in the three actions against Royal pending before this Court. Rather, Royal observes, the A&A Agreement recited: "Assignee [The Cadle Company] specifically acknowledges that despite the terms of this Assignment, Assignor [Sky Bank] will continue to be involved as a party in the MDL. . . ."[30] Royal argues that Sky Bank retained all rights to claims against Royal based on the SSA and that, since Royal and Sky now have settled their claims, all claims against Royal based upon the SSAs have been released and dismissed.

According to Royal, determination of this issue depends only upon a plain language interpretation of the A&A Agreement, and thus, it is irrelevant whether the Court chooses to apply California or Ohio law.[31] Royal thus cites cases from both California and Ohio relating to the construction and interpretation of contractual assignment provisions. *See, e.g., Polek v. Tillimon*, 2002 Ohio App. LEXIS 873 (6th Dist. Mar. 1, 2002)(applying contract rules to interpretation of an assignment); *Mission Valley East, Inc. v. County of Kern*, 120 Cal. App. 3d 89, 96-97 (5th Dist.1981)(an "assignment must describe the subject matter of the assignment with sufficient particularity to identify the rights assigned. . . ."). The *Mission Valley* court set

---

[30] Subsequent to the execution of the A&A Agreement, Sky filed counterclaims against Royal in two actions (02-16012 and 02-16022) based, in part, upon Royal's alleged breach of duties under the SSAs. (02-16012, Doc. 101; 02-16022, Doc. 80). The Court then denied Royal's motion to strike the counterclaims asserted by Sky. (02-16012, Doc. 108; 02-16022, Doc. 87). Subsequently, Sky and Royal settled their disputes and, in September 2007, Sky Bank and Royal filed Stipulations and Orders dismissing all claims between them. (02-16012, Doc. 111; 02-16022, Doc. 90).

[31] Royal posits that California law may apply based on the Court's prior finding that California law applies to the CMC transactions, through which CadleRock claims rights as assignee. *See* Doc. 1708, at 14-15. Alternatively, Royal suggests that Ohio law may apply, based on an Ohio choice of law provision contained in the A&A Agreement.

forth the California standards relating to interpretation of assignment contracts:

> The law governing interpretation of written instruments establishes that the *subjective intent* of a party is of no moment in ascertaining the meaning of the words used in the instruments. . . . [I]t is well settled that the correct approach is to avoid the terminology of 'intention' and to look for *expressed intent* under an *objective standard*. . . .

*Id.* at 97 (emphasis in original). Similarly, under Ohio law, "contracts should be construed so as to give effect to the intention of the parties, as evidenced by the contract language. . . ." *Polek*, 2002 Ohio App. LEXIS 873, at *4, *citing Aultman Hospital Ass'n v. Community Mut. Ins. Co.*, 46 Ohio St. 3d 51, 53 (1989).

Royal argues that, under both California and Ohio law, a court will look to the specific terms of the assignment to determine the precise scope of the rights assigned, and that the court must require "clear and positive" evidence of an assignment. *Cockerell v. Title Ins. & Trust Co.*, 42 Cal. 2d 284, 292 (1954). Royal cites cases from both jurisdictions in which courts have narrowly construed the scope of rights assigned pursuant to written assignment agreements. *See Williams v. Galloway*, 211 Cal. App. 2d 302, 306 (5th Dist. 1962)(refusing to recognize alleged assignment of claim in connection with assignment of lease); *Mission Valley East*, 120 Cal. App. 3d at 97 (holding that assignment transferring "all rights as owner of said property . . . in and to the following described real property. . . .," did not transfer personal rights such as the right to claim excess proceeds from tax sale); *Polek*, 2002 Ohio App. LEXIS 873, at *6 (holding that contract for sale of annuity payment did not constitute "an assignment of the right to attempt collection on the annuity. . . .").

