# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: COMMERCIAL MONEY | : | **Case No. 1:02CV16000** |
| CENTER, INC., EQUIPMENT | : | |
| LEASE LITIGATION | : | **(MDL Docket No. 1490)** |
| | : | |
| | : | **JUDGE O'MALLEY** |
| | : | |
| | : | **MEMORANDUM OF OPINION** |
| | : | **AND ORDER** |
| | : | |
| | : | **This Order Relates To Case Nos.** |
| | : | **02CV16012, 02CV16019,** |
| | : | **02CV16020, 02CV16022,** |
| | : | **03CV16002, 03CV16003,** |
| | : | **03CV16004, 03CV16005,** |
| | : | **03CV16006** |

On July 13-16, 2009, this Court conducted a bench trial in these matters. Following post-trial briefing, closing arguments were heard on September 10, 2009. The trial, conducted by consent of the parties, was limited to the threshold, and potentially determinative, issue of who the parties intended to be the original obligee on certain lease bonds ("Lease Bonds") issued by Royal Indemnity Company ("Royal") and Safeco Insurance Company of America ("Safeco")(collectively, "Sureties").[1] During the trial, evidence was presented by CadleRock Joint Venture, L.P. ("CadleRock"),[2] various Guardian Entities,[3] and both of the Sureties. CadleRock and Guardian are occasionally referred to collectively as "Plaintiffs."

---

[1] Where not defined herein, capitalized terms used in this Opinion have the meanings ascribed to them in the Court's Consolidated Rulings issued August 19, 2005. Docs. 1708, 1709.

[2] CadleRock is an assignee of the interests of various Banks in this action. The process by which CadleRock acquired its interests is set forth in more detail in section I.B.3., *infra*.

[3] For purposes of this Memorandum of Opinion and Order, the term "Guardian Entities," or "Guardian," includes Guardian Capital, LLC (03-16002); Guardian Capital I, LLC (03-16003); Guardian Capital II, LLC (02-16004); Guardian Capital III, LLC (03-16005); Diversity Capital One, Inc. (03-16006); Guardian Capital XV, LLC (02-16012); Guardian Capital IX, LLC (02-16019); and Diversity Capital II, LLC (02-16022).

In this trial, the Court is tasked with analyzing the structure of certain Commercial Money Center ("CMC") Lease Bond transactions, and determining the obligations the parties intended those Lease Bonds to guarantee. The Sureties assert that the Lease Bonds were meant as a guarantee of the obligations specified on the face of those Bonds—the obligations of the lessees to make lease payments to CMC. CadleRock and the Guardian Entities argue, however, that the designation of CMC as obligee was a "nominal" designation, and that CMC was not intended to have any actual rights under the Lease Bonds. Rather, CadleRock and Guardian contend, the parties intended CMC to retain a "co-principal" status with its lessees. According to Plaintiffs, the ultimate benefit of each transaction was intended to flow to the relevant Guardian Entity and its assignees, and they must, therefore, be deemed the true "obligees" in each transaction.

What the parties and the Court have dubbed the "obligee issue" is central to these proceedings for several reasons. Most significantly, as the Court previously found in its ruling on the Motions for Judgment on the Pleadings (02-16000, Doc. 1708), the Sureties may not assert defenses against Lease Bond obligees based upon the fraud of a Lease Bond principal. Accordingly, if the Guardian Entities are found to be the original obligees on the Sureties' Lease Bonds, the Sureties' fraud defenses arising out of fraud by CMC and its principals will be unavailable. The Court now resolves the question presented in this trial and sets forth its findings of fact and conclusions of law relating thereto.[4]

While the Court's findings of fact and conclusions of law, with attendant explanation and

---

[4] Throughout this Opinion, in referring to exhibits introduced by the parties at trial, the Court identifies such exhibits as [Party] Exh. __. In referring to witness testimony that is part of the Court transcript of the bench trial proceedings, the Court identifies such references to the transcript as Tr. __. In referring to witness testimony that was introduced into the record of the bench trial proceedings via deposition, the Court identifies such references as [Witness] Depo., at __.

analysis, are lengthy, its critical conclusions are not. The Court finds that CMC was the intended original obligee on all of the Lease Bonds at issue and that the Guardian Entities, and later certain banks, succeeded to the rights of CMC by assignment thereafter. As a result, the Sureties may assert defenses based on fraud by CMC.[5]

# I.    BACKGROUND[6]

## A.    Procedural Background

These actions were transferred to this Court by order of the Judicial Panel on Multidistrict Litigation ("the MDL Panel"), issued on October 25, 2002. 02-16000, Doc. 1. This Court ordered that these actions be coordinated for pretrial purposes. 02-16000, Doc. 2. Pursuant to this Court's Order, the parties conducted consolidated discovery over a period of several years.

On January 31, 2003, while discovery was ongoing, numerous Banks[7] filed a consolidated motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c)(Doc. 53)("Pleadings Motion"), asserting that the Banks were entitled to payment on the Lease Bonds

---

[5] The Court's determination in this Opinion has a meaningful impact only on fraud defenses asserted by the Sureties based upon alleged fraud by CMC. The banks involved in this action—including CadleRock—acquired their interests through a chain of assignments, each of which included a Guardian Entity as a prior holder of interests in the lease pools. Thus, even if Plaintiffs could demonstrate that the Guardian Entities had original obligee status in these transactions, the rights of the Banks still would have been subject to any fraud defenses assertable against the Guardian Entities.

[6] The background set forth in this section is a general summary of the complex background facts of these cases, taken from documents of record in these proceedings and exhibits introduced at trial. The Court's findings of fact as to the issues addressed in the bench trial will be set forth in a separate section.

[7] As used herein, the term "Bank" or "Banks" describes those entities that originally filed the motion for judgment on the pleadings, which was disposed of by the Court in its Lead Opinion, Doc. 1708. That group included Ameriana Bank and Trust, S.B., Atlantic Coast Federal, Bank of Waukegan, Bank One N.A., Bluebonnet Savings Bank FSB, Citibank, N.A., FirstMerit Bank, N.A., Footbridge Limited Trust, General Electric Capital Corp., JPMorgan Chase Bank (f/k/a Chase Manhattan Bank, N.A.), Lakeland Bank, Metropolitan Bank & Trust Company, NetBank, FSB, Riverway Bank, Second National Bank of Warren, Sky Bank (for itself and as successor in interest to Mid Am Bank), The Huntington National Bank, The Provident Bank and U.S. Bank National Association. The term "Bank" or "Banks" also describes any successors in interest to any of the foregoing, including CadleRock, one of the parties involved in this trial.

as a matter of law, based upon the terms of the transaction documents. The Sureties opposed this motion.

On August 19, 2005, the Court issued two Opinions resolving the issues raised in the Pleadings Motion. Docs. 1708, 1709. In the Court's Lead Opinion (Doc. 1708), the Court denied the Banks' motion for judgment on the pleadings against all Sureties other than Illinois Union Insurance Company ("Illinois Union"). The Court held that it could not determine as a matter of law whether the Banks were the intended obligees on the Lease Bonds issued by the Sureties. Lead Opinion, Doc. 1708, at 24. Although the Court noted that certain factors, including the execution of indemnity agreements by CMC in favor of the Sureties, favored the position advanced by the Banks, the Court found that the indemnity agreements alone did not justify a finding of obligee status in the face of Lease Bonds that *expressly named* CMC as obligee. Lead Opinion, Doc 1708, at 26. Rather, the Court found, a change in the obligee designated by the instruments could be effected only by reformation of the Lease Bond instruments upon consideration of extrinsic evidence. Lead Opinion, Doc. 1708, at 26-27.

The Court further considered, in the Lead Opinion, the language of the transaction documents, including the alleged "fraud waiver" provisions contained in the Lease Bonds. Lead Opinion, Doc. 1708, at 33-44. The Court held that, in the event that the Banks were ultimately found to be the intended obligees on the Lease Bonds, the "fraud waiver" provisions would preclude the Sureties from asserting fraud defenses against the Banks based upon the fraud of CMC. Lead Opinion, Doc. 1708, at 44. If, however, the Banks merely took their interests as assignees of CMC, the Court held, the Sureties would retain all defenses that would have been available under California law against CMC—including the defense of fraud in the inducement. Lead Opinion, Doc. 1708, at 38-39.

In the Illinois Union Opinion (Doc. 1709), on the other hand, the Court granted the Pleadings Motion as that motion related to Banks whose transactions involved Illinois Union. There, the Court found that the insurance policies issued by Illinois Union actually were Lease Bonds, on which Illinois Union was the Surety. Illinois Union Opinion, Doc. 1709, at 24. The Court further found that, based on the language of the transaction documents, the Banks *clearly* were the intended obligees on the Lease Bonds issued by Illinois Union. Illinois Union Opinion, Doc. 1709, at 26. Accordingly, the Court held that the fraud waiver provisions in the Illinois Union policies applied and that Illinois Union could *not* assert the fraud of CMC as a defense to the Banks' claims. Illinois Union Opinion, Doc. 1709, at 52. The Court specifically distinguished the Illinois Union policies from the Lease Bonds issued by other Sureties in these cases, since Illinois Union's policies expressly named the Banks as Insureds. Illinois Union Opinion, Doc. 1709, at 30-31.[8]

As a result of the Court's conclusions in the Illinois Union Order, one Bank, JPMorgan Chase Bank, N.A. (as Trustee for Citibank, N.A. ("Citibank")), subsequently was granted final judgment as against Illinois Union in Case No. 02CV16009. Doc. 1817. Illinois Union appealed this Court's ruling, and the Illinois Union Order was upheld in relevant part on appeal. *See Commer. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327 (6th Cir. 2007).[9]

Meanwhile, following the Court's Opinions on the Pleadings Motion, the parties amended their pleadings and completed discovery, including expert discovery. At this point, the

---

[8] The structural differences between the transactions discussed in the Illinois Union Opinion and those at issue in the within bench trial proceedings will be discussed in detail in section II.B.4. of this Opinion.

[9] The Sixth Circuit upheld this Court's findings that (1) the Illinois Union insurance policies actually were Surety Bonds; (2) the Banks were the intended obligees on the Surety Bonds; and (3) that Illinois Union could not assert the fraud of CMC as a defense to its payment obligations under those bonds. The Sixth Circuit reversed this Court's award of damages, however, and remanded the case for further proceedings related to calculation of damages. *See Commer. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327 (6th Cir. 2007).

Court has resolved all dispositive motions in these cases. Numerous parties have settled their claims, and a few actions have been remanded to their transferor courts for trial. The cases remaining pending before this Court are in the final stages of pretrial preparation.

Various motions in limine pursuant to *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) and/or *Kumho Tire v. Carmichael*, 526 U.S. 137 (1999), challenging the qualifications of certain experts proffered in these actions, have been filed and remain pending. The Court conducted oral arguments and heard testimony relating to those motions on July 16-17, 2009, and again on September 10, 2009; orders resolving those motions are forthcoming.

During a telephone conference conducted before the Court on May 13, 2009, counsel for CadleRock, the Guardian Entities, Royal and Safeco agreed to submit questions relating to the issue of the identity of the intended obligee on the Lease Bonds in these nine cases to the undersigned for resolution. The parties submitted pre-trial briefs on June 4-5, 2009 (Docs. 2238, 2239, 2241), June 19, 2009 (Docs. 2258, 2259, 2260) and June 29-30, 2009 (Docs. 2269, 2270). Bench trial proceedings were conducted before the undersigned on July 13-16, 2009 and, after post-trial briefing, again on September 10, 2009. *See* Doc. 2227. Post-trial briefs were submitted to the Court on August 21, 2009. Docs. 2416, 2417, 2418, 2419.

As noted, this Memorandum of Opinion and Order ("Opinion") constitutes this Court's findings of fact and conclusions of law as to the issues presented to the Court during the bench trial proceedings.

### B.  Factual Background

These cases involve Lease Bonds issued by the Sureties relating to equipment leases

originated by CMC.[10]  CMC was a Nevada corporation, which was founded by Ronald Fisher and Sterling Wayne Pirtle in 1997.  Mark Fisher, the son of Ronald Fisher, also took on a significant role in CMC's business.  CMC maintained an office in Escondido, California, from which it conducted a large volume of business.

CMC was engaged in leasing vehicles and equipment to subprime lessees.  CMC then assembled the leases into pools and sold the pools (or their associated income streams) to investors.  Investors in the CMC transactions purchased lease pools, or the income streams associated with those pools, at prices discounted to reflect each investor's negotiated rate of return.

In order to make the lease pools more attractive to potential investors, CMC obtained Lease Bonds from various Sureties to guarantee certain portions of the transactions.  Both of the Sureties involved here issued Lease Bonds on CMC transactions.[11]  Each Lease Bond guaranteed a stream of 60 monthly lease payments.[12]  Apparently, in most of the transactions involved here, CMC did not "fund" the underlying leases—that is, pay for the leased equipment—until the lease pool purchase transactions were consummated and CMC received funds from its investors.  CMC also paid the premiums to the Sureties for the Lease Bonds using funds received at closing.

As this Court explained in the Lead Opinion, there were four transactional forms utilized in the sale of CMC lease pools: (1) certain Banks purchased the income streams directly from CMC; (2) certain Banks purchased the income stream from third parties who purchased from

---

[10] Although CMC had several affiliates, including Commercial Servicing Center, Inc., the distinctions between these entities are not relevant to the issues presented in this bench trial.  Accordingly, except where individual reference is necessary, the CMC-related entities will be referred to collectively as "CMC."

[11] The three Royal transactions took place between November 2000 and April 2001; the five Safeco transactions occurred between September 1999 and April 2000.

[12] The 60 monthly payments apparently represented only a portion of the amounts due under the leases, as most of the leases apparently involved terms longer than 60 months.

CMC; (3) other Banks, known collectively as the "Ohio Banks," lent funds to special purpose entities, who used the loans to purchase the income stream from CMC and secured payment of all obligations under the loans by assigning the income streams from the lease pools and Lease Bonds; and (4) several Banks purchased notes from CMC special purpose entities that were secured by, and to be repaid from, the income stream from the leases.

All of the transactions involved in this bench trial proceeding involved "Ohio Banks," and fell within the third category listed above. The special purpose entities involved here are the "Guardian Entities," each of which was created for the purpose of investing in a CMC lease pool. The principal of the Guardian Entities is Blaine Tanner.

In each of the cases involved here, a Guardian Entity borrowed funds from an Ohio Bank in order to fund a CMC lease pool transaction and, in exchange for the loan, granted its lender bank a security interest in the assets purchased from CMC. The transactions were structured in such a way that the monthly income stream to each lender bank on its lease pools was greater than the monthly payment that the relevant Guardian Entity was required to make to the bank. The lender bank would remit any monthly excess to the Guardian Entities, thus permitting the Guardian Entities to profit from the transactions.

In connection with the Royal transactions, the lenders were Metropolitan Bank & Trust Company, Mid Am Bank, and Second National Bank of Warren. Through a series of mergers, each of those institutions was subsequently acquired by Sky Bank ("Sky"). For simplicity, each of the Guardian Entities' lending institutions in the Royal transactions will be referred to as "Sky." In connection with the Safeco transactions, the lenders were FirstMerit Bank, N.A ("FirstMerit"), The Provident Bank ("Provident"), and Bank One, N.A. ("Bank One").[13]

---

[13] Bank One, N.A. subsequently was acquired by JP Morgan Chase Bank, N.A. For simplicity, however, the Court continues to refer to that entity as "Bank One."

Each of the Sureties relied on a surety broker, Michael Anthony ("Anthony"), of Anthony & Morgan Surety & Insurance Services, Inc. ("A & M"), to locate investors, and to work with those investors to negotiate mutually acceptable transactions. Anthony was an independent broker and was responsible for arranging virtually all of the lease pool transactions at issue here. Anthony also signed many of the Lease Bonds on behalf of the Sureties, pursuant to powers of attorney issued to Anthony by the Sureties.

Throughout the relevant time period, however, Anthony also had a close working relationship with CMC. Undisputedly, Anthony received commissions from CMC on the lease pool transactions. Royal has asserted claims against Anthony in this litigation, alleging that, because of Anthony's undisclosed relationship with CMC, as well as his alleged breaches of duties owed to Royal, Anthony lacked authority to execute Lease Bonds and take other actions on behalf of Royal.[14]

In late 2001, CMC ceased to forward lease payments to its investors and, by early 2002, CMC had closed its doors and ceased operations. CMC filed for bankruptcy on May 30, 2002 and is not a party to the proceedings before this Court. These cases involve, primarily, disputes between investors and Sureties arising from the collapse of the CMC program. The Banks, investors in CMC's Lease Bond program, have sued the Sureties, seeking payment under the Lease Bonds.

The Sureties have denied liability, asserting that they were victims of a massive fraud orchestrated by CMC and its principals, Michael Anthony and others. The Sureties contend that CMC operated a Ponzi scheme, in which early investors were paid using money generated by

---

[14] Royal thus also asserts that the Lease Bonds, as well as the SSAs, are invalid based on Anthony's lack of authority to execute those documents.

new investors, while a large number of the supposed equipment leases were nonexistent or nonperforming. The Sureties also claim to have been defrauded by CMC's representations regarding its financial condition and the condition of its lease pools. As a result of these misrepresentations, the Sureties assert, the Lease Bonds were void *ab initio*, and the Banks cannot recover on these bonds.

As previously noted, the Sureties' ability to assert fraud defenses in this proceeding depends upon the obligation the Lease Bonds were intended to guarantee—*i.e.*, who was the principal obligor and who was the obligee. The bench trial proceedings conducted by this Court, and the evidence presented to the Court by the parties, focused on precisely this issue.

The Court sets forth separate summaries of the facts relevant to the specific Lease Bond transactions involving Royal and Safeco. Since the Court's determination of the relevant facts in these cases centers around the transactional documents executed by the parties, the Court includes detailed summaries of the relevant documents here.

While there is significant overlap among the transactional documents, there are certain material differences as well. Accordingly, the Court begins with a summary of the documents involved in the Royal transactions. To the extent that the documents utilized in the Safeco transactions differ materially, those differences are summarized in the separate section pertaining to Safeco, below.

### 1. Royal

Royal is a defendant on claims brought by CadleRock in three actions—02-16012, 02-16019 and 02-16022. These three actions involve a total of 259 Lease Bonds issued by Royal in three transactions involving Guardian Capital IX LLC ("Guardian IX"), Guardian Capital XV LLC ("Guardian XV"), and Diversity Capital II LLC ("Diversity II"), respectively. Those three

transactions closed on November 20, 2000 (Guardian IX); March 30, 2001 (Diversity II); and April 20, 2001 (Guardian XV).

At trial, Royal introduced the pre-closing lease files for each transaction into evidence. Royal Exhs. 4, 5 and 6. Each transaction entered into by Royal involved multiple transaction documents, as summarized below. At trial, both CadleRock and Royal used a lease executed by Alliance Restoration Services, Inc. ("Alliance Restoration"), as well as the Lease Bond and other documents associated with the Alliance Restoration transaction, as exemplar documents. Accordingly, where reference to exemplar documents is useful, the Court frequently also relies on the Alliance Restoration documents as exemplar documents. Since the Alliance Restoration lease was part of the Guardian IX lease pool, the documents from the Guardian IX transaction also are frequently used as exemplar documents.

### a.    Leases, Vendor Invoices, Delivery and Acceptance Receipts

Each of the 259 Royal Lease Bonds involved in these actions corresponds to an equipment lease ("Lease") executed by CMC (or a CMC affiliate) and an individual or business lessee. The Alliance Restoration Lease, introduced as an exemplar exhibit at trial, was executed by Funder Direct, Inc. (a CMC affiliate and alter ego), and by Alliance Restoration and Andy Farnsworth ("Farnsworth") as co-lessees, on November 10, 2000. Royal Exh. 7, at SKY II 04669-04670. That Lease involved specialized cleaning and restoration equipment, as well as office furniture. The Lease provides for the payment of rent to Funder Direct, Inc., and further provides that the Lease does not take effect until executed by the lessor. Royal Exh. 7, at SKY II 04670.

In connection with the Lease, the pre-closing lease file for Alliance Restoration (Royal Exh. 7) includes vendor receipts, which reflect that the underlying equipment was purchased by

CMC on November 8 and November 9, 2000. Royal Exh. 7 at SKY II 04680-04681. The Alliance Restoration lease file also contains a "Delivery and Acceptance Receipt," executed by Farnsworth on November 10, 2000. Royal Exh. 7, at SKY II 04674.

The Alliance Restoration Delivery and Acceptance Receipt, which is an exemplar for other Delivery and Acceptance Receipts involved in the Royal transactions, provides in part:

> Lessee hereby represents, warrants, and certifies:
>
> 1.    All the equipment described on the Lease Agreement or on any attached schedule has been delivered to the Lessee and properly installed; the Equipment has been inspected and tested by Lessee and is in good and satisfactory operating order; and the Equipment is therefore irrevocably accepted by Lessee for all purposes under the Equipment Lease Agreement.
>
> 2.    Lessee unconditionally accepts the Equipment and acknowledges that it has not been accepted on a "trial" basis.
>
> ***
>
> We now request that you sign the lease and pay the equipment vendor. We understand the importance of this certification to you prior to paying the vendor, and we understand we will be precluded from denying the truth of this certification in the future.

Royal Exh. 7, at SKY II 04674. The Alliance Restoration lease file contains documents reflecting that, on the same date the Lease and the Delivery and Acceptance Receipt were executed, Alliance Restoration paid $395 as a document fee, and forwarded to CMC its last two lease payments, as required by the terms of the Lease. Royal Exh. 7, at SKY II 04676.[15]

---

[15] The Court has reviewed Royal Exhibit 10, which contains a summary of the entirety of the Royal lease files, which were introduced into evidence as Royal Exhibits 4, 5 and 6. With the exception of a few undated leases, the vast majority of lease files (more than 80%) contain leases dated prior to the date of execution of the SSAs. Based upon the Court's review, a single lease file appears to contain a lease dated after the execution of the SSAs.

Certain lease files contained within this summary exhibit appear to be missing Delivery and Acceptance Receipts, or to contain undated Delivery and Acceptance Receipts. In one isolated instance, a single lease file appears to contain a Delivery and Acceptance Receipt dated after the execution of the SSAs. The overwhelming majority of the lease files (more than 80%), however, reflect that both execution of the lease and delivery of equipment occurred prior to the closing of the SSA transaction.

### b. Lease Bonds

Each Lease Bond issued by Royal names the lessee as "principal," Royal as "surety," and CMC as "obligee." *See* Royal Exh. 1, Tab 10; Royal Exh. 2, Tab 10; Royal Exh. 3, Tab 8. All Royal Lease Bonds contain substantially similar language. The Alliance Restoration Lease Bond, executed on November 17, 2000, provides:

> Know All Men By These Presents:
>
> That we, Alliance Restoration Services, Inc., as principal, and Royal Indemnity Company, . . . as Surety, are hereby firmly bound unto Commercial Money Center, Inc., as Obligee. . . .

Royal Exh. 1, Tab 10.

> Paragraph 1 of the Lease Bond references the Alliance Restoration Lease:
>
> The Obligee accepts the bond and Royal Indemnity Company, as Surety, agrees to pay to the Obligee any amounts due and owing by the principal with regards to the lease known as lease number Guardian 2000-21 Series 8—K10110 (Lease), subject to the following provisions:
>
> 1. If all payments required by the Lease are made in accordance with the Lease provisions, then this obligation shall be void; otherwise it shall remain in full force and effect.

Royal Exh. 1, Tab 10.

> Each Lease Bond contains so-called "fraud waiver" language in Paragraph 2:
>
> The Surety is responsible to Obligee for the individual underwriting of each lessee and Lease, including, but not limited to, all related credit matters, issues of fraud, bankruptcy and the accurate and timely performance by any sub-servicer designated by Surety, and Surety shall assert no defenses to any claim under this Bond as a result of any of the foregoing. This Lease Bond and the Surety's obligation constitute an unconditional and absolute guarantee of payment, not collection.

Royal Exh. 1, Tab 10.

---

Paragraph 5 of the Lease Bond defines the occurrence of "default" as follows:

> If the Obligee fails to receive a payment under the Lease from the Surety, as servicer or from any sub-servicer, on the scheduled due date, default under the Lease occurs. Upon such default, the Surety shall have thirty (30) days to cause the default to be remedied. The Surety shall make payment on this Bond to Obligee upon receipt of written demand from Obligee, within this 30 day period.

Royal Exh. 1, Tab 10.

Finally, Paragraph 7 of each Lease Bond contains language permitting CMC to assign the bond to an obligee:

> The Obligee shall notify the Surety within thirty (30) days by registered or certified mail of any assignment of Obligee's rights under this Bond. Any such assignee shall become the Obligee under this Bond, effective as of the date specified in the notice of assignment, immediately upon the Surety's receipt of such notice of assignment.

Royal Exh. 1, Tab 10.

### c.  Purchase and Security Agreements

In each transaction, after the Lease Bonds were issued, CMC assigned the income stream from the relevant lease pool, as well as the associated Lease Bonds, to a Guardian Entity, in exchange for a purchase payment by the relevant Guardian Entity. In order to purchase the rights from CMC, each Guardian Entity borrowed money from Sky.

As part of each assignment transaction, CMC entered into a Purchase and Security Agreement with the relevant Guardian Entity. The Guardian IX Purchase and Security Agreement was executed on November 20, 2000. The Purchase and Security Agreements executed in the transactions involving Guardian XV and Diversity II were substantively identical. *See* Royal Exh. 2, Tab 1; Royal Exh. 3, Tab 1.

The Purchase and Security Agreements contain certain warranties by CMC as to the

validity of the leases and the lessees' underlying obligations. The excerpts below are taken from the Purchase and Security Agreement in the Guardian IX transaction (the pool that included the Alliance Restoration Lease):

> **5.      Representations, Warranties and Covenants of the Seller.** The Seller represents and warrants to and covenants with the Purchaser as follows:
>
> ***
>
> (b)      Each Lease is a true, valid and existing obligation enforceable in accordance with its terms, all signatures, names, addresses, amounts and other statements and facts represented therein are true and correct, and each Lease, and the transaction underlying each Lease, conforms to all applicable laws, rules, regulations, ordinances and orders. The Lease is the only one executed by the Seller with respect to the equipment described in the Lease. The Seller will fully comply with and perform all its duties and obligations under each Lease.
>
> (c)      At the time of the Closing, each Lease Bond will be a true, valid and existing obligation of the Surety enforceable in accordance with its terms, all signatures, names, addresses, amounts and other statements and facts represented in the Lease Bonds will be true and correct, and the Lease Bonds will conform to all applicable laws, rules, regulations, ordinances and orders. At the time of the Closing, the Lease Bonds will be enforceable by and in favor of the Purchaser in accordance with its terms and fully assignable by Purchaser to its lender.
>
> ***
>
> (f)      The equipment that is the subject of each Lease has been, or will have been by the Closing, delivered to the lessee set forth in such Lease and accepted by such lessee in satisfactory condition. . . .

Royal Exhibit 1, Tab 1, at SKY KKYA 00107-00108.

### d.      Sale and Servicing Agreements

In each transaction, CMC also executed a Sale and Servicing Agreement ("SSA") with Royal and the relevant Guardian Entity. On each of the three lease pools issued by Royal, a period of approximately two to three days elapsed between the execution of the Lease Bonds and

execution of the SSAs. *See* Royal Exh. 1, Tab 10; Royal Exh. 2, Tab 10; Royal Exh. 3, Tab 8; Royal Exh. 1, Tab 5; Royal Exh. 2, Tab 6; Royal Exh. 3, Tab 5.

The SSAs govern various matters, including the collection of lease payments and servicing of the lease portfolios. In each SSA, the relevant Guardian Entity is designated as "Purchaser"; CMC as "Seller"; Royal as "Servicer"; and CMC as "Sub-Servicer."

The SSA for the Guardian IX transaction was executed on November 20, 2000. The SSAs executed in the Guardian XV and Diversity II transactions are substantively identical. Royal Exh. 2, Tab 6; Royal Exh. 3, Tab 5. The SSAs define "Lease Obligations" as follows:

> The 11.16900% Lease Obligations, Guardian Capital IX LLC 2000-21 Series 8, consisting of all amounts payable to the Purchaser hereunder in amounts sufficient for the Purchaser to recover the Monthly Base Distribution Amount on each Payment Date up to and including the last Collection Period Payment Date, whether from Scheduled Payments, realizations upon the security interests granted hereunder, or other amounts as provided herein.

Royal Exh. 1, Tab 5, at SKY KKYA 00143.

The SSAs define "Surety Bond" as follows:

> *Surety Bond* With respect to each Lease, a surety bond underwritten and validly issued by ROYAL INDEMNITY COMPANY or its successor, or one of its affiliates, in each instance reasonably acceptable to the Purchaser, or any of their successors, in each instance, which CMC or the Seller has: (i) purchased in order to protect against losses incurred due to default by the Lessee, and (ii) in which the Purchaser is named as loss payee, beneficiary, or obligee.

Royal Exh. 1, Tab 5, at SKY KKYA 00148.

Each SSA provides for the assignment of CMC's rights under the leases and Lease Bonds to the relevant Guardian Entity:

> SECTION 2.1 **Conveyance of Leases and Related.** (a) Subject to the terms and conditions of this Agreement, the Seller, pursuant to the mutually agreed upon terms contained herein, hereby sells,

transfers, assigns, and otherwise conveys to the Purchaser, without recourse (except as provided in this Agreement), as of the Closing Date, all of the right, title and interest, including any security interest, whether now owned or hereafter acquired, of the Seller in and to the following (the "Transferred Assets"):

(i)     all contract rights under each Lease to receive all Scheduled Payments. . . .

***

(iii)     all rights under the Surety Bonds.

Royal Exh. 1, Tab 5, at SKY KKYA 00150.  As part of Section 2.4, CMC, as Seller, also represents that it has "good title to the Lease Assets," and that "[t]he information with respect to the Leases contained in the Schedule of Leases is true, complete, and correct." Royal Exh. 1, Tab 5, at SKY KKYA 00154-00155.

The SSAs contain language providing that, upon full repayment to Guardian of the purchase price it paid to CMC, as well as a negotiated amount of interest, all rights under the Leases and Lease Bonds (included within the definition of "Transferred Assets") revert to CMC:

SECTION 2.8  **Termination of this Agreement.**  This Agreement shall terminate upon the receipt by Purchaser of the Original Principal Amount plus all Interest Distributable Amounts. . . .  *** Any remaining Transferred Assets shall thence be conveyed to the Seller without recourse.

Royal Exh. 1, Tab 5, at SKY KKYA 00157.

The definitional section of the SSAs defines Royal as "Servicer," (Royal Exh. 1, Tab 5. at SKY KKYA 00147), and Section 3.1 authorizes Royal to perform servicing duties, including collecting amounts due under the leases:

SECTION 3.1  **Duties of the Servicer.**  The Servicer is hereby authorized and directed to act as agent, custodian and bailee for the Purchaser and the Seller and in such capacity shall manage, service, administer, and make collections on the Leases. . . .

Royal Exh. 1, Tab 5, at SKY KKYA 00158.

Section 3.6(a)(ii) of the SSA imposes duties upon Royal, as Servicer, to refrain from taking any action that would impair the rights of CMC or the investors:

> (ii)  No Impairment.  The Servicer shall do nothing, by act or omission, to impair the rights of the Purchaser or the Seller in the Leases, the Insurance Policies or the other Lease Assets or Surety Bonds. . . .

Royal Exh. 1, Tab 5, at SKY KKYA 00164.

Under Section 3.7, CMC is designated as the "initial Sub-Servicer," but Royal, as Servicer, retains responsibility for lease servicing:

> SECTION 3.7 **Sub-Servicers.**  CMC is hereby appointed to be the initial Sub-Servicer and assumes all responsibility, as agent for and on behalf of the Servicer, to perform the duties of the Servicer hereunder.  The Servicer may otherwise, with the Purchaser's consent, which shall not be unreasonably withheld, maintain or enter into one or more agreements with Sub-Servicers for the servicing and administration of the Leases by such Sub-Servicers. Notwithstanding the terms or existence of any such agreement between the Servicer and a Sub-Servicer, including CMC, the Servicer shall not be relieved of any of its obligations under this Agreement by reason of such agreement and shall be obligated to the same extent and under the same terms and conditions as if the Servicer alone was servicing and administering the Leases, and neither the Purchaser nor the Seller shall have any obligation to deal with anyone other than the Servicer with respect to the servicing of the Leases; provided, however, that so long as CMC shall be the Sub-Servicer hereunder, the Purchaser and the Seller agree to deal directly with CMC as Sub-Servicer as CMC or the Servicer may reasonably request, but without in any way, releasing Servicer as primary obligor hereunder. . . .

Royal Exh. 1, Tab 5, at SKY KKYA 00166.

Under the terms of the Royal SSAs, CMC has the right, but not the obligation, to make "servicer advances" on the leases—i.e., to cover any shortfall between the lease payments CMC received and the payments due to the investor:

SECTION 4.6 **Servicer Advances.** On each Deposit Date, the Servicer may, but will not be required to, advance and remit to the Collection Account, in such manner as will ensure that there will be immediately available funds in the account on the related Payment Date, an amount (a "Servicer Advance") equal to any Scheduled Payments due during the prior Collection Period but unpaid prior to such Deposit Date with respect to any Lease. . . .

Royal Exh. 1, Tab 5, at SKY KKYA 00171-00172.

Finally, the SSAs also contain a provision permitting CMC, as Seller, to substitute defaulted leases under certain circumstances:

SECTION 9.1 **Substitution.**

(a) Subject to the satisfaction of the requirements set forth in Section 9.1(b) hereof, and as provided in Section 2.6 and, with respect to the Servicer, Sections 3.2(f) and 3.4(g), the Seller and the Servicer will have the right (but not the obligation) at any time to substitute one or more Substitute Leases and the Equipment subject thereto for a Lease (for purposes of this Section 9.1, such Lease referred to as a "Predecessor Lease") and the Equipment subject thereto if:

(i) the Predecessor Lease became (A) a Liquidated Lease, (B) a Warranty Lease or (C) an Adjusted Lease during the immediately preceding Collection Period; and

(ii) the aggregate Principal Balance of the Liquidated Leases, Adjusted Leases and Warranty Leases that are Predecessor Leases shall not in the aggregate exceed 10% of the Initial Pool Principal Balance.

Royal Exh. 1, Tab 5, at SKY KKYA 00180-00181.

e.        **Credit and Security Agreements**

Each Guardian Entity, as "Borrower," entered into a "Credit and Security Agreement" with Sky. Royal was not a party to the Credit and Security Agreements. Each Credit and Security Agreement sets forth the terms of Sky's loan to the Guardian Entity, and grants Sky a security interest in (1) the leases, including the right to receive all scheduled payments under the

leases; (2) the surety bonds associated with each lease transaction; and (3) the relevant SSAs, all of which are included within the broad definition of "collateral." *See* Royal Exh. 1, Tab 4; Royal Exh. 2, Tab 5; Royal Exh. 3, Tab 4.[16]

In Section 6.17 of the Credit and Security Agreements, each Guardian Entity affirms the parties' understanding as to the accuracy and validity of documents contained in the lease files:

> Section 6.17   PURCHASE AGREEMENT, ETC.   Borrower has duly executed and delivered the Purchase Agreement and the Sale and Servicing Agreement, and to Borrower's knowledge, CMC and Royal Indemnity have duly executed and delivered such respective documents as they are parties to respectively and the same are legal, valid and binding obligations thereof.   To Borrower's knowledge, the Leases have been duly executed and delivered by the lessee named therein, and such Leases are the legal, valid and binding obligations of such lessees. . . .

Royal Exh. 1, Tab 4, at SKY KKYA 00025.

### f.      "Comfort Letters"

In connection with the closing of each transaction, Royal delivered a "comfort letter" to the Guardian Entity's lender bank, confirming that the Royal Bonds and SSA were authorized and enforceable.   The "comfort letter" provided by Royal in connection with the Guardian IX transaction states:

> Royal Indemnity Company has approved the attached list of Lease Bonds and the related Sales and Servicing Agreement to be executed by our Attorney-in-fact, Mr. Michael Anthony.   The aggregate liability for these bonds [is] Six Million Five Hundred Forty-Eight Thousand Thirty Nine and 52/100 dollars ($6,548,029.52).   All bonds on this list are in full force and effect. Each Lease Bond executed by Royal Indemnity Company and the related Sales and Servicing Agreement is a valid and binding obligation of the Insurance Company enforceable in accordance with its terms, has been duly authorized by all necessary corporate

---

[16] The Guardian XV transaction apparently differed in that Guardian XV did not grant Sky a security interest in the Surety Bonds.   Rather, Guardian XV and Sky executed an "Assignment of Leases and Obligations," which assigned to Sky "all the Proceeds under the Leases and Surety Bonds. . . ." Royal Exh. 3, Tab 3, at MB&T 00131.

> action and does not violate or constitute a breach of the
> organizational documents of the Insurance Company, or any
> agreement, judgment, or order to which the Insurance Company is
> a party or by which any of its property is bound. The attached
> bonds and insurance premiums have been fully paid and are non-
> cancelable.

Royal Exh. 1, Tab 7, at HNB 00405. Substantively identical letters were provided in connection with the Guardian XV and Diversity II transactions. Royal Exh. 2, Tab 8; Royal Exh. 3, Tab 7.

### g.      Assignments and Notices of Assignment

Upon the closing of each transaction involving Royal, CMC exercised its right to assign its interests under the Lease Bonds to a Guardian Entity. The documents effecting the assignments in the Royal transactions differed slightly in form, but these differences are not relevant to the issues presented in these bench trial proceedings.

