# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: COMMERCIAL MONEY | : | **Case No. 1:02CV16000** |
| CENTER, INC., EQUIPMENT | : | |
| LEASE LITIGATION | : | **(MDL Docket No. 1490)** |
| | : | |
| | : | **JUDGE O'MALLEY** |
| | : | |
| | : | **ORDER** |
| | : | |
| | : | **This Order Relates To Case Nos.** |
| | : | **02CV16010, 02CV16012,** |
| | : | **02CV16014, 02CV16019,** |
| | : | **02CV16020, 02CV16022** |

      The dispute in these actions centers around the Sureties' liability on various surety bonds issued in connection with certain transactions between the Banks[1] and Commercial Money Center, Inc. ("CMC").  CMC's business involved the leasing of equipment and vehicles to numerous lessees in exchange for lease payments.  CMC then pooled the leases and sold them to institutional investors.  When CMC's business failed, the Banks ceased receiving lease payments, and now claim millions of dollars in losses from these transactions.  The Banks have sued the Sureties, seeking to recover on the bonds associated with the transactions.  The Sureties raise CMC's fraud as a defense to the Banks' claims and seek to rescind the surety bond transactions based on fraud in the inducement.[2]

      These actions were transferred to this Court by order of the Judicial Panel on Multidistrict

---

[1] Where not defined herein, capitalized terms used in this Opinion have the meanings ascribed to them in the Court's Consolidated Rulings, issued August 19, 2005 (Docs. 1708, 1709), and in the Bench Trial Opinion, issued May 28, 2010 (Doc. 2459).

[2] The Court does not summarize here the entirety of the complicated factual scenario involved in these cases. Rather, the Court refers the reader to its two Consolidated Rulings on the numerous Motions for Judgment on the Pleadings, issued August 19, 2005 (02-16000, Docs. 1708, 1709), and to its Bench Trial Opinion, issued May 28, 2010 (Doc. 2459).

Litigation ("the MDL Panel"), issued on October 25, 2002. (02-16000, Doc. 1). This Court has ordered that these actions be coordinated for pretrial purposes. (02-16000, Doc. 2).

Discovery now is complete in these actions, and the Court has determined all dispositive motions. Several actions have been remanded to their transferor courts for trial, and those actions remaining pending are in the final stages of pretrial preparation.

During a global status conference conducted before the Court on April 30, 2009, a number of parties represented that they intended to file motions in limine pursuant to *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) and/or *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), challenging the qualifications of certain experts proffered in these actions. The Court then ordered that it would resolve all of these motions through a global procedure, including a global *Daubert* hearing to be conducted before this Court. (Doc. 2222).

On July 16-17, 2009 and September 10, 2009, the Court conducted proceedings relating to numerous *Daubert* motions filed in these actions. During those proceedings, the Court heard testimony from certain designated experts;[3] in all other instances, the Court heard oral argument only. The *Daubert* proceedings conducted by this Court encompassed (a) all *Daubert* motions in all cases venued for trial in the Northern District of Ohio; and (b) all *Daubert* motions in cases not venued in the Northern District of Ohio, where such motions related to the admissibility of the testimony of an expert who also was designated to testify in a case venued in the Northern District of Ohio.

The following motions in limine pursuant to *Daubert* were filed in these cases and remain pending before the Court:

   (1)     Safeco Motion to exclude the testimony of Paul Palmer and Charles Kerner (Case

---

[3] The Court heard testimony from the following experts: Paul Palmer, Charles Kerner, Jerry Hudspeth and Daniel Cadle.

Nos. 02-16010, 02-16014, and 02-16020), and Jerry Hudspeth (Case Nos. 02-16010 and 02-16014)(Doc. 2254);

(2)     Royal Motion to exclude the testimony of Paul Palmer, Charles Kerner, and Thomas Davis (Case Nos. 02-16012, 02-16019, and 02-16022)(Doc. 2246);

(3)     Safeco Motion to exclude the testimony of Michael P. Larrick (Case No. 02-16014)(Doc. 2245);

(4)     Safeco Motion to exclude the testimony of Daniel Cadle (Case No. 02-16020)(Doc. 2249);

(5)     Royal Motion to exclude the testimony of Daniel Cadle (Case Nos. 02-16012, 02-16019, and 02-16022)(Doc. 2248);

(6)     Safeco Motion to exclude the testimony of Robert Lembke (Case No. 02-16014)(Doc. 2251); and

(7)     Royal Motion to exclude the testimony of Rolf Neuschaefer (Case Nos. 02-16012, 02-16019, 02-16022)(Doc. 2252).

The Court addresses each of these pending motions herein. Where multiple parties have moved to exclude the same expert, or where there otherwise is significant overlap among the arguments raised by the parties, the Court addresses multiple *Daubert* motions together.

For the reasons set forth herein, (1) the Sureties' motions to exclude the testimony of Paul Palmer and Charles Kerner on *Daubert* grounds are <u>denied</u>, although the Court establishes certain limits on the testimony of these experts; (2) Safeco's motion to exclude the testimony of Jerry Hudspeth pursuant to *Daubert* is <u>denied</u>, although the Court establishes certain limits on the testimony of Mr. Hudspeth; (3) Royal's motion to exclude the testimony of Thomas Davis pursuant to *Daubert* is <u>denied</u>; (4) Safeco's motion to exclude the testimony of Michael Larrick

pursuant to *Daubert* is <u>denied</u>, although the Court establishes certain limits on the testimony of Mr. Larrick; (5) the Sureties' motions to exclude the testimony of Daniel Cadle pursuant to *Daubert* are <u>granted</u>; (6) Safeco's motion to exclude the testimony of Robert Lembke pursuant to *Daubert* is <u>denied</u>, although the Court establishes certain limits on the testimony of Mr. Lembke; and (7) Royal's motion to exclude the testimony of Rolf Neuschaefer pursuant to *Daubert* is <u>denied</u>, although the Court establishes certain limits on the testimony of Mr. Neuschaefer.

I.     **Standards Applicable to Court's Determination of *Daubert* Motions and Motions in Limine**

Fed. R. Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993), the U.S. Supreme Court stated that courts fulfill a "gatekeeping role," in which "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. . . ." The gatekeeping function applies not only to scientific testimony, but to all expert testimony involving technical or other specialized knowledge. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

In examining a witness's expert qualifications, the Court examines "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question. . . ." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994).

"[T]he rejection of expert testimony is the exception rather than the rule. . . ." Fed. R. Evid. 702, Adv. Comm. Notes (2000). The Court analyzes each of the *Daubert* motions filed in these actions in light of the above standards.

As an initial note, the Court observes that many of the motions currently pending are grounded not in the qualifications of the experts, or the methodology employed by the experts, but rather seek orders imposing certain limitations on the experts' proposed testimony. In particular, the Sureties seek in several instances to preclude the Banks' expert witnesses from offering allegedly improper legal opinions, from engaging in allegedly impermissible contract interpretation, or from offering expert opinions as to "ultimate" facts. In this regard, the majority of these motions are motions in limine rather than true *Daubert* motions.

As set forth later in this opinion, this Court believes itself uniquely situated to resolve all issues raised in these motions, including issues properly presented via motions in limine, and will do so herein. The Court further observes, however, that the nature of motions in limine is such that many of the issues presented in such a motion are context-specific—that is, the Court's determination of the propriety of an objection often may be made only in the framework of a trial. Courts within this jurisdiction have held that rulings on motions in limine frequently should be deferred to the trial stage:

> The court has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds. . . . Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context. . . .

*Ind. Ins. Co. v. GE*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004)(Katz, J.). "Ultimately, whether a motion in limine is granted or overruled is a matter left to the sound discretion of the trial court. . . ." *Corporate Commun. Servs. of Dayton, LLC v. MCI Communs. Servs.*, 2009 U.S. Dist.

LEXIS 120113, *5 (S.D. Ohio Dec. 3, 2009)(unpublished disposition).

To the extent, therefore, that the motions presently pending before the Court are motions in limine, the Court intends, in this Opinion, to establish general guidelines for permissible (and impermissible) areas of inquiry for the experts proffered in these actions. The Court cannot anticipate, prior to trial, all objections to the testimony of these proffered experts, nor can the Court properly determine the appropriateness of all such objections outside the trial context. Nonetheless, it is the Court's expectation that the issuance of this Opinion at this stage will establish general parameters for the testimony of experts to be proffered in these actions and, accordingly, will minimize disputes in this regard at the time of trial.

II. **Analysis of *Daubert* Motions**

   A. **Safeco Motion re: Testimony of Paul Palmer, Charles Kerner [FDIC (receiver for NetBank), Case No. 02-16010, J.P. Morgan Chase (successor to Bank One), Case No. 02-16014, and CadleRock, Case No. 02-16020], and Jerry Hudspeth [FDIC (NetBank), Case No. 02-16010, and J.P. Morgan Chase (successor to Bank One), Case No. 02-16014](Doc. 2254)**

   **Royal Motion re: Testimony of Paul Palmer, Charles Kerner, and Thomas Davis [CadleRock, Case Nos. 02-16012, 02-16019, and 02-16022](Doc. 2246)**

Multiple sureties have moved to exclude the testimony of certain Bank experts, as set forth below. As there is significant overlap between the motions filed, this Opinion will address these motions together.

Safeco Insurance Company of America ("Safeco") has moved under *Daubert* to exclude the testimony of three experts—Paul Palmer, Charles Kerner and Jerry Hudspeth. Paul Palmer and Charles Kerner have been designated by FDIC (as receiver for NetBank, FSB)("NetBank"), in Case No. 02-16010, by J.P. Morgan Chase Bank, N.A., Successor by Merger to Bank One, N.A. ("Bank One"), in Case No. 02-16014, and by CadleRock Joint Venture, L.P.

("CadleRock"), in Case No. 02-16020. Jerry Hudspeth has been designated by NetBank in Case No. 02-16010 and by Bank One in Case No. 02-16014.

Royal Indemnity Company ("Royal") has moved under *Daubert* to exclude the testimony of Paul Palmer, Charles Kerner and Charles Davis. All three experts have been designated by CadleRock in Case Nos. 02-16012, 02-16019, and 02-16022.[4]

This section analyzes these motions on an expert-by-expert basis, below. For the reasons set forth herein, (1) the Sureties' motion to exclude the testimony of Paul Palmer and Charles Kerner on *Daubert* grounds is <u>denied</u>, although the Court establishes certain limits on the testimony of these experts; (2) Safeco's motion to exclude the testimony of Jerry Hudspeth pursuant to *Daubert* is <u>denied</u>, although the Court establishes certain limits on the testimony of Mr. Hudspeth; and (3) Royal's motion to exclude the testimony of Thomas Davis pursuant to *Daubert* is <u>denied</u>.

### 1. Palmer/Kerner

Paul Palmer and Charles Kerner ("Palmer" and "Kerner," respectively) are partners in Capital Credit Holdings, Inc., and have been jointly designated as expert witnesses in Case Nos. 02-16010, 02-16012, 02-16014, 02-16019, 02-16020 and 02-16022, to testify as to issues including (1) interpretation of bond language and "market expectations"; (2) the parties' intent to make the Banks original obligees under the surety bonds; (3) the nature, role, function and purpose of insurance/surety products as credit enhancements in structured finance transactions; (4) due diligence and underwriting standards; (5) servicing of lease portfolios; and (6) conduct of

---

[4] Originally, Paul Palmer and Charles Kerner also were designated as experts by United Security Bank ("USB") in Case No. 02-16024, and American Motorists Insurance Company ("AMICO") also moved under *Daubert* to exclude the testimony of Palmer and Kerner (Doc. 2255). The Court has been informed, however, that USB and AMICO have reached a settlement in Case No. 02-16024, and accordingly, this Opinion does not address the arguments set forth in AMICO's motion.

the Banks relating to the CMC lease bond program. Palmer and Kerner jointly created an expert report relating to each of the sureties involved here.

### a.    Summary of Proffered Testimony

As set forth in the expert reports of Palmer and Kerner and described in their testimony during the *Daubert* proceedings before this Court, Palmer and Kerner propose to testify as to numerous matters relating to the CMC lease bond program. The Court sets forth a summary of these experts' proffered testimony herein.[5]

First, Palmer and Kerner opine that, although the surety bonds named CMC as obligee, CMC was actually a co-principal with the lessees, and the intended obligees were the Banks. Palmer and Kerner base their opinion on several features of these transactions, including (1) the waiver of defenses provision in the lease bonds, which included "absolute and unconditional" language; (2) the language of the lease bonds defining "default"; (3) the Sureties' guarantee, in the lease bonds, of CMC's performance as subservicer; (4) the Sureties' securing of indemnity agreements from CMC and its principals; and (5) the Sureties' initiation of legal action against CMC to enforce the indemnity agreements. Based on these features, Palmer and Kerner opine that, absent assignment to an obligee, the obligations created by the bonds would have been circular, and the bonds would have had no economic purpose.

