**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: COMMERCIAL MONEY | : | **Case No. 1:02CV16000** |
| CENTER, INC., EQUIPMENT | : | |
| LEASE LITIGATION | : | **(MDL Docket No. 1490)** |
| | : | |
| | : | **JUDGE O'MALLEY** |
| | : | |
| | : | **TRIAL TEMPLATE** |
| | : | **FOR *COMMERCIAL MONEY*** |
| | : | ***CENTERS* MDL CASES** |

## I.     INTRODUCTION AND SUMMARY OF PURPOSE

This Court is the transferee court presiding over the Multidistrict Litigation ("MDL") known as *In re: Commercial Money Center, Inc. Equipment Lease Litigation*, MDL no. 1490. This document outlines the proceedings that have occurred in this MDL since its 2002 inception, and summarizes the Court's relevant pretrial rulings applicable to all MDL cases.

The purpose of this document is to assist trial judges in transferor courts who may preside over the trial of an individual *Commercial Money Center* case after the Judicial Panel on Multidistrict Litigation (the "MDL Panel") remands the case from this Court back to the transferor court.  All of this Court's written Orders cited in this document are available on the ECF docket of the within action, Case No. 02CV16000, unless another case docket is cited.

By Order of the MDL Panel dated October 25, 2002, numerous cases were transferred to this Court for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407.  Ultimately, 38 cases were made a part of the Commercial Money Centers MDL, and 15 cases remain pending.[1]

---

[1] By Order dated October 6, 2010 (Doc. 2478), the Court ordered that six cases be dismissed without prejudice, at the request of the parties.  As of the date of this Order, twelve cases (other than the three as to which this Court has suggested remand) remain pending in the Northern District of Ohio.  Of those twelve cases, eleven were originally filed in this District and are before this Court in its capacity as trial judge.

As transferee court, this Court has handled substantial motion practice and has overseen an extensive, multi-year discovery process, in coordination with related bankruptcy and state criminal proceedings. With the assistance of a Court-appointed mediator, numerous cases have settled.[2] Several cases also have been remanded to their transferor courts for trial. At this point, all common fact and expert discovery is complete in these cases, and all case-wide issues amenable to resolution in this transferee court have been resolved. The Court concludes, accordingly, that several civil actions pending in MDL 1490 are now ripe for remand to the transferor courts for final disposition.[3]

The multidistrict litigation statute makes clear that "[e]ach action so transferred shall be remanded by the [MDL Panel] at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated." 28 U.S.C. §1407(a).[4] The Supreme Court explains that this language normally "obligates the [MDL Panel] to remand any pending case to its originating court when, at the latest, those pretrial proceedings have run their course." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 34 (1998). *But see Manual for Complex Litigation, Fourth* § 20.132 at 224-25 (2004) (noting several procedural mechanisms parties may use to avoid remand of cases back to transferor

---

[2] As ordered by the Court in its Post-Ruling Partial Case Management Plan (Doc. 1739), mediation in these actions was conducted by Richard B. McQuade, Jr., a former federal judge.

[3] By a separate order, the Court has suggested that the MDL Panel order remand in the following actions: 02CV16003, 03CV16010, and 03CV16000.

[4] As noted, the statute makes clear that it is the MDL Panel, and not this MDL transferee court, that remands a transferred case to the originating transferor court. Because the MDL Panel normally awaits a suggestion of remand from the transferee court, however, this Order sometimes uses shorthand terminology and refers to "a remand by this Court," rather than "a suggestion of remand by this Court made to the MDL Panel." *See Manual for Complex Litig. Fourth* § 20.132 at 225 ("The Panel looks to the transferee court to suggest when it should order remand, but that court has no independent authority to order section 1407 remand.").

courts).  Thus, it is the transferor court, where the federal case originated, that must normally conduct the actual trial.

The Manual for Complex Litigation states that "[o]ne of the final actions of the transferee court should be a pretrial order that fully chronicles the proceedings, summarizes the rulings that will affect further proceedings, outlines the issues remaining for discovery and trial, and indicates the nature and expected duration of further pretrial proceedings." *See Manual for Complex Litigation, Fourth* § 20.132 at 224-25 (2004).  The instant document is this MDL Court's attempt to fulfill this directive and provide a "trial template" for transferor courts.[5]  At such time as a civil action is ordered by the MDL Panel to be remanded to the transferor court, the Clerk of this Court shall designate this Order as part of the record to be remanded.

As a general matter, the "transferor court is bound, upon remand, by the orders entered by the transferee court during the coordinated or consolidated pretrial proceedings. Those decisions are considered law of the case." *See* David F. Herr, *Multidistrict Litigation Manual* § 9:3 at 242 (2007)(footnote omitted).  This is true even with regard to matters affecting the conduct of the trial itself, such as the number of expert witnesses allowed. *See In re Factor VIII Or IX Concentrate Blood Prods. Litig.*, 169 F.R.D. 632, 633 & 637 n.3 (N.D. Ill. 1996) (MDL Judge who also sat on MDL Panel confirming that the MDL transferee court has "the authority to limit the number of common-issue expert witnesses at trials which will take place after remand to the transferor districts. . . .").  Thus, the evidentiary, procedural, and substantive decisions made by this MDL Court follow a *Commercial Money Center* case back to the transferor court, where they continue to adhere.

---

[5] The Court may amend this "Trial Template" from time to time to reflect additional rulings or circumstances of which transferor courts should be made aware.

This Court has worked assiduously to conserve judicial resources by placing transferor judges in the position of having to rule on as few remaining issues as possible before trial. With that goal in mind, the Court presents below an overview of the *Commercial Money Center* MDL history, parties, claims, and defenses, and also a catalog of the principal rulings the Court has entered that apply in remanded cases.

In preparing this summary, the Court has been mindful of the transferor courts' need to understand the "big picture" of this litigation, and thus has made an attempt to include all significant rulings in this summary, even where those rulings may not pertain to a particular remanded case. At the same time, however, the Court also is mindful of the many demands on the time and resources of the transferor courts, and does not wish to burden the courts with a large volume of irrelevant information. Thus, where a ruling is extremely voluminous and/or of tangential relevance to the remanded cases, the Court has simply included a citation to that ruling for the transferor courts' reference. Additionally, to the extent certain rulings have no impact on any cases to be remanded, insofar as they pertain solely to cases that either (1) have been resolved prior to trial; or (2) will remain in the Northern District of Ohio for trial, the Court has omitted reference to those rulings.