Royal argues that, although it would have been a simple matter to include rights under the SSAs within the A&A Agreement, Sky and CadleRock did not do so. According to Royal, the A&A Agreement could have listed the SSA rights among the rights assigned, as they had

previously been listed in the Notices of Disposition.  Since the SSA rights were not listed, Royal argues, the Court should strictly construe the A&A Agreement in accordance with its plain language and hold that such rights were not transferred.

In response, CadleRock argues that, through the Credit and Security Agreements, the Guardian Entities assigned to Sky Bank as collateral all of their rights to (1) the Purchase and Security Agreements executed between CMC and the Guardian Entities; (2) the SSAs executed by Royal, CMC and the Guardian Entities; and (3) the lease bonds.  CadleRock asserts that, after the foreclosure sale, SkyBank assigned the Credit and Security Agreements to The Cadle Company, CadleRock's predecessor in interest.  According to CadleRock, Sky's assignment of the Credit and Security Agreements carried with it an assignment of the collateral covered by the Credit and Security Agreements.

CadleRock asserts that the A&A Agreement is governed by Ohio law, based on a choice of law provision contained within the document.  CadleRock cites Ohio law supporting the proposition that an assignment should be interpreted in accordance with its plain written language. *See, e.g., Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 313 (1996)("The intent of the parties is presumed to reside in the language they chose to use in their agreement. . . ."); *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St. 3d 107, 108 ("If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined. . . ."); *Aultman Hospital Ass'n v. Community Mut. Ins. Co.*, 46 Ohio St. 3d 51, 53 (1989)("The general rule is that contracts should be construed so as to give effect to the intention of the parties. . . .").

CadleRock argues that the plain language of the A&A Agreement demonstrates that Sky Bank intended to assign to The Cadle Company all of its rights under the three Credit and

Security Agreements. CadleRock references paragraph 1 of the A&A Agreement, which provides:

> SkyBank (the 'Assignor') hereby sells and assigns, Without Recourse, to The Cadle Company, an Ohio corporation (the "Assignee")***, one hundred percent (100%) of the Assignor's rights and interests under the Guardian Credit Agreements and the other documents identified in Exhibit 1 hereto. . . .

Doc. 2158, attach. 8, at ¶ 1. Exhibit 1 to the A&A Agreement lists the Credit and Security Agreements as well as the UCC financing statements, which list the collateral covered by the security agreement.

CadleRock notes that the A&A Agreement further provides:

> From and after the Payment Dates, (i) the Assignee shall be a party to the Guardian Credit Agreements and have the rights and interests of the "Bank" thereunder and under the Loan Documents and (ii) the Assignor shall relinquish its rights and interests under the Guardian Credit Agreements and the Loan Documents.

Doc. 2158, attach. 8, at ¶ 1. CadleRock argues that, by virtue of these provisions in the A&A Agreement, The Cadle Company effectively acquired all rights of Sky in the collateral identified in the Credit and Security Agreements and the UCC financing statements.

CadleRock observes that the SSAs are listed as Item (f) under the definition of collateral in the Credit and Security Agreement, and that the UCC financing statements also list the SSAs as collateral in which the lender banks held security interests. Since the Credit and Security Agreements are effectively incorporated by reference in the A&A Agreement, argues CadleRock, those documents should be considered part of the A&A Agreement. *See, e.g., Center Ridge Ganley, Inc. v. Stinn*, 31 Ohio St. 3d 310, 314 (1987). Thus, CadleRock contends that Sky was not required to separately list the SSAs in the A&A Agreement in order to effectuate a transfer of rights in the SSAs.

According to CadleRock, the A&A Agreement transferred multiple rights of different classes from Sky to The Cadle Company. CadleRock asserts that certain rights were transferred by operation of law, by virtue of having been incorporated by reference into the Guardian Credit Agreements and Loan Documents, while other rights were required to be listed specifically in the A&A Agreement in order to effectuate transfer.