Generally, upon execution of an Assignment, CMC provided Royal with a Notice of Assignment, executed by both CMC and the relevant Guardian Entity, through which CMC notified Royal that it had assigned its rights to the Guardian Entity. The Notice of Assignment in the Diversity II transaction states, in relevant part:

> Please accept this letter as notice by the undersigned, as Certificate
> Holder under each of the Surety Bonds . . . that effective on the
> date hereof the undersigned has assigned and sold to [Diversity]
> Capital II, LLC . . . ("Assignee") all of the undersigned's right,
> title and interest in and to the Surety Bonds. . . .
>
> Please be advised that Assignee has granted a security interest in
> all of the Surety Bonds and all its rights thereunder to [Sky]. . . .
> With Assignee's acknowledgment and consent indicated below,
> until further written notice is received by Royal Indemnity
> Company from [Sky], any right to payment arising under any of
> the Surety Bonds accrues to [Sky]. . . .

Royal Exh. 2, Tab 9.[17]

_____

[17] The Notice of Assignment in the Guardian IX transaction is substantially similar, but refers to the "Endorsements" rather than Surety Bonds. Royal Exh. 1, Tab 9. In the Guardian XV transaction, there apparently was no Notice of

### h.      General Indemnity Agreements

On November 20, 2000—the same date as the closing of the Guardian IX transaction—Royal also received executed General Indemnity Agreements (each a "GIA") from CMC, its principals and their spouses, which contained agreements to hold Royal harmless from any losses on any bonds previously or subsequently issued by Royal, including the Lease Bonds. The GIA executed by CMC provides, in relevant part:

> This Agreement is made by the undersigned for the continuing benefit of Royal Indemnity Company . . . for the purpose of saving each and all of them harmless and indemnifying each and all of them from all loss and expense in connection with any Bonds executed on behalf of any one or more of the following persons, firms or corporations: Commercial Money Center, Inc; any company which is subsidiary to Commercial Money Center, Inc. . . .; any person or entity for whom Commercial Money Center Corporation requests a bond or bonds. . . .

CadleRock/Guardian Exh. 5, at RICNB 00405.[18]

### 2.      Safeco

Safeco is a defendant on claims brought by CadleRock in Case No. 02CV16020. That case involves claims by CadleRock against Safeco, seeking payment on the Lease Bonds. Safeco is also a defendant in Case Nos. 03CV16002, 03CV16003, 03CV16004, 03CV16005 and 03CV16006. Those cases involve claims by various Guardian Entities against Safeco seeking payment on the Lease Bonds, as well as various counterclaims by Safeco against the Guardian Entities.

The Guardian Entities involved in transactions with Safeco include Guardian Capital

---

Assignment, as no such document was introduced into evidence at trial. *See* Royal Exh. 3. The Guardian XV transaction apparently also differed in that Guardian XV did not grant Sky a security interest in the Surety Bonds. Rather, Guardian XV and Sky executed an "Assignment of Leases and Obligations," which assigned to Sky "all the Proceeds under the Leases and Surety Bonds. . . ." Royal Exh. 3, Tab 3, at MB&T 00131.

[18] The GIAs do not specifically reference the Lease Bonds; however, Royal has not disputed that the Lease Bonds were intended to fall within the scope of the GIAs.

LLC ("Guardian Capital"); Guardian Capital I, LLC ("Guardian I"); Guardian Capital II, LLC ("Guardian II"); Guardian Capital III, LLC ("Guardian III"); and Diversity Capital One, Inc. ("Diversity One"). The claims in these cases arise from five transactions, which closed on September 24, 1999 (Guardian Capital); December 1, 1999 (Guardian I); December 1, 1999 (Guardian II); February 10, 2000 (Guardian III); and April 21, 2000 (Diversity One), respectively. The transaction documents from the Safeco transactions, as introduced by the parties as trial exhibits, are summarized below.

### a. Leases, Invoices and Supporting Documentation

As with Royal, each Lease Bond issued by Safeco corresponds to an equipment lease executed by CMC and an individual or business lessee. While Safeco did not introduce the entirety of its pre-closing lease files into evidence, Safeco did present significant documentation relating to the execution of the leases and the lessees' acceptance of the leased equipment.

As an exemplar, Safeco introduced into evidence a Master Lease Agreement executed by CMC and by Roy Bresky on behalf of Shandoro Ventures, Inc. ("Shandoro") on February 19, 1999 (the "Shandoro Lease"). Safeco Exh. D.[19] Under the Shandoro Lease, Shandoro committed to make lease payments to CMC. Unlike the Royal exemplar lease introduced into evidence (which provides that it is effective upon signature by the lessor), the Shandoro Lease contains an effective date of February 19, 1999.

Safeco introduced, as Exhibits E, L, and T, Supplementary Schedules to the Master Lease Agreement contained in Exhibit D. Exhibit E contains ten Supplementary Schedules to the Master Lease Agreement, which itemize the equipment leased under each of the separate Shandoro leases. Safeco Exh. E. These Supplementary Schedules apparently are associated with

---

[19] Safeco introduced a second Master Lease Agreement into evidence as Exhibit AA. That Master Lease Agreement, also executed by Safeco and Shandoro, bears the same date and is substantively identical.

the Guardian Capital transaction, which closed on September 24, 1999. Contained in each of these Supplementary Schedules is a line designated "Acceptance Date." In all instances contained in Exhibit E, this line has been left blank.

Safeco's Exhibit E also contains a Certificate of Acceptance in connection with each Supplementary Schedule, each of which contains a representation that the items of leased equipment have been received and installed. Each Certificate of Acceptance provides as follows:

> The Undersigned Lessee acknowledges that the last Leased item of Equipment described above was received by Lessee on [date] ("Acceptance Date") and all Equipment above was fully installed and in good working condition and after full inspection thereof accepts such Equipment as satisfactory for all purposes of the lease.
>
> Lessee certifies that Lessor (i) has fully and satisfactorily performed all covenants and conditions to be performed by and under the Master Lease with the undersigned, and (ii) in accordance with Lessee's directions has delivered the Equipment which was selected solely by the Lessee[.]
>
> Lessee acknowledges that Lessor, relying on this Notice, will promptly pay vendor upon receipt of original invoice or Bill of Sale in proper form, for the Equipment accepted hereby, and that Basic Rent as specified in the Supplementary Schedule shall begin on the Acceptance Date so stated thereon and above.

Safeco Exh. E. Each Certificate of Acceptance contains a line intended for the "Acceptance Date" of the equipment listed in the applicable Supplementary Schedule. Although the Certificates of Acceptance contained in Exhibit E are signed by Roy Bresky, they are undated, and the line denominated "Acceptance Date" has been left blank in all instances. Safeco Exh. E.

Attached to the Supplementary Schedules are, apparently, invoices for CMC's purchase of each of the leased equipment items. Where these invoices are legible, they bear a date of December 8, 1998, a date well prior to the date of the Master Lease Agreement. Safeco Exh. E.

Safeco Exhibit L contains eleven additional Supplementary Schedules. These

Supplementary Schedules apparently are associated with the Guardian I transaction, which closed on December 1, 1999. Of these Supplementary Schedules, nine of them are fully completed and contain an Acceptance Date of December 1, 1999.[20] Safeco Exh. L. The remaining two Supplemental Schedules are signed and dated December 1, 1999, but the "Acceptance Date" has been left blank. Where the attached invoices are legible, they bear a date of December 8, 1998. Safeco Exh. L.

Safeco Exhibit T contains thirteen additional Supplementary Schedules, each apparently associated with the Guardian II transaction, which closed on December 1, 1999. Of the Supplementary Schedules contained in Exhibit T, twelve of them are fully completed and contain an acceptance date of December 3, 1999.[21] Safeco Exh. T. The remaining Supplemental Schedule is signed and dated December 3, 1999, but the Acceptance Date has been left blank. Where the attached invoices are legible, they bear a date of December 8, 1998. Safeco Exh. T.

Safeco has introduced, as Exhibit AA, a second Master Lease Agreement, also dated February 19, 1999, executed by Safeco and by Roy Bresky on behalf of Shandoro. Safeco also has introduced, as Exhibits BB and II, Supplementary Schedules to the Master Lease Agreement attached as Exhibit AA.

Safeco Exhibit BB contains twenty-four Supplementary Schedules, each apparently associated with the Guardian III transaction, which closed on February 10, 2000. Each of those Supplementary Schedules is fully completed and contains an Acceptance Date of February 10,

---

[20] Eight Certificates of Acceptance also bear an Acceptance Date of December 1, 1999. An additional Certificate of Acceptance contains no Acceptance Date, although it is signed, and its associated Supplementary Schedule contains a date of December 1, 1999. Two additional Certificates of Acceptance are unsigned and bear no Acceptance Dates.

[21] Seven Certificates of Acceptance also bear an Acceptance Date of December 1, 1999. The remaining five Certificates of Acceptance contain no Acceptance Date, although their associated Supplementary Schedules bear the date of December 3, 1999. One Certificate of Acceptance is undated and attached to a Supplementary Schedule in which the Acceptance Date is left blank.

2000. Safeco Exh. BB.  Twenty-three of the Certificates of Acceptance also contain an Acceptance Date of February 10, 2000.  Each attached invoice bears a date of December 8, 1998. Safeco Exh. BB.

Safeco Exhibit II contains thirteen Supplementary Schedules, each apparently associated with the Diversity One transaction, which closed on April 21, 2000.  Only two of the Supplementary Schedules contained in Exhibit II are fully completed, and these Supplementary Schedules contain an Acceptance Date of April 21, 2000. Safeco Exh. II.  The Certificates of Acceptance associated with those two Supplementary Schedules also each contain an Acceptance Date of April 21, 2000. [22] Safeco Exh. II.  Again, all the attached invoices, where they are legible, bear the date of December 8, 1998. Safeco Exh. II.

### b.    Lease Bonds

Exemplar Safeco Lease Bonds from each of the five Safeco transactions were introduced into evidence at trial. *See* Safeco Exhs. F, M, U, CC and JJ.  The Safeco Lease Bonds were issued on September 8, 1999 (Guardian Capital); November 16, 1999 (Guardian I); November 22, 1999 (Guardian II); January 20, 2000 (Guardian III); and March 14, 2000 (Diversity One). The Safeco Lease Bonds are substantively identical to the Royal Lease Bonds.

### c.    Purchase and Security Agreements

As with respect to the Royal transactions, each of the Guardian Entities involved in the Safeco transactions received an assignment of CMC's interests in the Lease Bonds.  As part of the assignment transaction, each Guardian Entity entered into a Purchase and Security Agreement with CMC.  Safeco introduced copies of the relevant Purchase and Security Agreements as exhibits at trial. *See* Safeco Exhs. H, O, W, EE, and LL.  The Safeco Purchase

---

[22] The remainder of the Certificates of Acceptance are, like their associated Supplementary Schedules, undated.

and Security Agreements are substantively identical to the Royal Purchase and Security Agreements described above.

### d. Sale and Servicing Agreements

In each of the five Safeco transactions, a Sale and Servicing Agreement was executed between Safeco, the relevant Guardian Entity, and the lender bank. Apparently, in the Safeco transactions, there was often a significant delay between issuance of the Safeco Lease Bonds and execution of the associated SSA. In every transaction involving Safeco, the Lease Bonds predated the SSAs by at least nine days. In the transaction involving Diversity Capital One, Inc., the time interval was 38 days. *See* Safeco Exhs. F, M, U, CC and JJ; Safeco Exhs. G, N, V, DD and KK.

The Safeco SSAs were introduced as evidence at trial. *See* Safeco Exhs. G, N, V, DD and KK. Those SSAs were executed on September 24, 1999 (Guardian Capital); December 1, 1999 (Guardian I); December 1, 1999 (Guardian II); February 10, 2000 (Guardian III); and April 21, 2000 (Diversity One). The Safeco SSAs are substantively identical to the Royal SSAs in all relevant aspects.

### e. Credit and Security Agreements

As with respect to the Royal transactions, each of the Guardian Entities involved in the Safeco transactions borrowed funds from a lender bank in order to purchase the CMC lease pools. The lenders to the respective Guardian Entities in the Safeco transactions were as follows: (1) The Provident Bank[23]—Guardian Capital and Diversity One; (2) FirstMerit Bank, N.A.[24]—

---

[23] The Provident Bank has resolved its claims with Safeco.

[24] During the pendency of this litigation, FirstMerit Bank, N.A. assigned its interest in this action to CadleRock. The details of that transaction are set forth in section I.B.3., below.

Guardian I; and (3) Bank One, N.A.[25]—Guardian II and Guardian III.

In each Safeco transaction, the Guardian Entity involved entered into a Credit and Security Agreement with its lender bank. The Safeco Credit and Security Agreements were introduced as exhibits at trial. *See* Safeco Exhs. I, P, X, FF and MM. Each Credit and Security Agreement sets forth the terms of the lender's loan, and grants the lender a security interest in the Leases, Surety Bonds, and SSAs. The Credit and Security Agreements in the Safeco transactions are substantively identical to those in the Royal transactions in all aspects relevant here.

### f. "Comfort Letters"

Like Royal, Safeco often delivered a "comfort letter" to the Guardian Entity's lender bank in connection with the closing of the lease pool transactions,[26] confirming that the Safeco Bonds and SSA were authorized and enforceable. The language of the letters delivered by Safeco, however, differs slightly from the language contained in the Royal "comfort letters." The "comfort letter" delivered by Safeco in connection with the Guardian I transaction provided as follows:

> SAFECO Insurance Company of America has approved the attached list of Lease bonds to be executed by our Attorney-In-Fact, Mr. Michael Anthony. The aggregate liability for these bonds [is] Six Million One Hundred Thirty Thousand One Hundred Thirty One and 10/100 dollars ($6,130,131.10). All bonds on this list are in full force and effect. Each Lease Bond executed by SAFECO Insurance Company of America is a valid and binding obligation of the surety enforceable in accordance with its terms, has been duly authorized by all necessary corporate action and does not violate or constitute a breach of the organizational documents of the Surety, or any agreement, judgment, or order to which the Surety is a party or by which any

---

[25] Bank One, N.A. has not resolved its claims with Safeco. JPMorgan Chase Bank, N.A., as successor in interest to Bank One, N.A., remains a party to Case No. 02CV16014. Neither Bank One, N.A. nor its successor in interest, however, were parties to the within bench trial proceedings.

[26] These letters, however, do not appear to have been delivered by Safeco in every transaction.

of its property is bound.  Upon notification of non-payment to SAFECO, SAFECO will remit payment to FirstMerit regardless of payment made to intermediaries or services. . . .

CadleRock/Guardian Exh. 19.  The "comfort letter" delivered by Safeco in the Guardian II transaction is substantively identical. CadleRock/Guardian Exh. 38.  The "comfort letter" delivered in the Guardian Capital transaction is similar, but omits the last sentence. CadleRock/Guardian Exh. 17.  "Comfort letters" for the Guardian III and Diversity One transactions were not introduced into evidence at trial, and it is unclear whether any such letters exist.

### g.  Assignments and Notices of Assignment

When the SSAs in the Safeco transactions were executed, CMC also executed an Assignment, assigning its rights to the lease pool income, as well as its rights under the Lease Bonds, to the relevant Guardian Entity. *See* Safeco Exhs. J, Q, Y, GG and NN.  All of the Assignment documents in the Safeco transactions were substantively identical.  The Assignment in the Guardian Capital transaction provided in relevant part:

> IN CONSIDERATION OF THE SUM OF Three Million Nine Hundred Thousand 00/100 DOLLARS ($3,900,000.00), the receipt, adequacy and sufficiency of which is hereby acknowledged, Commercial Money Center, Inc. . . . (the "Assignor"), hereby assigns, transfers and con[v]eys to Guardian Capital, LLC . . . (the "Assignee") . . . the following:
>
> (1)     All contract rights under each Lease. . .;
>
> (2)     All funds on deposit from time to time in the Collection Account;
>
> (3)     All rights under the Surety Bonds; and
>
> (4)     Any and all proceeds of the foregoing. . . .

Safeco Exh. J.

At about the same time, a Notice of Assignment signed by CMC and by the Guardian Entity to which the pools had been assigned was sent to Safeco. *See* Safeco Exhs. K, R, Z, HH and OO. The language of the Safeco Notices of Assignment is substantially similar in all respects to the Notices of Assignment executed in the Royal transactions.

### h.      General Agreements of Indemnity

Safeco, like Royal, received indemnity agreements from CMC in connection with certain of the Safeco bonds. The relevant Safeco agreement was the General Agreement of Indemnity ("GAI"). Both CMC and its parent corporation, Capital Markets Corporation, executed GAIs in favor of Safeco. The GAIs were executed by CMC and Capital Markets Corporation on April 30, 1999 and June 24, 1999, respectively. *See* Safeco Exhs. A, B.

The language in Safeco's GAI differs from that present in Royal's General Indemnity Agreement. Safeco's GAI provides, in relevant part:

> THIS AGREEMENT is made by the Undersigned in favor of the SAFECO INSURANCE COMPANIES for the purpose of indemnifying them from all loss and expenses in connection with any Bonds for which any SAFECO INSURANCE COMPANY now is or hereafter becomes Surety for any as Principal: COMMERCIAL MONEY CENTER, INC. . . . .

*See* Safeco Exh. A (the GAI executed by Capital Markets Corporation is substantially similar).

Safeco also introduced into evidence an Indemnity Agreement executed in favor of Safeco by a lessee on the Lease Bond program. *See* Safeco Exh. C. That Indemnity Agreement was executed by Roy H. Bresky ("Bresky"), president of Shandoro, on behalf of Shandoro[27] and in his personal capacity. In the Indemnity Agreement, Shandoro and Bresky promised:

> To reimburse Surety, upon demand made for; and to indemnify

---

[27] Bresky signed the Indemnity Agreement as "Roy H. Bresky, Pres.," and also executed a separate section titled, "Statement of Personal Indemnitors." Presumably, the first of these two signatures was intended to be a signature on behalf of Shandoro. The name of the Shandoro entity, however, does not appear anywhere within the document.

and keep indemnified Surety from:

> . . . all loss, contingent loss, liability and contingent liability claim, expense . . . for which Surety shall become contingently liable by reason of such suretyship, whether or not Surety shall have paid same at the time of demand. . . .

Safeco Exh. C.

### 3.     Subsequent Transfers of Investor Interests

As noted previously, CMC ceased forwarding payments to investors between December 2001 and January 2002.  CMC's collapse caused all of the Guardian Entities to default on their loans from the lender banks.  Certain banks pursued state court claims against the Guardian Entities and secured judgments against those entities; however, none of the state court proceedings are relevant to the issues presented here.

After the commencement of this litigation, FirstMerit Bank, N.A., a lender in the Guardian I transaction, transferred all of its rights in Case No. 02CV16020 to CadleRock, through an Asset Sale Agreement executed on September 9, 2004.

On November 9, 2005 (nearly four years after CMC had ceased to pay its investors), Sky foreclosed on its collateral, by conducting secured party sales with respect to the Guardian Entities' interests in the leases, bonds, and SSAs involved in its pools.  Sky's secured party sales were conducted pursuant to Notifications of Disposition of Collateral (each a "Notification of Disposition"), which enumerated the property to be sold.  Sky was the successful purchaser at its secured party sales, and thus took title to all of the interests of Guardian IX, Guardian XV, and Diversity II in the collateral, including the Royal Lease Bonds.

On December 14, 2005, Sky entered into an Assignment and Acceptance Agreement ("A&A Agreement") with The Cadle Company (an affiliate of CadleRock), and assigned to The Cadle Company specific rights relating to the three lease pools.  Subsequently, in June 2006, The

Cadle Company entered into an Assignment of the Assignment and Acceptance Agreement (the "Further Assignment") with CadleRock, under which The Cadle Company assigned all of its rights under the A&A Agreement to CadleRock.

Pursuant to the A&A Agreement and the Further Assignment, in August 2006, CadleRock became a plaintiff in Case Nos. 02CV16012, 02CV16019, and 02CV16022. The parties still disputed, however, the scope of the rights acquired by CadleRock through the A&A Agreement and the Further Assignment. On March 11, 2009 (Doc. 2214), this Court issued an Order finding that, while the A&A Agreement (and subsequently, the Further Assignment) transferred to CadleRock all of Sky's rights under the Lease Bonds, Sky did not transfer to CadleRock its rights under the SSAs. Accordingly, the Court held that CadleRock, as Sky's assignee pursuant to the A&A Agreement, possessed no rights under the Royal SSAs.[28]

Against this complex and multilayered factual backdrop, the Court considers the issues and evidence presented to it in this bench trial proceeding.

II.     FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.      Evidentiary Standard

As all parties apparently agree, the central focus of the inquiry presently before the Court must be the terms of the documents executed in connection with these transactions—all of which have been laid out in detail earlier in this Opinion. There is also no serious dispute that CadleRock and Guardian, as "plaintiffs" in this action seeking to recover under the Lease Bonds, bear the burden of demonstrating that the transaction documents support Plaintiffs' proposed construction.

---

[28] Royal has settled its disputes with Sky in these actions.

There is substantial disagreement among the parties, however, as to the evidentiary standard applicable to the Plaintiffs' proof in these cases. Plaintiffs claim a "preponderance of the evidence" standard applies, while the Sureties argue that the Court should use a more stringent "clear and convincing" standard. This threshold question must be decided before any other issues are resolved in these bench trial proceedings. In considering this issue, the Court applies California law, which has been cited by both parties in their briefs.

The Sureties argue that CadleRock and Guardian can establish obligee status on the Lease Bonds only by meeting the "clear and convincing evidence" standard necessary to support reformation of the express terms of the Lease Bonds. *See Inamed Corp. v. Medmarc Cas. Ins. Co.*, 258 F. Supp. 2d 1117, 1123 (C.D. Cal. 2002). Plaintiffs dispute this proposition, and assert that the Court can, and should, determine that the Guardian Entities are the intended obligees on these transactions[29] through contractual interpretation, without resort to concepts of reformation, or the heightened standard applicable thereto.[30]

For the reasons set forth herein, the Court finds that, in order to prevail in this action, Plaintiffs must convince the Court that it should order reformation of the Lease Bonds.

---

[29] Sky and FirstMerit, the Guardian Entities' lenders, acquired security interests in the lease bonds by virtue of the Credit and Security Agreements. *See* Sections 1.B.1.e. and 1.B.2.e., *supra*. Sky subsequently acquired additional rights by conducting secured party sales with respect to the Guardian Entities' interests in the leases, bonds and SSAs. CadleRock acquired all of its claims in this litigation by virtue of assignments from Sky and FirstMerit after the commencement of litigation. CadleRock, accordingly, cannot assert original obligee status. CadleRock does not appear to dispute this proposition. For purposes of these bench trial proceedings, the parties dispute only whether a Guardian Entity, rather than CMC, was the intended obligee on the Lease Bonds. For simplicity, this Memorandum of Opinion and Order may occasionally refer to the obligee interests of the "Plaintiffs" or "Banks."

[30] Alternatively, Plaintiffs assert, each SSA should be viewed as a novation of the original Lease Bond contracts. *See, e.g.,* RESTATEMENT (SECOND) OF CONTRACTS § 280; Cal. Civ. Code § 1531. Plaintiffs suggest that a novation can be found without reforming the language of the Lease Bonds since, they assert, the parties' intention to create a novation is apparent from the language of the bonds. *See, e.g., Fanucchi & Limi Farms v. United Agri Prods.*, 414 F.3d 1075, 1082 (9th Cir. 2005). Since the Court finds that the Lease Bonds are unambiguous and the Banks can prevail only through a reformation of the language of the Lease Bonds, the Court does not separately address the evidentiary standard applicable to a novation claim. In section II.B.3.e. of this Opinion, however, the Court considers the evidence presented by Plaintiffs in support of their novation claim, and determines that the evidence is insufficient to sustain a claim of novation under any standard.

Accordingly, under California law, Plaintiffs must present clear and convincing evidence sufficient to prove that the parties intended to identify the Guardian Entities as original obligees, and that the Lease Bonds should be rewritten to effectuate that intent.

The interpretive task presented to the Court here is, at its core, one governed by traditional contract law:

> The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. . . . The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. . . .

*Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (Cal. App. 1st Dist. 1998). "The presumption is that a written instrument deliberately executed expresses the intention of the parties. . . ." *Kayser v. Gorman*, 3 Cal. 2d 478, 486 (1935). In determining the contractual intent of parties to a surety contract, surety contracts are construed under the same rules as any other contract. *See, e.g.,* Cal. Civ. Code § 1647; *River Bank Am. v. Diller*, 38 Cal. App. 4th 1400, 1415 (Cal. App. 1st Dist. 1995).

CadleRock and Guardian argue that the concepts of interpretation and revision are not conceptually distinct under California law, *see, e.g.*, Cal. Civ. Code §§ 1640, 3399, and, thus, that the Court may ignore the parties' designation of CMC as "obligee" without actually reforming the parties' agreement. The essence of Plaintiffs' argument is that the Lease Bonds are ambiguous under California law, because they are subject to more than one reasonable interpretation, *citing MacKinnon v. Truck Ins. Exchange*, 31 Cal. 4th 635, 648 (2003). Accordingly, Plaintiffs assert, the Court may resolve the ambiguity on the basis of the evidence

presented without reforming the language of the bonds.

This Court first examined the language of the Lease Bonds in its Lead Opinion on the Motions for Judgment on the Pleadings ("Lead Opinion")(Doc. 1708), issued August 19, 2005. In the Lead Opinion, the Court examined the language of the various transaction documents executed by the parties, focusing particularly on the Lease Bonds and SSAs. The Court also considered the indemnity agreements executed by CMC and its principals. While the Court agreed that the existence of indemnity agreements executed by CMC in favor of the Sureties lent some credence to the Banks' argument that CMC was a Lease Bond principal, the Court held that the indemnity agreements alone provided insufficient basis to disregard the plain language of the Lease Bonds. Since the Lease Bonds expressly named CMC as obligee, the Court found that the Banks could override that designation only by showing that the language of the Lease Bonds did not reflect the parties' contractual intent.

The Court summed up its views as follows:

> The Court's ability to examine the substance of the transaction as a whole, however, is limited by the context in which the issue is presented to the Court. On a Rule 12(c) motion, the Court may not receive evidence outside the narrow transaction documents to determine the parties' intent in entering into the [Lease Bonds]. At this point, the Court is limited to the parties' pleadings and the plain language of the documents attached to, or incorporated in, those pleadings. Unquestionably, the [Lease Bonds] at issue here name only CMC as an obligee; in fact, there is no mention of any of the investor Banks in any of the [Lease Bonds].
>
> The Banks argue that the Court's evaluation of the transaction documents should not be limited to the [Lease Bonds]; rather, the Court must also consider the indemnity agreements between CMC and the Sureties. The Banks assert that construing these documents together permits the Court to divine the intent of the parties and thus, the true substance of their transaction. The Court agrees that the indemnity agreements, which designate CMC as principal, and affirmatively oblige CMC to indemnify each respective Surety, shed significant light on the transaction and tend

35

> to indicate the Sureties' intent to benefit parties other than CMC through the lease guarantee transactions. The difficulty is that the Banks' proposed construction contradicts the plain language of the [Lease Bonds], each of which explicitly conveys rights only to CMC. The Court finds that it may disregard the plain language of those documents only through a reformation of the [Lease Bonds], or by finding – after consideration of all aspects of the parties' relationship – that the intention of the parties is other than as expressed in those [Lease Bonds].

Doc. 1708, at 25-26. The Court acknowledged that California law requires clear and convincing evidence to permit reformation on the ground of mutual mistake, *see Inamed Corp.*, 258 F. Supp. 2d at 1117, and noted that such a standard generally can be met only through the introduction of parol evidence. The Court went on to find that neither the SSAs nor the Indemnity Agreements were sufficient as a matter of law to satisfy the "clear and convincing" standard or to override the express terms of the Lease Bonds, which designated CMC as Obligee. *See id.* at 27.

The Court now approaches this Opinion in an entirely different procedural posture and with the benefit of substantial evidence presented by the parties during the bench trial proceedings. The Court's renewed examination of the transaction documents, however, in conjunction with extensive extrinsic evidence as to the parties' contractual intent, fails to convince the Court that the Lease Bonds are reasonably subject to a different interpretation through contractual construction alone.

Under California law, a court interpreting a contract must first determine whether the contract is ambiguous. *See Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1351 (Cal. App. 2d Dist. 2004). A court determines contractual ambiguity as a matter of law after receiving (without formally admitting) extrinsic evidence of the parties' intent. *See id.* "An ambiguity arises only if there is more than one construction in issue which is semantically permissible . . . ." *Schaffter v. Creative Capital Leasing Group, LLC*, 166 Cal. App. 4th 745, 751 (Cal. App. 4th Dist.

2008)(internal quotation omitted). "When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is 'reasonably susceptible' to the interpretation urged by the party. . . ." *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 393 (2006)(citation and quotation omitted). "Extrinsic evidence is admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible. . . ." *Parsons v. Bristol Development Co.*, 62 Cal. 2d 861, 865 (1965)(internal quotation omitted).

The Court's ruling in the Lead Opinion, although made at the pleading stage, was rendered upon careful consideration of virtually all of the transaction documents in this case. In essence, the Court ruled in the Lead Opinion that the SSAs and other transaction documents were insufficient to allow the Court to conclude as a matter of law that the word "CMC" contained in the Lease Bonds actually meant "Guardian" (or another Bank entity). Similarly, the Court now finds that the transaction documents and other extrinsic evidence presented are insufficient to support a finding that the word "CMC" is "reasonably susceptible" to an interpretation whereby it would mean "Guardian."

As noted in the Lead Opinion, although certain language in the indemnity agreements and SSAs lends support to the Banks' position, an interpretive difficulty is created by "the juxtaposition of this language with [Lease Bonds] that contain <u>no mention</u> of the Banks' rights. . . ." *See* Lead Opinion, Doc. 1708, at 27 (emphasis in original). In the Court's view, even considering the Lease Bonds in light of the extrinsic evidence presented, those Bonds cannot be construed as ambiguous in the sense that "CMC" is susceptible to meaning "Guardian." As one California court has explained:

> [E]vidence of the meaning the parties gave to the contract language is only relevant if the contract language itself is reasonably susceptible to that meaning. Thus, extrinsic evidence cannot be used to show that when the parties said "Bunker Hill Monument"

> they meant "the Old South Church" or that when they said "pencils" they really meant "car batteries."

*Curry v. Moody*, 48 Cal. Rptr. 2d 627, 631 (Cal. App. 2d Dist. 1995)(citations omitted).

Plaintiffs attempt to avoid this dilemma by suggesting that the Court should construe the transaction documents together as a unified whole. *See, e.g.,* Cal. Civ. Code § 1642, *U.S. Bank Nat'l Ass'n v. United Air Lines, Inc. (In re United Air Lines)*, 438 F.3d 720, 727-28 (7th Cir. 2006)(applying third-party beneficiary analysis to find duty to a contractual non-party). If it does so, Plaintiffs assert the Court can find that entities other than CMC were the intended obligees on the bonds, despite bond language to the contrary.

The Court certainly has been mindful of each document's role in the entire transaction. Nonetheless, while jointly executed contracts must be considered in light of one another, those contracts are not merged into a single document. *See Pankow Constr. Co. v. Advance Mortg. Corp.*, 618 F.2d 611, 616 (9th Cir. 1980). Even more significantly, consideration of the entirety of the transaction cannot render the language of the Lease Bonds susceptible to a semantically impossible meaning. *See, e.g., Parsons*, 62 Cal. 2d at 865.

For the reasons set forth in the Lead Opinion and in sections II.B.1. and II.C.1. of this Opinion, the Court finds that the Lease Bonds unambiguously denominate CMC as obligee and are not susceptible to a contractual construction that would inject the Guardian Entities into the language of the Lease Bonds. Accordingly, Plaintiffs may prevail in this action only by demonstrating, by clear and convincing evidence, that the language of the Lease Bonds did not reflect the parties' actual intent to name the Guardian Entities as obligees.[31]

In light of this determination, the Court briefly summarizes the California legal standards

---

[31] This conclusion is consistent with the Court's analysis in the Lead Opinion of the plain language of the Lease Bonds. As analyzed in detail later in this Opinion, this conclusion also is consistent with the Court's analysis of the entirety of the evidence presented during the bench trial proceedings.

applicable to a reformation claim. Under California law, a contract may be reformed where a plaintiff demonstrates that, as a result of fraud, mutual mistake, or unilateral mistake (known by the other party), the contract does not reflect the parties' true contractual intention. *See Hess v. Ford Motor Co.*, 27 Cal. 4th 516, 524 (2002). The California Civil Code expresses this standard:

> When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value.

Cal. Civ. Code § 3399.

> In revising a written instrument, the court may inquire what the instrument was intended to mean, and what were intended to be its legal consequences, and is not confined to the inquiry what the language of the instrument was intended to be.

Cal. Civ. Code § 3401. *See also F. P. Cutting Co. v. Peterson*, 164 Cal. 44, 47 (1912)("[t]he fact that the parties used the very words which they intended to use is not always sufficient cause for refusing relief of this character. There may be no mistake as to the words used or to be used, and at the same time there may have been a mutual mistake as to some other matter of fact, affecting the meaning or application of the words. . . .").

A court cannot employ reformation to "make new contracts for the parties," *Hess*, 27 Cal. 4th at 524, but "may only reform the writing to conform with the mutual understanding of the parties at the time they entered into it. . . ." *Id.*, *see also Caviglia v. Jarvis*, 135 Cal. App. 2d 415, 421 (Cal. App. 3d Dist. 1955)("the duty of a court is to reform instruments to express the actual understandings of the parties and not to try to improve those understandings. . . ."). California courts have established stringent proof standards for plaintiffs seeking to reform a writing. *See, e.g., Inamed*, 258 F. Supp. 2d at 1123. *See also Tomaselli v. Transamerica Ins. Co.*, 31 Cal.

Rptr. 2d 433, 444 (proof must be "so clear as to leave no substantial doubt. . . .").

Contrary to the arguments advanced by the Plaintiffs, California courts treat interpretation and reformation as conceptually distinct:

> [T]he processes of 'interpretation' on the one hand, and of 'revision' or 'reformation' on the other hand are mutually exclusive. The former requires the interpreter to derive meaning from the written word, while the latter is invoked when the written word fails to express the parties' actual agreement. . . .

*In re Beverly Hills Bancorp*, 649 F.2d 1329, 1333 (9th Cir. 1981).

Under California law, reformation may be effected only upon a demonstration, by clear and convincing evidence, that the language of the parties' agreement reflects a meaning different from that intended by the parties:

> [I]n the absence of fraud or mistake, the intention of the parties as expressed in the agreement is controlling, and courts are not empowered under the guise of construction or explanation to depart from the plain meaning of the writing and insert a term or limitation not found therein. . . .

*Tanner v. Title Ins. & Trust Co.*, 20 Cal. 2d 814, 824 (1942).

The Court has reviewed all of the evidence presented by the parties in light of the above standards. Applying the California law standards summarized in this section, the Court sets forth its detailed findings of fact and conclusions of law below. Due to certain differences in the transactional documents between the Royal and Safeco transactions (as outlined above), as well as factual differences between the parties involved and their respective understandings of the transactional structure, the Court separately analyzes the parties' transactional intent as it relates to the Royal transactions and the Safeco transactions.

## B.      Royal Transactions

CadleRock and Royal presented various exhibits at trial, as well as numerous witnesses, focusing on the issue of the intent of the parties as of the execution of the Royal Lease Bond transactions. In addition to evidence focusing on the document terms relating specifically to obligee status and assignment of interests, a substantial portion of the evidence presented focused on the timing of various events—including the effective date of the Lease Bonds, and delivery and funding of the underlying leased equipment. All parties argued that the provisions made for timing in these transactions provide evidence relevant to the parties' intent as to the identity of the obligee.

Royal generally argued that the Lease Bond transactions were structured and intended by the parties to operate as "two-stage" transactions. In the first stage, according to Royal, CMC executed the underlying leases with its lessees, purchased equipment and secured the Royal Lease Bonds. In the second stage, the Guardian Entities secured funding from lenders, purchased rights in the lease pools, received assignments of CMC's rights in the Lease Bonds, and ultimately pledged or assigned those rights to the lenders. Royal presented evidence tending to show that, at least based upon the lease documentation, all parties would have understood that an effective lease existed as of the date of execution. Similarly, Royal contended, the Lease Bonds were intended to be effective as of execution, and a valid surety relationship, with CMC as obligee, was created immediately upon Royal's issuance of Lease Bonds.[32]

CadleRock, on the other hand, generally argued that the "first stage" of the Lease Bond transactions created no more than incomplete or "inchoate" rights, and that no party actually was

---

[32] Royal does not deny that it understood that CMC intended to transfer its rights as the original obligee to Guardian or others, or that such transfer would occur almost immediately after execution of the Lease Bonds. Royal argues, however, that the fact that a second stage was contemplated in the transaction does not alter the legal significance of the first.

intended to have enforceable rights until after the execution of the SSA, the receipt of funds from the lender bank, and the transfer of CMC's rights to a Guardian Entity. CadleRock presented evidence tending to show that all parties knew that a "second stage" transaction would occur, and that CMC intended to sell or transfer its rights under the Lease Bonds to investors. Through its evidence, CadleRock attempted to demonstrate that the parties never intended or expected CMC to invoke any rights to payment under the Lease Bonds; rather, all parties anticipated that such rights would be invoked by the Guardian Entities or subsequent assignees. Based on these understandings, CadleRock contended, the parties created an obligation under which the Guardian Entities were the first *real* obligee, and thus that the Guardian Entities should be treated as the original obligee.