Palmer and Kerner opine that, beginning in approximately 1999, various Sureties sought to enter the lucrative securitization market, and as a result, developed surety bond language that they believed would be acceptable to investors in the capital markets. In essence, these experts

---

[5] As described on the record during the bench trial proceedings and the *Daubert* proceedings, Palmer and Kerner generated a joint expert report for each of the cases in which they have been proffered as expert witnesses. Subsequently, based upon a ruling by Magistrate Judge Nancy A. Vecchiarelli, the Banks designated the portions of the expert reports attributable to Palmer and Kerner by color-coding. For purposes of these *Daubert* motions, the Court provides only a general summary of the testimony of both expert witnesses. The Court notes, however, that the parties will be required to adhere to Magistrate Judge Vecchiarelli's order, and each expert will be permitted to testify only as to the respective portions of each report that are attributable to him.

seek to testify that the Sureties customized a standard surety bond into a "financial guarantee product" to support CMC's needs in the lease bond program.

Palmer and Kerner state that, based upon their knowledge of the relevant market expectations and industry practices, the bonds were drafted so as to waive any defenses—a common feature required by investors purchasing financial guarantee bonds. Palmer and Kerner also opine that, although the lease bonds here were styled as standard surety bonds with CMC as the obligee, the documents were structured in such a fashion primarily to avoid a violation of New York's "Appleton Rule," and not to convey true obligee status to CMC.

By issuing a "modified" surety bond designed to compete with financial guarantee products, Palmer and Kerner opine, the Sureties became subject to principles underlying securitizations and structured financing, including allocation of risk, and also became subject to market expectations as to the respective roles and risk assumption of the various parties to the transactions. In the context of a financial guarantee structure, Palmer and Kerner opine, it was reasonable for the Banks to rely on the credit of the issuing Surety and not to perform their own underwriting of the CMC lease program.

In reaching the conclusion that all parties intended a transaction in which the Banks would be obligees, Palmer and Kerner also opine, effectively, that it would make no difference how many intervening parties or "assignees" were in the obligee chain between CMC and the ultimate investor. According to Palmer and Kerner, once the financial guarantee structure was created, the protection provided by the Sureties could be conveyed to or through *any* number of parties, with no difference in the investors' resulting rights.

As financial guarantors, Palmer and Kerner opine, the Sureties were responsible under the bonds and SSAs for properly underwriting the leases. According to Palmer and Kerner, the

Sureties failed to meet the applicable standards since, among other things, the Sureties (1) failed to perform sufficient investigation to permit them to understand CMC's business model; and (2) failed to conduct a proper analysis of historical defaults and reserve appropriately for future defaults. With respect to the Guardian I, Guardian II and Guardian III pools, Palmer and Kerner also opine that the Sureties undertook to guarantee pools that were insufficiently diversified, since 100 percent of the dollar value of those pools was concentrated in leases with Shandoro Ventures, Inc. and its affiliates.

Moreover, according to Palmer and Kerner, despite the servicing obligations undertaken in the SSAs, the Sureties failed to appropriately service the lease pools, and failed to investigate whether CMC had appropriate policies and procedures in place for servicing.

### b. Parties' Arguments

### 1. Sureties

The Sureties argue that the testimony of Palmer and Kerner does not meet the reliability and relevance standards set forth in Fed. R. Evid. 702 and *Daubert*, because these experts seek to testify as to erroneous legal conclusions (including conclusions as to contract interpretation), personal beliefs as to the weight of the evidence, and impermissible opinions on ultimate issues, such as breach of duty.[6]

The Sureties argue, in essence, that various conclusions rendered by Palmer and Kerner—particularly the conclusion as to the "obligee" status of the Banks—embrace legal, rather than factual, questions, and are not the proper subject of expert testimony. The Sureties additionally argue that the testimony of Palmer and Kerner invades the province of the trier of

---

[6] For purposes of this motion, Safeco concedes the educational qualifications of Palmer and Kerner. Royal, although it does not expressly make this concession, also raises no specific arguments regarding the educational qualifications of these expert witnesses.

fact by rendering conclusions as to ultimate issues of fact, including the following determinations: (1) the Sureties failed to exercise adequate due diligence and conduct appropriate monitoring; and (2) the Banks' reliance on the bonds, and on the underwriting performed by the Sureties, was reasonable. The Sureties maintain that these matters are appropriately determined by the fact finder, upon consideration of relevant witness testimony, and do not require expert assistance.

First, the Sureties argue, the opinion expressed by Palmer and Kerner as to the Banks' obligee status is inappropriate, since this ultimate issue clearly is subject to determination by the fact finder. In fact, the Sureties note, the Court conducted a bench trial relating to this specific issue. In any event, Safeco asserts, the Banks' status as "obligees" is irrelevant, since the sureties concede that the Banks are obligees by assignment. The only relevant issues, according to Safeco, center on the extent of the Banks' obligee status and how that status was achieved— i.e., whether the Banks are "original obligees," or merely "obligees by assignment." Moreover, the Sureties argue, testimony as to "market expectations" rather than the parties' actual intent is irrelevant to a determination of obligee status.

Second, since Palmer and Kerner are experts in securitization rather than surety law, the Sureties contend that these experts have no basis to make a determination regarding the Banks' obligee status under the surety bonds, or to opine regarding the Sureties' obligations in connection with those surety bonds. In short, they argue that there is no "fit" between these experts' areas of expertise and the transactions at issue in these cases. Similarly, Royal argues that Palmer and Kerner should not be permitted to testify as to customs and practices in the securitization industry, since the transactions at issue here (unlike the Citibank/Chase transactions also involved in this litigation) were not asset-backed securitizations. Rather, the

transactions in these cases involved simply a purchase of income streams by the Guardian Entities from CMC, and the securing of loans from banks to finance the purchases. Royal relies on Fed. R. Evid. 702, which requires that testimony be "based upon sufficient facts or data. . . ." Accordingly, Royal contends, without some corroborating evidence that these transactions were securitizations, any expert testimony to that effect should be precluded.

Royal also argues that Palmer and Kerner should be precluded from testifying as to Royal's allegedly inadequate due diligence and monitoring of leases, since California law does not require a surety to prove that its reliance upon a misrepresentation by the obligee was justified, and any non-disclosure of material facts by the obligee discharges the surety as a matter of law. *See Sumitomo Bank of California v. Iwasaki*, 70 Cal. 2d 81, 85 (1968). Royal contends that, since it relied (reasonably or not) on misrepresentations by its obligee, testimony as to what Royal could have learned through an adequate underwriting process is simply irrelevant.

With respect to the opinions of Palmer and Kerner as to the Sureties' alleged breach of underwriting and servicing duties, the Sureties argue that such testimony as to a legal conclusion is impermissible under Sixth Circuit law. *See McGowan v. Cooper Industries, Inc.*, 863 F.2d 1266, 1272-73 (6th Cir. 1988)(expert testimony permissible as to scope of duties imposed by industry standards, but impermissible as to defendant's <u>breach</u> of those duties). Moreover, with respect to CadleRock's cases against Royal, the Court has granted summary judgment to Royal on any claims arising under the SSAs. (Doc. 2214). Thus, Royal asserts, any testimony relating to Royal's servicing obligations under the SSAs must be excluded from the CadleRock cases on that basis. Finally, with respect to the testimony of Palmer and Kerner as to the "reasonableness" of the Banks' reliance, the Sureties argue that this testimony also goes to ultimate factual issues, invades the province of the jury, and is inappropriate.

### 2.     Banks

In opposition to the Sureties' motions, the Banks assert that both Palmer and Kerner have decades of experience in securitized asset sales involving financial guarantees, including surety bonds.  Additionally, Palmer has experience underwriting surety bonds, overseeing the drafting of surety bonds, and evaluating whether claims should be paid under surety bonds.  The Banks argue that, in determining the relevance of proffered expert testimony, the Court is not required to adopt the Sureties' characterization of the transaction, and the Banks are entitled to present evidence that the transaction was of a different nature than that suggested by the Sureties.

The Banks reject any suggestion that experience working for a multiline surety is required to develop a proper understanding of these transactions.  The Banks assert that these experts are experienced in lease pool financing transactions and the various forms of associated financial guarantees.  According to the Banks, Palmer and Kerner are amply qualified, and their expert opinions easily meet the reliability standards of *Daubert*.  In any event, the Banks assert, the reliability tests should be flexibly applied where experts testify based upon knowledge, skill and experience in a non-scientific field. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999).

The Banks argue that the Sureties' challenges to the testimony of Palmer and Kerner do not arise under *Daubert*, and instead are more in the nature of motions in limine.  The Banks contend that the opinions of these experts are both relevant and admissible, and that they will assist the jury in evaluating issues such as (1) the parties' intent with respect to the Banks' obligee status; (2) the due diligence and underwriting standards applicable to asset-backed securitizations; and (3) the application of such standards to these cases—including due diligence

that should have been undertaken with respect to CMC, its practices, and its principals.

First, with respect to the opinions of Palmer and Kerner on the issue of obligee status, the Banks argue that these experts' opinions are properly based on the structure of the transactions, including the terms of the documents and the existence of the indemnity agreements. The Banks further maintain that the testimony will assist a lay jury in understanding the parties' intent in these complex transactions. The Banks note that, in determining the parties' motions for judgment on the pleadings, the Court declined to rule as a matter of law as to the Banks' obligee status, absent further evidence on the issue of the parties' intent. Accordingly, the Banks contend, it is appropriate for experts to testify as to the custom and practice in an industry, as well as market expectations, insofar as such custom, practice, and expectations may weigh into the parties' understandings of the transactions.

The Banks argue, additionally, that testimony as to the Banks' original obligee status does not constitute an impermissible legal conclusion, since "obligee" is not a term of art and has an equivalent meaning within the vernacular in the financial guarantee industry. Moreover, the Banks assert, expert conclusions as to the Banks' obligee status are not improper merely because they go to an "ultimate" issue in the case. *See* Fed. R. Evid. 704(a)("testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. . . ."); *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 331-332 (6th Cir. 2001); *see also Century Indem. Co. v. Aero-Motive Co.*, 254 F. Supp. 2d 670, 677 (W.D. Mich. 2003)("a district court may admit opinion testimony if the expert's specialized knowledge is helpful to the jury to understand the evidence or determine a fact in issue, even if the opinion embraces an ultimate issue to be decided by the jury. . . .")(internal quotation omitted).

With respect to the opinions of Palmer and Kerner as to the Sureties' breach of industry standards for underwriting and servicing, the Banks argue that these opinions are admissible as well. The Banks contend that testimony relating to the Sureties' breach of these standards is relevant to the Banks' contractual claims, as well as to many of the Sureties' defenses, including fraud in the inducement. Moreover, with respect to NetBank, the claims for bad faith and breach of fiduciary duty remain pending against Safeco, and NetBank asserts that testimony relating to servicing standards is relevant to those claims. In this regard, the Banks again argue that expert opinions embracing ultimate issues are not *per se* inadmissible. *See* Fed. R. Civ. P. 704(a).

The Banks challenge the Sureties' interpretation of the *Sumitomo Bank* case, and argue that the *Sumitomo* court specifically declined to impose an absolute duty of disclosure on the creditor of a surety bond. *See Sumitomo Bank*, 70 Cal. 2d at 87. The Banks continue to assert that Safeco's reliance upon alleged misrepresentations by CMC was unreasonable, as the facts allegedly misrepresented fell within the scope of Safeco's underwriting and servicing responsibilities.

The Banks also argue that the *McGowan* case is inapposite, since it was decided pre-*Daubert*, and since the proposed expert was actually a lay witness. Moreover, the *McGowan* witness would have testified as to defendant's "negligence," which was a purely legal conclusion and within the province of the jury. The Banks cite numerous cases in which courts have admitted opinions as to industry standards and practices. *See, e.g., Shepherd v. Unumprovident Corp.*, 381 F. Supp. 2d 608, 611 (E.D. Ky. 2005); *ID Sec. Sys. Can., Inc. v. Checkpoint Sys.*, 198 F. Supp. 2d 598, 620-21 (E.D. Pa. 2002). The Banks argue that the testimony relating to the Sureties' breach of servicing duties is more akin to the testimony in these cases than to the testimony found impermissible in *McGowan*.

The Banks contend that the Sureties' motions are based upon the alleged absence of disputed facts relating to the circumstances surrounding the commencement of the CMC program, and the Sureties' participation in that program. According to the Banks, the Sureties' position assumes that the Court can determine as a matter of law—without consideration of any expert testimony—that the transaction documents are unambiguous. Contrary to Safeco's position, the Banks argue that the opinions of Palmer and Kerner are relevant in determining (1) whether any ambiguities exist in the transaction documents; (2) the proper resolution of any ambiguities found in the transaction documents; and (3) the circumstances and intent surrounding the development of the CMC program.