## II.   FACTUAL BACKGROUND AND PARTIES' CLAIMS

These extraordinarily complex disputes center around the potential liability of certain Sureties[6] on various surety bonds (the "Lease Bonds") issued in connection with certain

---

[6] As used in this Memorandum and Pretrial Order, "Sureties" means American Motorists Insurance Company ("AMICO"); ACE American Insurance Company ("ACE American"); Illinois Union Insurance Company of America ("Illinois Union"); RLI Insurance Company ("RLI"); Royal Indemnity Company ("Royal"); and Safeco Insurance Company of America ("Safeco"). Each of these Sureties is involved in at least one of the MDL actions remaining pending before this Court.

transactions involving the Banks[7] and Commercial Money Center, Inc. ("CMC").[8] CMC was a Nevada-based company that had significant operations in California. CMC was engaged in leasing vehicles and equipment to subprime lessees. CMC then assembled the leases into pools and sold the pools (or their associated income streams) to investors. Investors in the CMC transactions purchased lease pools, or the income streams associated with those pools, at prices discounted to reflect each investor's negotiated rate of return.

In order to make the lease pools more attractive to potential investors, CMC obtained Lease Bonds from various Sureties to guarantee certain portions of the transactions. The Banks in these actions are investors who purchased interests totaling more than $400 million in the CMC lease pools. CMC acted as sub-servicer of the various lease pools and was responsible for delivering the lease payments to the investors. Each investor expected to receive a monthly payment approximately equal to the amount due each month under the leases (or income streams) it purchased.

There were essentially four transactional forms utilized in the sale of CMC lease pools: (1) certain Banks purchased the income streams directly from CMC; (2) certain Banks purchased the income stream from third parties who purchased from CMC; (3) other Banks, known collectively as the "Ohio Banks," lent funds to special purpose entities known as the "Guardian Entities," who used the loans to purchase the income stream from CMC and secured payment of

---

[7]  While the "Bank Group" originally included numerous bank entities, many banks now have settled their disputes with the Sureties. For purposes of this Memorandum and Pretrial Order, "Banks" means those banks identified in the Court's two Opinions on the Motions for Judgment on the Pleadings (Docs. 1708, 1709). The only Banks that remain involved in the MDL actions pending before this Court are Bank One, n/k/a JP Morgan Chase Bank, N.A. ("Bank One"); Federal Deposit Insurance Corporation, as Receiver for NetBank, FSB ("NetBank"); and CadleRock Joint Venture, L.P. ("CadleRock"), as assignee of the interests of certain other banks.

[8]  CMC had several affiliates, including Commercial Servicing Center, Inc. ("CSC") and several special purpose entities. For simplicity, the CMC-affiliated entities will be referred to collectively as "CMC," except where individual reference is necessary.

all obligations under the loans by assigning the income streams from the lease pools and Lease Bonds; and (4) several Banks purchased notes from CMC special purpose entities that were secured by, and to be repaid from, the income stream from the leases.

Each of the Sureties relied on a surety broker, Michael Anthony ("Anthony"), of Anthony & Morgan Surety & Insurance Services, Inc. ("A & M"), to locate investors, and to work with the investors to negotiate mutually acceptable transactions. Anthony was an independent broker and was responsible for arranging virtually all of the lease pool transactions at issue. Anthony also signed many of the Lease Bonds on behalf of the Sureties, pursuant to powers of attorney issued to Anthony by the Sureties.

Throughout the relevant time period, however, Anthony also had a close working relationship with CMC. Undisputedly, Anthony received commissions from CMC on the lease pool transactions. Certain Sureties have asserted claims against Anthony in this litigation, alleging that, because of Anthony's undisclosed relationship with CMC, as well as his alleged breach of duties owed to the Sureties, Anthony lacked authority to execute Lease Bonds and take other actions on behalf of the Sureties. Those Sureties thus also assert that the Lease Bonds and other transaction documents executed by Anthony are invalid based on Anthony's lack of authority to execute those documents.

In late 2001, CMC ceased to forward lease payments to its investors and, by early 2002, CMC had closed its doors and ceased operations. CMC filed for bankruptcy on May 30, 2002 and is not a party to the proceedings before this Court. These cases involve, primarily, disputes between investors and Sureties arising from the collapse of the CMC program. The Banks, investors in CMC's Lease Bond program, have sued the Sureties, seeking payment under the Lease Bonds.

The Sureties have denied liability, asserting that they were victims of a massive fraud orchestrated by CMC and its principals, Michael Anthony and others. The Sureties contend that CMC operated a Ponzi scheme, in which early investors were paid using money generated by new investors, while a large number of the supposed equipment leases were nonexistent or nonperforming. The Sureties also claim to have been defrauded by CMC's representations regarding its financial condition and the condition of its lease pools. As a result of these misrepresentations, the Sureties assert, the Lease Bonds were void *ab initio*, and the Banks cannot recover on these bonds. In addition to their claims for rescission of the Lease Bonds based upon fraud in the inducement, certain Sureties asserted claims against Michael Anthony, A&M, the Guardian Entities, and certain individual defendants associated with the operations of CMC.