In this regard, CadleRock distinguishes between the rights transferred under the Credit and Security Agreements and those transferred in connection with other documents, such as the cognovit notes. With respect to the Credit and Security Agreements, CadleRock asserts that those Agreements were governed by Article 9 of the Ohio Uniform Commercial Code, O.R.C. § 1309 *et seq*. Pursuant to the relevant UCC provisions, CadleRock argues, the transfer of rights under those documents permitted SkyBank to assert choses in action against Royal for breaches of the lease bonds and SSAs, without having to take judgment against the Guardian Entities upon the cognovit notes. The cognovit notes, conversely, were negotiable instruments, governed by O.R.C. §§ 2323.12 through 2323.14. Pursuant to O.R.C. § 1303.69, the ability to enforce a negotiable instrument is discharged upon the entry of judgment. Sky had taken judgment on the cognovit notes prior to the execution of the A&A Agreement.

According to CadleRock, the A&A Agreement recognizes that the cognovit notes had become judgments and had been discharged prior to the assignment. Thus, CadleRock contends, Sky's mere assignment of rights under the Credit and Security Agreements would not have been effective to assign the judgments. In order to effectively convey those judgment rights, CadleRock asserts, the three judgments (as well as three creditors bills that Sky had filed in order to reach additional choses in action possessed by Guardian) were listed in the A&A Agreement as "other documents" being assigned.

CadleRock argues, therefore, that Sky listed as "other documents" only such rights and interests as would not have been encompassed as collateral under the Credit and Security Agreements and the UCC financing statements. The "other documents" listed in the A&A Agreement, CadleRock suggests, are additions to, not limitations on, the rights assigned to The Cadle Company by transfer of Sky's rights under the Credit and Security Agreements.

In its reply memorandum of law, Royal disputes CadleRock's assertion that Sky's transfer of rights under the Credit and Security Agreements also transferred rights in the collateral identified in those agreements. At the foreclosure sale held on November 9, 2005, Sky sold (and became the purchaser of) the collateral specified in the Credit and Security Agreements. Upon completion of that sale, Royal argues, the SSAs, as well as the other property sold through the secured party sale, were no longer collateral under the Credit and Security Agreements.

Royal relies on § 9-617 of the Uniform Commercial Code, which provides:

> (c) A secured party's disposition of collateral after default does all of the following:
>
> (1) Transfers to a transferee for value all of the debtor's rights in the collateral.
>
> (2) <u>Discharges the security interest under which the disposition is made</u>.
>
> (3) Discharges any subordinate security interest or other subordinate lien.

CAL. COM. CODE § 9-617 (emphasis added); *see also* O.R.C. § 1309.617; *Liqui*Lawn Corp. v. Andersons*, 31 Ohio St. 3d 145, 148 (1987). Royal relies heavily on § 9-617(a)(2), which provides that a secured party sale discharges any security interest in the underlying collateral. Royal alleges that, pursuant to this provision, Sky's purchase of the collateral at the foreclosure

sale changed the nature of Sky's interest in that collateral.

Since Sky was the successful purchaser at the secured party sale, Royal acknowledges that, after that sale, Sky owned all of the Guardian Entities' rights in the SSAs and other collateral. Royal asserts, however, that after the sale, Sky had such rights only as the successful purchaser—not under the Credit and Security Agreement. Royal argues, essentially, that once Sky sold its rights in collateral under the Credit and Security Agreement (and purchased those rights as the successful bidder at the foreclosure sale), it could no longer transfer interests in that collateral simply by transferring the Credit and Security Agreement.

Royal notes that other documents, such as the leases and lease bonds, also had been collateral under the Credit and Security Agreements, and had been among the collateral sold at the secured party sales. Thus, as of December 14, 2005 (the date of the A&A Agreement), Sky's interest in these documents was identical to its interest in the SSAs. Nonetheless, in the A&A Agreement, Sky specifically listed its interests in the lease bonds, including among the property assigned "the right to receive rent under those equipment lease pools, and the surety bonds related to such pools. . . ." Doc. 2158, attach. 8, at ¶ 1. Significantly, Royal argues, Sky's rights in the SSAs were not enumerated in similar fashion.