The Court conducts a detailed review below of the material evidence presented by all parties relating to the Royal Lease Bonds[33]—both the transactional documents presented as trial exhibits, and witness testimony as to the parties' intent. Upon consideration of all relevant evidence presented with respect to the Royal transactions, the Court finds that Plaintiffs have failed to satisfy their burden of demonstrating that the Guardian Entities, and not CMC, were the intended obligees on the Royal Lease Bonds. Accordingly, Plaintiffs are not entitled to reformation of the Royal Lease Bonds.

### 1. The Transaction Documents Support a Finding that CMC Is the Intended Obligee of the Lease Bonds

This Court's review of the evidence must commence with the terms of the transaction documents. While the transactions at issue are complex, the Court's review of the entirety of

---

[33] Royal was granted summary judgment against the Guardian Entities in Case Nos. 02-16012, 02-16018, 02-16019 and 02-16022 on September 15, 2008 (Doc. 2209), and accordingly, claims by the Guardian Entities against Royal were not part of the within bench trial proceedings. The Court still reviews all evidence presented by the Guardian Entities at trial, even to the extent that such evidence bears on the intent of the parties to the Royal transactions.

these transactions supports Royal's argument that CMC was the intended obligee in the Royal transactions.

The Court's starting point is the parties' designation of CMC as "obligee" in the Royal Lease Bonds.  The first paragraph of the Lease Bonds provides that "Royal Indemnity Company, . . . as Surety, [is] hereby firmly bound unto <u>Commercial Money Center, Inc., as Obligee</u>. . . ." Royal Exh. 1, Tab 10 (emphasis added).  The first paragraph of the Lease Bonds, moreover, also references the underlying lease, tying the bond amounts to "any amounts due and owing by the principal with regards <u>to the lease</u>. . . ." Royal Exh. 1, Tab 10 (emphasis added).

Notably, there is no language within the Lease Bonds suggesting that the bonds are not intended to be effective on issuance.  On their face, the Lease Bonds do not contemplate that an obligation will spring into effect upon the occurrence of a subsequent event—such as the execution of an SSA or payment to an equipment vendor.

Similarly, no language within the Lease Bonds gives any suggestion that a party other than CMC could be the intended original obligee of the bonds.  Paragraph 7 of the Lease Bonds, however, references the possibility of <u>assignment</u> of CMC's interests.  That paragraph grants CMC, as obligee, the right to assign "Obligee's rights under this Bond" to an "assignee . . . ," and specifically provides that such an assignee "shall become the Obligee under this Bond <u>as of the date specified in the notice of assignment</u>. . . ." Royal Exh. 7, Tab 10 (emphasis added).

The assignment language contained in the Lease Bonds contemplates that parties other than CMC may obtain obligee status by assignment of the rights of CMC <u>subsequent to</u> the date of execution of the Lease Bonds.  Notably, although the parties could have provided obligee status to each assignee <u>retroactive</u> to the date of issuance of the Lease Bond—thus effectively rendering CMC's original obligee status a nullity—the parties did not do so in any of the Lease

Bonds issued in the Royal transactions.  Thus, based simply upon the language contained within the four corners of the Lease Bonds, the only conclusion to be drawn is that the Lease Bonds were intended to create enforceable obligations by Royal in favor of CMC, at least for the time period prior to CMC's assignment of its interests to others.

The Court next examines the Royal lease files relating to the underlying equipment leases, which were introduced at trial as Royal Exhibits 4, 5, and 6 (as well as exemplar Exhibits 7 and 8).  All parties agree that the Royal lease files accurately reflect the documentation provided to Royal relating to each underlying lease prior to or at the closing of each SSA transaction.

The Royal lease files are significant because they provide the clearest evidence available of the parties' understandings at the time the parties entered into the Royal transactions.  While the Court does not disregard the potential relevance of post-transactional documents as circumstantial evidence of transactional intent, the Court finds that the documents executed as of the closing of the transactions, and the representations made therein, provide the truest snapshot of the parties' understandings at the relevant moment in time.  Again, a detailed review of the lease files reflects the parties' understanding that enforceable leases and Lease Bonds had been executed and were in place prior to the closing of each SSA transaction.

The Alliance Restoration lease file (Royal Exh. 7), which was utilized by both Royal and CadleRock as an exemplar during the trial, contains a lease executed by Andy Farnsworth and Alliance Restoration Services, Inc. on November 10, 2000. Royal Exh. 7, at SKY II 04669-70. That file also contains a Delivery and Acceptance Receipt signed by Mr. Farnsworth on November 10, 2000. Royal Exh. 7 at SKYII 04674.  In the Delivery and Acceptance Receipt, Mr. Farnsworth acknowledges the receipt and installation of the leased equipment, and requests

that the lessor (Funder Direct, Inc.) "sign the lease and pay the equipment vendor." In addition, the Alliance Restoration lease file contains (1) invoices for leased equipment dated November 8, 2000 and November 9, 2000, respectively (Royal Exh. 7, at SKYII 04680-81); (2) checks for certain fees due to Funder Direct, Inc. dated November 10, 2000 (Royal Exh. 7, at SKYII 04676); and (3) an Indemnity Agreement executed by Alliance Restoration and Mr. Farnsworth on November 11, 2000. (Royal Exh. 7, at SKYII 04683).

As noted above, the documents contained in each Royal lease file represent the entirety of the information available to the parties as of the closing of the Royal transactions. Based on a review of the contents of the Alliance Restoration lease file at or before the closing on November 20, 2000, any reasonable examiner would have concluded that (1) Alliance Restoration had executed a valid Lease; (2) Alliance Restoration had executed certain other documents and paid certain fees to Funder Direct in relation to the commencement of the Lease; (3) the equipment subject to the Lease had been purchased; and (4) the leased equipment had been delivered to Alliance Restoration and installed on the premises. As set forth in section I.B.1.a. of this Opinion, an examination of any one of the vast majority of the Royal lease files would have led to the same conclusion.[34]

Much evidence was presented by both Royal and CadleRock regarding the relationship between the Royal Lease Bonds and the SSAs. As previously noted, the SSAs were executed by the parties as part of the "second stage" of these transactions and govern various matters, including the collection of lease payments and servicing of the lease portfolios. Additionally, the SSAs reference the purchase by the Guardian Entities of the rights of CMC, including CMC's

---

[34] As discussed in detail later in this Opinion, Howard Bobrow, a Kahn Kleinman attorney who represented certain Banks at the time of the closing of the Royal Lease Bond transactions, testified that he did check the lease files prior to closing for the presence of leases and supporting documentation, including Delivery and Acceptance Receipts. Bobrow Depo., at 34-35.

rights under the Lease Bonds. CadleRock notes that all parties to the transaction are signatories to the SSAs, and contends that the parties actually intended that it would be the SSAs that would create and define the parties' ongoing obligations in these transactions. Thus, CadleRock asserts, the Lease Bonds can be understood only by reading them in conjunction with the SSAs, and the Lease Bonds should be deemed ineffective until the execution of the SSAs.

Unequivocally, the Lease Bonds and SSAs were executed by the parties as part of the same overall transaction, with the intent that these documents would work in tandem to effect the desired transaction structure. The Royal Lease Bonds contain implicit references to the SSAs, particularly in the definition of "default" contained in paragraph 5 of the bonds: "If the Obligee fails to receive a payment under the Lease <u>from the Surety, as servicer or from any sub-servicer</u>, on the scheduled due date, default under the Lease occurs. . . ." Royal Exh. 1, Tab 10 (emphasis added). The "servicer" and "sub-servicer" language of paragraph 5 is, in each case, an apparent reference to the SSA that was contemplated in each transaction, and clearly reflects that the parties anticipated the execution of SSAs in each Lease Bond transaction. Plaintiffs contend, therefore, that this language demonstrates that (1) the Lease Bonds cannot be understood without reference to the SSAs; and (2) reference to the terms of the SSAs shows that the actual obligations guaranteed were those of the Guardian Entities, not those of CMC.

Although the "default" language, standing alone, could arguably be read as incorporating the terms of the SSAs, the Court's consideration of the terms of all relevant documents defeats that interpretation. The Court is, rather, compelled to find that the underlying obligation for each Lease Bond is its specified Lease. First, each Lease Bond, in Paragraph 1, explicitly ties the obligations guaranteed under each bond to the underlying Lease. Second, while paragraph 5's definition of default references a payment to be received "from any sub-servicer," the referenced

payment is again explicitly designated as a payment "under the Lease." Given this unambiguous language, the references in paragraph 5 to payments "from [the] servicer or . . . any sub-servicer. . ." can reasonably be viewed as referring only to method of transmittal, not to a separate payment obligation.[35]

In fact, the terms of the SSAs themselves confirm that the parties did not intend the SSAs to create the underlying obligation for the Royal Lease Bonds. The Guardian IX SSA, executed on November 20, 2000, was used by the parties as an exemplar at trial, and will be used by the Court as an exemplar in this Opinion.[36] That SSA denominated Guardian IX as Purchaser, CMC as Seller and Sub-Servicer, and Royal as Servicer.

As noted previously, the SSAs defined "Surety Bond" as a surety bond underwritten and issued by Royal, "which CMC or the Seller has (i) purchased in order to protect against losses incurred due to default by the Lessee, and (ii) in which the Purchaser is named as loss payee, beneficiary, or obligee. . . ." Royal Exh. 1, Tab 5, at SKY KKYA 00148 (emphasis added). The plain language of this paragraph reflects the parties' understanding that the potential losses against which the Purchaser sought protection were those that might be incurred due to default by the lessees, and not any alleged obligation of CMC.[37]

Section 2.1 of the SSAs confirms Royal's assertion that the SSAs vested the Guardian Entities with rights as assignees of CMC's interests, not original obligees. That section provides that "the Seller . . . hereby sells, transfers, assigns and otherwise conveys to the Purchaser . . . all

---

[35] Plaintiffs' argument with respect to this language, as well as the impact of certain other language relied upon by Plaintiffs, will be addressed further in Section II.B.3.a. of this Opinion.

[36] Again, the SSAs entered into for Guardian XV and Diversity I were substantively identical.

[37] The reference within this definitional section to the requirement that Guardian IX be named as "loss payee, beneficiary, or obligee" does not undercut this conclusion. As explained in more detail in Section II.B.3.a. of this Opinion, there is no dispute that the Guardian Entities subsequently received assignments of CMC's rights under the Lease Bonds, and as such became obligees by assignment.

of the right, title, and interest . . . <u>of the Seller</u> in and to . . . the Surety Bonds. . . ." Royal Exh. 1, Tab 5, at Sky KKYA 00150 (emphasis added).

Section 2.4 of the SSAs, moreover, contains representations by CMC, as Seller, to the effect that CMC had "good title to the Lease Assets", and that "[t]he information with respect to the Leases contained in the Schedule of Leases is true, complete, and accurate. . . ." Royal Exh. 1, Tab 5, at SKY KKYA 00154-00155. Again, these representations demonstrate that all parties agreed that the leases and Lease Bonds created valid and existing rights prior to the parties' execution of the SSAs.

Perhaps most significantly, the SSAs cannot be read to transform CMC into a "principal" bearing separate obligations in these transactions, because the terms of the SSAs simply do not create any payment obligations on the part of CMC. Section 3.1 authorizes the Servicer to manage and administer the Leases, and Section 3.7 designates CMC as the "initial Sub-Servicer . . . as agent . . . on behalf of the Servicer. . . ." Royal Exh. 1, Tab 5, at SKY KKYA 00158, 00166. These sections unambiguously create a duty on the part of CMC to <u>transmit payments</u> received from the lessees.

In connection with CMC's servicing duties, Section 4.6 of the SSA grants CMC the right to make "Servicer Advances" to cover shortfalls in lessee payments. That section explicitly provides, however, that CMC "will not be required to" make such advances. Royal Exh. 1, Tab 5, at SKY KKYA 00171-00172. Moreover, no other section of the SSA requires payment by CMC (as opposed to transmittal of payments) to the Guardian Entities or their lender banks on account of the lease pools or any shortfall in the lease pool income stream. To the extent, therefore, that Plaintiffs argue that the SSA gives rise to an underlying obligation of CMC as principal, it is unclear what any such obligation could be.

While the Sureties were not parties to either the Purchase and Security Agreements or the Credit and Security Agreements, those Agreements also demonstrate the understandings of CMC, the Guardian Entities and their lender banks that each lease was in effect at the time of execution, and that the underlying equipment that was the subject of each lease had been delivered to the lessees prior to the execution of each respective document. Paragraph 5 of the Guardian IX Purchase and Security Agreement[38] contains representations by CMC to the relevant Guardian Entity that (1) each Lease is valid and existing; and (2) by closing, all of the equipment subject to each Lease will have been delivered to the lessee. Royal Exh. 1, Tab 1, at SKY KKYA 00107-108.

Because Royal was not a party to the Purchase and Security Agreement, that Agreement cannot reflect the intent of Royal at any point in time. The Guardian Entities, however, did enter into the Purchase and Security Agreement, and accepted CMC's representations as to the validity of the Leases and the delivery of the underlying equipment. The fact that the Guardian Entities executed documents representing that both the leases and Lease Bonds were valid and subsisting obligations undercuts the Guardian Entities' argument that these "first stage" transactions created no more than incomplete or inchoate rights.

Similarly, the Credit and Security Agreements contain affirmative representations by the Guardian Entities as to the accuracy, validity and enforceability of the documents contained in the lease files. Section 6.17 of the Guardian IX Credit and Security Agreement,[39] executed between Guardian IX and Mid Am Bank (a predecessor to Sky Bank), provides that, "[t]o

---

[38] As previously noted, the Purchase and Security Agreements for the Guardian XV and Diversity II transactions were substantively identical.

[39] As previously noted, the Credit and Security Agreements for the Guardian XV and Diversity II transactions were substantively identical.

Borrower's knowledge, the Leases have been duly executed and delivered by the lessee named therein, and such Leases are the legal, valid and binding obligations of such lessees. . . ." Royal Exh. 1, Tab 4, at SKY KKYA 00025. Once again, the fact that the Guardian Entities executed documents that confirm the validity and effectiveness of the underlying leases is at odds with Plaintiffs' theory that both the leases and Lease Bonds were "inchoate" prior to the execution of the SSAs.

Finally, the execution and delivery of Assignment and Notice of Assignment documents by the Guardian Entities, and delivery of the Notices of Assignment to Royal, further supports Royal's position. That the Guardian Entities executed these documents and delivered the Notices of Assignment confirms that the Guardian Entities were aware that the transaction structure created by the parties granted rights to the Guardian Entities only through assignment of the rights of CMC.

Accordingly, the Court finds that a plain language interpretation of the entirety of the transaction documents compels a finding that the obligations guaranteed by the Royal Lease Bonds were the underlying leases, and the original obligee of Royal's surety obligations was CMC. As set forth below, the Court's interpretation of the transaction documents is buttressed by the extrinsic evidence, which reflects that all parties intended a transaction structure that would give effect to the plain language of the transaction documents.

### 2. The Majority of the Evidence and Testimony Supports a Finding that CMC Was the Intended Obligee of the Lease Bonds

The bulk of the witness testimony introduced by all parties at trial and the other evidence presented further support the Court's plain language reading of the Royal transaction documents. A detailed examination of the evidence introduced by all parties confirms that all parties understood the two-stage transaction structure and intended that the Guardian Entities and their

lender banks would assume rights in the Lease Bond transactions only by assignment of the rights of CMC. The Court examines the evidence introduced by the parties below.

### a.      Evidence of Negotiation of Bond Language

First, the evidence demonstrated that the language of each of the relevant documents was extensively negotiated. Thus, the Guardian Entities and their lender banks had ample opportunity to review the agreements proposed and to seek changes, if desired, in the terms of the transaction documents. All parties introduced testimony showing that the Banks and Guardian Entities took advantage of this opportunity and, in fact, achieved significant changes in the terms of the bonds and other transaction documents.

Michael Anthony, CMC's broker and the Sureties' attorney in fact, testified as follows with respect to the Banks' involvement in negotiations:

> Q.      To your knowledge did any of the ultimate, any of the banks that were either investors or lenders but were involved in the program in providing funds, were they involved in any way in developing the language, to your knowledge?
>
> A.      Absolutely.
>
> Q.      How was that?
>
> A.      And well, if they didn't like some of the language or they wanted to change a paragraph or phrase, they would demand it. In order for them to accept the bond I would have to take it back to the surety, put the two together and let them work it out amongst their legal staffs or underwriters until they came up with a product they were both happy with.

Anthony Depo., at 62:11-63:1. Wayne Pirtle similarly testified as to the Banks' involvement:

> A.      . . . . Every one of those bonds and insurance policies had to be written. They had to be written to fit the various institutions. Most of the lawyers for the institutions would talk to Michael [Anthony] or they would talk with the

insurance companies and they would work out certain language.

Pirtle Depo., at 116:21-117:2. Michael Anthony also testified to the involvement of Neil Gurney and Thomas Holmes, counsel for the Guardian Entities, in the negotiation of the CMC transaction documents:

> Q.	Mr. Gurney and Mr. Holmes were requesting that changes be made on various CMC documents, isn't that correct?
>
> A.	Yes.
>
> ***
>
> Q.	They were trying to change the sureties['] language; is that correct?
>
> A.	I think every bank tried to change the sureties['] language.

Anthony Depo., at 170:5-21.

Royal Exhibits 27 and 28 also document the extensive involvement of counsel for the Guardian Entities in negotiating the language of the form bond. Royal Exhibit 27 is a memorandum dated February 18, 1999 from Michael Anthony to Neil Gurney and Thomas Holmes, specifically approving two changes to the bond form requested by Gurney and Holmes, and rejecting other suggested changes. In rejecting the additional changes proposed by Guardian counsel, Mr. Anthony stated:

> Surety is a three party agreement. In this case we guarantee the lessee will honor their contract to CMC, Inc. We are not guaranteeing a loan, but rather the performance of the lessee. . . .

Royal Exh. 27, at UB001163. In responding to Mr. Anthony's memorandum by letter dated February 19, 1999, Neil Gurney stated, "We have no problem with a three-party agreement. . . ." Royal Exh. 28, at UB001170.

The correspondence between Guardian counsel and Mr. Anthony thus reflects that the

Guardian Entities understood the nature of the transactional structure created by the documents and, to the extent they objected to that structure, had the opportunity to propose and negotiate acceptable language. In this context, it is difficult to argue that the language ultimately negotiated by the parties does not accurately reflect the Guardian Entities' intent.

> **b.** **Testimony as to the Parties' Understanding of the Two-Stage Transaction Structure**

Witness testimony and other evidence presented at trial also reinforce the Court's findings that the "two-stage" transaction structure described by Royal reflected a shared intent on the part of all parties, and that the Guardian Entities' <u>assignee</u> status was understood by both the Guardian Entities and their lender banks. Royal presented evidence that the Sureties insisted upon the two-stage transactional structure for two reasons. First, for some CMC lease pools, the identity of the financial institution that would "fund" a particular lease pool was not known at the time the Lease Bonds were executed, making it impossible to issue the Lease Bonds in favor of those financial institutions. As a result, the Sureties involved in the CMC program adopted a uniform practice of issuing the Lease Bonds to CMC in all instances, regardless of funding status. Second, the Sureties refused to issue bonds directly to the Banks or Guardian Entities because they feared that doing so would place them in violation of New York's "Appleton Law," N.Y. Ins. Law § 1106(c).

Wayne Pirtle testified that one reason for naming CMC as "obligee" on the Lease Bonds was the fact that the financial institution "funding" the transaction might not be known at the time of issuance of the Lease Bonds:

> A.   . . . When you originally do a lease, you don't know who, what pool it is going to go into, so you don't necessarily know which investor, so you can't write the lease—I'm sorry, you can't complete the lease and get it bonded or insured, depending on what you are doing here, unless you

> know what the insurance company is going to be, because
> you have to get the banks to agree to this insurance
> company. . . .

Pirtle Depo., at 1731:2-10.

As Royal's evidence demonstrates, however, with respect to the pools involved in this case, the identity of both the Guardian Entity involved in each transaction, and its lender bank, were known prior to issuance of the Royal Lease Bonds. Each Lease Bond issued by Royal in the three transactions involved here bore a lease number containing the name "Guardian" or "Diversity." Royal Exh. 1, Tab 10; Royal Exh. 2, Tab 10; Royal Exh. 3, Tab 8. In addition, in at least two of the three transactions at issue here, the relevant Guardian Entity had obtained a loan commitment prior to issuance of the Royal Lease Bonds.[40] Thus, had the parties desired to name a Guardian Entity or its lender as the original obligee, this issue should not have prevented them from doing so. Instead, Royal issued, and the Guardian Entities accepted, bonds denominating CMC as obligee.

With respect to the "Appleton Law," witnesses proffered by the Sureties explained that New York insurance laws prohibited multiline insurers doing business in New York from issuing surety bonds that guaranteed loans. Since each of the Sureties involved in the CMC program was a multiline insurer licensed in New York, each refused to issue surety bonds in the CMC transactions unless the bonds were structured as guarantees of leases rather than loans. CMC's principals, as well as Michael Anthony, testified as to their understanding of this rule.

Wayne Pirtle testified:

---

[40] In the Guardian XV transaction, Guardian XV received a commitment letter from Metropolitan Bank & Trust Company on April 10, 2001. Royal Exh. 13. The Lease Bonds were issued in the Guardian XV transaction on April 17, 2001. Royal Exh. 3, Tab 8. In the Diversity II transaction, Diversity II received a commitment letter from Second National Bank of Warren on March 19, 2001 (Royal Exh. 12), while the Lease Bonds were issued in the Diversity II transaction on March 28, 2001 (Royal Exh. 2, Tab 10).

> Q. And were you a party to discussions about Appleton to the effect that if the bond wasn't [sic] written initially to the investors, such as NetBank who were purchasing the income streams from the leases, that would violate Appleton, but if it is set up where the bonds are issued to CMC as a lessor and then assigned, that would not violate Appleton?
>
> A. That's my understanding of it.

Pirtle Depo., at 1728:22-1729:7. Michael Anthony further testified that he understood that the structure of the CMC program, whereby CMC was designated as obligee, was based upon an explicit requirement imposed by the Sureties:

> Q. Do you recall any surety discussing that with you that that would be an advantage of structuring it where CMC was a named obligee on the bond, that it would under that scenario not violate Appleton?
>
> A. The only specific thing I can recall is, they didn't want to guarantee[] loans. They would only do it with leases, because they felt leases were excluded from the Appleton law and that protected them.
>
> ***
>
> Q. Did any surety discuss with you—you said that the sureties felt that they needed to structure this where they were bonding leases and not, what did you say, guarantee loans?
>
> A. I didn't say they needed to structure it that way. They refused to bond any loans, they would only bond leases. It wasn't a pre-conceived structure. It was a rule of theirs.

Anthony Depo., at 322:4-13, 323:4:13. Mr. Anthony further explained the impact of the "Appleton Law" on the structure of the transactions as follows:

> Q. What is the difference, what is the distinction you were drawing between banking and loan language rather than the concept of suretyship?
>
> A. Suretyship is a three-party agreement, whereas a loan is a two-party agreement.

> Q. And what is the significance of that agreement in the context of the language of the bond form?
>
> A. I don't believe the sureties wanted to be in violation of the Appleton Act.
>
> Q. I see. And to your understanding, what would have put them in violation of that?
>
> A. Guaranteeing of a loan.

Anthony Depo., at 1899:15-1900:6.

The overwhelming majority of the testimony presented at trial demonstrates that all parties understood the two-stage "assignment" structure and the consequences of imposing such a structure on the Royal Lease Bond transactions. Wayne Pirtle testified simply that, according to his understanding of the transaction, "CMC was the original obligee and then they assigned it." Pirtle Depo., at 2357:9-10. Mark Fisher, CMC's chief operating officer, testified:

> Q. . . . The obligee on the surety bond is CMC and/or its assigns. Is that true?
>
> A. To the best of my recollection.
>
> Q. The obligor on the surety bond is the lessee. Is that true?
>
> A. I think so.
>
> Q. Now, at the time that the surety approves that lease, rather approves the lessee and issues the surety bond, CMC has not yet assigned it, have they?
>
> A. No. I don't believe so.

M. Fisher Depo., at 132:16-133:2, 133:13.

Michael Anthony, attorney-in-fact for the Sureties, also testified that the Sureties intended the Lease Bonds to guarantee payments from the lessees to CMC or its assignees:

> Q. . . . I'm asking you were you guaranteeing the lessee's

payments to CMC under the leases.

***

A.      We were guaranteeing the lessee's payment to CMC or any assignee.

Q.      On the face of the bond, the named obligee was always whom?

***

A.      Commercial Money Center, CMC.

***

Q.      Put in more particular [] terms, have you come to know why CMC was named obligee?

A.      That was the instruction of the insurance companies from the very beginning.

Anthony Depo., at 1901:5-10, 14-17, 19; 2420:13-17.  Michael Anthony further testified that

CMC advised the Sureties, including Royal, that the obligations sought to be bonded would be

leases, not loans:

Q.      Did you ever tell the—were you in a position to tell the sureties that you were asking them to bond loans?

A.      I believe that every file submitted to us was a lease.  I believe that all the underwriters believed they were leases.

***

Q.      Can you give me a rough estimate of how many hours you might have spent in various meetings between CMC and representatives of sureties, hundreds, thousands?

A.      Hours?

Q.      Hours.

A.      My best guesstimate would be [] 400 or 500 hours.

> Q. And in that 400 or 500 hours, did you ever hear CMC communicate to sureties with respect to whether the underlying obligations on which they were seeking bonds would be loans or leases?
>
> A. Yes.
>
> Q. What did they say?
>
> A. They would be leases.

Anthony Depo., at 1973:2-1973:4, 1973:7-9, 1973:24-1974:18.

Testimony by Royal employees also demonstrates that Royal believed its Lease Bonds would guarantee the payments on the underlying leases, not any payments by CMC to its investor banks. Robert VanEpps, Royal's actuary, testified that Cary Breese, an employee of A & M, introduced Royal to the CMC program and provided Royal with CMC's standard bond form. Mr. Breese wrote to Royal as follows:

> Enclosed please find a sample bond form for the Commercial Money Center, Inc. (CMC) program. The language was developed by Anthony & Morgan and has gone through numerous revisions during the past three years of the program as we have worked with a multitude of insurance companies, investors and their respective law firms. We feel that the wording as it stands today is optimal for satisfying the investors while at the same time maintaining the necessary safeguards for the insurance company (surety).

Royal Exh. 19; Royal Exh. 20, at RICNB 12456. The sample bond transmitted by Mr. Breese in connection with this correspondence provided that the surety was "bound unto Commercial Money Center, Inc. as Obligee. . . ." Royal Exh. 20, at RICNB 12457. Mr. VanEpps further testified:

> Q. And you understood based on your conversation with Mr. Breese [of Anthony & Morgan] that the bonds themselves would guarantee the lease payments on each lease, is that right, sir?
>
> A. Yes.

VanEpps Depo., at 67:6-12.  In notes taken by Mr. VanEpps during his conversation with Mr. Breese, Mr. VanEpps recorded that the bonds "bind each lease = guarantees lease payments." VanEpps Depo., at 113:4-114:1; Royal Exh. 40.

The testimony of Blaine Tanner, principal of the Guardian Entities, demonstrates that the understanding of the Guardian Entities with respect to the transactions did not differ from that of the Sureties or of CMC.  Tanner testified that CMC was the original obligee, and that the Guardian Entities received their rights by assignment:

> Q.   And did you have any understanding as to who the obligee was under the bonds issued in Royal's name when you entered into these transactions?
>
> A.   CMC, I believe, who assigned it to Guardian, who assigned it to the banks.
>
> Q.   And the original obligee was CMC, was that your understanding?
>
> A.   It was.
>
> Q.   Excuse me?
>
> A.   I believe so, yes.
>
> Q.   Let me—and how is it then that—did some other entity subsequently become the obligee under the Royal bonds?
>
> A.   I believe the chain went from, and I could be totally wrong, I'm just going to give you my belief, CMC to Guardian, or Diversity, whichever company was the single purpose entity that was formed, to the banks.
>
> Q.   So that CMC—it was your understanding that CMC assigned its rights under the lease bonds to Guardian?
>
> A.   Yes.

Tanner Depo., at 942:6-943:3.  In fact, Tanner explicitly testified that he understood that the

Guardian Entities would <u>not</u> be named obligees on the Lease Bonds:

> Q.    Was it your understanding pursuant to the sale and servicing agreement that Guardian Capital III LLC as the purchaser was to be a named obligee under the lease bond?
>
> Q.    Is that your understanding of how the transaction was supposed to work?
>
> A.    My understanding is that the purchaser, Guardian Capital III, LLC, was being assigned all the rights under the Safeco bond and the sale and servicing agreement.

Tanner Depo., at 1575:8-19.[41]

In his live testimony at trial, Tanner also expressed the opinion that the Guardian Entities received rights from CMC by assignment:

> THE WITNESS:    I'm sorry. Repeat the question.
>
> THE COURT:    I can read it back. "So isn't it—isn't it a fact, sir, that what is happening by [dint] of this agreement [the SSA], Clause 2.1, is the seller, CMC, is transferring or assigning all of its rights, whatever they may be, all of its title, whatever they may be, and all of its interests, whatever they may be, under the surety bonds to Guardian IX, the purchaser?
>
> THE WITNESS:    Yes.

Tr. 147.

The testimony of Thomas Holmes, an attorney for the Guardian Entities in the CMC transactions, confirms that the Guardian Entities understood that they were taking rights as assignees rather than original obligees:

> Q:    Was the bond issued to CMC originally, yes or no?
>
> A.    Originally, yes.

---

[41] Although this testimony was given by Blaine Tanner in response to questions relating to one of the <u>Safeco</u> transactions, Mr. Tanner testified at trial that all of the Guardian/Diversity deals were "[b]asically the same." Tr. 94. There has been no evidence presented that either the Lease Bonds or the Sale and Servicing Agreements differed substantively between the Royal and Safeco transactions.

> Q. Then CMC assigns the bond to Guardian and Diversity, correct?
>
> A. I don't recall whether we were—I think we were in the chain. Yes, we were in the chain.

Holmes Depo., at 217:8-15.[42]

During Mr. Holmes's deposition, he also was shown a copy of Royal Exhibit 27, a memorandum dated February 18, 1999 from Michael Anthony to Mr. Holmes and his co-counsel, Neil Gurney, explaining the structure of the CMC Lease Bond program. Mr. Holmes testified that he, on behalf of the Guardian Entities, understood the structure outlined in Mr. Anthony's memorandum:

> Q. And can I direct your attention to the third sentence, in that paragraph, which I'm going to read into the record. When you received Mr. Anthony's memo, did you take note of the fact that he was telling you and Mr. Gurney, quote, we are not guaranteeing a loan, but rather the performance of the lessee, period, close quote. Did you take note of that language?
>
> A. Yes.
>
> Q. Did you ever provide that language to any bank with whom you dealt with on behalf of Guardian or Diversity?
>
> A. Absolutely. The deals were always structured to reflect the fact that the guarantee was of the payment by the lessee and that the bank received an assignment of the guarantee from the insurance company, but it, the surety did not guarantee the loan agreement. It only guaranteed the performance by the lessee, which was collateral for the loan.

Holmes Depo., at 309:2-23.

---

[42] If the Guardian Entities actually had believed that they acquired their rights in the CMC transactions through some mechanism other than assignment, the Court would expect counsel for those entities to so testify. It is notable that the Guardian Entities did not call their attorneys as witnesses during the bench trial proceedings. Indeed, portions of the deposition transcripts of Thomas Holmes and Neil Gurney were presented by the Sureties only. Plaintiffs did not discuss the testimony of these witnesses at any point.

The testimony of Neil Gurney, co-counsel for the Guardian Entities, reinforces Mr. Holmes's testimony that the Guardian Entities understood their position as assignees of the bonds:

> Q.    Was it your understanding at that point in time, which would be March of 1999, that these bonds were going to be issued directly to Guardian?
>
> A.    No.
>
> Q.    To whom are the bonds going to be issued?
>
> A.    Whoever the obligee was.
>
> Q.    Did you conduct any research to determine whether if there was an assignment of the bond, the assignee stood in the shoes of the original obligee?
>
> A.    I believe we did.
>
> Q.    And what was your conclusion?
>
> A.    I believe we determined that based upon the language in the bond, the answer was yes.

Gurney Depo., at 69:5-21.[43]

Finally, to the extent the intent of the Guardian Entities' lender banks is relevant to the inquiry, the testimony of Christopher J. Smerglia, Vice President and Regional Manager for Commercial Lending of Second National Bank, a predecessor of Sky, demonstrates that the lender banks also believed that the Guardian Entities were purchasing the rights of CMC under an active and existing lease portfolio:

> Q.    … Was it your understanding that the leases Guardian was purchasing with the funds loaned by Second National Bank

---

[43] Mr. Gurney's testimony was proffered at trial via deposition transcript on behalf of Safeco, not Royal. Given, however, that this portion of Mr. Gurney's testimony related to the understanding of the Guardian Entities at a time prior to both the Safeco and Royal transactions, the Court considers this testimony in its evaluation of the parties' intent at the time they entered into the Safeco and Royal transactions.

were already in place?

A.     Was the lease portfolio in place?   Yes, that was my
        understanding.

Smerglia Depo., at 78:11-16.

Royal's Exhibits 24 and 25 confirm Mr. Smerglia's understanding that the Guardian Entities were assignees.  These two exhibits contain notes taken by Mr. Smerglia prior to the closing of the Diversity II transaction.  Notes taken at a February 26, 2001 meeting with Tanner state: "(Lease bonds) Commercial Money Center is the beneficiary." Royal Exh. 25; Smerglia Depo., at 163:12-164:4, 165:9-166:4.  An undated page of notes, also taken by Mr. Smerglia, states, "Lease bonds are assigned to Guardian and then the Bank." Royal Exh. 24; Smerglia Depo., at 80:22-81:1.

In an alternative argument, Plaintiffs have pointed to certain evidence which, Plaintiffs maintain, compels a finding that the commitments undertaken in the Royal Lease Bonds actually constituted financial guarantee obligations, rather than simple surety bonds.[44]  The weight of the evidence defeats this argument as well.

Plaintiffs argue, first, that the amounts guaranteed by Royal in the Lease Bonds are indicative of an intent to guarantee loans made to CMC from lender banks (using the Guardian Entities effectively as conduits), rather than to guarantee the underlying lease payments.  That intent is evidenced, according to Plaintiffs, by the fact that each Lease Bond guaranteed a payment stream of only 60 lease payments—although virtually all of the CMC leases had lease terms exceeding 60 months. *See* CadleRock/Guardian Exhs. 62A, 62C.  Plaintiffs note that the

---

[44] Plaintiffs introduced the testimony of expert witness Paul Palmer in support of their characterization of the Lease Bonds as "financial guarantees."  For the reasons set forth in section II.B.2.g., *infra*, the Court declines to rely on the testimony of Mr. Palmer, and discerns the intent of the parties through an examination of the relevant transaction documents and extrinsic evidence.

amount guaranteed by Royal, in each instance, is equivalent to the amount due and owing to the lender bank, not to the entire amount due on the underlying lease. *See* CadleRock/Guardian Exh. 62A, 62C.

Although the precise nature of Plaintiffs' argument in this regard is unclear, Plaintiffs apparently contend that the symmetry between the amounts guaranteed in the Lease Bonds, and the amounts owed on the Guardian Entities' loans, suggests that Royal actually intended to guarantee the loans themselves. Plaintiffs further suggest that the fact that the bonds were issued "in bulk" as part of a single transaction also lends support to a construction of the Lease Bonds as financial guarantee instruments.

Plaintiffs thus argue that the Lease Bonds were not intended to function as standard surety bonds, but rather as a letter of credit or a similar financial guarantee instrument. In this regard, Plaintiffs introduced at trial a September 28, 1998 letter written by Michael Anthony to Ron Fisher at CMC. That letter includes a general description of the CMC program. It provides, in pertinent part, as follows:

> A surety bond is unlike an insurance policy and acts more as a financial guarantee, similar to a letter of credit issued by banks. In the case of the lease bond program, if the lessee fails to make their payments, the surety will. This type of obligation is pure and simple from the surety's language on the bonds. It is a **<u>strict financial guarantee</u>**.
>
> ***
>
> The bond is non-cancelable by the surety and runs for the entire term of the lease. The leases can be sold to financial institutions and investors and the surety bond remains valid for the entire term. The surety understands that this is the purpose of the bond in the first place and understands that their obligation must remain the same regardless.

CadleRock/Guardian Exh. 8, at NC 04618-04619 (emphasis in original).

Plaintiffs further argue that the testimony of Wayne Pirtle, a principal of CMC, as to the "no-loss" nature of the surety obligations supports Plaintiffs' contention that the parties intended Royal to undertake financial guarantees in its Lease Bonds. Mr. Pirtle testified:

> Q. Did CMC refer to this initial bond form as providing a strict financial guaranty?
>
> A. The term we use[d] was guaranty. I don't have a recollection of saying unconditional guaranty, because I don't think that had come into play yet. But it was a 100 percent guaranty, which in my view, the intent and what I represented, it was—there was a no loss situation for the investor, and that meant by virtue of both the insurance policies and/or, yeah, insurance policies on skip insurance as well as these financial guarantees. I don't know how you would get more than 100 percent guaranty.
>
> Q. What do you mean, and I just want the record to be clear, what do you mean when you say the intent was to provide the investors with a no-loss situation?
>
> A. I mean that there was no eventuality that could occur that the investors would not have been paid by the insurance company.
>
> Q. And did you explain that intent to the initial sureties that participated in the program?
>
> A. Yes.
>
> Q. Did you explain that intent to the sureties who are parties in this case, American Motorists, RLI, Royal, Safeco?
>
> A. Yes.