### c. Analysis

As noted in the Sureties' briefing, and during discussions on the record during the *Daubert* proceedings, the Sureties do not raise any significant arguments relating to the qualifications of Palmer and Kerner to testify as to customs and practices in securitizations. Rather, the Sureties challenge the testimony of these experts on the grounds that: (1) testimony regarding the parties' expectations and obligations in securitized transactions is not relevant in these cases involving surety bonds; (2) it is never appropriate for experts to express legal opinions; and (3) the proffered opinions invade the fact-finding province of the trier of fact.

Each of the Sureties' objections to the proffered testimony, therefore, fails to raise grounds for excluding the testimony in its entirety pursuant to *Daubert*. Rather, as the Sureties concede, the Sureties' motions are more akin to motions in limine, in which the Sureties seek an order prohibiting some or all of their testimony on grounds that it is either irrelevant or otherwise inadmissible.

While the motions at issue are in fact akin to motions in limine, as the Court noted on the

record during the *Daubert* proceedings, this Court has extensive familiarity with the issues involved in these cases and is uniquely situated to resolve the issues raised in these motions, including issues properly characterized as motions in limine. The Court thus considers, in this Opinion, all of the issues raised and now made ripe by the parties.

Initially, the Court finds that the bulk of the proffered testimony of these experts relates to matters that have been addressed by this Court in certain of these cases, and thus are no longer at issue in those cases. As previously noted in this Opinion, in July 2009, the Court conducted bench trial proceedings in nine cases, and subsequently issued a Bench Trial Opinion (Doc. 2459). In the Bench Trial Opinion, the Court made the following findings: (1) in all transactions considered by the Court in the Bench Trial Opinion, CMC was the original obligee, and the Banks were assignees of the rights of CMC; (2) the bonds issued by the Sureties were not "financial guarantee" instruments but were simply surety bonds; and (3) the Sureties' interpretation of the *Sumitomo* case is impermissibly broad, and the Banks are not precluded from arguing unjustifiable reliance by the Sureties on information or representations provided by CMC.[7]

With respect to the cases involved in the bench trial proceedings, testimony contrary to the Court's findings as to any of the above issues is no longer material. Accordingly, as to Case Nos. 02CV16012, 02CV16019, 02CV16020, and 02CV16022, the following rulings apply:

(1)     Palmer and Kerner are precluded from testifying that these transactions were "financial guarantees," "structured finance" transactions, or "securitizations."

(2)     Palmer and Kerner are precluded from testifying that the parties intended to create

---

[7] In reaching the conclusions set forth in the Bench Trial Opinion, the Court declined to rely on the testimony of the experts proffered by either the Banks or the Sureties. Given the substantial witness testimony presented to the Court bearing upon the parties' transactional intent, as well as the language of the transaction documents themselves, the Court found expert testimony unnecessary to discern the intent of the parties to the CMC Lease Bond transactions.

or effect any of the above transactional forms.

(3)     Palmer and Kerner are precluded from testifying that the language of the bonds or any other transaction documents, or other structural elements of these transactions, are consistent with or indicative of any of the above transactional forms. To the extent the Banks can lay a foundation for these experts' knowledge of surety bond transactions, they may testify that aspects of these transactions were unusual in the surety context (if that is so) or would tend to create unusual expectations in the parties.

(4)     Palmer and Kerner are precluded from testifying as to the customs and practices or "market expectations" associated with any of the above transactional forms, but, as noted above, may express opinions regarding any unusual aspects of these surety transactions.

(5)     Palmer and Kerner are precluded from testifying that any entity other than CMC was the original obligee in these transactions.

(6)     Palmer and Kerner are precluded from testifying as to the underwriting standards applicable to a financial guarantor; however, to the extent that the Banks can lay a foundation as to these experts' knowledge of underwriting standards applicable to surety bond transactions, the testimony of these experts may be permitted on this limited issue.

(7)     Palmer and Kerner are precluded from testifying as to the appropriateness of the Banks' reliance on the underwriting conducted by the Sureties, to the extent that opinion assumes a transactional form that differs from the one the Court found in the Bench Trial Opinion.

(8)     Palmer and Kerner are precluded from testifying as to the appropriate servicing standards applicable to a financial guarantor of a lease pool transaction; however, to the extent that the Banks can lay a foundation as to these experts' knowledge of servicing standards

applicable to <u>surety bond</u> transactions, the testimony of these experts may be permitted on this limited issue.[8]

(9)    While these experts may be permitted to testify, to the extent delineated above, as to certain standards applicable to the Sureties, the Court will not permit these experts, in any event, to testify as to ultimate issues of fact—i.e., <u>breach</u> of the applicable standards.  In many instances, testimony as to breach of duty would encompass legal conclusions, and this Court has already stated on the record that it will not permit expert witnesses to express legal conclusions. *See* Transcript of Bench Trial Proceedings, at 341, 437; Transcript of *Daubert* Proceedings, at 203.    Even where testimony as to breach of duty would not necessarily involve a legal conclusion, the Court finds that such testimony would invade the province of the trier of fact and accordingly, will not be permitted.

As to those cases in which no bench trial proceedings occurred before this Court (including cases 02-16010 and 02-16014), the Court has issued no findings as to the issues set forth above, and the parties to those cases are not bound by the Court's determinations in the Bench Trial Opinion.  The analysis set forth below applies, accordingly, only to those cases not involved in the bench trial proceedings previously conducted before this Court.

As noted above, upon review of the Palmer and Kerner report, it appears that the opinions of these experts have general relevance and utility to the questions at issue in these cases.  The Court finds generally that these two experts are adequately qualified within their respective disciplines, and have knowledge and expertise sufficiently relevant to these transactions to

---

[8] With respect to the cases involving CadleRock and Royal (02-16012, 02-16019 and 02-16022, the Court notes that summary judgment has been previously granted to Royal in those cases, finding that CadleRock did not receive an assignment of the rights of its predecessor, SkyBank, in the Royal SSAs. (Doc. 2214).  Accordingly, to the extent that CadleRock seeks to proffer expert testimony as to the servicing duties of Royal, and the testimony sought to be elicited is based upon provisions of the SSAs, such testimony also will be precluded.

provide testimony that would be helpful to the trier of fact.

First, in those cases where the Court has not made findings as to the identity of the initial obligee in these transactions (including cases 02-16010 and 02-16014), the Court finds that the Banks are entitled to proffer the testimony of experts Palmer and Kerner to assist the finder of fact in determining that threshold issue.[9]  The testimony of these experts with respect to this issue, however, will be limited to (1) the structural elements of the CMC lease bond transactions; and (2) each expert's opinion as to the significance and purpose of each of those elements in the overall transactional structure.  Thus, to the extent that the Banks can lay sufficient foundation, and that the opinions sought to be elicited are relevant, Palmer and Kerner will be permitted to testify that (1) certain transactions contain elements consistent with a "securitization" structure; and (2) certain customs, practices, and expectations of investors prevail in the securitization market.

As noted previously in this Opinion, this Court will not permit expert witnesses to express legal conclusions, or opine as to ultimate issues of fact. *See* Transcript of Bench Trial Proceedings, at 341, 437; Transcript of *Daubert* Proceedings, at 203.  Accordingly, Palmer and Kerner are precluded from testifying as to (1) the identity of the original obligee; (2) the legal "meaning" of certain contractual provisions; or (3) the "intent" of the parties in structuring a transaction in a particular manner.

As discussed at some length in the Bench Trial Opinion, moreover, the Court rejects the narrow interpretation of the *Sumitomo* case advanced by the Sureties.  The Court will adhere to its reading of *Sumitomo* in future proceedings in all cases, and thus will not preclude the Banks

---

[9] While the Court found, in connection with the bench trial proceedings conducted in July and September 2009, that reliance on the testimony of Mr. Palmer was unnecessary to resolution of the issues presented to the Court in that proceeding, the Court does not presume that the same analysis would apply to a trial of this issue in connection with other transactions, and accordingly does not prejudge the relevance of these experts in such a trial.

from arguing unjustifiable reliance by the Sureties on information or representations provided by CMC. As such, to the extent that the Banks can lay an appropriate foundation, Palmer and Kerner also may be permitted to testify as to the underwriting and due diligence standards applicable to the Sureties in the context of these transactions.[10] Again, however, these experts will be precluded from expressing legal opinions or opining as to ultimate facts, including the "adequacy" of the Sureties' due diligence or the "reasonableness" of the Banks' reliance. In short, while these experts may testify to the content of industry standards with respect to underwriting, they will not be permitted to testify as to breach of those standards.

Finally, with respect to issues of servicing, the Court again declines to preclude the testimony of these experts (upon appropriate foundation) as relates to the general industry standards applicable to these Sureties for servicing and monitoring of the lease pools.[11] Again, however, while these experts may testify as to the content of industry standards relating to servicing, they will be precluded from testifying as to ultimate facts, including breach of the industry standards relating to servicing.

For the reasons set forth herein, the Sureties' motions to exclude the expert opinions of

---

[10] The Sureties have argued that Palmer and Kerner have insufficient experience with surety bonds to testify to the underwriting and servicing standards applicable to the issuers of surety bonds. Mr. Palmer testified, however, that he has worked with various forms of surety bonds—including excess SIPC bonds and financial responsibility bonds—throughout his career. Transcript of Bench Trial Proceedings, at 343. Thus, even in the event that these transactions are ultimately found not to involve securitizations, the Court will not, at this point, absolutely preclude the testimony of these experts as to the underwriting and servicing standards applicable to the Sureties.

In any event, in the cases where the Court has not conducted bench trial proceedings, the Court has issued no ruling as to whether the transactions under consideration should be viewed as "securitizations" or simple surety transactions. Accordingly, it is also unclear at this stage whether these experts may be permitted to testify to the content of the underwriting and servicing standards applicable to financial guarantors. In short, both the admissibility and relevant scope of these experts' testimony at later stages of these proceedings may be dependent, to some extent, on a finding by the Court as to the intended structure of these transactions. The Court will revisit that issue after the bench trial proceedings scheduled for October 4, 2010.

[11] With respect to the NetBank case, 02-16010, the Court notes that NetBank retains claims against Safeco under Georgia law for breach of the covenant of good faith and fair dealing/breach of fiduciary duty. In this context, the expert opinions of Palmer and Kerner as to applicable industry standards for servicing are particularly relevant.

Palmer and Kerner in their entirety pursuant to *Daubert* are <u>denied</u>. As set forth herein, however, the Court establishes certain restrictions and limitations on the testimony of these experts, which will be applicable to any future proceedings in these cases.

## 2. Hudspeth

Jerry Hudspeth ("Hudspeth") was retained by NetBank and Bank One in Case Nos. 02-16010 and 02-16014, to offer opinions as to the adequacy of Safeco's servicing of the leases. Safeco has challenged the admissibility of Hudspeth's testimony on a variety of grounds. For the reasons set forth herein, Safeco's motion to exclude the testimony of Jerry Hudspeth pursuant to *Daubert* is <u>denied</u>, although the Court establishes certain limits on the testimony of Mr. Hudspeth.

### a. Summary of Expert Testimony

As set forth in Mr. Hudspeth's expert report and described in his testimony during the *Daubert* proceedings, Mr. Hudspeth is an independent consultant in the area of financial services, as well as management of portfolios backed by asset-backed securities (including lease and loan portfolios). Mr. Hudspeth testified that he has experience auditing and evaluating the performance of servicers, and has worked with rating agencies to determine whether a particular servicer meets the criteria to obtain industry certification as a master servicer.

Hudspeth has been proffered in this action to testify as to the industry standards governing servicing of lease and subprime lease portfolios, as well as allocation of servicing duties, and to opine as to Safeco's compliance with those standards in the context of the CMC lease pool program. Hudspeth seeks to testify that (1) Safeco did not service the leases in accordance with industry standards; (2) Safeco did insufficient due diligence on CMC to determine CMC's ability to service the leases as subservicer; and (3) as master servicer, Safeco

conducted insufficient oversight of its subservicer, CMC.  Hudspeth seeks to testify, in part, that the SSA provisions requiring Safeco to service the leases are extremely unusual, and that it would be atypical for a surety such as Safeco to have the skills needed to properly service leases.

Upon review of Hudspeth's expert report, the Court notes that the report focuses primarily on a summary of the actions that an entity designated as "Master Servicer" should take with respect to ensuring proper performance by its subservicers.  Such actions include performance of proper due diligence with respect to the subservicer's systems and processes, as well as its financial strength or business stability.  In this regard, Hudspeth seeks to offer testimony that Safeco failed to comply both with the servicing standards set forth in the SSAs and with industry custom and practice.

### b.    Parties' Arguments

Safeco argues that Hudspeth's testimony does not meet the reliability and relevance standards set forth in Fed. R. Evid. 702 and *Daubert*, because his report includes erroneous legal conclusions (including conclusions as to contract interpretation), as well as impermissible opinions as to breach of duty.[12]  As with respect to Palmer and Kerner, Safeco argues that Hudspeth's testimony as to Safeco's alleged breach of its servicing duties is impermissible under Sixth Circuit law. *See McGowan*, 863 F.2d at 1272-73.  Safeco also argues that Hudspeth's opinion that the Sale and Servicing Agreement set forth the industry standards for the servicing of leases constitutes an inappropriate interpretation of contract language, which usurps the fact finder's function and is ultimately irrelevant.