## III.      INITIAL CASE ADMINISTRATION AND DISCOVERY

After consolidation of these cases before the undersigned, the Court issued an initial Case Management Plan (Doc. 22), which required all parties to amend their complaints, if necessary, and to file answers and counterclaims in the action prior to any motion practice. The Court also issued a Document Depository Order (Doc. 190) and Stipulated Protective Order (Doc. 191) applicable to all proceedings in these actions.[9]

Although the parties informed the Court that they contemplated filing Motions for Judgment on the Pleadings in these actions, the Court ordered that the parties proceed with discovery during the pendency of the motions. On May 13, 2003, the Court issued a Memorandum and Order (Doc. 221)(the "Discovery Order") governing the conduct of discovery

---

[9] Additionally, throughout these proceedings, the Court communicated extensively with the bankruptcy judge and bankruptcy trustee in the CMC bankruptcy case, in order to minimize disruptions in each of the associated proceedings.

in these actions.  In that Order, the Court designated three Liaison Groups in these actions for deposition purposes—the Bank Group, the Surety/Insurance Group, and the Third Group.[10]  The Court assigned to each group a set number of "deposition hours," to be used in any manner each group deemed appropriate.  The Court included a mechanism through which the parties could obtain additional deposition time upon a demonstration of good cause.  To discourage abuse, the Court also created a mechanism through which time could be deducted from a group's time allotment.  Finally, the Discovery Order created a mechanism through which disputes regarding deposition scheduling and the conduct of depositions would be presented to, and resolved by, Magistrate Judge Nancy A. Vecchiarelli.

Pursuant to the Court's initial Case Management Plan and the Discovery Order, the parties engaged in fact and expert discovery, under the supervision of Magistrate Judge Vecchiarelli, for a period of approximately four years.  The Court believes that, at this point, all general and case-specific discovery has been completed, and that none of the cases to be remanded will require any further discovery prior to trial.

## IV.  APPOINTMENT OF A SPECIAL MASTER

Despite the (relatively) small number of cases involved in these MDL proceedings, this Court recognized early on that the extraordinary factual and legal complexity of this MDL presented a significant analytical and organizational challenge.  This is not a traditional MDL, and neither the parties nor their claims can be neatly categorized.  As described in section II above, the transactions involved in these cases employed various complex structures, and the transactional documents are not identical between transactions.  Moreover, the defendants are not

---

[10] The Bank Group and the Surety/Insurance Group included the parties identified above as the "Banks" and "Sureties," respectively.  The "Third Group" included all other parties to the actions, and consisted primarily of certain individual defendants, brokers and intermediary parties, including the "Guardian Entities."

the same in all actions and are, in fact, very diverse. Thus, while there is a factual overlap in the cases involved in this MDL, these cases are not all "related" in the classic sense.

In order to enable the Court to manage these divergent and factually complex actions, as well as to deal with the large volume of motion practice, on January 3, 2006, the Court appointed Shannan C. Krasnokutski, Esq.[11] as Special Master to perform the following duties:

- assist the Court in preparing for hearings, conferences, or any other formal or informal interaction with the parties (including formulating agendas);

- oversee management of docketing, including the identification and processing of matters requiring Court rulings;

- assist the Court with legal analysis of the parties' motions or other submissions, whether made before, during or after trials;

- make recommendations and reports to the Court (which may include drafts of opinions and orders or any other written work product requested by the Court), upon request, regarding any matter pertinent to these proceedings; and

- communicate with the parties and attorneys as needs may arise in order to permit the full and efficient performance of these duties. . . .

Doc. 1750, at 6.

In these proceedings, the Court has applied the concept of a Special Master in a somewhat innovative manner, utilizing the Special Master effectively as an additional "law clerk," as opposed to a traditional Special Master with more expansive powers. In this regard, the Special Master is a former law clerk to the Court with extensive knowledge of these cases. Over the past four years, this innovative use of a Special Master has provided the Court with the necessary assistance in these complicated matters, while minimizing expense to the parties.

The Special Master has significant "institutional knowledge" of these cases, including her familiarity with the parties and with the complex issues that arise frequently in these cases. To

---

[11] Shannan C. Krasnokutski, Esq., Nolan & Heller, LLP, 39 N. Pearl St., Albany, New York 12207; (518) 449-3300 (tel.) (518) 432-3123 (fax); skrasnokutski@nolanandheller.com

the extent desired by any transferor judge, the Special Master is available to provide any assistance the transferor Court requires.

## V.     MOTION FOR JUDGMENT ON THE PLEADINGS

Pursuant to the Court's scheduling Orders, the Banks filed a consolidated Motion for Judgment on the Pleadings on January 31, 2003 (Doc. 53)(the "Pleadings Motion").[12] In the Pleadings Motion, the Banks asserted that they were entitled to payment on the Lease Bonds as a matter of law, based upon the terms of the transaction documents. The Banks contended, specifically, that (1) they were obligees on the Lease Bonds and were not involved in any alleged fraud; (2) fraud waivers contained in the documents precluded the Sureties from asserting fraud in the inducement as a defense; and (3) even if the Sureties could otherwise assert defenses to payment, the Sureties should be estopped from asserting such defenses because of "estoppel letters" issued by the Sureties touting the enforceability and legality of the transactions.

The Sureties opposed the Pleadings Motion, and contended that (1) CMC, not the Banks, was the original obligee on the surety bonds; thus, fraud in the inducement by CMC and/or its representative, Michael Anthony, rendered the Lease Bonds void *ab initio*; (2) the fraud waivers contained in some of the bonds were intended to cover only issues of fraud *by the lessees* against CMC; (3) a surety cannot waive the defense of fraud by an obligee, despite unambiguous language in the parties' agreement; and (4) the Banks failed to show that any sums were "due and owing" on the Lease Bonds, since many of the underlying leases were nonexistent or void.

On August 19, 2005, the Court issued two Opinions resolving the issues raised in the

---

[12] The Banks filing the Pleadings Motion included Ameriana Bank and Trust, S.B.; Atlantic Coast Federal Bank; Bank of Waukegan; Bank One N.A.; Bluebonnet Savings Bank FSB; Citibank, N.A.; FirstMerit Bank, N.A.; Footbridge Limited Trust; General Electric Capital Corp.; JPMorgan Chase Bank (f/k/a Chase Manhattan Bank, N.A.); Lakeland Bank; Metropolitan Bank & Trust Company; NetBank, FSB (NetBank, FSB subsequently filed a notice with the Court indicating its withdrawal from the Pleadings Motion); Riverway Bank; Second National Bank of Warren; Sky Bank (for itself and as successor in interest to Mid Am Bank); The Huntington National Bank; The Provident Bank; and U.S. Bank National Association.