The parties have briefed both sides of this issue thoroughly and quite cogently. After full consideration of the parties' positions and the governing documents, the Court ultimately agrees with Royal and finds that CadleRock is not the owner of Sky's interests under the SSAs. Because the Court reaches this conclusion for all the reasons articulated so well by Royal in its papers, the Court need only summarize its findings here.

Undisputedly, CadleRock possesses only such rights as were assigned to it by The Cadle Company through the Further Assignment, and the scope of the rights received by The Cadle

Company is delineated by the language of the A&A Agreement.  Accordingly, in considering Royal's summary judgment motion, the Court has carefully reviewed the provisions of the A&A Agreement to determine the precise nature of the rights assigned.  Based on the choice of law provision contained within the document, the Court has assumed the applicability of Ohio law—although there appears to be no relevant difference between Ohio and California law relating to the interpretation of contractual assignment provisions.

The Court has concluded that the plain language of the A&A Agreement did not convey to The Cadle Company any interest or rights under the SSAs.  As noted by Royal, Exhibit 1 of the A&A Agreement is precise, and specifically lists each document in which the parties sought to transfer an interest.  Despite the inclusion of interests in numerous specifically described documents, including the leases, lease bonds, cognovit judgments and Credit and Security Agreements, any reference to the SSAs is notably absent.

CadleRock suggests that transfer of Sky's interest in the SSAs occurred automatically, by operation of law, upon transfer of Sky's interests in the Credit and Security Agreements.  This argument is premised upon the notion that the SSAs were collateral under the Credit and Security Agreements, and thus were incorporated into the Credit and Security Agreements. Royal correctly observes, however, that the nature of Sky's ownership interest in the SSAs changed after completion of the November 9, 2005 foreclosure sale.  After that date, Sky held an interest in the SSAs as the successful purchaser of those interests, rather than as a secured party under the Credit and Security Agreements.  At that point, therefore, Sky's rights in the SSAs were not dependent on the Credit and Security Agreements, and did not pass automatically in connection with Sky's rights under the Credit and Security Agreements.

The A&A Agreement was negotiated, with the benefit of able counsel, by sophisticated

commercial parties. In this context, the Court finds it difficult to believe that the parties would have neglected to list rights and interests that could so easily have been included, and the Court is compelled to find that the parties' omission was material. The Court thus holds that the A&A Agreement and the Further Assignment did not operate to transfer to CadleRock any of Sky's rights and interests under the SSAs, and CadleRock possesses no such rights.

Royal's motion for summary judgment with respect to CadleRock's claims premised on the SSAs is <u>granted</u>.

### III.    CONCLUSIONS

For the reasons set forth herein, the motions of Safeco, Royal and AMICO (the "Sureties") for summary judgment are <u>granted</u> in part and <u>denied</u> in part. Safeco's motion for summary judgment against the Banks (Doc. 2150) is determined as follows:

> (a)    Safeco's motion for summary judgment on the Banks' claims for bad faith/breach of the covenant of good faith and fair dealing is <u>granted</u> as to all Banks except NetBank, and <u>denied</u> as to NetBank.

> (b)    Safeco's motion for summary judgment on CadleRock's claims for punitive damages is <u>granted.</u>

Royal's motion for summary judgment against CadleRock (Doc. 2154) is <u>granted</u> in its entirety, as follows:

> (a)    Royal's motion for summary judgment against CadleRock on CadleRock's claims for bad faith/breach of the covenant of good faith and fair dealing is <u>granted</u>.

> (b)    Royal's motion for summary judgment on CadleRock's claims for

punitive damages is <u>granted</u>.

(c) Royal's motion for summary judgment as to CadleRock's claims premised upon the SSAs is <u>granted</u>.

AMICO's motion for summary judgment against USB (02-16024, Doc. 52) as to USB's claims based on bad faith/breach of the covenant of good faith and fair dealing is <u>granted</u>.

**IT IS SO ORDERED.**


<u>s/ Kathleen M. O'Malley</u>
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: March 11, 2009**

63110-1