Pirtle Depo., at 1847-1849.

Finally, in connection with the "financial guarantee" argument, Plaintiffs point to the definitional sections of the SSAs, noting that the "Lease Obligations," rather than the "Leases," were the assets assigned to the Guardian Entities pursuant to the SSAs. Plaintiffs assert that the parties intended the assets assigned through the SSAs to be identical to the assets bonded under

the Lease Bonds. Accordingly, Plaintiffs urge the Court to find that Royal actually bonded the "Lease Obligations"—i.e., the payment stream or some portion thereof, which income stream happened to be secured by leases—not the leases themselves.

After considering the documents upon which Plaintiffs rely, as well as all other evidence presented by the parties, the Court rejects Plaintiffs' argument that the transaction documents created a financial guarantee arrangement in favor of the Banks in the Royal transactions. First, the fact that the Lease Bonds, by their terms, guaranteed only a portion of the scheduled lease payments is not indicative of a financial guarantee structure. While Royal has not disputed that the parties intended to "fractionalize" the leases and guarantee only a portion of the scheduled lease payments, the parties' agreement in that regard does not change the nature of the underlying guarantee.

Although the amount ultimately guaranteed on each pool may have been equivalent to the amount due on each investor's loan to the respective Guardian Entity, these parties were entitled to structure a transaction in which Royal agreed to guarantee payments attributable to assets of any type. The Lease Bonds state that Royal intended to guarantee lease payments in the amount set forth on the face of each Lease Bond. The testimony from virtually all witnesses also confirms that Royal intended to assume responsibility for payments due and owing under the leases, in the amount set forth in the Lease Bond. The fact that there may have been additional payments due and owing under the leases, which payments Royal did not undertake to guarantee, does not change the nature of the obligations assumed.

Further, while the Court has considered both Plaintiffs' Exhibit 8 and the testimony of Wayne Pirtle, this evidence also is insufficient to outweigh (1) the plain language of the transaction documents; and (2) the extensive witness testimony indicating that the parties

intended to create underlined surety bonds guaranteeing leases. First, Michael Anthony's September 28, 1998 memorandum (CadleRock/Guardian Exh. 8) was provided to CMC several years before either Royal or Safeco entered the CMC Lease Bond program. Thus, it is doubtful that any statements made by Anthony at that time could be attributable to Royal.

Moreover, given the subsequent negotiations between the parties with respect to the Lease Bond language—including the negotiations between Anthony and counsel for the Guardian Entities in early 1999 (*see* Royal Exhs. 27, 28)—it is difficult to conclude that Anthony's September 1998 letter accurately reflects the intent of these parties as of the time of closing of the Royal Lease Bond transactions.[45]

In any event, Michael Anthony repeatedly testified in these proceedings that Royal issued surety bonds guaranteeing leases, and that he advised all parties to the transaction to that effect. *See* Anthony Depo., at 322:4-13; 323:4:13; 1899:15-1900:6; 1901:5-10, 14-17, 19; 2420:13-17; 1973:2-1973:4, 1973:7-1973:9, 1973:24-1974:18. In light of that testimony, the Court cannot infer from the September 28, 1998 memorandum that (1) Mr. Anthony believed that the Royal Lease Bonds acted as letters of credit or other financial guarantee instruments; or (2) Mr. Anthony advised his surety clients that they would be issuing financial guarantees of CMC's repayment of loans.

Similarly, with respect to the testimony of Wayne Pirtle, Mr. Pirtle's testimony can not reasonably be read to suggest that Mr. Pirtle believed that the Lease Bond transactions created obligations on the part of Royal running directly to the Guardian Entities. Testimony to that effect would be inconsistent with Mr. Pirtle's testimony as to CMC's status as the original

---

[45] In this regard, it is noteworthy that in Michael Anthony's later memorandum to Neil Gurney, dated February 28, 1999 (Royal Exh. 27), Anthony stated, "We are not guaranteeing a loan, but rather the performance of the lessee. . . ."

obligee on the Lease Bond transactions. As previously noted within this Opinion, Mr. Pirtle testified, "CMC was the original obligee and then they assigned it." Pirtle Depo., at 2357:9-10.

In any event, none of the extrinsic evidence presented in these proceedings may serve to create a meaning at odds with the plain language of the transaction documents, nor may it impose a meaning to which the language of the transaction documents is not reasonably susceptible. Again, the Royal Lease Bonds simply are not susceptible to a meaning whereby "CMC" would mean "Guardian." Nor can the Court reasonably infer from the transaction documents that the parties intended "Lease Bond" to mean "financial guarantee," or that Royal's guarantee of "lease payments" would mean "loan payments."

With respect to Plaintiffs' argument that the definitional sections of the SSAs create or signify financial guarantee obligations in the Royal transactions, the Court rejects that argument as well. As Royal points out in its briefing, any such inference drawn from the definitional provisions of the SSAs would be at odds with the specific language of the Royal Lease Bonds. The Court agrees with Royal that no intent to bond the "Lease Obligations" can be inferred from the language of the SSA or any other portion of the transaction documents. Rather, the fact that "loans" and "Lease Obligations" are not referenced in any location in connection with the Sureties' bonding obligations is telling, and reveals that the Sureties did not intend to bond any such obligations.

Accordingly, as summarized herein, the vast majority of the evidence and testimony presented at trial demonstrates that all parties to the Royal transaction understood both (1) the two-stage transaction structure; and (2) the fact that the Guardian Entities were intended to take rights as assignees of CMC.

### c. Testimony as to Contents of Lease Files at Closing

Testimony relating to the pre-closing examinations of the Royal lease files further supports the Court's finding that the Lease Bonds were valid and effective when the SSA transactions closed. Testimony by virtually all witnesses involved in the SSA closings demonstrated that the contents of the lease files were thoroughly reviewed prior to closing, and that the documents contained in the lease files reflected that both the Lease Bonds and leases were in effect and valid at the time of closing.

Stella Kadras Prok, a paralegal for Sky Bank counsel Kahn Kleinman Yanowitz and Arnson ("Kahn Kleinman"), testified that she reviewed lease files for deficiencies and communicated with Mark Fisher at CMC in an attempt to remedy such deficiencies prior to closing. Prok Depo., at 12:1-13:7, 13:22-14:5. Howard Bobrow, a Kahn Kleinman attorney involved with the review of the CMC lease files on behalf of Sky, also testified that numerous items were checked and reviewed by Kahn Kleinman prior to closing the Lease Bond transactions:

> Q.   Did anyone review these leases when they were out on the tables at these closings?
>
> A.   Yes.
>
> Q.   What were they being reviewed for?
>
> A.   We reviewed them to be certain that they were in fact the same lease that we reviewed copies of in the days prior to the closings, and that they were originals and that they had all the proper attachments, and that they were properly signed.
>
> Q.   So the leases and other things needed to be properly dated and executed by lessees, for instance?
>
> A.   Correct.

Q. That's one of the items that would be checked?

A. Correct.

Q. Did you check whether the equipment had been delivered, that there was a delivery acceptance form within some of these lease files?

A. I believe that was one of the attachments in each lease file[], and yes, that was one of the things that we would have looked to see was present in each lease, in each lease bundle.

Q. And that would have to be signed and dated as well?

A. Yes.

Q. Did you ever come across a situation where a delivery and acceptance form was not signed and dated by a lessee?

A. Yes.

Q. What would happen in that situation?

A. Usually we would see that prior to the closing, and we would notify counsel to Guardian that there were—the lease file, respective lease file for that lease was incomplete, and it was something that was generally remedied at or prior to the closing.

Q. You say generally remedied. Were there time[s] it wasn't?

A. To my knowledge it was remedied—in all the transactions I was involved with, it was remedied prior to closing or at closing.

Bobrow Depo., at 33:21-35:18.

Stephan Kurkul, Vice President of Sky Bank, who was responsible for the Guardian IX closings, testified that he understood that Kahn Kleinman reviewed all of the lease files for completeness before closing of the Royal SSA transactions:

Q. What was the—what was your understanding of what the paralegal was doing when she was making these

checkmarks?

> A.    My interpretation of this is that she was reviewing the files
> to make sure all the appropriate documentation was in each
> lease file.  And as she determined that it was, checking it
> off.

Kurkul Depo., at 147:17-25; Royal Exh. 30.  Mr. Kurkul also testified as to his understanding,

based upon the contents of the lease files, that the leases were fully effective when the SSA

transactions closed:

> Q.    So when you already had the collateral you're saying that
> you understood the leases were all completed,
> consummated deals?
>
> A.    Correct.
>
> Q.    And the equipment had already been delivered to the
> lessee?
>
> A.    They were signing acceptance certificates, yes.

Kurkul Depo., at 471:21-472:4. *See also* Smerglia Depo., at 78:11-16.

The entirety of this testimony demonstrates that, consistent with this Court's analysis of

the Royal lease file documentation in section II.B.1. of this Opinion, the individuals responsible

for reviewing the lease documentation determined that (1) valid leases were in effect prior to

execution of the SSAs; and (2) equipment had been delivered to the lessees prior to execution of

the SSAs.[46]  These findings support Royal's assertion that the obligations undertaken in the

Royal Lease Bonds were intended to be effective immediately upon execution of the bonds.

### d.    Testimony as to Time of "Funding" of Lease Transactions

Much testimony and evidence was presented by Plaintiffs at trial relating to the "funding"

of the Lease Bond transactions—that is, the timing of actual payment for the underlying leased

---

[46] As set forth in section II.B.1. of this Opinion, the deviations from these standards in a small number of Royal
lease files do not detract from this conclusion.

equipment. Plaintiffs suggested that, until the moment of "funding," the obligations set forth in the leases and Lease Bonds were essentially inchoate, and that the obligations sprang to life upon payment of the purchase price for the underlying equipment. If no equipment had been purchased when the Lease Bonds issued, then, Plaintiffs argued, no <u>valid</u> lease could have existed and no bond obligation could have been created prior to execution of the SSAs.[47] The Court finds, however, that evidence as to the time of "funding" of the transactions is irrelevant to a determination of the Guardian Entities' obligee status.

In support of their arguments relating to the timing of "funding," Plaintiffs presented the testimony of CMC principal Mark Fisher:

> Q.    It says, the surety company employees that reviewed, underwrote and approved the issuance of bonds on the leases also were aware that they were not yet funded at the time of the bond's issuance. Do you see that?
>
> A.    Yes.
>
> Q.    Is that a true statement?
>
> A.    I believe so.
>
> Q.    How do you know?
>
>                                    ***
>
> A.    That was the way it was done.
>
> Q.    What do you mean by that?
>
> A.    That was the procedure that was followed. It would have been a rare occurrence that they were bonded—or that they were funded prior to being bonded. The initiation of the

---

[47] Plaintiffs also presented evidence, discussed later in this Opinion, tending to show that certain lessees had <u>not</u> received the leased equipment as of the time that those lessees signed Delivery and Acceptance Certificates. As explained in section II.B.3.d., below, evidence of actual lack of delivery of equipment is irrelevant here, since it is undisputed that the banks and Royal, as well as the Guardian Entities, entered into the Lease Bond transactions <u>in reliance on representations</u> that such delivery had occurred.

whole program was premised on them not being funded when they were bonded, because Commercial Money Center needed to get the money from the banks in order to fund the deals.

***

A. Banks and surety companies would come to Commercial Money Center to—before either purchasing a portfolio or bonding a lease and basically walk through the departments described earlier in this testimony and in these declarations. And CMC would basically just take them through the steps in the order that they occurred.

Q. The steps meaning the steps of processing the lease applications and selling the pools?

A. The leases coming in, the leases—the docs going out the docs coming back in. Going to get them bonded, putting them in a portfolio, sending them to the bank, getting the money back, funding them, setting them up for servicing.

Q. So you're saying that in presentations to surety companies and banks, CMC told both the surety companies and banks that the leases were only funded after a purchase by the banks; is that right?

A. Yes.

M. Fisher Depo, at 164:10-18, 164:25-165:9, 169:1-23.

The Sureties, on the other hand, argued that the fact most critical to the effective date of the leases was not funding of the equipment, but delivery of that equipment to the lessees. Regardless of whether CMC may have purchased certain equipment on credit, the Sureties asserted, a valid lease must have existed where CMC had <u>delivered</u> the leased equipment to its lessee.[48]

---

[48] The Sureties argued, in fact, that valid, effective leases existed regardless of whether any equipment had been delivered to the lessees, since the leases did not contain any provision conditioning their effectiveness on delivery of equipment to the lessees. The Court need not address this issue, however, since the record contains ample evidence either (1) that equipment actually was delivered to at least some lessees prior to the closing of the SSA transactions; or, at least, (2) that the Sureties and Banks entered into the CMC Lease Bond transactions based upon

73

The weight of the evidence presented by all parties at trial supports a finding that, at least in some instances, CMC actually did purchase the equipment to be leased on trade credit and deliver it prior to the closing of the SSAs. The testimony of Mark Fisher confirmed that vendors often would release equipment to CMC on trade credit:

> Q.     So how is it that the equipment is delivered prior to funding?
>
> A.     That's the way that—that's—that was just the way that it was done. There were cases that the lessee could sign what was called an early funding rider that said that CMC could fund prior to the delivery of the equipment, and if the equipment never was delivered, it was the lessee's problem and he would still have to pay on the lease.
>
> ***
>
> Q.     And in many cases, the vendors would release the equipment before it was paid for and then wait to be paid?
>
> A.     Correct.

M. Fisher Depo., at 270:16-271:3, 272:6-9. Michael Anthony further testified that vendors who had delivered equipment on credit were sometimes dissatisfied when payment was delayed until after closing of the SSA transactions:

> Q.     Did you ever hear of any vendor complaining that he had not been paid, he or she had not been paid?
>
> A.     Yes.
>
> Q.     And when was the first time you heard of such a thing?
>
> A.     I think a vendor would supply equipment on a bonded lease, and for one reason or another, the lease pool wouldn't be completed or it took them longer to complete an adequate size lease pool to be bonded, and from the time the vendor would deliver the equipment to the time—I

---

representations by CMC and others that such delivery of equipment had occurred prior to closing of the SSA transactions.

mean, if they were the first lease in the pool, he delivers the equipment and it took him six weeks to—it took CMC six weeks to gather a whole pool, 5 million was generally the amount, we tried to minimize them at. He could be complaining because he wasn't going to get funded until the pool was funded.

Q.   Do you remember the first time this kind of complaint, you became aware of this kind of complaint?

A.   Yes.

Q.   When?

A.   In between the first AIG bond and the second funding.

Q.   So it happened pretty quickly?

A.   Absolutely.

                              ***

Q.   Can you tell me what you said and what Mr. Pirtle said?

A.   Mr. Pirtle told me that all vendors know they are not going to get paid until CMC funds the pool, and that they are going to be whining a little.

Anthony Depo., at 1731:16-1732:18, 1732:25-1733:5.

In any event, regardless of any actual delivery of the leased equipment, documents provided by CMC to the Sureties and Banks prior to and at the time of closing unequivocally contained representations that such delivery had occurred. The Delivery and Acceptance Certificates contained in the Royal lease files (1) represented that each lessee had received its leased equipment; and (2) authorized CMC to pay each equipment vendor. Royal Exh. 7 at SKY II 04674.

CMC also provided Royal with separate documentation indicating that equipment generally was purchased on trade credit and delivered to the lessee prior to "funding." *See* CMC

Cash Flow Chart, Royal Exh. 21 ("Purchase of equipment from vendor usually with terms of net 60-90. . . .  Proceeds from lease pool sales satisfies A/R established by vendor. . . .").  Finally, in Section 2.4 of the SSA, CMC represented to both Royal and the lender banks that it had "good title to the Lease Assets", and that "[t]he information with respect to the Leases contained in the Schedule of Leases is true, complete, and accurate. . . ." Royal Exh. 1, Tab 5, at SKY KKYA 00154-00155.

Thus, the evidence presented by all parties reflects that, regardless of the time of "funding" of the Lease Bond transactions, in at least some instances, equipment actually was delivered to the lessees prior to closing of the SSAs.  Moreover, even in those cases where equipment was not actually delivered prior to closing, the evidence reflects that the Sureties and Banks entered into the CMC transactions based upon representations by CMC and its lessees that such delivery had occurred.

> **e.**    **Guardian Representations as to Effectiveness of Leases and Lease Bonds at Closing**

In addition to the representations made independently by CMC to Royal, the Guardian Entities executed documents (1) adopting representations made by CMC as to the validity and effectiveness of the leases and Lease Bonds; and/or (2) making affirmative representations as to the validity and effectiveness of those documents.  Paragraph 5 of the Guardian IX Purchase and Security Agreement—which was executed by Blaine Tanner on behalf of Guardian IX—contains representations by CMC that (1) each Lease is valid and existing; and (2) by closing, all of the equipment subject to each Lease will have been delivered to the lessee. Royal Exh. 1, Tab 1, at SKY KKYA 00107-108.

At trial, Tanner testified that the Guardian Entities believed and relied upon the representations made by CMC in the Purchase and Security Agreements as to the validity of the

leases:

> Q. That representation and warranty says, quote, "Each lease is a true, valid, and existing obligation, enforceable in accordance with its terms. All signatures, names, addresses, amounts and other statements and facts represented therein are true and correct." You see that statement?
>
> A. Yes.
>
> Q. Was that a true and correct statement at the time this document was executed, November 20, 2000?
>
> A. I have no reason to believe it wasn't.
>
> Q. As a matter of fact, you relied on that being the case, correct?
>
> A. I relied on all the documents.
>
> Q. Including this one?
>
> A. Including that one.

Tr. 129. Tanner also testified that, although he did not read the closing documents carefully, he also relied upon CMC's representations that the underlying leased equipment had been delivered to the lessees:

> Q. Let's look at the next representation and warranty, Subparagraph F. *** That representation and warranty says, quote, "The equipment that is the subject of each lease has been, or will have been by the closing, delivered to the lessee set forth in such lease and accepted by such lessee as in satisfactory condition." Is that—did I read that correctly, sir?
>
> A. You did. ***
>
> Q. All right. And at the time of the closing, you believed that to be a true and accurate statement in all respects; isn't that correct?
>
> A. Having not—I'm going to say yes. Go ahead.

Q.     You're sure?  Final answer?

A.     I'm sure that I didn't closely read these documents at closing, and I believe that the instrument is part of the documentation, and I signed the documentation.

Q.     You relied on all the documents.  You told us that already today, and I think you—

A.     Yes, I did.

Tr. 130-132.

In the Credit and Security Agreements, the Guardian Entities also made specific representations to their lenders as to the validity and effectiveness of the leases at the time of closing.  Tanner testified at trial that, at the time of closing, he believed these representations to be true:

Q.     Guardian IX makes the representation to the bank there, quote, "To borrower's knowledge, the leases have been duly executed and delivered by the lessee named therein, and such leases are the legal, valid, and binding obligation of such lessees."  Do you see that, sir?

A.     I do.

Q.     That's an accurate statement of your knowledge on November 20, 2000, regarding the leases that are the subject of this particular deal?

A.     As I said, I signed it.  It's all part of the deal package, and I'll stand by it.

Q.     So the answer is yes?

A.     Yes.

Tr. 140.

Despite Tanner's admissions as to the terms of the documents and the representations made and adopted by the Guardian Entities therein, Tanner further testified at trial that he

78

believed that "everyone knew" that the actual deal differed from the transaction outlined in the transaction documents. Tanner testified that the transaction documents were inaccurate as to the time of "funding" of the lease transactions, and that the actual deal was that the leased equipment would not be paid for until after closing, when funds were received from the lender bank:

> Q.      All right. And you never told MidAm Bank at any time prior to closing, at Paragraph F, not so true. Never told them that, did you?
>
> A.      Never came up in conversation.
>
> Q.      All right. I understand it didn't come up, but if it were not true, you would have told them, right?
>
> A.      If it was a problem, it would have been raised.
>
> Q.      And it wasn't a problem to you because you thought it to be accurate?
>
> A.      It wasn't a problem because everyone knew the deal was what the deal was.
>
> Q.      And the deal was what the documents say, right?
>
> A.      And the deal differed slightly from the documents, and we all knew that the equipment was paid for out of the funding.

Tr. 133. Tanner testified that, prior to the time of funding, the transaction documents were "accurate but not active." Tr. 323.

Tanner acknowledged, however, that the transaction documents actually contained no representations as to the time of "funding." Tanner further agreed that, to his knowledge, the representations contained in the Purchase and Security Agreement as to <u>delivery</u> of the leased equipment were accurate:

> Q:      This doesn't—by the way, this subparagraph doesn't say anything about funding, does it? It says equipment was delivered?

A.      I'm not going to disagree with anything that the documents say.  They say what they say.

Q.      You would agree with me that funding, paying for—use the precise term—pay for equipment is different than equipment being delivered?  It could be bought on credit, right?

A.      Correct.

Q.      This clause refers to delivery, based on its face, right?

A.      Yes.

Q.      So I want to put aside whether CMC bought the equipment on credit and delivered it or not, and whether the equipment was 100 percent paid for, partially paid for, a down payment on it.  Putting that aside, is it your—and you've told me about what everybody knew.  Did everybody know the equipment wasn't on place at the—each lessee's place of business?  Is that your testimony as distinguished from what you refer to as funding?

A.      I'm not—I'm not sure specifically if the equipment was in place, if it was on order going to be delivered, when it was delivered, or how it was delivered.

Q.      All right.  You'll agree with me that Paragraph F talks just about delivery, doesn't say what's been paid for, right?

A.      Right.

Q.      All right.  As to delivery of equipment, was this a true and accurate statement on November 20, 2000, yes or no; if you can?

A.      I don't know.

Q.      Do you have any reason to believe it was untrue back then?

A.      I have no reason to believe it was untrue, no.

Tr. 134-135.  Tanner further acknowledged that he knew that the banks were reviewing lease files at every closing (Tr. 151-153), and that the banks periodically raised questions to Mark

Fisher regarding perceived deficiencies in the lease files. Tr. 153-154; Tanner Depo., at 759:8-760:13.

Tanner's testimony in this regard suggests that Tanner was aware, at the time of closing, that the banks were relying on the accuracy of documents and representations contained in the lease file. Regardless, Tanner testified that he told neither the banks nor any Royal representative that the details of the transactions differed from the representations made in the transaction documents. Tr. 133, 324.

Again, despite Plaintiffs' focus on the time of "funding" of the Lease Bond transactions, the time of "funding" of these transactions was not addressed—and certainly was not given dispositive significance—in the transaction documents. Rather, those documents contained various representations by the Guardian Entities regarding the effectiveness of the leases and the time of delivery of the leased equipment. In light of these representations, it is difficult for Plaintiffs now to assert that they believed the Lease Bonds would be effective only upon delivery and funding of equipment at a later date.

### f.      Testimony Relating to "Substitution" of Lease Bonds

In an attempt to support their contention that the SSA created the underlying obligation between the parties, Plaintiffs relied on the lease "substitution" provisions contained in Section 9.1 of the SSA. In their pretrial brief, Plaintiffs argued that CMC's ability to "substitute" new leases for defaulted leases in a pool meant that the underlying obligation was actually the SSA rather than the lease. CadleRock/Guardian Brief, Doc. 2238, at 26. Although Plaintiffs suggested that such "substitution" of a lease could occur without the issuance of a new Lease Bond, Plaintiffs pointed to no language of the SSA that would permit transfer of a bond to a substitute lease.

At trial, moreover, the only testimony presented by Plaintiffs on this issue established only that no witness was certain whether such substitution had ever occurred in Royal's pools. Mark Fisher testified that substitution occurred in CMC's pools only rarely:

> Q. I believe CMC had a process in which to substitute leases; is that correct?
>
> A. Yes.
>
> Q. What was that process?
>
> A. From time to time throughout CMC's existence, leases would need to be substituted either because they were—they breached a representation or warranty, or they were in default. And CMC would just periodically, I don't know how many times, maybe three times over its whole life, other than—maybe more, went through and would take certain leases out of pools and put new ones in their place.

M. Fisher Depo., at 1274:16-1275:3. *See also* Holmes Depo., at 90:18-121.

Moreover, Plaintiffs were unable to produce any evidence demonstrating that substitution of a lease within a Royal pool could occur without issuance of a new bond. Wayne Pirtle, a CMC principal, testified that he was uncertain whether substitution of a lease under the relevant provisions of the SSA would require issuance of a new bond:

> Q. When replacement leases were obtained, did CMC obtain bonds on the new leases?
>
> A. No. We had the right to substitute collateral under those leases, and the bond—you know, I don't remember exactly how that worked. I would have to think about that a minute.
>
> But I know we had the right to replace collateral. We had the right to substitute leases. I don't know that we had to rebond or reinsure it. I'm not sure of that.

Pirtle Depo., at 268:6-18.

The only witness who testified with certainty as to CMC's process for substituting leases

in the Royal pools was Royal witness Jill Marisa Campos, the CMC employee who had responsibility for all lease and bond documentation at CMC. Ms. Campos testified unequivocally that issuance of a new bond <u>was</u> required for substitution of a lease:

> Q. Was Michael Anthony or A&M informed of the substitution of one lease for another?
>
> A. Yes, because we had to get a bond for the new one that was being replaced.

Campos Depo., at 203:3-6.

Given Ms. Campos's unrebutted testimony as to the necessity of a new bond for a lease substitution, the weight of this evidence does not lend any support to Plaintiffs' assertion that the obligations sought to be bonded by the Royal Lease Bonds were contained within the SSA rather than the underlying leases.

### g. Expert Testimony

Both the Plaintiffs and the Sureties proffered expert testimony in support of their respective positions as to the structure of the Lease Bond transactions, as well as the consequences that might be expected to flow from the creation of such a structure. For the reasons set forth in this subsection, the Court declines to rely on the testimony of either of the proffered experts in reaching the conclusions set forth in this Opinion.[49] For completeness, however, the Court provides a brief summary of the testimony of each proffered expert.

Plaintiffs' expert, Paul Palmer, is a structured finance executive employed by Capital

---

[49] Both Royal and Safeco filed motions seeking to exclude the testimony of Plaintiffs' expert, Paul Palmer, pursuant to *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993). Docs. 2246, 2254. The Sureties argue that Mr. Palmer's testimony fails to satisfy the reliability and relevance standards of Fed. R. Evid. 702 and *Daubert*, because it includes (1) erroneous legal conclusions (including conclusions as to contract interpretation); (2) personal beliefs as to the weight of the evidence; and (3) impermissible opinions on ultimate issues, such as breach of duty. Because the Court declines to rely on the testimony of Mr. Palmer, as set forth in this Opinion, the Court need not determine whether Mr. Palmer's testimony satisfies the standards of Fed. R. Evid. 702 and *Daubert* for purposes of this bench trial proceeding. The Court notes, moreover, that, while it allowed Mr. Palmer to testify in these proceedings subject to the Court's subsequent assessment of the Sureties' *Daubert* motion, the Court did not allow Mr. Palmer to express many of the opinions the Sureties challenged in their motion.

Credit Holdings.  Mr. Palmer was proffered to testify about the structure of the CMC Lease Bond transactions, which he described generally as "structured financial transactions" or, "effectively," "securitizations." Tr. 394, 347.  Mr. Palmer testified that a structured financial transaction is, essentially, an asset-based loan structure devised by the investment markets to separate the value of an asset from the enterprise that created the asset. Tr. 371-372.

According to Mr. Palmer, the transaction structure created by the parties here was a structure akin to that frequently utilized as a form of credit enhancement by parties needing to "monetize an asset"—in this case, the receivables of a lease.  Tr. 401-402.  In this regard, Mr. Palmer testified, the Sale and Servicing Agreement served a function much like that which would have been served by an Indenture in a classic securitization:

> Q.  What function did the Sales and Servicing Agreement play in that structured finance?
>
> A.  The Sales and Servicing Agreement would be called into an indenture that would tell the roles and responsibilities of the parties, who [owes] what to whom.

Tr. 395.

Essentially, Mr. Palmer testified, CMC contracted with the Sureties to mitigate the credit and performance risk on the Lease Bonds, thus permitting CMC to obtain a high advance rate on its receivables, with a low interest rate for repayment of its loans to its lenders. Tr. 371, 407-409. Mr. Palmer further testified that he based his conclusions as to the transaction structure in part on the language within the surety bond instrument, including (1) the "unconditional and absolute guarantee" language; and (2) the guarantee of servicing, which provisions he believed were indicative of the Sureties' commitment to undertake financial guarantee obligations. Tr. 405, 408.

Mr. Palmer testified, finally, that, in light of the financial guarantee structure reflected in

the transaction documents, the reference to CMC as obligee in the transaction documents "[didn't] make any sense," (Tr. 421), except if understood in the context of New York financial guarantee regulations—i.e., the "Appleton" rule. Mr. Palmer stated that the parties involved in the Lease Bond transactions must have "accepted this document with the understanding that this document was constructed in this way to avoid New York financial guarantee regulations. That's the only way it makes sense to me. . . ." Tr. 422.

The Sureties' expert, Geoffrey C. Hazard, Jr., is a Professor of Law at Hastings College of Law in San Francisco and the University of Pennsylvania in Philadelphia.[50] Additionally, as a former executive director of the American Law Institute, Professor Hazard oversaw the drafting and editing of the Restatement of Suretyship. Tr. 434. Professor Hazard was proffered to opine as to transaction structure generally, and to explain that particular rights and responsibilities flow from the structure chosen by the parties in any given transaction. Professor Hazard opined that the transactional structure generally determines the legal rights and responsibilities of parties to that transaction:

> Q. When a transaction is set up—and here again, I'm asking
> you—not asking you to opine on any issue of law, I'm only

---

[50]The Guardian Entities objected to certain legal conclusions contained in Professor Hazard's expert report and asked that he not be permitted to express legal conclusions at trial. The Court informed Professor Hazard that he, like all other witnesses in these proceedings, was barred from expressing any legal conclusions, thereby mooting Guardian's objection. *See* Tr. 435-36, 446-47.

CadleRock also objected to Professor Hazard's testimony. CadleRock argued that Professor Hazard was not sufficiently qualified to express opinions regarding the structure of the transactions at issue in this proceeding. Specifically, CadleRock argued that, because Professor Hazard had not actively participated in the structuring of corporate transactions or suretyship deals, he was ill-equipped to express opinions about them. The Court rejected CadleRock's objection on both procedural and substantive grounds.

First, as the Court noted at trial, no *Daubert* motion was filed seeking to bar Professor Hazard's anticipated testimony, despite a Court order setting a date for doing so and a standing order barring qualification-based attacks not filed by the Court's established *Daubert* deadlines. For this reason, the Court overruled the objection to Professor Hazard's qualifications as untimely. *See* Tr. 437-38, 446-47. The Court found, moreover, that Professor Hazard's education, training and involvement with cataloging the developments in the area of suretyship law rendered him sufficiently qualified to express the limited opinions he proffered in this matter.

asking you to opine relating to the purpose of the transaction—when a transaction is set up with a particular purpose that you're discerning from the documents themselves, would the—is it expected that the legal rights and responsibilities would flow from that structure without your opining on what those rights or responsibilities happen to be?

A.  Absolutely, and again, the simple example would be a corporation and a sales subsidiary.  If you have a corporation that's manufacturing advertising, saying we sell Volkswagens and it has a subsidiary that actually sells a vehicle to the local dealer, it makes all the difference in the world concerning eventual susceptibility to legal procedure in one state or another.  It's all kind of drawn on this example because it's so clear and simple.

You structure it this way, you get one result.  It's a big company.  One of the companies cannot be brought into the State of Ohio.  You set it up the other way, and they can.  Do lawyers know that?  Yes.  Is that the ambient law that's the legal structure that we transaction lawyers are doing things in?  Yes.  Do you pay attention when that's happening?  You bet.  You do it in a way that will make it happen in a way that will have the legal consequences you anticipate?  Yes.  That's what's involved in figuring out the structure of the transaction.

Tr. 450-51.  Professor Hazard opined, in particular, that the rights and responsibilities of parties to a multi-stage transaction would be different from the rights and responsibilities flowing from a single-stage transaction:

Q.  Where the transaction documents reflect a multi-stage structure, is the purpose of that structure to bring along the rights and responsibilities that relate to that structure?

A.  Well, that's the consequence of the structure.  I mean if you do it that way, then the rights and distributions of risks and opportunities follow from how the parties are characterized to find in the transaction documents.  ***  [T]his is the consequence we might say of legal planning.  And you want to set it up one way to produce one result of what the secondary and tertiary consequences are follows as a matter of law.  What those are is for the Court, not for me.

> Q. And if these documents reflected a one-stage transaction, is it correct that would have carried with it a different set of rights and responsibilities?
>
> A. Absolutely.

Tr. 452-453.

As noted above, while the Court finds that each of the proffered experts is knowledgeable in his field, and does not find it meaningful that they are not experts in each other's fields, the Court declines to rely on the testimony of either expert in connection with the issues presented in this bench trial.[51] Given the substantial witness testimony presented to the Court bearing upon the parties' transactional intent, as well as the language of the transaction documents themselves, the Court does not find expert testimony necessary to discern the intent of the parties to the CMC Lease Bond transactions. Indeed, most of what these experts discussed was placed into the record through a combination of (1) the parties' respective fact witnesses; and (2) the arguments of counsel regarding the legal and logical implications of that fact testimony.

In any event, the issues addressed by the parties' proffered experts here are largely tangential to the core questions presented to the Court. For example, while Professor Hazard testified that the obligations of the parties would flow from the chosen transaction structure, the ultimate question remaining for the Court is what the parties intended that transaction structure to be. Similarly, while Mr. Palmer testified that parties to a securitization seek a particular level of comfort from the "guaranteed" aspect of that transaction structure, it is the transaction documents and the parties' testimony to which the Court must turn to determine whether a securitization

---

[51] As this Court observed on the record, the parties' attacks on each other's experts on grounds that their expertise was too narrow are not well-taken. The Sureties challenged Mr. Palmer's testimony based on his lack of experience with suretyship, while Plaintiffs suggested that Professor Hazard had insufficient experience with securitization transactions. Given that the parties dispute which transactional structure is at issue in these cases, the fact that each party's experts have expertise limited to the transactional area endorsed by that party is neither surprising nor disqualifying. *See* Daubert Proceeding Tr. at 9-10.

occurred. As the Court has explained within this Opinion, the record is replete with evidence reflecting the intent of the parties, and that evidence supports the Court's finding that the parties actually intended to consummate a transaction where CMC was named as the original obligee.

None of the expert testimony relied on by the parties is sufficient to override or outweigh the evidence bearing directly on intent. While Plaintiffs rely heavily on (1) Mr. Palmer's testimony that naming CMC as obligee in the first stage of the transaction "[didn't] make any sense," (Tr. 421); as well as (2) Professor Hazard's concession that the multi-stage transaction "wouldn't make any sense" if it had ended after the first stage (Tr. 483-84), the reality is that the first stage was not the entirety of the transaction structured by these parties. In fact, as previously noted, the bulk of the evidence demonstrates that all parties both understood and intended that the contemplated transaction would occur in two stages.

Mr. Palmer's testimony seems to suggest, at best, that certain parties to the transaction, particularly the lender banks, may have hoped for a securitization structure—and, in fact, may have negotiated to create transactions that were <u>as close as possible</u> to a securitization structure within the framework of a surety bond. In reality, however, the transactions ultimately entered into were not structured as securitization transactions, and the Court cannot construe them as such. Unlike certain transactions previously considered by the Court in its Illinois Union Opinion, the transactions presently before the Court lack the essential features of securitization transactions.[52] Thus, despite Mr. Palmer's testimony that he viewed the Lease Bond transactions as securitizations, neither the transaction documents, nor the witness testimony as to the parties' intent, permit the Court to conclude that these transactions gave rise to such a structure.

The "securitization" issue will be addressed in detail in section II.B.4. of this opinion. The expert testimony proffered by the parties, however, adds little to that analysis.

---

[52] *See* section II.B.4., *infra.*

### 3.     An Examination of Plaintiffs' Proffered Evidence Does Not Support a Finding that the Guardian Entities Were the Intended Obligees of the Lease Bonds

In sections II.B.1. and II.B.2., above, the Court conducted a detailed review of the evidence and witness testimony supporting Royal's construction of the CMC Lease Bond transactions.  As noted previously in this Opinion, the vast majority of all evidence and testimony supports Royal's assertion that the parties intended a transaction in which CMC was named as the original obligee.

There remain, nonetheless, certain unusual facets of these transactions, the import of which is less clear, and which arguably lend support to Plaintiffs' claim of obligee status.  The Court, accordingly, conducts a separate examination of specific aspects of Plaintiffs' proffered evidence.  Upon review, the Court remains convinced that the evidence presented by Plaintiffs is insufficient to demonstrate that the parties actually intended a transaction in which the Guardian Entities would have original obligee status.  Rather, the Court concludes, the parties intended to effectuate the precise transaction memorialized in the Lease Bond transaction documents—the issuance of Lease Bonds guaranteeing payments on the underlying leases to the lessor, CMC, and its assignees.  While it seems that <u>both</u> parties anticipated a transaction that would have many of the protections of a securitization, both parties understood that they were not structuring a securitization, and could not do so under Appleton.

### a.     Language of Transaction Documents

Plaintiffs have relied heavily on certain specific language contained in the Lease Bonds and SSAs—which language, Plaintiffs argue, is consistent only with a finding that Plaintiffs are the original obligees on the Lease Bonds.  As the Court explained in section II.B.1. of this Opinion, an analysis of the entirety of the transaction documents defeats Plaintiffs'

interpretation.  Since these arguments are central to Plaintiffs' position, however, the Court addresses them in further detail herein.