In their responses to Safeco's motion, the Banks argue that Hudspeth is amply qualified, and that his testimony will be helpful to the jury in understanding the servicing standards

---

[12] For purposes of this motion, Safeco concedes the educational qualifications of Hudspeth.

applicable to subprime lease portfolios. The Banks assert that Hudspeth has many years of experience as a servicer and collateral manager for leasing and loan portfolios, and currently works as a consultant to various companies in the servicing industry. Additionally, Hudspeth has published several articles relating to servicing, securitization and portfolio management.

As with respect to Palmer and Kerner, the Banks contend that Hudspeth's expert opinions are relevant to the Banks' contractual claims, as well as Safeco's defense of fraud in the inducement. The Banks argue that Hudspeth's testimony is particularly relevant to the Banks' claims under the SSAs because the SSAs impose express obligations on Safeco to properly service the leases "in accordance with customary and usual practices of institutions which service equipment Leases. . . ." SSA, at § 2.2(d).

The Banks suggest that Hudspeth's testimony will be useful in determining the meaning and scope of the SSA provision requiring proper servicing of the leases, and is not inadmissible merely because it touches upon ultimate issues of breach of duty. "[T]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. . . ." Fed. R. Evid. 704(a). *See also Century Indem. Co. v. Aero-Motive Co.*, 254 F. Supp. 2d 670, 677 (W.D. Mich. 2003)( "a district court may admit opinion testimony if the expert's specialized knowledge is helpful to the jury to understand the evidence or determine a fact in issue, even if the opinion embraces an ultimate issue to be decided by the jury. . . ."). In short, the Banks argue that the issues raised by Safeco go not to the relevance or reliability of Hudspeth's testimony, but to its weight—a determination ultimately to be made by the trier of fact.

### c.       Analysis

Initially, the Court notes that the two cases in which Hudspeth has been proffered as an

expert were not part of the bench trial proceedings conducted by the Court in July and September 2009, and accordingly, the Court's Bench Trial Opinion has no impact on the admissibility of Hudspeth's expert testimony. For the reasons set forth herein, Safeco's motion to exclude the testimony of Jerry Hudspeth pursuant to *Daubert* is <u>denied</u>, although the Court establishes certain limits on the testimony of Mr. Hudspeth.

Given that the Banks retain breach of contract claims with respect to Safeco's obligations under the SSAs, Hudspeth's opinions as to the <u>content</u> of the prevailing servicing standards— i.e., standard practices and procedures in the servicing industry—appear to be both relevant and appropriate in the context of this litigation. As the Banks have noted, the provisions of the SSAs actually reference and incorporate industry servicing standards, and Hudspeth clearly is qualified to opine as to the content and scope of those industry standards.

As previously explained in this Opinion with respect to the Palmer and Kerner testimony, however, this Court will limit Hudspeth's testimony to the content and scope of industry standards, and Hudspeth will be precluded from testifying as to (1) any legal conclusions; or (2) any ultimate issues of fact. Hudspeth will be precluded, therefore, from actually interpreting the provisions of the SSAs, or from offering any testimony as to Safeco's "breach" of the standards applicable to a servicer of lease pools.

Further, to the extent that Hudspeth seeks to testify as to the "unusual" or unique nature of these transactions, he will be permitted to do so. Hudspeth may not, however, testify as to any conclusion that the "unique" nature of the transactions affects whether a breach of servicing standards occurred. Again, while Hudspeth may point out the extent to which the transaction documents contain certain elements that are either consistent or inconsistent with industry standards, Hudspeth will be precluded from invading the province of the trier of fact by offering

any testimony that would amount to interpretation or analysis of the contractual documents, or any of the parties' respective intent in connection therewith.

For the reasons set forth herein, Safeco's motion to exclude the expert testimony of Jerry Hudspeth in its entirety pursuant to *Daubert* is <u>denied</u>. As set forth herein, however, the Court establishes certain restrictions and limitations on the testimony of Mr. Hudspeth, which will be applicable to any future proceedings in these cases.

### 3. Davis

Thomas Davis ("Davis") is an accountant retained by CadleRock in Case Nos. 02-16012, 02-16019, and 02-16022 to opine as to the financial reporting of CMC. Royal has moved to exclude Davis's testimony. For the reasons set forth herein, Royal's motion to exclude the testimony of Davis pursuant to *Daubert* is <u>denied</u>.

### a. Summary of Expert Testimony

Davis has been proffered by CadleRock as a rebuttal witness to challenge one of the points made by Royal expert Robert Post. Mr. Post opined that Royal's underwriting procedures "included a review of CMC's financial position, as reflected in their [sic] financial statements. . . ." Davis, in rebuttal, testifies that the weaknesses in CMC's business should have been apparent to Royal through a careful review of CMC's financial statements.

Davis seeks to testify, in sum, that (1) CMC should have been reporting the sale of lease pools as secured borrowing; (2) if CMC had so reported its borrowing, the company's profitability on its balance sheets would have been greatly reduced; (3) CMC insufficiently reserved for anticipated defaults and losses on leases; (4) the financial statements relied on by Royal contained various deficiencies, as well as mathematical and other errors; and (5) the primary cause for CMC's failure was the flawed financial assumptions on which its business was

premised.

### b.   Parties' Arguments

Royal does not make clear the reasons that it seeks exclusion of Davis's testimony. Royal's brief suggests that, as with its challenge to the testimony of Palmer and Kerner, Royal believes that Davis's testimony purports to instruct on legal issues and/or invades the province of the jury. Royal also appears to argue that Davis's opinion as to Royal's allegedly deficient underwriting is irrelevant, because California law does not require a surety to demonstrate justifiable reliance on misrepresentations by its obligee. *See Sumitomo Bank*, 70 Cal. 2d at 85.

Although CadleRock initially failed to respond to Royal's motion to exclude the testimony of Davis, after the Court pointed out this oversight during the course of the *Daubert* proceedings, CadleRock filed a supplemental brief in opposition on July 17, 2009. (Doc. 2397).[13] In its supplemental brief, CadleRock argues that Davis's testimony is relevant to (1) the issue of justifiable reliance by the Sureties; and (2) the Sureties' contention that CMC was a fraudulent Ponzi scheme from its inception.

### c.   Analysis

Initially, the Court notes that each of the cases in which Davis has been proffered was part of the bench trial proceedings conducted before this Court and is subject to the rulings in the Court's Bench Trial Opinion. As such, in each of these cases, the Court anticipates that a jury trial will occur as to the "second stage" of the case, in which the trier of fact will consider the Sureties' defense of fraud in the inducement. In that context, the Court finds the testimony of Davis both relevant and admissible. Accordingly, Royal's motion to exclude Davis's testimony

---

[13] CadleRock's July 17, 2009 filing (Doc. 2397) was styled as a "Motion for Leave to Supplement Brief in Opposition to *Daubert* Motions." This motion is hereby <u>granted</u> as unopposed, and the Court will consider CadleRock's arguments in response to Royal's motion.

pursuant to *Daubert* is <u>denied</u>.

Upon review of Davis's expert report, this report does not appear to instruct on legal issues, nor does it embrace factual questions obviously within the province of the jury. Rather, Davis's report presents a logical and technical analysis of the financial statements of CMC during the 1998-2000 time period, and explains how those statements should have been interpreted by a knowledgeable and diligent reviewer. Given the special expertise required to properly interpret the CMC financial statements, the Court believes that Davis's testimony will be helpful to the jury in understanding the information that was in Royal's possession during its underwriting of the CMC program.

Moreover, as noted above with respect to the Palmer and Kerner expert reports, the Court has rejected the Sureties' reading of the *Sumitomo Bank* case, and will not preclude the Banks from introducing evidence to support their assertion that the Sureties unreasonably relied upon representations by CMC. Davis's analysis is highly pertinent to the justifiable reliance prong of Royal's fraud defense. Accordingly, the Court denies Royal's motion to exclude Davis's testimony, and declines, at this point, to impose any limitations upon Davis's testimony.

### B.  Safeco Motion re: Testimony of Michael P. Larrick
### [J.P. Morgan Chase (successor to Bank One), Case No. 02-16014] (Doc. 2245)

Safeco has moved to exclude the testimony of Michael P. Larrick ("Larrick"), an expert witness designated by Bank One.[14] Bank One has designated Larrick to testify as to various issues, including (1) research, investigation and development of program insurance and surety products; (2) the incorporation of financial guaranty language into a surety bond form; (3) the

---

[14] Larrick also was designated as an expert by The Provident Bank ("Provident") in 02-16021; however, Safeco and Provident recently reached a settlement of all claims in that action. *See* 02CV16021, Docs. 51, 52, 53.

underwriting of financial guaranty products; (4) the marketing of program insurance and surety products, and associated market expectations; and (5) the operation of these products in the marketplace. *See* Bank One brief, Doc. 2265, at 14. For the reasons set forth herein, Safeco's motion is <u>denied</u>, although the Court establishes certain limits on the testimony of Mr. Larrick.

### 1.      Summary of Expert Testimony

Larrick's testimony is based primarily on a review of the transaction documents, as well as Larrick's familiarity with the insurance industry and standards relating to the design and marketing of insurance products. Larrick opines, essentially, that (1) Safeco failed to conduct appropriate due diligence and underwriting to become sufficiently familiar with CMC's program prior to making the decision to participate in that program; and (2) in designing and marketing the CMC program, Safeco made numerous promises and representations to the Banks, which it later disavowed by denying the Banks' claims for payment.

As set forth in Larrick's expert report, the essence of Larrick's proposed testimony is reflected in fourteen specific conclusions articulated by Larrick, which are summarized by the Court below as follows:

(1)      Bank One has obligee status under the Safeco bond;

(2)      The Safeco bond contains no defenses;

(3)      The CMC lease bond program provided credit enhancement, and effectively substituted the creditworthiness of Safeco for the creditworthiness of CMC or its lessees;

(4)      CMC was "Safeco's business partner in underwriting, servicing, and marketing";

(5)      Safeco's bond constitutes a financial guarantee, and thus imposes on Safeco an obligation of due diligence;

(6)      The lease bonds were a novel product, which included the assumption of risks

outside the realm of surety;

(7) The SSAs were "an integral part" of the marketing of the lease bond program;

(8) The SSAs require Safeco to "perform a function" "outside the realm of surety";

(9) Safeco "bypassed all reasonable due diligence";

(10) Upon proper due diligence, Safeco would have declined to participate in the CMC program;

(11) Safeco failed to conduct proper monitoring and servicing over the life of the program;

(12) Safeco "does not have the right" to discontinue payments to banks or decline to honor the banks' claims;

(13) Safeco's position in this litigation is, effectively, a representation that its surety bond "was illusory"; and

(14) "There is no evidence" that Safeco's present interpretation of the bond, or Safeco's asserted defenses, were "considered, contemplated, discussed, envisioned or disclosed" during the design or marketing phases of the program.

### 2. Parties' Arguments

#### a. Safeco

Safeco argues that Larrick's testimony does not meet the reliability, relevance and qualification standards set forth in Fed. R. Evid. 702 and *Daubert*, since Larrick lacks the qualifications to testify as an expert in the area of suretyship, and Larrick's report draws numerous impermissible legal conclusions. Safeco argues, first, that Larrick's employment and consultant experience relates to the insurance industry, not the surety industry, and that Larrick never has acted as a consultant or expert witness on behalf of or against a surety. Additionally,

Safeco points out that, as Larrick testified at deposition, he lacks knowledge of suretyship law.

Generally speaking, however, Safeco's motion is targeted not at Larrick's qualifications or methodology, but at the relevance and utility of certain conclusions contained in Larrick's expert report. Safeco specifically challenges four of the fourteen conclusions articulated by Larrick, arguing that these opinions involve erroneous and impermissible legal conclusions.

The challenged opinions include Larrick's statements as to (1) the obligee status of Bank One; (2) Safeco's ability to assert fraud defenses in response to the Bank's claims under the lease bonds; and (3) Safeco's right to investigate the Banks' claims under the bonds. Safeco contends that these opinions involve contract interpretation, which is the exclusive function of the trier of fact. Safeco also argues that Larrick cannot opine as to whether Safeco's obligations under the lease bonds are independent of the lessees' obligations, since Larrick's opinion in this regard conflicts with fundamental principles of surety law.

Safeco further asserts that Larrick's opinions are impermissible insofar as they are based upon Larrick's beliefs as to what a surety should do in response to an obligee's misrepresentations, rather than actual legal requirements. For example, Larrick testifies that a surety has a "preeminent" duty to verify representations made by the obligee and that the surety may not rely on information provided by others. Safeco argues that the standards of conduct advocated by Larrick are more stringent than the law imposes, since California law provides that an obligee's failure to disclose material facts will discharge a surety from liability. *See Sumitomo Bank of Cal. v. Iwasaki*, 70 Cal. 2d 81, 85 (1968).