Pleadings Motion. (Docs. 1708, 1709). In the Court's Lead Opinion (Doc. 1708), the Court denied the Banks' motion for judgment on the pleadings against all Sureties other than Illinois Union Insurance Company ("Illinois Union"). In the Lead Opinion, the Court made certain threshold findings of broad application. First, the Court determined that California law applied to its analysis of the transactional documents, except where the relevant document contained an express choice of law provision.

Second, the Court held that it could not determine as a matter of law whether the Banks were the intended obligees on the Lease Bonds issued by the Sureties. *See* Doc. 1708, at 24. Although the Court noted that certain factors, including the execution of indemnity agreements by CMC in favor of the Sureties, lent some support to the Banks' position, the Court found that the indemnity agreements alone did not justify a finding of obligee status in the face of Lease Bonds that *expressly named* CMC as obligee. *See* Doc 1708, at 26. Rather, the Court found, a change in the obligee designated by the instruments could be effected only by reformation of the Lease Bond instruments upon consideration of extrinsic evidence. *See* Doc. 1708, at 26-27.

The Court further considered, in the Lead Opinion, the language of the transaction documents, including the alleged "fraud waiver" provisions contained in the Lease Bonds. *See* Doc. 1708, at 33-44. The Court found that the fraud waivers contained in the Lease Bonds were broad enough to encompass a waiver of the Sureties' defenses based upon the alleged fraud of CMC. *See* Doc. 1708, at 39. The Court held, therefore, that, in the event that the Banks were ultimately found to be the intended original obligees on the Lease Bonds, the "fraud waiver" provisions would preclude the Sureties from asserting fraud defenses against the Banks based upon the fraud of CMC. *See* Doc. 1708, at 44.

The Court found, however, that if CMC were the intended original obligee in the

transaction—and the Banks mere assignees of CMC's interests—California law would bar enforcement of a provision exempting a party from its own fraud. *See, e.g., Danzig v. Jack Grynberg & Assocs.*, 208 Cal. Rptr. 336, 342 (Cal. App. 1st Dist. 1984). Moreover, since an assignee in the Lease Bond transactions could acquire no rights greater than those of its assignor, *see* Doc. 1708, at 33, a finding that the Banks held only "assignee interests" would permit the Sureties to retain against the Banks all defenses that would have been available under California law against CMC—including the defense of fraud in the inducement. *See* Doc. 1708, at 38-39.[13]

In the Illinois Union Opinion (Doc. 1709), on the other hand, the Court granted the Pleadings Motion as that motion related to Banks whose transactions involved Illinois Union. In the Illinois Union Opinion, the Court found that the insurance policies issued by Illinois Union actually were Lease Bonds, on which Illinois Union was the Surety. *See* Doc. 1709, at 24. The Court further found that, based on the language of the transaction documents, the Banks *clearly* were the intended obligees on the Lease Bonds issued by Illinois Union. *See* Doc. 1709, at 26. Accordingly, the Court held that the fraud waiver provisions in the Illinois Union policies applied, and Illinois Union could not assert the fraud of CMC as a defense to the Banks' claims. *See* Doc. 1709, at 52. The Court specifically distinguished the Illinois Union policies from the Lease Bonds issued by other Sureties in these cases, since Illinois Union's policies expressly named the Banks as Insureds, and thus, by the plain terms of the transaction documents, granted them original obligee status in the Lease Bond transactions. *See* Doc. 1709, at 30-31.

As a result of the Court's issuance of the Illinois Union Order, one Bank, JPMorgan Chase Bank, N.A. (as Trustee for Citibank, N.A.)("Chase"), requested and subsequently was

---

[13] The Court declined, in the Lead Opinion, to rule on the Banks' assertions of estoppel based upon the alleged "estoppel letters," because the Court found questions of fact relating to (1) Anthony's authority to execute such letters; and/or (2) when such letters were executed and/or received by the Banks. *See* Doc. 1708, at 49-50.

granted final judgment as against Illinois Union in Case No. 02CV16009. *See* 02-16000, Doc. 1817; 02-16009, Docs. 33, 36. The Court also certified a partial final judgment in favor of Chase in Case No. 02CV16007 pursuant to Fed. R. Civ. P. 54(b). *See* 02-16007, Doc. 69. Illinois Union appealed this Court's ruling, and the Illinois Union Order was upheld in substantial part on appeal. *See Commer. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327 (6th Cir. 2007).[14] While the Sixth Circuit's Opinion has no direct relevance to any of the cases to be remanded in this matter, the Court includes a reference to that Opinion as a resource for any transferor court seeking a greater understanding of the background of this litigation.

## VI. APPLICABILITY OF COURT'S OPINIONS ON THE PLEADINGS MOTION TO NETBANK

In the Illinois Union Opinion (Doc. 1709), the Court noted that NetBank, FSB ("NetBank") had previously withdrawn its interest in the Pleadings Motion, and instead had filed a motion for summary judgment. *See* Doc. 1709, at 60-61. Upon issuing the Illinois Union Opinion, the Court granted NetBank ten days to file a motion seeking to renew its interest in the Pleadings Motion, and thus to make the Illinois Union Opinion applicable to NetBank. Pursuant to the Court's Order in the Illinois Union Opinion, NetBank filed a motion to renew its interest in the Pleadings Motion on August 19, 2005. (Doc. 1712). Illinois Union opposed NetBank's motion to renew its interest (Doc. 1714).

On May 9, 2006, the Court issued an Order (Doc. 1826)("Renewal Order") granting NetBank's motion to renew its interest in the Pleadings Motion, and thereby making the Illinois

---

[14] The Sixth Circuit upheld this Court's findings that (1) the Illinois Union insurance policies actually were Surety Bonds; (2) the Banks were the intended obligees on the Surety Bonds; and (3) Illinois Union could not assert the fraud of CMC as a defense to its payment obligations under those bonds. The Sixth Circuit reversed this Court's award of damages, however, and remanded the case for further proceedings related to calculation of damages. *See Commer. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327 (6th Cir. 2007). The parties settled the damages issue soon after remand, and an Order of Dismissal with Prejudice was entered on March 31, 2008. *See* 02-16009, Doc. 60; *see also* 02-16007, Doc. 80.