First, as previously noted in this Opinion, Paragraph 5 of the Lease Bonds defines "default" under the bonds as follows:

> If the Obligee fails to receive a payment under the Lease from the Surety, as servicer or from any sub-servicer, on the scheduled due date, default under the Lease occurs.  Upon such default, the Surety shall have thirty (30) days to cause the default to be remedied.  The Surety shall make payment on this Bond to Obligee upon receipt of written demand from Obligee, within this 30 day period.

Royal Exh. 1, Tab 10; CadleRock Exh. 44.

Plaintiffs assert that several aspects of this "default" language are inconsistent with a finding that CMC is the intended obligee.  First, Plaintiffs contend, the "default" language contained in paragraph 5 refers not to payments from the lessees, but from the "Surety, as servicer or from any sub-servicer. . . ."  According to Plaintiffs, this choice of language strongly suggests that the payment referenced in paragraph 5 is one to be made by CMC to its investors—the Guardian Entities or their lender banks.

Plaintiffs point out another potential inconsistency between the language of paragraph 5 and the "obligee" status of CMC.  Since CMC was both sub-servicer and named obligee, Plaintiffs contend, construing the "obligee" language as referring to CMC within this paragraph would result in an absurdity—i.e., defining "default" as occurring upon CMC's failure to make payments to itself.

Plaintiffs additionally rely on paragraph 2 of the Lease Bonds, which provides:

> The Surety is responsible to Obligee for the individual underwriting of each lessee and Lease, including, but not limited to, all related credit matters, issues of fraud, bankruptcy and the accurate and timely performance by any sub-servicer designated by

> Surety, and Surety shall assert no defenses to any claim under this Bond as a result of any of the foregoing. This Lease Bond and the Surety's obligation constitute an unconditional and absolute guarantee of payment, not collection.

Royal Exh. 1, Tab 10; CadleRock Exh. 44. Plaintiffs argue that the language of paragraph 2 obligates the Sureties not only to guarantee Lease Bond payments but to assume responsibility for additional matters, including (1) the underwriting of each lessee and Lease; and (2) CMC's servicing of the Leases. Royal Exh. 1, Tab 10, at ¶ 2. The guarantees of CMC's performance undertaken by Royal in this paragraph suggest, according to Plaintiffs, an assumption of responsibility to the lender banks rather than to CMC.

More broadly, Plaintiffs contend, the reference within this paragraph to the "servicer" and "sub-servicer" of the leases suggests an essential connection between the Lease Bonds and the SSAs contemplated in the second stage of each Lease Bond transaction. Plaintiffs assert that the use, within the Lease Bonds, of these terms defined within the SSAs means that the Lease Bonds cannot be read or understood without reference to those SSAs. From this premise, Plaintiffs infer that the SSA, rather than the Lease Bond, is the relevant document reflecting the essence of the parties' agreements.

In further support of their position, Plaintiffs rely on the language of certain definitional sections contained within the SSAs. First, Plaintiffs contend that the SSAs' definition of "Surety Bond" supports an inference that the parties intended the Guardian Entities to have original obligee status. That section defines "Surety Bond," in relevant part, as a bond issued by a Surety, which CMC has "(i) purchased in order to protect against losses incurred due to default by the Lessee, and (ii) in which the Purchaser is named as loss payee, beneficiary, or obligee. . . ." Royal Exh. 1, Tab 5, at SKY KKYA 00148; CadleRock Exh. 44 (emphasis added). Plaintiffs assert that, since the SSAs define Guardian as the "Purchaser," the underscored language is

equivalent to an identification of the Guardian Entities as "obligees" in the Lease Bond transactions.

Finally, Plaintiffs note that, within the SSAs, the Surety Bonds are defined as "Related Documents" and are part of the "Transferred Assets" conveyed by CMC to the Guardian Entities within the SSA documents. Overall, Plaintiffs argue, the Lease Bonds and SSAs are inextricably linked, and the Court should not make a determination of "obligee" status based only on the obligations undertaken by the Sureties within the four corners of the Lease Bond.

The Court rejects each of the Plaintiffs' arguments with respect to the import of the language of these transaction documents. First, with respect to the language of the Lease Bonds, the Court finds that the targeted references to the "servicer" and "sub-servicer" within the bonds refer to the contemplated method of transmission of payments, and do not give rise to independent rights on the part of the Guardian Entities.

As noted previously in section II.B.1. of this Opinion, the Lease Bonds specifically define the payments to be guaranteed as payments "due and owing by the principal <u>with regards to the lease</u>. . . ." Royal Exh. 1, Tab 10; CadleRock Exh. 44 (emphasis added). The references in paragraph 5 to the "servicer" and "sub-servicer" do not serve to alter this definition. In fact, paragraph 5 continues to define default as a failure by the Obligee to receive "payment under the Lease. . . ." Royal Exh. 1, Tab 10; CadleRock Exh. 44.[53] The juxtaposition of the "servicer" and "sub-servicer" references with the "payment under the Lease" language, within the same paragraph, suggests that the parties understood the interrelationship of these two phrases and

---

[53] The documentary evidence introduced at trial further confirms that the parties always intended to define "default" in relation to the underlying lease. In a letter introduced as Royal Exh. 28, Thomas Holmes, attorney for the Guardian Entities, proposed defining "default" as "when the Obligee notifies Surety that Obligee has not received a lease payment. . . ." Royal Exh. 28, at UB 001748. In a draft submitted to Michael Anthony on March 1, 1999 (also introduced as part of Royal Exhibit 28), Neil Gurney proposed defining default as "when lessee fails to make payment or other charges when due under the Lease. . . ." Royal Exh. 28, at UB 001756-001757.

intended a meaning that would render the two phrases compatible. In this context, the "servicer" and "sub-servicer" references are best understood as referring to the method of transmission of the lease payments rather than the identity of the payor party.

The references to the "servicer" and "sub-servicer" language make clear that all parties anticipated the execution of the SSAs in the "second stage" of these transactions. Once that second stage was complete, all parties expected lease payments to flow (1) from the lessees to CMC (as lessor); and (2) from CMC (as sub-servicer) to its investors, the obligees by assignment. The language in paragraph 5 reflects the parties' understanding of the flow of funds, and provides that default shall occur under the lease upon the breakdown of either of these two steps in the transmission process.

That the parties understood assignments would be effectuated in the second stage of these transactions also is clear from paragraph 5's reference to receipt of payment by an "Obligee . . . from any sub-servicer. . . ." Plaintiffs have vigorously argued that an absurdity would result from construing CMC to be the "Obligee" within paragraph 5. What Plaintiffs have ignored, however, is that all parties to these transactions understood and expected additional, subsequent obligees to succeed to the rights of CMC upon the execution of the SSAs and assignment documents. In fact, neither of the Sureties has disputed that the Guardian Entities succeeded to "obligee" status at some point in time. The Guardian Entities purchased that status from CMC, and succeeded to the rights of CMC upon consummation of the "second stage" of the Lease Bond transactions.

While the language of paragraph 5 might have made little sense in the context of a "single-stage" transaction, the evidence demonstrates that all parties knew these to be two-stage transactions. Given this universal understanding, it is apparent that the language of paragraph 5

does no more than protect the right of subsequent obligees to make claims under the bonds based upon their failure to receive payments of lease income from CMC, the designated sub-servicer.

The guarantees of performance in paragraph 2 of the Lease Bonds, as well as the further references to the "servicer" and "sub-servicer" of leases contained within that paragraph, also must be read within this two-stage framework. Although CMC was designated the original sub-servicer under the SSA, the SSA permitted Royal to appoint other sub-servicers, provided that Royal assumed ultimate responsibility for the servicing of the leases. Paragraph 2, like the rest of the Lease Bond, was designed to provide a continued flow of payments in the event of transfer of rights or substitution of any party involved in the transaction.

The fact that all parties understood that CMC's assignees would become the beneficiaries of the Lease Bonds, and that the Lease Bonds were structured in recognition of those future interests, does not mean that the Court may disregard the plain language of the transaction documents governing the manner in which these future obligees would acquire their interests. Paragraph 7 of the Lease Bonds (Royal Exh. 1, Tab 10; CadleRock Exh. 44) recognizes CMC's right to assign its interests, and section 2.1 of the SSAs (Royal Exh. 1, Tab 5, at SKY KKYA 00150; CadleRock Exh. 44) confirms that the Guardian Entities acquired their rights by assignment. As noted previously, in section II.B.1. of this Opinion, these documents contain no language providing for contingencies to their effectiveness, nor do they suggest that a subsequent assignment may effectively "undo" CMC's original obligee status.

While the Court recognizes the integral connection between the Lease Bonds and SSAs, there is no language in the SSAs suggesting that the Guardian Entities were intended to acquire rights other than as assignees of CMC's rights under the leases and Lease Bonds. In fact, as previously noted in section II.B.1. of this Opinion, the SSAs do not create any independent rights

to payment in the Guardian Entities.[54]  Rather, section 4.6 of the SSAs expressly provides that CMC has no obligation to make servicer advances or to make any other payments to its assignees. Royal Exh. 1, Tab 5, at SKY KKYA 00171-00172; CadleRock Exh. 44.  Thus, all of the transaction documents compel a finding that the rights assigned to the Guardian Entities in section 2.1 of the SSAs were rights created by the underlying leases and the Lease Bonds, not by the terms of the SSAs themselves.

Plaintiffs' reliance on the definitional language of the SSAs does not change this conclusion.  Plaintiffs have cited to the SSAs' definition of "Surety Bond," which refers to a bond "in which the Purchaser is named as loss payee, beneficiary, or obligee. . . ." Royal Exh. 1, Tab 5, at SKY KKYA 00148; CadleRock Exh. 44 (emphasis added).  Plaintiffs have failed to note, however, that the same definitional section also refers to a bond "purchased in order to protect against losses incurred due to default by the Lessee. . . ." Royal Exh. 1, at SKY KKYA 00148; CadleRock Exh. 44 (emphasis added).  The language linking the bond to the lease obligations confirms that this section was not intended to change the underlying obligation undertaken in the Lease Bonds.   Moreover, even if this section could be read in the manner urged by Plaintiffs, this definitional section could not create obligee status where none otherwise would exist.

Rather, the Court finds that this definitional section does no more than acknowledge the parties' understanding that "obligee" rights would arise in the Guardian Entities by virtue of the assignments to be consummated in the "second stage" of the Lease Bond transactions.  As

---

[54] Even if the SSAs did give rise to independent rights in the Guardian Entities (which rights were later acquired by Sky pursuant to foreclosure and sale of its collateral), the Court previously has found that CadleRock did not succeed to any of Sky's rights in the SSAs through the A&A agreement. (Doc. 2214).  Thus, if Plaintiffs were successful in convincing this Court that the operative documents giving rise to Plaintiffs' rights were the SSAs, it is questionable whether CadleRock would have any rights against Royal at all.   Since the Court has found that Plaintiffs have succeeded to the rights of CMC under the Lease Bonds by assignment, however, the Court need not address this question.

previously noted, paragraph 7 of the Lease Bonds contains language expressly permitting the assignment of Lease Bond rights, and further provides that any assignee of CMC's rights in a Lease Bond "shall become the obligee under this Bond. . . ." Royal Exh. 1, Tab 10. The rights possessed by the Guardian Entities after the execution of the SSAs unquestionably were in the nature of "obligee" rights—even if those rights were limited by the scope of the rights held by CMC prior to the assignment. Thus, although the Guardian Entities were not designated as <u>original</u> obligees under the Lease Bonds (and accordingly did not obtain all rights available to an original obligee), the Guardian Entities' rights as <u>obligees by assignment</u> were incorporated in the Lease Bonds by reference, by virtue of the language of paragraph 7. The Court finds that the definitional provisions of the SSAs reflect the parties' recognition of these rights to be conferred upon the Guardian Entities by assignment of CMC's interests.

In any event, as noted by Royal in its post-trial brief, to the extent the actual structure of the transaction did not comport with the expectations of the Guardian Entities, the mistake should have been immediately apparent from the face of the Lease Bonds, and the Guardian Entities had the opportunity to refuse to proceed with the transaction as structured. *See, e.g., Burnand v. Nowell*, 84 Cal. App. 2d 1, 6 (Cal. App. 2d Dist. 1948)(reformation of deed denied "where [purchaser] had knowledge of such deficiency at the time the deed thereto was tendered and failed to object. . . ."). The Guardian Entities did not take such action, however—presumably because, as all Guardian witnesses testified, they in fact expected that they would take the rights of CMC as assignees under the SSAs. In such circumstances, the Guardian Entities have effectively waived any objection to the structure of the Lease Bond transactions.

Accordingly, the Court rejects Plaintiffs' arguments based upon the language of the Lease Bonds and SSAs, and reaffirms its finding that the plain language of the transaction

documents expresses the intention of all parties to name CMC as the original obligee in the Lease Bond transactions.

### b. Indemnity Agreements/ Evidence of CMC's "Principal" Status

In support of their contention that CMC was intended to be a "principal" rather than an obligee on the Lease Bonds, Plaintiffs also have relied heavily on certain components of the transaction structure which, according to Plaintiffs, are inconsistent with a finding of obligee status on the part of CMC. A primary focus of Plaintiffs' argument is the existence of indemnity agreements running from CMC (and its principals) to Royal.

Plaintiffs rely on statements by this Court in the Lead Opinion, and by the Sixth Circuit in its decision on appeal of the Illinois Union Opinion, indicating that the existence of an indemnity agreement may be a factor demonstrating the "principal" status of the indemnitor. *See* Lead Opinion, Doc. 1708 ("The Court agrees that the indemnity agreements, which designate CMC as principal, and affirmatively oblige CMC to indemnify each respective Surety, shed significant light on the transaction and tend to indicate the Sureties' intent to benefit parties other than CMC through the lease guarantee transactions. . . ."); *Commer. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 341 (6th Cir. 2007)("it is quite common for an indemnity agreement to be entered into between a principal obligor and the secondary obligor. . . .").

Plaintiffs also cite to the testimony of surety broker Michael Anthony, which they argue supports their view that the existence of an indemnity agreement renders CMC the "principal" on the Lease Bond transactions:

> Q.      Given your understanding of this program and your participation in the issuance of the bonds and discussions with banks and the sureties about the bonds is it your understanding that under these bonds [] CMC is a principal?

Specifically, was it your understanding that CMC was a co-principal with the individual lessees?

A.   I believe CMC was responsible as a company and personally for any losses that the surety and/or insurance company absorbs.

Q.   Isn't that generally in the world of the surety bonds, isn't that the principal [sic], that if the surety has to pay the principal indemnifies the surety?

A.   Correct.

Q.   Have you ever sold a bond, a surety bond where the obligee was responsible for indemnifying the surety if the surety paid the obligee on the bond?

A.   No.

Q.   You agree that, would that render the bond meaningless if the obligee had to pay back the surety for what the surety paid the obligee under the bond?

A.   In my opinion, you're right.

A.   I would like to clarify.  I would like to clarify my last answer.

Q.   Go ahead.

A.   In no case have I ever seen any obligee indemnify the surety, other than this CMC program, which I considered very unique.  This is the first time I have ever seen it happen, but the intent was that the bonds were going to be immediately assigned to an investor, and that CMC was most likely a co-principal rather than co-obligee.

Anthony Depo., at 401:5-403:17.

Royal, on the other hand, maintains that the existence of the GIAs, whether considered alone or in combination with other factors, does not lead to a finding that the Guardian Entities were the original, intended obligees.  Royal argues, first, that the GIAs were not executed on behalf of CMC until after the closing of the first SSA transaction, in which the first set of Royal

Lease Bonds had been assigned to a Guardian Entity. Thus, with respect to the first Royal transaction, CMC was not an indemnitor during any time period in which it retained its obligee status.

With respect to the later Royal Lease Bond transactions, Royal contends that the existence of the GIAs was based on the understanding of all parties that the same two-stage transaction would be completed. Royal argues, in effect, that the parties did not intend to enforce the GIAs against CMC while CMC retained obligee status. Rather, Royal asserts, the GIAs were intended to provide the Sureties with the ability to recoup losses from CMC if the Sureties were compelled to pay on claims made by later obligees—the assignees of CMC.

Finally, Royal contends, the GIAs did not impose an indemnity obligation on CMC alone. Rather, those agreements were also executed by Sterling Wayne Pirtle and Ron Fisher individually, as well as their spouses. Since the indemnification was from a group which had participants other than only the Lease Bond obligee, Royal asserts, the structure of the obligations created in these transactions would not have been circular, and the GIAs would not have "canceled out" the Lease Bond obligations.

As previously noted, Plaintiffs and Royal do not dispute that the GIAs executed by CMC, its principals and their spouses created an obligation on the indemnitors in favor of Royal for any liability incurred by Royal on the Lease Bonds. *See* Pirtle Depo., at 1910-1911; CadleRock/Guardian Exh. 5, at RICNB 00405.[55] The parties dispute, rather, the import of the indemnity agreements when coupled with Lease Bonds plainly identifying CMC as the obligee of the Lease Bond transactions.

While the Court recognizes the superficial appeal of Plaintiffs' argument and the apparent

---

[55] Safeco, on the other hand, disputes that its GAIs actually were intended to cover any liability incurred by Safeco in connection with the Lease Bonds. Safeco's arguments will be discussed in detail later in this Opinion.

ambiguity presented by the existence of the GIAs, the Court ultimately finds that the execution of GIAs by CMC and its principals does not prevent this Court from finding that CMC was the original obligee under the Lease Bonds. First, as the Court noted in the Lead Opinion, the juxtaposition of indemnity agreements with the Lease Bonds, SSAs and other transaction documents creates an interpretive difficulty, since the indemnity agreements alone are insufficient to permit a modification of the plain language of the transaction documents. *See* Lead Opinion, Doc. 1708, at 27. Accordingly, as the Court found in the Lead Opinion, the indemnity agreements may support a reformation of the Lease Bonds only if buttressed by additional extrinsic evidence demonstrating that the parties actually intended to name the Guardian Entities as obligees on the Lease Bonds. *See* Lead Opinion, Doc. 1708, at 27-28.

After conducting a bench trial on this issue and considering all evidence proffered by the parties, the Court again finds that the existence of the indemnity agreements is, in connection with all other evidence, insufficient to support a reformation of the plain language of the Lease Bonds. As previously discussed in sections II.B.1. and II.B.2. of this Opinion, the vast majority of the evidence and testimony presented by the parties undercuts Plaintiffs' reformation arguments. Representatives of CMC, the Sureties, Guardian, and Sky Bank, all testified that (1) the parties understood the "two-stage" structure of the Lease Bond transactions; (2) CMC and the Guardian Entities made unambiguous representations, both in the transaction documents and elsewhere, as to the validity of the leases and Lease Bonds upon execution, prior to the assignment of CMC's rights to Guardian; (3) the parties understood that the obligations undertaken in the Lease Bonds constituted guarantees of lease payments, not loans; and (4) all parties intended that the Guardian Entities would take the rights of CMC as assignees.

In the face of the overwhelming evidence of transactional intent, the Court concludes that

the indemnity obligations undertaken by CMC in the GIAs do not override the parties' clear designation of CMC as obligee in the Lease Bonds, and do not support Plaintiffs' reformation claims. To the extent the obligations undertaken by CMC in the GIAs suggest an inconsistency with the Lease Bonds, the Court finds that any apparent inconsistency is explained by the parties' recognition of the two-stage nature of these transactions. The execution of the GIAs by CMC, while creating an apparently circular obligation at the first stage of the transactions, gave rise to a logical structure—one that was intended by the parties—upon the assignment of CMC's rights through the SSAs at the second stage.

Michael Anthony's testimony as to CMC's principal status, heavily relied upon by Plaintiffs, does not change this analysis. First, as Anthony is neither a party to the transaction nor an attorney, his personal opinion as to CMC's "principal" status carries little weight. Second, Anthony testified unequivocally as to the parties' understandings that (1) the Lease Bonds were intended to guarantee leases, not loans; and (2) the parties understood that the Guardian Entities would take the rights of CMC by assignment. These facts, as previously explained by the Court in sections II.B.1. and II.B.2. of this Opinion, are inconsistent with any finding that the parties intended CMC to be a Lease Bond principal.

Finally, Anthony testified that the obligations undertaken by CMC in the indemnity agreements were "unique," but that these unique obligations likely were attributable to the parties' intent that CMC would immediately assign the Lease Bonds. Once again, while this transaction may have appeared illogical if artificially collapsed into one stage, the parties were entitled (for any reason) to structure a transaction that would give rise to the rights and obligations that they intended and desired after the completion of the second stage. Accordingly, the existence of certain apparent inconsistencies at the first stage does not permit the Court to

disregard the parties' carefully constructed structure.

In arguing that CMC was intended to be a "co-principal" rather than an obligee in the Lease Bond transactions, Plaintiffs also rely on several other unique aspects of the transactions. Upon examination, the Court finds each of these factors similarly unpersuasive. Plaintiffs note that:

(1)    CMC applied for, and paid for, the Lease Bonds for the benefit of its investors/purchasers. *See* M. Fisher Depo., at 1260; Carron Depo., at 374:21-24.

(2)    CMC was required to maintain internal cash reserves to fund sub-servicer advances. *See* Anthony Depo., at 1710-1713, 1717-1719.

(3)    CMC also posted cash collateral reserves with each Surety upon the closing of each SSA transaction. *See* Anthony Depo., at 117-120, 1710-1713.

(4)    Following the execution of the SSA transactions, each investor was the party in actual possession of the original Lease Bonds. *See* Anthony Depo., at 2896-2898.

While Plaintiffs argue that each of these factors is consistent only with the existence of "principal" status on the part of CMC, the Court finds that none of these factors, alone or in combination, are particularly compelling in the context of the Royal Lease Bond transactions. With respect to the requirements that CMC maintain internal reserves and post cash collateral reserves with the Sureties, those conditions do not appear irrational in light of the two-stage "assignment" structure and the indemnification obligations undertaken in connection with that structure. CMC's agreement to pay premiums for the Lease Bonds, while also somewhat unusual, is similarly reasonable in light of this unique transactional structure.

Finally, although Plaintiffs rely on Michael Anthony's testimony that the original Lease Bonds were delivered to the lender banks, Anthony actually testified that the original bonds were

delivered to CMC, which then delivered the bonds to the investors. Anthony Depo., at 2896-2898. This sequence of events certainly is not inconsistent with the assignment structure memorialized by the transaction documents and, ultimately, lends no support to Plaintiffs' position.

Accordingly, the Court declines to accept Plaintiffs' position that the GIAs, in combination with other elements of the transaction structure, indicate the existence of original "principal" status on the part of CMC. Rather, the Court adheres to its determination that the entirety of the parties' proffered evidence compels a finding that CMC was the intended original obligee of the Lease Bond transactions.

### c. "Comfort" Letters

As previously explained, in connection with the closing of each of the Royal transactions, Royal provided a "comfort letter" to each Guardian Entity's lender bank, affirming the validity of the Lease Bonds and SSAs executed in connection with that particular transaction. *See* Royal Exh. 1, Tab 7, at HNB 00405; Royal Exh. 2, Tab 8; Royal Exh. 3, Tab 7. Plaintiffs contend that Royal's issuance of such letters directly to the lender banks is significant, since it demonstrates that Royal knew that the ultimate beneficiary of its Lease Bond obligations was to be an entity other than CMC.

Royal, on the other hand, asserts that the "comfort letters" have no impact on the transaction structure, since those letters do not attempt to explain the terms of the Royal Lease Bonds and convey no additional rights either to the Guardian Entities or to their lenders. Rather, the comfort letters simply confirm that the Lease Bonds issued in each transaction were "in full force and effect," and that each bond is "enforceable in accordance with its terms. . . ." Royal Exh. 1, Tab 7, at HNB 00405.

Upon review of the language of the comfort letters, the Court agrees with Royal. The language contained in the Royal letters is straightforward, and is limited to confirming the effectiveness and validity of the Lease Bonds. The Court does not find, moreover, that Royal's transmission of these letters directly to the Guardian Entities' lender banks is evidence of anything other than Royal's knowledge of the intended assignments.

In any event, Royal's transmission of the comfort letters to the lender banks is hardly indicative of an intent on the part of Royal to alter the transaction documents to effect a change in the status of the Guardian Entities. Upon careful examination, the Court is unable to find any language in the Royal comfort letters that would suggest any contemplated change to the terms of the transaction documents. It is clear, accordingly, that the Royal comfort letters do not grant obligee status, or any status at all, to the Guardian Entities.[56]

### d.      Evidence as to Late Delivery of Leased Equipment

As previously noted, Plaintiffs argued at trial that the time at which CMC "funded" each of the leases is significant, since it was the funding that defined when the leases were to become effective, and the Lease Bond obligations were to become "active." As the Court previously has explained, however, neither the transaction documents nor the witness testimony presented at trial support Plaintiffs' position, since (1) the proffered evidence demonstrated that CMC frequently purchased equipment on "trade credit," for later payment after the closing of the SSA transactions; and (2) the parties entered into these transactions based upon representations that the equipment had been delivered prior to the closing of the SSA transactions.

In the face of this abundance of evidence demonstrating that the date of "funding" was

---

[56] In fact, Plaintiffs do not seriously argue that the Royal comfort letters have any such effect. Rather, Plaintiffs focus the majority of their argument on the language of the Safeco comfort letters. The Court's analysis of the Safeco comfort letters is more complex, and will be set forth in detail later in this Opinion.

irrelevant to the validity of the Lease Bonds, Plaintiffs have proffered evidence tending to show that equipment often was not in fact <u>delivered</u> until after the closing of the SSA transactions. Presumably, Plaintiffs suggest that a delay in delivery also would serve to demonstrate the parties' intent to delay the effective date of the leases and Lease Bonds.

In this regard, Plaintiffs presented the testimony of Jon Gluckner, account manager of CadleRock, who currently holds responsibility for servicing the lease pools held by CadleRock. Tr. 589-90. Mr. Gluckner testified that, at least in some cases, Quick-Track reports[57] placed in the lease files after closing reflected that the equipment had not been delivered as of the date of closing. Tr. 594-595 (relating to the Alliance Restoration lease).

On cross-examination, however, Mr. Gluckner admitted that the lease files in CadleRock's possession contained documents that had been added after the date of closing, (Tr. 602-603), and that the Quick-Track reports contained in CadleRock's files were not part of the documentation provided to Royal at closing. Tr. 604. In fact, Mr. Gluckner testified, since several of the Quick-Track reports contained in CadleRock's file were generated after the Guardian IX closing, those documents could not have been provided to Royal prior to closing. Tr. 607-608.

For the reasons explained previously in sections II.B.2.d. and II.B.2.e. of this Opinion, and herein, the Court finds Mr. Gluckner's testimony irrelevant to the question presented in this bench trial proceeding. As previously noted, evidence regarding the actual date of delivery of the leased equipment is insufficient to override the express language of the transaction documents or other substantial evidence of the parties' respective intent therein.

First, as the Court has noted, the effectiveness of the leases and Lease Bonds was not

---

[57] Mr. Gluckner testified that Quick-Track was a third-party verification service utilized by CMC to confirm the existence and delivery of the leased equipment. Tr. 590.

conditioned on delivery of the leased equipment. Second, regardless of the actual timing of delivery, the proffered evidence demonstrated that, at the time of execution of the SSAs, the parties believed that delivery had occurred. All witnesses testified either that the leased equipment was delivered prior to closing of the SSAs, or that they were uncertain when such delivery occurred.

Third, the Delivery and Acceptance Receipts signed by the lessees contained affirmative representations that the equipment subject to lease had been delivered and accepted by each lessee prior to the date of closing. Finally, and perhaps most significantly, the Purchase and Security Agreements and Credit and Security Agreements contained representations by CMC and Guardian, parties to the SSA transactions, that delivery of the leased equipment had occurred, or would occur prior to closing of the SSAs.

In light of the multiple representations contained in the transaction documents, the Court cannot conclude that Royal would have known or expected that delivery of equipment had not occurred as of the time of closing. Absent such knowledge, Royal could not have intended to issue Lease Bonds whose effectiveness was conditioned upon delivery of the leased equipment at some unknown future date.

Accordingly, the Court finds that evidence as to the date of delivery of the leased equipment is irrelevant to the issues presented to the Court, and can have no bearing on the Court's conclusions as to the "obligee issue."

### e. Novation Argument

Both in their briefing and during trial arguments, Plaintiffs placed significant reliance on their alternative argument that the parties intended the execution of the SSAs to constitute a "novation," in which the Guardian Entities, with the consent of all parties, were substituted for

CMC as obligee on the Royal Lease Bonds. Plaintiffs argue, in essence, that the parties intended, upon the execution of the SSAs, to extinguish the obligations contained in the Lease Bonds and substitute a new contract in which the Guardian Entities were the beneficiaries of Royal's guarantees.

In support of this position, Plaintiffs cite ¶ 7 of the Lease Bonds, providing that "[a]ny such assignee shall become the Obligee under this Bond. . . ." Royal Exh. 1, Tab 10, CadleRock/Guardian Exh. 55. Plaintiffs argue that this language demonstrates a clear intent to substitute one obligee for another, thus effecting a novation.

Royal, on the other hand, vigorously disputes that the transaction documents contain any language from which the Court could infer the intent to create a novation. Rather, Royal argues, the execution of the SSAs could not have created a novation, because the SSAs imposed no obligations on Royal other than servicing responsibility. According to Royal, the SSAs could not have imposed an obligation on Royal to make payments to the Guardian Entities, because the SSAs imposed no payment obligations on Royal at all.[58]

Royal further argues that section 2.8 of the SSA negates any inference of intent to effect a novation through the SSAs. That section provides for the reversion of any remaining "Transferred Assets", including the Lease Bonds, to CMC upon the investors' receipt of all sums due. *See* Royal Exh. 1, Tab 5, at SKY KKYA 00157. CMC's reversionary interest in the Lease Bonds, Royal asserts, is inconsistent with any intent to extinguish all rights of CMC upon the execution of the SSAs. Finally, Royal argues, Plaintiffs cannot establish a claim of novation

---

[58] In addition, Royal argues with some force that, since this Court previously has ruled that CadleRock has no rights under the SSAs (Doc. 2214, at 55-69), CadleRock cannot in any event seek to enforce any rights arising from the SSAs against Royal. Royal further argues that Plaintiffs should be precluded from claiming novation, since Plaintiffs pleaded facts in their Amended Complaints that are inconsistent with the existence of a novation. Given the Court's finding, in this section, that the execution of the SSA did not effect a novation, the Court need not address these issues.

without overcoming Royal's "fraud in the inducement" defense, because a showing of novation requires the existence of a prior valid contract.

"Novation is the substitution of a new obligation for an existing one. . . ." *Wells Fargo Bank v. Bank of America*, 32 Cal. App. 4th 424, 431 (Cal. App. 2d Dist. 1995); *see also Howard v. County of Amador*, 220 Cal. App. 3d 962 (Cal. App. 3d Dist. 1990). A novation may be effected either by "(1) a new obligation between the same parties[;] or (2) a new obligation arising because of new parties, either a new debtor or new creditor. . . ." *Wells Fargo*, 32 Cal. App. 4th at 431. "The effect of a novation is to make the original agreement a nullity (that is, void and of no effect), and the rights of the new parties are governed solely by the new agreement. . . ." *Eckart v. Brown*, 34 Cal. App. 2d 182, 187 (Cal. App. 2d Dist. 1939).

Under California law, there are four essential requirements for creating a novation: "First, a previous valid obligation; second, the agreement of all the parties to the new contract; third, the extinguishment of the old contract; and fourth, the validity of the new one. . . ." *Airs Int'l v. Perfect Scents Distributions*, 902 F. Supp. 1141, 1147 (N.D. Cal. 1995). In order to establish that the parties intended to effect a novation, it must "clearly appear that the parties intended to extinguish rather than merely modify the original agreement. . . ." *Grand Ave. Partners, L.P. v. Goodan*, 25 F. Supp. 2d 1064, 1068 (C.D. Cal. 1996)(internal quotation omitted); *see also Hunt v. Smyth*, 25 Cal. App. 3d 807, 818 (Cal. App. 1st Dist. 1972).

Thus, essential to any novation is the existence of a previous, valid obligation. *See Airs, Int'l*, 902 F. Supp. at 1147. Royal cites several cases in which courts have held that a fraud in the inducement defense is not waived by the parties' execution of a novation. *See, e.g., Holder v. Maaco Enterprises*, 644 F.2d 310, 313 (4th Cir. 1981); *Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch)*, 237 B.R. 160, 171 (B.A.P. 9th Cir. 1999). It appears, therefore, that even

if Plaintiffs could establish that the parties intended a novation, such a finding still would not insulate Plaintiffs from the Sureties' fraud in the inducement defenses.

In any event, the Court is unable to find any evidence, within the transaction documents or otherwise, that the parties intended the SSAs to constitute a novation of the prior agreement memorialized in the Lease Bonds. First, as Royal points out, the transaction documents do not contain any language suggesting that the execution of the SSAs was intended to extinguish the obligations contained in the Lease Bonds in their entirety.

It is, in fact, difficult to understand how extinguishment of the Lease Bonds could have been intended or desired by Plaintiffs, since the Lease Bonds contain the entirety of the Sureties' guarantee obligations. While the SSAs contain servicing responsibilities on the part of Royal, there are no provisions within the SSAs that require Royal to make payments to any obligee from its own funds. In any event, the provisions of the SSAs, including the language in section 2.8 providing for reversion of the Lease Bonds to CMC, suggest that the agreements executed at the "first stage" of these transactions remain in effect.

The language of section 7 of the Lease Bonds, moreover, does not undercut this conclusion. While that section states that a subsequent assignee "shall become the obligee . . . as of the date specified in the Notice of Assignment," it does not state that an assignee of CMC's rights shall replace CMC as the original obligee, or that the execution of a Notice of Assignment acts to extinguish all rights and obligations created under the Lease Bonds. All parties to these transactions operated under the guidance of sophisticated counsel. Had the parties intended to memorialize an agreement that the SSAs would effect a novation rather than an assignment, it would not have been difficult to do so.

Most significantly, as noted by Royal, this Court previously reviewed substantively

identical transaction documents, and determined that the language of those documents was inconsistent with a claim of novation. In denying Atlantic Coast's request to file a motion for summary judgment as to its novation claim, this Court stated:

> Although Atlantic Coast argues, in essence, that novation may be determined as a matter of law where "the issue turns upon the meaning of a written instrument and there is no conflicting extrinsic evidence. . . .," *Howard v. County of Amador*, 220 Cal. App. 3d 962, 980 (3d Dist. 1990), this is not such a case. As the Court specifically noted in its opinion disposing of the parties' motions for judgment on the pleadings (Doc. 1708), the language of the relevant transaction documents here precludes any finding as to the Sureties' obligations to the Banks without the consideration of extrinsic evidence of intent. Although the Court's analysis in considering the pleadings motions was focused on the Banks' assertion of obligee status under the transaction documents, that analysis is equally pertinent to the novation issue. . . .

Doc. 2138, at 8.

The Court went on to review its analysis, set forth in the Lead Opinion, of the plain language of the transaction documents. The Court noted that the Lease Bonds, on their face, conveyed rights only to CMC, and that the SSAs contained no language that would alter that conclusion. Accordingly, the Court observed, the Banks could successfully advance a contrary interpretation of the transaction documents only by the presentation of extrinsic evidence demonstrating that the parties intended to effect a result different from the plain language of the transaction documents. *See* Doc. 2138, at 8-9, *citing* Lead Opinion, Doc. 1708, at 26-28. The Court stated, finally, that the novation claim advanced by Atlantic Coast was not susceptible to determination based upon the transaction documents alone:

> Just as the Court was unable to determine the Banks' obligee status on the basis of the transaction documents alone, it cannot rely on those same documents to find a novation as a matter of law. . . .

Doc. 2138, at 9.

Upon review of all of the evidence proffered by the parties at trial, it is apparent to the Court that Plaintiffs' novation claim is based solely upon Plaintiffs' interpretation of the language of the transaction documents. Plaintiffs have presented no evidence that any party to the transaction (1) stated that a novation was intended to occur through execution of the SSA; or (2) actually believed that a novation was intended.

In short, Plaintiffs proffer no extrinsic evidence demonstrating that the parties intended to establish a contractual relationship different from that outlined in the Lease Bonds, SSAs and other transaction documents. In the absence of such evidence, the Court cannot find that the transaction documents created a contractual relationship inconsistent with the plain language of those documents.

For the reasons set forth herein, the Court rejects Plaintiffs' arguments and finds that the SSAs did not create a novation, and did not effect a substitution of the Guardian Entities as obligees under the Lease Bonds

### f. Other Arguments

While the Court has reviewed the majority of the documentary evidence and witness testimony in sections II.B.1. and II.B.2. of this Opinion, Plaintiffs have raised several additional arguments arising from certain court rulings issued in these cases and related litigation. For completeness, the Court addresses those arguments in this section. As explained, the Court adheres to its view that the parties did not intend to grant obligee status to the Guardian Entities in the Lease Bond transactions.

Plaintiffs have argued in their briefing that CMC's "principal" status under the Lease Bonds has been established by rulings from the Ninth Circuit Bankruptcy Appellate Panel (the "BAP Decision"), as well as the rulings of this Court and the Sixth Circuit relating to the Illinois

Union transactions. No evidence relating to these Opinions was introduced at trial; however, this Court may take judicial notice as to the existence and contents of these court rulings. *See* Fed. R. Evid. 201; *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008).