Safeco relies on this Court's opinion in *Welding Fume Products*, in which this Court excluded testimony of a business ethicist, based on the Court's determination that testimony as to ethical standards more stringent than the law requires would "tend to misdirect the finder of fact.

. . ." *In re Welding Fume Prods. Liab. Litig.*, 2005 U.S. Dist. LEXIS 46164, *86 (N.D. Ohio Aug. 8, 2005). Safeco argues that, similarly, Larrick cannot testify as to standards of conduct inconsistent with actual legal requirements.

### b.    Bank One

Bank One argues that Safeco has improperly couched a simple motion in limine as a *Daubert* motion, and that all of the issues raised by Safeco go to the weight of Larrick's testimony, not its admissibility. Bank One asserts, first, that Larrick is amply qualified in the fields of insurance and financial guarantees—qualifications that Safeco does not dispute. While Larrick's area of expertise does not include surety law, Bank One contends that such expertise is not necessary, since Larrick's testimony is based on (1) his familiarity with financial guarantee products; and (2) his knowledge regarding research and development, underwriting, and marketing of insurance and financial guarantee products. Moreover, Bank One asserts, despite the fact that Larrick's opinion encompasses a broad range of topics, Safeco seeks to challenge only a few narrow conclusions in Larrick's report. Accordingly, Bank One maintains, exclusion of the entirety of Larrick's testimony would be inappropriate.

Bank One rejects Safeco's assertion that Larrick's testimony is based upon impermissible legal conclusions. Bank One argues, rather, that the heart of Larrick's expert opinion is his determination that Safeco customized a standard surety bond into a "financial guarantee product" to support CMC's needs in the lease bond program. All of Larrick's further conclusions, according to Bank One, are based not upon surety law, but upon industry standards and market expectations relating to transactions involving financial guarantee products.

Bank One insists that Larrick's conclusions relating to (1) the Bank's obligee status, (2) Safeco's ability to assert fraud defenses; (3) Safeco's waiver of the right to investigate

claims; and (4) Safeco's liability independent of the lessees, are based not on Larrick's personal beliefs or legal analysis, but upon Larrick's understanding of the operation of financial guarantee products, as well as industry custom and common industry usage of terms. According to Bank One, Larrick does not interpret any contractual terms pursuant to legal standards. Rather, Larrick testifies that the transaction was structured in such a way as to qualify Safeco's bond as a "financial guarantee product." Within that framework, Bank One contends, Larrick then testifies as to industry custom, practice and standards relating to the usual operation of financial guarantee products. In Larrick's view, financial guarantee products generally contain a waiver of defenses, and do not include a right to investigate claims prior to payment. Bank One asserts that Larrick's conclusions relating to Bank One's obligee status, as well as Safeco's obligations vis-à-vis the lessees, also stem from his basic conclusion that the bonds are financial guarantee instruments.

Bank One acknowledges that some of Larrick's conclusions may embrace ultimate issues in these actions. Bank One relies, however, on Fed. R. Evid. 704(a), and *Century Indem. Co.*, 254 F. Supp. 2d at 677, discussed above, for the proposition that expert reports touching upon ultimate issues are not *per se* inadmissible.

With respect to Safeco's arguments as to the scope of its underwriting requirements, Bank One argues that Larrick can testify as to market expectations and industry standards, even to the extent that such standards exceed the requirements imposed on sureties by law. Given the parties' disagreement as to the form of the transaction, Bank One argues that Larrick's testimony will assist the jury in understanding the underwriting practices and standards relevant to different insurance products, and the expectations that a purchaser of a financial guarantee product would have had with respect to underwriting of the transactions. Larrick's testimony, Bank One argues,

will be particularly helpful in assisting the jury to understand the complex area of insurance. *See, e.g., Peckham v. Continental Casualty Ins. Co.*, 895 F.2d 830, 837 (1st Cir. 1990).

### 3.    Analysis

As with many of the other motions filed in these actions, Safeco's motion addressed to the testimony of Larrick appears to be more akin to a motion in limine than to a *Daubert* motion. As previously expressed in this Opinion, however, this Court will determine all issues relating to the pending motions. For the reasons set forth herein, the Court finds generally that Mr. Larrick is adequately qualified within his discipline, and has knowledge and expertise sufficiently relevant to these transactions to provide testimony that would be helpful to the trier of fact on certain matters at issue in these cases. Accordingly, Safeco's motion to exclude Larrick's testimony in its entirety pursuant to *Daubert* is denied.

Initially, the Court notes that Larrick has been proffered only by Bank One to testify in Case No. 02-16014, a case that was not part of this Court's bench trial proceedings. Accordingly, this case is unaffected by the Court's Bench Trial Opinion, and the Court has issued no findings in this case as to the transactional structure or the intended obligee.

Given that this Court has issued no findings as to the identity of the initial obligee in the Bank One transactions, the Court finds that Bank One is entitled to proffer the testimony of Mr. Larrick to assist the Court in determining that threshold issue. As with other experts discussed in this Opinion, however, the testimony of Mr. Larrick will be limited to (1) the structural elements of the CMC lease bond transactions; and (2) Mr. Larrick's opinion as to the significance and purpose of each of those elements in the overall transactional structure. Mr. Larrick thus will be permitted to testify that (1) certain elements present in these transactions are consistent with elements generally found within a financial guarantee transaction; and (2) certain customs,

practices, and expectations prevail with respect to purchasers of financial guarantee instruments.

Again, as noted previously in this Opinion, this Court will not permit expert witnesses to express legal conclusions, or opine as to ultimate issues of fact. *See* Transcript of Bench Trial Proceedings, at 341, 437; Transcript of *Daubert* Proceedings, at 203. Accordingly, Mr. Larrick is precluded from testifying as to (1) the identity of the original obligee; (2) the legal "meaning" of certain contractual provisions; or (3) the "intent" of the parties in structuring a transaction in a particular manner.

Thus, the Court will not permit Mr. Larrick to testify as to any purported obligation or requirement imposed upon a surety, to the extent that such a requirement is inconsistent with, or more stringent than, the requirements of California law. *See In re Welding Fume Prods. Liab. Litig.*, 2005 U.S. Dist. LEXIS 46164, *86 (N.D. Ohio Aug. 8, 2005). Nor will Mr. Larrick be permitted to opine as to the legal requirements imposed upon Safeco by these particular bonds, including issues relating to (a) the purported waiver of defenses by Safeco pursuant to the "fraud waiver" language in the lease bond; or (b) any purported wrongful conduct by Safeco based upon its assertion of legal defenses in these proceedings.

With respect to Mr. Larrick's opinions relating to underwriting and servicing standards, this Court already has found that the Banks will be permitted to introduce evidence in support of their arguments pertaining to unjustifiable reliance by the Sureties on information or representations provided by CMC. Moreover, as the Court has issued no findings in this case pertaining to the intended structure of these transactions, the Court cannot disqualify Mr. Larrick at this point based upon his alleged lack of experience with surety underwriting. As such, to the extent that the Banks can lay an appropriate foundation, Mr. Larrick also may be permitted to testify as to the underwriting, due diligence and servicing standards applicable to Safeco in the

context of these transactions.[15]   Again, however, Mr. Larrick may not express legal opinions or opine as to ultimate facts, including the "adequacy" of the Sureties' due diligence or the "reasonableness" of the Banks' reliance.  Thus, Mr. Larrick may testify to the <u>content</u> of industry standards but will be precluded from testifying as to <u>breach</u> of those standards.

By way of example, while Mr. Larrick (1) may testify that the Safeco lease bonds (or other transactional documents) contain features consistent with those frequently contained in financial guarantee instruments; and (2) may opine as to the customs, practices and expectations pertaining to the market for financial guarantee instruments, Larrick may not opine that the lease bonds are or were intended to be financial guarantee instruments.  Moreover, Larrick may not interpret the language of the lease bonds or associated transaction documents in order to offer opinion testimony as to the rights and obligations of the parties thereunder.

For the reasons set forth herein, Safeco's motion to exclude Larrick's expert opinion in its entirety pursuant to *Daubert* is <u>denied</u>.  As set forth herein, however, the Court establishes certain restrictions and limitations on the testimony of Mr. Larrick, which will be applicable to any future proceedings in these cases.


    **C.**    **Safeco Motion re: Testimony of Daniel Cadle**
        **[CadleRock, 02-16020](Doc. 2249)**

        **Royal Motion re: Testimony of Daniel Cadle**
        **[CadleRock, 02-16012, 02-16019, and 02-16022](Doc. 2248)**

Royal and Safeco have moved, pursuant to *Daubert*, to exclude the testimony of proffered CadleRock expert Daniel Cadle ("Cadle").  Mr. Cadle is a former president of The

---

[15] The relevance (and accordingly, the admissibility) of Mr. Larrick's testimony to later trial proceedings may be dependent, ultimately, on a determination by the Court as to the structure of these transactions.  The Court will revisit that issue at the conclusion of the bench trial proceedings scheduled for October 4, 2010.

Cadle Company, Inc. (an affiliate of CadleRock), and a current Chairman of the Board and director of that company. Mr. Cadle testified that he has owned and/or controlled The Cadle Company, Inc. and associated companies since 1987.

CadleRock has designated Cadle as its expert to testify as to numerous matters at issue in these cases. Royal and Safeco have moved to exclude Cadle's testimony pursuant to *Daubert* based upon (1) Cadle's asserted lack of qualifications in the relevant areas; and (2) Cadle's status as an owner and high-level officer of a party to this case. That status, the Sureties allege, renders Cadle a partisan and far too biased to provide a reliable expert opinion in this matter.

For the reasons set forth herein, the Sureties' motion to exclude Cadle's testimony pursuant to *Daubert* is granted.

### 1. Summary of Expert Testimony

Cadle has been designated to testify, according to CadleRock, as to the following subject matter areas:

(1) The commonly understood definition of prime and subprime credit risk within the financing industry.

(2) Valuing subprime debt instruments based upon anticipated default rates and cost of funds.

(3) Servicing required to achieve anticipated or projected payments upon the debt instruments during the runoff of the instruments.

(4) The normal costs of servicing C and D leases (as opposed to B & C leases).

(5) Impact of cash flow when the original lessor is required to make the payments on behalf of the original lessees in order to keep the default rate low regardless of the actual lessee default rate.

(6)     The peril of having risk concentration within an individual pool of leases.

(7)     Determining that the guaranteed leases of Shandoro, Super Shrimp, Inc., etc., were not typical lease guarantees to be used in securitization due to both the size of the individual transaction and the percentage of this one lessee as a percentage to the overall portfolio.

(8)     Whether the servicing provided by CMC was adequate to address the credit risks posed by the lease pools being serviced.

(9)     Anticipated runoff rates if normal servicing procedures are followed.

(10)    Actual runoff rates and losses as a result of actual servicing.

CadleRock Brief, Doc. 2262, at 9-10. Based upon this summary and upon the content of Cadle's report, it appears that CadleRock has proffered Cadle primarily to testify as to (1) the Sureties' underwriting and servicing failures with respect to the CMC lease bond program; (2) CMC's failure to comply with its "business plan," which allegedly caused the CMC losses; and (3) Cadle's findings as to the absence of fraud in the CMC lease bond program.

The actual range of opinions expressed by Cadle in his expert report and during the *Daubert* proceedings, however, was far broader, and extended to expressing wide-ranging legal conclusions, including the opinions that (1) the Sureties violated the Appleton Rule; (2) the Sureties "committed fraud in the inducement or actual fraud" against the Banks; (3) the Banks had no obligation to conduct due diligence or verify data; and (4) the Sureties "had knowledge" or "were aware" of various aspects of the CMC lease program.

###     2.     Parties' Arguments

####         a.     Sureties

The Sureties argue that the testimony of Cadle does not meet qualification, reliability and

relevance standards under *Daubert* and Fed. R. Evid. 702, since Cadle has insufficient qualifications to opine on suretyship issues.  Moreover, the Sureties assert that Cadle's testimony is unreliable because Cadle reaches unsubstantiated legal conclusions, and engages in weighing of the evidence to offer his personal opinions as to facts properly within the province of the fact finder.

First, the Sureties maintain that Cadle is not qualified by "knowledge, experience, training or education," and thus cannot meet the qualification standards for an expert witness as set forth in Fed. R. Evid. 702.  As the Sureties note, Cadle's professional background involves various positions at a number of banks, as well as experience in managing his own company.  For the past twenty years, Cadle has been the executive officer, director and primary shareholder of The Cadle Company, Inc., and has been involved in purchasing and servicing commercial and individual delinquent loans.  Cadle testified that all of his opinions derived (1) from his experience in servicing subprime loans; or (2) from information supplied by his attorneys or other third parties.  Cadle has very little experience in servicing leases, apart from the lease pools involved in this case.  Cadle has never been designated as an expert in any surety-related area, and his only prior expert testimony related to the subject of property valuation.  Cadle testified that he also may have written two expert reports on the subject of asset valuation.