Union Opinion applicable to NetBank. *See* Doc. 1826, at 14. Based upon the Court's prior findings in the Illinois Union Order, the Court granted NetBank judgment on numerous counterclaims asserted by Illinois Union. However, based upon Illinois Union's allegations of <u>direct</u> <u>fraud</u> by NetBank on certain lease pools, the Court denied judgment on Illinois Union's Fifth Counterclaim, and on NetBank's affirmative claims against Illinois Union.

Ultimately, NetBank and Illinois Union resolved all claims between them. *See* 02-16010, Doc. 52; 02-16007, Doc. 77. As of the date of this Order, NetBank retains claims only against Safeco Insurance Company of America ("Safeco"). *See* docket, 02-16010.

Notably, since the Renewal Order addressed only the applicability of the Illinois Union Opinion to NetBank's claims, the Renewal Order did not address NetBank's claims against any Surety other than Illinois Union. Thus, except to the extent required by law of the case and other applicable judicial doctrines, *see, e.g.,* Doc. 1826, at 7, the remaining claims between NetBank and Safeco <u>are</u> <u>not</u> <u>subject</u> to the Court's findings as set forth in the Lead Opinion.

## VII. SETTLEMENT EFFORTS

Given the unique nature of these cases, where the primary wrongdoers were either dead, being criminally prosecuted, in bankruptcy, or apparently judgment-proof, the Court encouraged the parties early in the litigation process to attempt to resolve their differences, rather than to expend substantial funds pursuing a limited resource pool. To that end, the Court offered to set aside two full weeks of time prior to ruling on the Pleadings Motion, to work with the parties with a view toward effectuating resolutions of the many matters pending in these cases. At that time, however, the parties were not amenable to settlement discussions.

Accordingly, following the Court's rulings on the Pleadings Motion, the Court issued a Post-Ruling Partial Case Management Plan (Doc. 1739), in which the Court ordered the parties

to participate in mediation, and appointed former federal judge Richard B. McQuade, Jr. as Mediator. The Mediator spent a substantial amount of time working with the parties in the various actions, initially devoting more than three weeks of his time to this complex endeavor, and subsequently conducting additional meetings with certain parties. Largely as a result of the Mediator's efforts, numerous claims within this MDL, and several entire cases, were resolved.

## VIII. MOTIONS FOR LEAVE TO AMEND

Subsequent to issuance of the Court's rulings on the Pleadings Motion, and pursuant to the Court's Post-Ruling Partial Case Management Plan (Doc. 1739), on or before March 29, 2006, numerous parties filed motions for leave to file amended pleadings. In a detailed Memorandum of Opinion and Order issued on October 3, 2006 (Doc. 1865)("Amendment Order"), the Court resolved forty amendment motions, as set forth in a chart included within that Opinion. To the extent any issue relating to the parties' operative pleadings may arise subsequent to remand, the transferor court is referred to the relevant sections of this Court's analysis in its Amendment Order.

## IX. NOTICES OF INTENT AND SUMMARY JUDGMENT MOTIONS

### A. Notices of Intent

As set forth in the Court's Amended Revised Case Management Plan (Doc. 1861), issued on September 12, 2006, given the extensive analysis of the issues in its earlier orders, this Court was of the view that only narrow, limited issues would be amenable to summary judgment in these actions. Accordingly, the Court required the parties to file brief Notices of Intent, setting forth the issues as to which summary judgment was sought and requesting leave to file dispositive motions as to those issues. Pursuant to the Amended Revised Case Management Plan (Doc. 1861), multiple parties filed Notices of Intent in November 2006.

In a Memorandum of Opinion and Order issued December 19, 2007 (Doc. 2138), the Court issued rulings on twenty-nine Notices of Intent, as set forth in a chart included within that Opinion. To the extent any issue relating to the scope of summary judgment motions permitted by this Court may arise subsequent to remand, the transferor court is referred to the relevant sections of this Court's analysis in its Opinion ruling on the various Notices of Intent.

B.      Summary Judgment Motions

In accordance with this Court's ruling on the Notices of Intent, the parties subsequently filed summary judgment motions. In three written orders, the Court analyzed and ruled upon six separate motions for summary judgment.

The only summary judgment opinion of relevance to the cases to be remanded is this Court's Memorandum and Order dated March 11, 2009 (Doc. 2214)("March 2009 Summary Judgment Opinion"). The March 2009 Summary Judgment Opinion resolved three separate summary judgment motions filed by Safeco, Royal and AMICO against various Banks, as well as the Guardian Entities, in a total of thirteen cases. The primary issue involved in the summary judgment motions addressed by the Court's March 2009 Summary Judgment Opinion was the viability of certain bad faith claims asserted by the Banks against Safeco, Royal and AMICO.[15]

In considering the bad faith claims asserted by the Banks, the Court conducted a separate choice of law analysis for each of the thirteen cases in which the bad faith claims were asserted. The Court noted that the applicable law for each of the pending cases generally would be the law dictated by the choice of law rules of the state of the transferor court. *See* Doc. 2214, at 5-6. The Court noted that for eleven of the cases involved in the pending motions, the applicable choice of

---

[15] The March 11, 2009 Opinion also granted summary judgment to Safeco and Royal as to certain separate claims asserted against them by CadleRock. Since the CadleRock claims have no relevance to any of the cases to be remanded, however, the Court does not summarize here its analysis relating to the CadleRock claims.

law rules were those of Ohio. *See* Doc. 2214, at 6-7. For one of the cases involved in the pending motions, California choice of law rules would apply. *See* Doc. 2214, at 6. With respect to the remaining case, 02CV16010, the Court found that the procedural posture of the case required the application of Georgia choice of law rules. *See* Doc. 2214, at 7. Applying the choice of law rules described above, the Court then conducted a separate substantive choice of law analysis for the Banks' bad faith claims under the law of each relevant state.

For the one case subject to California choice of law rules, the Court applied tort choice of law principles and engaged in a "governmental interest" analysis, finding that California local law governed the bad faith claims asserted in Case No. 02CV16024. *See* Doc. 2214, at 8-12. For those cases subject to Ohio choice of law rules, the Court again applied tort choice of law principles, and applied the principles of the Restatement of Conflicts of Law to determine that Ohio had the "most significant relationship" to the Banks' bad faith claims in Case Nos. 02CV16012, 02CV16019, 02CV16022, 02CV16014, 02CV16020, 02CV16021, and 03CV16002 through 03CV16006. *See* Doc. 2214, at 12-21.