Plaintiffs first rely on *NetBank, FSB v. Kipperman (In re Commer. Money Ctr., Inc.)*, 350 B.R. 465 (B.A.P. 9th Cir. 2006). That case was an adversary proceeding commenced by the CMC trustee, seeking to set aside the transfer of lease and bond rights to NetBank within the 90-day preference period, as well as any interest of NetBank that was not properly perfected under the Uniform Commercial Code. In order to analyze how and to what extent NetBank's security interests had been perfected, the BAP Decision addressed whether the transfer to NetBank was a "true sale," or was, instead, a "secured loan," under which CMC would retain some obligations after transfer of its rights to NetBank. The Bankruptcy Appellate Panel found that CMC's transfer of interests to NetBank was, in fact, a secured loan. Plaintiffs argue that the BAP Decision effectively found that CMC was the "obligor" under the transaction documents.

Royal vigorously disputes that the BAP Decision has any relevance to the issues presented to the Court in this bench trial proceeding. First, Royal argues, the BAP Decision did not purport to determine the "obligor" status of CMC. Rather, that decision dealt solely with the issue of whether the transfer of rights reflected in the SSAs constituted a sale or a loan.

Moreover, as Royal points out, the BAP Decision was made in the context of considering the perfection of interests under Revised Article 9 of the Uniform Commercial Code. Royal denies that any portion of the Bankruptcy Appellate Panel's analysis addresses (1) whether CMC was the principal on the lease bonds; (2) what primary obligation was guaranteed by the Royal Lease Bonds; or (3) the identity of the obligee under the Royal Lease Bonds.[59]

---

[59] Royal further relies on a second opinion issued by the Panel in 2008 (*FDIC v. Kipperman (In re Commer. Money Ctr., Inc.)*, 392 B.R. 814 (B.A.P. 9th Cir. 2008)) (the "2008 Decision"), which found that the lease bonds had no

The Court agrees with Royal that the BAP Decision is immaterial to the issues presented in this bench trial proceeding. The questions posed to the Court were narrow, considering only Revised UCC Article 9 issues, and the Bankruptcy Appellate Panel's analysis was specifically directed to the questions posed. The specialized nature of Revised Article 9 limits the usefulness of the Panel's conclusions to the questions presented in these proceedings.

In any event, while the Panel's finding that CMC retained some obligations vis-à-vis the Banks is no doubt helpful to the Banks, that finding does not establish the Banks' obligee status. In fact, the Sureties do not actually dispute that CMC undertook certain obligations to the Banks in the SSAs. The Sureties contend, rather, that any obligations undertaken by CMC in the SSAs are separate commitments, not guaranteed by the Sureties. This is an issue that was never presented to the Bankruptcy Appellate Panel, and was not determined in the course of the NetBank adversary proceeding. Accordingly, the BAP Decision does not answer the questions presented in these actions and is not binding upon this Court.

With respect to Plaintiffs' argument that the rulings of this Court and of the Sixth Circuit relating to the Illinois Union transactions are dispositive of the obligee status of the Guardian Entities in these transactions, the Court also rejects that argument for the reasons set forth in

---

independent existence apart from the equipment leases. In the 2008 Decision, for purposes of determining whether NetBank properly perfected its interests in the CMC lease pools, the Bankruptcy Appellate Panel examined the nature of the obligations created by the surety bonds and by the lease payment streams. FDIC, as Receiver of NetBank, argued that the bonds were "instruments," while the CMC Trustee argued that they were "supporting obligations," for which the primary obligation was the equipment leases. In that context, the Bankruptcy Appellate Panel found that the surety bonds were "supporting obligations" that "d[id] not stand independent of the underlying leases as monetary payment obligations. . . ." *FDIC v. Kipperman*, 392 B.R. at 835. The 2008 Decision, Royal contends, undermines Plaintiffs' contention that the Bankruptcy Appellate Panel found the obligations of the SSAs to be the subject of the Sureties' guarantee obligations. Rather, Royal argues, the 2008 Decision demonstrates that the primary obligation guaranteed by each lease bond is its underlying lease.

Like the BAP Decision (cited by Plaintiffs), the 2008 Decision considered all issues presented under Revised UCC Article 9. The specialized nature of Revised Article 9 limits the usefulness of both decisions to the questions presented in these proceedings. In any event, since the Court finds that the BAP Decision lends no support to Plaintiffs' position in the context of these proceedings, the Court need not address whether the 2008 Decision likewise undermines Plaintiffs' argument.

section II.B.4., *infra*.

For the reasons set forth herein, the Court's rejects Plaintiffs' arguments on these issues, and adheres to its view that the parties did not intend to grant obligee status to the Guardian Entities in the Lease Bond transactions.

### 4. Comparison with Illinois Union Transactions and with Securitization Structure

Throughout these bench trial proceedings, a central focus of Plaintiffs' arguments has been the contention that the transaction structure established by the Royal transaction documents created, in effect, a securitization. Under such a structure, Plaintiffs again assert that CMC should be viewed as a principal or obligor, with the Guardian Entities and/or Banks as intended obligees. The underlying obligation guaranteed by Royal, Plaintiffs contend, is the loan repayment obligation of CMC.[60] This section specifically addresses the securitization issue, and summarizes the differences between (1) the transactions presented to the Court in these bench trial proceedings; and (2) the transactions previously considered by this Court in its Illinois Union Opinion and by the Sixth Circuit on appeal from the Illinois Union Opinion.

As outlined herein, the essential differences between these transaction structures are evident from this Court's detailed examination of the provisions of the transaction documents. Even if the transaction documents were ambiguous in this regard, however, the witness testimony also makes clear that the parties understood the functional differences between these

---

[60] As previously discussed in section II.B.2.g. of this Opinion, Plaintiffs proffered the expert testimony of Paul Palmer in support of their argument that these transactions actually should be understood as "securitization" or "financial guarantee" transactions. For the reasons set forth in that section, the Court declines to consider the testimony of Mr. Palmer as to this issue. As explained in section II.B.2.g. and herein, given the substantial witness testimony presented to the Court bearing upon the parties' transactional intent, as well as the language of the transaction documents themselves, the Court does not find expert testimony necessary to discern the intent of the parties to the CMC Lease Bond transactions or to understand those transactions. As noted, the parties' proffered evidence supports the Court's finding that the parties actually intended to consummate a lease bond transaction, in which CMC was named as the original obligee.

transactional forms and intended different rights and obligations to flow from the differently structured transactions.

The Illinois Union Opinion, issued by this Court on August 19, 2005 (Doc. 1709), specifically considered only the transactions involving insurance policies issued by Illinois Union. With regard to the Illinois Union policies, the Court found that (1) those policies created a suretyship, rather than an insurance relationship; and (2) the actual obligees of the surety obligations created in the Illinois Union transactions were the investor banks. As a result of the Court's Illinois Union Opinion, Chase subsequently was granted final judgment against Illinois Union. Illinois Union appealed, and that appeal resulted in a decision by the Sixth Circuit affirming this Court's Illinois Union Opinion in substantial part. *See Commer. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327 (6th Cir. 2007)(the "Sixth Circuit Opinion").

While Plaintiffs attempt to rely on both the Illinois Union Opinion and the Sixth Circuit Opinion in support of their argument that these transactions created a securitization structure, those Opinions in fact highlight the differences between the Illinois Union transactions and those presented to the Court here. As described in detail in the Illinois Union Opinion, each of the Illinois Union transactions employed a structure different from that present in the Royal Lease Bond transactions. With respect to the Chase transaction in particular, the underlying transaction documents reflected that the structure created by the parties actually effected a securitization. There are multiple differences between the transactions at issue here and each of the Illinois Union transactions.

First, unlike the Royal Lease Bonds, each of the insurance policies issued by Illinois Union named an investor bank as an Insured or Additional Insured—thereby indicating, on the face of the policy, the parties' intent to convey rights directly to the investor bank. *See* Illinois

Union Opinion, Doc. 1709, at 27. Thus, within the text of the policy, Illinois Union assumed some responsibility for the receipt of lease payments by its insureds, specifically including the <u>investor banks</u>.

Further, Illinois Union issued only one policy for each transaction. Each of the insurance policies issued by Illinois Union covered an entire pool of equipment leases (rather than the one lease covered by each Lease Bond) and specifically named an investor bank as an "Insured" or "Additional Insured." Also unlike the Royal Lease Bonds, each Illinois Union policy made specific reference to an SSA covering the same pool of equipment leases.

Additionally, and notably, each of the Illinois Union transactions was structured as a "one-stage" transaction, and no subsequent "assignment" transactions occurred. Rather, the SSAs were executed prior to or contemporaneously with the insurance contracts, and the Banks took their rights as part of that single-stage transaction. In that context, each Bank dealt directly with Illinois Union, and was a party to the contract giving rise to Illinois Union's guarantee obligations.

While these differences alone would be enough to differentiate all of the Illinois Union transactions from the transactions considered in these cases, the Chase policy employed a structure entirely distinct from all other transactions considered by the Court in the Illinois Union Opinion. That transaction—the single "securitization" transaction considered by the Court thus far in these cases—bears the hallmarks of a securitization and is easily identifiable as such based upon the transaction structure.

In the Chase transaction, CMC Lease Funding 2000-220 L.P. ("Lease Funding"), a "special purpose entity" created and wholly owned by CMC, acquired a pool of leases from CMC and, in turn, conveyed interests in the leases to Citibank. Through an Indenture, Lease

Funding issued Notes totaling $50 million to Chase (as Trustee for Citibank), which Notes were secured by, and to be repaid from, the payment stream underlying the leases. Finally, Illinois Union issued its "credit insurance" policy guaranteeing the payment stream. *See* Doc. 1817, at 2. The parties to the Chase transaction entered into an SSA, executed by CMC as Seller, Lease Funding as Issuer, Commercial Servicing Center ("CSC") as Sub-Servicer, Illinois Union as Credit Insurer and Servicer, and Chase as Trustee.

Under the Chase policies, Chase was designated as an "Additional Insured/Loss Payee." Based upon this designation, Illinois Union was required to pay any amounts due directly to Chase, not to CMC. Within the text of the Chase policy, Illinois Union guaranteed that "unless and until otherwise notified by the Trustee . . ., the Company shall make all payments hereunder to the Trustee on behalf of the Additional Insured/Loss Payee and not the Insured. . . ." Doc. 1709, at 28. That policy further provided for payments to be made by Illinois Union even in the event that a scheduled payment was received by CMC and not paid over to Chase. *See id.*

The structure of the Chase transaction—including the presence of an Indenture, and the issuance of Notes to a Trustee, is consistent with a classic securitization transaction. None of the Royal Lease Bond transactions bear these characteristics, and the absence of those features differentiates the Royal Lease Bonds from the securitization transaction created between Illinois Union and Chase. None of the documents executed in the Royal transactions is equivalent to an Indenture. There were no notes or securities issued in these transactions, nor was there a Trustee. Moreover, the Royal Lease Bonds were not issued to noteholders or to a Trustee, but rather to CMC.

In considering Illinois Union's appeal from this Court's judgment in favor of Chase, the Sixth Circuit noted the differing structures presented by the various CMC transactions, and

observed:

> The financing transactions took four basic forms: (1) some banks purchased the income stream directly from CMC; (2) some banks purchased the income stream from third parties who purchased from CMC; (3) some banks lent funds to third parties who purchased the income stream from CMC or its related entities; and, finally, (4) several banks purchased notes from CMC special purpose entities that were secured by and to be repaid from the income stream from the leases. The transaction in this case fell under this last category and was essentially a "securitization" of the lease payments.

*Commer. Money Ctr.*, 508 F.3d at 333.

It was the specific "securitization" structure of the Chase transaction that was considered by the Sixth Circuit, and which provided the underpinnings for the Sixth Circuit Opinion. Although Plaintiffs seek to rely on certain statements and analysis contained in the Sixth Circuit Opinion, the language set forth above reflects that the Sixth Circuit understood the difference between the Chase securitization transaction and the structure presented to the Court here. Notably, while the Chase transaction fell within the fourth "category" of transaction described above (and which the Sixth Circuit classified as a "securitization"), the Royal Lease Bond transactions indisputably are part of the third "category." The structure put into place by the parties to the Royal transactions thus is manifestly different from that created in the Chase transaction, and the Sixth Circuit's conclusions with respect to the Chase transaction cannot be reflexively extended to the transactions under consideration here.

In any event, the evidence presented at trial shows that the parties also understood the differences between the transactions currently under consideration and a "securitization" form of transaction. Exhibits drafted by B.J. Rood of Royal reflected Royal's understanding that none of the Lease Bond transactions were securitizations—although Mr. Rood believed that Royal might have the opportunity to participate in securitization transactions with CMC in the future. In an

August 16, 2000 e-mail, Mr. Rood explained:

> I have been thinking about CMC.  I see this as three deals:
>
> 1. Securitization of a pool of existing deals.
> 2. A flow of surety business where RSA [Royal] is added to their list of surety writers.
> 3. A captive [insurance company].

CadleRock/Guardian Exh. 52; Rood Depo., at 53:4-56:8, 57:20-58:15.  Rood testified, further, that the contemplated securitizations were never completed, and the "flow business," involving surety bonds, was separate from the securitization concept:

> Q.    Yeah.  But these—the flow [] business was not unlike a private placement securitization, was it sir?
>
> A.    The flow [] business was a surety bond.

Rood Depo., at 76:19-22.  *See also* Royal Exh. 42 (discussing separate handling of "flow business" and "one off" securitization transactions).

The testimony of Michael Anthony further confirms that the parties understood both that (1) the Royal Lease Bond transactions would not be securitizations; and (2) the Lease Bond transactions would, in fact, differ from all of the prior transactions entered into with Illinois Union.  In his deposition, which was introduced into evidence at trial, Anthony described the differences between the Royal Lease Bonds and a securitization transaction, as well as Anthony's own efforts to develop the expertise to complete a securitization:

> Q.    What, do you have any understanding what the difference would be between a securitization as you described it in this memo, and what was already happening with the bonding or insuring lease pools regarding CMC?
>
> A.    I can give you my opinion.
>
> Q.    Sure.
>
> A.    Securitization is a whole different ball game.   Very

stringent underwriting. They set up reserves. Very strong into actual statistics, actuarial numbers. They have to survive the scrutiny of the rating agencies. But once they're done, it's an excellent source to create large sums of money.

Q. Did you actually take any steps or were you involved in any steps to actually do a securitization?

A. I think the whole process and evolution of CMC was headed that way. And I steered them that way.

Q. Okay.

A. To get better financial statements, to do business with higher quality banks, to add the most sophisticated automation, to add the most intelligent, experienced staff. Definitely I was pushing them that way.

Q. Okay. But as far as beyond just pushing I guess CMC that way, did you ever take any steps to actually set up a securitization offering? Was there any work on that?

A. I didn't feel like I had the expertise to do that.

Q. Okay.

A. But I was going through the learning process myself and understanding all the steps necessary and trying to take baby steps to get there.

Anthony Depo., at 570:3-7, 570:10-571:17.

Anthony testified further that A & M had explained to the Sureties that the Lease Bonds, unlike insurance policies, would not allow the investors to be named directly as beneficiaries:

Q. Well, would it—let me—do you recall that coming up in any of the particular deals with Safeco [or] for that matter anybody else, before the deal was done, hey, can the investor who is going to be the ultimate obligee can they be named as the obligee initially on a bond?

A. I specifically recall Cary Breese explaining that the insurance policy can directly name the obligee as the beneficiary of the bond or the who being the investor can

> name the policy whereas a bond[] didn't have that
> advantage.

Anthony Depo., at 325:9-15, 18-23.

Finally, Blaine Tanner testified that he understood the differences between the transactions at issue here and the Illinois Union transactions, since Guardian Capital V, LLC ("Guardian V"), an entity not involved in these bench trial proceedings, had entered into a CMC transaction for which an Illinois Union insurance policy was issued. Tanner testified that, in the Guardian V transaction, the insurance policy structure permitted Guardian V to be named as an additional insured, while the Royal Lease Bonds did not permit that designation:

> Q. You had a special purpose [entity] called Guardian Capital V; is that right?
>
> A. I'm going to assume you're right, yeah.
>
> Q. I beg your pardon?
>
> A. I'll say yes.
>
> Q. Okay. That was a transaction that involved Ace Illinois Union, do you recall that?
>
> A. I do remember an Ace deal, yes.
>
> Q. That wasn't the surety bond deal, was it?
>
> A. No, it was different than a surety bond.
>
> Q. An insurance policy, at least on its face, correct?
>
> A. That was my understanding.
>
> Q. And Guardian was expressly named as the beneficiary of this policy, right?
>
> A. I believe so.
>
> Q. Guardian V in that particular case, correct?

A.      I believe so.

Q.      And that's a distinction from the surety bond, related deals that are involved in Guardian IX, Guardian XV, and Diversity II, isn't it?

A.      It's a deviation.

Q.      Deviation, distinction, you agree with that?

A.      Yes.

Q.      By the time you got around to doing Guardian IX, nothing prevented you from doing an insurance policy [] deal[,] rather than a surety bond deal[,] that would expressly name your company as beneficiary, correct?

A.      Nothing would have prohibited it, no.

Tr. 164-165.

For the reasons previously set forth in this Opinion and herein, the Court finds that the Lease Bond transactions under consideration here lack certain characteristics present in each of the Illinois Union transactions and, in particular, those essential features present in the securitization transaction of which Chase was the beneficiary. Moreover, the evidence introduced by all parties indicates that the parties understood the transactional structure, and neither intended nor expected a securitization to arise as a result of the Royal Lease Bond transactions. Finally, had the parties desired to enter into a securitization transaction, they understood that alternative structures existed that would effectuate that intent; they did not employ those alternatives. For all of these reasons, the Court declines to find that a securitization was either intended or created here.

### 5.      Summary of Evidence and Findings in Royal Transactions

The Court now has considered the parties' arguments and evidence with respect to the Royal Lease Bond transactions. Due to the length and complexity of the Court's analysis in this

Opinion, the Court briefly summarizes in this section its essential findings and observations with respect to the evidence presented.

In this bench trial, the Court has received extensive evidence and testimony from all parties to these actions as to the rights and obligations undertaken in the Royal Lease Bond transactions. Remarkably, all parties to these deals testified that, while they expected the transactions to be extraordinarily lucrative, they also anticipated that they would run no risk of loss. *See, e.g.,* Tr. 95-96 (Tanner expected a 13.5 percent return with zero risk); Tr. 218 (Safeco underwrote the bond transactions to a zero-loss ratio). Meanwhile, at the center of these transactions were individuals with little or no experience in the equipment leasing field,[61] upon whom all parties were depending for the protection of their investments. While the Court observes that virtually all parties demonstrated an astonishing lack of foresight in entering into these transactions, and essentially eschewed any meaningful form of due diligence, the Court's determinations here are based solely upon the terms of the transaction documents and the evidence presented to the Court during the bench trial.

As explained throughout this Opinion, the Court has found that the evidence and testimony proffered by all parties demonstrates that the parties to the Royal transactions intended to effectuate (1) lease bond transactions in which CMC was the intended obligee; and (2) a series of subsequent assignments, through which CMC assigned its interests in the Royal Lease Bonds to various Guardian Entities. As also previously noted, even if the Banks and/or Guardian Entities had subjectively understood that they would be original obligees (or have rights equivalent to original obligees) on the Royal Lease Bonds, those subjective expectations would

---

[61] Mark Fisher testified that he had an engineering degree and six months of experience working with CMC at the time he became Chief Operating Officer of CMC. *See* Fisher Depo., at 36:21-25, 37:25-38:23, 41:12-16, 41:24-42:7. Wayne Pirtle testified that he and Ron Fisher started CMC operating "in Ron Fisher's garage and my garage," and that he had had no prior experience selling leases in pools prior to founding CMC. *See* Pirtle Depo., at 103-104.

be defeated by the express objective terms of the transaction documents.

Plaintiffs insist that the parties agreed to name CMC as an "obligee" under the Lease Bonds only to permit the Sureties to avoid the impact of New York's "Appleton Law." Under these circumstances, Plaintiffs argue that the Court should ignore the transactional form and focus on the transactional purpose of guaranteeing income to the investors.

Despite the reason for the parties' choice of transactional structure, the Court is unable to regard the parties' selection of form so lightly. Even if it is true that these transactions could have been consummated as financial guarantees but for the Appleton rule, that does not change the fact that the parties <u>did not</u> in fact choose a financial guarantee structure. The parties, operating with the advice of sophisticated counsel, had the option of choosing any number of transactional forms, for any number of reasons. Regardless of their choice, all parties were entitled to assume that their rights and obligations would flow from the transactional form selected.

Moreover, although the Banks suggest some illegal motive in the Sureties' attempt to "avoid" the Appleton Law, there is no inherent illegality in attempting to <u>comply</u> with legal constraints. Additionally, while the structure of the Royal Lease Bond transactions may have been driven by legal restrictions on the Sureties, it is also true that the Banks always had the option of purchasing alternative coverage—akin to the letter of credit or financial guarantee that they apparently desired—in the marketplace.[62] Alternatively, the Banks had the alternative of purchasing an insurance policy equivalent to that issued by Illinois Union to various banks

---

[62] Notably, the Guardian Entities and the Banks <u>did</u> obtain much of what they wanted by way of the two-stage transaction in these cases. While the designation of CMC as the original obligee did carry with it the risk of a defense to the Lease Bond obligations premised on the fraud of CMC, Guardian and its lenders were protected from most other forms of identifiable risk—such as the risk of fraud by the lessees, or the non-performance of those lessees or the sub-servicers with respect to the income streams created by the leases. Thus, the parties appear to have come as close as they could to structuring a loan guarantee transaction, while maintaining the characteristics of a suretyship relationship that were critical to the Sureties' ability to legally participate in the transactions.

involved in the CMC program.

The rulings Plaintiffs have requested from this Court sweep far beyond the reach of contractual interpretation—or even contractual reformation. The Court must determine the nature of the suretyship relation between the parties. While the transaction documents may be just the starting point for that inquiry, the inquiry cannot occur properly in disregard of those documents.

Upon the Court's initial review of the transaction documents in the Lead Opinion, the Court concluded that because (1) the Lease Bonds unequivocally declare CMC to be the obligee; and (2) certain other aspects of the transaction are consistent with that designation, the Court could not find as a matter of law that any party other than CMC was the intended obligee. Accordingly, the Court held that the result sought by Plaintiffs could be reached only through a reformation of the Lease Bonds upon the introduction of extrinsic evidence.

In the context of this bench trial, Plaintiffs now argue that the Court can restructure the parties' deal either (1) by reference to the transaction documents alone; or (2) through a re-casting of the transaction as a financial guarantee or securitization. The first of these options is impermissible for the reasons previously set forth in the Lead Opinion. The second option presented by Plaintiffs would require the Court to make findings far beyond those encompassed within the purview of contract reformation. Plaintiffs in fact are not requesting reformation of a surety bond in order to substitute a different obligee, but rather are asking the Court to recharacterize the entire transaction.[63] While seeking to enforce the guarantees of payment undertaken by Royal in the Lease Bonds, Plaintiffs actually deny that those documents were

---

[63] While the plaintiffs now appear to regret the structure chosen for this transaction and wish they would have obtained greater protections against CMC's fraud than were obtained, wishing cannot make it so; the transaction this Court has identified is exactly what the parties intended, wisely or not.

Lease Bonds at all. Rather than suggesting that the Court revise or rewrite certain narrow portions of the transaction documents, Plaintiffs would require the Court to ignore many of those documents entirely. This the Court cannot do.

For the reasons set forth herein, the Court rejects Plaintiffs' position. The Court concludes that Royal issued Lease Bonds on which CMC was the intended original obligee, and that the Guardian Entities succeeded to CMC's obligee status by virtue of various assignment transactions. Accordingly, while the Guardian Entities are "obligees" of the Royal Lease Bonds by assignment, the Guardian Entities never had original obligee status, and they (as well as their subsequent assignees) are subject to the fraud in the inducement defense that could have been asserted against their assignor, CMC.


### C.    Safeco Transactions

The Court now separately examines the evidence and testimony proffered by the parties relating to the five transactions involving the Safeco Lease Bonds. As with the Royal transactions, the Court's analysis begins with an examination of the terms of the negotiated transaction documents. Where witness testimony and other extrinsic evidence are useful to aid the Court in construction of the Safeco transaction documents, the Court analyzes that evidence in detail as well.

As with the Royal transactions, all parties to the Safeco transactions introduced substantial evidence relating to the timing of various events—including the time at which the Lease Bonds were intended to be effective, funding of the transactions, and delivery of the underlying leased equipment. Again, Safeco argues that the parties intended a "two-stage" transaction, in which the leases and Lease Bonds were effective immediately upon execution.

Plaintiffs argue, conversely, that the parties' obligations were not intended to be effective until after the closing of the SSA transactions, and that the real conveyance of rights and obligations did not occur until that time.

To the extent certain provisions in the Safeco transaction documents are identical to those contained in the Royal documents, the Court refers back to its analysis of the Royal documents, previously set forth in this Opinion. Insofar as certain aspects of the Safeco transactions differ from the Royal transactions, however, the Court analyzes those differences in detail herein.

Initially, it is clear to the Court that, due to certain differences in the underlying transaction documents, as well as witness testimony reflecting the parties' differing understandings of the transactional structure, Plaintiffs' position is significantly stronger with respect to the Safeco transactions than the Royal transactions. Ultimately, however, the Court's analysis of the documents and testimony compels the Court to conclude that Plaintiffs have not sustained their burden of proving by clear and convincing evidence that CMC was not also the intended obligee in the Safeco Lease Bond transactions.

### 1. The Transaction Documents Support a Finding that CMC Is the Intended Obligee of the Lease Bonds

As set forth previously in this Opinion, certain transactional documents are substantively identical between the Royal and Safeco transactions. These include the Lease Bonds, SSAs, Purchase and Security Agreements, and Credit and Security Agreements. Accordingly, the Court will discuss those documents only briefly, and will instead refer to its prior analysis of those documents where necessary. The evidence does reflect that certain relevant differences exist between (1) the leases underlying the Safeco Lease Bonds, and their supporting documentation; (2) the comfort letters issued to the lender banks by each respective Surety; and (3) the language of the indemnity agreements required by each respective Surety as part of the

transaction documentation.[64]    The Court's analysis will focus primarily on those Safeco documents requiring separate review.

The Court begins its examination by incorporating its analysis, previously set forth herein, of the relevant provisions of the Lease Bonds and SSAs.  For the reasons previously stated in sections II.B.1. and II.B.3.a. of this Opinion, the Court finds that the plain language of the Lease Bonds and SSAs is inconsistent with a finding that the Guardian Entities were the intended obligees on the Lease Bonds.  The language of the Safeco transaction documents is substantively identical to those issued by Royal, and accordingly, these documents do not support Plaintiffs' argument that the Guardian Entities were the original intended obligees.  Thus, if Plaintiffs are to prevail with respect to the Safeco transactions, they must satisfy their burden of proof based upon other documents and evidence presented to the Court.

As previously noted in this Opinion, Safeco did not introduce the entirety of its lease files into evidence at trial, but presented substantial documentation relating to the execution of the leases and the lessees' acceptance of the leased equipment.  A summary of the lease documents introduced by Safeco is set forth in section I.B.2.a. of this Opinion.  Although the parties have not focused significant attention on Safeco's lease documentation, the Court nonetheless analyzes those documents.

As noted by Plaintiffs, the lease documentation introduced by Safeco reflects that, at least in certain instances, the leased equipment was not delivered and accepted by the lessees until a date simultaneous with or after the closing of the SSA transactions.  The documents associated with the Guardian II transaction, for example, reflect that the SSA was executed on December 1, 1999, while the Supplementary Schedules and Certificates of Acceptance show acceptance of the

---

[64] Plaintiffs' arguments relating to (1) the indemnity agreements executed by CMC in favor of Safeco; and (2) the comfort letters sent by Safeco to each of the investor banks will be analyzed separately later in this Opinion.

leased equipment on December 3, 1999. *See* Safeco Exhs. V, T. The documents associated with the Guardian III transaction reflect that both the closing of the SSA and the lessees' acceptance of equipment occurred on February 10, 2000. *See* Safeco Exhs. DD, BB. Plaintiffs argue, accordingly, that if delivery of equipment did not occur prior to execution of the SSAs, then the leases could not have been effective prior to that time, and CMC could not have had a right to make a claim as "obligee" under the Lease Bonds against Safeco.

Without question, the import of the lease file documents is far less clear with respect to the Safeco lease files than the Royal lease files. As previously noted in this Opinion, a relatively small number of the Royal lease files contain missing or undated leases or Delivery and Acceptance Receipts,[65] while the vast majority of the Royal files include all essential documents. A substantial number of Safeco files, in contrast, contain Supplementary Schedules and Certificates of Acceptance that are incomplete and/or undated. For all of the leases included in the Guardian II transaction, moreover, the Acceptance Date for the underlying leased equipment is December 3, 1999—two days <u>after</u> the execution of the SSA for the Guardian II transaction.[66] With respect to the Guardian II transaction, therefore, the transaction documents reflect that the lessees in fact did not receive equipment until after closing of the SSA.

On the other hand, the majority of the Safeco lease files do contain completed Supplementary Schedules and Certificates of Acceptance. Most of those fully completed documents reflect that, as of the date of closing of the SSA transactions, (1) leases had been executed; and (2) the underlying equipment had been delivered to the lessees. In those files

---

[65] In addition, as previously noted in this Opinion, one Royal lease file contains a lease dated after the date of execution of the corresponding SSA. One Royal lease file contains a Delivery and Acceptance Receipt dated after the date of execution of the corresponding SSA.

[66] As noted by Plaintiffs, and based on the Court's examination of the exhibits proffered by Safeco, the transaction documents associated with at least three other Safeco transactions bear an Acceptance Date <u>simultaneous</u> with the execution of the SSAs.

containing completed Certificates of Acceptance, Roy Bresky represented, on behalf of Shandoro, that the underlying equipment had been accepted and installed by Shandoro prior to the closing of the SSA transaction. While the Court is troubled by the lack of uniformity within the Safeco lease documentation, the Court cannot entirely disregard the substantial documentation reflecting that, in most cases, leases were executed and equipment was delivered prior to the closing of the SSA transactions.

In any event, the Court views the transaction documents as a whole, and analyzes the Safeco lease documentation in light of the other transaction documents, particularly the Lease Bonds and SSAs. As previously discussed in section II.B.1. of this Opinion, the plain language of the Lease Bonds and SSAs compels a finding that the leases and the Lease Bonds were effective as of their respective dates of execution. The Court finds that Safeco's lease file documentation is, at best, ambiguous as to the parties' intent, and is not sufficient to overcome the Court's reading of the plain language of the Lease Bonds and SSAs.

The Court's conclusion that the leases and bonds were effective upon execution is based both on (1) the Lease Bond itself, which ties the surety guarantees to the lease obligations, refers only to underline assignment of CMC's interests, and contains no preconditions to its effectiveness; and (2) the terms of the SSA, including CMC's representations that it had "good title to the Lease Assets", and that "[t]he information with respect to the Leases contained in the Schedule of Leases is true, complete, and accurate. . . ." Safeco Exh. G., at PROV 00090. Significantly, the Court also has noted that the SSAs, while providing for transmittal of payments to the investor banks, contain no separate payment obligations on the part of CMC, and thus do not convert CMC into a "principal" on the Lease Bonds. The Court's prior analysis of these aspects of the transaction documents is directly applicable to the Safeco transactions as well.

The Court further incorporates herein its prior analysis of the Purchase and Security Agreements and Credit and Security Agreements, which lend additional insight into the transactional intent of both CMC and the Guardian Entities. The Court notes that those Agreements contain representations by CMC and the Guardian Entities as to (1) the validity of the leases and bonds as of the date of closing of the SSAs; and (2) the delivery of the leased equipment prior to closing. Again, while Safeco was not a party to either of those agreements, it is difficult, in the face of these explicit representations, to conclude that either CMC or the Guardian Entities expected that the effectiveness of the Safeco Lease Bonds would be conditioned on future events, such as "funding" of the transaction or later delivery of equipment.

At best, Safeco's lease documentation demonstrates no more than that the parties' adherence to the promises and representations contained in the transaction documents was uneven. Thus, the Court declines to find that the deficiencies in Safeco's lease files permit the Court to infer that the parties intended to impose preconditions to the validity of the leases or Lease Bonds.

As previously set forth, the Court's examination of the entirety of the transaction documents reveals that the transaction documents are consistent only with a finding that the Lease Bonds were intended to guarantee the underlying lease obligations to CMC as obligee. For the reasons set forth in section II.B.1. and herein, the Court's review of the Safeco transaction documents compels the same result.

## 2. The Majority of the Evidence and Testimony Supports a Finding that CMC Was the Intended Obligee of the Lease Bonds

Further, the majority of the evidence and testimony introduced by the parties bolsters the Court's conclusions. As with this Court's analysis of the transaction documents, the Court's examination of the witness testimony and other evidence with respect to the Safeco transactions

is far more difficult than the analysis previously conducted with respect to the Royal transactions. The bulk of the evidence, however, ultimately supports the Court's conclusion that the parties intended to create a two-stage transaction structure (or, at least, that Plaintiffs have not proven they did not), in which the investor banks would succeed to the rights of CMC through a series of assignment transactions. The Court examines in detail the evidence introduced by all parties below.

### a.        Incorporation of Court's Prior Analysis

As to certain aspects of the Safeco Lease Bond transactions, the evidence and testimony presented by the parties is substantively identical to that presented with regard to the Royal transactions, and thus has been analyzed in previous sections of this Opinion. To that extent, the Court incorporates its previous analysis and findings with respect to certain issues.

The Court's incorporation of its prior analysis includes the subsections in this Opinion relating to evidence of (1) negotiation of bond language by the Guardian Entities; (2) time of "funding" of the Lease Bond transactions;[67] (3) representations by the Guardian Entities as to the validity and effectiveness of the leases and lease bonds; and (4) the expert testimony introduced by all parties. The Court's analysis relating to the above issues is contained in sections II.B.2.a., sections II.B.2.d.-e., and section II.B.2.g. of this Opinion. In each of those subsections, the Court conducted a thorough analysis of the parties' proffered evidence.

In each of the subsections referenced above, the Court concluded that the entirety of the evidence proffered by the parties as to each of these issues is consistent only with a finding that

---

[67] The Court's prior analysis relating to the time of "funding" of the Lease Bond transactions refers to certain Royal-specific evidence, which is not applicable to the Court's analysis of the Safeco transactions. Certain testimony, however, including the testimony of Mark Fisher and Michael Anthony, does relate equally to the Safeco transactions and is incorporated herein. For the reasons set forth in section II.B.2.d., the Court finds that evidence relating to time of "funding" is irrelevant to the Court's analysis of the Safeco transactions as well.

the parties entered into a Lease Bond transaction where the obligations guaranteed by the Sureties were the obligations of the lessees to make lease payments. As discussed in those subsections, the evidence proffered by the parties as to each of those issues was substantial, and the Court's detailed examination of that evidence was critical to the Court's conclusions set forth in those subsections. As to the issues enumerated above, the Court's analysis is identical with respect to Safeco, and thus the Court's conclusions previously set forth are hereby extended to Safeco as well.

> **b.** **Testimony as to the Parties' Understanding of the Two-Stage Transaction Structure**

Each of the parties involved in the Safeco transactions presented detailed evidence at trial relating to the understandings of all parties as to the nature and scope of the rights and obligations created by those transactions. In this section, the Court conducts an examination of that evidence and testimony. In conducting its analysis of the parties' intent, the Court examines the testimony of a number of witnesses, particularly employees of Safeco.[68] As with the Royal transactions, the Court finds that the parties undertook to structure the CMC transactions in a specific way for numerous reasons, including the Sureties' need to comply with insurance industry regulations. Regardless of the reasons underlying the chosen structure, however, the Court finds that the structure selected was both carefully negotiated and well understood by the parties.

While the Court's analysis of the evidence relating to the intent of the parties to the Safeco transactions is complex, an examination of the undisputed evidence demonstrates that

---

[68] In section II.B.2.b., *supra*, the Court previously analyzed the evidence and testimony introduced by Royal as to the parties' understanding of these transactions and the parties' intent underlying the designation of CMC as "obligee." To the extent that the testimony of certain witnesses, including (1) the CMC principals; (2) Blaine Tanner; (3) counsel for the Guardian Entities; and (4) Michael Anthony, is relevant to the Safeco transactions as well, the Court incorporates its analysis of that testimony herein.

Safeco never could have intended to issue Lease Bonds guaranteeing the obligations of CMC to its lenders.  All parties were aware that such an undertaking would have placed Safeco in violation of regulations to which it was subject in at least one of the states where it did business.  Moreover, all parties understood the two-stage "assignment" structure produced by the transaction documents.  Thus, despite Plaintiffs' reliance on testimony that the Safeco Lease Bonds were intended to provide an "unconditional" guarantee, the Court finds that all parties understood that the rights the investors received could be no greater than the rights initially held by CMC.

At trial, Plaintiffs argued that the parties understood Safeco's bonding obligations to provide an "unconditional guarantee" of payment, which would pay the amounts due the investors in absolutely any circumstance.  In support of this contention, Plaintiffs introduced the testimony of CMC principal Mark Fisher:

> Q.   Was there any discussion at the NetBank/Safeco meeting that we've been—that we've been talking about, was there any discussion about the bond being an unconditional guaranty to pay?
>
> A.   The—yeah, the bond was to be an unconditional guaranty to pay, even—you know, and I distinctly remember in this meeting that it was stated, and I don't know if Michael Anthony stated it or if Ken Martin stated it, but they basically said if CMC took the $25 million from this first transaction and just disappeared, NetBank would get paid.