The Sureties observe that Cadle has no experience with surety companies, nor does he have any knowledge of the surety area.  In support of this proposition, the Sureties point to Cadle's deposition, in which he testified that (1) he lacked any personal or professional experience in the surety area; (2) he had never read a surety bond prior to this case; (3) he was unsure what standards Safeco was legally obligated to meet; (4) the areas of surety and insurance are identical; (5) an FHA or HUD guarantee loan is identical to a surety bond; (6) there are only

two parties to a surety relationship; (7) the "surety" on a surety bond is another word for the "obligee"; and (8) his conclusion as to Safeco's fraud upon the Banks was based upon his reading and understanding of the Statute of Frauds. *See* Safeco brief, Doc. 2249, at 2; Royal brief, Doc. 2250, at 9.

The Sureties point out, moreover, that during Cadle's testimony in the course of the *Daubert* proceedings, Cadle was unable to (1) describe the methodology employed in reaching his conclusions; or (2) identify the documents on which he had relied in reaching those conclusions. To the extent Cadle did identify particular documents, the Sureties note, none of those documents had been disclosed on the reliance list previously provided by CadleRock.

The Sureties observe that Cadle has been designated to testify as to a wide range of topics—including the Sureties' allegedly insufficient due diligence, alleged misrepresentations by the Sureties, the Sureties' "intent" in entering into the lease bonds, and the Sureties' allegedly improper servicing of leases. The Sureties contend that Cadle lacks expertise to testify in any of these areas, and that the topics on which Cadle has been proffered are unrelated to any expertise possessed by Cadle.

This argument is supported by reference to Cadle's deposition, in which Cadle testified that the areas on which he was to opine were determined by Cadle's attorney, based merely upon a list of areas that needed to be addressed. *See* Safeco brief, Doc. 2249, at 4. The Sureties also refer to Cadle's testimony, during the *Daubert* hearings, that many of his opinions were formed based primarily on case law and other documents that were provided to him as a result of research conducted by CadleRock's in-house counsel.

The Sureties argue that Cadle's testimony is neither reliable nor relevant, because Cadle freely reaches legal conclusions, and engages in weighing of the evidence to offer his personal

opinions. For example, Cadle opines that CMC did not commit any fraud—a determination clearly within the province of the fact-finder—and also offers legal opinions as to the Sureties' fraud and alleged violations of the New York Appleton Law.[16] Finally, Cadle repeatedly opines as to the Sureties' state of mind, including statements that the Sureties "never intended to pay any bond amounts due to the Banks."

Royal further argues that Cadle offers opinions as to matters that are not at issue in this case, including opinions as to the Sureties' servicing of the lease pools. Even if Cadle were qualified to opine in that regard, Royal asserts, the Court has granted summary judgment to Royal as to CadleRock's claims under the SSAs, and any testimony as to servicing of leases thus should be irrelevant in cases involving Royal. Royal further objects to Cadle's intent to testify, in cases involving Royal, as to various opinions relating to the Safeco bonds.

Finally, the Sureties argue that Cadle is precluded from testifying as an expert in these cases because of Cadle's personal bias. Cadle is the President and 100% shareholder of CadleRock, Inc., which is the sole general partner of CadleRock Joint Venture, L.P., a party to all of the cases in which Cadle has been designated. Through Cadle's ownership interests in various limited partners of CadleRock, Cadle personally holds a 40% interest in that entity, and members of his family hold or control an additional 20% to 30% of CadleRock.[17] The Sureties argue that an expert must be excluded where there is a showing of such extreme bias that the proposed testimony cannot be considered reliable under *Daubert*. *See In re Welding Fume Prods. Liab. Litig.*, 534 F. Supp. 2d 761, 766 (N.D. Ohio 2008); *see also Proteus Books, Ltd. v. Cherry*

---

[16] As Cadle testified at deposition, he reached his conclusion that the Sureties violated the Appleton Law by asking his attorneys to provide him with a copy of the New York statute, and by reading that statute.

[17] These figures are based on the Court's previous findings in its Order on CadleRock's motion seeking payment of the expert compensation of Daniel Cadle (Doc. 2204, at 1), as confirmed by the testimony of Mr. Cadle during the *Daubert* proceedings conducted on September 10, 2009. Tr. 788.

*Lane Music Co.*, 873 F.2d 502, 515 (2d Cir. 1989)(court has discretion to determine that a party to a case may not testify as an expert).

### b.    CadleRock

In response to the Sureties' motions, CadleRock argues that the opinions articulated by Cadle in his expert reports are relevant to explain the practical considerations that impact whether a company originating and servicing subprime debt can operate profitably.  CadleRock asserts that Cadle's basis of expertise for this testimony is his 20 years of experience in evaluating subprime portfolios for purchase, as well as his experience in servicing subprime debt portfolios.  CadleRock does not explain how Cadle's experience in these areas qualifies him to address the far broader areas as to which he has been proffered.  Nor has CadleRock addressed the issue of Cadle's personal bias in this action.

### 3.    Analysis

As set forth previously in this Opinion, in evaluating motions filed pursuant to *Daubert*, a district court fulfills a "gatekeeper role" in evaluating the reliability of proffered expert testimony.  In *Daubert*, the Court identified a nonexhaustive list of factors to assist courts in evaluating the reliability of the scientific theory or methodology upon which an expert's opinion is based, including whether the theory or technique can be or has been tested, whether it has been subjected to peer review, whether it has a known or potential rate of error, and whether it has general acceptance in the scientific community. *See Daubert*, 509 U.S. at 593-594.  *Kumho* extended these standards to nonscientific testimony, and held that, "where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [the relevant] discipline. . . ." *Kumho*, 526 U.S. at 149 (internal quotation omitted).

Upon a review of Cadle's proffered expert reports and of his testimony during the *Daubert* proceedings, it is clear that the testimony Cadle intends to offer falls far short of these standards. Other than limited experience relating to loan servicing (not lease servicing), Cadle freely admits that he has no experience relevant to the technical areas involved in this case. Moreover, despite the limited nature of Cadle's experience, the list of topics as to which Cadle has been designated to testify is extraordinarily broad.

While his business success is certainly testimony to his general business savvy and apparent expertise in certain financial transactions, Cadle's testimony during the *Daubert* proceedings confirmed his manifest misunderstanding of many areas at issue in this case, including the area of suretyship and surety bonds. This testimony demonstrates his lack of qualifications to testify as to the issues on which he has been proffered. Even more problematic, Cadle's testimony reveals a willingness to opine on virtually any matter, including issues calling for legal conclusions, or matters plainly within the province of the fact finder.

During the September 10, 2009 proceedings, Cadle testified to the following:

(1)     Prior to this case, Cadle never drafted or even read a surety bond. Tr. 802.

(2)     Cadle has never underwritten a surety bond. Tr. 803.

(3)     Cadle's expert conclusions as to the alleged "knowledge" of the Sureties were based, at least in part, on Cadle's own examination of the transaction documents and depositions, and on his weighing of the evidence. Tr. 808.

(4)     Cadle had never heard of the "Appleton Rule" prior to this case. Tr. 820.

(5)     In Cadle's opinion, Royal's maintaining an excess credit concentration in the CMC lease pools violated "all insurance rules in the country," including the Appleton Rule. Tr. 821-822.

(6)     Cadle formulated his opinion, in part, based upon legal research provided to him by CadleRock's in-house counsel. Tr. 835-36.

(7)     Cadle was unable to identify the portions of the various depositions he had read; he testified that he reviewed primarily those parts highlighted by CadleRock's in-house counsel. Tr. 838.

(8)     Cadle's understanding of the legal definition of fraud—on which he apparently premised his conclusion that the Sureties committed fraud—was based upon Cadle's reading of the "statute of frauds." Tr. 839.

On cross-examination during the *Daubert* hearings, moreover, Cadle was unable to identify the specific documents upon which he relied to formulate his opinions, stating that, "I looked up things online, I looked at dictionaries, I looked at a whole bunch of things that I did not and do not retain copies of. . . ." Tr. 832.[18] Cadle conceded that many of the items he viewed had probably been deleted from his computer and not disclosed to the Sureties. Tr. 836.  Many other items upon which Cadle purportedly relied, as described in his testimony, were not included on CadleRock's expert witness reliance list, and thus also had not been disclosed to the Sureties.

While Cadle may be qualified by general experience to opine as to some limited issues set forth in his expert report, vast portions of that report go far beyond his experience and are based primarily on legal analysis provided to Cadle by his counsel.  Accordingly, even if Cadle could meet the qualification standards set forth in *Daubert* and *Kumho*, Cadle's expert report demonstrates that his testimony would be, at best, unhelpful to the jury.   At worst, expert

---

[18] Cadle further testified that he could not list the documents upon which he relied to determine what CMC's business model was, and whether CMC had followed that model.  Cadle testified vaguely that he had made those determinations based upon "[d]ocuments that I obtained from basically the court files in this case. . . ." Tr. 841-42.

testimony by Cadle would be confusing and extremely misleading. Cadle's report is riddled with vague and unsupported statements, many of which are outside the area of proper expert testimony, and many of which are blatantly improper legal conclusions. Cadle shows no hesitation in opining as to the Sureties' alleged fraudulent intent, or in determining the Sureties' violation of law based upon a single reading of a statute.

Finally, and most troubling, Cadle is a mere proxy for a party in this case, and his extreme partisanship renders any testimony that he could provide unhelpful. In its Order on CadleRock's motion seeking payment of Daniel Cadle's expert fees (Doc. 2204), the Court found that Cadle was "essentially a proxy for [CadleRock] itself . . . ," Doc. 2204, at 11, and "substantially identical with a party. . . ." Doc. 2204, at 12. Because of his partisan status, the Court found that Cadle was not entitled to expert witness fees pursuant to Fed. R. Civ. P. 26(b)(4)(C). For the same reasons, and for the additional reasons set forth in this Opinion, Cadle is not qualified to serve as an expert witness in these proceedings. The Sureties' *Daubert* motion to exclude the testimony of Daniel Cadle is <u>granted</u>.

**D.    Safeco Motion re: Testimony of Robert Lembke**
**[J.P. Morgan Chase (successor to Bank One), Case No. 02-16014](Doc. 2251)**

Safeco has moved, pursuant to *Daubert*, to exclude the testimony of Robert Lembke ("Lembke"), an expert designated by Bank One in Case No. 02-16014.[19]  Bank One has offered Lembke to testify as to various issues, including (1) surety claims management; (2) the mishandling of bond claims by Safeco; (3) the importance of understanding transactional intent of the parties to the underlying obligations; and (4) Safeco's breach of duties under the lease

---

[19] Although Lembke also was designated as an expert by Provident, in Case No. 02-16021, the parties have reached a settlement of all claims in that case. *See* 02CV16021, Docs. 51, 52, 53.

bonds, SSAs and estoppel letters. *See* Bank One brief, Doc. 2264, at 1.

For the reasons set forth herein, Safeco's motion to exclude the testimony of Lembke in its entirety pursuant to *Daubert* is <u>denied</u>, although the Court establishes certain limitations on the testimony of Lembke.

### 1. Summary of Expert Testimony

The expert report prepared by Mr. Lembke is extensive and covers a wide range of issues, including claims handling, surety underwriting, and servicing. Mr. Lembke additionally expresses opinions about the transactional structure, opining that the lease bond transactions created a "co-principal arrangement" between CMC and its lessees. Based upon the Court's review of the "Conclusions" section of Lembke's expert report, the essence of Lembke's testimony appears to be the following determinations:

(1)    Safeco performed virtually no due diligence on the CMC program until well after writing over $96,000,000 in bonds.

(2)    Safeco failed to recognize that, due to the "co-principal" arrangement established by the transaction documents, Safeco was required to underwrite CMC and its principals, as well as the lessees.

(3)    Safeco failed to understand that it was also required to underwrite CMC from a servicing standpoint and understand the servicing controls that CMC had in place.

(4)    Safeco conducted insufficient underwriting of the CMC lessees, agreed to assume an excessive concentration of assets in Shandoro/MedQuik bonds, and failed to adequately underwrite Shandoro and its principals.

(5)    Safeco's claims handling practices were improper, as Safeco should have paid all claims and limited its investigation to seeking recovery from the indemnitors.

(6)    Safeco also engaged in improper claims practices, insofar as it instructed its servicer to focus on avoiding payment of claims rather than maximizing collections on leases.

(7)    Safeco "misrepresented" the terms of the bonds and SSAs to the Banks.

(8)    Safeco "never intended to pay any bond amounts due to the Banks."

(9)    Safeco's claims of fraud by CMC constitute "post-loss underwriting," and are "pure sophistry of the highest order."