With respect to Case No. 02CV16010, the Court determined that NetBank's claims for bad faith were properly characterized as tort claims under Georgia law, and thus applied Georgia tort choice of law principles. The Court acknowledged that, under Georgia's traditional *lex loci delicti* rule, the location of the tort is the state where the tortious injury occurred. *See Best Canvas Products & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983). Since NetBank was headquartered in Georgia and sustained economic injury there, the Court held that Georgia local law would apply to NetBank's bad faith claims in Case No. 02CV16010. *See* Doc. 2214, at 21-26.

Having determined the applicable law, this Court then conducted a detailed analysis

under the laws of each of the relevant states. For various reasons articulated in detail in the March 2009 Summary Judgment Opinion, the Court found that neither California nor Ohio law would recognize a claim for bad faith/breach of the covenant of good faith and fair dealing against a surety in connection with the handling of bond claims. *See* Doc. 2214, at 26-49. Thus, with respect to the twelve cases governed by California and Ohio law, summary judgment was granted to the Sureties on the Banks' bad faith claims.

With respect to Case No. 02CV16010, however, which involved bad faith claims by NetBank against Safeco, the Court found that application of Georgia law compelled a different result. Since Georgia statutory law (O.C.G.A. § 10-7-30(b); O.C.G.A. § 13-6-11) expressly permitted the assertion of a bad faith claim against a surety in these circumstances, the Court denied Safeco's motion for summary judgment against NetBank, and held that NetBank's bad faith claim in Case No. 02CV16010 should stand. *See* Doc. 2214, at 49-50.

## X. BENCH TRIAL PROCEEDINGS

On July 13-16, 2009, the Court conducted a bench trial by consent of the parties in nine cases venued in the Northern District of Ohio.[16] The bench trial proceedings focused on the threshold, and potentially determinative, issue of who the parties intended to be the original obligee on the Lease Bonds issued by the Sureties in the CMC transactions—an issue known by the parties and the Court as the "obligee issue." During the bench trial proceedings, evidence was presented by CadleRock (as the assignee of certain Banks) and various Guardian Entities (collectively, "Plaintiffs"), as well as Royal and Safeco. After receiving post-trial briefing, the Court heard closing arguments on September 10, 2009.

On May 28, 2010, the Court issued a voluminous Bench Trial Opinion (Doc. 2459),

---

[16] The cases included in the bench trial proceedings were 02CV16012, 02CV16019, 02CV16020, 02CV16022, 03CV16002, 03CV16003, 03CV16004, 03CV16005, and 03CV16006.

which resolved all of the matters presented to the Court in the bench trial proceedings. Although the Court's findings of facts and conclusions of law, with attendant analysis of evidence and witness testimony, were lengthy, the Court's conclusions with respect to the obligee issue were simple and straightforward.

In the Bench Trial Opinion, the Court found that CMC was the <u>intended</u> <u>original</u> <u>obligee</u> on all of the Lease Bonds at issue and that the Guardian Entities, and later certain banks, succeeded to the rights of CMC <u>by</u> <u>assignment</u> thereafter. As a result, the Sureties were not precluded from asserting defenses based on alleged fraud by CMC.

In finding that CMC was the intended obligee on the Lease Bonds, the Court first found that the parties' evidence was appropriately analyzed under the standard applicable to reformation claims, and thus that Plaintiffs were required to demonstrate the propriety of reformation by clear and convincing evidence. *See* Doc. 2459, at 33-38. The Court found that Plaintiffs failed to meet this standard, since the bulk of the evidence and witness testimony demonstrated that all parties understood that (1) CMC was intended to be the original obligee on the Lease Bonds; and (2) the Guardian Entities and Banks were intended to succeed to the rights of CMC <u>by</u> <u>subsequent</u> <u>assignment</u>, and were not intended to hold original obligee status on the Lease Bonds.

In finding that the parties to the Lease Bonds intended CMC to hold original obligee status on those bonds, the Court expressly distinguished those cases involved in the bench trial proceedings from the cases considered in the Court's prior Illinois Union Opinion (Doc. 1709). *See* Doc. 2459, at 115-118. The Court first noted that "each of the insurance policies issued by Illinois Union named an investor bank as an Insured or Additional Insured—thereby indicating, on the face of the policy, the parties' intent to convey rights directly to the investor bank." Doc.

2459, at 115. Second, the Court observed, Illinois Union issued only one policy for each transaction, each of which covered an entire pool of leases, and made specific reference to an SSA covering the same pool of leases. *See* Doc. 2459, at 116. Third, "each of the Illinois Union transactions was structured as a 'one-stage' transaction, and no subsequent "assignment" transactions occurred. Rather, the SSAs were executed prior to or contemporaneously with the insurance contracts, and the Banks took their rights as part of that single-stage transaction. . . ." Doc. 2459, at 116.

With respect to the transaction between Illinois Union and Chase, in particular, the Court noted that that transaction bore the hallmarks of a "securitization" transaction, and thus was uniquely distinguishable from the transactions considered in the Bench Trial Opinion. The Court noted that the structure of the Chase/Illinois Union transaction, unlike the cases involved in the bench trial proceedings, included an Indenture, as well as the issuance of Notes to a Trustee. *See* Doc. 2459, at 116. While the Plaintiffs in the bench trial proceedings sought to argue that their transactions also were securitizations, the Court expressly rejected that argument. *See* Doc. 2459, at 122.

While holding in the Bench Trial Opinion that the fraud waivers contained in the transaction documents did not preclude the Sureties from asserting fraud defenses based upon the fraud of CMC, the Court also reaffirmed its prior findings in the Lead Opinion (Doc. 1708), and specifically delineated the scope and impact of its rulings. *See* Doc. 2459, at 178. Initially, the Court stated that its ruling as to CMC's original obligee status meant that the Sureties' fraud in the inducement defenses were assertable against the Banks.