M. Fisher Depo., at 1298:4-18 (objections omitted).  Similarly, Wayne Pirtle testified:

> Q.   I believe that you said yesterday that you didn't distinguish or don't distinguish between a guaranty and an absolute guaranty; do you recall that statement?
>
> A.   Yes.
>
> Q.   What do you mean by that?

> A. I don't know the definition between the two. The intent of the whole thing was it was all—the only thing I can really associate that with is like an insurance policy guarantees against all risks.
>
> In other words, the program was worked out with the sureties, it was worked out with the banks, and the understanding was that it was cradle to grave, it covered all eventualities, fraud, bankruptcies, all these other things, that no matter what happened, the sun came up in the west, if there was a default in the sense that the banks didn't receive their payments, that the sureties would make the payments.

Pirtle Depo., at 1840:3-23. Blaine Tanner also testified several times at trial that he believed the Lease Bond program provided "guaranteed," "no-risk" investments:

> Q. What was your understanding of that program?
>
> A. That it was a guaranteed investment program.
>
> Q. And what did you understand that to mean?
>
> A. That the investment was guaranteed.
>
> Q. And by guaranteed, would it be certain circumstances where you can lose money but only a few or were there no circumstances? What was your understanding?
>
> A. Unconditional, ironclad guarantee, no chance of loss.
>
>                 ***
>
> Q. Tell us what Exhibit 2 is?
>
> A. Safeco Insurance Company of America lease bond.
>
>                 ***
>
> Q. Now, with regard to Number 2, take a look at Paragraph 2. It says, "The surety shall assert no defenses to any claim." Do you see that?
>
> A. Yes.

> Q. What did you understand that to mean?
>
> A. That it was an ironclad guarantee to pay.
>
> Q. And then in the next line, it says, "The surety's obligation constitute an unconditional and absolute guarantee of payment. What did you understand that to mean?
>
> A. That the sureties had an unconditional guarantee to pay.

Tr. at 93 (objections omitted); 110-111.

Plaintiffs argued that Safeco issued its Lease Bonds with an understanding that those bonds would be used not only to guarantee lease payments to CMC, but to facilitate CMC's borrowing by providing a measure of security to CMC's lenders. Plaintiffs introduced the testimony of several witnesses, including James Schrader, Safeco's senior underwriting officer for commercial surety, to support their contention that Safeco knew of this purpose of the Lease Bonds. Mr. Schrader testified:

> Q. So you understood these bonds that you were issuing were to support CMC's borrowing from its lenders, correct?
>
> A. I understand that's what they were doing.

Tr. 226. Plaintiffs argued that, in agreeing to issue bonds that would facilitate CMC's borrowing for its lease program, Safeco also was agreeing to assume the enterprise risk of CMC as its subservicer. *See* 6/1/2000 Boh Dickey e-mail, CadleRock/Guardian Exh. 23 ("[I]f all the leases became a problem or if [CMC] were unavailable to service them that [Safeco] could be left with the proverbial bag. . . .").

Kenneth Martin, Safeco's former senior account analyst, testified that CMC had the right, as an obligee, to make a claim under the Lease Bonds only for the period of time prior to the assignment of the Safeco Lease Bonds to an investor, and that Safeco never actually expected CMC to make such a claim:

A. My understanding [was] that when CMC was the obligee, they—we could not go back on them. Once they gave up the position of obligee by assignment, then we could.

Q. But you're aware that this whole matter happened simultaneously and CMC never actually for any period of time existed as an obligee except at the instant they assigned it to Guardian; isn't that correct?

A. That would be correct.

Q. It was never expected or anticipated by you that CMC would ever make a claim under these bonds, was it sir?

A. That is correct.

Martin Depo., at 454-455; *see also* Martin Depo., at 192-194.

Mr. Martin also testified that he authored a memorandum dated April 20, 1999 (CadleRock/Guardian Exh. 11), which summarized a meeting held between Safeco employees and principals of A&M relating to the CMC lease bond opportunity. In that memorandum, Mr. Martin stated, "We had an opportunity to review this program a year or so ago and declined because it was structured as a credit enhancement. They have made several adjustments in the program and so it is possible that we could participate and underwrite each leasee [sic] and guarantee only the lease payments, thus overcoming the NY Appleton law. Basically, the program will guarantee income flow to the investors. . . . While the obligee on the bond is CMC, they pass the benefit of the bond on to the investors. . . ." CadleRock/Guardian Exh. 11.

Mr. Martin testified that the purpose of the CMC lease program, ultimately, was to guarantee income flow to the investors:

Q. And you understood, again, that what Anthony & Morgan was again proposing was that CMC was bundling leases and selling them to investors?

A. That was my understanding.

Q. And that they wanted Safeco to issue bonds to guarantee the income flow to the investors?

A. That is correct.

Q. And that was the purpose of the lease bonds that Safeco ended up issuing regarding CMC, was to guarantee the income flow to the investors, correct?

A. That is correct. May I state that maybe in a little different way—we were guaranteeing the lease payments by the lessees to ultimately go to the investor.

Q. Correct. And you recognized—your memo states that the discussion was while the obligee on the bond would be CMC, they would pass the benefit of the bond on to the investors? Do you see that?

A. Yes, I do.

Q. Do you remember discussing why the obligee would be CMC?

A. Because CMC was the entity leasing the equipment to the lessee. . . .

***

Q. And you knew that was the whole purpose of pooling the leases, was to sell them to investors, correct?

A. Yes.

Martin Depo., at 104-105, 112-113. *See also* M. Fisher Depo., at 1266-67 ("the sureties would pay on the bonds because they, you know, quote, had no weasel clauses in them. And they—you know, no matter what happened, they were to pay the investors. . . . From the bank's perspective, the banks were secured because, you know, it was an unconditional financial guarantee that, you know, took into consideration every single thing that the CMC program was. . . . ").

Based on Safeco's understanding that the benefits of the Safeco Lease Bonds ultimately

would flow to the investors, Plaintiffs have argued that the Safeco bonds actually should be understood as financial guarantees. In connection with that argument, Plaintiffs also presented evidence demonstrating that Safeco classified the Lease Bonds internally as financial guarantee bonds. Plaintiffs presented the testimony of William Carron, Safeco's director of surety operations, who testified that Safeco's 1999 annual account report (CadleRock/Guardian Exh. 21) classified the CMC bonds as financial guarantees:

> Q. This is for Commercial Money Center account—it [is] a summary for the Commercial Money Center account. Correct?
>
> A. Yes.
>
> Q. And it states at the bottom—or toward the bottom of the first page, "Current credit lines." Under financial guarantee it has outstanding liability, current, $32,199,000. Do you see that?
>
> A. Yes.
>
> Q. And that's categorized as financial guarantee bonds. Correct?
>
> A. Yes.

Carron Depo., at 92:24-93:10. *See also* Declaration of Gene Sawyer, CadleRock/Guardian Exh. 64, at ¶ 3 ("Safeco issued at least 696 bonds known as financial guarantee bonds. . . .").

Plaintiffs also rely on the testimony of surety broker Michael Anthony, who described the Lease Bonds as "credit enhancement" bonds:

> A. . . . The type of bonds that in the CMC were more used as a credit enhancement, where there was, contracts that were enhanced with the surety bond, guaranteed.
>
> Q. Well, could you elaborate a bit on the concept of credit enhancement, not necessarily for the matter at hand but just in the industry? Could you explain to us what you mean by a credit enhancement?

> A. Well, credit enhancement to me was taking a risk and applying some type of mitigation factors to reduce that risk. Having a surety of good caliber stand behind it and make whoever was[] the obligee feel more comfortable with the risk.

Anthony Depo., at 29:1-15.

Despite Plaintiffs' general categorization of the Safeco bonds, and the broad references to the Lease Bonds as "financial guarantees," Safeco's witnesses were clear in stating that they did not understand the Lease Bonds as financial guarantees in the same sense as would have been prohibited by the New York "Appleton" rule. All of Safeco's witnesses testified that the industry-specific use of the term "financial guarantees" would apply to the bonds generally, but would not render them credit enhancement vehicles as contemplated by Appleton. Mr. Schrader testified at trial, in fact, that all bonds could be categorized as "financial guarantee" in some sense:

> Q. Do you have an understanding of the term financial guarantee?
>
> A. Yes.
>
> Q. What is it?
>
> A. In our business, it's a very broad term. There's kind of a universe of financial guarantee bonds, many of which are standard, surety-type obligations. More frequently, we hear people refer to financial guarantee as that very small part of that universe, that's the restricted portion, which is a—I shouldn't say forbidden—which is restricted to being issued by only types of companies.
>
> Q. Aren't all bonds to some extent a financial guarantee bond?
>
> A. I think that can be made, yes. That generally guaranteed the payment of money in default.
>
> Q. The lease bonds are in the same category of that greater

category?

> A.     Yes, lease bonds are part of the large financial guaranteed group of which there are many types that are legitimate surety obligations and written on a daily basis.

Tr. 184-185.

Mr. Carron explained Safeco's internal classification of the CMC bonds as follows:

> Q.     Okay.   You were writing bonds that you classified internally as financial guarantee bonds?

> A.     We classified internally as financial guarantee bonds but not as financial guarantees as defined by the state of New York or Appleton or any of those other laws that are out there.   Not credit enhancement guarantees.   There is a distinction.

> Q.     What do you understand the distinction to be?

> A.     Credit enhancement is where you're backing up a credit facility and guaranteeing a rating like an S&P or a Moody['s] rating.

Carron Depo., at 146:22-147:7.

In fact, both Mr. Schrader and Mr. Martin testified that the CMC lease program had been modified from the structure originally proposed to Safeco, which was akin to a credit enhancement.   These witnesses testified that the restructuring of the obligations as lease bonds was a significant adjustment, since it allowed Safeco to participate in the program without running afoul of the Appleton rule.   Under the new lease bond structure, Schrader and Martin testified, the surety obligations were not credit enhancement vehicles.   Mr. Schrader testified:

> Q.     Ultimately, sir, to get to the point, did Safeco decide to participate in the Commercial Money Center program?

> A.     Yes, it did.

> Q.     Did it decide to participate the first time it was offered the program?

141

A. The initial offering that came to us was presented on a basis other than something that we were comfortable with, and we turned that down.

Q. Was that something you were uncomfortable with?

A. The way it was initially presented to us, bonds would run directly to banks.

Q. What's wrong with that?

A. Well, that runs contrary to some restrictive insurance regulations that we have to deal with in the state of New York, which basically says it's—it's regarding financial guarantees. . . .

\*\*\*

Q. With respect to this Appleton Rule, did the existence of that rule enter into Safeco's decision to participate in this program?

A. It entered into our decision to decline it the first time.

Q. Why?

A. We felt that as presented to us, it would fall into that restricted category of the restricted portion of the financial guarantee bond market.

Q. What was it about the second presentation that you were more comfortable with, with respect to the CMC program?

A. It was presented to us as a simple lease bond program, and leases may be bonded under the—under the financial—they don't run afoul of the financial guarantee regulations.

Tr. 170-172. *See also* Tr. 177.

Plaintiffs did not dispute, and in fact acknowledged, that Safeco agreed to participate in the CMC program only after restructuring of the program to address the Appleton concerns. Perhaps even more significantly, the weight of the evidence introduced by all parties

overwhelmingly demonstrated that (as was true with the Royal transactions) the parties to the

Safeco transactions understood and intended to effect a two-stage "assignment" structure.

In this regard, Michael Anthony testified:

> Q.    When you entered into or provided the first bond on behalf of AIG, was it your understanding that that bond ultimately was going to be assigned to a financial institute of some kind who would be the obligee?
>
> A.    Yes.
>
> Q.    Was that your understanding for every bond that you issued, relating to CMC, through Anthony & Morgan?
>
> A.    Yes.
>
>        It was my understanding that every bond I issued would be assigned to a various bank or lender or funding source.

Anthony Depo., at 34:17-35:1, 35:5-7.   Anthony further testified as to the reasons for the

transactional structure and for the designation of CMC as "obligee":

> Q.    Do you know why CMC was named obligee on the Safeco surety bonds in the context of Guardian II and Guardian III?
>
> A.    That was how the surety wanted it to be.
>
> Q.    When you say, the surety, that was whom on behalf of the surety?
>
> A.    All sureties.
>
> Q.    All sureties, so you specifically recall that Safeco wanted CMC named as obligee?
>
> A.    Yes.
>
> Q.    And who at Safeco informed you of that?
>
> A.    Ken Martin.
>
> Q.    Did Mr. Martin share with you his basis or reasoning for

that directive?

A.  He was directed by Jim Schrader.

Q.  What did Mr. Martin tell you that Mr. Schrader directed?

A.  That CMC be the obligee under the bond and that it be assigned to whatever financial institution was purchasing the lease.

Q.  Did Mr. Martin share with you the reasoning behind that directive; in other words, what was the purpose of that structure?

A.  I believe it was discussed that it was a way around the Appleton Law, of any conflict with the Appleton Law.

Q.  When you say you believe, is it your recollection or some kind of conjecture on your part?   Were there discussions along these lines?

A.  It's my recollection.

Anthony Depo., at 2398:19-2400:3 (objections omitted).

Safeco introduced the testimony of various witnesses concerning their understanding that

CMC was the original obligee and that the investors took their rights by assignment from CMC.

Mr. Martin testified:

Q.  All right.  You were aware, were you not, that the investors in the CMC bond pool—particularly from Cleveland—in fact had lender banking institutions in those transactions to whom they assigned the bonds that were assigned to the investors?

A.  Yes.

***

Q.  OK.  So you were, then, aware that Diversity Capital I was purchasing a lease pool represented by the bonds listed on this notice of assignment and was financing them, assigning the bonds to Provident Bank, correct?

> A. Yes.

Martin Depo., at 483:8-13, 530:24-531:2. Mr. Martin further testified:

> Q. CMC didn't make any claims on any defaulted leases on the bond relating to them, did they?
>
> A. CMC wouldn't make a claim on the bond.
>
> Q. They wouldn't make a claim because—
>
> A. They'd assigned their rights.

Martin Depo., at 536:25-537:5.

CMC principal Wayne Pirtle testified as to his understanding of the "assignment" structure of the transactions:

> Q. Now, do you understand that under the CMC program if an investor was not paid an investor would be entitled to make a claim on the surety bond associated with his pool or its pool?
>
> A. The surety bonds were assigned to the respective investor as additional collateral for the payments that they purchased. It came with that.
>
>                    ***
>
> Q. The obligee must notify the surety by registered or certified mail of any default under this lease within 30 days after obligee discovers such default.
>
>     And who is obligee according to the third line of this instrument, CMC, right?
>
> A. Well, CMC is the obligee, subject to, they may have well assigned it. I don't know.

Pirtle Depo., at 2163:1-9, 2231:7-15.

Finally, Safeco introduced the testimony of Blaine Tanner concerning his understanding of the structure of the Safeco transactions:

Q. With regard to the Safeco bonds and each of the transactions, was it your understanding that the particular Guardian or Diversity entity would be the assignee of all of the rights of CMC under those bonds?

A. Yes.

Tanner Depo., at 1583:14-20.

The entirety of the testimony concerning the Safeco lease pools reflects, first, that all parties, including Safeco, believed that the Lease Bonds were guarantees of the underlying leases and not direct guarantees of CMC's loan obligations. Safeco's witnesses testified, without contradiction, that the structure of the CMC transactions was implemented, at least in part, in order to ensure the Sureties' compliance with the New York Appleton rule. That rule would have prohibited Safeco from guaranteeing CMC's obligations to its lender banks—thus undertaking obligations equivalent to credit enhancement.

Despite the imprecise references to "financial guarantees" made by Safeco's employees, the witness testimony and exhibits demonstrate that Safeco did not intend to issue credit enhancement bonds within the meaning of the Appleton rule.[69] The history of Safeco's review of the CMC transaction opportunity, as summarized by Martin and Schrader (and memorialized in numerous Safeco-generated exhibits) indicates that, if Safeco had believed the CMC Lease Bonds guaranteed CMC's obligations to its lenders directly, it would have declined to participate in those transactions. The testimony of Michael Anthony makes clear that he was given instructions from Safeco to that effect.

As previously discussed in section II.B.2.b., both Wayne Pirtle and Michael Anthony testified that the Appleton Law was a significant factor in determining the structure of the Lease

---

[69] Again, as noted previously, substantial guarantees were obtained via the transaction structure chosen by the parties—they just did not insure against the possibility of fraud in the inducement by CMC vis-à-vis the Sureties.

Bond transactions. As also explained in that section, testimony from Mark Fisher, Michael Anthony and Blaine Tanner demonstrates all parties understood that (1) the Lease Bonds guaranteed the obligations of the lessees to make lease payments; and (2) the Guardian Entities would acquire rights under the Lease Bonds only by virtue of assignments from CMC. Testimony from Neil Gurney and Thomas Holmes, counsel for the Guardian Entities at the time of negotiation of the Lease Bond transactions, bolsters the Court's findings in this regard.

Plaintiffs place great emphasis on the fact that the parties to the Safeco transactions designated CMC as obligee, at least in part, to ensure Safeco's compliance with regulations to which it was subject—specifically, the New York Appleton rule. Regardless of the purpose for the designation, however, the testimony of Safeco witnesses, as well as that of CMC principals and Blaine Tanner, demonstrates that the parties did understand that structure and understood that the Guardian Entities (and their lender banks) would take rights in the transactions only by virtue of assignments from CMC.

As with the Royal transactions, it is also clear that the parties understood that the obligations to be guaranteed by the Lease Bonds were the underlying leases, and not CMC's loan obligations. The fact that the guarantee of the lease payments to CMC provided some comfort to the lender banks, and thus facilitated the Banks' extension of credit to CMC, does not compel a finding that the Lease Bonds themselves guaranteed the obligations of CMC.

Thus, the testimony by Mark Fisher, Wayne Pirtle and Blaine Tanner as to the "unconditional" nature of Safeco's bond obligations must be read in tandem with their testimony regarding (1) the identity of the obligee on the Safeco Lease Bonds; and (2) the effect of the "assignment" structure of these transactions. It is not reasonable to assume that witnesses who clearly understood this contemplated assignment structure could have anticipated that the Banks

would acquire, through assignment, rights greater than those possessed by their assignors. Accordingly, the Court finds that the evidence and testimony presented with regard to the Safeco transactions again compel a finding that the parties intended to effect a two-stage transaction, in which CMC was the original obligee on the Lease Bonds.

### c. Testimony Relating to "Substitution" of the Lease Bonds

The Court has considered the entirety of the testimony presented as to (1) the lease "substitution" provisions contained in the SSA; and (2) the parties' practice as to substitution of leases in the Safeco pools. Again, upon careful consideration of all relevant evidence and testimony, the Court concludes that the evidence relating to substitution lends no support to Plaintiffs' claims of "obligee" status on the Safeco Lease Bonds.

Plaintiffs introduced the testimony of Kenneth Martin, Safeco's former senior account analyst. Mr. Martin testified that he believed that substitution of leases would not require issuance of a new bond:

> Q.  And what was your understanding of how the substitution procedure would work?
>
> A.  That they would pull a lease out that was a problem lease and insert one in of equal or greater value to keep the lease payment flow going.
>
> ***
>
> Q.  If there was a lease in default, you understood that CMC was supposed to immediately substitute an equal or better lease for a defaulted lease; correct?
>
> A.  Correct.
>
> Q.  And it was not your understanding that CMC was going to submit the new lease for bonding by a surety[?]
>
> A.  Our understanding that a bond was in place as a part of the lease, and I recall Mr. Schrader and I in our discussion with

Mr.—and there could have been others there available that—or in that meeting, but I remember Mr. Pirtle, who raised a concern about the bonding of the new lease, and we—we talked about putting in—because a bond was in place, that bond would run for the five years, the initial five-year purpose—or period, and we would not charge beyond—we—if there's any runover, we would have to charge beyond that on a prorated basis. That's the only bonding we discussed of replacement leases.

\*\*\*

Q.     So your—it was your understanding that if CMC—if Safeco bonded a particular lease and the lease went into default and CMC substituted another lease in that pool—just hang on, please—that Safeco's bond would make—would remain valid[?]

A.     Correct.

\*\*\*

Q.     Now when you took a—when a new lease would be put in, would there be a bond covering that new lease?

A.     At the tail end, if—if the bond ran past the initial five-year period, there would be a tail there is what we learned, there would be a tail [that] would have to be covered by a new bond.

Q.     And the reason for that, I take it, is so that the cash flow coming out of the pool would be the same to the obligee.

A.     That is correct.

Q.     And it was necessary that CMC structure this and would operate it such that there was always the set cash flow going to the obligee, it didn't matter which bonds were in the pool as long as they were producing sufficient dollars to produce this income stream; correct?

A.     That is correct.

\*\*\*

Q.     Would you have expect—was your understanding that

there would then be another bond, a separately written bond that covered that—that replacement lease, or could you just roll over the bond on the defaulted company into that lease?

A.    Our initial reaction was that it would have gone in there with the remaining amount of time being the same as the original one and there would be no need to change the bond.  The obligee was covered, the assignee was covered.

Q.    So in other words, as you understood it, the existing bond like the ones you identified wouldn't change, they would just essentially, this is overdoing it or simplifying it, pull off the bad bond and staple a new—the bad lease and staple a new lease onto that bond and the bond would cover the new lease; is that correct?

A.    That was my understanding, yes.

Martin Depo., at 324, 325, 326, 456-457, 458-459.  Thus, in contrast to the Royal transactions, Plaintiffs have proffered the testimony of one Safeco witness who apparently believed that substitution of leases in the Safeco pools could occur <u>without</u> the issuance of a new bond.  Plaintiffs introduced no testimony, however, indicating that "substitution" actually occurred in the Safeco pools in the manner contemplated by Mr. Martin.

The Court notes that Mr. Martin's testimony conflicts with that of CMC employee Jill Marisa Campos (previously discussed in section II.B.2.f.), who testified that it was necessary to secure a new bond upon any lease substitution.   Since Ms. Campos was the employee responsible for all lease and bond documentation within CMC, the Court finds Ms. Campos's testimony more reliable on this point.  In any event, the Court does not find the conflicting testimony on this point particularly significant.

As Mr. Martin noted in his testimony, the obligee on each Lease Bond was CMC. Moreover, since every pool was assigned in its entirety to a single investor, substitution of a lease within the pool would not change the identity of CMC's assignee either.  Thus, even if

Plaintiffs could show that each Lease Bond would remain effective upon substitution of a lease, without any additional action by Safeco, the result would be the assumption of obligations by Safeco equal in amount, to the same obligees.[70] Thus, the Court finds that the parties' decision to allow substitution of a lease under an original lease bond has little probative value with respect to the parties' intent in naming CMC as the obligee of Safeco's guarantee obligations. Accordingly, the Court finds that the testimony relating to substitution of leases lends no support to Plaintiffs' assertion that the obligations sought to be bonded were contained within the SSA rather than the underlying leases.

> ### 3. An Examination of Plaintiffs' Proffered Evidence Does Not Support a Finding that the Guardian Entities Were the Intended Obligees of the Lease Bonds

As with respect to the Royal Lease Bonds, in sections II.C.1. and II.C.2. of this Opinion, the Court reviewed the evidence and witness testimony supporting Safeco's construction of the CMC Lease Bond transactions. Again, the Court observes that the majority of all evidence and testimony supports Safeco's position.

Certain aspects of these transactions, however, are foundational to Plaintiffs' arguments and require separate review. Accordingly, the Court conducts an examination of Plaintiffs' proffered evidence as to certain additional issues. Upon thorough examination, the Court again concludes that Plaintiffs' proffered evidence is insufficient to demonstrate that the parties actually intended a transaction in which the Guardian Entities would have original obligee status. Thus, the Court adheres to its finding that CMC is the original intended obligee on the Safeco

---

[70] The Court is not unmindful of the significance of Safeco's decision—if, in fact, such a decision were made—to permit the substitution of a lease, with a new principal, without conducting any separate underwriting of that principal. The undisputed testimony indicates, however, that such substitution would occur only in a limited context, where the lease originally bonded was <u>already</u> in default. It is conceivable that Safeco might agree to assume such a risk in a context where CMC's substitution of leases could serve only to <u>limit</u> Safeco's potential loss.

Lease Bonds.

### a.      Incorporation of Court's Prior Analysis

As to certain arguments and evidence presented by Plaintiffs, the Court's analysis is substantively identical to that previously set forth with regard to the Royal transactions. To that extent, the Court incorporates its previous analysis and findings with respect to certain issues. The Court's incorporation of its prior analysis includes the subsections in this Opinion relating to (1) the effect of certain provisions of the Lease Bonds and SSAs (section II.B.3.a.); (2) Plaintiffs' novation argument (section II.B.3.e.);[71] and (3) Plaintiffs' arguments premised on court rulings issued in this case and in related litigation (section II.B.3.f.).

In each of the subsections referenced above, the Court concluded that the entirety of the

---

[71] With respect to Plaintiffs' novation argument, the Court previously found, in section II.B.3.e. of this Opinion, that the transaction documents are inconsistent with any finding that the parties intended the execution of the SSAs to effect a novation. In addition to joining in the arguments made by Royal, Safeco has advanced several additional arguments in support of its position that no novation was contemplated or intended by the parties.

First, Safeco references section 2.1 of the SSA, which contains the following language:

> The foregoing does not constitute, nor is it intended to result in, the creation or assumption by the Purchaser of any obligation of the Seller, the Servicer or any other Person in connection with the Leases or the related Equipment or any agreement or instrument relating thereto, including any obligation to the Obligors.

Safeco Exh. G, at PROV 00087.

Second, Safeco proffers the testimony of James Schrader with respect to Safeco's lack of intent to effect a novation:

> Q.      Let me ask you this. In accepting the assignment of the bond from CMC to an investor, did Safeco have an intention at any time for an entirely new contract to evolve between Safeco and that investor?
>
> A.      Absolutely not.

Tr. 180.

Since this Court previously found, in section II.B.3.e. of this Opinion, that the transaction documents do not permit a finding that the parties intended the execution of the SSAs to effect a novation, the Court need not address Safeco's additional arguments in detail. The Court notes, however, that this additional evidence provides further support for the Court's conclusion that the parties neither contemplated nor intended a novation in the Safeco Lease Bond transactions.

evidence proffered by the parties as to each of these issues was consistent only with a finding that the parties entered into Lease Bond transactions, where the obligations guaranteed by the Sureties were the obligations of the lessees to make lease payments. As discussed in those subsections, the evidence proffered by the parties as to each of those issues was substantial, and the Court's examination of that evidence was critical to the Court's conclusions set forth in those subsections. As to the issues enumerated above, the Court's analysis is identical with respect to Safeco, and thus the Court's conclusions previously set forth are hereby extended to Safeco as well.

### b. Indemnity Agreements/ Evidence of CMC's "Principal" Status

In section II.B.3.b. of this Opinion, the Court considered the language of the indemnity agreements entered into between CMC (and its principals) and Royal. The Court concluded in that section that the Royal GIAs, while indicative of an intent to benefit the investors in the Lease Bond transactions, were insufficient to support a reformation of the plain language of the Lease Bonds. To the extent that the Court's prior analysis of certain testimony pertains to the effect of indemnity agreements generally, the Court incorporates its prior analysis here.

Because of certain significant differences between the indemnity agreements executed in the Royal transactions and the Safeco transactions, however, the Court separately conducts an analysis of the Safeco GAIs. Upon doing so, the Court concludes that, even assuming that CMC undertook indemnity obligations with respect to the Safeco Lease Bonds, the existence of such indemnity obligations also is insufficient to support reformation of the bonds to grant Plaintiffs obligee status.

Safeco, unlike Royal, argues that it had no indemnity agreement with CMC with respect to the obligations guaranteed by the Safeco Lease Bonds. Rather, Safeco asserts, its GAIs were

intended to cover only those circumstances under which Safeco issued bonds for CMC <u>as</u>
<u>principal</u>—for example, those situations in which CMC intended to repossess equipment from a
lessee and required a replevin bond. *See* Tr. 189-90 (Schrader testified that he believed Safeco
issued replevin bonds for CMC, as well as possibly license bonds and court bonds).  Safeco
relies on the language of its GAIs, which state that they apply to "any Bonds for which any
SAFECO INSURANCE COMPANY now is or hereafter becomes Surety for <u>any as Principal</u>:
COMMERCIAL MONEY CENTER, INC. . . . ." Safeco Exh. A (emphasis added).[72]

Although Safeco did not introduce a copy of even one of the bonds allegedly issued for
CMC as principal, there is evidence in the record tending to show that such bonds were in fact
issued by Safeco.  *See* Tr. at 536-537 (Sawyer testimony).  Grace Reza, a Safeco underwriting
trainee, also testified:

> Q.    You understand in the lease bonds—by the way, do you
>        know if Safeco ever issued any other kinds of bonds, other
>        than lease bonds, in which investors invested?
>
> A.    On Commercial Money Center, yes.  There was Replevin
>        activity.
>
> Q.    You were saying something about Replevin bonds?
>
> A.    Replevin bonds, yes.
>
> Q.    Do you know how many were issued?
>
> A.    Not off hand.

Reza Depo., at 80:21-81:9 (objections omitted).  There is also evidence in the record that Safeco
did receive executed indemnity agreements from at least some of its lessees. *See* Safeco Exh. F.

James Schrader testified that Safeco did not intend the GAIs to provide Safeco with

---

[72] As noted previously in this Opinion, a separate GAI was executed by Capital Markets Corporation, the parent
company of CMC. *See* Safeco Exh. B.

indemnity from CMC and its principals for the obligations secured by the Lease Bonds:

> Q.    This is a written indemnity agreement that protects the surety, correct?
>
> A.    Correct.
>
> Q.    Can you take a look at this document, sir, and let us know whether or not this document, in your understanding as a surety underwriting officer, protected Safeco from any payments or loss claims on the lease program?
>
> A.    No.
>
> Q.    How can you tell?
>
> A.    The bond would protect only—would cover us only for bonds issued for CMC as principal.
>
> Q.    Okay.  How do you know that?
>
> A.    Because that's what the document says.
>
> Q.    Where does the document say that?
>
> A.    Right up at the top where they name—Commercial Money Center, Inc. is typed in, in the situations where we look to have an indemnitor cover more than just one entity.  We either name those entities or if there's going to be many entities, we use what we call omnibus wording, which would say something along the lines of Commercial Money Center, any company subsidiary to Commercial Money Center, anyone else for whom they requested a bond or bonds.

***

> Q.    Okay.  So this document reads this agreement is made by the undersigned in favor of the Safeco Insurance Companies for the purpose of indemnifying them from all loss and expense in connection with any bonds for which any Safeco Insurance Company now is or hereafter becomes surety for any as principal and then there's only one name?
>
> A.    Correct.

Q.    What's the name?

A.    Commercial Money Center, Inc.

***

Q.    So if there were a loss or a claim made on the lease program, a claim was made to Safeco and Safeco paid it, could they enforce their indemnity rights pursuant to the Exhibit in Tab 2?

A.    No.

Q.    Not at all?

A.    They don't—they would not expect any rights under this agreement for a loss as you described.

Q.    Why not?

A.    Because this covers strictly bonds where Commercial Money Center was the principal.

Q.    And this—and what we're talking about is the bonds you referred to as replevin bonds, license[] bonds, those kinds of things?

A.    Correct.

Tr. 191-194.

Grace Reza agreed with Mr. Schrader that the GAIs did not cover the obligations guaranteed by Safeco as part of the Lease Bond program:

Q.    And you understood that CMC had provided indemnity agreements to indemnify Safeco in case they ever had to pay on any of the bonds; correct?

A.    No.  That indemnity agreement was for the L&P [license & permit] obligations and the Replevin-type obligations that we were seeing on the account.

Q.    Where did you get that understanding from?

A.  Because you can't—the indemnity agreement covers the principal on the bond. The indemnity agreement doesn't cover an obligee, so there's no way to use the indemnity agreement for that.

So if they were originally the obligee on the bonds, you couldn't cover—the indemnity agreement couldn't cover that. It would cover the L&P obligations where they are the principal, like the Replevin activities.

***

Q.  Well, again, you understood the reality of these transactions was that it wasn't simply some name given to the account, but that the reality was that C.M.C. was the principal, as you just testified; correct?

A.  On some of the bonds, they were principal and on some of the bonds, they were the obligee. You had them both on the account.

Reza Depo., at 69:16-70:9 (objections omitted), 80:11-80:19 (objections omitted).

Plaintiffs, on the other hand, argue vigorously that the Safeco GAIs were intended to provide indemnity to Safeco from CMC for the obligations contained in the Lease Bonds. Plaintiffs cite to Safeco's prior pleadings and filed documents (both in this case and the CMC bankruptcy case), in which Safeco asserted indemnity claims against CMC and its principals premised on the Safeco GAIs. *See* CadleRock/Guardian Exhs. 26, 27, 60, 64. *See also* Tr. 531-32, 541-42. Similarly, Plaintiffs rely on several 2002 letters to the CMC principals authored by Eugene Sawyer, Safeco's Senior Claims Representative, demanding that those individuals agree to indemnify Safeco for any losses incurred due to claims filed on the CMC Lease Bond program. *See, e.g.*, CadleRock/Guardian Exhs. 6, 7, 34, 35. Plaintiffs additionally cite to a May 1, 2000 e-mail from James Schrader, which stated, "[W]e have an indemnity agreement with CMC requiring them to take whatever action necessary to prevent us suffering from defaults. . . ." CadleRock/Guardian Exh. 21.

Mr. Schrader testified, however, that Safeco entered into indemnity agreements with its lessees as principals on the bonds, and that Safeco also had informal "indemnity" or protection agreements with CMC, through which CMC agreed to use its best efforts to cure defaults and minimize losses to the Sureties:

> Q.     Did Safeco have any indemnity rights you're aware of with respect to a potential loss on the leases?
>
> A.     In the indemnity rights, yes. We have a—we had a number of indemnity rights. And when I say that, we kind of use the term indemnity and protection interchangeably in our business, at least in our organization.
>
> And our indemnity package, if you will, included a number of things, such as common law against our principals, the lessees, specific indemnities from the lessees. We had an agreement with Commercial Money Center, Inc. where they would use their best efforts to cure defaults under leases through rapid, you know, response to repossessing the equipment, selling it, paying off the lease, or releasing it to keep the income stream going.
>
> And finally, we also had some collateral. So we had a—we had a package of—protection package, an indemnity package in place that included those things. Is that to which you refer?
>
> Q.     Well, I'm wondering if you were to pay a loss on the lease program, I think I understand you to be saying that your only remedy for reimbursement, regardless of what you call it, whether indemnity or protection, subrogation, whatever, but that has to come from what party?
>
> A.     Well, first it comes from the lessee, and then we had, as I mentioned, we had—we did have some collateral, and we would hope we had an agreement where CMC would do its best efforts to cure the default, but once all those remedies had been exhausted, then there's nothing more for us to look to.

Tr. 194-195. Mr. Schrader testified that his e-mail reference to an "indemnity agreement" actually referred to this type of informal arrangement with CMC:

Q.    You go on to generally describe the program, 3 percent collateral, collateral is more than adequate to cover all the defaults, and then in the parent, that ends that paragraph, the phrase appears, quote, "We have an indemnity agreement with CMC requiring them to take whatever action necessary to prevent us from suffering from default." Do you see that?

A.    Yes, I do.

Q.    Doesn't that refer to these general indemnity agreements we talked about at Tab 3 and 4?

A.    No, it does not. This refers to an agreement we had with them where they would take action to cure defaults. And those actions were when we had interviewed them, they showed us their system and what they were currently doing and what they were doing for the existing sureties. They had—all their plea agreements [sic] were online auto bill payments, and they were within 24 hours of a default, and within ten days, they gave their lessees the option, opportunity to cure those defaults or they would repossess the equipment and immediately start the process of either liquidating it or releasing it.

That's part of that indemnity package I mentioned we had with them, our protection package. This is one of those layers of protection. We had their agreement to do the— make their best effort to cure defaults.

Q.    Looks like indemnity agreement to me is indemnity agreement. You're saying that that's not a term of precisional art in the nature of this memo?

A.    No, not in this—as you can see, I'm referring to some specific performance on their behalf, which would not be delineated in a general agreement of indemnity.

Tr. 212-213. Mr. Schrader conceded that the informal arrangement between Safeco and CMC was not memorialized in any writing. *See* Tr. 227-28.

Plaintiffs rely on the testimony of Ken Martin, Safeco's former senior account analyst, who testified that he believed Safeco did take indemnity from CMC and its principals for the

Lease Bond program.  Mr. Martin testified that he authored a memo (CadleRock/Guardian Exh.

11) explaining that Safeco would receive indemnity from both the lessees and from CMC:

> Q. In regard to indemnification, at the bottom of the page you talk about indemnification for individual lessees and you also state that you will require an indemnity of C.M.C. and the personal indemnity of its owners and their spouses; correct?
>
> A. Correct.
>
> Q. And as far as the indemnification from C.M.C., you were going to require that it be on the Safeco general indemnity agreement form; correct?
>
> A. Correct.
>
> Q. But you didn't make that requirement about the indemnification from the lessees?
>
> A. That is correct.
>
> ***
>
> Q. At any rate, you made sure that you had this in hand before you—this indemnification agreement from CMC and its principals before you issued any bonds under the bonded lease program; correct?
>
> A. That is the normal procedure is to have it in hand prior to issuance of any bonds, yes.

Martin Depo., at 131, 227-228.  Martin also testified that he was unaware of any other situation

in which Safeco had taken indemnification from the obligee:

> Q. And in surety, unlike the other types of insurance, the risk generally remains with the principal, correct?
>
> A. Yes.
>
> Q. Have you ever, in your experience in the surety field, obtained an indemnification agreement from the obligee of the bonds?