(10)    Safeco engaged in "every ploy, tactic and deceit" against the Banks "to delay, deny and obfuscate the truth."

(11)    Safeco's assertion of defenses in this litigation is "outrageous and egregious conduct on the part of Safeco," and violated numerous standards, including "custom and practice of the industry, . . . good claims practices and various portions of the Association of Insurance Commissioners, model act on Unfair Claims Practices Act. . . ."

### 2.    Parties' Arguments

#### a.    Safeco

Safeco argues that Lembke's testimony does not meet the reliability, relevance and qualification standards set forth in Fed. R. Evid. 702 and *Daubert*, since Lembke lacks the qualifications to testify as an expert in the areas as to which he has been proffered. Additionally, Safeco maintains, Lembke's testimony draws numerous impermissible legal conclusions, and frequently invades the province of the jury by weighing the evidence and offering personal opinions as to disputed factual matters.

Safeco notes that Lembke has no formal educational background in insurance or business-related matters. Rather, Lembke has attended only sporadic seminars involving insurance claims, reinsurance and workers' compensation. Lembke has never attended any

seminars involving suretyship or surety bonds, and has not participated in professional associations relating to the surety industry. Rather, Lembke's experience focuses on adjusting insurance and reinsurance claims. Although Lembke has decades of work experience in the insurance and reinsurance industries, Lembke testified that only a small percentage of his work related to surety bonds, and none related to lease bonds. Safeco asserts that this experience is insufficient to qualify Lembke to testify on the topics as to which he has been designated in this case.

According to Safeco, Lembke's deposition testimony reveals that Lembke has insufficient knowledge in principles of surety law. For example, Safeco notes, when questioned as to whether a surety may raise fraud in the inducement based upon misrepresentations by the obligee, Lembke responded that he had insufficient information to answer the question, and later declined to offer an opinion. Additionally, Lembke testified that he was not an underwriter and had never underwritten a surety bond. In light of this testimony, Safeco argues that Lembke should be precluded from testifying about Safeco's alleged insufficient due diligence in underwriting.

Safeco points out that Lembke has testified as an expert in only two court cases, both of which involved the issue of the scope of insurance coverage. Safeco cites a district court opinion in one of those cases, *McDermott v. Industrial Risk Insurers*, Nov. 12, 2003 Order, District Court, E.D. La. In that Order, the court held that Lembke's proposed testimony impermissibly "cross[ed] into the realm of making legal conclusions concerning Defendant's compliance with legal duties arising from those customs and practices. . . ." *McDermott*, Nov. 12, 2003 Order, at 2.

Safeco contends that, within the framework of the issues on which Lembke has been

proffered, Lembke purports to opine as to issues including (1) Safeco's lack of due diligence in underwriting; (2) misrepresentations allegedly made by Safeco; (3) Safeco's intent never to pay any amounts due under the bonds; and (4) Safeco's breach of duties under the transaction documents. Safeco argues that, even if these opinions were arguably appropriate, they fall outside the scope of Lembke's qualifications. Pursuant to *Daubert* and its progeny, Safeco asserts, the district court must ensure that the "actual testimony does not exceed the scope of the expert's expertise, which if not done can render testimony unreliable under Rule 702. . . ." *In re Welding Fume Prods. Liab. Litig.*, 2005 U.S. Dist. LEXIS 46164, *34 (N.D. Ohio Aug. 8, 2005), *quoting Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001).

Safeco argues, further, that Lembke's testimony is neither reliable nor relevant, because Lembke's testimony invades the province of the fact finder by weighing the evidence and offering personal opinion, and impermissibly reaches legal conclusions about the conduct of Safeco. Safeco cites, for example, Lembke's conclusions that (1) there was no fraud on the part of CMC; and (2) Safeco's answers to the Bank complaints committed a "fraud on the court." According to Safeco, Lembke has impermissibly ignored or disregarded the testimony of numerous Safeco witnesses and injected his personal assessment of the evidence into his expert opinion.

Moreover, Safeco asserts, Lembke's expert report is replete with legal conclusions, including his opinions that (1) Safeco acted in bad faith; (2) Safeco's conduct violated the Unfair Claims Practices Act; (3) Safeco breached its fiduciary duties to the Banks; (4) Safeco breached its duties under the bonds, estoppel letters, and SSAs; and (5) the manner in which Safeco handled the Banks' claims is "unconscionable, egregious and punitive in nature. . . ." These

conclusions, Safeco contends, are based on Lembke's erroneous determinations that Safeco was precluded from raising a fraud in the inducement defense, and was precluded from conducting an investigation of the Banks' claims prior to payment. These conclusions, according to Safeco, additionally rely on Lembke's interpretation of Safeco's intent or state of mind, which is a jury determination and not a proper subject for expert testimony.

Finally, Safeco argues, Lembke purports to testify as to certain matters relating to Safeco's alleged bad faith in processing bond clams. However, in this Court's opinion granting Safeco's Motion for Partial Summary Judgment (Doc. 2214), Safeco was granted summary judgment as to the bad faith claims asserted by Bank One. In this context, Safeco asserts that issues of alleged bad faith in claims processing are no longer relevant.

### b.    Bank One

In response to Safeco's motion, Bank One argues that Lembke's experience in insurance and surety matters is extensive, and is amply sufficient to permit Lembke to testify as to the topics for which he has been proffered. Bank One asserts that Lembke has over 40 years of experience in claims management, insurance and surety, including supervisory responsibility over surety claims during Lembke's tenure at American Reinsurance. Bank One also cites to Lembke's knowledge in underwriting, including his prior membership on an underwriting committee at American Reinsurance. Additionally, Bank One observes, Safeco has itself retained Lembke in the past to audit and review surety/fidelity insurance programs. The scope of those retentions, according to Lembke, included a "detailed examination of the claim, accounting and underwriting files, as well as the offices' management of the involved companies. . . ." Lembke Affidavit, Doc. 2264, Ex. 1. Safeco's prior reliance on Lembke's knowledge and experience, Bank One asserts, undercuts Safeco's challenge to Lembke's qualifications.

Bank One further notes that Safeco has not challenged Lembke's qualifications to opine as to financial guarantee products and the claims handling for those products. The bonds at issue in this case, Bank One argues, are more appropriately denominated as financial guarantees than as lease bonds. Moreover, Bank One contends, Lembke's testimony is offered not strictly as to surety issues, but as to broader topics, including (1) custom and practice regarding coverage; (2) underwriting; (3) accounting and claims handling; and (4) the duties of an insurer to its principals, obligees and assignees. With respect to these areas, Bank One asserts, Lembke's qualifications are unchallenged.

According to Bank One, Safeco's attempt to limit the scope of appropriate expertise in this matter to the area of "lease bonds" is an artificial construct based upon the unique facts of this case, and is aimed at excluding well-qualified bank experts. Bank One maintains that Sixth Circuit law prohibits the imposition of an overly narrow test of expert qualifications, *see United States v. Barker*, 553 F.2d 1013, 1024 (6th Cir. 1977), and argues that this Court should refrain from applying such an excessively restrictive standard here.

Bank One argues that Safeco's motion does not raise grounds for exclusion under *Daubert*, but rather raises only issues appropriate for cross-examination. Bank One contends that Safeco challenges only a few limited opinions in Lembke's report, most of which are taken out of context. To the extent that Safeco contests Lembke's opinion based on Lembke's alleged failure to consider the testimony of certain Safeco witnesses, Bank One asserts that such a challenge bears only on the weight of Lembke's testimony, not its admissibility. Bank One further asserts that, rather than offer impermissible legal opinions, Lembke's expert report does no more than describe industry standards and customs.[20] Bank One cites numerous cases in

---

[20] To support this assertion, Bank One relies on various excerpts of Lembke's deposition testimony, in which Lembke stated that his opinions were based upon industry standards rather than legal definitions.

which courts have admitted opinions as to industry standards and practices. *See, e.g., Shepherd v. Unumprovident Corp.*, 381 F. Supp. 2d 608, 611 (E.D. Ky. 2005); *ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 198 F. Supp. 2d 598, 620-21 (E.D. Pa. 2002). While the application of industry standards may touch upon ultimate issues in the litigation, Bank One asserts that this does not render Lembke's opinions *per se* inadmissible. *See* Fed. R. Evid. 704(a).

Finally, Bank One argues that Lembke's testimony is not *per se* excludable merely because limited portions of Lembke's expert report discuss his belief as to Safeco's state of mind. Bank One relies on the relatively liberal standards of the Federal Rules of Evidence, and reminds the Court that the "rejection of expert testimony is the exception rather than the rule. . . ." Fed. R. Evid. 702, Adv. Comm. Notes (2000).

### 3. Analysis

Lembke is one of the few experts challenged by the Sureties on "qualification" grounds, rather than merely the "reliability" prong of *Daubert*. Safeco has argued that Lembke's background and experience are focused on the insurance and reinsurance industries, and that Lembke has insufficient knowledge of the surety law issues underlying these actions. For the reasons set forth herein, Safeco's motion to exclude Lembke's testimony in its entirety pursuant to *Daubert* is <u>denied</u>.

Initially, the Court notes that Lembke has been proffered only by Bank One to testify in Case No. 02-16014, a case that was not part of this Court's bench trial proceedings. Accordingly, this case is unaffected by the Court's Bench Trial Opinion, and the Court has issued no findings in this case as to the transactional structure or the intended obligee.

As a threshold matter, the Court finds that Lembke is adequately qualified within his discipline, and has knowledge and expertise sufficiently relevant to provide testimony that would

be helpful to the trier of fact as to certain issues. Upon review of the parties' arguments and Lembke's curriculum vitae, it appears that Lembke has significant experience in insurance claims handling, as well as some degree of underwriting experience, particularly in the area of financial guarantee bonds. Lembke's experience in claims handling, moreover, appears to be relevant to Bank One's claims under the SSAs, as Bank One has alleged that certain provisions of the SSAs established relevant standards for the processing of bank claims upon the bonds.[21]

Particularly in the absence of findings as to the parties' intended transactional structure, or the obligee in the Bank One transactions, the Court is unable to disqualify Lembke at this point on the basis of his education and/or experience. While the Sureties assert that Lembke has limited experience with "surety bonds" or "lease bonds," the Banks correctly point out that this Court has not determined the nature of the underlying transaction in this case. The Sureties have not disputed that Lembke has ample experience with claims handling and/or underwriting with respect to financial guarantee instruments. Therefore, as with several other experts proffered by the Banks, the admissibility and/or scope of Lembke's testimony may be dependent, to some extent, on a determination by this Court on the threshold issues of (1) the structure of these transactions; and (2) the Banks' obligee status.

The Sureties' arguments, however, as to the legal conclusions and personal opinions offered by Lembke stand upon a different footing, and are largely well taken. Upon the Court's review of the expert report authored by Lembke, it is apparent that the scope of the opinions offered by Lembke is broad, encompassing issues ranging from underwriting to bond interpretation to claims handling. A large number of statements and conclusions within

---

[21] In addition, Lembke's testimony may be relevant to the bad faith claims raised by Bank One. Although the Court has granted Safeco summary judgment as to Bank One's bad faith claims in tort (*see* Doc. 2214), Bank One argues in its brief that it retains contractual claims based upon Safeco's improper handling of Bank One's bond claims.

Lembke's report involve (1) legal conclusions offered by Lembke; (2) impermissible "weighing" of the evidence; or (3) conclusions as to ultimate issues of fact, which improperly invade the province of the fact-finder. Testimony falling into any of these categories is outside the scope of permissible expert testimony and will be excluded.

Lembke will be permitted to testify as to the content of industry standards governing claims handling and underwriting, to the extent that Bank One can lay sufficient foundation for Lembke's opinions in these areas. As explained previously in this Opinion, however, the Court will not permit testimony by any expert as to ultimate issues of fact—including breach by Safeco of any applicable standards. Lembke will be precluded, therefore, from offering any opinion as to (1) the structure of these transactions as financial guarantees; or (2) the identity of the "obligee" in the Bank One transactions.

For the same reasons, the Court will not allow Lembke to step outside his expert role and render factual findings not based upon any expertise held by Lembke. The Court will, accordingly, preclude testimony as to any of the following matters: (1) statements as to Safeco's intent or state of mind; (2) conclusions as to factual issues such as the fraud of CMC; (3) any purported "interpretations" of the language of the transaction documents; or (4) any determinations that Safeco violated certain statutes or committed fraud as against the Banks.

As previously noted in this Opinion, the expert report submitted by Lembke is extensive, and the Court cannot anticipate every opinion that Lembke may seek to offer, nor every objection that the Sureties may raise. The Court will, however, apply the standards set forth in this opinion to restrict the breadth of Lembke's testimony as proffered by Bank One in the context of a trial.

Safeco's motion to exclude Lembke's testimony in its entirety pursuant to *Daubert* is

denied.  As set forth herein, however, the Court establishes certain limitations on the testimony of this expert.