The Court further explained, however, that the Sureties could prevail on such defenses only by demonstrating the elements of fraud in the inducement—including the elements of

falsity, knowledge of falsity, and justifiable reliance. *See* Doc. 2459, at 178-79. The Court rejected the Sureties' argument that California law did not require a showing of justifiable reliance on a claimed fraud, and held that the Sureties would be required to show justifiable reliance on specific representations by CMC. *See* Doc. 2459, at 181. The Court further observed that only fraud <u>by</u> <u>CMC</u>—and not fraud by a lessee or another party—could vitiate the Sureties' obligations under the Lease Bonds. *See* Doc. 2459, at 180.

By its terms, the Bench Trial Opinion applies only to the nine cases tried before this Court in July 2009, and to the parties involved in those cases. Given the similarities, however, in transactional structures, as well as the transaction documents, in other cases remaining pending, and the centrality of the "obligee issue" to all of these cases, the Court has summarized the rulings contained in the Bench Trial Opinion in detail. In doing so, the Court recognizes that certain differences exist between the cases involved in the bench trial proceedings and other cases remaining pending, and that it is possible that not all aspects of this Court's analysis in the Bench Trial Opinion will be pertinent to other cases upon remand. The Court has, however, spent a significant amount of time analyzing the legal issues involved in these cases, and summarizes its analysis here in an attempt to provide assistance and guidance to transferor courts faced with similar issues.

## XI.     OBLIGEE ISSUE OPINION RE: CASE NO. 02CV16014

On June 14, 2010, the Court issued an Order (Doc. 2462) applicable only to Case No. 02CV16014, *JPMorgan Chase Bank, N.A. v. Safeco Insurance Company of America*. Although that case is venued in the Northern District of Ohio for trial, the parties in Case No. 02CV16014 did not consent to this Court's determination of the "obligee issue," and accordingly, the case was not included in the bench trial proceedings conducted before this Court in July 2009.

Because the parties in Case No. 02CV16014 disputed whether the obligee issue was properly one for determination by a jury or by the Court, they submitted briefs to the Court on that issue. In its June 14, 2010 Order (Doc. 2462)(the "Obligee Issue Opinion"), the Court found that the obligee issue was a purely equitable one, subject to resolution by the Court.[17]

In the Obligee Issue Opinion, the Court found, first, that the transaction documents were not reasonably susceptible to an interpretation whereby a party other than CMC would hold original obligee rights. Thus, the Banks could override the designation of CMC as obligee in the transaction documents only through meeting the standards for reformation of the Lease Bonds. *See* Doc. 2462, at 13.

The Court then applied established federal law to conclude that reformation is an equitable issue, triable to the Court, and that no jury trial right exists on a reformation claim. *See* Doc. 2462, at 13-14. The Court found, moreover, that the equitable questions involved in determination of the obligee issue were severable from the legal claims asserted by the Banks. *See* Doc. 2462, at 15-18. Accordingly, the Banks had no jury trial right on the distinct question of obligee status.

As with the Bench Trial Opinion, the Court notes that its June 14, 2010 Opinion in Case No. 02-16014 applies by its terms only to that case, and has no direct application to any case that may be remanded to a transferor court for trial. Regardless, given the significance of these issues, and the similarity of issues that may arise in certain remanded cases, the Court summarizes its analysis in detail in an attempt to aid transferor courts that may face related questions.

---

[17] Accordingly, this Court has scheduled a bench trial in Case No. 02CV16014 for determination of the obligee issue.

## XII. *DAUBERT* PROCEEDINGS

On July 16-17, 2009 and September 10, 2009, the Court conducted proceedings relating to numerous *Daubert* motions filed in these actions. The *Daubert* proceedings conducted by this Court encompassed (1) all *Daubert* motions in all cases venued for trial in the Northern District of Ohio; and (2) all *Daubert* motions in cases not venued in the Northern District of Ohio, where such motions related to the admissibility of the testimony of an expert who also was designated to testify in a case venued in the Northern District of Ohio. On July 27, 2010, this Court issued an Order ("*Daubert* Order")(Doc. 2464), which resolved all of the pending motions to exclude expert testimony. The Court summarizes the relevant portions of the *Daubert* Order herein.

The only experts considered in the *Daubert* Order whose testimony may be relevant to cases to be remanded are (1) Paul Palmer ("Palmer") and Charles Kerner ("Kerner") (whose testimony was jointly introduced via a single expert report); and (2) Jerry Hudspeth ("Hudspeth"). Each of these experts was proffered by NetBank in Case No. 02CV16010, as well as by certain other Banks in the cases venued in the Northern District of Ohio. In the *Daubert* Order, the Court considered motions by both Royal and Safeco (Docs. 2246, 2254) to exclude the testimony of Palmer and Kerner, and a Safeco motion (Doc. 2254) to exclude the testimony of Hudspeth. The Court denied each of the Sureties' motions to exclude the expert testimony in its entirety pursuant to *Daubert*, but established substantial limitations on the testimony of each of these experts.

### A. Palmer/Kerner

Palmer and Kerner were designated by certain Banks to testify as to various issues, including (1) interpretation of bond language and "market expectations"; (2) the parties' intent to make the Banks original obligees under the surety bonds; (3) the nature, role, function and

purpose of insurance/surety products as credit enhancements in structured finance transactions; (4) due diligence and underwriting standards; (5) servicing of lease portfolios; and (6) conduct of the Banks relating to the CMC lease bond program. Palmer and Kerner sought to testify, essentially, that the structure of the lease bond program was akin to a financial guaranty transaction, and was effectively a "securitization." Palmer and Kerner also sought to testify as to the principles underlying securitizations, including allocation of risk, and the market expectations that would attach to such a financial structure. Finally, Palmer and Kerner sought to express opinions as to the underwriting and servicing requirements that would apply to the Sureties within the structure of a securitization transaction.

While the Sureties did not challenge the qualifications of Palmer and Kerner within the securitization industry, the Sureties argued that these experts' testimony was irrelevant, since the expertise of these experts was limited to securitization transactions, and did not encompass surety bonds. Additionally, the Sureties argued that the testimony of Palmer and Kerner failed to meet the reliability requirements of *Daubert*, since these experts sought to offer (1) erroneous legal conclusions (including conclusions as to contract interpretation); (2) personal beliefs as to the weight of the evidence; and (3) impermissible opinions on ultimate factual issues, such as breach of duty.