> A.    I do not recall ever receiving one from an obligee.
>
> Q.    To obtain an indemnification agreement from the obligee would render the bond meaningless, wouldn't it?
>
> A.    Yes.

Martin Depo, at 39-40.  Plaintiffs note, additionally, that the testimony of CMC principal Mark Fisher demonstrates that CMC believed it had an indemnity obligation to Safeco. *See* M. Fisher Depo., at 1346 ("CMC had an indemnity to Safeco, so CMC holding the bonds for itself would be circular, I suppose. . . ."). *See generally* Pirtle Depo., at 1593-1597 (upon default of a lease, CMC had option of making a servicing advance, or making a claim, which would then be repaid under the indemnity agreement).

Mr. Schrader testified specifically that the testimony of Ken Martin to the effect that Safeco had taken indemnity from CMC for the Lease Bond program was incorrect:

> Q.    Okay.  Mr. Martin testified by videotape that if Safeco had a claim on MedQuik/Shandoro leases and Safeco paid it, that CMC would be obligated to repay Safeco.  Do you agree with that statement?
>
> A.    No, that's incorrect.
>
> Q.    Why do you disagree with the guy you supervise?
>
> A.    Because we didn't have any indemnity agreement from CMC that said it would cover bonds for Shandoro.
>
> Q.    Mr. Martin is just wrong, right?
>
> A.    He's absolutely wrong.

Tr. 195-96.  Mr. Schrader further testified that Safeco would not take indemnity from an entity in the position of CMC in the ordinary course, since CMC was designated as obligee under the lease bonds:

> . . . Occasionally, I get these kinds of offers from people in the

field who think that it is a good deal. I have to explain to them that we don't. When you issue a bond to an obligee and then take the indemnity of the obligee, you've painted a picture of protection that doesn't really exist, and at the very least, it's deceptive, and at the very wors[t], it's potentially fraud. . . .

Tr. 203.

The Court has reviewed the testimony proffered by all parties regarding the significance of the GAIs executed between Safeco and CMC. As with the Royal transactions, the focus of Plaintiffs' argument is that the existence of indemnity agreements running from CMC to Safeco is suggestive of an intent by Safeco to undertake guarantee obligations directly to the Guardian Entities as original obligees—i.e., if Safeco does not normally seek indemnification from obligees on its Lease Bonds, but did seek indemnification from CMC here, then Safeco must not have viewed CMC as an obligee. Safeco, on the other hand, argues that no such inference can be drawn, since Safeco in fact did <u>not</u> take indemnity from CMC on the Lease Bonds.

Initially, in light of the filings made by Safeco in this litigation and in the CMC bankruptcy case, Safeco's position that it did not believe it had entered into an indemnity agreement with CMC as to the Lease Bonds is difficult to accept. Safeco filed a complaint in this action seeking indemnity from CMC and its principals based upon the GAIs,[73] and it filed a Proof of Loss in the CMC bankruptcy case on the same basis. Safeco did not withdraw its indemnity claims against the CMC principals in this action until March 2006 and, to the Court's knowledge, it never amended its position in the CMC bankruptcy action. In light of the prior representations and claims made by Safeco, Mr. Schrader's testimony appears self-serving.

While Safeco argues that the delay in amending its position was due to a court-imposed "stay" on filing amended pleadings, no such stay was imposed until <u>after</u> the Court's issuance of

---

[73] Safeco's indemnity claims against CMC were stayed as a result of CMC's bankruptcy filing in May 2002.

the Lead Opinion on August 19, 2005. As the Court has observed in previous opinions (*see* Docs. 1743 and 1817), the Court did not restrict any party from amending its pleadings during the Court's consideration of the motions for judgment on the pleadings.

To the contrary, the Court continually stated its desire for amendment of pleadings to occur "sooner rather than later." *See* Transcript, 10/22/2003 Status Conference (Doc. 557, at 90). In May 2004, the Court affirmed its intention to continue with the adjudication of the Rule 12(c) motions even if a party chose to amend its pleadings during the pendency of the motions. *See* Transcript, 5/20/04 Status Conference, at 10-11. In light of these continued statements by the Court, Safeco's decision to amend in early 2006, <u>after</u> the Court's issuance of the Lead Opinion, appears to be merely a midstream strategy change by Safeco in reaction to that Lead Opinion.

Regardless of the Court's observations in this regard, however, the Court need not actually determine whether Safeco's GAIs were intended to encompass the obligations undertaken by Safeco in the Lease Bonds.[74] The Court previously has found, in section II.B.3.b. of this Opinion, that Royal's execution of indemnity agreements with CMC and its principals was insufficient to demonstrate Royal's intent to undertake obligations directly to CMC's lenders. As discussed in that section, the Court found that (1) the indemnity agreements alone were insufficient to override the plain language of the Lease Bonds, which unequivocally denominated CMC as obligee; and (2) the extrinsic evidence presented by the parties demonstrated that the parties intended to effect a two-stage transaction, in which the banks succeeded to CMC's rights by assignment. In that context, the Court found, the contemplated

---

[74] As noted below, however, this evidence, and its inherent strengths and weaknesses, may be highly relevant to other stages of these proceedings, most particularly to any claim by Safeco that it reasonably relied on any fraud by CMC in entering into these transactions.

two-stage transaction structure explained the apparent inconsistency created by the existence of the indemnity agreements.[75]

As noted earlier, there is no relevant difference in language between the Lease Bonds and SSAs issued by Royal and Safeco. Additionally, as set forth in section II.C.2.b. of this Opinion, the bulk of the evidence and testimony presented in connection with the Safeco transactions also supports a finding that the parties intended to name CMC as obligee under the Safeco Lease Bonds.

Assuming, therefore, that Safeco's GAIs actually were intended to cover the obligations undertaken by Safeco in the Lease Bonds, the Court extends its prior analysis to Safeco, and declines to accept Plaintiffs' position that the GAIs indicate the existence of "principal" status on the part of CMC.

### c.    "Comfort" Letters

Plaintiffs further base their claim of obligee status in the Safeco transactions on the "comfort letters" forwarded to the Guardian Entities' lender banks on behalf of Safeco. The language contained in the Safeco comfort letters differs from that contained in the Royal letters.[76] *See* Tr. 156-57. Accordingly, this Court conducts a separate analysis of Plaintiffs' argument with regard to the Safeco letters.

Unlike the Royal letters, several of the Safeco comfort letters contain the following language in the final sentence: "Upon notification of non-payment to SAFECO, SAFECO will remit payment to First Merit regardless of payment to intermediaries or services [*sic*]. . . ."

---

[75] In addition, the Court found that certain other factors—for example, CMC's payment of premiums and posting of reserves on the transactions—were not indicative of CMC's "principal" status in this context. This analysis applies equally to the Safeco transactions and is incorporated herein.

[76] The meaning of the language of the Royal comfort letters was discussed in section II.B.3.c. of this Opinion.

CadleRock/Guardian Exh. 19. *See also* CadleRock/Guardian Exh. 38 (referencing Bank One).[77] Plaintiffs do not specify precisely how this language conveys obligee status upon the Guardian Entities. Plaintiffs point out, however, that this sentence indicates an acknowledgment by Safeco that the Banks would be the actual recipients of any payments on claims under the bonds, and thus were the ultimate beneficiaries of the Lease Bond transactions. According to Plaintiffs, Safeco's confirmation that it would make payment to the investors bolsters Plaintiffs' claim that no one expected CMC to receive payments, and that CMC actually was a principal in these transactions.

Safeco's comfort letters, while demonstrating Safeco's recognition of the Banks' role as lenders and their financial interest in the transactions, cannot be interpreted as conveying or acknowledging obligee status to the Guardian Entities. First, as with the Royal comfort letters, the majority of the text does no more than confirm the existence and validity of the Lease Bonds, as well as the amounts guaranteed. The letters further acknowledge that the Lease Bonds are valid and "enforceable in accordance with [their] terms," but contain no explanation or analysis of the terms of the Lease Bonds. The comfort letters certainly do not designate any obligee under the Lease Bonds.

Plaintiffs' arguments have focused on the last sentence of the comfort letters. Notably, this sentence does not appear in every Safeco comfort letter introduced at trial. *See, e.g.,* CadleRock/Guardian Exh. 17. Thus, even if this sentence could be read as conveying obligee status to the Guardian Entities, the Guardian Entities could not have assumed such status in every Safeco transaction by virtue of the comfort letter.

---

[77] As previously noted, the comfort letter sent by Safeco to Provident Bank in the Guardian Capital transaction omits the relevant language. Comfort letters for the Guardian III and Diversity One transactions were not introduced into evidence, and it is unclear whether any such letters exist.

In any event, the letters are directed to Guardian's lenders and do not reference the Guardian Entities at all. Rather, the letters appear to be intended to assure the lender banks that Safeco will honor the Banks' assignee status and pay claims submitted by the Banks if necessary. All parties agree that the lender banks are mere assignees of the rights of the Guardian Entities, and cannot be treated as original obligees in these transactions. Safeco's acknowledgment, through its comfort letters, of the banks' right to receive payment does not alter the manner in which these banks received their rights, nor can it expand the scope of those rights. More importantly, those letters cannot serve to convey any status on the intermediate assignees, the Guardian Entities. Accordingly, the Court rejects Plaintiffs' argument that the comfort letters provide a basis for disregarding the parties' designation of CMC as "obligee" in the Safeco Lease Bonds.

### d. Alleged Safeco "Admissions"

Plaintiffs have introduced evidence of various references, by Safeco employees and agents, to CMC as "principal" under the Lease Bonds. Particularly in connection with Safeco's initial handling of the bond claims, Plaintiffs assert that Safeco frequently referred to and treated CMC as the principal on its Lease Bonds. Plaintiffs argue that these references are admissions by Safeco, and reflect Safeco's actual understanding that the parties intended Safeco to be principal, not obligee, in the Lease Bond transactions. Upon careful review, the Court declines to accept Plaintiffs' position.

One of the references relied on by Plaintiffs is contained in CadleRock/Guardian Exh. 12, which contains a commercial bond request for CMC generated by Kenneth Martin. Mr. Martin testified that he set up the request in Safeco's computer system, and reported the bond principal as CMC. *See* Martin Depo., at 187-88, 191. Plaintiffs also cite to certain correspondence

authored by Ronald Goetsch, a Safeco employee, and sent to Safeco's reinsurers, in which CMC was identified as "principal" on the Lease Bonds. *See* CadleRock/Guardian Exh. 25, at SICA 030463-030464; CadleRock/Guardian Exh. 28, at SICA 030467-030468. Plaintiffs point out that Safeco's reinsurer noticed the references in Safeco correspondence to CMC as "principal." In correspondence sent to Safeco employees Ron Goetsch and Bill Carron on April 30, 2002, Safeco's reinsurer, Guy Carpenter, requested that Safeco confirm that the reference to CMC as "principal" on the Lease Bonds was correct. *See* CadleRock/Guardian Exh. 28.[78]

Plaintiffs also introduced at trial significant correspondence generated by Eugene Sawyer, a Safeco Senior Claims representative, during Mr. Sawyer's investigation of claims made by NetBank and Epic Funding Corp. on the Safeco Lease Bonds. In multiple letters generated in 2002, Mr. Sawyer identified CMC as bond "principal" in the caption. *See* CadleRock/Guardian Exh. 29, at SICA 001114; CadleRock/Guardian Exh. 32, at SICA 002669; CadleRock/Guardian Exh. 34, at SICA 028159; CadleRock/Guardian Exh. 35, at SICA 027606; CadleRock/Guardian Exh. 36, at FM 01036.[79] A Declaration executed by Mr. Sawyer, which was filed in the District of California in this case, also stated, "I am the claims representative assigned by Safeco to investigate and administer all matters including all claims related to Safeco's <u>bond principal</u>, Commercial Money Center Inc. ("CMC"), and related entities. . . ." CadleRock/Guardian Exh. 64, at ¶ 1 (emphasis added).[80]

---

[78] There is no evidence in the record as to whether such confirmation was ever provided.

[79] As previously discussed in Section II.C.3.b. of this Opinion, numerous letters authored by Mr. Sawyer to the CMC principals also referenced the GAIs, referred to CMC and its principals as "indemnitors," and demanded that CMC and its principals indemnify Safeco for amounts paid on claims on the Lease Bonds.

[80] Mr. Schrader, Safeco's senior underwriting officer, also made an inadvertent reference at trial to the "principal" status of CMC. When questioned about the asserted informal indemnity agreement with CMC, Mr. Schrader testified as follows:

> Q.    Well, that's what I'm getting to. That agreement where they said that

Safeco argues that the Court should attach no evidentiary significance to these alleged "admissions," for several reasons. With respect to the references to CMC as "principal" contained in Safeco's internal computer records, Safeco cites to the testimony of James Schrader. Mr. Schrader explained at trial that the purpose of classifying CMC as bond "principal" within the computer system was to aid in the tracking of the hundreds of bonds issued by Safeco in the CMC program. Mr. Schrader further testified that, where a bank was designated as "obligee" in Safeco's internal computer system, such a designation must have resulted from a mistake by Safeco's clerical staff:

> Q. Let's go over to Tab 12. You have that, sir?
>
> A. Yes, I do.
>
> Q. What is it?
>
> A. This is a—this is a copy of the screen that's in our system that reflects a bond execution.
>
> ***
>
> Q. Does this document identify an obligee?
>
> A. Yes, it does.
>
> Q. Who is it?
>
> A. It shows NetBank.

---

they would, at least to a limited extent, answer for your obligations, is that agreement in writing?

A. No. And typically, I'll say this, the way the manner in which we do business typically is we have a lot of commitments <u>from our principals</u> on things that we expect them to do that they tell us they'll do. . . .

Tr. 227-228 (emphasis added). While Mr. Schrader's error is unfortunate in the context of the issues presented to the Court in the within bench trial proceeding, in light of all other testimony presented, the Court ultimately attributes this error to a mere mistake in speech, and does not construe it as a binding admission on the part of Safeco.

Q. And does it identify a principal?

A. Yes, it shows CMC as principal.

Q. You believe NetBank is the obligee in June of '99?

A. No, it wasn't. Commercial Money Center was the obligee on all of our lease bonds.

Q. Well, why was it referred to this way in this document?

A. I don't know. It appears to be a mistake. These documents were done in the local field office, filled out by a coordinator, who would have taken some information from Mr. Martin in order to complete the form.

Q. Is there some kind of system in place at Safeco for controlling the way it would administer a program this size that would possibly explain those designations?

A. Well, the notice that the account name is Commercial Money Center, they filled in CMC as principal, there is no entity named CMC. It could have said a number of things, various lessees or lessees of, you know, CMC, but our system limitation is pretty much as you see it here. There's not very many spaces, and we could only fill in a limited name.

Certainly we couldn't fill in on principal hundreds of names that show up under a given transaction. And we do this and we still do this today. We simply list a company that is basically generating the business as the account, even though they are not the principal. It's just a way for us to track the business.

***

Q. Now, you suggested in your answer that when these bonds were recorded in bulk, listing CMC as the principal and the bank as the obligee, that there was an error from one of your field offices?

A. Are you referring to that memo we talked about?

Q. Well, referring to all these bond reports of lease pools that say CMC principal and bank obligee?

A.    The only—all the listing of CMC as principal is—I'm not going to call that an error because that's the way we do it, and that's the way we still do it. That's the only way to do the system limitations. We can book hundreds of bonds under any bond program, and we write a number of bond programs, and we do it that way. As far as listing the banks, yeah, I would call that a mistake in error on the part of the clerical staff that put these in the books.

Tr. 204, 204-205, 222-223.

Safeco further asserts that no significance should be attached to Mr. Sawyer's correspondence designating CMC as principal since (1) Mr. Sawyer had no involvement in the issuance of the Lease Bonds, and thus cannot speak to the intent of the parties at the time those bonds were issued; and (2) given the complexity of the transactional structure, it is not surprising that it took Mr. Sawyer a long period of time to understand CMC's role in these transactions. Mr. Sawyer testified at trial that the letters in question were form letters, and he inserted the name of CMC as principal simply because it was classified as such in Safeco's computer system. Tr. 521. Mr. Sawyer further testified that he learned, upon completion of a more detailed investigation and discussions with Mr. Schrader, that CMC was not the principal and had never been the principal on the Lease Bonds. Tr. 533-34.

The Court carefully has reviewed the documents and testimony presented by Plaintiffs on this issue, and has concluded that, either alone or coupled with other evidence in this case, the context of the alleged "admissions" does not permit the Court to draw any inferences (or at least not sufficient ones to reach the conclusions Plaintiffs urge) as to the parties' intent at the time of the Safeco Lease Bond transactions. With respect to the references to CMC as "principal" within Safeco's computer system, regardless of the reason for those designations, the Court agrees with Safeco that those references, created primarily by clerical staff after the negotiation and

consummation of the Safeco Lease Bond transactions, are not determinative of the intent of the parties at the time of execution of those transactions. As previously noted, the Lease Bond transactions were extensively negotiated, and the precise language of the transaction documents was crafted by sophisticated counsel for all parties. As set forth above, the Court has determined that the transaction documents are not consistent with any finding that CMC was the intended "principal" at the time of closing of these transactions. Accordingly, the Court declines to attribute dispositive significance to these subsequent computer references, particularly where the intent underlying those references is ambiguous at best.[81]

With respect to the Sawyer correspondence, the Court similarly declines to find that statements by Safeco's claims employee, years after execution of the Safeco transaction documents, may retrospectively serve as evidence of Safeco's intent to denominate CMC as a "principal" on its Lease Bonds. Moreover, given the complexity of these transactions, the Court does not find Mr. Sawyer's early failure to understand the transactional structure particularly unusual. As noted by Safeco's counsel in closing argument, Plaintiffs' expert, Mr. Palmer, testified that it took him two full years of work (with the assistance of his partner) to understand these transactions.[82] Plaintiffs seek to hold Mr. Sawyer to a far higher standard.[83]

As Mr. Sawyer testified at trial, *see* Tr. 515, and as the Court previously has noted, Mr. Sawyer had no involvement in negotiating or underwriting the Safeco Lease Bond transactions. As Mr. Sawyer further testified, his early actions in connection with investigating the claims on

---

[81] Again, these references may be significant to later stages of these proceedings; given the issue presented to the Court now, however—the identification of the intended original obligee in the Lease Bonds—they are not.

[82] Indeed, counsel and the Court have spent years analyzing all aspects of these transactions in an effort to glean their intended form and legal significance; it has been no easy feat and little consensus has been reached.

[83] Alternatively, and somewhat inexplicably, Plaintiffs also imply that Mr. Sawyer's earlier testimony (*see* CadleRock/Guardian Exh. 64) was suggestive of intentional perjury. *See* Tr. 560-65.

the Lease Bonds included filling in form letters with information gleaned from Safeco's internal computer system. *See* Tr. 521. The Court declines, accordingly, to hold that Mr. Sawyer's conduct in investigating the Lease Bond claims is binding on Safeco with respect to the meaning of a contract executed years before.[84]

The Court, rather, adheres to its prior findings based upon the plain language of the transaction documents, and concludes that CMC is the obligee on the Safeco Lease Bonds.

**e.** **Other Arguments**

In section II.B.3.f. of this Opinion, the Court examined Plaintiffs' arguments relating to findings made by (1) the Ninth Circuit Bankruptcy Appellate panel in an Opinion issued in connection with the CMC bankruptcy case; and (2) this Court in its Illinois Union Opinion. The Court concluded that each of those Opinions, for the reasons set forth in that section, was either irrelevant to the issues presented to the Court here or, in the case of the latter category of opinions, supported the Court's current conclusions. With respect to the issues described above, the Court's analysis is identical as to Safeco, and the Court hereby incorporates its analysis, set forth in section II.B.3.f., herein.

Plaintiffs have raised one additional argument—directed particularly toward Safeco—in support of their position that the Lease Bonds were not effective prior to the execution of the SSAs. Plaintiffs note that, when CMC was unable to close on SSA transactions involving Shandoro leases bonded by Frontier Insurance Company ("Frontier") due to Frontier's declining credit status, CMC did not pay for the Frontier bonds and eventually discarded them. *See* M. Fisher Depo., at 1332-1336. Plaintiffs contend that the parties' conduct with respect to the

---

[84] The Court's conclusions herein are buttressed by the significant extrinsic evidence and testimony tending to demonstrate that the parties intended to designate CMC as the obligee on the Safeco Lease Bonds. *See, e.g.,* section II.C.2.b. of this Opinion.

Frontier bonds demonstrates that the parties generally did not consider the Lease Bonds to be effective upon issuance. Rather, Plaintiffs assert, the discard or revocation of the Frontier bonds demonstrates that a surety relationship was not intended to attach until the execution of the SSAs—at which time the investor would "fund" the transaction and CMC would pay for the Lease Bonds.

This final argument by Plaintiffs fails to evidence any intent <u>by these parties</u> to delay effectiveness of the Safeco Lease Bonds until after closing of the SSA transactions. First, Mark Fisher testified that the events in question occurred prior to the involvement of either of the Sureties presently before the Court. *See* M. Fisher Depo., at 1332. Clearly, therefore, no intent can be attributed to Safeco as a result of the events involving the Frontier bonds—particularly in the absence of evidence that Safeco knew of those events. Plaintiffs have proffered no evidence relating to the knowledge of Safeco or, in fact, of any party (other than CMC) involved in the transactions presently before the Court.

Mark Fisher's testimony, moreover, demonstrated only a vague recollection of the events relating to the decision to discard the Frontier bonds. *See* M. Fisher Depo., at 1334-1336. No testimony was introduced as to (1) which individuals and entities were involved in the decisions relating to the Frontier bonds; and (2) what the <u>intent</u> of the parties was in discarding or revoking the Frontier bonds.

Such evidence would be necessary before the Court could attribute any relevance to CMC's decision to discard the Frontier bonds. The Court can envision a scenario, for instance, where the parties believed Frontier's lease bonds to be effective, but Frontier simply agreed to revoke those bonds in order to avoid a dispute with CMC over payment of premiums. In short, the murky context of the events described renders Mark Fisher's testimony unreliable, and thus

irrelevant to the issues presented to the Court.

For the reasons set forth herein, the Court rejects Plaintiffs' arguments and adheres to its view that the parties did not intend to grant obligee status to the Guardian Entities in the Lease Bond transactions.

### 4.    Comparison with Illinois Union Transactions and with Securitization Structure

In section II.B.4. of this Opinion, the Court conducted an analysis of the structure of the Royal Lease Bond transactions.    In that section, the Court compared    (1) the transactions presented to the Court in these bench trial proceedings; and (2) the transactions previously considered by this Court in its Illinois Union Opinion and by the Sixth Circuit on appeal from the Illinois Union Opinion.

As this Court also has previously noted in this Opinion, the Royal and Safeco transactions share many similarities.    The Lease Bonds and SSAs, in fact, are substantively identical in all relevant aspects.    Thus, with the exception of the specific testimony from Royal witnesses, the analysis set forth in section II.B.4. of this Opinion is identical with respect to Safeco, and the Court incorporates that analysis here.

Accordingly, for the reasons set forth in section II.B.4. of this Opinion, the Court finds that securitizations were neither intended nor created by the parties to the Safeco Lease Bond transactions.

### 5.    Summary of Evidence and Findings in Safeco Transactions

The Court now has considered the parties' arguments and evidence with respect to the Safeco Lease Bond transactions.    The Court briefly summarizes in this section its essential findings and observations with respect to the evidence presented.    Although the Court's analysis is less straightforward in the Safeco transactions than the Royal transactions (and the Court finds

that the Safeco transactions were neither very carefully structured nor fully understood by many of Safeco's own employees), the Court finds that the parties intended to enter into Lease Bond transactions, whereby Safeco guaranteed to CMC the obligations of CMC's equipment lessees.

While the Safeco lease file documentation is less uniform than that contained in the Royal lease files, the Court has considered the Safeco lease files in context with the entirety of the transaction documentation. As explained, the Safeco lease files are ambiguous at best and provide an insufficient basis for the Court to render a finding contrary to the plain language of the Lease Bonds and SSAs.

Despite Plaintiffs' arguments to the contrary, the extrinsic evidence introduced by Plaintiffs at trial also fails to demonstrate by clear and convincing evidence that the parties intended the Safeco Lease Bonds to create "credit enhancement" or "financial guarantee" obligations in favor of the Guardian Entities. Rather, the evidence reflects that, when presented with a proposed transaction structure that ran afoul of surety regulations, Safeco declined to enter into that transaction. It was only when presented with a new transaction structure—one that did not give rise to a credit enhancement—that Safeco agreed to participate in the CMC Lease Bond program.

As with the Royal transactions, the Court declines to ascribe an improper motive to Safeco based on Safeco's attempt to comply with insurance industry regulations. As the Court has stated multiple times within this Opinion, the Court will give effect to the parties' intended transaction, regardless of the reasons for the chosen transactional structure.

Moreover, the Court again notes that the Lease Bonds were not the only protection option available to the Banks in these transactions. As explained previously, in section II.B.5. of this Opinion, each Bank could have purchased a letter of credit or a financial guarantee.

Additionally, instruments akin to the Illinois Union insurance policies were available, and in fact were purchased by some of the investors in the CMC program.

Most significantly, as previously explained in section II.B.5., the rulings Plaintiffs have requested of this Court are beyond the purview of either contractual interpretation or reformation. Finally, for the reasons set forth in sections II.B.4. and II.C.4. of this Opinion, these transactions cannot be understood as securitizations.

Accordingly, the Court rejects Plaintiffs' position, and concludes that Safeco issued Lease Bonds, each of which guaranteed the obligations undertaken in an equipment lease to the bond obligee, CMC.

## III. IMPACT OF THIS COURT'S RULING

As all parties are aware, this Court's ruling on the issue of CMC's obligee status does not conclude these cases, and questions remain as to the impact of the Court's determinations on the issues remaining in the litigation.[85] The Court summarizes, in this section, its view of the impact of this Opinion on the future course of this litigation. Based upon the determinations made in the Lead Opinion and herein, the Court identifies the issues remaining in dispute, as well as the anticipated process for resolving these remaining issues.

As previously noted, the Sureties have asserted throughout these actions that the fraud of CMC renders the Lease Bond obligations void based on fraud in the inducement. The Court found in its Lead Opinion (Doc. 1708) that the fraud waivers contained in the Lease Bonds were

---

[85] A contrary conclusion by this Court would have been more likely to put an end to these matters—a tempting thought for the Court in this complex and lengthy litigation. The evidence presented and the legal principles by which this Court must be guided would not permit the Court to indulge that temptation, however.

broad enough to encompass a waiver of the Sureties' defenses based upon the fraud of CMC.[86] Doc. 1708, at 39. The Court further found, however, that, if CMC were the obligee in the transaction, California law would bar enforcement of a provision exempting a party from its own fraud. *See, e.g., Danzig v. Jack Grynberg & Assocs.*, 208 Cal. Rptr. 336, 342 (Cal. App. 1st Dist. 1984).

Thus, if CMC were the intended obligee, the Court concluded, the fraud waivers, though otherwise very broad, would not bar the Sureties from asserting fraud in the inducement as a defense against CMC. Doc. 1708, at 38. A finding that CMC was the intended obligee also would permit the Sureties to assert fraud defenses against the Banks <u>as CMC's assignees</u>, since an assignee in the Lease Bond transactions could acquire no rights greater than those of its assignor. *See* Doc. 1708, at 33 ("This inability to enforce a contract induced by fraud extends to all subsequent assignees of the fraudfeasor. . . ."); *see also Berrington v. Williams*, 52 Cal. Rptr. 772, 776 (Cal. App. 2d Dist. 1966)("[t]he assignee 'stands in the shoes' of the assignor, taking his rights and remedies, subject to any defenses which the obligor has against the assignor prior to notice of assignment. . . .").

Conversely, as the Court held in its Lead Opinion, if an innocent Bank were the original obligee under the Lease Bonds, the fraud waivers contained in both the Royal and Safeco Lease Bonds would preclude the Sureties from asserting the fraud of CMC as a defense against that Bank. *See* Doc. 1708, at 32 ("If the Court were to find obligee status, the Banks would be protected by the basic principles of surety law, and CMC's fraud could not be imputed to them. Regardless of CMC's fraud, the Sureties could not rescind the [Lease Bonds] where the Banks

---

[86] As noted in section II.B.1.b. of this Opinion, paragraph 2 of each Lease Bond contains a provision waiving the Sureties' right to assert defenses based on fraud, and stating that each lease bond is an "unconditional and absolute" guarantee of payment. *See* Royal Exh. 1, Tab 10.

gave value and relied on those contracts prior to the rescission. . . ."). *See also Citibank, N. A. v. Plapinger*, 66 N.Y.2d 90 (1985)(refusing to consider parol evidence supporting a fraud in the inducement defense, where the executed guarantees were "absolute and unconditional"); *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 212 (3d Cir. 2005)(holding that, where the language of Royal's guarantees was negotiated between sophisticated parties and was "absolute, unconditional and irrevocable," Royal was precluded from introducing the principal's fraud in the inducement as a defense).

Thus, the Court's determination here that CMC <u>was the original obligee</u> on the Lease Bonds means that, to the extent the Sureties have a colorable defense against CMC, that defense also may be asserted against the Guardian Entities and their subsequent assignees.[87]  The Sureties have asserted, throughout this litigation, that they were fraudulently induced by CMC to enter into the Lease Bond transactions.  If proven, such a defense could indeed defeat Plaintiffs' claims for recovery against the Sureties.

As all parties apparently agree, however, resolution of the Sureties' fraud defenses (if assertable, as the Court now concludes they are) must occur through a full trial on the merits, and the factual issues underlying the fraud defenses are subject to jury determination.  It is, therefore, premature to speculate as to whether the Sureties will be able to demonstrate successfully fraudulent inducement in connection with their decision to issue the Lease Bonds.  The Court will, however, outline its understanding of the issues remaining in dispute, and the hurdles remaining for the Sureties in seeking to show fraudulent inducement of the Lease Bonds.

To prevail on a defense of fraud in the inducement under California law, the Sureties must show (1) a false representation or concealment of a material fact; (2) knowledge of the

---

[87] In this regard, it is also clear that allegations of fraud against the Guardian Entities, if proven, would be imputable to the Guardian Entities' lender banks as subsequent assignees.

falsity, or insufficient knowledge to make a representation; (3) intent to induce reliance upon the representation; (4) justifiable reliance; and (5) damages. *See South Tahoe Gas Co. v. Hofmann Land Improv. Co.*, 25 Cal. App. 3d 750, 765 (Cal. App. 1st Dist. 1972). Initially, therefore, in order to prevail on the fraudulent inducement defense, the Sureties must present evidence as to the misrepresentations made by CMC, and evidence as to the falsity of those representations. In making such a showing, examination of each individual transaction will be necessary, to determine (1) what representations were made to the Sureties; (2) the falsity of each of those representations <u>at the time it was made</u> by CMC;[88] and (3) the state of the Sureties' knowledge regarding CMC's activities <u>at that point in time</u>.

With regard to the required proof relating to misrepresentations made by CMC, the Court emphasizes that only instances of demonstrated fraud will support the Sureties' fraud in the inducement defense, and that proof of mere mismanagement and operational incompetence by CMC cannot suffice. This finding is based upon (1) the obligations—including the servicing obligations—undertaken by the Sureties in the Lease Bonds; (2) the Sureties' undisputed consent to CMC's assignment of its rights; and (3) the breadth of the language of the fraud waivers contained in each Lease Bond. Although California law does not permit enforcement of a fraud waiver provision by CMC (or its assignees), no circumstance <u>other than</u> fraudulent inducement by CMC can relieve the Sureties of their Lease Bond obligations.

The Sureties have suggested that a broad range of circumstances, including (1) fraudulent general representations by CMC as to its overall Lease Bond program; or (2) fraudulent activities by the lessees with respect to particular leases, could cut off the Sureties' liability on their Lease

---

[88] In this regard, the Court notes that the falsity of a representation may, in some instances, depend on the time at which it was made. Since the performance of CMC's lease pools apparently worsened over time, a hypothetical representation by CMC as to the validity and performance of its leases may have been true if made during an early transaction, while it would have been false if made at a later date.

Bonds.  While the Court will not render advisory determinations as to factual scenarios that have not been presented, the Court expresses significant skepticism with respect to these arguments.

The Court notes, first, that it has already made several rulings as to the scope of the fraud waiver provisions, all of which are explained in the Lead Opinion.  As set forth in the Lead Opinion, the plain terms of the fraud waivers encompass both fraud by CMC and by its lessees.  As this Court previously held, the single exception to the applicability of the fraud waivers would be presented in a scenario where CMC, as the <u>obligee</u> of the Lease Bonds, had actually induced the issuance of the Lease Bonds by fraud.

In a situation, for example, where a lease represented by CMC as valid and existing was actually fictitious, the Court believes that the Sureties' obligations as to that lease would be vitiated.  If, on the other hand, a lessee under an otherwise valid lease had merely made misrepresentations as to its financial condition, a far different situation would be presented.  Under the suretyship principles outlined in the Lead Opinion, simple misrepresentations by the lessees, as principals under the Lease Bonds, would not fall within any exception to the fraud waivers.

Additionally, to the extent the Sureties argue that broad, general misrepresentations by CMC as to its Lease Bond program can relieve the Sureties of liability <u>even as to legitimate leases</u>, the Court is similarly doubtful as to the validity of that proposition.  In the Court's view, analysis of the Sureties' fraud in the inducement defense will require individual examination of the Lease Bond transactions, to determine the falsity and materiality of the representations made by CMC in each transaction.

The Court finds, moreover, that the Sureties may not prevail on their defense of fraud in the inducement without a showing of justifiable reliance by the Sureties on the alleged

misrepresentations made by CMC. In this regard, the Sureties have argued that California law does not require a surety to prove reliance on an obligee's misrepresentation, *see Sumitomo Bank of California v. Iwasaki*, 70 Cal. 2d 81, 85 (1968), and that any non-disclosure of material facts by the obligee discharges the surety as a matter of law. The Court emphatically rejects this argument and the Sureties' excessively broad reading of *Sumitomo Bank*.

The holding of the *Sumitomo Bank* case is, in fact, far narrower than the reading advanced by the Sureties. While the California Supreme Court, in *Sumitomo*, noted the applicability of an "absolute disclosure" rule to obligees on <u>fidelity bonds</u>, the court expressly declined to impose such an absolute rule in the context of a credit suretyship. *See Sumitomo Bank*, 70 Cal. 2d at 88. No language within the *Sumitomo Bank* case supports the Sureties' assertion that the Banks are precluded from arguing unjustifiable reliance in the circumstances presented by these cases, and the Court declines to so find.

Thus, while Plaintiffs may not use the fraud waivers as a sword to demand payment as a matter of law, questions still remain as to the materiality of any alleged misrepresentations, and the Sureties' justifiable reliance. These questions would include, among others:

(1)     Questions as to the role of Michael Anthony:

     (A)     Is Anthony's knowledge of particular facts imputable to the Sureties?

     (B)     What did Anthony know, and when?

(2)     Questions as to the Sureties' justifiable reliance:

     (A)     To what extent did the Sureties deem representations by CMC material to their decisionmaking?

     (B)     To what extent did the Sureties conduct due diligence, which might have led them to believe that CMC's representations were false?

In summary, it appears that all parties commenced this litigation with very simplistic views as to the legal issues involved. The investor Banks, in their motion for judgment on the pleadings, asserted that they were obligees on the Lease Bonds, and that the fraud waivers precluded the Sureties from asserting <u>any</u> fraud defense. Thus, the Banks claimed that they were entitled to payment from the Sureties, regardless of how the Banks acquired their rights under the bonds, and regardless of any fraud by anyone in the chain of assignment. The Sureties, on the other hand, asserted that CMC was the original obligee on the Lease Bonds, and that CMC's fraud in connection with the handling of the Lease Bond program acted as an absolute bar to the Sureties' liability.

As is now apparent, both sides were wrong. As the Court has explained, it is clear that the lender Banks are mere assignees in the Lease Bond transactions. Even taking the Banks' argument in the best possible light, only the Guardian Entities could possibly have been the original obligees. Thus, even if Plaintiffs had prevailed in demonstrating the Guardian Entities' obligee status in these bench trial proceedings, the rights of the Banks still would have been subject to any fraud defenses assertable against the Guardian Entities. For the reasons set forth herein, however, it is now apparent that the transaction documents do not grant obligee status to the Guardian Entities either.

Based upon the Court's conclusions in this Opinion, claims on the Lease Bonds by either (1) the Guardian Entities; or (2) the investor Banks are subject to defenses of fraud in the inducement based upon the fraud of CMC. As the Court held in its Lead Opinion, however, the fraud waiver provisions contained in the Lease Bonds remain in effect, and will be interpreted in accordance with the Lead Opinion and California law. Accordingly, the Sureties' defenses of fraud in the inducement may be asserted against Plaintiffs only to the extent outlined in the Lead

Opinion, and in this one.

## IV.    CONCLUSION

For the reasons set forth herein, the Court finds that Plaintiffs have failed to satisfy their burden of demonstrating, by clear and convincing evidence, that the Guardian Entities were intended to be the obligees on the Royal and Safeco Lease Bonds.  The Court determines, rather, that CMC was the intended original obligee, and that the Guardian Entities succeeded to the rights of CMC by virtue of various assignment transactions.

Accordingly, Plaintiffs are not entitled to reformation of the Lease Bonds.

**IT IS SO ORDERED.**

**s/Kathleen M. O'Malley**
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: May 28, 2010**

72168-1