      **E.**      **Royal Motion re: Testimony of Rolf Neuschaefer**
                  **[Michael Anthony and Anthony & Morgan, Case Nos. 02-16012, 02-16019, 02-16022](Doc. 2252)**

Royal has moved, pursuant to *Daubert*, to exclude the testimony of Rolf Neuschaefer ("Neuschaefer"), an expert proffered by Michael Anthony and Anthony & Morgan Surety & Insurance Services, Inc. (collectively, "A&M"), in cases 02-16012, 02-16019, and 02-16022. A&M has designated Neuschaefer to testify as to two primary issues: (1) the role and responsibilities of a surety agent/broker to his/her client; and (2) compensation to the agent/broker.

As an initial note, during the *Daubert* hearings conducted on July 17, 2009, this Court heard oral argument with respect to Royal's motion to exclude the testimony of Neuschaefer.  At that time, the Court conducted a discussion on the record with counsel for both Royal and A&M. A&M's counsel agreed that there were certain statements within Mr. Neuschaefer's expert report that exceeded the scope of Mr. Neuschaefer's expertise and constituted impermissible legal conclusions.  The Court then directed counsel for Royal and A&M to confer and provide the Court with an annotated expert report indicating (1) the opinions that A&M would agree to withdraw; and (2) the remaining opinions to which Royal continued to object.

Despite the parties' apparent agreement as to some issues during the July 17, 2009 proceedings, on October 19, 2009, Royal filed an annotated expert report of Rolf Neuschaefer (Doc. 2429), which highlighted the portions of Neuschaefer's expert report to which Royal objected.  In that submission, Royal indicated that it had been unable to reach agreement with

A&M to withdraw *any* portion of Neuschaefer's expert report. Accordingly, the Court considers Royal's motion as originally filed, and as clarified by Royal's filing of an annotated expert report.

For the reasons set forth herein, Royal's motion to exclude the testimony of Neuschaefer pursuant to *Daubert* is <u>denied</u>, although the Court establishes certain limits on the testimony of Mr. Neuschaefer.

### 1.    Summary of Expert Testimony

A&M has proffered Mr. Neuschaefer to opine as to the role and responsibilities of an agent or insurance broker to his or her client (the insured or principal), as well as to the insurance carrier. Mr. Neuschaefer also seeks to opine as to the compensation to be paid to such agents and brokers in the form of commission and fees, and the applicable industry requirements regarding disclosure of such fees.

Neuschaefer's expert report includes a background, or "summary," discussion of the respective role of a surety vis-à-vis its agent, including the duty of the surety underwriter as "gatekeeper" and decisionmaker with respect to the bonds authorized. Within this summary, Neuschaefer also makes statements as to (1) a surety's inability to assert defenses, including fraud defenses, against its obligee; (2) an obligee's reasonable expectation that it may rely upon the bonds; and (3) the duties imposed upon the underwriter to obtain all necessary information.

Neuschaefer's expert report contains certain statements which appear to (1) contain legal conclusions; or (2) reflect a weighing of the evidence by A&M's expert. For example, Royal objects to the following statements (stated below in summary form):

(1)    Based upon a review of the transaction documents, there was "no evidence" that A&M breached any fiduciary obligations;

(2)     Based upon a review of the depositions, A&M was given no underwriting authority;

(3)     There was "no evidence" that A&M was ever informed that it had violated the Sureties' trust;

(4)     The commission paid to A&M by the Sureties was in the normal or standard range for the surety industry;

(5)     Based upon a review of the depositions, A&M did not receive profit sharing on the CMC bonds;

(6)     Based upon a review of the agency agreements, A&M was not prohibited from billing fees to, and receiving payment from, its client, CMC; and

(7)     Based upon a review of all evidence, A&M's conduct did not fall below the standard of care applicable to an agent or broker.

### 2.     Parties' Arguments

#### a.     Royal

Apparently, Royal does not challenge Neuschaefer's education or experience, nor does it challenge the general thrust of the testimony that Neuschaefer seeks to offer. Royal argues, however, that Neuschaefer's report deviates significantly from the topics for which Neuschaefer was designated and sets forth numerous irrelevant opinions that are impermissible under Rule 702.

First, Royal objects to virtually the entirety of Neuschaefer's general "background" discussion as to underwriting, including the discussion of appropriate surety underwriting. Royal contends that Neuschaefer impermissibly opines as to issues including (1) the absence of defenses where a surety has failed to properly underwrite an account; and (2) a surety's

unconditional obligation to an obligee despite fraud in the application process. According to Royal, this commentary is outside the scope of Neuschaefer's designated testimony and irrelevant to Royal's case against A&M. While Royal does not dispute that an expert may offer opinions as to duties imposed by custom and practice, Royal contends that Neuschaefer's discussion of industry practice is simply not pertinent to the issues involved in Royal's claims against A&M. Moreover, Royal argues, these statements represent impermissible legal conclusions by Neuschaefer.

Based upon Fed. R. Evid. 702 and applicable case law, Royal also objects to certain other statements that allegedly constitute legal conclusions, including Neuschaefer's statements that (1) A&M did not breach any fiduciary duties; and (2) certain agency agreements did not prohibit the receipt of certain undisclosed fees by Michael Anthony.

Finally, Royal challenges certain opinions by Neuschaefer that allegedly are based upon a weighing of the evidence or invade the province of the fact finder, including Neuschaefer's conclusions that (1) A&M was given no underwriting authority by the Sureties with respect to the CMC account; (2) A&M did not receive profit sharing on the CMC bonds; and (3) the range of commissions paid to A&M on the CMC account was "normal." Royal asserts that such statements merely summarize Neuschaefer's own view of the evidence and thus are unhelpful to a fact finder.

### b.     A&M

In opposition to Royal's motion, A&M argues that Neuschaefer is appropriately qualified to opine on the issues addressed in his expert report, and that the opinions offered are both relevant and helpful to the fact finder in determining the issues involved in Royal's claims against A&M. A&M points to Neuschaefer's three decades of experience in the insurance

industry, as well as his possession of a CPCU designation and other professional certifications. A&M further notes that Neuschaefer has published several articles relating to agent/broker rights, responsibilities and standards of care, and has qualified as an expert in two prior cases.

Moreover, A&M argues, the opinions offered by Neuschaefer go directly to the issues of agent/broker rights, responsibilities to client and carrier, compensation, standards of care and duties—matters that are directly at issue in the context of Royal's claims against A&M. A&M contends that Neuschaefer's report is directed to the scope of an agent's duties to an insurance carrier, and thus that it will aid in determining whether A&M violated relevant agency standards—a question that is directly relevant to Royal's claims of fraud and breach of fiduciary duty. A&M contends that, even where an expert testifies as to a party's compliance with legal standards within a given industry, such testimony is permissible where it is relevant and based upon the customs and practices of a given industry. *See, e.g., Calusinski v. Kruger*, 24 F.3d 931, 937 (7th Cir. 1994); *Haley v. Gross*, 86 F.3d 630, 645 (7th Cir. 1996).

### c.      Analysis

As with many of the other motions filed in these actions, Royal's motion to exclude the testimony of Neuschaefer challenges only the relevance and reliability of the opinions to be offered by Neuschaefer. As such, this motion is more akin to a motion in limine than to a *Daubert* motion. The Court finds generally that Mr. Neuschaefer is adequately qualified within his discipline, and has knowledge and expertise sufficiently relevant to provide testimony that would be helpful to the trier of fact as to certain matters at issue. Accordingly, Royal's motion to exclude Neuschaefer's testimony in its entirety pursuant to *Daubert* is <u>denied</u>.

The proffered testimony is relevant, in a general sense, to Royal's claims against A&M and A&M's defenses to those claims. Royal has alleged breach of fiduciary duty, fraud and

conspiracy to defraud.  Presumably, A&M seeks to offer the testimony of Neuschaefer to support its assertions that (1) A&M dealt with the carriers in a manner consistent with the requirements imposed on agents/brokers by the insurance industry; and (2) A&M did not violate any duties to the Sureties.  A&M also apparently seeks to offer Neuschaefer's testimony that an agent has no underwriting duties to demonstrate that A&M had no knowledge of fraud or any other misconduct by CMC, and did not participate in any fraud committed by CMC against the Sureties.

Upon a careful review of the expert report authored by Neuschaefer, the Court finds that, while the opinions expressed by Neuschaefer in his expert report are relevant to the issues described above, portions of the Neuschaefer report do contain statements that stray beyond the permissible scope of expert testimony.  In the areas where this occurs, Neuschaefer's testimony either (1) usurps the role of the fact-finder in weighing evidence; or (2) offers legal conclusions that are both inappropriate and unhelpful to the fact-finder.  Testimony by Neuschaefer that falls into either of these two categories will be precluded.

Initially, while there is some utility to Neuschaefer's background description of the expected "division of labor" between a surety and its agent/broker, the Court finds that Neuschaefer's testimony in this area must be limited, in order to weed out inappropriate legal conclusions and avoid jury confusion.  Thus, while Neuschaefer will be permitted to testify as to the typical division of functions between the surety underwriter and the broker, Neuschaefer will not be permitted to testify as to (1) any legal "duties" allegedly imposed on the underwriter; (2) the reasonableness of a hypothetical obligee's reliance on the underwriting performed by a surety; or (3) a surety's ability to assert fraud defenses in the context of a surety bond or other instrument.

Additionally, Neuschaefer will not be permitted to express any conclusions to the extent that those conclusions are predicated upon Neuschaefer's own evaluation of the evidence, rather than upon any special expertise possessed by Mr. Neuschaefer. Thus, Mr. Neuschaefer may not testify as to his view of the facts in this action (including the amount of commissions received by A&M or the underwriting authority given to A&M), where the basis for Mr. Neuschaefer's opinions is his "review of the depositions," "review of the transaction documents," or "review of the evidence."

With respect to the legal conclusions allegedly contained in Mr. Neuschaefer's report, this Court has already held that it will not permit any expert to testify to legal standards, or to a party's compliance with those standards. Nor will this Court permit an expert to testify to the requirements imposed upon a party merely by interpreting the governing agreement. Thus, to the extent that Neuschaefer seeks to testify as to (1) the duties imposed upon A&M by the agency agreement; or (2) A&M's breach of any fiduciary duties or of applicable standards of care, such testimony will not be permitted. Further, Mr. Neuschaefer may not testify as to the legal requirements imposed on A&M by California law relating to compensation or disclosure of commissions.

To the extent, however, that Neuschaefer seeks to opine only as to the <u>content</u> of industry standards—including (1) prevailing rates of commission for surety brokers; (2) standard practice as to compensation and disclosure of compensation; (3) the <u>custom and practice</u> in the surety industry relating to the standard of care applicable to brokers; or (4) the fact that the scope of certain duties generally is governed by or memorialized in an agency agreement—Neuschaefer will be permitted to so testify.

Again, while the Court cannot anticipate every opinion that Neuschaefer may seek to

offer, nor every objection that the Sureties may raise, the Court intends that the restrictions and limitations set forth in this opinion will govern the testimony of Neuschaefer in future proceedings in these actions.

For the reasons set forth herein, Royal's motion to exclude Neuschaefer's testimony pursuant to *Daubert* is <u>denied</u>, although the Court establishes certain limits on the testimony of Mr. Neuschaefer.

## III.    Conclusions

For the reasons set forth herein,

(1)    Safeco's Motion to exclude the testimony of Paul Palmer, Charles Kerner and Jerry Hudspeth (Doc. 2254) is <u>denied</u>, although the Court establishes certain limitations on the testimony of these experts.

(2)    Royal's Motion to exclude the testimony of Paul Palmer, Charles Kerner, and Thomas Davis (Doc. 2246) is <u>denied</u>.  Royal's motion to exclude the testimony of Palmer and Kerner is <u>denied</u>, although the Court establishes certain limitations on the testimony of these experts.  Royal's motion to exclude the testimony of Davis is also <u>denied</u>, and the Court finds that the imposition of limitations on Davis's testimony is inappropriate at this point in time.

(3)    Safeco's Motion to exclude the testimony of Michael P. Larrick (Doc. 2245) is <u>denied</u>, although the Court establishes certain limitations on the testimony of Larrick.

(4)    Safeco's Motion to exclude the testimony of Daniel Cadle (Doc. 2249) is <u>granted</u>.

(5)    Royal's Motion to exclude the testimony of Daniel Cadle (Doc. 2248) is <u>granted</u>.

(6)    Safeco's Motion to exclude the testimony of Robert Lembke (Doc. 2251) is <u>denied</u>, although the Court establishes certain limitations on the testimony of Lembke.

(7)     Royal's Motion to exclude the testimony of Rolf Neuschaefer (Doc. 2252) is

denied, although the Court establishes certain limitations on the testimony of Neuschaefer.

**IT IS SO ORDERED.**

_ **s/ Kathleen M. O'Malley** _
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: July 27, 2010**

73468-1