As set forth above, the Court denied the Sureties' motion to strike the testimony of Palmer and Kerner in its entirety, but imposed substantial limitations on the testimony of these experts. Initially, the Court held, it would not permit any expert in these cases to express legal conclusions, or to opine on ultimate issues of fact. *See* Doc. 2464, at 19.

In analyzing the proffered testimony of Palmer and Kerner in the *Daubert* Order, the Court noted the need to conduct separate analyses for those cases subject to the Bench Trial

Opinion, and for those cases in which no bench trial proceedings had occurred. As to those cases subject to the Bench Trial Opinion, the Court held that Palmer and Kerner would be prohibited from expressing any opinions inconsistent with the conclusions reached by the Court in the Bench Trial Opinion. *See* Doc. 2464, at 17-19.

With respect to the cases in which no bench trial proceedings occurred (including Case Nos. 02CV16010 and 02CV16014), however, the Court noted that no determination had been made as to the issue of the intended original obligee on the lease bonds. The Court thus found that "the Banks are entitled to proffer the testimony of experts Palmer and Kerner to assist the finder of fact in determining that threshold issue. . . ." Doc. 2464, at 20. The Court further held, however, that "[t]he testimony of these experts with respect to this issue . . . will be limited to (1) the structural elements of the CMC lease bond transactions; and (2) each expert's opinion as to the significance and purpose of each of those elements in the overall transactional structure. . . ." *Id.* Again, the Court stated, Palmer and Kerner would be precluded from expressing legal opinions, or opining on ultimate issues of fact. *See id.*

B.   Hudspeth

In the *Daubert* Order, the Court also considered Safeco's motion to exclude the testimony of Hudspeth, who was proffered by certain Banks in Case Nos. 02CV16010 and 02CV16014, to offer opinions as to the adequacy of Safeco's servicing of the CMC leases.[18] Again, Safeco did not challenge Hudspeth's expert qualifications. As with respect to Palmer and Kerner, Safeco argued that Hudspeth's testimony was unreliable, because Hudspeth sought to express impermissible legal opinions and to opine as to ultimate factual issues.

---

[18] Since neither of these cases were part of the bench trial proceedings conducted by the Court, the Court noted that its Bench Trial Opinion had no impact on the admissibility of Hudspeth's testimony. *See Daubert* Order, Doc. 2464, at 24-25.

The Court denied Safeco's motion to exclude Hudspeth's testimony in its entirety, finding that Hudspeth was qualified to opine as to servicing standards for subprime lease portfolios. *See* Doc. 2464, at 25. The Court noted that the Banks had asserted breach of contract claims, based in part upon the servicing obligations set forth in the SSAs, and that Hudspeth's opinions as to the <u>content</u> <u>and</u> <u>scope</u> of industry servicing standards would be relevant to those claims. *See id.* Once again, however, the Court noted that it would not permit Hudspeth to testify to (1) any legal opinions, including interpretation of the provisions of the SSAs; or (2) ultimate issues of fact, including Safeco's <u>breach</u> of the relevant servicing standards. *See id.*

## XIII. DEFAULT JUDGMENT ENTRIES

Pursuant to an Order to Show Cause issued by the Court on May 13, 2009 (Doc. 2223), the Court directed certain parties in this action to appear, in person or through counsel, and show cause why the Court should not dismiss all claims asserted by them (for failure to prosecute) or enter judgment against them on all of the claims asserted against them (for failure to comply with the Court's orders). On July 13, 2009, the Court conducted a default judgment hearing pursuant to its previously-issued Order to Show Cause. None of the defaulting defendants appeared at the scheduled hearing. At the July 13, 2009 hearing, requests for default judgment against various defaulting defendants were presented to the Court by AMICO, Royal, Ace American/Illinois Union, and RLI. Most of the requests for default judgment related to (1) individual defendants, including principals and other employees of CMC, some of whom initially appeared in these proceedings and subsequently ceased to comply with Court orders; and (2) certain CMC-affiliated entities, which never appeared in these proceedings.

In an Order issued September 16, 2009 (Doc. 2424), the Court ruled on the various requests for default judgments, and granted default judgments against numerous defendants, as

set forth therein. Final judgments then were entered against the defaulting defendants in the appropriate cases. To the extent any issue may arise after remand relating to parties as to whom default judgment has been entered, the transferor court is referred to the Court's September 16, 2009 Order (Doc. 2424) for a summary of those default judgments.

## XIV. STATUS ORDER FOR CASES TO BE REMANDED

On August 9, 2010, the Court issued a Status Order (Doc. 2465), which set forth the status of all pending cases—including cases to be remanded, as well as those cases venued in the Northern District of Ohio for trial. The Court's Status Order summarizes the claims remaining pending in each of these MDL actions, as well as any issues needing to be resolved prior to remand. To the extent any question may arise after remand as to the claims remaining pending in a remanded action, the transferor court is referred to this Court's Status Order (Doc. 2465) for a brief summary.

## XV. CONCLUSION

Over the past eight years, this Court has handled substantial motion practice, issuing dozens of written rulings on procedural, substantive and evidentiary matters. The Court also has conducted bench trial proceedings, and issued a voluminous Bench Trial Opinion, on certain issues central to these cases. This Court's rulings, as well as certain settlements between the parties, have resulted in a substantial narrowing of the issues to be decided.

This "Trial Template" document attempts to synthesize, organize, and summarize the relevant issues and rulings, to assist trial judges in transferor courts who may preside over the trial of a remanded *Commercial Money Center* case. Without a doubt, variations on these issues, and also entirely new issues, will arise during future trials of other *Commercial Money Center* cases. To the extent this Trial Template does not provide sufficient assistance, the MDL Judge

and the Special Master remain available and committed to providing any help other judges may

require.

   **IT IS SO ORDERED.**

                                        **s/Kathleen McDonald O'Malley**
                                        **KATHLEEN McDONALD O'MALLEY**
                                        **UNITED STATES DISTRICT JUDGE**


**Dated: October 6, 2010**

76444-1